# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

DAHLIA DOE; SARA DOE; NESMA DOE;
LAILA DOE; WALEED DOE; MUSTAFA DOE;
and AHMAD DOE, on their own behalf and on
behalf of others similarly situated,

*Plaintiffs*,

– *versus* –

Kristi NOEM, Secretary, United States Department
of Homeland Security, in her official capacity;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES
CITIZENSHIP AND IMMIGRATION SERVICES;
and UNITED STATES OF AMERICA,

*Defendants*.

Case No. 1:25-cv-08686-KPF

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO POSTPONE EFFECTIVE
DATE OF AGENCY ACTION**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF THE RELEVANT FACTS ............................................................................. 2

   I.    Statutory Scheme for Temporary Protected Status ............................................................ 2

   II.   TPS Designation for Syria ................................................................................................ 4

   III.   The First Trump Administration's Attempts to End Access to TPS ............................. 5

   IV.   Defendants' Ongoing Project to End Access to TPS...................................................... 6

   V.    Preordained Termination of TPS for Syria ..................................................................... 9

LEGAL STANDARD ................................................................................................................... 10

ARGUMENT ............................................................................................................................... 11

   I.    Plaintiffs Are Likely to Succeed on the Merits............................................................... 11

      A.   The Court Has Jurisdiction Over Plaintiffs' Claims. ................................................. 11

      B.   The Termination Violates the APA Because it is Contrary to Law and Arbitrary and
      Capricious. .................................................................................................................... 12

         i.    The termination was pre-determined and thus contrary to law.................................. 12

         ii.   The termination's reliance on the "national interest" is contrary to law and arbitrary
         and capricious. ................................................................................................................. 15

         iii.   The termination decision was arbitrary and capricious because it was politically
         influenced and pretextual. ................................................................................................ 17

         iv.   The termination impermissibly broke with past practice regarding orderly
         transition periods without explanation and is therefore arbitrary and capricious. ........... 18

      C.   The Termination Is Contrary to Law Because it Violates the Fifth Amendment. ....... 20

   II.   Syrian TPS Holders and Applicants Face Irreparable Harm Without Postponement. ..... 24

   All of these injuries are severe and irreparable and weigh heavily in favor of postponement. 28

   III.   The Balance of Hardships and Public Interest Weigh Heavily in Favor of
   Postponement.................................................................................................................. 27

CONCLUSION............................................................................................................................ 28

# TABLE OF AUTHORITIES

Page

**Cases**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) .......................................................................................................21

*Arizona Dream Act Coal. v. Brewer,*
855 F.3d 957 (9th Cir. 2017) ......................................................................................25, 26

*Bolling v. Sharpe,*
347 U.S. 497 (1954) .......................................................................................................21

*Brenntag Int'l Chems., Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ............................................................................................25

*Brown v. City of Oneonta, N.Y.,*
221 F.3d 329 (2d Cir. 2000) ............................................................................................21

*CASA de Maryland, Inc. v. Trump,*
355 F. Supp. 3d 307 (D. Md. 2018) ................................................................................12

*CASA, Inc. v. Noem,*
2025 WL 1907378 (D. Md. July 10, 2025) ......................................................................12

*Centro Presente v. DHS,*
332 F. Supp. 3d 393 (D. Mass. 2018) ...................................................................12, 22, 24

*Conn. Dep't of Env't. Prot. v. O.S.H.A.,*
356 F.3d 226 (2d Cir. 2004) ............................................................................................25

*Deide v. Day,*
676 F. Supp. 3d 196 (S.D.N.Y. 2023) .............................................................................22

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ...................................................................................................18, 19

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ...........................................................................................................20

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
559 F.3d 110 (2d Cir. 2009) ............................................................................................25

*FDA v. Wages & White Lion Invs., LLC.,*
604 U.S. 542 (2025) ...................................................................................................17, 19

*Freedom Holdings, Inc. v. Spitzer,*
408 F.3d 112 (2d Cir. 2005) ............................................................................................25

*Haitian Evangelical Clergy Ass'n v. Trump,*
    No. 25-CV-1464, 2025 WL 1808743 (E.D.N.Y. July 1, 2025)......................................7, 8, 12

*Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.,*
    438 F.3d 195 (2d Cir. 2006)...........................................................................................21

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)............................................................................................28

*Make the Road N.Y. v. Cuccinelli,*
    419 F. Supp. 3d 647 (S.D.N.Y. 2019) .............................................................................28

*Make the Road N.Y. v. Pompeo,*
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) .............................................................................28

*McNary v. Haitian Refugee Cent., Inc.,*
    498 U.S. 479 (1991).......................................................................................................12

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016)...........................................................................................22

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018).............................................................................................11

*Nat'l TPS All. v. Noem,*
    2025 WL 2233985 (N.D. Cal. July 31, 2025)............................................................ *passim*

*Nat'l TPS All. v. Noem,*
    No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ........................ *passim*

*Nat'l TPS All. v. Noem,*
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ....................................................................... *passim*

*New York v. United States Dep't of Educ.,*
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) .............................................................................11

*Nken v. Holder,*
    556 U.S. 418 (2009).......................................................................................................28

*Noem v. Nat'l TPS All.,*
    No. 25A326, 2025 WL 2812732 (Oct. 3, 2025) ................................................................4

*Ramos v. Nielsen,*
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ..........................................................................12

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................................................6

*Ramos v. Nielsen*,
  709 F. Supp. 3d 871 (N.D. Cal. 2023) ...............................................................5, 6

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................ *passim*

*Torres-Jurado v. Biden*,
  2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023) ..................................................26, 28

*Town of Orangetown v. Ruckelshaus*,
  740 F.2d 185 (2d Cir. 1984) ...............................................................................18

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ............................................................................................21

*United States v. Suquilanda*,
  116 F.4th 129 (2d Cir. 2024) ..............................................................................21

*United States v. Virginia*,
  518 U.S. 515 (1996) ............................................................................................21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...........................................................................21, 22, 23, 24

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................................21

*You v. Nielsen*,
  321 F. Supp. 3d 451 (S.D.N.Y. 2018) .................................................................28

**Statutes**

5 U.S.C. § 705 ...........................................................................................................10

6 U.S.C. § 557 .............................................................................................................2

8 U.S.C. § 1254a ............................................................................................. *passim*

**Other Authorities**

8 C.F.R. § 244.10 .....................................................................................................25

77 Fed. Reg. 19026 (Mar. 29, 2012) ..........................................................................5

78 Fed. Reg. 36223 (June 17, 2013) ...........................................................................5

80 Fed. Reg. 245 (Jan. 5, 2015) ...........................................................................5, 22

81 Fed. Reg. 50533 (Aug. 1, 2016) ............................................................................5

81 Fed. Reg. 66054 (Sep. 26, 2016) ...........................................................................20

83 Fed. Reg. 9329 (Mar. 5, 2018) ................................................................................5

84 Fed. Reg. 49751 (Sep. 23, 2019) .............................................................................5

86 Fed. Reg. 14946 (Mar. 19, 2021) ............................................................................5

87 Fed. Reg. 46982 (Aug. 1, 2022) ..............................................................................5

89 Fed. Reg. 5562 (Jan. 29, 2024) ..........................................................................5, 11

90 Fed. Reg. 9040 (Feb. 5, 2025) ...........................................................................7, 17

90 Fed. Reg. 20309 (May 13, 2025) ...................................................................8, 14, 17

90 Fed. Reg. 23697 (June 4, 2025) .........................................................................8, 17

90 Fed. Reg. 24151 (June 6, 2025) .........................................................................8, 17

90 Fed. Reg. 28760 (July 1, 2025) ..........................................................................9, 17

90 Fed. Reg. 30086 (July 8, 2025) ..........................................................................9, 17

90 Fed. Reg. 30089 (July 8, 2025) ..........................................................................9, 17

90 Fed. Reg. 43225 (Sep. 8, 2025) ..............................................................................7

90 Fed. Reg. 45398 (Sep. 22, 2025) ................................................................... *passim*

Protecting the American People Against Invasion. E.O. 14159 § 16(b), 90 Fed. Reg. 8443 ......6, 7

H.R. Rep. No. 100-627 (1988).......................................................................................2

## INTRODUCTION

After 13 years of civil war, Syria continues to endure pervasive armed conflict and a humanitarian crisis that the U.S. government itself has stated renders no part of the country safe. Yet Defendants have decided to terminate Temporary Protected Status ("TPS"), effective November 21, 2025, for almost 7,000 Syrians who have lived in the United States for years. There is no reasonable basis in fact for this decision. It is instead part of the Trump Administration's preordained, political decision—motivated by animus—to end this Congressionally-authorized program by terminating TPS designations across the board.

Plaintiffs are seven Syrian nationals, with family ties in the United States, who face near-certain danger if forced to return to Syria. They urge the Court to order immediate postponement of the effective termination date of Syrian TPS because, absent this Court's intervention, Syrians and their family members will suffer irreparable harm. On November 21, 2025, Syrian TPS holders and applicants will lose work authorization and protection from detention and deportation, leaving them vulnerable to family separation and removal to a country currently embroiled in conflict and crisis.

Plaintiffs are likely to succeed on the merits of their claims that Defendants' actions in terminating Syria's TPS are contrary to law, arbitrary and capricious, and unconstitutional in violation of the Administrative Procedure Act. Defendants' termination of TPS for Syria violates the TPS statute because Defendants failed to adhere to its statutory mandates. Defendants made their decision to terminate Syria's TPS *before* undertaking the interagency consultation and objective review of country conditions required by Congress—and then issued a pretextual decision that relied on impermissible extra-statutory factors. In an unacknowledged and

unexplained break with decades of past practice, Defendants arbitrarily provided TPS holders just *60 days* to prepare for loss of status despite their many years residing lawfully in the United States. Moreover, Defendants' actions were motivated by the racial, ethnic, and national origin-based animus that undergirds the Trump Administration's attempts to end TPS for the nationals of non-white, non-European countries and were therefore unconstitutional.

A decision declaring the termination unlawful after it has already gone into effect could never undo the damage done to Plaintiffs and their families and communities. Plaintiffs thus ask that this Court expeditiously enter an order postponing the effective date of the Secretary's termination notice pending final resolution of this case on the merits.

## STATEMENT OF THE RELEVANT FACTS

### I.      Statutory Scheme for Temporary Protected Status

Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on the prior practice of ad hoc presidential action for those purposes. H.R. Rep. No. 100-627, at 4 (1988). While a country is designated for TPS, beneficiaries receive employment authorization and protection from immigration detention and removal. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *Id.* § 1254a(b)(1).

The statute provides that the Secretary of Homeland Security, *see* 6 U.S.C. § 557, may designate a country for TPS and its nationals within the United States for temporary immigration relief if the Secretary finds that any of three circumstances are met:

> (a) there is an "ongoing armed conflict within the state" and returning nationals "to that state would pose a serious threat to their personal safety;"

2

     (b) there has been "an earthquake, flood, drought, epidemic, or other environmental disaster in the state" the foreign state is "unable, temporarily, to handle adequately the return of" nationals; or

     (c) there exist "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety," unless the Secretary "finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States."

8 U.S.C. § 1254a(b)(1)(A)-(C).

     In keeping with its intent to free the designation of countries for protection from domestic politics, Congress established a statutory framework governing TPS decision-making. The statute first requires the Secretary to consult with "appropriate" agencies. *Id*. § 1254a(b)(1). After that, she "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts 6-18 months, effective either upon notice in the Federal Register or "such later date as [the Secretary] may specify." *Id*. § 1254a(b)(2). The Secretary has substantial discretion over initial designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

     By contrast, Congress strictly limited the Secretary's discretion to review existing TPS designations. After a country is designated for TPS, the statute requires periodic review. *Id*. § 1254a(b)(3)(A). At least 60 days before the end of each designation period, the Secretary, "after consultation with appropriate agencies of the Government," must "review the conditions in the foreign state" and determine whether the conditions for TPS designation "continue to be met." *Id.* The review process typically begins months before the 60-day deadline. *See* Exh. 1 at 20-21.[1] Generally, USCIS manages and coordinates the periodic review process for the Secretary, compiling a country-conditions report and soliciting materials from the State Department. *See Saget v. Trump,* 375 F. Supp. 3d 280, 299-300 (E.D.N.Y. 2019); Exh. 1 at 20-26. Based on the

---

[1] Plaintiffs' exhibits are attached to the declaration of Guadalupe Aguirre, filed concurrently with this motion.

materials provided, USCIS prepares a detailed recommendation for the Secretary. *Id.* USICS's recommendation is called a "Decision Memo." *Saget,* 375 F. Supp. 3d at 299.

Unless the Secretary determines that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for at least 6 months. 8 U.S.C. § 1254a(b)(3)(B), (C). The statute "essentially provides extension as a default." *Nat'l TPS All. v. Noem,* 773 F. Supp. 3d 807, 851 (N.D. Cal. 2025), *aff'd,* 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I*").[2] In contrast, if the Secretary timely "determines" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.*

The Secretary has discretion to postpone the effective date of a termination "in order to provide for an orderly transition." *Id.* § 1254a(d)(3). Prior to 2025, in each of the twelve TPS terminations announced over the past two decades, the agency provided at least a six-month orderly transition period and, more commonly, a twelve- or eighteen-month period. *See* Exh. 2. Prior to 2025, in the 35-year history of the TPS program, only four TPS designations were terminated without an orderly transition period. Each of those terminations occurred more than twenty years ago and involved designations that had been in place for three years or less. *Id.*

## II.    TPS Designation for Syria

The Department of Homeland Security ("DHS") initially designated Syria for TPS in 2012 based on brutal government repression of Syrian citizens, armed conflict between government

---

[2] A subsequent final judgment in the *NTPSA I* case, No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025), has been stayed by the Supreme Court in a non-precedential order that does not include any analysis of the merits of the claims. *See Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (Oct. 3, 2025).

forces and anti-government groups, and largescale internal displacement. 77 Fed. Reg. 19026, 19027 (Mar. 29, 2012). DHS then extended TPS for Syria, and redesignated it for TPS, numerous times as the initial armed conflict developed into a civil war that saw the destruction of critical infrastructure, mass displacement, human rights abuses, and more than 550,000 civilian casualties. 89 Fed. Reg. 5562, 5565 (Jan. 29, 2024).[3] Throughout this period, Syrians suffered from a severe humanitarian crisis, with high levels of food insecurity and limited access to healthcare and clean water, compounded by a major earthquake in February 2023. *Id.*

Then-Secretary Alejandro Mayorkas issued the latest extension and redesignation of TPS for Syria in January 2024, reasoning that Syria still suffered from "ongoing armed conflict" and "extraordinary and temporary conditions." *Id.* at 5565. Secretary Mayorkas noted the continuing civil war in Syria, then in its thirteenth year, which had displaced 61 percent of Syria's pre-war population. *Id.* He also considered (1) widespread human rights abuses and civilian deaths; (2) the fact that 85% of the population could not meet their basic needs; (3) dire economic conditions; (4) the continued effects of the February 2023 earthquake; (5) lack of access to healthcare; and (6) lack of access to clean water for more than half the population. *Id.* at 5562-5567.

### III.    The First Trump Administration's Attempts to End Access to TPS

The first Trump Administration attempted to end access to TPS for many non-white, non-European countries. Between 2017 and 2018, DHS announced that it would terminate TPS for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876–80 (N.D. Cal. 2023). Litigation and congressional investigations revealed that the termination decisions were based not on an objective review of country conditions as required by

---

[3] *See* 78 Fed. Reg. 36223 (Jun. 17, 2013); 80 Fed. Reg. 245 (Jan. 5, 2015); 81 Fed. Reg. 50533 (Aug. 1, 2016); 83 Fed. Reg. 9329 (Mar. 5, 2018); 84 Fed. Reg. 49751 (Sep. 23, 2019); 86 Fed. Reg. 14946 (Mar. 19, 2021); 87 Fed. Reg. 46982 (Aug. 1, 2022); 89 Fed. Reg. 5562 (Jan. 29, 2024).

statute but rather on a "predetermined decision to terminate TPS and abate the presence of non-white immigrants in the country." *Saget,* 375 F. Supp. 3d at 369; *see Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094 (N.D. Cal. 2018)*.* That attempt to end TPS failed; court orders prevented all the terminations from taking effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878.

### IV.    Defendants' Ongoing Project to End Access to TPS

The second Trump administration arrived in office with explicit plans to end TPS for nationalities it deems undesirable. At her confirmation hearing, DHS Secretary Kristi Noem asserted that "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed." Exh. 3 at 27,18-20. Her assertion echoed statements made by President Trump and Vice President Vance during the campaign. *See* Exhs. 4, 5. Indeed, in an October 2024 interview, then-candidate Trump stated that he intended to "revoke" TPS if elected because—notwithstanding TPS's clear statutory basis—"in my opinion, it's not legal." Exh. 6.

On the day he took office, President Trump issued Executive Order 14159, "Protecting the American People Against Invasion." E.O. 14159 § 16(b), 90 Fed. Reg. 8443, 8446. The so-called "invasion" in the President's view was the purported "unprecedented flood of illegal immigration into the United States." *Id.* § 1. The Order directed the DHS Secretary to "promptly take all appropriate action," to rescind prior administrations' decisions that allegedly "increased or continued [the] presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." *Id.* § 16. Although TPS holders are by definition lawfully present, the Order mandated that TPS designations be "appropriately limited in scope" to ameliorate the "continued presence of illegal aliens in the United States." *Id.*

Even before Defendant Noem was confirmed on January 25, 2025, DHS had begun to terminate TPS. DHS began drafting the decision to vacate the TPS extension for Venezuela on

January 24th. *NTPSA I*, 2025 WL 2578045, at *7. Vacatur of TPS was unprecedented. By January 25, when Defendant Noem was confirmed, the decision to vacate the extension of TPS for Venezuela had already been made. *Id.*

The same day, DHS began to draft a notice terminating TPS for Venezuela—before the required country conditions analysis was conducted. *Id.* Notably, this termination was based in part on the assertion that it is "contrary to the national interest" to continue TPS for Venezuela, 90 Fed. Reg. at 9040, 9042, the first time in the program's 35-year history that this factor, distinct from "conditions in the foreign state," 8 U.S.C. § 1254a(b)(3)(B), was relied upon at termination. *See* Exh. 7 ¶¶ 5-6. [4]

Less than a month later, on February 24, 2025, Defendant Noem announced a partial vacatur of the July 2024 extension of TPS for Haiti. *Haitian Evangelical Clergy Ass'n v. Trump,* No. 25-CV-1464, 2025 WL 1808743, at *1 (E.D.N.Y. July 1, 2025) ("*HECA*"). DHS's press statement reiterated Defendant Noem's pre-confirmation assertions that "for decades the TPS system has been exploited and abused" and claimed that it was "returning integrity to the TPS system" and "returning TPS to its original status: temporary." Exh. 9. The statement linked the decisions concerning Haiti and Venezuela to the administration's project to shrink "the TPS system." *Id.*

Between May and July 2025, Defendant Noem issued decision after decision terminating TPS for six countries, all of which are acknowledged by the administration to suffer from significant instability and dire humanitarian conditions.

- **Afghanistan** (May 13, 2025):  Despite an ongoing Level 4 State Department "Do

---

[4] On September 8, 2025, the Secretary issued a second termination notice for TPS for Venezuela, terminating the 2021 designation, ensuring that all Venezuelan TPS holders will lose their TPS by November 7, 2025. 90 Fed. Reg. 43225.

Not Travel" warning "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities," Exh. 10, Defendant Noem concluded "that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety" and, citing E.O. 14159, stated that permitting Afghans to stay was "contrary to the national interest." 90 Fed. Reg. 20309, 20310.

- **Cameroon** (June 4, 2025): The Secretary found TPS holders could safely return to the country even though "two major [armed] conflicts" . . . "remain active" and, citing E.O. 14159., stated that permitting them to stay was "contrary to the national interest." 90 Fed. Reg. 23697, 23698. The State Department's travel advisory urges "increased caution . . . due to armed violence, civil unrest, crime, health, kidnapping, and terrorism." Exh. 11.

- **Nepal** (June 6, 2025): Just three months after the termination notice, 90 Fed. Reg. 24151, the State Department urged the public to "reconsider travel" to Nepal due to "civil unrest." Exh. 12.

- **Haiti** (July 1, 2025): The Secretary justified termination based solely on a finding, citing to E.O. 14159, that extension is not in the national interest—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is "contrary to the U.S. national interest." 90 Fed. Reg. 28760, 28762-64 (acknowledging "widespread gang violence . . . sustained by the country's lack of functional government authority" has "destabilized Haiti" and that "'Haiti is in the grip of severe humanitarian and human rights crisis,'" but nonetheless terminating TPS). Two weeks later, the State Department issued a Level 4 travel advisory, advising "Do Not Travel" due to

"kidnapping, crime, civil unrest, and limited health care." Exh. 13.

- **Honduras** (July 8, 2025): The State Department maintains a travel advisory urging the public to "reconsider travel" to Honduras due to "violent crime." Exh. 14; *cf.* 90 Fed. Reg. 30089 (Honduras Termination Notice).

- **Nicaragua** (July 8, 2025): The State Department maintains a travel advisory, urging the public to "reconsider travel" due to "arbitrary enforcement of laws, the risk of wrongful detentions, and limited healthcare availability." Exh. 15; *cf.* 90 Fed. Reg. 30086 (Nicaragua Termination Notice).

### V.    Preordained Termination of TPS for Syria

On September 19, 2025, Defendant Noem announced the termination of TPS for Syria, presenting the termination as a measure to "restor[e] sanity to America's immigration system[.]" Exh. 16. The Secretary reached two remarkable conclusions: first, that an armed conflict no longer exists in Syria; and second, that although "most Syrians require some form of humanitarian assistance," nothing prevents the safe return of Syrian nationals. 90 Fed. Reg. 45398, 45400 (Sep. 22, 2025).

In reaching these conclusions, the Secretary minimized the scope of continuing violence. Although the Assad regime fell in December 2024, armed conflict permeates Syria, as "sectarian violence involving members of minority communities, Syrian security forces, nonstate armed groups, and armed vigilantes have threatened Syria's stability since March," with thousands of civilian deaths and more than 200,000 newly displaced people. Exh. 17 at 2, 9-12. Moreover, the interim government "does not exercise control over all of Syria," with areas of the country under control of different armed factions. *Id.* at 1; *see also* Exh. 25 (recent Reuters investigation describing eastern Syria as a "lawless frontier under the control of armed groups with scores to

settle.").  In addition, Turkish and Israeli forces control portions of Syria, Exh. 17 at 1, and Israel launches airstrikes and ground incursions deeper into Syria, Exh. 18 at 21-22. The Secretary's assessment contradicts the State Department's Level 4 "Do Not Travel" advisory, issued in July 2025, which warns that "No part of Syria is safe from violence" due to "terrorism, civil unrest, kidnapping, hostage taking, and armed conflict." Exh. 19.

The termination notice failed to address many factors considered in the January 29, 2024, redesignation, including human rights abuses; infrastructure destruction; widespread food insecurity and lack of clean water; the ongoing effects of the earthquake; the devastated economy; and lack of healthcare access. *Compare* 89 Fed. Reg. 5562 *with* 90 Fed. Reg. 45398. The Secretary asserted that country conditions were irrelevant, because "even assuming the relevant conditions remain both 'extraordinary' and 'temporary,'" termination of TPS is "required because it is contrary to the national interest" to allow Syrian nationals to remain in the United States. 90 Fed. Reg. at 45400. To support this finding, the notice cited purported difficulties vetting Syrian nationals and the prosecutions of two Syrian nationals in the United States, neither of whom is identified as a TPS recipient. *Id.* Further, the termination pointed to "foreign policy reasons" for ending TPS and cited a directive instructing the Department of State to "put American citizens first," *Id*. at 45401-02.

## LEGAL STANDARD

"The standard for a stay" postponing the effective date of agency action pending adjudication of underlying claims "under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. United States Dep't of Educ*., 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020). Plaintiffs are therefore entitled to a stay if they show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) both serious questions on the merits and a

balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,* 883 F.3d 32, 37 (2d Cir. 2018).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

### A.    The Court Has Jurisdiction Over Plaintiffs' Claims.

A strong presumption of judicial review of agency action applies in this case, which is unaffected by the TPS statute's narrow jurisdiction-stripping provision. That carveout provides that "[t]here is no judicial review of any *determination* of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The operative word is "determination," which the Supreme Court has interpreted to mean "*a single act* rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Cent., Inc.,* 498 U.S. 479, 492 (1991) (emphasis added). The "determination" in the TPS statute is "whether conditions" in a given country meet or "continue to" meet the "conditions for such designation." 8 U.S.C. § 1254a(b)(3)(A); *see also id.* § 1254a(b)(3)(B) ("determines . . . that a foreign state . . . no longer meets the conditions for designation"); *id.* § 1254a(b)(3)(C) ("does not determine . . . that a foreign state . . .  no longer meets the conditions for designation.").

Every court to consider the scope of Section 1254a(b)(5)(A) has found that the provision does not bar courts from reviewing collateral challenges to the process underlying TPS determinations and ensuring that agency actions conform to the requirements of the APA and the Constitution. *See Saget*, 375 F. Supp. 3d at 330-33; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 405-409 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 319-322 (D. Md. 2018); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1101-08 (N.D. Cal. 2018); *NTPSA I*, 773 F.

Supp. 3d at 830-31; *CASA, Inc. v. Noem,* 2025 WL 1907378, at *10 (D. Md. July 10, 2025); *HECA*, 2025 WL 1808743, at *5-6; *Nat'l TPS All. v. Noem,* 2025 WL 2233985 at *9-11 (N.D. Cal. July 31, 2025) ("*NTPSA II*").[5]

**B.    The Termination Violates the APA Because it is Contrary to Law and Arbitrary and Capricious.**

**i.    *The termination was pre-determined and thus contrary to law.***

The Immigration and Nationality Act ("INA") directs the Secretary to review TPS designations prior to the expiration of each extension period to determine whether TPS protections will remain available to people whom DHS previously found could not safely return to their home countries. The statute requires that the Secretary's decision to extend or terminate TPS designations be made *after*, and based on, "consultation with appropriate agencies" and a "review [of] the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). And Congress's directive that the Secretary "shall review the conditions in the foreign state," *id.*, "evinces Congressional intent that the Secretary undertake a periodic review grounded in fact—*i.e.,* based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Saget,* 375 F. Supp. 3d at 346. Finally, the statute requires the Secretary to publish "the true and factual basis for termination" in the Federal Register. *Id.* at 346-47; *see* 8 U.S.C. § 1254a(b)(3)(B). If the Secretary instead issues a predetermined and pretextual termination notice, she violates these statutory mandates, and her decision is "not in accordance with the law." *Saget*, 375 F. Supp. 3d at 345-46.

The statements and actions of the Secretary, the President, and others make clear that the decision to terminate TPS for Syria was a predetermined *fait accompli.* President Trump campaigned

---

[5] The *NTPSA II* decision has been stayed, pending appeal, by the Ninth Circuit in a non-precedential order with no reasoning. *NTPSA II,* No. 25-4901, Dkt. No. 19.1 (9th Cir. Aug. 20, 2025).

on a message that if elected, he would end humanitarian immigration programs across the board, including by "revok[ing] TPS." Exh. 6; *see supra* pages 9-10. At her confirmation hearing, Defendant Noem asserted that TPS "had been abused and manipulated" and suggested that TPS extensions "will no longer be allowed." Exh. 3 at 27.

Once in office, the Secretary followed through on her promises to end TPS, terminating the designation for eight countries in as many months. Rather than making individualized and objective determinations about conditions in particular countries, as required by statute, the Secretary approached all of these decisions as part of one overarching, political effort to "return[] integrity to the *TPS system*." Exh. 9 (emphasis added). And she celebrated her decisions to revoke TPS as putting an end to an "immigration scheme[] that make[s] Americans less safe." Exh 8.

In their rush to end TPS, Defendants have repeatedly failed to engage in the interagency consultations and objective country-conditions review that Congress required. Defendants have routinely failed to consult with other agencies. *See NTPSA I*, 2025 WL 2578045 at *7, *30 (Venezuela termination decision made without any recommendation from State); Exhs. 20 & 21 (same as to Nicaragua); *cf.* Exh. 1 at 18-23 (detailing usual consultation process). USCIS—the subcomponent of DHS that heads and coordinates the periodic review process—has recommended termination *before* receiving any country-conditions materials to review. *NTPSA I*, 2025 WL 2578045 at *7 (Venezuela); Exh. 20 & Exh. 21 (USCIS Decision Memo recommending termination for Nicaragua written before reviewing country conditions); Exh. 22 (same, as to Honduras). And Defendants have wildly distorted the objective review process to cherry pick "positive improvements," *see, e.g.,* Exh. 23, while disregarding entire categories of country conditions that do not suit their goal of terminating TPS. This has resulted in country conditions assessments that directly contradict those of the U.S. State Department and contrast sharply with

explicit "Do Not Travel" advisories to the public. *Compare* 90 Fed. Reg. at 20311 (justifying termination of Afghanistan's TPS based on the Taliban's promotion of tourism and social media images of the "peaceful countryside") *with* Exh. 10 (warning against travel to Afghanistan "for any reason" because of "civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities").

The termination of Syrian TPS is no different. Defendant Noem was told to end TPS, and she wanted to end TPS, so she did—without the required objective review of country conditions. The Federal Register notice leaves little room to doubt these conclusions. The Secretary found no "ongoing armed conflict" in Syria, contrary to the U.S. State Department's own Do Not Travel warning that warns of "active armed conflict" *see* Exh. 19 (July 23, 2025) ("[n]o part of Syria is safe from violence" due to "[h]ostage taking by armed groups, terrorism, remnants of war such as unexploded ordnance, and aerial bombardment."); *see also* Exhs. 17 & 18.  Indeed, the very sources on which the Secretary relies make clear that violence and armed conflict, far from being "sporadic" and "episodic" in Syria, 90 Fed. Reg. at 45400, remain widespread and systematic. *See* Exhs. 17; 24 (cited in 90 Fed. Reg. at 45400 ns. 10, 11). Further, the Secretary entirely ignored a specific armed conflict—Israel's ongoing ground incursions and air strikes across Syria. *See* Exh. 18 at 21-22; Exh. 26.

As to "extraordinary and temporary conditions," the termination notice does not meaningfully dispute that such conditions exist and prevent safe return to Syria. In a single paragraph, the Secretary acknowledged that "most Syrians require some form of humanitarian assistance" but claimed that the humanitarian crisis did not prevent nationals from returning safely. 90 Fed. Reg. at 45400. And the termination notice does not acknowledge that even the paltry sources it cites discuss ongoing displacements of Syrians, Exh. 27, and portray a "humanitarian

situation" that "remains dire," with limited access to life-saving resources, Exh. 28—because those facts run contrary to the goal of termination. *See also* Exh. 29 (documenting a "deeply concerning [] humanitarian situation" with "escalation of violence," "unprecedented levels [of] food insecurity," and "severe drought").

Defendants' decision to end TPS for Syria was clearly predetermined—based on express promises to end TPS, systematic terminations of similarly-situated countries, and the flawed and selective country conditions analysis—and this predetermined decision contravenes the mandates of the TPS statute and violates the APA.

> ### ii. The termination's reliance on the "national interest" is contrary to law and arbitrary and capricious.

The termination notice's incredible conclusions make clear that Syria's country conditions were not considered relevant to the termination decision. Rather, the driving factor justifying the termination is the purported "national interest"—which Defendant Noem claimed, without statutory basis, "require[s]" termination regardless of ongoing conditions in Syria. 90 Fed. Reg. at 45400. Defendant Noem's reliance on the "national interest" to terminate the TPS designation is both contrary to the TPS statute and arbitrary and capricious.

At initial designation, the INA allows the Secretary to consider whether allowing noncitizens to remain in the country "is contrary to the national interest of the United States" only when the Secretary is designating a country for TPS under the "extraordinary and temporary conditions" provision. 8 U.S.C. § 1254a(b)(1)(C). The Secretary may not consider "national interest" when designating a country for TPS based on ongoing armed conflict, nor when designating based on environmental disaster. *Compare id.* § 1254a(b)(1)(C) *with* § 1254a(b)(1)(A)-(B). Syria has been designated for TPS based on both the "ongoing armed conflict" and "extraordinary and temporary conditions" criteria since its first redesignation in

2013. *See supra* n. 3.

That limitation carries over to termination decisions: the Secretary can consider only whether the country "continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(1)(A). The "national interest" therefore can play no part in revoking a designation made on the basis of an armed conflict. But here, it did. As made clear from the Secretary's numerous statements about TPS, she wanted to end TPS to serve the Trump administration's view of the "national interest." The entire termination decision—including the decision to ignore the ongoing armed conflict in Syria—reflects the primacy of this single criterion. Indeed, the Secretary gave the game away by admitting that country conditions were simply not relevant because the national interest "required" termination. 90 Fed. Reg. at 45400. In reviewing a designation based on "ongoing armed conflict," this reliance on the "national interest" violates the TPS statute.

Even as to "extraordinary and temporary conditions," Congress did not permit consideration of the "national interest" during the periodic review process. Rather, when conducting the periodic review and determining whether to extend or terminate TPS for an already-designated country, the Secretary must review "the conditions in the foreign state" and determine if those conditions for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A). In other words, when reviewing TPS for an already-designated country, the statute directs the Secretary to focus solely on conditions in *that* country—not in the United States.

The reliance on "national interest" to terminate is also arbitrary and capricious. No prior Secretary had ever terminated a TPS designation on the basis that extending TPS was "contrary to the national interest." *See* Exh. 7. When an agency breaks with long-standing past practice, the agency must "display awareness that it *is* changing position," offer "good reasons for the new policy," and consider "serious reliance interests" engendered by the prior policy. *FDA v. Wages &*

*White Lion Invs., LLC.*, 604 U.S. 542, 570 (2025). Failure to do so renders an agency action arbitrary and capricious. *Id.* at 567. Here, the Secretary failed across the board. She did not acknowledge her break with past practice, offered no reasons for that break, and did not consider the reliance interests of TPS holders who expected that TPS would be terminated only based on improved country conditions.

> ### iii.    The termination decision was arbitrary and capricious because it was politically influenced and pretextual.

A TPS decision is arbitrary and capricious if it is based on "improper political influence"—where political pressure "caused the agency's action to be influenced by factors not relevant under the controlling statute." *Saget*, 375 F. Supp. 3d at 359-60 (quoting *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984)). Here, the President gave a political direction to terminate TPS to advance his own anti-immigrant agenda, without regard for the country conditions considerations required by statute. *See supra* pages 9-10. Defendant Noem expressly stated that she would follow the President's "directive" to terminate TPS. *Id.*; *see also* Exh. 30. And once in office, she immediately proceeded to revoke and terminate TPS designations, explicitly linking her decisions to the President's instructions to "limit[] TPS." *See* 90 Fed. Reg. at 9043 (Venezuela); *id.* at 28762 (Haiti); *id.* at 20310 n.3 (Afghanistan); *id.* at 23698 (Cameroon); *id.* at 24152 n. 10; (Nepal); *id.* at 30088 n. 4 (Nicaragua); *id.* at 30091 n.10 (Honduras) (all citing E.O. 14159).[6] The otherwise unjustifiable termination of Syria's TPS was the latest casualty of this same political directive, and was therefore "influenced by factors not relevant under the controlling statute." *See Saget*, 375 F. Supp. 3d at 359-60.

---

[6] The termination notice for Syria is the first that does not directly cite to E.O. 14159, as a justification for termination—likely in an attempt to mask the unlawful policy to mass-terminate TPS from judicial review. *See NTPSA II*, 2025 WL 2233985 at *12 (holding that citation of E.O. 14159 supported finding that Secretary was following Presidential directive).

The termination decision is also arbitrary and capricious because it is pretextual. As the Supreme Court has made clear, "[t]he reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). "Accepting contrived reasons would defeat the purpose of the enterprise." *Id.*; *accord Saget*, 375 F. Supp. 3d at 359-362. The complete disconnect between what the Secretary and the Trump Administration have said about TPS outside the confines of the Federal Register and the deeply implausible reasoning in the termination notice leave no doubt that the Secretary's stated justifications are pretextual.

> ### iv. *The termination impermissibly broke with past practice regarding orderly transition periods without explanation and is therefore arbitrary and capricious.*

In an unjustified and arbitrary break with past practice, Defendant Noem gave Syrian TPS holders only 60 days to pack up their bags and leave. Prior to 2025, no termination that ended a TPS designation that had been in place for longer than three years provided affected TPS holders with less than six-months' notice. *See* Exh. 2. Between 2004 and 2025, all terminations of a designation of *any length* provided at least a six-month transition period, and more commonly a 12 or 18-month transition period. *Id.* (four six-month transition periods, four 12-month periods, and four 18-month periods); *see also NTSPA II*, 2025 WL 2233985 at *13 (finding no dispute that agency's prevailing practice was to provide at least a six-month orderly transition). Here, the TPS designation for Syria has been in place for well over a decade, and many Syrian TPS holders have significant roots in the United States. *See generally* Exhs. 39-45.

Agencies may change their policies. But when an agency breaks with long-standing past practice, the agency must offer "good reasons for the new policy," and consider "serious reliance interests" engendered by the prior policy. *FDA*, 604 U.S. at 570. The Secretary has complied with none of these requirements. Rather than "display[ing] awareness" of the longstanding past practice

of providing at least a six-month orderly transition period when ending a TPS designation, she acknowledged that the agency had "allowed for an additional transition period . . . under certain previous [TPS] terminations" but did not recognize that providing at least a six-month transition period had been the agencies' practice, without exception, for more than two decades. 90 Fed. Reg. at 45402.

Further, the termination notice does not offer a "good reason" for the shift in a decades-long policy. The notice justifies the 60-day period as "sufficient and warranted" based only on the "Secretary's finding that continuing to permit Syrian nationals to remain temporarily in the United States is contrary to the U.S. national interest." *Id.* Defendants do not provide any explanation for why this finding justifies this extreme and harmful shift from past practice, nor does they explain why allowing for a longer transition period would harm the national interest. *Id.*  Nor does the notice address the rationale DHS previously provided in support of an "orderly transition" period— allowing TPS recipients time to apply for other immigration benefits for which they are eligible, or to prepare for and arrange their departure. *See, e.g.*, 81 Fed. Reg. 66054 (Sep. 26, 2016) (Sierra Leone).

 Finally, while the termination notice pays lip service to the reliance interests of TPS holders, 90 Fed. Reg. at 45402, it fails to actually "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). It does not consider that TPS holders from countries of longstanding designation, like Syria, would reasonably expect that, if TPS were terminated, that they would have at least six months to take care of their affairs, apply for another status, or plan to depart the country. By ignoring these important reliance interests and decades of past practice without acknowledgment or justification, Defendants' failure to provide an

orderly transition period runs afoul of the APA.

**C.      The Termination Is Contrary to Law Because it Violates the Fifth Amendment.**

The Fifth Amendment's Due Process Clause "contains an equal protection component" that prohibits federal government officials from discriminating on the basis of certain immutable characteristics, including race, ethnicity, and national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[7] Here, Defendants' decision to terminate TPS for Syria violates Plaintiffs' equal protection rights because it was motivated by discriminatory animus and resulted in disparate impact against noncitizens who are not white or of European origin.

Courts apply strict scrutiny to assess government decisions motivated by discriminatory purpose. *Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006).  The limited exception for deferential review adopted in *Trump v. Hawaii*, 585 U.S. 667 (2018), applies only to restrictions on entry *into* the United States and does not apply to TPS determinations, which concern individuals already in the country. *See Saget*, 375 F. Supp. 3d at 367; *NTPSA I*, 2025 WL 2578045, at *35; *NTPSA II*, 2025 WL 2233985 at 14-15; *see also United States v. Suquilanda*, 116 F.4th 129, 140 (2d Cir. 2024) (applying strict scrutiny to equal protection challenge to domestic immigration law).

To establish an equal protection claim, plaintiffs must allege that a government actor intentionally discriminated against them because of race, ethnicity, or national origin. *Jana-Rock*, 438 F.3d at 204. Plaintiffs can show this intentional discrimination by, among other things,

---

[7] The doctrinal and factual analysis is the same whether this claim is viewed as about race, ethnicity, or national origin. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) (strict scrutiny applies to classifications based on national origin); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (strict scrutiny applies to classifications by ethnicity).

establishing that "a discriminatory purpose [was] a motivating factor" in the challenged government action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see Brown v. City of Oneonta, N.Y.,* 221 F.3d 329, 337 (2d Cir. 2000).

Discriminatory purpose can be demonstrated by "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Evidence of discriminatory intent can include the sequence of events leading to a decision, departures from normal procedures or substantive conclusions, the background of a decision, and disparate impact. *Id*. at 266–67. For instance, "the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy" can in tandem establish that "a discriminatory purpose was a motivating factor in a decision." *Deide v. Day,* 676 F. Supp. 3d 196, 221 (S.D.N.Y. 2023) (quoting *Centro Presente,* 332 F. Supp. 3d at 415). Defendants' use of "charged code words" may serve as "evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 609 (2d Cir. 2016) (internal citation omitted).

Plaintiffs have—even before discovery—marshalled compelling evidence of discriminatory intent. Both Defendant Noem and President Trump have repeatedly used charged code words in describing policy goals that dehumanize non-white, non-European noncitizens and lay bare their animus. Defendant Noem has described immigration as an "invasion happening on purpose . . . to remake the foundation of this country," Exh. 31, and her agency has encouraged noncitizens to "[r]emigrate," Exh. 49, a term that invokes white nationalism and ethnic cleansing via "mass deportation of non-white immigrants," Exh. 50. *See also* Exh. 32 (explaining that invasion rhetoric echoes the "great replacement theory" that non-white immigrants will "replace"

the white race, and in doing so undermine the country's perceived white foundation, history, and culture). Defendant Noem has described TPS as an "immigration scheme that makes Americans less safe," Exh. 8, and her agency has described TPS holders as "poorly vetted migrants" that include "known terrorists," "MS-13 gang members," and "murderers." Exh. 33. These statements "reflect the Secretary's animus against immigrants and the TPS program even though individuals with TPS hold lawful status." *NTPSA II,* 2025 WL 2233985 at *16. "By stereotyping the TPS program and immigrants as invaders that are criminal . . . Defendant Noem's statements perpetuate the discriminatory belief that certain immigrant populations will replace the white population." *Id.*

President Trump, who instructed the Secretary to end TPS, has repeatedly expressed racist and xenophobic animus, including campaigning on a message that migrants are "poisoning the blood of our country." Exh. 34; *see also* Compl. ¶¶ 90-93; 101-110. He has employed rhetoric equating immigrants from Muslim-majority countries with enemies and terrorists—often specifically naming Syria. Compl. ¶¶ 89-93. During his campaign, President Trump promised to reinstate his previous ban on the entry of nationals from Muslim-majority countries, including Syria, claiming that some "very, very rough people come out of these areas" and generalizing that all Syrians "want to blow up our country." Exh. 35. And with E.O. 14159, issued on day one of his presidency, President Trump directly "connected TPS" with an "invasion," painting TPS holders, among other immigrants, as presenting "'significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." *NTPSA II*, 2025 WL 2233985, at *17 (citing E.O. 14159).

Further, the "historical background of the decision" shows this is the latest decision in "a series of official actions taken for invidious purposes." *Arlington Heights,* 429 U.S. at 267. The termination of TPS for Syria is the eighth in as many months—and courts have already found the

preceding terminations were motivated by improper animus. *NTPSA I*, 773 F. Supp. 3d at 855-866; *NTPSA II*, 2025 WL 2233985 at *14-17; *see also NTPSA I*, 2025 WL 2578045 at *35-36 (denying government's motion for summary judgment on equal protection claims). Defendants have not been able to provide a reasoned or lawful explanation for the shift in policy to mass-terminate TPS designations that have been in place for decades—because their policy shift can only be explained by discriminatory motive. *Centro Presente*, 332 F. Supp. 3d at 415 (plaintiffs plausibly alleged that TPS terminations violated equal protection where terminations rested on an "unreasoned shift in policy"). And simultaneous to their attempts to rapidly terminate TPS (a humanitarian protection) for noncitizens from majority non-white countries, the administration has coopted the United States' longstanding overseas refugee program to accelerate new admissions of only one population—white Christian Afrikaners from South Africa—all the while suspending admissions for refugees from non-white countries. Exh. 36; 37; *see also* Exh. 38 (suspending parole program *en masse* for Cubans, Haitians, Nicaraguans, and Venezuelans, while leaving similar program for Ukrainians intact).

Finally, the disparate "impact of the official action," and "whether it bears more heavily on one race," is relevant in assessing discriminatory intent. *Arlington Heights,* 429 U.S. at 266 (internal quotation marks omitted). Here, Defendant Noem's decision to terminate TPS for thousands of Syrians—both individually and in combination with the decision to terminate TPS for seven other countries with non-white majorities—"bears more heavily" on people perceived in this country as non-white. *Id*.

The historical and contemporaneous evidence of decision-makers' animus towards non-white, non-European immigrants in general, and TPS holders in particular; the charged code words used to justify the termination of TPS; the unreasoned shift in policy to terminate TPS across the

board for non-European countries; and the disparate impact of the termination policy support the conclusion that Plaintiffs are likely to succeed on the merits of their equal protection claim. At the very least, there are serious questions going to the merits that justify postponement of the termination notice.

## II.    Syrian TPS Holders and Applicants Face Irreparable Harm Without Postponement.

"A showing of irreparable harm is the single most important prerequisite" for the issuance of preliminary relief pending disposition of the merits of the case. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (cleaned up). A party seeking preliminary relief must show that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the position they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The harm must be "actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal citation omitted).

The substantial and imminent irreparable harm that Plaintiffs face on November 21 could not be clearer. First, Plaintiffs have established *per se* irreparable harm because they allege cognizable violations of their constitutional rights. "[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (internal citations and quotation marks omitted).

Furthermore, the termination of TPS will immediately trigger the loss of Plaintiffs' lawful status to reside in the United States, and with it, their permission to work, their livelihoods, and ability to pursue long-held professions.[8] *See Arizona Dream Act Coal. v. Brewer,* 855 F.3d 957,

---

[8] Individuals with pending applications for TPS, like Plaintiff Ahmad, are protected from deportation and eligible for work authorization while their TPS application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10.

24

978 (9th Cir. 2017) ("[l]oss of opportunity to pursue one's chosen profession constitutes irreparable harm."). Plaintiffs will lose jobs and careers into which they have invested years, including plaintiffs who work as a highly-specialized pediatrician, Exh. 40 ¶¶ 3, 11, as a journalist, Exh. 45 ¶¶ 3, 7, 9, as a behavioral health specialist for adults with special needs, Exh. 42 ¶¶ 4, 9, and in a senior management role at private company, Exh. 43 ¶¶ 7-8. In addition to losing her job, Plaintiff Laila Doe will have to abandon the nursing degree she has been working towards for years. Exh. 42 ¶ 17. As the sole breadwinner in her family, Laila will no longer be able to provide for her elderly U.S. citizen mother and her teenage daughter if she loses TPS. *Id.* ¶¶ 12-13. Similarly, Plaintiff Waleed Doe will lose his senior management job, leaving him and his wife, also a TPS holder, without the ability to work and provide for their three U.S. citizen children. Exh. 43 ¶¶ 4, 7. Plaintiffs will lose access to essential health care where eligibility is linked to their work or their status. *See, e.g.,* Exh. 43 ¶ 17. In many states, TPS holders will lose their drivers' licenses—losing both their mobility and their only state-issued identification. *See* Exh. 41 ¶ 7; *see also Brewer*, 855 F.3d at 978 (loss of driver's licenses causes cascading and irreparable harms).

In addition, Plaintiffs without any other immediate status will be subject to arrest and detention pending deportation as of November 21, 2025. Exh. 46 ¶¶ 14, 23; *see* Exhs. 39-45 (plaintiffs have no other status). "The deprivation of [a noncitizen's] liberty is, in and of itself, irreparable harm." *Torres-Jurado v. Biden*, 2023 WL 7130898, at *5 (S.D.N.Y. Oct. 29, 2023) (internal citation omitted). Plaintiffs will be subject to placement in removal proceedings and could soon face deportation to a country where violence and human-rights abuse are pervasive while food, housing, water, and medical care are scarce. *See supra* pages 12-13; 17-18. Plaintiff Sara Doe faces deportation to a country that she previously fled after family members were killed and

---

TPS applicants also face irreparable harm from the termination of TPS, as they will lose this crucial protection and work authorization.

where she faced threats for her medical work. Exh. 40 ¶¶ 5-6. Laila faces return to her sister's home in Damascus, in a neighborhood that was hit by airstrikes only two months ago. Exh. 42 ¶¶ 14-15. Plaintiff Nesma, age 77 and with chronic health conditions, faces loss of all family connection and support, with no way to survive as an elderly single woman in Syria. Exh. 41 ¶¶ 13-15. And TPS holders who grew up outside of Syria—but have no residency or citizenship status in any other country—face return to a wholly unfamiliar and hostile country. *See* Exhs. 39, 45.

Many Plaintiffs will suddenly find themselves unable to apply for other types of immigration relief, either because the alternative form of relief depends on maintaining lawful immigration status, or because they are subject to detention or deportation while they wait. *See* Exh. ¶¶ 16-23; *see also* Exhs. 40-45. For many TPS holders with other potential pathways to status, the rapid termination of TPS has left them without time to pursue or complete these complex, multi-step processes. *See, e.g.,* Exh. 40 ¶¶ 12, 18.

TPS holders also face harmful choices concerning family separation. Because they have lived here for years, many TPS holders have U.S. citizen children who have never been to Syria. *See* Exh. 43 ¶¶ 4, 11-15. These TPS holders "will confront the impossible choice of either leaving their [U.S. citizen] children behind or taking their children with them to a country [in] which they may not be safe." *Saget*, 375 F. Supp. 3d at 75 (finding irreparable harm). And many TPS holders have extensive U.S. citizen and permanent resident family members and dread the separation and isolation that will result from leaving them behind in the United States. *See* Exhs. 39-44. The possibility of being separated from loved ones, giving up one's life in the United States, and returning to danger has caused Plaintiffs enormous mental anguish. *See* Exhs. 39-45.

All of these injuries are severe and irreparable and weigh heavily in favor of postponement.

### III.    The Balance of Hardships and Public Interest Weigh Heavily in Favor of Postponement

The final considerations—the balance of hardships and public interest—merge when the government is a party. *Nken v. Holder,* 556 U.S. 418, 435 (2009). These considerations weigh heavily in favor of Plaintiffs.

"[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority." *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020); *accord, e.g.*, *Saget*, 375 F. Supp. 3d at 377. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citation omitted).

In contrast, there is strong public interest in allowing Plaintiffs to retain TPS pending a final resolution of this case on the merits. To start, "there is a public interest in maintaining families together," *You v. Nielsen*, 321 F. Supp. 3d 451, 469 (S.D.N.Y. 2018); *accord, e.g.*, *Torres-Jurado*, 2023 WL 7130898 at *5. Plaintiffs here face separation from their elderly parents, spouses or minor children who rely on them, putting this interest in stark relief. *See supra* page 29. Moreover, the public has an interest in avoiding "economic and public health harms." *Make the Road N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665–66 (S.D.N.Y. 2019), *aff'd as modified sub nom. New York v. DHS*, 969 F.3d 42 (2d Cir. 2020).  If removed to Syria, TPS holders will likely experience worse health outcomes, malnutrition, poverty, and poor educational attainment. *See* Exhs. 28, 29, 47.

Additionally, postponement of the termination is in the public interest because the Secretary's unlawful termination of Syria's TPS designation will impose significant economic costs—both direct and indirect—on the communities where Syrian TPS holders currently live.

TPS holders are both employed at high rates, Exh. 48, and ineligible for public assistance. *See* 8 U.S.C. § 1254a(f)(2). Syrian TPS holders hold crucial jobs in their communities. *See supra* page 28. The termination of Syria's TPS designation, and the corresponding end to TPS holders' work authorization, will cause economic harm in communities where Syrian TPS holders have settled. The termination would also inflict non-economic harm on those communities, given that "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *NTPSA I*, 773 F. Supp. 3d at 841.

For these reasons, the public interest and balance of the equities—like each of the other factors to be considered—strongly favors postponement of the termination of TPS for Syria.

## **CONCLUSION**

For all the foregoing reasons this Court should grant Plaintiffs' motion.

Dated: October 21, 2025                    Respectfully submitted,

INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Ghita Schwarz
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
gschwarz@refugeerights.org
mhauptman@refugeerights.org

Megan Hauptman*
650 Massachusetts Avenue NW, St 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

MUSLIM ADOVCATES
/s/ *Golnaz Fakhimi*
Golnaz Fakhimi
Sadaf Hasan*
1032 15th Street N.W. # 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

VAN DER HOUT LLP
/s/ *Marc Van Der Hout*
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
ndca@vblaw.com

*Counsel for Plaintiffs*

*\*Application for admission Pro Hac Vice*
*forthcoming*

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this motion Memorandum of Law in support of Plaintiffs'

motion to postpone complies with the word limits of Local Rules of the United States District

Courts for the Southern & Eastern Districts of New York § 7.1(c) and United States District

Judge Katherine Polk Failla, Individual Rules of Practice of Civil Cases § 4(B). According to the

word-processing system used to prepare this Memorandum of Law, the total word count for all

printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7(c) and U.S.

Dist. J. Katherine Polk Failla, Individual Rules of Practice of Civil Cases § 4(B) is 8,750 words.


Dated: October 21, 2025
New York City, New York

/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
