UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAHLIA DOE, *et al.*,<br><br>                    Plaintiffs,<br><br>                        v.<br><br>KRISTI NOEM, Secretary, United States Department of Homeland Security, in her official capacity, *et al.*,<br><br>                    Defendants. | Case No. 25 Civ. 8686 (KPF) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION**

JAY CLAYTON
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2734/2713
*Attorney for Defendants*

REBECCA S. TINIO
MARK OSMOND
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................ 4

   I.  STATUTORY BACKGROUND ..................................................................... 4

   II.  FACTUAL BACKGROUND: TPS FOR SYRIA ............................................. 5

LEGAL STANDARD ......................................................................................... 7

ARGUMENT ................................................................................................... 8

   I.  THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ...................... 8

      A.  Section 1254a Prohibits Judicial Review of TPS Terminations ................... 8

      B.  Section 1252(f)(1) Precludes Plaintiffs' Requested Relief ......................... 11

   II.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS, EVEN IF THE COURT COULD DECIDE THEM ....... 13

      A.  Plaintiffs' APA Claims Fail on the Merits ............................................. 13

         1.  The Secretary Lawfully Terminated Syria's TPS Designation After Considering the Relevant Factors ...................................................13

         2.  Plaintiffs' Counterarguments Lack Merit...........................................15

      B.  Plaintiffs' Animus Claim Fails on the Merits ........................................ 19

   III. ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENTLY TEMPORARY NATURE OF TEMPORARY PROTECTED STATUS........................ 24

   IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF .............................................................. 25

CONCLUSION................................................................................................ 27

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Amgen, Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ................................................................................. 9

*Anderson v. United States*,
   2004 WL 2326386 (N.D.N.Y. Oct. 13, 2004) ...................................................... 12

*Biden v. Texas*,
   597 U.S. 785 (2022) ........................................................................................... 13

*Can't Stop Prods., Inc. v. Sixuvus, Ltd.*,
   295 F. Supp. 3d 381 (S.D.N.Y. 2018)................................................................. 24

*Chen v. Garland*,
   43 F.4th 244 (2d Cir. 2022) ................................................................................ 17

*Const. Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*,
   868 F.3d 87 (2d Cir. 2017)................................................................................. 16

*DCH Reg'l Med. Ctr.* v. *Azar*,
   925 F.3d 503 (D.C. Cir. 2019)............................................................................ 11

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019)............................................................................................ 15

*Dep't of Homeland Security v. D.V.D.*,
   145 S. Ct. 2153 (2025) ....................................................................................... 25

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988)............................................................................................ 26

*FDA v. Wages and White Lion Invs., L.L.C.*,
   604 U.S. 542 (2025)............................................................................................ 19

*Fiallo v. Bell*,
   30 U.S. 787, 792 (1977)...................................................................................... 26

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)............................................................................ 13

*Friends of Animals v. Romero*,
   948 F.3d 579 (2d Cir. 2020)................................................................................ 14

*Friends of Ompompanoosuc v. FERC*,
   968 F.2d 1549 (2d Cir. 1992)............................................................................. 14

*Futia v. United States*,
   2023 WL 3061903 (S.D.N.Y. Apr. 24, 2023)...................................................... 9

*Galvan v. Press*,
   347 U.S. 522 (1954)............................................................................................ 20

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022)............................................................................................ 13

*Gill v. Whitford*,
   585 U.S. 48 (2018).............................................................................................. 27

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ............................................................................................ 10, 25

*Info. Ctr. v. U.S. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) ..................................................................................... 13

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ................................................................................................... 20

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ..................................................................................................... 8

*I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*,
  510 U.S. 1301, 1305-06 (1993) ................................................................................. 25

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................... 18

*Maryland* v. *King*,
  567 U.S. 1301 (2012) ................................................................................................. 26

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ..................................................................................................... 9

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ..................................................................................................... 20

*Musadique v. Garland*,
  No. 19 Civ. 8381 (AJN), 2021 WL 1089414 (S.D.N.Y. Mar. 22, 2021) ..................... 9

*Nat'l TPS All. v. Noem*,
  773 F. Supp. 3d 807 (N.D. Cal. 2025) .................................................................. 9, 19

*New Jersey v. Bessent*,
  149 F.4th 127 (2d Cir. 2025) ..................................................................................... 15

*New York v. FERC*,
  783 F.3d 946 (2d Cir. 2015) ....................................................................................... 17

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ................................................................................................... 23

*Noem v. Doe*,
  145 S. Ct. 1524 (2025) ............................................................................................... 25

*Patel v. Garland*,
  596 U.S. 328 (2022) ..................................................................................................... 8

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ...................................................................................... 21

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ............................................................................. passim

*Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................................... passim

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ...................................................................................... 25

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021) ..................................................................................................... 4

*Shapiro v. Cadman Towers, Inc.*,
  51 F.3d 328 (2d Cir. 1995) ........................................................................................ 24

iii

*Skagit County Pub. Hosp. Dist. No. 2 v. Shalala*,
    80 F.3d 379 (9th Cir. 1996) ................................................................ 11
*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ........................................................................... 27
*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
    709 F. Supp. 3d 118 (S.D.N.Y. 2024) ................................................. 7
*Thompson v. United States*,
    795 F. App'x 15 (2d Cir. 2019) .................................................. passim
*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................................... 27
*Trump v. Hawaii*,
    585 U.S. 667 (2018) .............................................................. 18, 20, 21
*United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) ........................................................................... 12
*United States R.R. Retirement Bd. v. Fritz*,
    449 U.S. 166 (1980) ........................................................................... 21
*United States v. Nixon*,
    418 U.S. 683 (1974) ........................................................................... 23
*United States v. Welden*,
    377 U.S. 95 (1963) ............................................................................. 12
*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................... 17
*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ................................................................. 7
*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 7, 13
*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................... 24
*Yale New Haven Hosp. v. Becerra*,
    56 F.4th 9 (2d Cir. 2022) ................................................................ 9, 11

Statutes

1 U.S.C. § 204(a) ................................................................................. 12
5 U.S.C. § 701(a)(2) .............................................................................. 9
5 U.S.C. § 702 ....................................................................................... 9
5 U.S.C. § 705 ..................................................................................... 27
6 U.S.C. § 557 ....................................................................................... 4
8 U.S.C. Ch. 12 ................................................................................... 12
8 U.S.C. § 1101(a)(47) ........................................................................ 24
8 U.S.C. § 1252(f)(1) ....................................................................... 3, 11
8 U.S.C. § 1254a ........................................................................... 11, 12
8 U.S.C. § 1254a(a)(1)(A) .............................................................. 24, 25
8 U.S.C. § 1254a(b) ......................................................................... 1, 4
8 U.S.C. § 1254a(b)(1) ....................................................................... 10

8 U.S.C. § 1254a(b)(1)(A) ............................................................................ 17
8 U.S.C. § 1254a(b)(1)(C) ....................................................................... 18, 24
8 U.S.C. § 1254a(b)(2)(B) .......................................................................... 4, 5
8 U.S.C. § 1254a(b)(3)(A) ............................................................................ 15
8 U.S.C. § 1254a(b)(3)(B) ....................................................................... 9, 18
8 U.S.C. § 1254a(b)(5)(A) ........................................................................ 2, 8
8 U.S.C. § 1254a(d)(2) ................................................................................. 19
Pub. L. No. 101-649 ...................................................................................... 4

Regulations

8 C.F.R. § 244.13(b) ..................................................................................... 19
83 Fed. Reg. ..................................................................................................... 5
C.F.R. § 244.19 ............................................................................................. 19

Other Authorities

77 Fed. Reg. 19 ............................................................................................... 5
80 Fed. Reg. 245 ............................................................................................. 5
89 Fed. Reg. 5 ................................................................................................. 5
90 Fed. Reg. ..................................................................................................... 2
Pub. L. No. 104-208 ...................................................................................... 11

Defendants (the "government") respectfully submit this memorandum of law in opposition to the motion to postpone the date of agency action filed by plaintiffs Dahlia Doe, Sara Doe, Nesma Doe, Laila Doe, Waleed Doe, Mustafa Doe, and Ahmad Doe, on their own behalf and on behalf of others similarly situated ("Plaintiffs"), on October 21, 2025. ECF No. 21 ("Motion").[1]

## PRELIMINARY STATEMENT

In 1990, Congress created the Temporary Protected Status ("TPS") program to provide, on a discretionary basis, temporary protected status to individuals who cannot safely return in the short-term to their home nation, or whose country is temporarily unable to handle adequately the return of its nationals because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security (the "Secretary") may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible individuals who are present in the United States on the effective date and register with the government are temporarily protected from removal and receive work authorization. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if the Secretary determines that the conditions for the designation are no longer met. Congress further provided that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. *Id.* § 1254a(b)(5)(A).

---

[1] At the October 24, 2025, conference, the Court granted Plaintiffs' motion for leave to proceed under pseudonyms. *See* ECF No. 14. Accordingly, this brief refers to Plaintiffs by their pseudonyms.

Exercising that statutory authority, Secretary Noem terminated the TPS designation for Syria effective November 21, 2025. In accordance with statutory and regulatory requirements, the Secretary provided 60 days' notice of the termination, published in a Federal Register Notice that explained the bases for the Secretary's decision. *See Termination of the Designation of Syria for TPS Status*, 90 Fed. Reg. 45,398 (Sept. 22, 2025) ("FRN"). Plaintiffs bring this suit challenging the termination and asserting claims under the APA and the equal-protection guarantee of the Fifth Amendment's Due Process Clause. Plaintiffs moved for a preliminary injunction that would postpone the effective date of the Secretary's TPS termination. The Court should deny Plaintiffs' motion.

Earlier this year, another district court stayed the termination of TPS for Venezuela. The Supreme Court granted interim relief, with just one noted dissent. *Noem v. Nat. TPS Alliance* ("*NTPSA I*"), No. 24A1059, 2025 WL 1427560 (May 19, 2025). When the same district court later entered judgment in the plaintiffs' favor, the Supreme Court again intervened. *Noem v. Nat'l TPS Alliance* ("*NTPSA II*"), No. 25A326, 2025 WL 2812732, at *1 (Oct. 3, 2025). In doing so, the Court necessarily determined that the government was likely to succeed on the merits and that the balance of harms favored giving effect to the termination during litigation. This case involves similar claims and similar requests for relief, and the same result is warranted.

Plaintiffs' arguments are likely to fail for several other reasons as well. First, Congress has barred courts from issuing the requested relief. The TPS statute expressly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions of TPS. 8 U.S.C. § 1254a(b)(5)(A). The Secretary's decision to terminate TPS is shielded from judicial review under section 1254a. *Id.*

Second, the Court lacks jurisdiction because an additional statute, 8 U.S.C. § 1252(f)(1), bars the relief Plaintiffs seek. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." *Id.* § 1252(f)(1) (emphasis added). Section 1254a is one such covered provision, and an order postponing the Secretary's TPS termination is the sort of order "enjoin[ing] or restrain[ing]" the Secretary that section 1252(f)(1) prohibits.

Even if Plaintiffs' APA and equal protection claims were properly before this Court, Plaintiffs have failed to demonstrate a likelihood of success on the merits. Fatal to the APA claim, the Secretary's TPS determination was reasonable, accords with the TPS statute, and comports with all procedural requirements. As the FRN termination notice demonstrates, the Secretary considered statutorily authorized factors in reaching her determination. Plaintiffs' constitutional claim fares no better, because Plaintiffs fail to identify any specific evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that the Secretary's termination decision reflects an immigration policy that is rationally related to government objectives.

Finally, Plaintiffs fail to show that the remaining equitable factors favor them, and the balance of equities and public interest tilt against preliminary relief. The Government and the public share an interest in ensuring that the process established by Congress—under which the Secretary can carry out her responsibilities to weigh the statutory factors governing TPS designations—is followed. And in this case, as the Secretary observed, the conditions for Syria's

TPS designation are no longer met. Delay of the Secretary's decision threatens to undermine the United States' foreign policy and national interests, particularly where Congress has provided the Secretary with broad discretion to assess conditions in foreign countries and reach determinations regarding TPS.

For these reasons and those discussed below, the Court should deny Plaintiffs' Motion.

## **BACKGROUND**

### I.    STATUTORY BACKGROUND

The Immigration Act of 1990 established a program for temporary, discretionary shelter in the United States for aliens from countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return (or, for environmental disasters, temporarily render the country unable to adequately handle its nationals' return). Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary, "after consultation with appropriate agencies," to designate countries for TPS if the Secretary makes certain findings. 8 U.S.C. § 1254a(b); *see also id.* § 1103; 6 U.S.C. § 557 (transferring authority to the Secretary). When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work, so long as they remain in valid temporary protected status. *Id.* § 1254a(a), (c); *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations may not exceed eighteen months. 8 U.S.C. § 1254a(b)(2)(B). Each extension also must be no longer than eighteen months. *Id.* § 1254a(b)(3)(C). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A). If the Secretary finds that the foreign state "no longer continues to meet" those conditions, she "shall terminate the designation" by publishing notice in

the Federal Register. *Id*. § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then the TPS designation "is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C). Finally, the statute makes TPS determinations unreviewable by providing that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## II.    FACTUAL BACKGROUND: TPS FOR SYRIA

On March 29, 2012, then-Secretary Janet Napolitano designated Syria for TPS for a period of 18 months, due to "extraordinary and temporary conditions in Syria" resulting from "a brutal crackdown" undertaken by the Syrian Arab Republic Government, led by former Syrian President Bashar al-Assad. *Designation of Syrian Arab Republic for Temporary Protected Status*, 77 Fed. Reg. 19,026, 19,026-27 (Mar. 29, 2012). TPS for Syria was repeatedly extended for 13 years until 2025, when the Secretary announced that it would be terminated.[2] *See* FRN.

Specifically, on September 22, 2025, the Department of Homeland Security ("DHS") published notice in the Federal Register that TPS for Syria would be terminated effective on November 21, 2025. *Id.* As the FRN explained, in determining whether to terminate TPS for Syria, Secretary Noem considered whether "extraordinary and temporary" conditions in Syria that prevent Syrian nationals from returning in safety continue to exist; (b) if permitting Syrian nationals to remain temporarily is contrary to the national interest of the United States; (c) whether

---

[2] *See* 80 Fed. Reg. 245, 247-48 (Jan. 5, 2015); 83 Fed. Reg. 9,329, 9,331-32 (Mar. 5, 2018); 89 Fed. Reg. 5,562, 5,565 (Jan. 29, 2024).

there is ongoing armed conflict within Syria; and (d) whether, due to such conflict, requiring aliens who are nationals of Syria to return would pose a serious threat to their personal safety. *Id.* at 45,399-400.

The Secretary noted in the FRN that the Assad regime fell in December 2024, and since then, Interim President Ahmed al-Sharaa has taken steps to establish a governing infrastructure for the country, as well as a legal framework, for the post-Assad era. *Id.* at 45,400. The Secretary also noted that in May 2025, President Trump met with Interim President al-Sharaa and announced that the United States would be lifting sanctions and normalizing relations with Syria. *Id.*

The Secretary then determined that, while some "sporadic and episodic violence occurs in Syria," the situation no longer meets the criteria for an ongoing armed conflict that poses "a serious threat to the personal safety of returning Syrian nationals." *Id.* The Secretary highlighted that since the Assad regime's fall in December 2024, the nature of violence in Syria has significantly changed: a "national-level war" shifted to "localized clashes," and then lessened to "sporadic, isolated episodes of violence." *Id.* The Secretary explained that while the current events in Syria represent "continuing security challenges," they do not reflect "full-scale conflict." *Id.* The Secretary likewise underscored the improvements that the Interim President's government has undertaken, including establishing a caretaker cabinet, ratifying a constitutional declaration granting executive authority for a five-year transitional period, and initiating mechanisms such as the National Dialogue Conference. *Id.* Such efforts demonstrate the Syrian government's effort to "move the country to a stable institutional governance, not a perpetuation of armed conflict." *Id.*

With respect to extraordinary and temporary conditions, while the Secretary recognized that most Syrians require humanitarian assistance, this does not prevent nationals from returning

6

in safety to Syria, as evidenced by a U.N. estimate that over 1.2 million Syrians have returned to Syria since 2024, and internal returns (*i.e.*, of internally displaced people) have increased as well. *Id.* And the Secretary also noted that termination of TPS designation for Syria was necessary because it is contrary to the national interest to permit Syrian nationals to remain temporarily in the United States, in part because the government lacked information to reliably vet Syrians applying for entry into this country. *Id.* at 45,401. The Secretary also found compelling foreign policy reasons for ending the designation. *Id*. at 45,401-02. In sum, the Secretary's TPS termination determination was "grounded in a comprehensive assessment of national interest factors including public safety, national security, and foreign policy as well as an analysis of the nature of the violence in the country today." *Id.* at 45,402.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

#### A.    Section 1254a Prohibits Judicial Review of TPS Terminations

The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, *or termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute thus makes clear that TPS termination determinations are committed to the Secretary's unreviewable authority.

The plain meaning of the statute's terms confirms its broad sweep. *See Patel v. Garland*, 596 U.S. 328, 338-39 (2022) (examining the ordinary meaning of broadening terms in §1252(a)(2)(B)(i)'s review bar). The term "determination" covers action by the Secretary regarding TPS designations. *See Merriam-Webster's Dictionary* (2025), Determination ("act of deciding definitely and firmly"); *Black's Law Dictionary* 450 (6th ed. 1990) ("[t]o settle or decide by choice of alternatives or possibilities.").

The modifier "any," in the phrase "any determination," has a similarly expansive meaning. *Patel*, 596 U.S. at 338 ("the word 'any' has an expansive meaning" encompassing "judgments of 'whatever kind'" (cleaned up)). And the term "respecting" likewise "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). Indeed, the Supreme Court held that materially similar jurisdiction-stripping language in the Immigration and Nationality Act was so expansive that it precluded judicial review of factual findings. *Patel*, 596 U.S. at 337–40 (statute barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter).

Applying §1254a(b)(5)(A) here is straightforward. Plaintiffs directly challenge Secretary Noem's "determination[s] … with respect to … the termination" of the Syria TPS designation. §1254a(b)(5)(A). That action falls within the statute's scope, so this Court should decline to exercise jurisdiction over any of Plaintiffs' claims.[3]

This is especially evident for Plaintiffs' arbitrary-and-capricious claims. As the Second Circuit has recognized, "[i]f a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 20 (2d Cir. 2022) (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)).

In related litigation, the Supreme Court has granted the government's stay applications that relied on this same judicial-review argument. *See Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025). In that litigation, a district court twice held—first in a preliminary posture and then in entering final judgment—that it had jurisdiction to review the plaintiffs' claims that the Secretary had acted arbitrary and capriciously in terminating TPS for Venezuela. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, No. 25 Civ. 1766 (EMC) (N.D. Cal. 2025). The government sought relief from the Supreme Court, arguing that Section 1254a(b)(5)(A)

---

[3] Because section 1254a(b)(5)(A) bars this Court's jurisdiction to review any claim regarding the Secretary's TPS termination, Plaintiffs' claims are also not cognizable because the APA does not waive sovereign immunity where another statute forbids the relief sought. Specifically, a court may not "grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *cf. Futia v. United States*, 2023 WL 3061903, at *5 (S.D.N.Y. Apr. 24, 2023), *aff'd*, 2024 WL 2151115 (2d Cir. May 14, 2024); *Thompson v. United States*, 795 F. App'x 15, 19 (2d Cir. 2019). This "provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Here, Congress in section 1254a(b)(5)(A) has explicitly precluded district court jurisdiction over Plaintiffs' claims. Similarly, the APA precludes review where the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Musadique v. Garland*, No. 19 Civ. 8381 (AJN), 2021 WL 1089414, at *4 (S.D.N.Y. Mar. 22, 2021). The Secretary's determinations regarding the continued existence of conditions supporting the designation of a country for TPS are committed to the agency's discretion and are therefore unreviewable under the APA. *See* 8 U.S.C. § 1254a(b)(3)(B).

precluded judicial review of those arbitrary-and-capricious claims. *Noem v. Nat'l TPS All.*, No. 25A326, Appl. 19; *Noem v. Nat'l TPS All.*, No. 24A1059, Appl. 15-20. And the Supreme Court twice intervened, staying both the district court's preliminary order and its final judgment. *Nat'l TPS All.*, 2025 WL 2812732, at *1. The Supreme Court necessarily determined that the government was likely to succeed on the merits of its reviewability argument. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).[4]

The Ninth Circuit, too, has held that "the TPS statute precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos v. Wolf*, 975 F.3d 872, 892 (9th Cir. 2020), *vacated upon reh'g en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023). Foreclosing judicial review conforms with a statutory scheme that "does not dictate any substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations" and does not "set forth or define the conditions in the foreign state that the Secretary must consider … or how she should weigh these conditions." *Id.* at 891; 8 U.S.C. § 1254a(b)(1), (b)(3).

Further, even if truly collateral challenges were reviewable (which they are not), Plaintiffs seek here to directly (and impermissibly) challenge the Secretary's discretionary TPS terminations. Plaintiffs do not challenge any guidance document, regulation, or policy distinct from the Secretary's termination of Syria's TPS designation; instead, they challenge the findings and

---

[4] The Ninth Circuit has stayed preliminary relief in another similar challenge, and the Fourth Circuit denied a motion for preliminary relief pending appeal of a district court's denial of preliminary relief in another similar case. *NTPSA II,* No. 25-4901, Dkt. No. 19.1 (9th Cir. Aug. 20, 2025); *CASA, Inc. v. Noem*, No. 25-1792, Dkt. No. 12 (4th Cir. July 21, 2025.

reasoning for the Secretary's determination. Plaintiffs argue, for example, that the Secretary erroneously "found no 'ongoing armed conflict' in Syria, contrary to the U.S. State Department's own Do Not Travel warning," and that the termination notice does not "discuss ongoing displacements of Syrians." Motion at 14. Similarly, they argue that the Secretary allowed "political direction" to influence the decision because the decision was "otherwise unjustifiable" and "deeply implausible." *Id.* at 17–18. Those arguments fall within the core of the judicial-review bar.

Plaintiffs cannot evade that bar by characterizing an arbitrary-and-capricious challenge as procedural. An APA challenge claiming that a Secretary failed to adequately explain her decision or departed from past practice is "essentially an attack on the substantive considerations underlying the Secretary's specific TPS determinations, over which the statute prohibits review." *Ramos*, 975 F.3d at 89; *see, e.g.*, *Skagit County Pub. Hosp. Dist. No.* 2 v. *Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (no-review provision applies when "procedure is challenged only in order to reverse the individual [unreviewable] decision"). To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr.* v. *Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019).

## B.    Section 1252(f)(1) Precludes Plaintiffs' Requested Relief

Additionally, the relief Plaintiffs seek would have the effect of enjoining or restraining DHS's implementation of the TPS provisions in section 244 of the INA, 8 U.S.C. § 1254a. But 8 U.S.C. § 1252(f)(1) bars such relief by providing that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," except on an individual-alien basis. 8 U.S.C. § 1252(f)(1).

Section 1254a is one of the statutory provisions § 1252(f)(1) covers. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-

11

208, §§ 306, 308, 110 Stat. 3009-546. Although, in the U.S. Code, section 1254a appears in Part

V, the TPS provisions in Section 244 of the INA appear in Chapter 4 of that statute. *Id.* When there

is a conflict, the INA prevails. *See Anderson v. United States*, 2004 WL 2326386, at *1 (N.D.N.Y.

Oct. 13, 2004) ("[W]here there is an inconsistency or conflict between the Code and the Statutes

at Large, the Statutes at Large prevail over the Code. (citing *United States v. Welden*, 377 U.S. 95,

98-99 n. 4 (1963)); *see also United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,

508 U.S. 439, 448 (1993) ("Though the appearance of a provision in the current edition of the

United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. §

204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112….").

INA section 244 (which includes Section 1254a) lies within chapter 4 of title II of the INA, as

amended. Historical editor's codification notes lend further support to this interpretation:

> Renumbering and transfer … of the sections of the [INA] that are
> set out as sections 1251 to l254a of this title, together with the
> amendment of the table of contents of the [INA] … suggests a
> Congressional intent to move these renumbered and transferred
> sections into chapter 4 of title III of the Act … without actually
> making such chapter change pursuant to specific directory language.
> Such a Congressional intent … would serve to restructure this
> subchapter by moving sections 1251 through 1254a of this title into
> Part IV of this subchapter as shown above and have Part V begin
> with section 1255 of this title.

8 U.S.C. Ch. 12, Subch. II, Pt. V, Refs & Annos.

Section 1252(f)(1) thus forecloses a district court's authority to issue orders enjoining or

restraining implementation of 8 U.S.C. § 1254a. Plaintiffs' requested preliminary relief would be

functionally identical to a preliminary injunction, and it would likewise "restrain" the Secretary's

implementation of the TPS statute by delaying her TPS termination while this litigation proceeds.

Section 1252(f)(1) thus prohibits that relief. It "generally prohibits" lower courts from entering

orders that require "federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (citation and quotation marks omitted; emphasis added); *see also* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). As the Supreme Court explained, to "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022) (citation omitted). An order postponing the effective date of a TPS termination determination would thus "restrain" federal officials. *Id.* at 550.

## II. PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS, EVEN IF THE COURT COULD DECIDE THEM

Because the Court cannot review or enter the requested relief on Plaintiffs' claims for the reasons discussed above (*see supra* at 8-13), Plaintiffs necessarily cannot demonstrate a likelihood of success on the merits. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). Even if judicial review were available, however, Plaintiffs could not show a likelihood of success because, as discussed below, both their APA and due process claims lack merit.

### A. Plaintiffs' APA Claims Fail on the Merits

#### 1. The Secretary Lawfully Terminated Syria's TPS Designation After Considering the Relevant Factors

Plaintiffs cannot demonstrate a likelihood of success on their APA claims because the Secretary reasonably terminated Syria's TPS status after considering relevant factors. "Under the

13

APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). This "'narrow'" standard does not allow a court "'to substitute its judgment for that of the agency.'" *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (citation omitted).

Here, as explained above and as elucidated in the FRN, the Secretary considered whether extraordinary and temporary conditions continued to prevent Syrians from safely returning to their country and, regardless, whether Syria's continued TPS designation was contrary to the national interest of the United States. *Supra* at 5-7; 90 Fed. Reg. at 45,399-402. The Secretary also analyzed whether there was an ongoing armed conflict that would prevent Syrians from safely returning to Syria. 90 Fed. Reg. at 45,399-402. In making these determinations, the Secretary observed that Syria's TPS status dated back to 2012—shortly after the onset of a "pervasive civil war" that lasted from 2011 to 2024. *Id*. The Secretary acknowledged that violence in the country persists today, but the "nature of violence" shifted from "nationwide hostilities" to "sporadic episodes of violence." *Id.* at 45,400-02. The Secretary explained that the new Syrian government had established a governing structure and that the United States had recently lifted sanctions and begun to normalize relations with the country. *Id.* at 45,400. While the Secretary acknowledged that most Syrians require some form of "humanitarian assistance," the Secretary concluded that this did not prevent displaced Syrians from returning to their country, noting that over 1.2 million Syrians had returned from abroad since 2024 and that over 1.7 million internally displaced Syrians had returned home since 2024. *Id.* Even assuming that conditions remained "extraordinary" and "temporary," the Secretary concluded that permitting Syrian nationals to remain temporarily in the United States

was contrary to the national interest because, among other things, the U.S. government lacks access to information to reliably vet Syrian nationals—a problem that previously led to the admission of a Syrian national implicated in torture under the Assad regime and another individual charged with providing material support to ISIS. *Id.* at 45,401. Though Plaintiffs may disagree with the Secretary's determination, it is reasonable, adequately explained in the FRN, and accords with the APA. *See New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (agency need only have "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'").

### 2. Plaintiffs' Counterarguments Lack Merit

Plaintiffs' arguments to the contrary lack merit. For example, Plaintiffs contend that the termination of Syria's TPS was predetermined and pretextual given that President Trump and the Secretary had previously criticized TPS. Motion at 12-15, 17-18. But there is nothing unlawful (or even surprising) about politicians and policymakers having preexisting views on government policy. As the Supreme Court has recognized, "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 78 (2019); *see also Ramos*, 975 F.3d at 897 ("It is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies.").

Plaintiffs also fault the Secretary for overemphasizing improvements in Syria (Motion at 13), but the consideration of improving conditions is consistent with the TPS statute, which requires that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Moreover, Plaintiffs' contention

that the Secretary overemphasized certain evidence ignores that the weighing of evidence is in her discretion and "[a] reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency." *Const. Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 102 (2d Cir. 2017) (quotation marks omitted).

Plaintiffs also criticize the Secretary for finding no "ongoing armed conflict" under section 1254a(b)(1)(A) when, months ago, the U.S. State Department issued a "Do Not Travel" Advisory, which stated that Syria has experienced "active armed conflict" since 2011.[5] Motion at 14. But State Department Travel Advisories describe the "the risks and recommended precautions for U.S. citizens—not foreign nationals" and they are an "assessment of threats *only* insofar as they may impact U.S. citizens, nationals, and legal residents."[6] Thus, State Department Travel Advisories are written for American travelers visiting foreign countries—not for nationals of those countries. Moreover, the Secretary never denied ongoing violence in Syria and instead simply found that the "the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals"—noting that since the "Assad regime's ouster in December 2024, … [i]nstead of nationwide hostilities, violence now takes form in localized security and insurgent flare-ups." 90 Fed. Reg. at 45,400.

Though Plaintiffs speculate that other agencies were not consulted before the Secretary made her decision as required (Motion at 12), the notice itself confirms that it was "informed by her consultations with appropriate U.S. Government agencies." *Id.* at 45,401. The statute places

---

[5] *Syria Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Oct. 28, 2025).

[6] *Travel Advisories*, https://travel.state.gov/en/international-travel/travel-advisories.html (last visited Oct. 28, 2025) (emphasis added).

no restrictions or requirements on the nature of predecisional intra-agency consultations other than that they occur (8 U.S.C. § 1254a(b)(1)(A)), and these consultations should thus not be managed by courts. *See Chen v. Garland*, 43 F.4th 244, 252 (2d Cir. 2022) ("[T]here is no jurisdiction if the statute or regulation said to govern the challenged agency action is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion[.]" (emphasis and quotation marks omitted)); *New York v. FERC*, 783 F.3d 946, 956 (2d Cir. 2015) (agencies are generally "free to fashion their own rules of procedure" (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978)).

Plaintiffs further argue that the Secretary's determination that Syria no longer met the statutory definition of an "ongoing armed conflict" under section 1254a(b)(1)(A) was improperly based on considerations of the "national interest." Motion at 15-16. But the FRN makes clear that this is incorrect. As noted above, Syria was previously granted TPS status on two bases: "extraordinary and temporary conditions" and "ongoing armed conflict." The Secretary made clear—at the outset of the notice—that her "national interest" finding related only to the "extraordinary and temporary conditions" ground. 90 Fed. Reg. at 45,399 ("This review included examining: (a) whether extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning in safety continue to exist, and (b) if permitting Syrian nationals to remain temporarily in the United States is contrary to the national interest of the United States."). Her analysis of the "ongoing armed conflict" basis was separate. *Id.* at 45,399-400 ("The Secretary *also* examined: (c) whether there is ongoing armed conflict within the state, and (d) whether, due to such conflict, requiring aliens who are nationals of that state to return would pose a serious threat to their personal safety." (emphasis added)). Plaintiffs' argument therefore lacks merit.

17

Plaintiffs also posit that the Secretary cannot consider the "national interest" of the United States *at all* when deciding to whether to terminate TPS status—even when based on "extraordinary and temporary conditions." Motion at 16-17. But a statutory precondition for a TPS designation on that basis is that "permitting the aliens to remain temporarily in the United States is [not] contrary to the national interest of the United States," 8 U.S.C. § 1254a(b)(1)(C), and the Secretary must terminate the designation under that ground if that condition is no longer met, *id.* § 1254a(b)(3)(B). Thus, Plaintiffs' argument that the Secretary cannot consider the United States' national interest when considering whether to extend TPS is directly at odds with the statute's plain text. Indeed, while the statute directs the Secretary to consider "the conditions in the foreign state" when deciding to renew TPS status, it does not limit the Secretary's review to those conditions; she instead must "determine whether the conditions for [TPS] designation … continue to be met," which necessarily requires her to examine whether the TPS designation is still in the national interest. *Id.* § 1254a(b)(3)(A).[7]

Finally, Plaintiffs' argument that the Secretary's determinations departed *sub silentio* from past practice is without merit. Motion at 18-20. Though Plaintiffs argue 60 days' notice of the TPS cancellation is arbitrary and capricious, this timeline is expressly permitted by statute. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published"). Indeed, the relevant regulations make clear that TPS protections typically end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal

---

[7] Perhaps because the question of what is in the "national interest" provides "no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993), Plaintiffs do not challenge the Secretary's "national interest" finding itself. *See Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018) (where the President has statutory discretion to determine if an alien's entry "would be detrimental to the interests of the United States," courts should not inquire "into the persuasiveness of the President's justifications").

Register." 8 C.F.R. § 244.19; *see also* 8 C.F.R. § 244.13(b). In her discretion, the Secretary "may" provide for a longer transition period. 8 U.S.C. § 1254a(d)(2). But the government has never made a "hard-and-fast commitment" to offer longer periods—let alone taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient. *FDA v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 573-85 (2025) (litigant's "belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interes[t]'"). Even if the agency's past choices of wind-down periods for other countries could create a "hard-and-fast commitment," those past choices reflect *variation*, not consistency, on the length of wind-down periods. Plaintiffs' own chart (ECF No. 20-2) shows four terminations with no wind-down period, ten with six-month periods, four with twelve-month periods, and four with eighteen-month periods. There is no basis to find that the Secretary "deviated 'from a prior policy *sub silentio* or simply disregard[ed]' what it had previously said." *Id.* at 575. And even if the Secretary had somehow done so, that would not support indefinitely postponing the termination. Plaintiffs should hardly be able to obtain a longer wind-down period through an indefinite stay than they claim to be entitled to under the supposed past practice they cite.

### B.    Plaintiffs' Animus Claim Fails on the Merits

Echoing arguments that the Supreme Court implicitly rejected in *NTPSA I*, [8] Plaintiffs argue that strict scrutiny applies and that the TPS termination violated the equal protection guarantee of the due process clause because "it was motivated by discriminatory animus." Motion

---

[8] In its preliminary order, the district court concluded—after considering arguments that mirror the arguments raised by Plaintiffs here, *see NTPSA I*, ECF No. 16, at 11-16 (plaintiffs' brief)—that the plaintiffs were likely to succeed on the merits of their equal protection claim. *NTPSA I*, 773 F. Supp. 3d at 855-67. But the Supreme Court stayed that order, making clear that the district court was mistaken. *See TPS All.*, 145 S. Ct. at 2728-29 (2025).

at 20. But rational basis is the appropriate standard and, regardless of the level of scrutiny, plaintiffs' equal protection claim does not succeed.

*Trump v. Hawaii*, 585 U.S. 667 (2018), prescribes that rational basis review governs constitutional challenges to executive branch immigration policies and that such policies pass constitutional muster so long as they are "plausibly related" to the government's policy objective. *Id.* at 704. That deferential review reflects that "decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications … defined in the light of changing political and economic circumstances,'" which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* at 702 (citation omitted); *see Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the executive gave a "facially legitimate and bona fide" reason for its action); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). That reasoning applies to TPS-related actions, which involve unique country-specific determinations that both "implicate 'relations with foreign powers'" and "involve 'classifications defined in the light of changing political and economic circumstances.'" *Hawaii*, 585 U.S. at 702 (cleaned up). As the Supreme Court has explained, "the upshot of [its] cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest

caution,' and our inquiry into matters of entry and national security is highly constrained." *Id.* at 704.

It makes no difference that *Hawaii* involved policies directed at aliens seeking entry into the country, whereas TPS concerns aliens who are already in the United States. Indeed, the Second Circuit has applied rational basis review for an equal protection challenge brought by aliens within the United States. *See Rajah v. Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008). The Supreme Court cited *Rajah* approvingly in *Hawaii* and further reasoned that rational-basis review applies in the context of immigration decisions "across different contexts and constitutional claims." 585 U.S. at 703-04.

The Secretary categorially denies that any racial, ethnic, or other animus motivated her decisions, and her termination determinations easily pass rational-basis review. In enacting the TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return to their home countries because of, among other things, extraordinary and temporary conditions or armed conflicts. The Secretary's termination decision is "plausibly related" to the government's border security priorities, foreign relations interests, and the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end."). After appropriately consulting with other governmental agencies, the Secretary determined that the conditions that prompted the TPS designation for Syria were no longer present. 90 Fed. Reg. at 45399-402. This conclusion was based on developments following the end of a civil war and the establishment of a new government with which the United States is normalizing relations—changes that have taken place as millions of displaced Syrians have returned home. *Id.*

The Secretary's determinations are fully consistent with Congress's goal of providing TPS to eligible aliens until the Secretary determines the relevant conditions no longer exist. Thus, under the rational-basis test, Plaintiffs' constitutional claim fails.

Even under the heightened standard in *Arlington Heights*, which Plaintiffs invoke (Motion at 21), Plaintiffs' due equal protection is likely to fail, as they cannot establish racially discriminatory intent—because there was none. Under *Arlington Heights*, to establish an equal protection claim under the Fifth Amendment's due process clause, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265-66. Plaintiffs cannot show discriminatory animus through statements taken out of context and without direct links to the Secretary's determinations. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus"); *see also Ramos*, 975 F.3d at 897 (rejecting similar constitutional claim "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by animus against 'non-white, non-European' countries").

Here, the Secretary provided reasoned, non-discriminatory explanations for her determinations, and Plaintiffs have not plausibly connected any discriminatory purpose to those determinations. Rather than focusing on the neutral, statutorily based justifications laid out in the FRN, Plaintiffs instead cherry-pick statements from the Secretary in other contexts to suggest

discriminatory motives for the TPS determinations. Motion at 21-22. But none of these allegations reflect animus based on race or national origin—much less against Syrians.

Lacking such comments from the Secretary, Plaintiffs cite statements from the President about restricting immigration from various countries, including Syria. Motion at 22. But these statements—similar to those challenged and rejected in *Hawaii*—were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents of the Univ. of Cal.*, 591 U.S. at 35.

Furthermore, President Trump's prior statements do not and cannot establish animus by the Secretary, much less animus infecting this particular TPS determination. *See, e.g., Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second-guessing of an agency official's actions based on mere allegations that a different government official harbored some discriminatory motive. Such second-guessing would in turn open the door to impermissible intrusion on privileged executive branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

In sum, none of the evidence cited by Plaintiffs is sufficient to support a claim that the Secretary's TPS determinations were motivated by racial animus. Even if the *Arlington Heights* test were applied, Plaintiffs would still fail to state a Fifth Amendment claim because the Secretary's determinations were consistent with the TPS statute, including its emphasis on the temporariness of the protection afforded and its assignment of responsibility for determining whether, in the Secretary's informed judgment, continuing to permit the TPS recipients to remain

23

temporarily in the United States is in the national interest. *See* 8 U.S.C. § 1254a(b)(1)(C). Accordingly, Plaintiffs have failed to plausibly allege a Fifth Amendment equal protection violation.

## III. ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENTLY TEMPORARY NATURE OF TEMPORARY PROTECTED STATUS

Plaintiffs' request for preliminary relief should also be denied because they fail to show irreparable harm that warrants extraordinary relief. "A showing of irreparable harm is essential to the issuance of a preliminary injunction." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995). The movant must show "that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se* constitute irreparable harm. Motion at 24. These alleged harms, however, occur only if the government violated Plaintiffs' constitutional or statutory rights. As explained above, Plaintiffs are not likely to succeed on those claims, so they cannot make this showing. *See supra* at 8-23.

Plaintiffs also allege injuries from the termination of TPS status—all of which relate to the loss of the right to live and work in the United States. Motion at 24-26. But these harms are inherent in the scheme of "temporary" status that Congress designed. 8 U.S.C. § 1254a(a)(1)(A). TPS was never designed to provide permanent protection, so the loss of temporary status is designed to occur eventually, regardless of whether the Court issues preliminary relief. *See Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 401 n.19 (S.D.N.Y. 2018) (no irreparable injury where harm "would have been suffered sooner or later anyway"). Concerns that Plaintiffs might be removed if Syria loses its TPS designation also do not warrant preliminary relief. Termination of TPS is not equivalent to a final removal order. *See* 8 U.S.C. § 1101(a)(47). Instead, it returns

24

beneficiaries to the immigration status they held before the designation. They may have other immigrant or nonimmigrant status, *id.* § 1254a(a)(5), and those who have a credible fear of persecution in their home country may apply for asylum. Durable legal status and work authorization can be achieved only through some other immigration relief or legislative action. Because Plaintiffs fail to show likely irreparable harm that this Court could remedy, their motion should be denied. *See Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.").

## IV.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF

Plaintiffs have also failed to show that the remaining equitable factors weigh in their favor, particularly in light of the Supreme Court's stays in *NTPSA I*. There, on two occasions, the Supreme Court granted the government's applications for stays of district court orders—both on preliminary relief and at final judgment—in a lawsuit in which the plaintiffs made similar arguments as to irreparable harm, the balance of the equities, and the public interest. *See supra* at 9-10; *see also Noem v. Doe*, 145 S. Ct. 1524 (2025) (stay of injunction suspending termination of immigration parole program); *see also U.S. Dep't of Homeland Security v. D.V.D.*, 145 S. Ct. 2153 (2025) (stay of immigration-related preliminary injunction for nationwide class). When evaluating the district court's order, the Supreme Court necessarily considered those factors and decided that they favored the government. *See Hollingsworth*, 558 U.S. at 190. The analysis in this case should end there.

Universal relief here would represent "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *I.N.S. v. Legalization Assistance Project of*

*Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'") And the harm here arises in an area that implicates "a fundamental sovereign attribute exercised by the Government's political departments[,] largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted). The harm here is particularly pronounced because the Secretary determined that termination of Syria's TPS designation was needed to protect "the national interest" based on "foreign policy, public safety … , national security … , and economic considerations." 90 Fed. Reg. at 45,400. Those concerns are especially relevant in light of "Syria's continued designation as a state sponsor of terrorism" and the inability of the United States to "adequately vet Syrian nationals for identity, criminal history, or potential terrorist affiliations." *Id.* at 45,401. In the Secretary's view, that inability "pos[es] an ongoing threat to public safety and national security." *Id.* Likewise, "compelling foreign policy reasons" for ending the designation weigh strongly in the balance, with promising new diplomatic efforts directed toward normalizing relations with Syria's new transitional government. *Id.* Extending Syria's TPS designation "could complicate the administration's broader diplomatic engagement" with Syria's new government. *Id.* at 45,402. The Court should not interfere with sensitive, ongoing diplomacy, an area that is "the province and responsibility of the Executive" and in which "the courts have traditionally shown the utmost deference" to the executive branch. *Dep't of the Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (citations omitted).

The Government and the public share an interest in ensuring that the process established by Congress—under which the Secretary has unreviewable authority to carefully weigh the

statutory factors governing TPS designations—is followed. Where, as here, the Secretary follows the statutory requirements, the Court should deny the extraordinary remedy of preliminary relief.[9]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion to delay agency action.

Dated:  New York, New York
         October 31, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney
                                        Southern District of New York
                                        *Attorney for Defendants*

                              By:    /s/ Mark Osmond
                                        REBECCA S. TINIO
                                        MARK OSMOND
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2774/2713
                                        rebecca.tinio@usdoj.gov
                                        mark.osmond@usdoj.gov

---

[9] Even if preliminary relief were warranted here, Plaintiffs have no basis to request universal relief benefitting non-parties. See *Trump v. CASA, Inc.*, 606 U.S. 831 (2025); *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A court granting equitable relief "may administer complete relief between the parties," *CASA*, 606 U.S. at 851 (cleaned up), and nothing in section 705 rebuts the presumption that traditional equitable rules apply to relief ordered under section 705. To the contrary, section 705's language embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration. 5 U.S.C. § 705; *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles). In sum, there is no basis to read section 705 to depart from the "party-specific principles" that "permeate our understanding of equity." *CASA*, 606 U.S. at 844. Plaintiffs make no effort to explain why they are entitled to universal relief.

**<u>Certificate of Compliance</u>**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certify that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,265 words.