**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Dahlia DOE, et al.,

    *Plaintiffs*,

    *v.*

Kristi NOEM, et al.,

    *Defendants*.

Case No. 1:25-cv-08686-KPF

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

**INTRODUCTION**

Defendants' opposition advances oft-rejected arguments and evidence-free assertions. Courts have uniformly exercised judicial review over collateral challenges to TPS terminations. Defendants have no answer to overwhelming evidence that the termination of TPS for Syria—the eighth termination this year[1]—was predetermined and pretextual. Their equal protection arguments, meanwhile, misstate the governing standard and have no factual basis. Plaintiffs have shown a likelihood of success on the merits or that serious merits questions exist. And the remaining factors governing preliminary relief weigh heavily in Plaintiffs' favor. The Court should grant Plaintiffs' motion.

**ARGUMENT**

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

**A. Plaintiffs' Claims Are Justiciable and the Court Can Set Aside Syria's TPS Termination.**

Except for one vacated decision, every court to have addressed TPS terminations has found jurisdiction to review collateral challenges to such terminations. Defendants nonetheless argue that two INA provisions foreclose judicial review here: §1254a(b)(5)(A) and §1252(f)(1). Opp. 8, 11. Defendants fail to demonstrate the requisite "clear and convincing evidence" of legislative intent necessary to overcome the "'strong presumption that Congress intends judicial review of'" Plaintiffs' constitutional and APA challenges. *Saget v. Trump*, 375 F.Supp.3d 280, 330-31 (E.D.N.Y. 2019) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670-73 (1986)).

*i.     Section 1254a permits collateral challenges to unlawful agency action.*

The TPS statute's narrow jurisdiction-stripping provision precludes "judicial review of any

---

[1] A ninth termination, published today, ends TPS for South Sudan. Ex. 3.

1

determination … with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. §1254a(b)(5)(A). Here, §1254a's jurisdictional bar turns on whether Plaintiffs challenge Defendant Noem's "determination" of "whether conditions" in Syria "continue to" meet the conditions for which it was designated. Mot. 11. Plaintiffs do not. Syria's termination is the eighth of nine terminations in 2025, and Plaintiffs challenge the pre-ordained, pretextual *process* that Defendants took to reach that decision; the TPS statute allows these types of pattern-and-practice challenges. *See McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 483-84 (1991); *CASA de Maryland v. Trump*, 355 F.Supp.3d 307, 320 (D. Md. 2018). Critically, Plaintiffs do not seek "findings of fact concerning [Syria's] current conditions" or findings concerning "the factual accuracy of [DHS's] findings." *Saget*, 375 F.Supp.3d at 331-32. Rather, Plaintiffs ask this Court to evaluate "procedural deficiencies in the decision to terminate" Syria's TPS, and order relief that would require Defendants "make a new, good faith, fact-and evidence-based determination regarding [Syria's] status." *Id*. at 332; *see also McNary*, 498 U.S. at 495 (entitlement to have Respondents' applications considered, not a specific outcome). Defendants' argument based on 5 U.S.C. § 701(a)(2), Opp. 9 n.3, fails for the same reason: DHS does not have discretion over the propriety of its procedure.[2]

Courts have rightly rejected Defendants' extreme contention that §1254a(b)(5)(A) forecloses all judicial review related to TPS terminations. Mot. 11-12 (collecting cases). Constitutional claims are barred only if Congress includes a clear statement stripping jurisdiction. *See Bowen*, 476 U.S. at 680-81. Defendants identify no such statement, and §1254a(b)(5) nowhere uses the word "constitutional."

Nor does §1254a(b)(5) bar Plaintiffs' process-based APA challenges. Defendants'

---

[2] Defendants' §702 argument is inapposite as §1254a does not provide an exclusive remedy for claims concerning TPS terminations.

argument for a "broad [and] sweep[ing]" interpretation of the jurisdictional bar, Opp. 8, cannot be squared with controlling caselaw. As Plaintiffs showed, Mot. 11, the Supreme Court has preserved review of similar claims concerning other immigration procedures despite nearly identical language barring judicial review "of a determination respecting an application" in certain contexts. *McNary*, 498 U.S. at 491-92.

Defendants ignore *McNary* and instead rely on *Patel v. Garland*, 596 U.S. 328 (2022), arguing that the phrase "any determination" is indefinitely broad. Opp. 8. But the language at issue in *Patel* has no overlap with the language in §1254a, and the decision rests on words not in the TPS statute ("judgment" and "regarding") and an entirely different statutory history and context. *See Patel*, 596 U.S. at 336-40. The phrase "any determination … with respect to," 8 U.S.C. §1254a(b)(5), "does not subsume 'any' [challenge to] general policies or practices," *Ramos v. Nielsen*, 321 F.Supp.3d 1083, 1104 (N.D. Cal. 2018). When Congress wants to include categorical preclusion language in a statute, it does so expressly. *See Saget*, 375 F.Supp.3d at 331 (noting statute could have used "broader statutory language" to bar collateral challenges); *see also Gebhardt v. Nielsen*, 879 F.3d 980, 984-85 (9th Cir. 2018) (statute specifying that decisions were in Secretary's "sole and unreviewable discretion" barred review of non-constitutional claims). No such language appears in §1254a(b)(5)(A).

Defendants' other cases, Opp. 8-11, are no more persuasive. The Supreme Court's emergency stays in *Noem v. National TPS Alliance* ("*NTPSA I*")[3] say nothing concerning Defendants' jurisdictional arguments. 145 S.Ct. 2728 (2025) (Mem.); 2025 WL 2812732 (Oct. 3, 2025) (Mem.). Defendants' suggestion that the stays speak to the merits is misplaced. *See Merrill v. Milligan*, 142 S.Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The Court's stay order is not

---

[3] Case No. 25-cv-01766-EMC (N.D. Cal.).

3

a decision on the merits"). And the stay in *Hollingsworth v. Perry*, which Defendants cite, is distinguishable, as it contains substantial reasoning.[4] *See* 558 U.S. 183, 190-198 (2010). Moreover, the stays in *NTPSA I* apply only to the termination of Venezuela's TPS—Defendants did not appeal the vacatur of Haiti's TPS termination. 2025 WL 2812732, at *1. And *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), was vacated and rejected by the Ninth Circuit sitting en banc, 59 F.4th 1010 (9th Cir. 2023). Regardless, Plaintiffs raise procedural challenges, which the vacated opinion in *Ramos* recognized as reviewable. *See* 975 F.3d at 892-93. This Court should join the numerous other courts that have rejected Defendants' attempt to foreclose all review of "DHS procedure[s] regarding TPS determinations." *Saget*, 375 F.Supp.3d at 333.

### ii.   Section 1252(f)(1) does not bar postponement.

The plain language of §1252(f)(1) also does not bar review of Plaintiffs' claims. Section 1252(f)(1) limits a court's ability "to enjoin or restrain the operation of part IV of this subchapter"—namely, 8 U.S.C. §§1221-1232. The TPS statute, §1254a, is in *part V* of the same subchapter. This is not merely a formal distinction: part IV focuses on detention and removal, while part V focuses on adjustment and changes in status, including TPS. Section 1252(f)(1)'s limitation on review therefore cannot apply. *See, e.g.*, *CASA, Inc. v. Noem*, No. CV 25-1484-TDC, 2025 WL 1907378, at *12 (D. Md. July 10, 2025) (collecting cases).

Even where it applies, §1252(f)(1) "is nothing more or less than a limit on *injunctive* relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (emphasis added). "[A] stay or postponement of agency action under the APA" is not injunctive relief. *NTPSA I v. Noem*,

---

[4] Responding to Plaintiffs' letter motion seeking production of the administrative record, Defendants repeat this argument and cite inapposite cases. *See* ECF 37 at 2. *Trump v. Boyle* reaffirmed that emergency stays "are not conclusive as to the merits," involved a case that could overrule existing precedent, and relied on *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), a stay decision with substantive reasoning. 145 S.Ct. 2653, 2654 (2025); *accord Trump v. CASA, Inc.*, 606 U.S. 831, 874 (Kavanaugh, J., concurring) (decision provides guidance when it involves "the interim legal status of a major new federal statute or executive action"). Here, Plaintiffs seek to maintain a long-standing status quo.

4

150 F.4th 1000, 1018 (9th Cir. 2025); *accord Haitian Evangelical Clergy Ass'n v. Trump*, 789 F.Supp.3d 255, 271 (E.D.N.Y. 2025) ("*HECA*"). Similarly, numerous courts have already held that §1252(f)(1) does not bar vacatur, which "does nothing but" "re-establish the status quo." *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022); *accord CASA,* 2025 WL 1907378, at *13. Defendants' argument that the relief sought is "functionally identical" to an injunction therefore lacks merit. Opp. 12-13.

### B. Plaintiffs Are Likely to Prevail on the Merits of Their Substantive Claims.

#### *i.   The predetermined termination of TPS for Syria was contrary to law.*

The termination of TPS for Syria was contrary to law because Defendants failed to comply with required statutory review procedures. Mot. 12-15. Specifically, Defendants failed to engage in an "objective" and "good faith" review of country conditions; "consult[] with appropriate government officials"; make a determination "base[d] … on the 'conditions in the foreign state' and on [appropriate] consultations"; or "publish the true and factual basis for termination." *Saget,* 375 F.Supp.3d at 346-47. In interpreting those statutory requirements, the Court—contrary to Defendants' arguments, Opp. 15-17—owes no deference to Defendant Noem. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 412-3 (2024).

Defendants' scattershot responses are unpersuasive. Plaintiffs do not ask the Court to "substitute its judgment for that of the agency," Opp. 14, but rather to enforce the procedural obligations Congress placed on the agency, Mot. 12-15. Similarly, Plaintiffs refer to conditions in Syria and evidence Defendant Noem ignored, *see* Opp. 15-16, not to challenge her substantive determination but rather to illustrate procedural violations, Mot. 14-15.

Defendants' suggestion that the government's July 2025 Do-Not-Travel advisory is irrelevant, Opp. 16, is not credible; of course, the ongoing "active armed conflict" affects others

besides traveling Americans. The government's acknowledgment of that conflict illustrates the preordained and pretextual nature of Defendant Noem's finding. Mot. 14. The same is true of the advisory's warnings about "[h]ostage taking by armed groups, terrorism, remnants of war such as unexploded ordnance, and aerial bombardment" and its recognition of "the destruction of infrastructure, housing, medical facilities, schools, and power and water utilities," ECF 20-19, all of which is consistent with DHS's assessment in its 2024 extension and redesignation notice. 89 Fed. Reg. 5,562, 5,565-5,567.

To justify Defendant Noem's reasoning, Defendants reiterate statistics on the return of refugees from a United Nations press release—the sole document on which the termination relies to show abatement of "extraordinary" country conditions. *See* 90 Fed. Reg. 45,398, 45,400 n.22 (Sep. 22, 2025); Opp. 14. That release acknowledges continued violence and displacement in Syria and otherwise contains no facts regarding improved conditions. *See* ECF 20-27. In any event, the press release is dated September 2, 2025—a full month *after* Defendant Noem was statutorily required to make her determination.[5] *Id*. The very fact that she considered the press release shows her failure to conform to statutory procedures.

Finally, Defendants state that the termination was "informed by [Defendant Noem's] consultations with appropriate U.S. Government agencies," a conclusory assertion insufficient to show compliance with statutory consultation requirements. Opp. 16 (citing 90 Fed. Reg. at 45,401).[6] No evidence supports that assertion. *Cf.* ECF 20-1 at 15-26 (outlining consultation steps). Rather, the significant mismatch between the State Department advisory and Defendant Noem's

---

[5] Defendant Noem's determination to terminate Syria's TPS was due by August 1, 2025. *See* 8 U.S.C. §1254a(b)(3)(A) (requiring decision to extend or terminate TPS 60 days before expiration of current designation); *see also* 90 Fed. Reg. 19,217 (May 6, 2025) (acknowledging 60-day requirement).
[6] Defendants appear to argue that the Secretary has discretion not to consult with the State Department, *see* Opp. 17, but any such choice would be an arbitrary and capricious departure from longstanding practice. *See NTPSA I*, 2025 WL 2578045, at *31 (N.D. Cal. Sep. 5, 2025).

6

statements, coupled with the significant evidence unearthed in other recent TPS cases, Mot. 13-14, strongly suggests that required consultations did not occur.

> ii. *The terminations were politically influenced and pretextual and thus arbitrary and capricious.*

Plaintiffs have shown the termination decision is arbitrary and capricious because it resulted from improper political influence and because the explanation given was pretextual. Mot. 17-18. Defendants' argument that Defendant Noem had discretion to weigh evidence and substantiate preferred policy preferences, Opp. 15-16, thus misses the point. Agencies must base their decisions on factors "relevant under the controlling statute," *Town of Orangetown v. Ruckelshaus,* 740 F.2d 185, 188 (2d. Cir. 1984), and publish the true reasons for their decisions, *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019).

That did not happen here. Mot. 17-18. Political influence—which Congress intended to remove from TPS determinations, *NTPSA I*, 150 F.4th at 1008—led Defendant Noem to base her decision on statutorily irrelevant factors, including the President's position that the TPS program is "not legal," ECF 20-6; the President's "directive," unmoored from statutory requirements, to terminate TPS, ECF 20-30; and the administration's goal to mass deport non-white immigrants, *see* Mot. 6-7, 21-24. As the rapid-fire and procedurally deficient terminations for nine countries demonstrate, Mot. 6-9; 13-14, the supposed justifications in Syria's termination decision mask a preordained political agenda. And the very case on which Defendants rely, *Department of Commerce*, makes clear that an agency cannot rely on a contrived and pretextual rationale. 588 U.S. at 785.

> iii. *DHS's reliance on the "national interest" was unlawful.*

Defendants do not dispute that Defendant Noem's "national interest" justification was arbitrary and capricious because it departed from past practice without explanation. *See* Mot. 16-

17; ECF 20-7. That undisputed violation of the APA provides sufficient grounds alone to grant postponement.

Further, Defendants do not contest that §1254a bars the Secretary from considering "national interest" in conjunction with an "armed conflict" designation, instead, arguing only that these two analyses were conducted "separate[ly]." Opp. 17.[7] It is clear that "national interest" held primacy in the determination decision and was not considered in a silo. The notice spends seven paragraphs on national interest and only one on armed conflict before considering those factors in tandem: the termination "is grounded in a comprehensive assessment of national interest factors including public safety, national security, and foreign policy *as well as* an analysis of the nature of the violence in the country today." *Id*. (emphasis added); *see also* Ex. 1 (DHS communicating new policy of adding a national interest analysis to TPS decision memos, seeking data about the vanishingly small number of "fraud" cases to support termination). Since national interest cannot be considered as part of an "armed conflict" designation, Defendant Noem needed to pretextually conclude, in the face of widespread evidence, that armed conflict had ceased, a conclusion driven by the preordained goal of termination.

> iv. ***The 60-day transition period broke with past practice without acknowledgement or explanation.***

Defendants do not meaningfully dispute that the provision of only a 60-day transition period is arbitrary and capricious. Mot. at 18-20. They never contest that the 60-day period breaks with two decades of uninterrupted practice; that an agency must "display awareness" of, and "offer good reasons" for, a departure from a "decades-old practice," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025); or that Defendant Noem did neither of these things. The four

---

[7] The Secretary may consider "national interest" at designation, not termination, as, during the periodic review, the Secretary shall consider only "conditions in the foreign state." 8 U.S.C. §1254a(b)(3)(A).

terminations with no wind-down period that Defendants reference all occurred prior to 2004, and for countries that had been designated for TPS for less than three years. *See* ECF 20-2.

> **v.    *Plaintiffs are likely to prevail on their equal protection claim*.**
>
>> **a.  *Plaintiffs will prevail under the governing standard in* Arlington Heights.**

Plaintiffs' equal protection claim is properly analyzed under *Arlington Heights.* Mot. 20-21. *Trump v. Hawaii*, 585 U.S. 667 (2018), which concerned entry restrictions on individuals from certain countries, does not displace the *Arlington Heights* standard. "[T]here is no general rule that federal immigration laws ... should receive rational basis review." *United States v. Suquilanda*, 116 F.4th 129, 140 (2d Cir. 2024).[8] Indeed, every court to have considered equal protection challenges to TPS terminations applied *Arlington Heights. See* Mot. 20 (collecting cases); *see also Ramos*, 975 F.3d at 895-96. TPS is a domestic, statutory humanitarian program, not a national-security-based executive entry restriction. *See, e.g., Ramos*, 975 F.3d at 895-96.

Under *Arlington Heights,* Plaintiffs are likely to prevail. Mot. 20-23. Plaintiffs provided overwhelming, undisputed evidence that the Secretary, President Trump, and other administration officials harbor animus towards nonwhite, non-European immigrants and weaponize that animus in restrictive immigration policies. *See, e.g.*, ECF 20-5, 20-6, 20-32, 20-33, 20-34, 20-35, 20-36, 20-37. The weight of circumstantial evidence—including significant and unexplained departures from past agency practice, Mot. 12-16; 18-19—provides further proof.  *See Arlington Heights*, 429 U.S. at 266.

In response, Defendants merely offer that Defendant Noem "categorically denies" that any "animus motivated her decisions," Opp. 21. Defendant Noem's bare assertion—weighed against

---

[8] The other cases cited by Defendants, Opp. 20, do not consider claims against a suspect class and are inapposite. And *Rajah v. Mukasey* concerned a selective prosecution challenge, an area in which courts apply almost-unlimited deference to the executive. 544 F.3d 427, 438 (2d Cir. 2008).

the evidence of animus—is insufficient to rebut Plaintiffs' claim. Moreover, Defendant Noem's statements are not unrelated to the TPS context, nor "remote in time," Opp. 22-23. Defendant Noem has repeatedly villainized TPS-holders this year, *see e.g.,* ECF 20-31 at 6-7; ECF 20-33, while attempting to terminate TPS for nine countries. Animus permeates DHS's ongoing enforcement efforts—last month, DHS called for TPS holders and other noncitizens to "remigrate"—a violent term linked to white nationalism and ethnic cleansing. ECF 20-49, 20-50. Defendant Noem's actions cannot be separated from the President's animus where she is following his "directive," ECF 20-30, and against a "historical background," *Arlington Heights,* 429 U.S. at 267, in which the administration is aggressively engaged in a wide range of escalating and racially targeted immigration policies and enforcement actions. Indeed, last week, the President slashed refugee admissions for 2026 from 125,000 to 7,500—with white Afrikaners making up most of that number—repurposing the humanitarian program to carry out an animus-driven mission. Ex. 2; *see also* ECF 20-36, 20-37.

### *b. Plaintiffs would also prevail under rational basis review.*

Plaintiffs would prevail even under the deferential *Hawaii* standard. Defendants argue that the termination decision is "plausibly related" to the government's "border security priorities, foreign relations interests, and the objectives of the TPS program," Opp. 21, but fail to explain how TPS holders already present in the United States affect border security or foreign relations. And Defendants' action impairs the "objectives of the TPS program," which Congress enacted to formalize this humanitarian protection and insulate it from political meddling. *See NTPSA I*, 150 F.4th at 1008. The termination decision thus cannot pass even rational basis review.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT POSTPONEMENT.

Defendants do not dispute that the harms Plaintiffs describe, Mot. 24-26, are irreparable. Defendants instead argue that these harms are not traceable to the termination because they are "inherent" in the "temporary" TPS scheme. Opp. 24. That is incoherent. Because the statute vests the Secretary with the decision to continue or terminate TPS, Defendants cannot shift harms arising from unlawful termination onto Congress.

Defendants' other arguments distort immigration law. While losing TPS is not equivalent to a removal order, Opp. 24, termination strips Plaintiffs of statutory protections from removal and detention, 8 U.S.C. §1254a(a)(1)(A), (d)(4), and DHS has directed Syrian TPS holders to "self-deport" and threatened immediate "arrest and deportation" of those who do not depart, ECF 20-16. Moreover, losing TPS will render many Plaintiffs ineligible to pursue other relief conditioned on maintaining lawful status. ECF 20-46 ¶¶ 21-23. Asylum is not an adequate collective backstop, Opp. 25, because even those who qualify will be without status and vulnerable to detention for years. *See* ECF 20-46 ¶¶ 16-20.

### III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR PLAINTIFFS.

Defendants ask this Court to ignore specific and compelling equities that weigh heavily in Plaintiffs' favor, Mot. 27-28, based largely on non-binding and unreasoned emergency stays. Opp. 25-26. Those stays provide little guidance about the equities here. *See Merrill*, 142 S.Ct. at 879 (Kavanaugh, J., concurring); *supra* Section I.A.i. As courts analyzing the effects of unlawful TPS terminations have found, "[P]laintiffs' injuries far outweigh any harm to the government from a postponement." *HECA*, 789 F.Supp.3d at 276; *accord Saget*, 375 F.Supp.3d at 377-78.

Purported harms to Defendants' policy objectives do not tip the scales because "perpetuation of unlawful agency action is not in the public interest" and Defendants may continue "to engage in foreign relations activities and enforce the nation's immigration laws *within the*

11

*bounds Congress has set.*" *HECA*, 789 F.Supp.3d at 276 (citation modified, emphasis added); *see also Saget*, 375 F.Supp.3d at 377.[9]

## CONCLUSION

This Court should grant Plaintiffs' motion.


Dated: November 6, 2025                                    Respectfully submitted,


                                              INTERNATIONAL REFUGEE ASSISTANCE PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Ghita Schwarz
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman*
650 Massachusetts Avenue NW, Ste 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

MUSLIM ADVOCATES
Golnaz Fakhimi
Sadaf Hasan**
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

---

[9] Defendants' argument that postponing Syria's termination constitutes impermissible universal relief under *CASA*, 606 U.S. 831, is misconstrued. Opp. 27 n.9. A postponement under 8 U.S.C. §705 is a stay of agency action, not a merits injunction, and is not constrained by *CASA*'s limitations. *See id.* at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring); *see also City of Columbus v. Kennedy*, 2025 WL 2426382, at *33–34 (D. Md. Aug. 22, 2025) (holding *CASA* does not limit §705 postponement). Because Plaintiffs challenge a single, generally applicable agency decision, limiting §705 postponement to named plaintiffs would be illogical: a stay of a uniform agency action operates on the action itself.

VAN DER HOUT LLP
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Ste 800
San Francisco, CA 94108
Telephone: (415) 981-3000
ndca@vblaw.com

*Counsel for Plaintiffs*

*\*Admitted Pro Hac Vice*
*\*\* Application for Admission Pro Hac Vice Forthcoming*

13

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this motion Memorandum of Law in support of Plaintiffs' motion to postpone complies with the word limits of Local Rules of the United States District Courts for the Southern & Eastern Districts of New York § 7.1(c) and United States District Judge Katherine Polk Failla, Individual Rules of Practice of Civil Cases § 4(B). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7(c) and U.S. Dist. J. Katherine Polk Failla, Individual Rules of Practice of Civil Cases § 4(B) is 3,489 words.

Dated: November 6, 2025
      New York, New York

                                             /s/ *Guadalupe Aguirre*
                                             Guadalupe Aguirre