PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

July 28, 2025

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM:        Joseph B. Edlow
             Director

SUBJECT:     **Review of the Designation of Syria for Temporary Protected Status**

PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000001

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000002

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000003

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000004

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000005

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000006

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000007

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000008

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000009

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000010

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000011

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000012

PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000013



**Secretary's Decision:**

1. _Terminate_: _Terminate Syria's designation_

    Specify the Effective Date of the Termination (60 days or longer): _____

    Approve/date ~~_signature_~~    07-31-26

**Attachments:**

| | |
|---|---|
| Attachment A: | Temporary Protected Status Legal Authority |
| Attachment B: | USCIS RAIO Country of Origin Information Considerations Report, Syria |
| Attachment C: | USCIS OP&S Policy Considerations Report, Syria |

DHS-AR-000014

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

DHS-AR-000015

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2


is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

PRE-DECISIONAL/DELIBERATIVE

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20588



# TEMPORARY PROTECTED STATUS (TPS) COUNTRY OF ORIGIN INFORMATION CONSIDERATIONS: Syria (May 2025)[1]

### OVERVIEW

On December 8, 2024, the government of authoritarian President Bashar al Asad fell as opposition rebels led by the Islamist armed group Hay'at Tahrir al Sham concluded their 11-day lightning advance in Syria from Idlib to the capital Damascus.[2]  After nearly 14 years of civil war that followed the pro-democracy Arab Spring demonstrations in 2011, many Syrians celebrated the collapse of the repressive regime that Bashar and his father Hafez built over five decades.[3]  Asad's departure has hardly meant an end to the armed conflict, however.  Hay'at Tahrir al Sham – previously designated as a foreign terrorist organization by the U.S. Department of State[4] – has formed a transitional government but has struggled to integrate armed groups into the nascent security forces.[5]  The transitional government's flag has been raised at

---

[1] This report covers events from October 1, 2023, through May 31, 2025, and also includes information on the June 30, 2025 Executive Order, Providing for the Revocation of Syria Sanctions, and the July 8, 2025 Department of State revocation of Hay'at Tahrir al Sham as a foreign terrorist organization.

[2] Maya Gebeily and Timour Azhari, Syrian rebels topple Assad who flees to Russia in Mideast shakeup, Reuters, Dec. 8, 2024, available at: https://www.reuters.com/world/middle-east/syria-rebels-celebrate-captured-homs-set-sights-damascus-2024-12-07/ (last visited May 31, 2025).

[3] William Christou and Bethan McKernan, Syrians celebrate fall of Bashar al-Assad after five decades of dynastic rule, The Guardian, Dec. 8, 2024, available at: https://www.theguardian.com/world/2024/dec/08/syrians-celebrate-fall-of-bashar-al-assad-after-five-decades-of-dynastic-rule (last visited May 31, 2025).  Hafez al Asad seized power in a 1970 coup. Greg Myre, In Syria, the Assads leave a bitter legacy after a half-century of repressive rule, NPR, December 9, 2024, available at: https://www.npr.org/2024/12/08/g-s1-37298/in-syria-the-assads-leave-a-bitter-legacy-after-a-half-century-of-repressive-rule (last visited May 31, 2025).

[4] The Department of State designated Hay'at Tahrir al Sham as a Foreign Terrorist Organization on May 15, 2014, and subsequently revoked its designation as a Foreign Terrorist Organization on July 8, 2025. Department of State, Revocation of the Foreign Terrorist Organization Designation of al-Nusrah Front, Also Known as Hay'at Tahrir al-Sham, 90 Fed. Reg. 30187, July 8, 2025, available at: https://www.federalregister.gov/documents/2025/07/08/2025-12720/revocation-of-the-foreign-terrorist-organization-designation-of-al-nusrah-front-also-known-as-hayat (last visited July 10, 2025); Foreign Terrorist Organizations, Department of State, Bureau of Counterterrorism, available at: https://www.state.gov/foreign-terrorist-organizations/ (last visited July 10, 2025).

[5] Rahaf Aldoughli, Syria's New Rulers Are Working To Unify Military Power, New Lines Magazine, Feb. 25, 2025, available at: https://newlinesmag.com/reportage/syrias-new-rulers-are-working-to-unify-military-power/ (last visited May 31, 2025); Syria gives holdout armed groups deadline to join state forces, The New Arab, May 17, 2025, available at: https://www.newarab.com/news/syria-gives-holdout-armed-groups-deadline-join-state-forces (last visited May 31, 2025).

DHS-AR-000017

the United Nations (UN),[6] and President Trump recently issued an Executive Order, *Providing for the Revocation of Syria Sanctions*, and expressed hope for the success of "Syria's new government."[7]  In addition, President Trump appointed a special envoy to Syria in May 2025.[8]  The U.S. embassy in Damascus remains closed, even as the U.S. Department of State expresses its desire to help the transitional government and work with local officials on aid.[9]

Fighting continues to rage in the north of the country between Arab and Kurdish-led armed groups,[10] and in the coastal region where transitional government security forces massacred hundreds of minority Alawi civilians in March 2025.[11]  Transitional government and Druze forces have clashed at several points, and Israel continues to expand its airstrikes and ground operations in the south of the country.[12]  Meanwhile, the essential needs of millions of Syrians remain unmet in terms of food security, clean water, stable shelter, healthcare, economic opportunity, and safe movement.[13]  Hundreds of thousands of displaced Syrians have returned to their homes in areas under transitional government control, but they have largely returned to

---

[6] Abby Sewell and Farnoush Amiri, New Syrian foreign minister attends UN Security Council in first US appearance since Assad's fall, Associated Press, Apr. 25, 2025, available at: https://apnews.com/article/syria-shibani-un-security-council-flag-0dacf40a9f901fbe54b85fcaa83e4f85 (last visited May 31, 2025).

[7] Executive Order 14312, Providing for the Revocation of Syria Sanctions, 90 Fed. Reg. 29395, June 30, 2025, available at: https://www.federalregister.gov/documents/2025/07/03/2025-12506/providing-for-the-revocation-of-syria-sanctions (last visited July 10, 2025); White House, Fact Sheet: President Donald J. Trump Provides for the Revocation of Syria Sanctions, June 30, 2025, available at: https://www.whitehouse.gov/fact-sheets/2025/06/fact-sheet-president-donald-j-trump-provides-for-the-revocation-of-syria-sanctions/ (last visited July 10, 2025).

[8] Erika Solomon, New U.S. Envoy Makes First and Symbolic Trip to Syria, New York Times, May 29, 2025, available at: https://www.nytimes.com/2025/05/29/world/europe/syria-damascus-envoy-barrack-israel.html (last visited May 31, 2025).

[9] Secretary of State Marco Rubio Before the Senate Committee on Foreign Relations on the FY26 Department of State Budget Request, U.S. Department of State, May 20, 2025, available at: https://www.state.gov/secretary-of-state-marco-rubio-before-the-senate-committee-on-foreign-relations-on-the-fy26-department-of-state-budget-request/ (last visited May 31, 2025) (U.S. Secretary of State Marco Rubio: "We don't have an embassy in Syria.  It's operating out of Türkiye.  But we need to help them.  We want to help that government succeed because the alternative is full-scale civil war and chaos, which would of course destabilize the entire region. And we are going to allow our people on the ground – both our embassy personnel at the Damascus embassy located in Türkiye and, for the short period of time, at least during the interim, our ambassador in Türkiye – to work with local officials there to make determinations about what kind of aid they need.")

[10] Paul Iddon, Why fighting is raging in north Syria between the Turkish-backed SNA and Kurdish-led SDF, The New Arab, Jan. 21, 2025, available at: https://www.newarab.com/analysis/why-fighting-raging-north-syria-between-sna-and-sdf (last visited May 31, 2025); Clashes reportedly erupt between Syrian army, YPG-led SDF near Tishrin Dam, Türkiye Today, May 19, 2025, available at: https://www.turkiyetoday.com/region/clashes-reportedly-erupt-between-syrian-army-and-ypg-led-sdf-near-tishrin-dam-3201648 (last visited May 31, 2025).

[11] Massa Bashour and Nader Durgham, A weekend from hell in coastal Syria, Middle East Eye, Mar. 10, 2025, available at: https://www.middleeasteye.net/news/weekend-hell-coastal-syria (last visited May 31, 2025); One month on, killings persist in Syria's Alawi heartlands, Middle East Eye, Apr. 11, 2025, available at: https://www.middleeasteye.net/news/syria-one-month-killings-persist-alawi-heartland (last visited May 31, 2025); Sirwan Kajjo, Sectarian Violence Against Syria's Alawites Has Not Stopped, Middle East Forum, May 15, 2025, available at: https://www.meforum.org/mef-observer/sectarian-violence-against-syrias-alawites-has-not-stopped (last visited May 31, 2025).

[12] David Gritten, Israel says it struck near Syria palace over violence in Druze areas, BBC, May 2, 2025, available at: https://www.bbc.com/news/articles/ckg58kyxxvxo (last visited May 31, 2025).

[13] Syria: Up to one million people plan to return home in desperation, UNHCR, Mar. 7, 2025, available at: https://news.un.org/en/story/2025/03/1160886 (last visited May 31, 2025).

2

destruction.[14]  Several hundred thousand more have been newly displaced by conflict[15] or fled abroad fearing retribution from the country's new authorities.[16]  U.S. Secretary of State Marco Rubio estimated in May 2025 that due to internal tensions and transitional authority challenges, Syria could be weeks or months away from "potential collapse and a full-scale civil war of epic proportions, basically the country splitting up" if the situation does not improve.[17]

## ARMED VIOLENCE

### Civil War under the Asad Government

Syria is a country in the Levant – or Eastern Mediterranean – region with an estimated population of 23.87 million people, most of whom are ethnic Arabs, with a significant 10 percent minority of ethnic Kurds.[18]  In terms of religion, about 74 percent of Syrians are Sunni Muslim, with the rest of the population composed of religious minorities, including Alawis, Druze, Shi'ites, and Christians.[19]

After Hafez al Asad seized power in a 1970 coup, the Asad family (who are Alawi) ruled Syria with an iron fist, suppressing any potential challengers with the force of the regime's large military and feared secret police.[20]  Following the 2011 Arab Spring protests calling for political reform and the fall of the Asad government, a civil war broke out between government forces and a variety of disparate opposition armed groups, with foreign powers supporting both sides. Years of bloody war, siege, displacement, and humanitarian catastrophe resulted in the "cantonization" of the country by 2018: the major urban areas from Damascus to Aleppo ultimately fell under the control of the Asad government, Idlib in the northwest fell under the Islamist Hay'at Tahrir al Sham, the northeast under the Kurdish-led Syrian Democratic Forces, and the northern border region under various factions of the Turkish-backed Syrian National Army formerly dubbed the Free Syrian Army.[21]

---

[14] Accelerating Economic Recovery is Critical to Reversing Syria's Decline and Restoring Stability, UNDP, Feb. 20, 2025, available at: https://www.undp.org/syria/press-releases/accelerating-economic-recovery-critical-reversing-syrias-decline-and-restoring-stability (last visited May 31, 2025).

[15] Syria governorates IDPs and IDP returnee's overview, UNHCR, Mar. 15, 2025, available at: https://data.unhcr.org/en/documents/details/115290 (last visited May 31, 2025).

[16] Laila Bassam, John Davison, Maggie Michael and Tuvan Gumrukcu, Syrian Shi'ites and other minorities flee to Lebanon, fearing Islamist rule, Reuters, Dec. 13, 2024, available at: https://www.reuters.com/world/middle-east/syrian-shiites-other-minorities-flee-lebanon-fearing-islamist-rule-2024-12-13/ (last visited May 31, 2025)

[17] David Gritten, Rubio warns Syria could be weeks away from 'full-scale civil war', BBC, May 20, 2025, available at: https://www.bbc.com/news/articles/c3v553py965o (last visited May 31, 2025).

[18] Syria, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/syria/ (last visited May 31, 2025).

[19] Syria, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/syria/ (last visited May 31, 2025).

[20] Greg Myre, In Syria, the Assads leave a bitter legacy after a half-century of repressive rule, NPR, December 9, 2024, available at: https://www.npr.org/2024/12/08/g-s1-37298/in-syria-the-assads-leave-a-bitter-legacy-after-a-half-century-of-repressive-rule (last visited May 31, 2025).

[21] Armenak Tokmajyan and Kheder Khaddour, A Fractured Border: Syria, Türkiye, and Cantonization, Carnegie Endowment for International Peace, Mar. 27, 2023, available at: https://carnegieendowment.org/research/2023/03/a-fractured-border-syria-turkiye-and-cantonization?lang=en&center=middle-east (last visited May 31, 2025).

3

DHS-AR-000019

Altogether over the course of the Syrian civil war, approximately 620,000 people were killed, including an estimated 231,495 civilians, out of a total pre-war population of 22 million.[22]

**The Fall of Bashar al Asad**

On December 8, 2024, the government of former president Bashar al Asad fell as opposition rebels led by the Islamist armed group Hay'at Tahrir al Sham concluded their 11-day lightning advance from Idlib to the capital Damascus.[23]  Asad's government was plagued with internal disfunction stemming from years of corruption, mismanagement, economic crisis, sectarian favoritism, and alleged complicity in the drug trafficking of captagon, a synthetic stimulant.[24] Meanwhile, Asad's armed forces were stretched thin, threatened with internal mutiny, and reliant on foreign allies did not intervene, such as Russia, Iran, Iran-backed Iraqi armed groups, and Lebanese Hizballah.[25]  Rebels entered Damascus with scant resistance from Asad's forces,[26] as Asad and his family fled to Russia.[27]

Many Syrians celebrated as they witnessed the momentous collapse of the Asad dynasty and the repressive police state built by Bashar and his father Hafez over more than 50 years.[28]  After nearly 14 years of civil war that followed the pro-democracy Arab Spring demonstrations in 2011, Syria had new political leadership.[29]

**The Hay'at Tahrir al Sham-Led Transitional Government**

As the lead rebel group in the offensive that toppled Asad, Hay'at Tahrir al Sham announced its control of a new transitional government the day after the collapse of the regime.[30]  On January 29, 2025, Hay'at Tahrir al Sham claimed to have formally dissolved its military wing and

---

[22] Aryn Baker, How Many People Have Died in Syria's Civil War?, New York Times, Dec. 11, 2024, available at: https://www.nytimes.com/2024/12/11/world/middleeast/syria-civil-war-death-toll.html (last visited May 31, 2025).

[23] Maya Gebeily and Timour Azhari, Syrian rebels topple Assad who flees to Russia in Mideast shakeup, Reuters, Dec. 8, 2024, available at: https://www.reuters.com/world/middle-east/syria-rebels-celebrate-captured-homs-set-sights-damascus-2024-12-07/ (last visited May 31, 2025).

[24] Bashar al-Assad: Sudden downfall ends decades of family's iron rule, BBC, Dec. 9, 2024, available at: https://www.bbc.com/news/10338256 (last visited May 31, 2025).

[25] Suadad al-Salhy, How Syrian mutinies and betrayal sunk Iran's support for Assad, Middle East Eye, Feb. 5, 2025, available at: https://www.middleeasteye.net/news/how-syrian-mutinies-and-betrayal-sunk-irans-support-assad (last visited May 31, 2025).

[26] Eyad Kourdi, Christian Edwards, Nic Robertson and Avery Schmitz, Syrian rebels claim Damascus 'liberated' as Assad regime's defenses crumble, CNN, Dec. 8, 2024, available at: https://www.cnn.com/2024/12/07/middleeast/syria-rebels-homs-damascus-assad-intl/index.html (last visited May 31, 2025).

[27] Hadeel Al-Shalchi and Scott Detrow, Bashar al-Assad flees Syria for Russia, NPR, Dec. 8, 2024, available at: https://www.npr.org/2024/12/08/nx-s1-5221462/bashar-al-assad-flees-syria-for-russia (last visited May 31, 2025).

[28] Maya Gebeily and Timour Azhari, Syrian rebels topple Assad who flees to Russia in Mideast shakeup, Reuters, Dec. 8, 2024, available at: https://www.reuters.com/world/middle-east/syria-rebels-celebrate-captured-homs-set-sights-damascus-2024-12-07/ (last visited May 31, 2025).

[29] William Christou and Bethan McKernan, Syrians celebrate fall of Bashar al-Assad after five decades of dynastic rule, The Guardian, Dec. 8, 2024, available at: https://www.theguardian.com/world/2024/dec/08/syrians-celebrate-fall-of-bashar-al-assad-after-five-decades-of-dynastic-rule (last visited May 31, 2025).

[30] Maya Gebeily and Timour Azhari, With Syria's Assad gone, his PM agrees to hand power to rebel administration, Reuters, Dec. 9, 2024, available at: https://www.reuters.com/world/middle-east/with-assad-ousted-new-era-starts-syria-world-watches-2024-12-09/ (last visited May 31, 2025).

4

integrated its fighters into the transitional government's security forces.[31]  On that same day, Hay'at Tahrir al Sham leader Ahmad al Sharaa (*nom de guerre*: Abu Muhammad al Jolani) was declared president of the country.[32]  Sharaa previously battled U.S. forces in Iraq, joined the Islamic State of Iraq, and founded Hay'at Tahrir al Sham's predecessor group, the Nusra Front (*Arabic*: Jabhat al Nuṣra), as an al Qa'ida affiliate in Syria in January 2012.[33]  The Nusra Front subsequently broke ties with al Qa'ida in July 2016 and rebranded itself as the Levant Conquest Front (*Arabic*: Jabhat Fataḥ al Shâm), before forming Hay'at Tahrir al Sham with several other Islamist armed groups in January 2017.[34]  On July 8, 2025, the U.S. Department of State revoked the designation of Hay'at Tahrir al Sham as a designated foreign terrorist organization.[35]

Hay'at Tahrir al Sham and its predecessor groups have a long history of killing civilians in areas formerly controlled by the Asad government (especially members of the Alawi religious minority), in addition to cracking down on civilian protestors, restricting women's rights, evicting Christians from their homes, and torturing political enemies in Idlib Governorate.[36] Hay'at Tahrir al Sham predecessor Nusra Front seized control of Idlib with a coalition of other armed groups dubbed the Army of Conquest (*Arabic*: Jaysh al Fataḥ) in a 2015 offensive,[37] and Hay'at Tahrir al Sham began ruling in Idlib with an iron fist as the de facto government in 2017.[38]  In recent years, Hay'at Tahrir al Sham leaders have somewhat moderated their hardline stances, focusing on the Syrian front over transnational jihad, and targeting  more extreme Islamic State (ISIS) and al Qa'ida militants (who are also Hay'at Tahrir al Sham rivals).[39]

---

[31] Ahmed al-Sharaa named as new interim president of Syria, The New Arab, Jan. 29, 2025, available at: https://www.newarab.com/news/ahmed-al-sharaa-named-new-interim-president-syria (last visited May 31, 2025) ("All military factions are dissolved ... and integrated into state institutions," the Syrian state news agency SANA quoted Hay'at Tahrir al Sham military commander Hassan Abdel Ghani as saying, as well as announcing "the dissolution of the defunct regime's army" and security agencies, as well as Assad's Baath Party, which ruled Syria for decades).

[32] David Gritten, Ahmed al-Sharaa named Syria's transitional president, BBC, Jan. 31, 2025, available at: https://www.bbc.com/news/articles/c8d9r0vg6v7o (last visited May 31, 2025).

[33] Patrice Taddonio, Assad Has Fallen. Who Is Abu Mohammad al-Jolani, the Syrian Militant Who Led The Rebel Offensive That Toppled Him?, Frontline, PBS, Dec. 8, 2024, available at: https://www.pbs.org/wgbh/frontline/article/abu-mohammad-al-jolani-hts-hayat-tahrir-al-sham-documentary-interview-syria-assad/ (last visited May 31, 2025).

[34] Omar Haj Kadour, Hay'at Tahrir al-Sham TNT Terrorism Backgrounder, Center for Strategic and International Studies, Oct. 4, 2018, available at: https://www.csis.org/programs/former-programs/warfare-irregular-threats-and-terrorism-program-archives/terrorism-backgrounders/hayat-tahrir (last visited May 31, 2025).

[35] Department of State, Revocation of the Foreign Terrorist Organization Designation of al-Nusrah Front, Also Known as Hay'at Tahrir al-Sham, 90 Fed. Reg. 30187, July 8, 2025, available at: https://www.federalregister.gov/documents/2025/07/08/2025-12720/revocation-of-the-foreign-terrorist-organization-designation-of-al-nusrah-front-also-known-as-hayat (last visited July 10, 2025); Foreign Terrorist Organizations, Department of State, Bureau of Counterterrorism, available at: https://www.state.gov/foreign-terrorist-organizations/ (last visited July 10, 2025).

[36] Aaron Y. Zelin, The Age of Political Jihadism: A Study of Hayat Tahrir al-Sham, Washington Institute for Near East Policy, pp. 36-38 and 54-56, 2022, available at: https://www.washingtoninstitute.org/media/5547 (last visited May 31, 2025).

[37] Lina Sinjab, Syria: How a new rebel unity is making headway against the regime, BBC, May 1, 2025, available at: https://www.bbc.com/news/world-middle-east-32540436 (last visited May 31, 2025).

[38] Actor Profile: Hayat Tahrir al-Sham (HTS), ACLED, Jul. 26, 2023, available at: https://acleddata.com/2023/07/26/actor-profile-hayat-tahrir-al-sham-hts/ (last visited May 31, 2025).

[39] Mackenzie Holtz, Examining Extremism: Hayat Tahrir Al-Sham, Center for Strategic and International Studies, Aug. 3, 2023, available at: https://www.csis.org/blogs/examining-extremism/examining-extremism-hayat-tahrir-al-sham-hts (last visited May 31, 2025).

DHS-AR-000021

Under Sharaa's leadership since late January 2025, the Hay'at Tahrir al Sham-led transitional government seized control of all state institutions. It also suspended the Syrian constitution, dissolved the parliament, disbanded the army and state security agencies, integrated rebel armed groups into state institutions,[40] fired thousands of government employees,[41] banned the former ruling Ba'th Party,[42] and warned that organizing elections in Syria could take up to five years.[43] In place of the former ruling structure, the transitional government held a national dialogue conference in February 2025, intended to chart a political path forward for the country, but was criticized by many Syrians as hastily organized and lacking transparency on how recommendations for reform would be implemented.[44]

In March 2025, Sharaa issued a constitutional declaration. Some Syrians criticized the declaration for monopolizing power in the president, Islamizing the state, and failing to guarantee protections for Syria's ethnic and religious minorities.[45] While the constitutional declaration guarantees freedom of belief and elevates rights stipulated in international human rights conventions to constitutional status, observers note that the provision enshrining Islamic jurisprudence as *the* primary source of legislation in the country may portend a more concrete application of Islamic law in Syria than in neighboring countries with vaguer constitutional references to the principles of shari'a.[46] Already Hay'at Tahrir al Sham authorities have instituted training in Islamic law for new police cadets and vetted applicants for police positions by religion, deterring non-Sunnis from recruitment.[47]

Some religious minorities in the country have also objected to the centering of Islam in the constitutional declaration, including Druze spiritual leader Hikmat al Hijri, who called the Hay'at

---

[40] David Gritten, Ahmed al-Sharaa named Syria's transitional president, BBC, Jan. 31, 2025, available at: https://www.bbc.com/news/articles/c8d9r0vg6v7o (last visited May 31, 2025).

[41] Harun al-Aswad and Alex MacDonald, Sacked Syrian workers stage nationwide protests as government targets public sector, Middle East Eye, Mar. 7, 2025, available at: https://www.middleeasteye.net/news/syria-sacked-workers-stage-protest-jobs-back (last visited May 31, 2025).

[42] President al-Sharaa and no more Baath party: What else has Syria announced?, Al Jazeera, Jan. 29, 2025, available at: https://www.aljazeera.com/news/2025/1/29/president-al-sharaa-and-no-more-baath-party-what-else-has-syria-announced (last visited May 31, 2025).

[43] Syria's interim president says organising elections could take up to five years, France 24, Feb. 3, 2025, available at: https://www.france24.com/en/middle-east/20250203-syria-s-interim-president-says-organising-elections-could-take-up-to-five-years (last visited May 31, 2025).

[44] Christina Goldbaum, Talks on Syria's Future Fall Short of Promises, Participants Say, New York Times, Feb. 26, 2025, available at: https://www.nytimes.com/2025/02/26/world/middleeast/syria-national-dialogue-conference.html (last visited May 31, 2025).

[45] Syria's new constitution gives sweeping powers, ignores minority rights, France 24, Mar. 14, 2025, available at: https://www.france24.com/en/live-news/20250314-syria-s-new-constitution-gives-sweeping-powers-ignores-minority-rights (last visited May 31, 2025).

[46] Nathan J. Brown, Syria's Leaders Show Their Intentions: The country recently approved a constitutional declaration that plants unusual seeds worth watching, Carnegie Endowment, Mar. 19, 2025, available at: https://carnegieendowment.org/middle-east/diwan/2025/03/syrias-leaders-show-their-intentions (last visited May 31, 2025).

[47] Amina Ismail and Khalil Ashawi, Syria's new leaders turn to Islamic law in effort to rebuild Assad's police, Reuters, Jan. 23, 2025, available at: https://www.reuters.com/world/middle-east/syrias-new-leaders-turn-islamic-law-effort-rebuild-assads-police-2025-01-23/ (last visited May 31, 2025).

DHS-AR-000022

Tahrir al Sham-led government "radical" following the declaration,[48] as well as a Syriac Christian group, who said the declaration would continue to marginalize Christians in Syria.[49] Meanwhile, the Kurdish-led Syrian Democratic Council (SDC) in the autonomous northeast of the country said the constitutional declaration "reproduced authoritarianism in a new form" by failing to check executive power, and called for a decentralized political system.[50]

**Death Toll in the Recent Armed Violence**

In the midst of Syria's political upheaval, armed conflict continues on multiple fronts.  The Syrian Observatory for Human Rights has documented the deaths of 6,316 people throughout Syria in the first 100 days after the fall of the Asad government (between December 8, 2024, and March 18, 2025), including 4,711 civilians, among whom 1,805 were extrajudicially executed.[51] This is significantly higher than the death toll tallied after the first six months of the Arab Spring uprising in Syria in 2011, which stood at 2,200.[52]

The killing has not ceased in more recent months. civilians constituted approximately 2,069 of the 2,644 people killed in March 2025,[53] 352 of the 452 people killed in April 2025,[54] and 295 of the 428 people killed in May 2025.[55]

**Recent Armed Violence in the Central and Coastal Areas**

The Hay'at Tahrir al Sham-led transitional government security forces have engaged in regular operations targeting armed groups loyal to Asad, including former regime paramilitaries, as well as former members of the Asad armed forces, primarily in Syria's central areas of Hama and Homs and the Mediterranean coastal governorates of Latakia and Tartus.[56]

---

[48] Druze leader dismisses chance of agreement with 'radical' Syria government after constitution emerges, The New Arab, Mar. 14, 2025, available at: https://www.newarab.com/news/druze-leader-says-no-agreement-radical-syria-government (last visited May 31, 2025).

[49] The View from Damascus -- Syria's Constitutional Declaration: Reform or a Return to Authoritarianism?, The Syrian Observer, Mar. 17, 2025, available at: https://syrianobserver.com/syrian-actors/the-view-from-damascus-syrias-constitutional-declaration-reform-or-a-return-to-authoritarianism.html (last visited May 31, 2025).

[50] Jana Choukeir and Emma Farge, Kurdish-led Syrian group rejects Islamist authorities' new constitution framework, Reuters, Mar. 14, 2025, available at: https://www.reuters.com/world/middle-east/kurdish-led-syrian-group-rejects-islamist-authorities-new-constitution-framework-2025-03-14/ (last visited May 31, 2025).

[51] Including 1,805 civilians extrajudicially executed | 4,711 civilians killed in 100 days after fall of Al-Assad regime, Syrian Observatory for Human Rights, Mar. 18, 2025, available at: https://www.syriahr.com/en/357985/ (last visited May 31, 2025).

[52] UN: Syria death toll tops 2,200, Al Jazeera, Aug. 22, 2011, available at: https://www.aljazeera.com/news/2011/8/22/un-syria-death-toll-tops-2200 (last visited May 31, 2025).

[53] Monthly death toll | 2,069 civilians among 2,644 people killed in March 2025, Syrian Observatory for Human Rights, Apr. 1, 2025, available at: https://www.syriahr.com/en/359032/ (last visited May 31, 2025).

[54] Monthly death toll | 352 civilians among 452 people killed in April 2025, Syrian Observatory for Human Rights, May 1, 2025, available at: https://www.syriahr.com/en/361036/ (last visited May 31, 2025).

[55] Monthly death toll | 295 civilians among 428 people killed in May 2025, Syrian Observatory for Human Rights, Jun. 1, 2025, available at: https://www.syriahr.com/en/363158/ (last visited Jun. 1, 2025).

[56] Khaled Yacoub Oweis and Nada Maucourant Atallah, At least 13 Syrian security troops killed in clashes with pro-Assad gunmen, Mar. 06, 2025, available at: https://www.thenationalnews.com/news/mena/2025/03/06/syrian-government-fighters-quell-southern-militia-after-heavy-clashes/ (last visited May 31, 2025).

DHS-AR-000023

In an effort to consolidate power, the new Syrian government started disarming the population. Within days of Asad's fall, the transitional government set up "reconciliation centers" where thousands of former Asad military and Iran-backed militia members have handed in their weapons and received ID cards exempting them from immediate legal prosecution, so long as they did not commit war crimes, whereas failure to settle one's status could lead to arrest and prosecution.[57]  It is unclear how long these ID cards will shield their bearers, as the eligibility criteria for reconciliation are not systematically applied, and many cards are only marked valid for three months.[58]  According to the director of a reconciliation center in Hama, the cards only serve a temporary purpose until the transitional government completes the reconciliation process and the situation in the country stabilizes.[59]

Some Syrians fear that the new transitional authorities may seek retribution against them for their past military service, just as the Asad government sometimes reneged on reconciliation arrangements it made in years past in areas it retook from opposition factions.[60]  While a small number of technical specialists in Asad's military have returned to their duties in the reconstituted security forces, most reconciled soldiers have been left in limbo – prompting fears of an Iraq-style post-de-Baathification insurgency led by disaffected former soldiers.[61]  Indeed, former senior officers in Asad's armed forces have called on Alawis – a religious minority who made up a large share of Asad's soldiers – to take up arms against the Hay'at Tahrir al Sham-led government.[62]  Asad loyalists have formed armed groups such as the Syrian Popular Resistance, Coastal Shield Forces, and Military Council to Free Syria.[63]

Government operations against Asad loyalists have resulted in hundreds of arrests and a steady string of armed clashes.[64]  Early on, transitional government forces avoided targeting civilians,

---

[57] 'Reconciliation centres' for Assad regime personnel spark debate, The New Arab, Dec. 19, 2024, available at: https://www.newarab.com/news/reconciliation-centres-assad-regime-personnel-spark-debate (last visited May 31, 2025).

[58] Anna Myriam Roccatello, Coming to Terms with the past in Syria: The First, Fragile, Steps of "Transitional Justice", Italian Institute for International Political Studies, Feb. 7, 2025, available at: https://www.ispionline.it/en/publication/coming-to-terms-with-the-past-in-syria-the-first-fragile-steps-of-transitional-justice-199922 (last visited May 31, 2025).

[59] Lizzie Porter, Inside a Syrian 'reconciliation centre' handling soldiers of fallen Assad regime, The National [UAE], Dec. 20, 2025, available at: https://www.thenationalnews.com/news/mena/2024/12/20/inside-a-syrian-reconciliation-centre-handling-soldiers-of-fallen-assad-regime/ (last visited May 31, 2025).

[60] Anna Myriam Roccatello, Coming to Terms with the past in Syria: The First, Fragile, Steps of "Transitional Justice", Italian Institute for International Political Studies, Feb. 7, 2025, available at: https://www.ispionline.it/en/publication/coming-to-terms-with-the-past-in-syria-the-first-fragile-steps-of-transitional-justice-199922 (last visited May 31, 2025).

[61] Rahaf Aldoughli, Syria needs security – can Al-Sharaa build a united army to provide it?, Chatham House, Mar. 10, 2025, available at: https://www.chathamhouse.org/publications/the-world-today/2025-03/syria-needs-security-can-al-sharaa-build-united-army-provide (last visited May 31, 2025).

[62] Ahmad Sharawi, Continued chaos in Syria: Iraqi militias and an Alawite insurgency, Foundation for Defense of Democracies, Jan. 29, 2025, available at: https://www.fdd.org/analysis/op_eds/2025/01/29/continued-chaos-in-syria-iraqi-militias-and-an-alawite-insurgency/ (last visited May 31, 2025).

[63] Aaron Y. Zelin, Syria's Transitional Honeymoon Is Over After Massacres and Disinformation, Washington Institute for Near East Policy, Mar. 10, 2025, available at: https://www.washingtoninstitute.org/policy-analysis/syrias-transitional-honeymoon-over-after-massacres-and-disinformation (last visited May 31, 2025).

[64] Nearly 300 arrested in Syria crackdown on Assad loyalists: monitor, The New Arab, Dec. 29, 2024, available at: https://www.newarab.com/news/nearly-300-arrested-syria-crackdown-assad-loyalists-sohr (last visited May 31, 2025).

DHS-AR-000024

though government raids sparked fear among Alawis (who make up an estimated 10 percent of the population) that they would be targeted as a community for their perceived affiliation with Asad (who favored his Alawi co-religionists in government and military hiring).[65]

Adding to Alawis' fears, the transitional government has struggled to contain attacks by vigilantes (many wearing militant insignia) in apparent sectarian retribution against Alawi civilians.[66] In some cases, the vigilante attacks appeared to target former Asad government officials, including civilians such as judges.[67] In other cases, gunmen went door-to-door and shot people in Alawi villages.[68] In February 2025, Ahmad al Sharaa, self-proclaimed president of the interim government in Syria, visited Latakia and Tartous in a visit aimed at reassuring Alawis of the inclusiveness of the transitional government, but also possibly as a show of the government's strength in the former Asad stronghold.[69]

In March 2025, violence in Syria escalated drastically. On March 6, Asad loyalists ambushed a patrol of transitional government security forces in the coastal town of Jable and took control of Asad's hometown, Qardaha.[70] The government then ordered the mass mobilization of Hay'at Tahrir al Sham, Syrian National Army groups, and foreign jihadist fighters, who responded over the course of the next three days with not only security operations against Asad loyalists, but also a campaign of retributive massacres against primarily Alawi civilians.[71] Notably, the government's mobilization was dressed in the religious garb of a *nafīr 'âm*, or Islamic call to arms, that echoed from the loudspeakers of mosques in the north of the country and was posted on social media.[72] Eyewitnesses described convoys of government fighters spreading through

---

[65] Giovanna Vial, HTS raids and forced disappearances fuel fear in Syria's Alawi heartlands, Middle East Eye, Jan. 17, 2025, available at: https://www.middleeasteye.net/news/syria-hts-raids-forced-disappearances-fuel-alawi-fear (last visited May 31, 2025).

[66] Loveday Morris, Suzan Haidamous, Louisa Loveluck, Nilo Tabrizy and Imogen Piper, Syria's new leaders struggle to contain revenge killings after Assad, Washington Post, Dec. 18, 2024, available at: https://www.washingtonpost.com/world/2024/12/18/syria-revenge-killings-hts-damascus-assad/ (last visited May 31, 2025).

[67] Yogita Limaye, Inside a Syrian 'reconciliation centre' where Assad's soldiers give up their weapons, BBC, Dec. 29, 2024, available at: https://www.bbc.com/news/articles/cx2n35j5340o (last visited May 31, 2025).

[68] Loveday Morris, Zakaria Zakaria, and Salwan Georges, Killings in Syrian village foreshadowed flare-up of sectarian violence, Washington Post, Mar, 21, 2025, available at: https://www.washingtonpost.com/world/2025/03/21/syria-sectarian-violence-alawite-sunni/ (last visited May 31, 2025); 15 people killed in 'sectarian' massacre in Alawi village in Syria, The New Arab, Feb. 1, 2025, available at: https://www.newarab.com/news/15-killed-sectarian-massacre-alawi-village-syria (last visited May 31, 2025).

[69] Syria's interim leader Ahmed al-Sharaa visits former Assad strongholds, The New Arab, Feb. 16, 2025, available at: https://www.newarab.com/news/syrias-sharaa-visits-ex-assad-strongholds-latakia-and-tartus (last visited May 31, 2025).

[70] Syria's worst violence in months reopens wounds of the country's 13-year civil war, PBS, Mar. 10, 2025, available at: https://www.pbs.org/newshour/world/syrias-worst-violence-in-months-reopens-wounds-of-the-countrys-13-year-civil-war (last visited May 31, 2025).

[71] Aaron Y. Zelin, Syria's Transitional Honeymoon Is Over After Massacres and Disinformation, Washington Institute for Near East Policy, Mar. 10, 2025, available at: https://www.washingtoninstitute.org/policy-analysis/syrias-transitional-honeymoon-over-after-massacres-and-disinformation (last visited May 31, 2025).

[72] Katya Alkhateeb and Faten Ghosn, Syria faces renewed sectarian violence as government fails to deliver inclusivity, The Conversation, May 12, 2025, available at: https://theconversation.com/syria-faces-renewed-sectarian-violence-as-government-fails-to-deliver-inclusivity-255974 (last visited May 31, 2025).

DHS-AR-000025

coastal towns and cities, looting, burning shops and homes, and extrajudicially killing Alawis,[73] including entire families.[74]  The fighters, some wearing Hay'at Tahrir al Sham insignia, used sectarian slurs against their victims, such as "Alawite dogs."[75] Some Alawis were even forced to bark like dogs at rifle point before being fatally shot.[76]

The Syrian Observatory for Human Rights estimates that more than 2,089 people were killed in more than 58 massacres in March 2025, three-quarters of whom were civilians (1,557).[77] Meanwhile, the Syrian Network for Human Rights estimates that among the 1,334 civilians (mostly Alawis) killed, 889 were killed by armed forces in the security crackdowns, while 446 were killed by Asad loyalists.[78]  Over 21,000 Syrians fled to Lebanon after the coastal massacres,[79] and several thousand Alawis sought protection at the Russian airbase in Hmeimim,[80] with many remaining there.[81]  Secretary of State Marco Rubio condemned the massacres and called on Syria's interim authorities to "hold the perpetrators of these massacres against Syria's minority communities accountable."[82]

Interim President Sharaa promised to punish those responsible for the March 2025 massacres and set up what he called an independent committee to investigate; however, he declined to comment on whether foreign jihadist fighters, allied Islamist factions, or his own security forces were

---

[73] Massa Bashour and Nader Durgham, A weekend from hell in coastal Syria, Middle East Eye, Mar. 10, 2025, available at: https://www.middleeasteye.net/news/weekend-hell-coastal-syria (last visited May 31, 2025).
[74] 'Entire families' killed in Syria fighting, UN says, Al Jazeera, Mar. 11, 2025, available at: https://www.aljazeera.com/news/2025/3/11/entire-families-killed-in-syria-fighting-un-says (last visited May 31, 2025).
[75] Tamara Qiblawi, Sarah El Sirgany, Allegra Goodwin and Gianluca Mezzofiore, 'Ethnic cleansing!' Videos show Syrian government-aligned forces reveling in massacre of minorities in coastal town, CNN, Mar. 17, 2025, available at: https://www.cnn.com/2025/03/17/middleeast/syria-massacre-alawite-minority-intl-invs/index.html (last visited May 31, 2025).
[76] Mostafa Salem, Syrian government loyalists accused of executing civilians as violence erupts, CNN, Mar. 9, 2025, available at: https://www.cnn.com/2025/03/09/middleeast/syria-executions-violence-assad-alawite-intl/index.html (last visited May 31, 2025).
[77] As more massacres documented | The number of people killed during security operations in Syrian coastline exceeds 2,000, Syrian Observatory for Human Rights, Mar. 17, 2025, available at: https://www.syriahr.com/en/357944/ (last visited May 31, 2025).
[78]  One month on, killings persist in Syria's Alawi heartlands, Middle East Eye, Apr. 11, 2025, available at: https://www.middleeasteye.net/news/syria-one-month-killings-persist-alawi-heartland (last visited May 31, 2025).
[79] UN says more than 21,000 people fled Syria sectarian violence for Lebanon, Agence France-Presse, Mar. 25, 2025, available at: https://www.arabnews.com/node/2594818/middle-east (last visited May 31, 2025); Nader Durgham, Syrian Alawis sheltering in Lebanon say it isn't safe to return home, Middle East Eye, Mar. 11, 2025, available at: https://www.middleeasteye.net/news/syrian-alawis-sheltering-lebanon-isnt-safe-return-home (last visited May 31, 2025).
[80] Feras Killani, BBC finds Syrian families sheltering at Russian airbase from sectarian attacks, BBC, Mar. 14, 2025, available at: https://www.bbc.com/news/articles/cyve9prq3qjo (last visited May 31, 2025).
[81] Omar Albam, Militants kill 2 soldiers in attack on Russian air base in Syria, Associated Press, May 21, 2025, available at: https://apnews.com/article/syrian-hmeimim-russian-base-attack-2b61871338c51ec233d61df00f759a29 (last visited May 31, 2025).
[82] Rubio says Syria must hold accountable 'perpetrators of massacres', Agence France-Presse, Mar. 9, 2025, available at: https://www.voanews.com/a/rubio-says-syria-must-hold-accountable-perpetrators-of-massacres-/8004267.html (last visited May 31, 2025).

DHS-AR-000026

involved in the massacres.[83]  Reports indicate that transitional government forces not only participated in the massacres, but advised and monitored armed civilians who traveled to the coast and killed civilians.[84]  Observers also point to the massacres as indicative of the transitional government's failure to regulate and control the former armed groups and hardline foreign fighters who now make up the ranks of its security forces.[85]  Only about 30 people have been arrested so far for suspected involvement in the massacres.[86]  The transitional government delayed the release of findings from a fact-finding committee in April 2025, and Alawi victims and their families worry that perpetrators of the massacres still roam free.[87]

In May 2025, the European Union sanctioned three backed Syrian National Army armed groups it accused of participating in human rights abuses and arbitrarily killing Alawis – the Sultan Murad Division, Sultan Sulaiman Shah Brigade, and Hamza Division – as well as individual sanctions against the leaders of the latter two groups, Muhammad Hussein al-Jasim (a.k.a. Abu Amsha) and Sayf Boulad (a.k.a. Abu Bakr).[88]  All three armed groups are nominally part of the transitional government's Ministry of Defense: Sultan Murad leader Fahim Issa was appointed deputy defense minister and commander of the northern region in the new Syrian army in April 2025[89]; Sulaiman Shah leader al-Jasim was appointed commander of defense ministry forces in Hama in February 2025[90]; and Hamza leader Boulad (a former IS fighter) was named commander of the 76th Division.[91]  The U.S. Department of the Treasury had previously sanctioned the Sulaiman Shah and Hamza armed groups and their leaders in August 2023 for human rights abuses committed by these groups in Afrin.[92]

---

[83] Samia Nakhoul, Maya Gebeily and Timour Azhari, New Syrian leader Sharaa says killings of Alawites threaten unity, vows justice, Reuters, Mar. 10, 2025, available at: https://www.reuters.com/world/middle-east/new-syrian-leader-sharaa-says-killings-alawites-threaten-unity-vows-justice-2025-03-10/ (last visited May 31, 2025).

[84] Lucy Williamson, Syrian security forces monitored armed civilians who killed Alawites, accused man says, BBC, May 4, 2025, available at: https://www.bbc.com/news/articles/cm2erkr1n15o (last visited May 31, 2025).

[85] Taylor Luck and Dominique Soguel, Deadly clashes in Syria are precisely what new leaders sought to avert, Christian Science Monitor, Mar. 10, 2025, available at: https://www.csmonitor.com/World/Middle-East/2025/0310/syrian-ethnic-violence-alawites-assad-jihadists (last visited May 31, 2025).

[86] Lucy Williamson, Syrian security forces monitored armed civilians who killed Alawites, accused man says, BBC, May 4, 2025, available at: https://www.bbc.com/news/articles/cm2erkr1n15o (last visited May 31, 2025).

[87] William Christou, 'I just want security': fear remains for Syrian massacre survivors awaiting justice, The Guardian, May 27, 2025, available at: https://www.theguardian.com/world/2025/may/27/syria-sectarian-massacres-families-wait-for-justice (last visited May 31, 2025).

[88] EU sanctions Syrian militia groups over ethnic violence targeting Alawites, France 24, May 28, 2025, available at: https://www.france24.com/en/middle-east/20250528-eu-sanctions-syrian-militia-groups-ethnic-violence-targeting-alawites (last visited May 31, 2025).

[89] Iran Update, Institute for the Study of War, Apr. 14, 2025, available at: https://www.understandingwar.org/backgrounder/iran-update-april-14-2025 (last visited May 31, 2025).

[90] Syria/Afrin: Promises by Transitional Authorities to Restore Rights and End Violations Against Kurds, Syrians for Truth & Justice, Apr. 11, 2025, available at: https://stj-sy.org/en/syria-afrin-promises-by-transitional-authorities-to-restore-rights-and-end-violations-against-kurds/ (last visited May 31, 2025).

[91] Ahmad Sharawi, Trump Tells Syria to Expel Foreign Fighters, But Sharaa Gives Them Army Divisions, Foundation for Defense of Democracies, May 20, 2025, available at: https://www.fdd.org/analysis/2025/05/20/trump-tells-syria-to-expel-foreign-fighters-but-sharaa-gives-them-army-divisions/ (last visited May 31, 2025).

[92] Treasury Sanctions Two Syria-Based Militias Responsible for Serious Human Rights Abuses in Northern Syria, U.S. Department of the Treasury, Aug. 17, 2023, available at: https://home.treasury.gov/news/press-releases/jy1699 (last visited May 31, 2025).

11

DHS-AR-000027

Even several weeks after the massacres, reports continued to emerge in April and May 2025 of ongoing killings, abductions and raids in the coastal and central regions targeting Alawis, including civilians.[93]  Alawis are reportedly profiled at government checkpoints based on their religion and regularly interrogated, beaten, insulted, and detained.[94]

**Recent Armed Violence in the North and Northeast**

In the north and northeast of Syria, hostilities are ongoing between the Kurdish-led Syrian Democratic Forces and the Arab-led Syrian National Army.  The backed Syrian National Army is a Türkiye-backed (and often Türkiye-directed) coalition of various armed groups,[95] many of whom previously operated under the early umbrella label for opposition armed groups, the Free Syrian Army.[96]  While officially integrated into the Ministry of Defense under the January 29, 2025, declaration of the transitional government dissolving opposition armed groups, the backed Syrian National Army has only partially integrated on the ground, as backed Syrian National Army commanders fear losing power and influence to a military dominated by their former rival, Hay'at Tahrir al Sham.[97]  Such reluctance to submit to central government command and control reflects the reality that the transitional government's armed forces (particularly outside of Damascus) function less as a united front, and more as a patchwork of ragtag fighters and disparate armed groups (including hardline fighters) now affiliated with the new government through ad hoc, local arrangements.[98]

As Hay'at Tahrir al Sham-led forces captured Aleppo City in late November 2024, the backed Syrian National Army simultaneously launched an offensive dubbed Dawn of Freedom (*Arabic*: Fajr al Ḥurriya) to seize several Syrian Democratic Forces-controlled cantons west of the

---

[93] One month on, killings persist in Syria's Alawi heartlands, Middle East Eye, Apr. 11, 2025, available at: https://www.middleeasteye.net/news/syria-one-month-killings-persist-alawi-heartland (last visited May 31, 2025); Khaled Yacoub Oweis, Syrian tribesmen kill 14 Alawites in latest sectarian violence, The National [UAE], Apr. 27, 2025, available at: https://www.thenationalnews.com/news/mena/2025/04/27/sectarian-violence-in-central-syria-leaves-14-alawites-dead/ (last visited May 31, 2025); Natacha Danon, Extrajudicial killings of Alawites plague Homs city, Syria Direct, May 9, 2025, available at: https://syriadirect.org/extrajudicial-killings-of-alawites-plague-homs-city/ (last visited May 31, 2025); Khaled Yacoub Oweis, Six Syrian Alawites killed in outbreak of sectarian violence, The National [UAE], May 11, 2025, available at: https://www.thenationalnews.com/news/mena/2025/05/11/sectarian-killings-continue-in-syria-despite-french-stabilisation-effort/ (last visited May 31, 2025); Sirwan Kajjo, Sectarian Violence Against Syria's Alawites Has Not Stopped, Middle East Forum, May 15, 2025, available at: https://www.meforum.org/mef-observer/sectarian-violence-against-syrias-alawites-has-not-stopped (last visited May 31, 2025).

[94] One month on, killings persist in Syria's Alawi heartlands, Middle East Eye, Apr. 11, 2025, available at: https://www.middleeasteye.net/news/syria-one-month-killings-persist-alawi-heartland (last visited May 31, 2025).

[95] Levent Kemal, From rebel factions to an army: Efforts to tame the Syrian National Army, Atlantic Council, Jun. 18, 2024, available at: https://www.atlanticcouncil.org/blogs/menasource/syrian-national-army-turkey-reform/ (last visited May 31, 2025).

[96] Rayhan Uddin, The Syrian National Army: Rebels, thugs or Turkish proxies?, Middle East Eye, Dec. 7, 2024, available at: https://www.middleeasteye.net/news/who-are-syrian-national-army (last visited May 31, 2025).

[97] Rahaf Aldoughli, Syria's New Rulers Are Working To Unify Military Power, New Lines Magazine, Feb. 25, 2025, available at: https://newlinesmag.com/reportage/syrias-new-rulers-are-working-to-unify-military-power/ (last visited May 31, 2025).

[98] Taylor Luck and Dominique Soguel, Deadly clashes in Syria are precisely what new leaders sought to avert, Christian Science Monitor, Mar. 10, 2025, available at: https://www.csmonitor.com/World/Middle-East/2025/0310/syrian-ethnic-violence-alawites-assad-jihadists (last visited May 31, 2025).

DHS-AR-000028

Euphrates, including Tel Rif'at and Manbij.[99]  The violence displaced tens of thousands of civilians,[100] mostly Kurds,[101] who fled to Syrian Democratic Forces-controlled areas to the east such as al Tabqa.[102]  Many of the 120,000 Kurds displaced from Tel Rif'at alone were originally displaced from Afrin in 2018.[103]  backed Syrian National Army militants committed a number of alleged human rights violations during Operation Dawn of Freedom, including: summary executions, arbitrary arrests, torture, and looting of property.[104]  Prior to the fall of the Asad government and after seizing swaths of territory from the Syrian Democratic Forces in the north between 2016-2019, backed Syrian National Army militants and Turkish soldiers also perpetrated alleged human rights violations against Kurds , including: summary killings, arbitrary arrests, enforced disappearances, unlawful detentions (including of children), pillage, unlawful seizure of property, sexual violence, and torture.[105]  Violations continue today, even as backed Syrian National Army factions integrate with the transitional government forces, with reports of ongoing mistreatment, extortion, and detention of civilians with impunity.[106]

The Syrian Democratic Forces launched a counter-offensive against the backed Syrian National Army in late December 2024.[107] Armed clashes and car bomb attacks continued into 2025, particularly in Manbij and near the Tishrin Dam.[108]  Türkiye and the backed Syrian National Army have long sought to take control of the dam, seeing it as a strategic gateway to regions east of the Euphrates controlled by the Syrian Democratic Forces since the Syrian Democratic Forces

---

[99] Clashes erupt near Syria's Tishrin Dam as Turkish-backed SNA and Kurdish-led SDF battle for control, The New Arab, Dec. 26, 2024, available at: https://www.newarab.com/news/syrias-tishrin-dam-sees-fierce-clashes-between-sna-and-sdf (last visited May 31, 2025).

[100] Paul Iddon, Why fighting is raging in north Syria between the Turkish-backed SNA and Kurdish-led SDF, The New Arab, Jan. 21, 2025, available at: https://www.newarab.com/analysis/why-fighting-raging-north-syria-between-sna-and-sdf (last visited May 31, 2025).

[101] Rayhan Uddin, The Syrian National Army: Rebels, thugs or Turkish proxies?, Middle East Eye, Dec. 7, 2024, available at: https://www.middleeasteye.net/news/who-are-syrian-national-army (last visited May 31, 2025).

[102] Displaced persons arrive from northern Aleppo to SDF areas, Enab Baladi, Dec. 3, 2024, available at: https://english.enabbaladi.net/archives/2024/12/displaced-persons-arrive-from-northern-aleppo-to-sdf-areas/ (last visited May 31, 2025).

[103] Wladimir van Wilgenburg, Syria: Aleppo's Kurds fear displacement as thousands flee rebels in Tel Rifaat, Middle East Eye, Dec. 3, 2024, available at: https://www.middleeasteye.net/news/aleppos-kurds-fear-displacement-thousands-flee-rebels-tel-rifaat (last visited May 31, 2025).

[104] "We Will Kill You Wherever You Go": Violations Committed during SNA-Led Operation Dawn of Freedom, Syrians for Truth & Justice and Synergy Association for Victims, May 9, 2025, available at: https://stj-sy.org/en/we-will-kill-you-wherever-you-go-violations-committed-during-sna-led-operation-dawn-of-freedom/ (last visited May 31, 2025).

[105] "Everything is by the Power of the Weapon" Abuses and Impunity in Turkish-Occupied Northern Syria, Human Rights Watch, Feb. 29, 2024, available at: https://www.hrw.org/report/2024/02/29/everything-power-weapon/abuses-and-impunity-turkish-occupied-northern-syria (last visited May 31, 2025).

[106] Syria: Türkiye-backed Armed Groups Detain, Extort Civilians, Human Rights Watch, May 14, 2025, available at: https://www.hrw.org/news/2025/05/14/syria-turkiye-backed-armed-groups-detain-extort-civilians (last visited May 31, 2025).

[107] Kareem Chehayeb and Hogir al Abdo, Kurdish-led forces push back Turkish-backed Syrian rebels in a tense offensive, Associated Press, Dec. 24, 2024, available at: https://apnews.com/article/syria-kurds-turkey-sdf-manbij-kobani-84928d1755cc09c239fe00074291ff0f (last visited May 31, 2025).

[108] Ragip Soylu, Syria: Manbij car bomb attack suspends SDF-Damascus talks, Middle East Eye, Feb. 4, 2025, available at: https://www.middleeasteye.net/news/syria-manbij-car-bomb-attack-suspends-sdf-damascus-talks (last visited May 31, 2025).

13

DHS-AR-000029

began expelling Islamic State militants from the area in mid-2016.[109]  The violence has resulted in hundreds of deaths, among both civilians and combatants.[110]  Turkish drone and air strikes have allegedly targeted Kurdish civilians in and around the dam, including protestors seeking to prevent strikes by staging sit-ins on the dam,[111] and an ambulance transporting the wounded.[112]  Despite an April 2025 agreement for the Syrian Democratic Forces to cede control of the dam to the transitional government and for the backed Syrian National Army to withdraw from the area,[113] backed Syrian National Army/Syrian Democratic Forces clashes at the dam erupted again in May 2025.[114] The ongoing violence threatens the integrity of the dam, which provides electricity for 400,000 people and was put out of service after sustaining damage in December 2024.[115]  Kurdish officials still struggled to make needed repairs as of April 2025.[116]

The fighting between the Syrian Democratic Forces and backed Syrian National Army continues despite the fact that both entities are now nominally affiliated with the government.  As mentioned above, backed Syrian National Army factions were officially disbanded on January 29, 2025, and their members nominally integrated into the Ministry of Defense.[117]  Meanwhile in March 2025, the Syrian Democratic Forces signed a deal to integrate into the Ministry of Defense by the end of 2025.[118]  A Turkish/ backed Syrian National Army escalation in hostilities resulted in clashes with the Syrian Democratic Forces and scores of deaths in the first half of March 2025 alone, including 10 civilians, according to the Syrian Observatory for Human

---

[109] 280 dead as Turkey-backed SNA battle Kurdish-led SDF for control of Syria's strategic Tishrin dam, The New Arab, Jan. 7, 2025, available at: https://www.newarab.com/news/280-dead-sna-battles-sdf-control-syrias-tishrin-dam (last visited May 31, 2025).

[110] Paul Iddon, Why fighting is raging in north Syria between the Turkish-backed SNA and Kurdish-led SDF, The New Arab, Jan. 21, 2025, available at: https://www.newarab.com/analysis/why-fighting-raging-north-syria-between-sna-and-sdf (last visited May 31, 2025).

[111] Andrew Waller and Khabat Abbas, Protests and bloodshed at Tishreen Dam, the Syrian war's last faultline, Middle East Eye, Jan. 31, 2025, available at: https://www.middleeasteye.net/news/protests-bloodshed-tishreen-dam-syria-war-last-faultline (last visited May 31, 2025).

[112] Northeast Syria: Apparent War Crime by Türkiye-Backed Forces, Human Rights Watch, Jan. 30, 2025, available at: https://www.hrw.org/news/2025/01/30/northeast-syria-apparent-war-crime-turkiye-backed-forces (last visited May 31, 2025).

[113] Seth Frantzman, Syrian government, SDF, and other factions move to end tensions over strategic dam, Long War Journal, Foundation for the Defense of Democracies, Apr. 15, 2025, available at: https://www.longwarjournal.org/archives/2025/04/syrian-government-sdf-and-other-factions-move-to-end-tensions-over-strategic-dam.php (last visited May 31, 2025).

[114] Clashes reportedly erupt between Syrian army, YPG-led SDF near Tishrin Dam, Türkiye Today, May 19, 2025, available at: https://www.turkiyetoday.com/region/clashes-reportedly-erupt-between-syrian-army-and-ypg-led-sdf-near-tishrin-dam-3201648 (last visited May 31, 2025).

[115] Andrew Waller and Khabat Abbas, Protests and bloodshed at Tishreen Dam, the Syrian war's last faultline, Middle East Eye, Jan. 31, 2025, available at: https://www.middleeasteye.net/news/protests-bloodshed-tishreen-dam-syria-war-last-faultline (last visited May 31, 2025).

[116] Karwan Faidhi Dri, Syrian Kurds struggle to repair key dam damaged by militants, Rudaw, Apr. 8, 2025, available at: https://www.rudaw.net/english/middleeast/syria/080420252 (last visited May 31, 2025).

[117] Rahaf Aldoughli, Syria's New Rulers Are Working To Unify Military Power, New Lines Magazine, Feb. 25, 2025, available at: https://newlinesmag.com/reportage/syrias-new-rulers-are-working-to-unify-military-power/ (last visited May 31, 2025).

[118] Christina Goldbaum and Euan Ward, Syrian Government Signs Breakthrough Deal With Kurdish-Led Forces, New York Times, Mar. 10, 2025, available at: https://www.nytimes.com/2025/03/10/world/middleeast/syria-kurds-agreement.html (last visited May 31, 2025).

DHS-AR-000030

Rights.[119]  Observers raise concerns about how realistic it is to expect rival Syrian Democratic Forces integration into the transitional government in the face of this ongoing violence with government-aligned backed Syrian National Army, especially considering the government's political sidelining of an official Syrian Democratic Forces delegation from participation in the February 2025 national dialogue conference.[120]

In a key move, several convoys of central government forces entered Afrin in February 2025, signaling an initial step toward the government's retaking control of the north from the backed Syrian National Army.[121]  Kurdish activists nevertheless remain wary of the political and security situation in the north and claim that Kurdish prisoners are still being held in prisons controlled by armed groups in Afrin.[122]  Approximately 70,000 Kurds of the 300,000 displaced from Afrin in 2018 have returned to their homes since Asad's fall, particularly as displaced Arabs living in Afrin return to their places of origin elsewhere in the country; however, some Kurdish returnees have been arrested by backed Syrian National Army militants on alleged links to the Syrian Democratic Forces, and many more Kurds remain too afraid to attempt return.[123]  Kurdish activists estimate that only 70 to 80 percent of backed Syrian National Army factions have left Afrin so far, and returnees face difficulty reclaiming their homes from current occupants.[124]

Elsewhere in the northeast of Syria along the Euphrates River, Hay'at Tahrir al Sham-led government forces captured Dayr al Zor City in mid-December 2024 after a tribal military council defected from the Syrian Democratic Forces.[125]  The violence nevertheless continued into 2025, with clashes between the Syrian Democratic Forces and tribal fighters claiming government affiliation.[126]  Output of Syrian gas and oil – largely concentrated in the Euphrates

---

[119] Turkish escalation in Aleppo countryside: Nearly 35 people killed since early March and SOHR calls for stopping Turkish attacks in NE Syria, Syrian Observatory for Human Rights, Mar. 19, 2025, available at: https://www.syriahr.com/en/358056/ (last visited May 31, 2025).

[120] Ibrahim Al-Assil, The national dialogue in Syria: A step forward or a concerning trajectory?, Middle East Institute, Mar. 5, 2025, available at: https://www.mei.edu/publications/national-dialogue-syria-step-forward-or-concerning-trajectory (last visited May 31, 2025).

[121] Seth Frantzman, Syrian government forces enter Afrin, signaling a change in control, Long War Journal, Foundation for the Defense of Democracies, Feb. 6, 2025, available at: https://www.longwarjournal.org/archives/2025/02/syrian-government-forces-enter-afrin-signaling-a-change-in-control.php (last visited May 31, 2025).

[122] Newroz Resho, VOA Kurdish: Kurdish activists claim prisoners still being held in Afrin, Voice of America, Dec. 12, 2024, available at: https://www.voanews.com/a/voa-kurdish-kurdish-activists-claim-prisoners-still-being-held-in-afrin/7899912.html (last visited May 31, 2025).

[123] Northwest Syria: 70,000 Kurds have returned to Afrin since fall of Assad regime, The New Arab, Jan. 29, 2025, available at: https://www.newarab.com/news/syria-70000-kurds-return-afrin-fall-assad (last visited May 31, 2025).

[124] Salam Ali, 'Afrin belongs to its people': More Kurds return to Afrin, while others wait for guarantees, Syria Direct, Apr. 30, 2025, available at: https://syriadirect.org/more-kurds-return-to-afrin-while-others-wait-for-guarantees/ (last visited May 31, 2025).

[125] HTS-led Syria government captures Deir ez-Zor city from Kurdish SDF, Middle East Monitor, Dec. 11, 2024, available at: https://www.middleeastmonitor.com/20241211-hts-led-syria-government-captures-deir-ez-zor-city-from-kurdish-sdf/ (last visited May 31, 2025).

[126] Tensions in northeast Syria rise amid Damascus-SDF negotiations, The New Arab, Jan. 20, 2025, available at: https://www.newarab.com/news/tensions-northeast-syria-rise-amid-damascus-sdf-negotiations (last visited May 31, 2025).

15

Valley, whose east bank is under Syrian Democratic Forces control – has fallen by 75 percent since the start of the conflict in 2011.[127]

**Recent Armed Violence in the South**

In the south of Syria, power is de facto divided between the Hay'at Tahrir al Sham-led central government, Druze militias in Suwayda Governorate, Israeli security forces, and – until recently – southern rebels in Dar'a Governorate under the control of Ahmad al 'Awda.

'Awda was initially a rebel commander in Dar'a, where the Arab Spring uprising began, but later reconciled with the Asad government after it retook the south in 2018.[128]  He eventually assumed command of the Eighth Brigade of the Russian-backed Fifth Corps and enjoyed wide autonomy in the south under nominal Asad government control.[129]  'Awda turned on Asad in November 2024 when Hay'at Tahrir al Sham launched its lightning campaign from the north.  His former Eighth Brigade forces – and allied armed groups collectively known as the Southern Operations Room – reportedly entered Damascus before Hay'at Tahrir al Sham, but quickly withdrew to avoid clashes with the group.[130]  For months, 'Awda had resisted disbanding the Eighth Brigade and incorporating his forces into the Ministry of Defense,[131] but finally relented after government forces entered the Eighth Brigade's stronghold in Busra al Sham in April 2025 on the pretense of collecting bodies after clashes between the Eighth Brigade and a government-linked group.[132]  Other armed group commanders in the south have not submitted without the use of force.  In March 2025, central government forces overran the city of Sanamayn to eliminate the threat from warlord Mohammad al Humaid.[133]  Dar'a Governorate has seen a recent uptick in assassinations and violence due to the government security vacuum, spread of weapons, and

---

[127] Khaled Yacoub Oweis, New front created in eastern Syria as Turkish-backed fighters try to pierce Kurdish defences, The National [UAE], Jan. 23, 2025, available at: https://www.thenationalnews.com/news/mena/2025/01/23/new-front-created-in-eastern-syria-as-turkish-backed-fighters-try-to-pierce-kurdish-defences/ (last visited May 31, 2025).

[128] Kian Sharifi, Who Is Ahmed Al-Awda, The Man Who Could Be A Threat To Syria's New Rulers?, Radio Free Europe/Radio Liberty, Jan. 17, 2025, available at: https://www.rferl.org/a/ahmad-al-awda-syria-leadership-threat-islamists-uae-ties/33279067.html (last visited May 31, 2025).

[129] Kian Sharifi, Who Is Ahmed Al-Awda, The Man Who Could Be A Threat To Syria's New Rulers?, Radio Free Europe/Radio Liberty, Jan. 17, 2025, available at: https://www.rferl.org/a/ahmad-al-awda-syria-leadership-threat-islamists-uae-ties/33279067.html (last visited May 31, 2025).

[130] South Syria fighters reluctant to give up weapons: spokesman, Agence France-Presse, Jan. 8, 2025, available at: https://www.france24.com/en/live-news/20250108-south-syria-fighters-reluctant-to-give-up-weapons-spokesman (last visited May 31, 2025).

[131] Jana al-Issa, Hassan Ibrahim and Ali Darwish, What has been achieved and where did it fail? Interim government of Damascus establishes a transitional ground, Enab Baladi, Mar. 6, 2025, available at: https://english.enabbaladi.net/archives/2025/03/interim-government-of-damascus-establishes-a-transitional-ground/ (last visited May 31, 2025); Loveday Morris and Zakaria Zakaria, Syria could allow Russia to keep its bases, new defense minister says, Washington Post, Feb. 6, 2025, available at: https://www.washingtonpost.com/world/2025/02/06/syria-defense-minister-russia-bases/ (last visited May 31, 2025).

[132] Khaled Yacoub Oweis, Powerful southern Syrian militia disbands under pressure from government, The National [UAE], Apr. 14, 2025, available at: https://www.thenationalnews.com/news/mena/2025/04/14/syria-shara-hts-odeh/ (last visited May 31, 2025).

[133] Khaled Yacoub Oweis, Powerful southern Syrian militia disbands under pressure from government, The National [UAE], Apr. 14, 2025, available at: https://www.thenationalnews.com/news/mena/2025/04/14/syria-shara-hts-odeh/ (last visited May 31, 2025).

DHS-AR-000032

proliferation of armed groups and criminal organizations there – all conditions that were also at play for years under the Asad government.[134]  Newer contributing factors include the flight of some Asad loyalists to the area and settling of old scores between rival parties.[135]

Meanwhile in Suwayda, the majority Druze population remains divided on the transitional government.  Some Druze citizens have staged protests calling for decentralization,[136] while others protest for a united Syrian state[137] based on secular or civil principles guaranteeing minority rights.[138]  On the united state end of the spectrum, groups like the Men of Dignity (*Arabic*: Rijâl al Karâma) and Gathering of the Arab Mountain Liberators (*Arabic*: Tajammu' Aḥrâr Jabal al 'Arab) have offered support for the government's police presence (albeit limited) in the area.[139]  The Men of Dignity (the largest armed faction in Suwayda) even agreed to join the government's Ministry of Interior (MOI) in March 2025,[140] and together with the Mountain Gathering and Dignity Guesthouse (*Arabic*: Maḍâfat al Karâma) groups, activated the so-called General Security Forces in the area under MOI authority.[141]

On the other end of the spectrum, a new Druze armed group called the Suwayda Military Council (SMC) was formed in late February 2025 by ex-regime defector Colonel Tareq Al-Shoufi.[142]  Together with other Druze formations like the Military Council of Southern Syria, the

---

[134] Khaled al-Jeratli and Mahjoub al-Hashish, Assassinations: A continuing phenomenon in Daraa, Enab Baladi, Apr. 13, 2025, available at: https://english.enabbaladi.net/archives/2025/04/assassinations-a-continuing-phenomenon-in-daraa/ (last visited May 31, 2025).

[135] Khaled al-Jeratli and Mahjoub al-Hashish, Assassinations: A continuing phenomenon in Daraa, Enab Baladi, Apr. 13, 2025, available at: https://english.enabbaladi.net/archives/2025/04/assassinations-a-continuing-phenomenon-in-daraa/ (last visited May 31, 2025).

[136] Demonstration in As-Suwayda opposing Damascus government, Enab Baladi, Mar. 6, 2025, available at: https://english.enabbaladi.net/archives/2025/03/demonstration-in-as-suwayda-opposing-damascus-government/ (last visited May 31, 2025).

[137] Syrians protest against Israeli attempts to 'divide south', The New Arab, Feb. 24, 2025, available at: https://www.newarab.com/news/syrians-protest-against-israeli-attempts-divide-south (last visited May 31, 2025).

[138] Ruth Michaelson and Obaida Hamad, 'We will keep protesting': Druze minority demands a voice in new Syria, The Guardian, Jan. 30, 2025, available at: https://www.theguardian.com/world/2025/jan/30/syria-druze-minority-protests-militia-suwayda (last visited May 31, 2025).

[139] Jana al-Issa, Hassan Ibrahim and Ali Darwish, What has been achieved and where did it fail? Interim government of Damascus establishes a transitional ground, Enab Baladi, Mar. 6, 2025, available at: https://english.enabbaladi.net/archives/2025/03/interim-government-of-damascus-establishes-a-transitional-ground/ (last visited May 31, 2025); Loveday Morris and Zakaria Zakaria, Syria could allow Russia to keep its bases, new defense minister says, Washington Post, Feb. 6, 2025, available at: https://www.washingtonpost.com/world/2025/02/06/syria-defense-minister-russia-bases/ (last visited May 31, 2025).

[140] Druze leader dismisses chance of agreement with 'radical' Syria government after constitution emerges, The New Arab, Mar. 14, 2025, available at: https://www.newarab.com/news/druze-leader-says-no-agreement-radical-syria-government (last visited May 31, 2025).

[141] Demonstration in As-Suwayda opposing Damascus government, Enab Baladi, Mar. 6, 2025, available at: https://english.enabbaladi.net/archives/2025/03/demonstration-in-as-suwayda-opposing-damascus-government/ (last visited May 31, 2025).

[142] Diaa al-Sahnawi, Suweida Military Council - what does it want and who is behind it?, The New Arab, Feb. 28, 2024, available at: https://www.newarab.com/news/what-suweida-military-council-and-why-did-it-appear-now (last visited May 31, 2025).

17

SMC calls for decentralization, prompting concerns about secessionism.[143]  There are reportedly 160 armed groups in Suwayda.[144]

In terms of hostilities, Druze fighters blocked the entry of Hay'at Tahrir al Sham government forces into Suwayda on New Year's Eve, raising tensions.[145]  Then in late February 2025, Druze fighters clashed with government forces at a checkpoint in Jaramana, a Druze-majority suburb near Damascus, resulting in the death of one Ministry of Defense employee and nine others injured.[146]  The violence escalated again in late April 2025 after a since-debunked audio clip of a Druze cleric supposedly insulting the Prophet Muhammad emerged on social media.  Islamist fighters and government security forces entered the Druze-majority areas of Jaramana and Ashrafiyat Sahnaya, killed dozens of people (including civilians and the mayor of Sahnaya), and clashed with Druze gunmen – stoking fears among some Druze – a religious minority – that they are not safe under Syria's new transitional government, particularly after the massacres in the coastal region against Alawis, another religious minority.[147]  In early May 2025, a Druze shrine in al Soura al Kabira village in Suwayda Governorate was ransacked and burnt by unknown assailants.[148]

In the midst of the power struggle and armed clashes in southern Syria, Israel has militarily intervened.  Immediately after the fall of the Asad government, the Israeli Air Force carried out more than 130 airstrikes across Syria (concentrated in the western and southern regions), wiping out 70 to 80 percent of Syria's military capacity within 48 hours.[149]  Israeli officials justified the attacks as a means of preventing the conventional and chemical weapons that belonged to the Asad regime from falling into the rebels' hands.[150]  Israel has continued regular airstrikes on

---

[143] Syria's Druze: Key players caught between local and regional power struggles, The New Arab, Mar. 11, 2025, available at: https://www.newarab.com/analysis/syrias-druze-key-players-caught-between-rival-power-struggles (last visited May 31, 2025).

[144] Syria's Druze: Key players caught between local and regional power struggles, The New Arab, Mar. 11, 2025, available at: https://www.newarab.com/analysis/syrias-druze-key-players-caught-between-rival-power-struggles (last visited May 31, 2025).

[145] Abby Sewell, Southern rebels loom large as Syria's new rulers try to form a national army, Associated Press, Jan. 22, 2025, available at: https://www.ap.org/news-highlights/spotlights/2025/southern-rebels-loom-large-as-syrias-new-rulers-try-to-form-a-national-army/ (last visited May 31, 2025).

[146] Syria forces deploy in Damascus suburb after deadly unrest: state media, The New Arab, Mar. 2, 2025, available at: https://www.newarab.com/news/syria-forces-deploy-damascus-suburb-after-deadly-unrest (last visited on May 31, 2025).

[147] Madeline Edwards, Syria's Druze fearful after deadly attacks on Damascus suburbs, Middle East Eye, May 1, 2025, available at: https://www.middleeasteye.net/news/syrias-druze-fearful-after-deadly-attacks-damascus-suburbs (last visited May 31, 2025); Sebastian Usher, Deadly clashes in Syria's Druze areas raise fears of widening unrest, BBC, May 1, 2025, available at: https://www.bbc.com/news/articles/clywl4nz2zjo (last visited May 31, 2025).

[148] Attack on Damascus nightclub kills woman, Druze shrine burnt in southern Syria, The New Arab, May 5, 2025, available at: https://www.newarab.com/news/gunmen-attack-another-damascus-nightclub-killing-one-woman (last visited May 31, 2025).

[149] Sinem Adar, Muriel Asseburg, Hamidreza Azizi, Margarete Klein and Guido Steinberg, The Fall of the Assad Regime: Regional and International Power Shifts, Stiftung Wissenschaft und Politik, Feb. 25, 2025, available at: https://www.swp-berlin.org/publikation/the-fall-of-the-assad-regime-regional-and-international-power-shifts (last visited May 31, 2025).

[150] Intense IDF Strikes Reported on Former Assad Regime's Military Sites in Syria, Foundation for Defense of Democracies, Dec. 16, 2024, available at: https://www.fdd.org/analysis/2024/12/16/intense-idf-strikes-reported-on-former-assad-regimes-military-sites-in-syria/ (last visited May 31, 2025).

DHS-AR-000034

Syria since, and in late February 2025 unilaterally declared all Syrian territory south of Damascus as a demilitarized zone that transitional government forces could not enter.[151]

In terms of ground operations, the Israeli Prime Minister Binyamin Netanyahu declared the 1974 disengagement agreement with Syria "collapsed" on the same day as the rebel takeover of the country in December 2024, and Israeli forces seized the buffer zone that previously separated Israeli and Syrian forces in the Golan Heights in the Qunaytra Governorate.[152]  Israeli forces have constructed several military posts or bases both within and outside of the buffer zone.[153] They have also destroyed several Syrian homes and fired on civilian protestors in the buffer zone.[154]  Israeli forces have entered other parts of Qunaytra and Dar'a Governorates,[155] such as Koayiah where clashes with local residents resulted in four Syrian deaths in March 2025,[156] and Saida where Israeli forces arrested two Syrian civilians in May 2025.[157]  Israeli Defense Minister Israel Katz said Israeli troops will remain in southern Syria for an "unlimited time."[158]

Israeli ministers have openly expressed support for federalism in Syria,[159] and quietly discussed plans to break Syria into autonomous cantons along ethnic and religious lines, according to Israeli media reports.[160]  Specifically regarding the Syrian Druze, Israeli Prime Minister Netanyahu has said Israel will not accept any threats to Druze in southern Syria and instructed the Israeli armed forces to "prepare to defend" the Druze after Druze fighters clashed with government forces in Jaramana in February 2025.[161]  Israeli authorities permitted Syrian Druze

[151] William Christou, Israel strikes targets in southern Syria after demanding demilitarisation, The Guardian, Feb. 25, 2025, available at: https://www.theguardian.com/world/2025/feb/25/israel-strikes-targets-in-southern-syria-after-demanding-demilitarisation (last visited May 31, 2025).

[152] Jon Donnison, Israel seizes Golan buffer zone after Syrian troops leave positions, BBC, Dec. 8, 2024, available at: https://www.bbc.com/news/articles/c77jrrxxn07o (last visited May 31, 2025).

[153] Satellite images show Israel building military bases in Syria buffer zone, Al Jazeera, Feb. 3, 2025, available at: https://www.aljazeera.com/news/2025/2/3/satellite-images-show-israel-building-military-bases-in-syria-buffer-zone (last visited May 31, 2025).

[154] Hadeel Al-Shalchi, In Syria's Golan Heights buffer zone, residents fear Israel is making a land grab, NPR, Jan. 23, 2025, available at: https://www.npr.org/2025/01/23/g-s1-43325/syria-golan-heights-israel (last visited May 31, 2025).

[155] Israeli forces launch deepest ground incursion yet into southern Syria, The New Arab, Mar. 5, 2025, available at: https://www.newarab.com/news/israeli-forces-launch-deepest-incursion-yet-southern-syria (last visited May 31, 2025).

[156] Omar Albam and Kareem Chehayeb, Israeli strikes in southwestern Syria kill 4 people as troops clash with residents, The Independent, Mar. 25, 2025, available at: https://www.independent.co.uk/news/syria-israeli-damascus-sana-bashar-assad-b2721211.html (last visited May 31, 2025).

[157] Israel steps up Quneitra incursions, abducts man, teenager in Syria, The New Arab, May 10, 2025, available at: https://www.newarab.com/news/israel-steps-quneitra-incursions-abducts-civilians-syria (last visited May 31, 2025).

[158] Jason Burke, Israel to occupy Syrian southern territory for 'unlimited time', says minister, The Guardian, Mar. 12, 2025, available at: https://www.theguardian.com/world/2025/mar/12/israel-to-occupy-syrian-southern-territory-for-unlimited-time-says-minister (last visited May 31, 2025).

[159] Seth Frantzman, Netanyahu calls for the demilitarization of southern Syria, Long War Journal, Foundation for Defense of Democracies, Feb. 25, 2025, available at: https://www.longwarjournal.org/archives/2025/02/netanyahu-calls-for-the-demilitarization-of-southern-syria.php (last visited May 31, 2025).

[160] Israeli ministers discuss plan to divide Syria along ethnic, religious lines: report, The New Arab, Jan. 11, 2025, available at: https://www.newarab.com/news/israeli-ministers-discuss-plan-divide-syria-report (last visited May 31, 2025).

[161] Emanuel Fabian, Netanyahu and Katz direct IDF to 'prepare to defend' Syrian Druze suburb of Damascus, The Times of Israel, Mar. 1, 2025, available at: https://www.timesofisrael.com/netanyahu-and-katz-direct-idf-to-prepare-to-defend-syrian-druze-suburb-of-damascus/ (last visited May 31, 2025).

DHS-AR-000035

to visit their co-religionists in the Golan Heights in March 2025 and promised to allow Syrian Druze to work in Israel.[162]  Israeli airstrikes on groups that Israeli officials said were attacking Druze followed the April 2025 clashes in Jaramana and Ashrafiyat Sahnaya.[163]

**Islamic State Attacks**

The Islamic State (IS) tripled its attacks in Syria in 2024 and is reportedly primed to take advantage of the political instability in Syria to expand operations, a tactic the group is known for.[164]  This uptick stems from IS efforts to gradually rebuild capabilities since 2022 in the central Syrian desert, though recent U.S. airstrikes following Asad's fall have set it back.[165] While Hay'at Tahrir al Sham has a history of pursuing IS militants in Idlib and the transitional government stated it had  thwarted an IS attack on a Shi'ite shrine in Damascus in January 2025,[166] fears persist that IS militants may be able to embed or blend among the jihadist (or former jihadist) fighters who now constitute much of the rank and file  of the transitional government forces.[167]  In May 2025, IS militants claimed their first attack on transitional government forces with a car bomb attack that left five dead in the eastern town of Mayadin.[168] The Syrian Democratic Forces also warns about the vulnerability of the prisons it runs in the northeast of the country that house 65,000 alleged IS militants and their relatives.[169] IS-affiliated families have attempted to flee the al Hol camp the Syrian Democratic Forces runs, and IS attacks in the al Hol region have been intensifying in recent months.[170]  From early 2025 through

---

[162] Alon Bernstein, Dozens of Syrian Druze make a rare visit to Israeli-controlled Golan Heights, Associated Press, Mar. 14, 2025, available at: https://apnews.com/article/syria-israel-druze-golan-heights-tarif-assad-fall-hts-2000a5fdc1d53a1df2dccd404b6cf140 (last visited May 31, 2025).

[163] Sebastian Usher, Deadly clashes in Syria's Druze areas raise fears of widening unrest, BBC, May 1, 2025, available at: https://www.bbc.com/news/articles/clywl4nz2zjo (last visited May 31, 2025).

[164] Colin P. Clarke, The Islamic State Is Making a Comeback, Foreign Policy, Feb. 17, 2025, available at: https://foreignpolicy.com/2025/02/17/islamic-state-syria-comeback-terrorism/ (last visited May 31, 2025); Charles Lister, With al-Assad Gone, the Risk of an ISIS Resurgence Grows, New York Times, Dec. 15, 2024, available at: https://www.nytimes.com/2024/12/15/opinion/al-assad-syria-isis.html (last visited May 31, 2025).

[165] The Islamic State's Global Long Game and Resurgence in Syria Poses an Evolved Threat to the West, Institute for the Study of War, Jan. 9, 2025, available at: https://www.understandingwar.org/backgrounder/islamic-state's-global-long-game-and-resurgence-syria-poses-evolved-threat-west (last visited May 31, 2025).

[166] Syria's new government says it thwarted Islamic State attack on Shia shrine, Middle East Eye, Jan. 11, 2025, available at: https://www.middleeasteye.net/news/syrias-new-government-says-it-thwarted-islamic-state-attack-shia-shrine (last visited May 31, 2025).

[167] Jeremy Hodge, The Islamic State (ISIS) in Syria, Small Wars Journal, Mar. 13, 2025, available at: https://smallwarsjournal.com/2025/03/13/the-islamic-state-isis-in-syria/ (last visited May 31, 2025).

[168] Aaron Zelin, The Islamic State Attacks the New Syrian Government, Washington Institute for Near East Policy, May 19, 2025, available at: https://www.washingtoninstitute.org/policy-analysis/islamic-state-attacks-new-syrian-government (last visited May 20, 2025).

[169] William Christou and Michael Safi, Forgotten by the west, Syria's IS prisons are under threat as militant group mobilises, Feb. 25, 2025, available at: https://www.theguardian.com/world/2025/feb/25/forgotten-by-west-syria-is-prisons-threat-militant-group-mobilises (last visited May 31, 2025).

[170] Zana Omer, VOA Kurdish: SDF secure and protect al-Hol Camp, Voice of America, Feb. 12, 2025, available at: https://www.voanews.com/a/voa-kurdish-sdf-secure-and-protect-al-hol-camp-/7971489.html (last visited May 31, 2025).

20

DHS-AR-000036

mid-May 2025, IS was able to carry out 86 attacks, in spite of ongoing counterterrorism efforts by the Syrian Democratic Forces.[171]

## RISKS IMPACTING CHILDREN

Children have been disproportionately affected by the 14 years of armed conflict that has devasted Syria.  More than 75 percent of the country's 10.5 million children were born into war.[172]  Currently, more than 40 percent of the nearly 20,000 schools in the country remain closed, leaving over 2.4 million children out of classrooms, and over one million at risk of dropping out.[173]  This puts them at higher risk of child labor, recruitment as child soldiers, child marriage, and trafficking.  High poverty rates have led many families to cope by putting their children to work and agreeing to early marriage for their daughters.[174]  Malnutrition threatens the lives of more than 500,000 children under five, and two million more are on the verge of malnourishment.[175]  The recruitment of child soldiers by armed groups – 28 groups in total, including Hay'at Tahrir al Sham and Syrian Democratic Forces, according to a UN report – remains a concern as armed conflict and armed groups persist.[176]

## FORCED CONSCRIPTION

During the Syrian civil war, the government of Bashar al Asad mandated military service for men for 18 months; however, in practice conscripts were forced to serve for an unspecified time, prompting many to either pay expensive exemption fees or evade service and risk harsh punishments ranging from detention to the death penalty.[177]  After December 2024, the new transitional government abolished mandatory military service, except in national emergencies relating to war.[178]  Some armed groups active in Syria have a long history of forced recruitment. For example, the Kurdish-led Syrian Democratic Forces armed group in northeast Syria

---

[171] Including 14 attacks in May | ISIS carries out 86 attacks in SDF-controlled areas since early 2025, Syrian Observatory for Human Rights, May 19, 2025, available at: https://www.syriahr.com/en/362228/ (last visited May 31, 2025).

[172] As Syria's children step out of the shadows of war, securing their future is more critical than ever, UNICEF, Mar. 25, 2025 available at: https://www.unicef.org/press-releases/syrias-children-step-out-shadows-war-securing-their-future-more-critical-ever-unicef (last visited May 31, 2025).

[173] As Syria's children step out of the shadows of war, securing their future is more critical than ever, UNICEF, Mar. 25, 2025 available at: https://www.unicef.org/press-releases/syrias-children-step-out-shadows-war-securing-their-future-more-critical-ever-unicef (last visited May 31, 2025).

[174] As Syria's children step out of the shadows of war, securing their future is more critical than ever, UNICEF, Mar. 25, 2025 available at: https://www.unicef.org/press-releases/syrias-children-step-out-shadows-war-securing-their-future-more-critical-ever-unicef (last visited May 31, 2025).

[175] As Syria's children step out of the shadows of war, securing their future is more critical than ever, UNICEF, Mar. 25, 2025 available at: https://www.unicef.org/press-releases/syrias-children-step-out-shadows-war-securing-their-future-more-critical-ever-unicef (last visited May 31, 2025).

[176] Syrian refugee crisis: Facts, FAQs, and how to help, World Vision, Mar. 10, 2025, available at: https://www.worldvision.org/refugees-news-stories/syrian-refugee-crisis-facts (last visited May 31, 2025); Children and armed conflict, United Nations Security Council, Jun. 23, 2022, p. 25, available at: https://documents.un.org/doc/undoc/gen/n22/344/71/pdf/n2234471.pdf (last visited May 31, 2025).

[177] Why Al-Sharaa's scrapping of conscription for Syrians matters, The New Arab, Dec. 16, 2024, available at: https://www.newarab.com/news/why-al-sharaas-scrapping-conscription-syrians-matters (last visited May 31, 2025).

[178] Why Al-Sharaa's scrapping of conscription for Syrians matters, The New Arab, Dec. 16, 2024, available at: https://www.newarab.com/news/why-al-sharaas-scrapping-conscription-syrians-matters (last visited May 31, 2025).

DHS-AR-000037

mandates one year of service and enforces it at checkpoints where draft evaders and deserters are punished with an extension of service.[179]

## FOOD SECURITY

Prior to the outbreak of conflict in 2011, Syria was the only country in the region that was self-sufficient in food production due to its robust agriculture sector.[180] Years of civil war have rendered Syria the sixth most food-insecure country in the world.[181] Compounding the effects of war, Syria (and particularly its fertile Euphrates Basin region) has been facing a drought since 2020 that has significantly reduced agriculture production, elevated food prices, and exacerbated food insecurity.[182] Other developments in recent years – including the war in Ukraine since 2022 (which sent food prices skyrocketing in Syria due to reliance on imported wheat since the start of the Syria conflict in 2011), the 2023 earthquakes (which complicated aid delivery to affected populations in the north), and economic collapse (tripling the cost of living over the last three years) – have put food out of reach for many Syrians.[183] While centered in Türkiye, the earthquakes devastated an already dire humanitarian situation in northern Syria, killing 5,954 people, displacing 392,000, and affecting 8.8 million.[184]

Today, 16.5 million people in Syria are in need of humanitarian assistance,[185] 12.9 million are food insecure, and 3 million are in the grip of severe hunger.[186] The population of Syria is 23.87 million.[187] According to the UN World Food Programme (WFP), Syria's post-Asad transition is fragile, and its success may depend to a large extent on meeting food security needs by ceasing hostilities, reviving the food system, rebuilding infrastructure, and increasing international assistance.[188] Indeed, Syria's continued food insecurity may threaten not only national, but also

---

[179] Syria: Military recruitment in North and East Syria, Danish Immigration Service, Jun. 2024, available at: https://www.ecoi.net/en/file/local/2112078/ffm-report-military-recruitment-in-nes-final.pdf (last visited May 31, 2025).

[180] Food Insecurity in War-Torn Syria, Carnegie Endowment for International Peace, Regional Insight, Jun. 4, 2015, available at: https://carnegieendowment.org/2015/06/04/food-insecurity-in-war-torn-syria-from-decades-of-self-sufficiency-to-food-dependence-pub-60320 (last visited May 31, 2025).

[181] After 13 Years of War in Syria, More than Half the Population Faces Hunger, Action Against Hunger, Mar. 17, 2024, available at: https://reliefweb.int/report/syrian-arab-republic/after-13-years-war-syria-more-half-population-faces-hunger (last visited May 31, 2025).

[182] Jalal Al-Attar, Syria's Water and Food Security Crisis, Carnegie Endowment, Apr. 4, 2024, available at: https://carnegieendowment.org/sada/2024/04/syrias-water-and-food-security-crisis?lang=en (last visited May 31, 2025).

[183] What's Happening in Syria? How the Civil War Is Worsening Hunger Among Civilians, World Food Program USA, Dec. 12, 2024, available at: https://www.wfpusa.org/articles/whats-happening-syria-civil-war-worsening-hunger-among-civilians/ (last visited May 31, 2025).

[184] UNDP's Response: Türkiye-Syria Earthquakes, United Nations Development Programme (UNDP), available at: https://www.undp.org/turkiye-syria-earthquakes (last visited May 31, 2025).

[185] Syria's humanitarian crisis: 16.5 million in need amid continuing conflict, UN News, Mar. 20, 2025, available at: https://news.un.org/en/story/2025/03/1161326 (last visited May 31, 2025).

[186] Emergency: Syria, World Food Programme, available at: https://www.wfp.org/emergencies/syria-emergency (last visited May 31, 2025).

[187] Syria, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/syria/ (last visited May 31, 2025).

[188] WFP Syria Emergency Response - External Situation Report, World Food Programme, Mar. 2, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/wfp-syria-emergency-response-external-situation-report-19-february-2025 (last visited May 31, 2025).

DHS-AR-000038

regional stability.[189]  Armed violence – particularly in the coastal areas and the northeast – has caused severe food shortages, and the outlook for the 2024/2025 wheat cropping season is bleak due to conflict-related disruptions to irrigation and planting work.[190]  Cuts to international food assistance since the Hay'at Tahrir al Sham-led government assumed power have only complicated the response to food crisis.[191]

## ACCESS TO WATER

Access to clean water and sanitation in Syria remains a major challenge, with many families depending on unreliable water sources, increasing the risk of disease.[192]  A January 2025 survey found that across Syria, 47 percent of people lack sufficient water, and 70 percent rely on water trucking as their primary water source, which is more expensive and less reliable than piped water, particularly in a country like Syria racked by poverty and water insecurity.[193]  Drought in recent years has devastated the country's water capacity.[194]  After the dryest winter in decades, Damascus and its suburbs are currently facing a water crisis.[195]  In order to cope, people without sufficient water reduce their consumption, use less preferred water sources, and do not bathe regularly.[196]

Waterborne diseases remain a problem.  The 2022 cholera outbreak has been contained, but poor water and sanitation systems – particularly in crowded displacement centers and detention facilities such as the al Hol camp in northeast Syria – have led to repeated outbreaks of infectious diseases, including a cholera resurgence in 2024.[197]

---

[189] Anan Tello, How Syria's continuing food insecurity threatens national and regional stability, Arab News, Feb. 1, 2025, available at: https://www.arabnews.com/node/2588675/middle-east (last visited May 31, 2025).

[190] Syrian Arab Republic: Humanitarian Situation Report No. 3, UN OCHA, Mar. 10, 2025, available at: https://www.unocha.org/publications/report/syrian-arab-republic/syrian-arab-republic-humanitarian-situation-report-no-3-10-march-2025 (last visited May 31, 2025).

[191] UN food agency says some countries are hesitant to fund urgent Syrian aid under new government, The New Arab, Jan. 15, 2025, available at: https://www.newarab.com/news/un-food-agency-says-donors-hesitant-fund-urgent-syrian-aid (last visited May 31, 2025).

[192] Syria Complex Emergency - Need Assessment Report, Syria Red Crescent, Mar. 2025, available at: https://reliefweb.int/report/syrian-arab-republic/syria-complex-emergency-need-assessment-report-march-2025-enar (last visited May 31, 2025).

[193] Rapid Needs Assessment (RNA) - Water, Sanitation and Hygiene Services: Whole of Syria WASH Cluster, UNICEF, Mar. 2025, available at: https://reliefweb.int/report/syrian-arab-republic/rapid-needs-assessment-rna-water-sanitation-and-hygiene-services-whole-syria-wash-cluster-march-2025 (last visited May 31, 2025).

[194] Lyse Mauvais, Northeastern Syria's Water Crisis and the Limits of Humanitarian Intervention, in The Thirst for Power: Overcoming the Politics of Water in the Middle East, Center for Strategic & International Studies, March 7, 2025, available at: https://www.csis.org/analysis/thirst-power (last visited May 31, 2025).

[195] Ghaith Alsayed and Omar Sanadiki, Syria's driest winter in nearly 7 decades triggers a severe water crisis in Damascus, Associated Press, May 20, 2025, available at: https://apnews.com/article/syria-water-shortages-damascus-ein-alfijeh-barada-3f2d129001949167beb13ce6cdeb03aa (last visited May 31, 2025).

[196] Rapid Needs Assessment (RNA) - Water, Sanitation and Hygiene Services: Whole of Syria WASH Cluster, UNICEF, Mar. 2025, available at: https://reliefweb.int/report/syrian-arab-republic/rapid-needs-assessment-rna-water-sanitation-and-hygiene-services-whole-syria-wash-cluster-march-2025 (last visited May 31, 2025).

[197] Community-based surveillance improves cholera reporting in Al Hol Camp, Syria, World Health Organization, Mar. 10, 2025, available at: https://www.emro.who.int/syria/news/community-based-surveillance-improves-cholera-reporting-in-al-hol-camp-syria.html (last visited May 31, 2025).

23

Armed violence continues to severely impact water infrastructure and the power stations that infrastructure depends on, reducing clean water access, especially in the northeast of the country where 80 percent of water supply systems are not functioning and 1.8 million people lack access to safe water.[198]  Fighting at the Tishrin Dam east of Aleppo in December 2024 has cut off water and electricity for 400,000 people.[199]  The main water station serving over 100,000 people in Kobani/'Ayn al 'Arab was destroyed in fighting in February 2025.[200]  Türkiye also diverts the flow of water from the Euphrates River for its own use, reducing its availability downstream in Syria.[201]  Internally displaced people are particularly vulnerable to water insecurity: over two million IDPs living in camps and informal settlements in the northwest and northeast are still in need of life-saving water and sanitation services.[202]  Water infrastructure in the north was severely impacted by the February 2023 earthquakes.[203]

## HEALTHCARE

Years of civil war have caused severe damage to Syria's healthcare infrastructure, destroying or significantly damaging more than half of the country's hospitals.[204]  Currently, only 57 percent of Syrian hospitals and 37 percent of primary healthcare centers are fully functional, and shortages of medical supplies are widespread.[205]  More than 65 percent of the population (or 15.8 million people) are in need of humanitarian health assistance in 2025.[206]

Healthcare provision remains unstable in conflict-afflicted areas of the country.  The recent armed violence in Syria's coastal areas, for example, has impacted 14 public hospitals and 260 health facilities, flooded them with casualties, and prevented health staff from reporting for

---

[198] Syrian Arab Republic: Water, Sanitation and Hygiene, Humanitarian Action, Jan. 28, 2025, available at: https://humanitarianaction.info/plan/1276/document/syrian-arab-republic-humanitarian-response-priorities-january-march-2025/article/39-water-sanitation-and-hygiene-0 (last visited May 31, 2025).

[199] Syria Situation Report, iHH Humanitarian Relief Foundation, Jan. 10, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/ihh-syria-situation-report-10-january-2025 (last visited May 31, 2025).

[200] Whole of Syria WASH Cluster: Advocacy note on Water Access Crisis in Kobani/AinArab, Ein Issa and Manbij – Aleppo and Raqqa Governorates, Syria, UNICEF, Mar. 24, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/whole-syria-wash-cluster-advocacy-note-water-access-crisis-kobaniainarab-ein-issa-and-manbij-aleppo-and-raqqa-governorates-syria-24-march-2024 (last visited May 31, 2025).

[201] Jalal Al-Attar, Syria's Water and Food Security Crisis, Carnegie Endowment for International Peace, Apr. 4, 2024, available at: https://carnegieendowment.org/sada/2024/04/syrias-water-and-food-security-crisis?lang=en (last visited May 31, 2025).

[202] Syrian Arab Republic: Water, Sanitation and Hygiene, Humanitarian Action, Jan. 28, 2025, available at: https://humanitarianaction.info/plan/1276/document/syrian-arab-republic-humanitarian-response-priorities-january-march-2025/article/39-water-sanitation-and-hygiene-0 (last visited May 31, 2025).

[203] Inadequate water and sanitation pose health threats in Syria, Doctors without Borders, Jun. 16, 2023, available at: https://www.msf.org/inadequate-water-and-sanitation-pose-health-threats-syria (last visited May 31, 2025).

[204] Talya Meyers, A Stunning End to Civil War in Syria Brings Urgent Need, New Possibilities, Direct Relief, Dec. 12, 2024, available at: https://www.directrelief.org/2024/12/a-stunning-end-to-civil-war-in-syria-brings-urgent-need-new-possibilities/ (last visited May 31, 2025).

[205] Health Sector Syria - Health Sector Bulletin, World Health Organization, Mar. 2, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/health-sector-syria-health-sector-bulletin-february-2025 (last visited May 31, 2025).

[206] Health Sector Syria - Health Sector Bulletin, World Health Organization, Mar. 2, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/health-sector-syria-health-sector-bulletin-february-2025 (last visited May 31, 2025).

24

duty.[207]  International assistance shortfalls threaten 246 health facilities in the conflict-afflicted north of the country with closure.[208]  Up to 70 percent of Syria's health workforce left the country during the civil war, making medical training and capacity building in the post-Asad transitional phase essential.[209]  The collapse of the Asad government and reunification of territory under the control of transitional authorities has in fact allowed health providers to travel to hospitals and health facilities that had been out of reach for years.[210]

## UNEXPLODED ORDNANCES, INCLUDING LANDMINES

Syria has the second highest number of annual casualties from antipersonnel mines in the world, after Burma/Myanmar.[211]  Unexploded ordnances, including landmines, pose a serious risk for the Syrian population.  Thousands of landmines, unexploded shells and munitions are scattered across the country, in both major cities and rural areas, as a result of 14 years of armed conflict.[212]  Since the fall of the Asad government in December 2024, 640 people have been killed or injured by these war remnants, a spike in casualties attributed to the accidental contact Syrians have had while increasingly moving throughout the country (over one million displaced people have returned to their home areas).[213]  One third of the victims are estimated to be children.[214]

Understanding the scale of the threat posed by unexploded ordnances is itself a challenge due to the ongoing conflict.  The Halo Syria organization has called for a comprehensive survey of unexploded ordnances to be conducted and estimates that around a million devices would need to be destroyed to protect civilian lives.[215]  In the meantime, groups like the White Helmets are attempting to remove visible ordnances, but due to the threat posed by less-visible landmines,

---

[207] Syrian Arab Republic: Humanitarian Situation Report No. 3, UN OCHA, Mar. 10, 2025, available at: https://www.unocha.org/publications/report/syrian-arab-republic/syrian-arab-republic-humanitarian-situation-report-no-3-10-march-2025 (last visited May 31, 2025).

[208] WHO calls for urgent support to rebuild Syria's health system, World Health Organization, Eastern Mediterranean Region, Mar. 17, 2025, available at: https://www.emro.who.int/syria/news/who-calls-for-urgent-support-to-rebuild-syrias-health-system.html (last visited May 31, 2025).

[209] WHO calls for urgent support to rebuild Syria's health system, World Health Organization, Eastern Mediterranean Region, Mar. 17, 2025, available at: https://www.emro.who.int/syria/news/who-calls-for-urgent-support-to-rebuild-syrias-health-system.html (last visited May 31, 2025).

[210] Talya Meyers, Lifesaving medical training becomes available to once-isolated areas of Syria, Direct Relief, Mar. 17, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/lifesaving-medical-training-becomes-available-once-isolated-areas-syria (last visited May 31, 2025).

[211] Landmines: New Casualties Show Need to Support Treaty Ban, Human Rights Watch, Nov. 19, 2024, available at: https://www.hrw.org/news/2024/11/19/landmines-new-casualties-show-need-support-treaty-ban (last visited May 31, 2025).

[212] Landmines in Syria kill hundreds of civilians returning home after fall of Assad, The Guardian, Mar. 17, 2025, available at https://www.theguardian.com/global-development/2025/mar/17/syria-landmines-kill-hundreds-fall-of-assad (last visited May 31, 2025).

[213] Landmines in Syria kill hundreds of civilians returning home after fall of Assad, The Guardian, Mar. 17, 2025, available at https://www.theguardian.com/global-development/2025/mar/17/syria-landmines-kill-hundreds-fall-of-assad (last visited May 31, 2025).

[214] Landmines in Syria kill hundreds of civilians returning home after fall of Assad, The Guardian, Mar. 17, 2025, available at https://www.theguardian.com/global-development/2025/mar/17/syria-landmines-kill-hundreds-fall-of-assad (last visited May 31, 2025).

[215] Syrians returning home face deadly threats of landmines, BBC, Jan. 23, 2025, available at: https://www.bbc.com/news/articles/cn9311vwy0yo (last visited May 31, 2025).

DHS-AR-000041

have taken to cordoning off affected fields, homes, and neighborhoods to warn residents of the danger posed.[216]  Unexploded ordnances also have a negative economic impact, preventing farmers and home owners from using their properties.[217]

## INFRASTRUCTURE

Years of civil war in Syria have left the country's infrastructure in tatters.  Relentless fighting, airstrikes, and sieges have devastated industrial zones, agricultural land, and public infrastructure and destroyed roads, bridges, hospitals, schools and power plants, leaving millions without access to essential services.[218]  The estimated cost of rebuilding the country ranges between $250 billion and $400 billion.[219]  That is a monumental figure considering that Syria's gross domestic product in 2022 (the most recent figure recorded by the World Bank) was $23.62 billion.[220]

According to the United Nations Development Programme (UNDP):

> Almost one-third of all housing units were either destroyed or severely damaged during the conflict years, leaving 5.7 million people in Syria in need of shelter support today. Over half of water treatment plants and sewer systems are damaged or non-operational, leaving nearly 14 million people – more than half the population – without clean water, sanitation, and hygiene. Energy production has fallen by 80 percent, with over 70 percent of power plants and transmission lines damaged, reducing the national grid's capacity by more than three-quarters.[221]

One of the most pressing infrastructure challenges is keeping the lights on: Syria's heavily damaged electrical grid and gas refineries cannot meet domestic demand, and power rations of just two hours per day have left Syrians in the dark.[222]  Transitional government authorities say they aim to rebuild the energy infrastructure by rooting out corruption and importing needed spare parts.  In the meantime, Syrians who can afford to, use noisy diesel-powered generators to cope with energy deficits, but even they struggle to do so because domestic oil production has

---

[216] Syrians returning home face deadly threats of landmines, BBC, Jan. 23, 2025, available at: https://www.bbc.com/news/articles/cn9311vwy0yo (last visited May 31, 2025).

[217] Syrians returning home face deadly threats of landmines, BBC, Jan. 23, 2025, available at: https://www.bbc.com/news/articles/cn9311vwy0yo (last visited May 31, 2025).

[218] Majid Rafizadeh, Rebuilding Syria's infrastructure a critical priority, Arab News, Jan. 23, 2025, available at: https://www.arabnews.com/node/2587499/%7B%7B (last visited May 31, 2025).

[219] Diana Rayes, Dispatch from Damascus: The challenges of rebuilding are becoming clearer in Syria, Atlantic Council, Jan. 3, 2025, available at: https://www.atlanticcouncil.org/blogs/menasource/dispatch-from-damascus-challenges-of-rebuilding-in-syria/ (last visited May 31, 2025).

[220] GDP (current US$) - Syrian Arab Republic, World Bank Group, available at: https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=SY (last visited May 31, 2025).

[221] Accelerating Economic Recovery is Critical to Reversing Syria's Decline and Restoring Stability, UNDP, Feb. 20, 2025, available at: https://www.undp.org/syria/press-releases/accelerating-economic-recovery-critical-reversing-syrias-decline-and-restoring-stability (last visited May 31, 2025).

[222] Emily Feng and Jawad Rizkallah, Syria's new government is trying to rebuild. First it must keep the lights on, NPR, Feb. 2, 2025, available at: https://www.npr.org/2025/01/28/nx-s1-5269427/syria-new-government-electricity (last visited May 31, 2025).

26

fallen, and fuel has to be smuggled from Lebanon.[223]  In May 2025, Syria signed a memorandum of understanding with a consortium of international companies led by Qatar's UCC Holding to rebuild electricity infrastructure.[224]

Another challenge in rebuilding Syria's infrastructure is the rising cost of building materials, driven by increasing demand as displaced people return to destroyed homes and seek to rebuild. Some factories like the Hama Cement Plant are back up and running, but production capacity remains low.[225]

## TRANSPORTATION

Transportation throughout Syria remains a daily challenge for Syrians.  Prior to the collapse of the Asad government in December 2024, difficulties in transportation were mainly attributed to high fuel cost and damage to infrastructure.[226]  Fuel prices in post-Asad Syria have varied chaotically due to the transitional government's permissive attitude toward fuel smuggling from Lebanon and challenges in properly importing fuel from abroad through oil and gas transport lines.[227]  The increase in fuel prices has led to a rise in transportation costs and obstructed the return of displaced people to their original cities and towns with their possessions.[228]

Meanwhile roads and bridges damaged or destroyed in the civil war (often deliberately by the warring parties) remain largely in need of repair.[229]  These include important highways such as the Homs-Latakia highway, which was blocked in the recent hostilities in the coastal region, restricting humanitarian access and movement.[230]  Debris from the February 2023 earthquakes remains on many roads in the north, though clean-up efforts are underway.[231]

---

[223] Emily Feng and Jawad Rizkallah, Syria's new government is trying to rebuild. First it must keep the lights on, NPR, Feb. 2, 2025, available at: https://www.npr.org/2025/01/28/nx-s1-5269427/syria-new-government-electricity (last visited May 31, 2025).

[224] Riham Alkousaa, Syria signs $7 billion power deal with Qatar's UCC Holding-led consortium, Reuters, May 29, 2025, available at: https://www.reuters.com/business/energy/syria-signs-7-billion-power-deal-with-qatars-ucc-holding-led-consortium-2025-05-29/ (last visited May 31, 2025).

[225] Samah Alloush, Construction material prices rise by 20% in northern Syria, Enab Baladi, Mar. 19, 2025, available at: https://english.enabbaladi.net/archives/2025/03/construction-material-prices-rise-by-20-in-northern-syria/ (last visited May 31, 2025).

[226] William Christou, Syria raises gas prices for second time within one month despite protests, The New Arab, Sep. 19, 2023, available at: https://www.newarab.com/news/syria-raises-gas-prices-second-time-one-month (last visited May 31, 2025).

[227] Fuel stalls: Efforts to regulate parallel market in Damascus, Enab Baladi, Feb. 18, 2025, available at: https://english.enabbaladi.net/archives/2025/02/fuel-stalls-efforts-to-regulate-parallel-market-in-damascus/ (last visited: May 31, 2025).

[228] Samah Alloush, Transportation fees hinder return of displaced persons in Idlib, Enab Baladi, Jan. 16, 2025, available at: https://english.enabbaladi.net/archives/2025/01/transportation-fees-hinder-return-of-displaced-persons-in-idlib/ (last visited May 31, 2025).

[229] Fareed Rahman, Turkish firms see massive boost as they eye contracts for Syria's reconstruction, MSN, Mar. 19, 2025, available at: https://www.msn.com/en-ae/money/news/turkish-firms-see-massive-boost-as-they-eye-contracts-for-syrias-reconstruction/ar-AA1Bd486 (last visited May 31, 2025).

[230] Syrian Arab Republic: Humanitarian Situation Report No. 3, UN OCHA, Mar. 10, 2025, available at: https://www.unocha.org/publications/report/syrian-arab-republic/syrian-arab-republic-humanitarian-situation-report-no-3-10-march-2025 (last visited May 31, 2025).

[231] Clearing debris to save and improve lives, OCHA, Mar. 19, 2025, available at: https://reliefweb.int/report/syrian-arab-republic/clearing-debris-save-and-improve-lives (last visited May 31, 2025).

27

DHS-AR-000043

Türkiye is hoping to lead the rehabilitation of Syria's transportation infrastructure, and Turkish transport minister Abdulkadir Uraloğlu has laid out an ambitious plan that includes rebuilding sections of the historic Hejaz Railway that ran from Istanbul, through Syria, to Medina in present-day Saudi Arabia.[232]  In February 2025, Türkiye sent a team of technicians to Syria to start work on rebuilding Damascus International Airport.[233]

## ECONOMY

Despite recent political changes, Syria's economy is still in crisis.  Years of armed conflict have shrunk the economy drastically from a pre-war gross domestic product of $61.39 billion in 2010 to $23.62 billion in 2022.[234]  The UNDP estimates a cumulative economic loss over the course of the conflict at $800 billion,[235] and warns that at current growth rates, Syria's economy will not regain its pre-war GDP level until 2080.[236]  Syria's poverty rate has nearly tripled from 33 percent before the conflict to 90 percent today, while extreme poverty has surged six-fold, from 11 percent to 66 percent.[237]

Syria's new Islamist leaders have sought not only to lift international sanctions and recuperate frozen assets,[238] but also to radically overhaul the economy from one based on state direction to the free market.[239]  They are in talks with the World Bank to resume cooperation.[240]  Meanwhile, Syrians continue to feel the economic pinch with high prices at market.  The transitional government eased import restrictions, which reduced the cost of some goods, but it also

---

[232] Sergio Cantone, Syria's road ahead: How transport infrastructure could be the key to stability, Euro News, Jan. 10, 2025, available at: https://www.euronews.com/2025/01/10/syrias-road-ahead-how-transport-infrastructure-could-be-the-key-to-stability (last visited May 31, 2025).

[233] Turkey sends team of experts to Syria to help renovate Damascus International Airport, The New Arab, Feb. 17, 2025, available at https://www.newarab.com/news/turkey-sends-team-syria-renovate-damascus-airport (last visited May 31, 2025).

[234] GDP (current US$) - Syrian Arab Republic, World Bank Group, available at: https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=SY (last visited May 31, 2025).

[235] UNDP calls for long-term investment to support recovery in Syria, UN News, Feb. 20, 2025, available at: https://news.un.org/en/story/2025/02/1160346 (last visited May 31, 2025).

[236] Accelerating Economic Recovery is Critical to Reversing Syria's Decline and Restoring Stability, UNDP, Feb. 20, 2025, available at: https://www.undp.org/syria/press-releases/accelerating-economic-recovery-critical-reversing-syrias-decline-and-restoring-stability (last visited May 31, 2025).

[237] Accelerating Economic Recovery is Critical to Reversing Syria's Decline and Restoring Stability, UNDP, Feb. 20, 2025, available at: https://www.undp.org/syria/press-releases/accelerating-economic-recovery-critical-reversing-syrias-decline-and-restoring-stability (last visited May 31, 2025).

[238] Karin Strohecker and Libby George, Syria's economy: The devastating impact of war and sanctions, Reuters, Jan. 6, 2025, available at: https://www.reuters.com/world/middle-east/syrias-new-leaders-face-economy-decimated-by-war-sanctions-2025-01-06/ (last visited May 31, 2025).

[239] Ceyda Caglayan, Turkish firms pursue ambitious plans in rebuilding of Syria's economy, Reuters, Feb. 4, 2025, available at: https://www.reuters.com/world/middle-east/turkish-firms-pursue-ambitious-plans-rebuilding-syrias-economy-2025-02-04/ (last visited May 31, 2025).

[240] Syria economy minister discusses resuming cooperation with World Bank, Arab News, Feb 25, 2025, available at: https://www.arabnews.com/node/2591496/middle-east (last visited May 31, 2025).

DHS-AR-000044

eliminated bread subsidies (sending the cost of the food staple skyrocketing tenfold) and set limits on cash withdrawals in the face of a liquidity crisis.[241]

Syria's currency, the lira, crashed with the economic crisis in neighboring Lebanon in 2019. Asad-era officials attempted to cope by setting different exchange rates for different transactions, but this created huge disparities between official and black-market rates.  The new transitional government has adopted a unified exchange rate, and the lira has gained in strength from 22,000 lira to the dollar (the black-market rate around Asad's fall in December 2024) to around 13,000 in early 2025.[242]

Initial statements or decisions by the United States[243] and European Union[244] to begin lifting sanctions on Syria sparked some optimism among Syrians about their economic prospects[245] and increased the value of the Syrian lira; however, experts say that economic improvement will take time, and undoing multiple sanction regimes is a complex process.[246]

Captagon narcotics production became the most valuable economic sector in Syria under Asad (reaching an estimated $5.6 billion in market value).[247]  The transitional government has vowed to crackdown, but concerns remain about new players taking the place of Asad's cronies (alleged to be central players in captagon production), as well as the need to find alternative licit economic pathways to fill the economic gap that stamping out captagon would create.[248]

### RETURN TO SYRIA

Over the course of Syria's 14-year civil war, more than 14 million Syrians fled their homes, 6 million of whom left the country.[249]  Since the fall of the Asad government in December 2024,

---

[241] Raja Abdulrahim, As Ramadan Nears, Syrians Feel the Pinch of a Cash Shortage, New York Times, available at: https://www.nytimes.com/2025/02/28/world/middleeast/syria-ramadan-economy-cash-shortage.html (last visited May 31, 2025).

[242] Karin Strohecker and Libby George, Syria's economy: The devastating impact of war and sanctions, Reuters, Jan. 6, 2025, available at: https://www.reuters.com/world/middle-east/syrias-new-leaders-face-economy-decimated-by-war-sanctions-2025-01-06/ (last visited May 31, 2025).

[243] Zeke Miller, Bassem Mroue and Aamer Madhani, Trump says he will ease sanctions on Syria and move to restore relations with new leader, Associated Press, May 13, 2025, available at: https://apnews.com/article/ahmad-alsharaa-trump-syria-bashar-al-assad-6facdef5b881286955b95e0c5b2704d7 (last visited May 31, 2025).

[244] EU reaches initial deal to lift economic sanctions on Syria: Reports, Al Jazeera, May 20, 2025, available at: https://www.aljazeera.com/news/2025/5/20/eu-agrees-to-lift-all-economic-sanctions-on-syria-diplomats (last visited May 31, 2025).

[245] Ayah El-Khalidi, Memes, merriment and market buzz: Syrians celebrate US plan to lift sanctions, Middle East Eye, May 14, 2025, available at: https://www.middleeasteye.net/trending/syrians-celebrate-trump-announcment-lifting-sanctions (last visited May 31, 2025).

[246] Kareem Chehayeb and Bassem Mroue, What would lifting US sanctions on Syria mean to the war-torn country?, Associated Press, May 14, 2025, available at: https://apnews.com/article/trump-lifting-syria-sanctions-al-sharaa-8bcf421edddad122780a56e7f2b63187 (last visited May 31, 2025).

[247] Karin Strohecker and Libby George, Syria's economy: The devastating impact of war and sanctions, Reuters, Jan. 6, 2025, available at: https://www.reuters.com/world/middle-east/syrias-new-leaders-face-economy-decimated-by-war-sanctions-2025-01-06/ (last visited May 31, 2025).

[248] Emir Nader, What now for Syria's £4.5bn illegal drug empire, Dec. 21, 2024, available at: https://www.bbc.com/news/articles/c2dxnn1406do (last visited May 31, 2025).

[249] Syria Refugee Crisis Explained, UNHCR, Mar. 13, 2025, available at: https://www.unrefugees.org/news/syria-refugee-crisis-explained/ (last visited May 31, 2025).

DHS-AR-000045

about 500,000 have crossed the border back into Syria from neighboring countries like Türkiye, Lebanon, and Jordan,[250] many hopeful to rebuild their lives in their country.[251]  Syria's transitional government has also encouraged refugees to return home and help rebuild the country.[252]  Significantly, however, tens of thousands have also fled Syria in the same time period.  Estimates range between 44,000 to 100,000 people – primarily religious minorities and those affiliated with the former Asad government – who fled to Lebanon after Hay'at Tahrir al Sham-led rebels seized control in December 2024, fearing retribution.[253]  More recently, an estimated 13,000 Alawis fled to Lebanon following the March 2025 sectarian massacres in Syria's coastal governorates.[254]

In a January 2025 survey conducted by UNCHR, 80 percent of respondent Syrians displaced abroad expressed a desire to return home one day, yet only 27 percent expressed an intention to return in the next 12 months.[255]  Many are watching closely to see the impact of the new transitional government, while others are unsure if they still have a home to return to.  Sixty percent of Syrians displaced abroad expressed an interest in doing a "go and see" visit to check on their former homes before making the decision to return.[256]

While many Syrians have expressed a desire to return to their country, those who choose to return may face serious challenges, including high poverty levels, food insecurity, lack of basic services, safety concerns, and difficulty finding housing.[257]  An estimated 328,000 homes in

[250] Syrian centenarian leads his family home as returns reach half a million, UNHCR, May 16, 2025, available at: https://www.unhcr.org/us/news/stories/syrian-centenarian-leads-his-family-home-returns-reach-half-million (last visited May 31, 2025).

[251] Returning Syrians filled with hope despite the challenges ahead, UNHCR, Feb. 11, 2025 available at: https://www.unrefugees.org/news/returning-syrians-filled-with-hope-despite-the-challenges-ahead/ (last visited May 31, 2025).

[252] Richard Spencer, Samer Al-Atrush, Edmund Bower, and Tom Kington, New Syrian PM urges refugees: Come home and help us rebuild, The Times, Dec. 11, 2024, available at: https://www.thetimes.com/world/middle-east/article/israel-defends-strikes-syria-conflict-gzx8xz7d3 (last visited May 31, 2025).

[253] Nada Homsi, Syrians who fear retribution from rebels flee to Lebanese border, The National [UAE], Dec. 22, 2024, available at: https://www.thenationalnews.com/news/mena/2024/12/22/syrian-minorities-camp-on-lebanese-border-in-fear-of-retribution-from-rebels/ (last visited May 31, 2025) (estimating the number of Syrians who fled to Lebanon at 44,000, according to Lebanese officials); Laila Bassam, John Davison, Maggie Michael and Tuvan Gumrukcu, Syrian Shi'ites and other minorities flee to Lebanon, fearing Islamist rule, Reuters, Dec. 13, 2024, available at: https://www.reuters.com/world/middle-east/syrian-shiites-other-minorities-flee-lebanon-fearing-islamist-rule-2024-12-13/ (last visited May 31, 2025) (estimating the number at 100,000, according to a senior Lebanese official).

[254] Nearly 13,000 Syrians fled to Lebanon since recent attacks: Report, Agence France-Presse, Mar. 19, 2025, available at: https://www.khaleejtimes.com/world/nearly-13000-syrians-fled-to-lebanon-since-recent-attacks-report (last visited May 31, 2025); Nader Durgham, Syrian Alawis sheltering in Lebanon say it isn't safe to return home, Middle East Eye, Mar. 11, 2025, available at: https://www.middleeasteye.net/news/syrian-alawis-sheltering-lebanon-isnt-safe-return-home (last visited May 31, 2025).

[255] Repatriation explained: why Syrian refugees are voluntarily returning, UNHCR, Mar. 12, 2025, available at: https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning/ (last visited May 31, 2025).

[256] Repatriation explained: why Syrian refugees are voluntarily returning, UNHCR, Mar. 12, 2025, available at: https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning/ (last visited May 31, 2025).

[257] Beyond return: Ensuring sustainable recovery & (re)-integration in Syria, Norwegian Refugee Council, May 15, 2025, available at: https://www.nrc.no/resources/reports/beyond-return-ensuring-sustainable-recovery--re-integration-in-syria (last visited May 31, 2025).

DHS-AR-000046

Syria have either been destroyed or severely damaged during the civil war, and between 600,000 and one million homes moderately or lightly damaged.[258]  Before the war, the total number of housing units in Syria in 2010 was estimated at four million.[259]

## RELOCATION WITHIN SYRIA

Syria has an estimated 7.4 million internally displaced persons (IDPs).[260]  That IDP figure constitutes about 31 percent of the total population of 23.87 million[261] and represents the second highest number of internally displaced people in the world after Sudan.[262]  Of the total IDP population, 5.2 million are estimated to be living outside designated IDP sites, while 2.1 million reside across 1,736 IDP sites.[263]  Between November 2024 and March 2025, 673,038 new IDPs have been recorded; however, an estimated 926,242 individuals have returned home since the fall of the Asad government, including 188,121 returning home from IDP sites.[264]  The UN estimates that up to 600,000 internally displaced people inside of Syria could return to their hometowns over the subsequent six months, with up to one million planning to return home within the next year.[265]

Despite the growing number of returnees, the 7.4 million IDPs remain some of the most vulnerable people in Syria.  The UN's International Organization for Migration (IOM) reports that 28 percent of those who returned to their places of origin are residing in damaged or unfinished buildings.[266]  According to UNHCR, Syria remains entrenched in a "humanitarian crisis" stemming from 14 years of civil conflict, which complicates efforts to meet returnees' basic needs, including: housing, jobs, schools, hospitals, electricity and clean water.[267]  The serious risk of death or injury from unexploded ordnances also impedes the ability of displaced

---

[258] Raja Abdulrahim, Syrians Want to Go Home, but Many No Longer Have One to Return To, The New York Times, Mar. 13, 2025, available at: https://www.nytimes.com/2025/03/13/world/middleeast/syria-refugees-return-home-war.html (last visited May 31, 2025).

[259] The Housing Crisis in Syria: Do Social Housing and Housing Cooperatives Still Have a Role?, The Syria Report, Sep. 29, 2021, available at: https://hlp.syria-report.com/hlp/the-housing-crisis-in-syria-do-social-housing-and-housing-cooperatives-still-have-a-role/ (last visited May 31, 2025).

[260] Syris Refugee Crisis Explained, UNHCR, Mar. 13, 2025, available at: https://www.unrefugees.org/news/syria-refugee-crisis-explained/ (last visited May 31, 2025).

[261] See: Syria, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/syria/ (last visited May 31, 2025).

[262] Syrian Arab Republic, Internal Displacement Monitoring Centre (IDMC), last updated May 14, 2025, available at: https://www.internal-displacement.org/countries/syria/ (last visited May 31, 2025).

[263] Syria governorates IDPs and IDP returnee's overview, UNHCR, Mar. 15, 2025, available at: https://data.unhcr.org/en/documents/details/115290 (last visited May 31, 2025).

[264] Syria governorates IDPs and IDP returnee's overview, UNHCR, Mar. 15, 2025, available at: https://data.unhcr.org/en/documents/details/115290 (last visited May 31, 2025).

[265] Syria: Up to one million people plan to return home in desperation, UNHCR, Mar. 7, 2025, available at: https://news.un.org/en/story/2025/03/1160886 (last visited May 31, 2025).

[266] Syria: Up to one million people plan to return home in desperation, UNHCR, Mar. 7, 2025, available at: https://news.un.org/en/story/2025/03/1160886 (last visited May 31, 2025).

[267] Syria: Up to one million people plan to return home in desperation, UNHCR, Mar. 7, 2025, available at: https://news.un.org/en/story/2025/03/1160886 (last visited May 31, 2025).

DHS-AR-000047

people to return to their homes.[268]  The transitional government has so far not put forward a comprehensive plan for resettling displaced people.[269]

Hundreds of thousands of previously displaced Syrians have, nonetheless, been able to return to their original homes in the cities and towns more firmly under the control of the transitional government stretching from Aleppo and Idlib in the north, to central Hama and Homs, and the capital Damascus in the south.  The Asad government's practice of hampering freedom of movement by requiring a security clearance to enter and leave regime-held areas,[270] is now a thing of the past.

Serious obstacles to relocation within Syria include extensive damage to the country's transportation system and infrastructure, the widespread presence of unexploded ordnances, lack of food and water, economic turmoil, armed group control of territory, and armed conflict that continues to displace people and rage in large segments of the country (particularly the coastal region, the northeast, and the south).

Government and armed group checkpoints also complicate relocation, as they are sites of violence for some and security for others.  For example, in Homs, Hay'at Tahrir al Sham checkpoints have stirred fear among Alawis (some who have been subjected to enforced disappearances),[271] but have brought calm to others who welcome inspection at checkpoints as a means of restoring order and stopping violent criminals and Asad loyalists.[272]  Religious, ethnic, and tribal belonging may also inhibit relocation, given that tensions between the various communities in Syria can make people feel unsafe, unwelcome, or vulnerable in regions other than their own.[273]  Sex may also be a factor in relocation, as women (especially displaced women) are often the victims of reported security issues such as theft, kidnapping, revenge crimes, and sexual violence.[274]

---

[268] Landmines in Syria kill hundreds of civilians returning home after fall of Assad, The Guardian, Mar. 17, 2025, available at https://www.theguardian.com/global-development/2025/mar/17/syria-landmines-kill-hundreds-fall-of-assad (last visited May 31, 2025).

[269] Tim Whewell, 'I'm overjoyed to be back': Syrians face daunting rebuild after years of war, BBC, May 15, 2025, available at: https://www.bbc.com/news/articles/clyg20822j7o (last visited May 31, 2025).

[270] 2023 Country Reports on Human Rights Practices: Syria, U.S. Department of State, Apr. 22, 2024, available at: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/syria/ (last visited May 31, 2025).

[271] Giovanna Vial, HTS raids and forced disappearances fuel fear in Syria's Alawi heartlands, Middle East Eye, Jan. 17, 2025, available at: https://www.middleeasteye.net/news/syria-hts-raids-forced-disappearances-fuel-alawi-fear (last visited May 31, 2025).

[272] Abby Sewell, An uneasy calm settles over Syrian city of Homs after outbreak of sectarian violence, Associated Press, Dec. 26, 2024, available at: https://apnews.com/article/syria-homs-alawites-hts-assad-sectarian-6c8d534d9f93da13dc8629f2f2c49aae (last visited May 31, 2025).

[273] Samer Bakkour and Rama Sahtout, Uprooting, removing and relocating populations: The role and significance of internal displacement in the syrian regime's integrated military–political war strategy, Comparative Migration Studies, Jan. 2, 2025, available at: https://comparativemigrationstudies.springeropen.com/articles/10.1186/s40878-024-00403-1 (last visited May 31, 2025).

[274] Nour Jarrouj, Forcibly displaced Syrian women's crucial role in rebuilding a free Syria for all, UNHCR, Mar. 7, 2025, available at: https://www.unhcr.org/us/news/stories/forcibly-displaced-syrian-womens-crucial-role-rebuilding-free-syria-all (last visited May 31, 2025).

DHS-AR-000048

## TOURISM

In 2010, a year before the Arab Spring civic uprising in Syria, more than 10 million tourists visited Syria, and tourism reportedly accounted for 14 percent of Syria's gross domestic product.[275]  During the civil war, tourism slowed to a trickle, and the number of tourists even became difficult to track.[276]  In the latter years of the war as Asad's forces began to retake territory, his ministry of tourism attempted to market tourism as a means of portraying legitimacy and obscuring the government's human rights record.[277]

Since the fall of the Asad government, tourism rates have not increased to any significant degree,[278] though hotels and restaurants in the old city of Damascus have noticed a small uptick in mostly expatriate Syrians visiting.[279]  Bashar al Asad's summer villa on the Mediterranean Sea has also seen crowds of domestic Syrian tourists eager to pose for photographs in the luxurious halls of the former authoritarian leader (now stripped bare of their adornments).[280]  It may be too early to assess tourism in Syria, especially as multiple western governments caution their citizens not to visit Syria, and advise those in the country to leave.[281]  Nevertheless, some adventure travel companies are scheduling tours for as early as May 2025,[282] anticipating that the new Syria may quickly become a travel destination for foreigners.[283]  Archeologists are also returning to Syria's heritage sites, such as the ancient city of Palmyra, in an attempt to restore them and attract tourists.[284]

---

[275] Richard Collett, Everything is better than before: How Syria is reopening to tourists, CNN, Feb. 19, 2025, available at: https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence/index.html (last visited May 31, 2025).

[276] Syria awaits exceptional season in tourism sector, Enab Baladi, Mar. 1, 2025, available at: https://english.enabbaladi.net/archives/2025/03/syria-awaits-exceptional-season-in-tourism-sector/ (last visited May 31, 2025).

[277] Joseph Daher, Tourism in Syria: Tool for Capital Accumulation and Political Normalisation, Friedrich Ebert Stiftung, May 2024, available at: https://library.fes.de/pdf-files/bueros/beirut/21227.pdf (last visited May 31, 2025).

[278] Richard Collett, Everything is better than before: How Syria is reopening to tourists, CNN, Feb. 19, 2025, available at: https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence/index.html (last visited May 31, 2025).

[279] Syria awaits exceptional season in tourism sector, Enab Baladi, Mar. 1, 2025, available at: https://english.enabbaladi.net/archives/2025/03/syria-awaits-exceptional-season-in-tourism-sector/ (last visited May 31, 2025).

[280] Hadeel Al-Shalchi, Once off-limits to Syrians, Assad's former summer residence now attracts tourists, NPR, Jan. 25, 2025, available at: https://www.npr.org/2025/01/25/g-s1-44554/syria-assad-summer-home-latakia (last visited May 31, 2025).

[281] Richard Collett, Everything is better than before: How Syria is reopening to tourists, CNN, Feb. 19, 2025, available at: https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence/index.html (last visited May 31, 2025).

[282] Richard Collett, Everything is better than before: How Syria is reopening to tourists, CNN, Feb. 19, 2025, available at: https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence/index.html (last visited May 31, 2025).

[283] Simon Calder, Could Syria return as a tourism destination? What to consider after years of devastation under Assad, The Independent, Dec. 17, 2024, available at: https://www.the-independent.com/travel/news-and-advice/syria-tourism-insurance-safety-advice-b2665711.html (last visited May 31, 2025).

[284] Sally Abou Aljoud and Ghaith Alsayed, Experts push to restore Syria's war-torn heritage sites, including renowned Roman ruins at Palmyra, Associated Press, Feb. 17, 2025, available at: https://apnews.com/article/syria-heritage-sites-war-palmyra-assad-tourism-dbdf67015d91c6eb1cc0d19db992bf0a (last visited May 31, 2025).

DHS-AR-000049

While tourism may not have picked up yet, international airlines – including Qatar Airways and Turkish Airlines – have resumed operations in Damascus for the first time since the start of the conflict in 2011.[285]  Romania's Dan Air is also planning to offer direct flights to Syria in June 2025, connecting the country directly to Europe.[286]

Notably, the U.S. Department of State has issued a travel advisory warning U.S. citizens not to travel to Syria "due to the significant risks of terrorism, civil unrest, kidnapping, hostage-taking, armed conflict, and unjust detention. **No part of Syria should be considered safe from violence**."[287]

---

[285] Richard Collett, Everything is better than before: How Syria is reopening to tourists, CNN, Feb. 19, 2025, available at: https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence/index.html (last visited May 31, 2025).

[286] Romania's Dan Air to offer direct flights to Syria in June, in EU first, The New Arab, May 10, 2025, available at: https://www.newarab.com/news/first-eu-airline-offer-direct-flights-syria-june (last visited May 31, 2025).

[287] Security Alert: U.S. Citizens in Syria, U.S. Embassy in Syria, Apr. 18, 2025, available at: https://sy.usembassy.gov/security-alert-u-s-citizens-in-syria/ (last visited May 31, 2025) (emphasis in original).

DHS-AR-000050

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



July 10, 2025

**TEMPORARY PROTECTED STATUS
POLICY CONSIDERATIONS: Syria
(July 2025)[1]**

Throughout 2024, Syrians endured human rights abuses, war crimes, and humanitarian hardship due to the armed violence, worsened economic conditions, and general insecurity. Prior to its collapse, the former Syrian government did not halt abuses or ensure accountability despite an order by the International Court of Justice to prevent state-sponsored torture. Some accountability efforts continued outside Syria with war crimes and crimes against humanity convictions in European courts.

After the fall of the long-time dictator of the country, Bashar al-Assad, to Hay'at Tahrir al-Sham,[2] Syria's political future is uncertain. Although a new ruling government has been established, power struggles persist.[3] Legal scholars also express concerns about the transitional constitutional declaration, which lacks protection for religious and ethnic minorities and fails to establish a separation of governmental branches.[4] Others have expressed concern for the future of women's and girls' rights, given the prior track record on the matter of many incoming leaders.[5]

There have been small improvements in the political stability and economic recovery from 13 years of civil war. An increased focus on repairing heritage sites and improving infrastructure to support both locals and tourists appear to be cornerstone of Syria's economic recovery plan.[6] Measures to increase Syria's energy independence have been signed with hopes of providing at least 50% of Syria's energy

---

[1] The reporting period for this report is January 1, 2024, to July 10, 2025.
[2] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).
[3] UN News, 'Syria simply cannot withstand another wave of instability,' Security Council hears, Jun. 17, 2025, available at
https://www.hrw.org/world-report/2025/country-chapters/syria (last visited Jun. 23, 2025).
[4] Voice of America, Analysts see flaws in Syria's temporary constitution, Mar. 14, 2025, available at
https://www.voanews.com/a/analysts-see-flaws-in-syria-s-temporary-constitution/8011117.html (last visited Mar. 24, 2025).
[5] The New Arab, New Syrian justice minister 'oversaw execution of women for prostitution' in 2015, Jan. 5, 2025, available at
https://www.newarab.com/news/syrian-minister-oversaw-execution-women-prostitution (last visited Jun. 18, 2025).
[6] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at
https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

DHS-AR-000051

needs.[7] Despite the fragile nature of these improvements, many refugee hosting countries, including Turkey and Lebanon, have deported thousands of Syrians back to Syria.[8] Many countries across Europe paused processing Syrian asylum claims after December 8.[9] Other Syrian refugees returned to their homeland due to economic crises in their host countries, which have made life particularly hard for displaced people.[10]

**Temporary Protected Status Designation Time Frame:**
- Initial Temporary Protected Status designation: March 29, 2012

- Temporary Protected Status redesignation periods:
    - October 1, 2013, to March 21, 2015
    - April 1, 2015, to September 30, 2016
    - October 1, 2016, to March 31, 2018

- Temporary Protected Status extension periods:
    - April 1, 2018, to September 30, 2019
    - October 1, 2019, to March 31, 2021
    - March 31, 2021, to September 30, 2022
    - October 1, 2022, to March 31, 2024

- Current redesignation period: April 1, 2024, to September 30, 2025

**Reason(s) for Initial Temporary Protected Status Designation for Syria:**

Syria was initially designated for Temporary Protected Status on March 29, 2012, based on extraordinary and temporary conditions that prevented nationals of Syria from returning in safety (77 FR 20046).

**Reason(s) for 2024 Extension and Redesignation of Temporary Protected Status for Syria:**

DHS reviewed country conditions in Syria. Based on the review, including input received from the Department of State and other U.S. Government agencies, the then-Secretary determined that an 18-month Temporary Protected Status extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions supporting Syria's Temporary Protected Status designation remain (89 FR 5562).

## I.  Statutory Basis for Designation

***Have the conditions under which the foreign state was designated for Temporary Protected Status ceased to exist?***

---

[7] Reuters, Syria signs $7 billion power deal with Qatar's UCC Holding-led consortium, May 29, 2025, available at https://www.reuters.com/business/energy/syria-signs-7-billion-power-deal-with-qatars-ucc-holding-led-consortium-2025-05-29/ (last visited Jun. 18, 2025).

[8] The Washington Post, After Assad's fall, some say it's time for Syrian refugees to go home, Dec. 9, 2024, available at https://www.washingtonpost.com/world/2024/12/09/syrian-refugees-return-assad-europe/ (last visited Jun. 25, 2025).

[9] ReliefWeb, Europe: Thousands of Syrian lives on hold amid asylum application freeze, May 6, 2025, available at https://reliefweb.int/report/syrian-arab-republic/europe-thousands-syrian-lives-hold-amid-asylum-application-freeze-enar (last visited Jun 25, 2025).

[10] Center for Strategic and International Studies, Don't Rush Syrian Refugees' Return, Dec. 11, 2024, available at https://www.csis.org/analysis/dont-rush-syrian-refugees-return (last visited Mar. 25, 2025).

DHS-AR-000052

Syria was initially designated for Temporary Protected Status on March 29, 2012, based on extraordinary and temporary conditions that prevented nationals of Syria from returning in safety. Following the initial designation, DHS extended and redesignated Syria for Temporary Protected Status in 2013, 2015, 2016, 2018, 2021, 2022, and 2024.[11] The current Temporary Protected Status redesignation for Syria extends through September 30, 2025 (89 FR 5562).

## A. Armed Conflict

### 1. Is the foreign state still involved in an ongoing, internal, armed conflict?

What began as protests against President Assad's regime in 2011 quickly escalated[12] into a full-scale war between the Syrian government—backed by Russia and Iran—and anti-government rebel groups—backed by the United States and a rotating number of U.S. allies, including France, the United Kingdom, Italy, Saudi Arabia, Turkey, Jordan, and the United Arab Emirates. Conflicts between the Syrian government, US-backed rebel forces, and the Islamic State were ongoing with various sides gaining and losing territory through a combination of coordinated and guerilla offensives.[13] International rights groups and prosecutors alleged widespread use of torture and extrajudicial killings in Syria's government-run detention centers. The war has killed nearly half a million people and displaced half of the country's prewar population of 23 million.[14]

Several efforts to reach a diplomatic resolution had been unsuccessful.[15,16,17] Under the first Trump administration, the United States largely withdrew from Syria, leaving only about 400 U.S. troops as a contingency force.[18] The departure of most U.S. troops increased uncertainty around the role of other external parties to the conflict—including Iran, Israel, Russia, and Turkey—as well as the future of internal actors.

The conflict appeared to be frozen in recent years, with Assad's government regaining control of most of Syria's territory while the northwest remained under the control of opposition groups and the northeast

---

[11] *Extension and Redesignation of Syria for Temporary Protected Status*, 78 FR 36223 (Jun. 17, 2013); *Extension and Redesignation of Syria for Temporary Protected Status*, 80 FR 245 (Jan. 5, 2015); and *Extension and Redesignation of Syria for Temporary Protected Status*, 81 FR 50533 (Aug. 1, 2016). *Extension and Redesignation of Syria for Temporary Protected Status*, 83 FR 9329 (Mar. 5, 2018); *Extension and Redesignation of Syria for Temporary Protected Status*, 86 FR 14946 (Mar. 19, 2021); *Extension and Redesignation of Syria for Temporary Protected Status*, 87 FR 46982 (Aug. 1, 2022) and *Extension and Redesignation of Syria for Temporary Protected Status*, 89 FR 5562 (Jan. 29, 2024).

[12] AP News, The fall of Bashar Assad after 13 years of war in Syria brings to an end a decades-long dynasty, Dec. 8, 2024, available at https://apnews.com/article/syria-bashar-assad-war-1468a97ff95bb782f5933856d99c9a8d

[13] Global Conflict Tracker Center for Preventative Action, Conflict in Syria, May 14, 2025, available at https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria#RecentDevelopments-1 (last visited Jun 26, 2025).

[14] AP News, The fall of Bashar Assad after 13 years of war in Syria brings to an end a decades-long dynasty, Dec. 8, 2024, available at https://apnews.com/article/syria-bashar-assad-war-1468a97ff95bb782f5933856d99c9a8d (last visited Jun. 26, 2025).

[15] The Atlantic, The End of the Beginning in Syria, Mar. 30, 2016, available at https://www.theatlantic.com/international/archive/2016/03/syria-geneva-peace-talks/476034/ (last visited Jun. 26, 2025).

[16] BBC, Syria war: Peace talks restart in Geneva, May 16, 2017, available at https://www.bbc.com/news/world-middle-east-39934868 (last visited Jun. 26, 2025).

[17] Reuters, Syria Peace Talks in Astana close with no sign of rebels, Mar. 30, 2026, available at https://www.reuters.com/article/us-mideast-crIslamic State-syria-astana-idUSKBN16M0M8/ (last visited Jun. 26, 2025).

[18] CBS News, Several hundred troops to remain in Syria, Feb. 19, 2019, available at https://www.cbsnews.com/news/us-troops-peacekeepers-to-remain-in-syria/ (last visited Jun. 26, 2025).

DHS-AR-000053

under Kurdish control.[19] Although Damascus remained under crippling Western sanctions, neighboring countries had begun to resign themselves to Assad's continued hold on power. The Arab League[20] reinstated Syria's membership in 2023, and Saudi Arabia in May announced[21] the appointment of its first ambassador since severing ties with Damascus 12 years ago.

The geopolitical tide turned quickly when opposition groups in northwest Syria in late November launched a surprise offensive.[22] On December 8, 2024, the Assad regime fell, and Hay'at Tahrir al- Sham assumed control over much of Syria. Government forces quickly collapsed while Assad's allies, preoccupied by other conflicts — Russia's war in Ukraine and the yearlong wars between Israel and the Iran-backed militant groups Hezbollah and Hamas — appeared reluctant to forcefully intervene.[23]

According to Travel Advisory issued by the U.S. Department of State in March 2025, no part of Syria is safe from violence. Attacks from armed groups could happen with little or no warning.[24] Hostage taking by armed groups, unjust detentions, the use of chemical warfare, shelling, mine fields, and aerial bombardment of civilian centers pose significant risk of death or serious injury. The destruction of infrastructure, housing, medical facilities, schools, and power and water utilities has also increased hardships inside the country. The interim entities in Syria currently cannot provide even the most routine public services.[25]

***Would the return of nationals of state still pose threat to personal safety?***

In the wake of the government takeover by Hay'at Tahrir al-Sham, there continues to be armed violence in Syria between the new government and armed loyalists to the former regime. Despite
the danger, the United Nations High Commissioner for Refugees estimates that more than 302,000 Syrian refugees have crossed the border back into Syria between December 2024 and March 2025, with many

---

[19] AP News, The fall of Bashar Assad after 13 years of war in Syria brings to an end a decades-long dynasty, Dec. 8, 2024, available at https://apnews.com/article/syria-bashar-assad-war-1468a97ff95bb782f5933856d99c9a8d (last visited Jun. 26, 2025).

[20] AP News, What's behind Syria's return to the Arab League?, May 8, 2023, available at https://apnews.com/article/syria-arab-league-cairo-saudi-arabia-qatar-7de1b30587560531dad1df4eb29f4ef3 (last visited Jun. 26, 2025)

[21] US News and World Report, Saudi Arabia Appoints First Ambassador to Syria Since 2012, May 8, 2023, available at https://www.usnews.com/news/world/articles/2024-05-26/saudi-arabia-appoints-first-ambassador-to-syria-since-2012 (last visited Jun. 26, 2025).

[22] AP News, In a shock offensive, insurgents breach Syria's largest city for the first time since 2016, Nov. 29, 2024, available at https://apnews.com/article/syria-bashar-assad-war-1468a97ff95bb782f5933856d99c9a8d (last visited Jun. 26, 2025).

[23] AP News, The fall of Bashar Assad after 13 years of war in Syria brings to an end a decades-long dynasty, Dec. 8, 2024, available at https://apnews.com/article/syria-attack-clashes-aleppo-9c07da6f83036f34d4b18a479de9d085 (last visited Jun. 26, 2025).

[24] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[25] U.S. Department of State, Syria International Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

4

more arriving daily.[26] In the same time frame, more than 885,000 internally displaced persons have also returned to their homes.[27]

While there has been a surge in Syrians rushing back to Syria following al-Assad's ouster, many of these trips are likely temporary ones, to celebrate, and more importantly, to check on conditions. It is unlikely on-the-ground realities will be stable enough in the near term for individuals to consider permanent repatriation.[28] According to the International Organization for Migration Displacement Tracking Matrix, one in five displaced people in Syria are residing in tents or makeshift shelters, facing harsh living conditions.[29] Around 28 per cent of those who returned to their places of origin are residing in damaged or unfinished buildings.[30]

## B.  Extraordinary and Temporary Conditions

**1.  *Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?***

**Safety**

The U.S. government suspended operations in 2012. The Department of State continues to warn U.S. citizens and other foreign nationals against travel to Syria due to the risk of terrorism, civil unrest, kidnapping, hostage taking, armed conflict, and unjust detention.[31,32] Those in detention may not have access to fair judicial process or medical attention.[33] Former Assad regime detention centers were known to be unsanitary facilities where widespread cruel, inhumane, and degrading treatment of detainees had been documented, as well as torture and extrajudicial killings.[34] Detention center conditions under interim entities are unclear but could be harsh and unsanitary.[35]

---

[26] UNHRC The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[27] UNHRC The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[28] Migration Policy Institute (MPI), The Complicated Reality of Syrians' Return, Dec. 2024, https://www.migrationpolicy.org/news/post-assad-returns-syria (last visited Jun. 20, 2025).

[29] UNHRC The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[30] UNHRC The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[31] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 18, 2025).

[32] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[33] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).

[34] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).

[35] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).

5

Prior to the fall of the Assad regime, Iran-backed militia groups in Syria and Iraq that oppose Israel's campaign in Gaza have attacked[36] U.S. troops in the region at least 165 times since the Israel-Hamas War began. Since mid-October 2023, American bases in Iraq and Syria have been subject to attacks from these various groups.[37] On November 23, 2023, U.S. and international forces in northeastern Syria and Iraq were attacked[38] with drones and rockets four times in 24 hours. In February 2024, the U.S. conducted a series of retaliatory strikes following an attack in Jordan on a U.S. military outpost near the Syrian border that killed three U.S. soldiers.[39] The strikes included more than eighty-five targets[40] throughout Iraq and Syria, though U.S. officials have signaled that these strikes were only the start of their response. In response, Iran-backed militias have begun a series of new strikes on U.S. bases, with a drone strike[41] in the eastern province of Deir el-Zour in Syria killing seven and injuring at least 18 other Kurdish fighters.

While thousands of former regime and militia members have surrendered weapons and reconciled, some elements or supporters of the former Assad regime remain active in the country and continue fighting with Hay'at Tahrir al-Sham.[42] Deadly clashes between elements of the Syrian National Army and the Syrian Democratic Forces in the north continue.[43] Turkish and Israeli airstrikes impacting civilians also continue.

**Terrorism**

Terrorist groups are active in Syria. Parts of Syria have experienced recent increases in incidents of bombings, improvised explosive devices, and assassinations.[44] Syria was designated as a State Sponsor of Terrorism since 1979 and has given support to a variety of terrorist groups, affecting the stability of the region.[45] Much of Syria, including Damascus, is controlled by or under the influence of designated

---

[36] UN News, Middle East: Security Council meets on US strikes in Iraq and Syria, Feb. 5, 2024, available at https://news.un.org/en/story/2024/02/1146227 (last visited Jun. 26, 2025).

[37] Global Conflict Tracker Center for Preventative Action, Conflict in Syria, Attack May 14, 2025, available at https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria#RecentDevelopments-1 (last visited Jun. 26, 2025).

[38] Reuters, US forces attacked 4 times in Iraq, Syria within hours, Nov. 23, 2023, available at https://www.reuters.com/world/us-forces-attacked-4-times-iraq-syria-within-hours-2023-11-23/ (last visited Jun. 26, 2025).

[39] Global Conflict Tracker Center for Preventative Action, Conflict in Syria, Attack May 14, 2025, available at https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria#RecentDevelopments-1 (last visited Jun. 26, 2025).

[40] US Department of Defense, U.S. Strikes Targets in Iraq and Syria in Response to Deadly Drone, Attack Feb. 2, 2024, available at https://www.defense.gov/News/News-Stories/Article/Article/3665734/us-strikes-targets-in-iraq-and-syria-in-response-to-deadly-drone-attack/ (last visited Jun. 26, 2025).

[41] BBC Drone attack kills six Kurdish-led fighters at US base in east Syria, Attack Feb. 4, 2024, available at https://www.bbc.com/news/world-middle-east-68209007 (last visited Jun. 26, 2025).

[42] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[43] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[44] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).

[45] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).

6

terrorist groups.[46] Syria is also home to several groups hostile to the United States.[47] Foreign combatants – including members of Iranian-aligned militia groups, Hizballah fighters, violent extremists, Islamic State, and al-Qa'ida elements – have historically participated in hostilities in the region.[48] Additionally, Turkey has engaged in military operations in Syria, seeking to counter the influence of the Kurdistan Worker's Party, a designated terrorist organization.[49] These operations have reportedly resulted in deaths. Israel engages in military operations in Syria that have resulted in deaths and has extended its military position farther across the Golan Heights treaty line.[50]

Throughout August 2023, the Syrian army was subject to various Islamic State and Israeli military attacks. Attacks by Islamic State sleeper cells in Syria, especially in the vast desert areas they once controlled, have increased throughout 2023. For example, a bus carrying Syrian soldiers in the eastern desert province of Deir Ezzor was ambushed[51] by the Islamic State, killing twenty-three. Meanwhile, an Israeli missile attack near Damascus in early August killed[52] at least four Syrian soldiers and wounded four others. Although Israel has carried out attacks against what it has described as Iran- linked targets in Syria for years, the number and scope have increased following the October 7 Hamas attack on Israel. Since December, Israeli strikes in and around Damascus have killed[53] more than half a dozen members of Iran's Islamic Revolutionary Guard Corps, among them one of Iran's top intelligence officials.

The Islamic State no longer controls territory in Syria but continues to operate as an insurgency throughout the country.[54] The Islamic State continues to pose a significant threat to civilians residing in Syria and has demonstrated the ability to conduct coordinated attacks against armed actors and civilians.[55] On June 22, 2025, Syria's interior ministry said the Islamic State was responsible for a suicide attack in a Damascus church that killed more than 20 people.[56] It was reportedly the first major Islamic

---

[46] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).
[47] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).
[48] U.S. Department of State, Syria Travel Advisory, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Jun. 17, 2025).
[49] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).
[50] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).
[51] Reuters, Exclusive: Iran's Guards pull officers from Syria after Israeli strikes, Aug. 11, 2023, available at
https://www.reuters.com/world/middle-east/attack-bus-kills-23-syrian-troops-war-monitor-2023-08-11 (last visited Jun. 26, 2025).
[52] Al Jazeera, Four Syrian soldiers killed in Israeli missile attack: Report, Aug. 3, 2023, available at
https://www.aljazeera.com/news/2023/8/7/four-syrian-soldiers-killed-in-israeli-missile-attack-report (last visited Jun. 26, 2025).
[53] Reuters, Exclusive: Iran's Guards pull officers from Syria after Israeli strikes, Feb 1, 2024, available at
https://www.reuters.com/world/middle-east/irans-guards-pull-officers-syria-after-israeli-strikes-2024-02-01/ (last visited Jun. 26, 2025).
[54] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).
[55] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at
https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).
[56] CNN, Jun 22, 2025, Suicide bomber attack on church in Syria kills at least 20 people, available at
https://edition.cnn.com/2025/06/22/middleeast/church-attack-damascus-syria-intl-latam (last visited Jun. 26, 2025).

DHS-AR-000057

State attack since former President Bashar al-Assad was ousted last December; the group has attempted to rebuild its forces amid the security vacuum in Syria following Assad's ouster.[57]

They have targeted major city centers, road checkpoints, border crossings, government buildings, energy infrastructure, shopping areas, and open spaces in Damascus, Aleppo, Hamah, Dara, Homs, Idlib, Deir Ezzor provinces and parts of northeast Syria.[58] These groups have murdered, kidnapped or taken hostage U.S. citizens, both for ransom and political purposes; in some instances, U.S. citizens have disappeared within Syria.[59] The U.S. government's ability to help U.S. citizens kidnapped or taken hostage is very limited.[60]

Elements within Hay'at Tahrir al-Sham as well as other non-state actor groups maintain anti-U.S. sentiment, which may intensify following significant events in the region, particularly those related to U.S.-Syria relations, international intervention in the armed violence, Israeli-Palestinian issues, the status of Jerusalem, and clashes in Lebanon.[61] The combination of terrorist organizations, a porous border with Iraq, and long-standing border issues with all its neighbors (Jordan, Lebanon, Iraq, Turkey, and Israel) have made Syria a destabilizing factor in the region and a potential target for reprisal.[62]

**Refugees and Internally Displaced Persons**

Displacement remains one of the most dire and protracted consequences of the war. Since the start of the armed conflict in 2011, about half of the Syrian population has been forced from their homes: 12.3 million have been forced to flee the country, 6.7 million currently internally displaced across the country, 2 million live in temporary settlements and camps, and more than 17,000 refugee and asylum seekers registered with U.N. High Commissioner for Refugees.[63,64]

The United Nations High Commissioner for Refugees estimates that more than 302,000 Syrian refugees have crossed the border back into Syria between December 2024 and March 2025, with many more

---

[57] The Guardian, Jun 22, 2025, Islamic State suicide bombing in Damascus church kills 22 and injures 63, available at https://www.theguardian.com/world/2025/jun/22/islamic-state-suicide-bombing-damascus-church-multiple-deaths (last visited Jun. 26, 2025).

[58] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[59] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[60] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[61] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[62] U.S. Department of State, Syria Travel Information, Mar. 3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

[63] United Nations Human Rights Office of the High Commissioner (OHCHR), UN Commission warns Syrian war is intensifying amid continuing patterns of war crimes and fear of large-scale regional conflict, available at https://www.ohchr.org/en/press-releases/(2024)/09/un-commission-warns-syrian-war-intensifying-amid-continuing- patterns-war (last visited Mar. 25, 2025).

[64] UNHCR, Syria Needs Overview, available at https://reliefweb.int/report/syrian-arab-republic/(2024)-unhcr-syria-needs-overview-february-(2024)-enar (last visited Mar. 25, 2025).

8

DHS-AR-000058

arriving daily.[65] In the same time frame, more than 885,000 internally displaced persons have also returned to their homes.[66]

## Environmental Considerations

The February 6, 2023, earthquake and subsequent aftershock that hit southern Turkey near the Syrian border also contributed to the worsening humanitarian situation and economic deterioration in Syria.[67] According to the International Blue Crescent Relief and Development Foundation, the earthquake killed 8,476 people in Syria.[68] In addition to the loss of life, the earthquake has also had devastating effects on Syria's economy, infrastructure, and health sector.[69] The World Bank estimates that the total effect of both the damage and loss due to the earthquake on Syria's health sector is 300.4 million dollars.[70] Northwest Syria's earthquake-damaged infrastructure includes water, sanitation, and hygiene, and healthcare facilities, raising health concerns related to contaminated water and an increased risk of waterborne illness.[71,72] An estimated 170,000 employees lost their jobs because of the earthquake and approximately 35,000 micro, small, and medium sized businesses were damaged.[73] As a result, Syria's temporary loss of employment has been calculated to be a loss of labor income equal to at least 5.7 million dollars per month.[74] The United Nations estimates that Syria needs almost 15 billion dollars to recover from the earthquakes.[75]

## Human Rights Abuses and Civilian Deaths

[65] UNHRC: The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[66] UNHRC: The UN Refugee Agency, Repatriation explained: why Syrian refugees are voluntarily returning, Mar. 12, 2025, available at https://www.unrefugees.org/news/repatriation-explained-why-syrian-refugees-are-voluntarily-returning (last visited Jun. 20, 2025).

[67] Center for Strategic & International Studies (CSIS), Shattered Relief: A 7.8-Magnitude Earthquake Strikes Turkey and Syria, CSIS, Feb. 7, 2023, available at https://www.csis.org/analysis/shattered-relief-78-magnitude-earthquake-strikes- turkey-and-syria (last visited Oct. 10, 2023).

[68] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, available at https://reliefweb.int/report/turkiye/devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr (last visited Oct. 10, 2023).

[69] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, available at https://reliefweb.int/report/turkiye/devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr (last visited Oct. 10, 2023).

[70] The World Bank, Syria Earthquake 2023 Rapid Damage and Needs Assessment (RDNA), Mar. 2023, available at https://reliefweb.int/report/syrian-arab-republic/syria-earthquake-2023-rapid-damage-and-needs-assessment-rdna-enar (last visited Nov. 9, 2023).

[71] The LANCET Infectious Diseases, Communicable diseases in northwest Syria in the context of protracted armed conflict and earthquakes, Jul. 2023, available at https://doi.org/10.1016/S1473-3099(23)00201-3 (last visited Oct. 6, 2023).

[72] The World Bank, Syria Earthquake 2023 Rapid Damage and Needs Assessment (RDNA), 17 Mar. 2023, available at https://reliefweb.int/report/syrian-arab-republic/syria-earthquake-2023-rapid-damage-and-needs-assessment-rdna-enar (last visited Oct. 10, 2023).

[73] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, available at https://reliefweb.int/report/turkiye/devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr (last visited Oct. 10, 2023).

[74] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, available at https://reliefweb.int/report/turkiye/devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr (last visited Oct. 10, 2023).

[75] United Nations (UN) News, Almost $15 billion needed for earthquake recovery in Syria, May 8, 2023, available at https://news.un.org/en/story/2023/05/1136452 (last visited Oct. 6, 2023).

DHS-AR-000059

Since the conflict began, civilian casualty counts have varied among media sources and human rights groups, in part due to the large number of missing and forcibly disappeared Syrians. Human rights groups estimate more than 500,000 people have been killed since the start of the conflict.[76] Armed actors, including Turkey, the US, and those loyal the former regime and its Russian allies, continue to strike civilians and civilian facilities. Clashes between the new Syrian regime and supporters of former president Assad in early March 2025 led to dozens of religiously motivated revenge killings and the death of over 800 people in less than a week, including entire families, women and children.[77,78] A March 16, 2025, drone attack by Turkey or Turkish-backed Syrian factions killed seven Kurdish children, their 18-year-old sister, and their parents, apparently all civilians.[79] On June 10, 2025, the US military executed an airstrike which killed the Islamic State's external attack planner as well as four civilians.[80]

For decades, the former government systematically arrested and disappeared activists and human rights defenders, oppressed local human rights organizations and denied international human rights organizations access to the country.[81] The new authorities have pledged to embrace human rights amid renewed ties with Europe and America.[82] But those promises are complicated by al-Sharaa's decision to hand control of a key military division to Sayf Boulad Abu Bakr, whose militia was sanctioned by the United States for kidnapping, torturing and sexually abusing women from Syria's ethnic Kurdish minority.[83] Other controversial appointees include Mohammad Hussein al-Jasim and Ahmad Ihsan Fayyad al-Hayes, who have also been accused by both US and United Nations investigators of extrajudicial killings, forced disappearances, and trafficking.[84] These moves have sparked concern among international observers and human rights advocates, who warn it could undermine hopes for reform and reconciliation.[85]

## Humanitarian Situation

---

[76] U.S. Department of State, 2023 Country Report on Human Rights Practices: Syria, 2024, available at https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/syria/ (last visited Jun. 17, 2025).

[77] CNN, What we know about the deadly violence in Syria, Mar. 12, 2025, available at https://www.cnn.com/2025/03/10/middleeast/syria-violence-explainer-intl-latam (last visited Jun. 17, 2025).

[78] Stars and Stripes, Syria's worst violence in months reopens wounds of the civil war Jun. 5, 2025, available at https://www.stripes.com/theaters/middle_east/2025-03-09/syria-violence-reopens-wounds-civil-war-17087076.html (last visited Jun. 17, 2025)

[79] Ground News, Syria: Türkiye-Backed Attack Kills, Injures Family, Jun 4, 2025, available at https://ground.news/article/syria-turkiye-backed-attack-kills-injures-family (last visited June 15, 1015).

[80] FDD's Long War Journal, US strike in northwestern Syria kills Islamic State's external attack planner, Jun. 12, 2025, available at https://www.longwarjournal.org/archives/2025/06/us-strike-in-northwestern-syria-kills-islamic-states-external-attack-planner.php (last visited Jun. 17, 2025).

[81] Amnesty International, Syria: New government must prioritize justice and truth measures to prevent further abuse, May 16, 2025, https://www.amnesty.org/en/latest/news/2025/05/syria-new-government-must-prioritize-justice-and-truth-measures-to-prevent-further-abuse/2025 (last visited Jun. 20, 2025).

[82] 82CNN, As Syria's president preaches human rights, new evidence details abuse allegedly carried out under one of his key commanders, Jun. 12, 2025, https://edition.cnn.com/interactive/asequals/syria-army-commander-women-abuse-as-equals-intl-invs/ (last visited Jun. 20, 2025).

[83] CNN, As Syria's president preaches human rights, new evidence details abuse allegedly carried out under one of his key commanders, Jun. 12, 2025, https://edition.cnn.com/interactive/asequals/syria-army-commander-women-abuse-as-equals-intl-invs/ (last visited Jun. 20, 2025).

[84] The Jerusalem Post, Syria's Al-Sharaa sparks outcry for promoting militia leaders accused of rights abuses, Jun. 20, 2025, https://www.jpost.com/middle-east/article-858404/ (last visited Jun. 20, 2025).

[85] The Jerusalem Post, Syria's Al-Sharaa sparks outcry for promoting militia leaders accused of rights abuses, Jun. 20, 2025, https://www.jpost.com/middle-east/article-858404/ (last visited Jun. 20, 2025).

10

The humanitarian situation in Syria continued to deteriorate in 2024. Since 2022, the number of people in Syria in need of humanitarian assistance increased to 16.7 million people, which is over two thirds of the population.[86] It has been estimated that 85 per cent of households cannot meet their basic needs.

Malnutrition remains a significant issue in Syria, fueled by ongoing food insecurity.[87] Approximately 16.5 million people—more than half of the population—struggled to access sufficient quality food,[88] with an additional three million more Syrians at risk of food insecurity.[89] Food prices had doubled in 2024 compared with 2023, and the local currency had devalued to one-15th of its 2020 value.[90] After years of conflict, Syria is now one of six countries "with the highest food insecurity in the world."[91] Over the course of the conflict "wheat production has declined by 75 per cent due to damaged infrastructure, the high cost of fuel, and drought-like conditions."[92] Yet, humanitarian funding for Syria plunged to its lowest levels in recent years.[93]

The impact of the extensive destruction is evident in long-term economic challenges as well as in the health care sector. The World Health Organization reports that only 57 percent of public hospitals and 37 percent of primary health care facilities are fully functioning.[94] Further, up to 70 percent of healthcare workers have fled Syria since the start of the conflict.[95] In January 2023, sources in regime- controlled areas reported a lack of medicine in pharmacies as well as a significant increase in the prices of medicine for heart disease, epilepsy, diabetes, cancer, and the flu.[96]

Shortages in clean water have resulted in a significant increase in the spread of waterborne diseases, including confirmed cholera cases throughout Syria.[97] Before the war, 92 percent of Syrians had consistent access to clean water but now over half the population lack access to clean water and must turn

---

[86] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

[87] Bertelsmann Stiftung's Transformation Index (BTI), Country Report: Syria, available at https://bti-project.org/en/reports/country-report/SYR (last visited Jun. 20, 2025).

[88] UNHCR, Syria Needs Overview, available at https://reliefweb.int/report/syrian-arab-republic/(2024)-unhcr-syria-needs-overview-february-(2024)-enar (last visited Mar. 25, 2025).

[89] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

[90] Al Jazeera, Syria in 2024: A year that changed everything in a war-torn nation, Jan 2, 2025, available at https://www.aljazeera.com/gallery/2025/1/2/2024-a-year-that-turned-the-tables-in-war-torn-syria (last visited Jun. 26, 2025).

[91] Food Security Cluster, Syria, available at https://fscluster.org/syria (last visited Jun. 17, 2025).

[92] Emergency Response Coordination Centre (ECHO), Syria - Historic drought impacting food security (DG ECHO, UN OCHA, FAO, WFP), Jun. 19, 2025, https://erccportal.jrc.ec.europa.eu/ECHO-Products/Echo-Flash#/echo-flash- items/29184 (last visited Jun. 20, 2025).

[93] ReliefWeb, Syrians Left Hanging with Lowest Levels of Funding as Humanitarian Needs Hit Highest Levels in Thirteen Years of Crisis, May 29, 2024, available at https://reliefweb.int/report/syrian-arab-republic/syrians-left-hanging-lowest- levels-funding-humanitarian-needs-hit-highest-levels-thirteen-years-crisis (last visited Jun. 25, 2025).

[94] ReliefWeb, Health Sector Syria - Health Sector Bulletin - February 2025, Mar. 3, 2025, available at https://reliefweb.int/report/syrian-arab-republic/health-sector-syria-health-sector-bulletin-february-2025 (last visited Jun. 17, 2025).

[95] Arab News, Exodus of doctors and health workers leave sick and ailing Syrians out on a limb, Jun. 12, 2024, available at https://www.arabnews.com/node/2529491/middle-east (last visited Jun. 17, 2025).

[96] medRxiv, Access to essential medicines for noncommunicable diseases during conflicts: the case cardiovascular diseases, diabetes and epilepsy in Northern Syria, May 21, 2025, available at https://www.medrxiv.org/content/10.1101/2025.05.20.25327993v1 (last visited Jun. 17, 2025).

[97] World Health Organization (WHO), Millions at risk from cholera due to lack of clean water, soap and toilets, and shortage of cholera vaccine, Mar. 20, 2024, available at https://www.who.int/news/item/20-03-2024-millions-at-risk-from- cholera-due-to-lack-of-clean-water-soap-and-toilets-and-shortage-of-cholera-vaccine (last visited, Jun. 17, 2025).

11

DHS-AR-000061

to unsafe alternatives, such as polluted rivers or unregulated private companies providing unclean water.[98] Without clean water, Syrians must forego basic hygiene and clean drinking water, which leaves Syrians at risk for infectious waterborne diseases.[99]

There are no social security measures in place to alleviate the impact on Syria's citizens.[100] In most areas of Syria, power outages are common, with some regions having as little as two hours of electricity per day. Living standards have deteriorated, even in areas that have not been as heavily affected by the war.[101]

Prior to its collapse in December 2024, the Syrian government continued to impose severe restrictions on the delivery of humanitarian aid in government-held areas of Syria and elsewhere in the country and to divert aid to punish former opposition areas.[102] Complex and wide-ranging sanctions imposed on the Syrian government, officials, and related entities further hampered the principled and impartial delivery of humanitarian aid to communities in need and the rehabilitation of critical infrastructure, such as healthcare and sanitation facilities.[103]

However, despite these and other challenges, humanitarian operations continue, and progress is being made in light of the new regime.[104] In the wake of President Trump lifting sanctions on Syria[105], more than 1,000 aid trucks have entered Syria from Turkey since the start of 2025 — a seven-fold increase compared to last year, as cross-border access remains a cost-effective modality.[106] Additionally the World Health Organization and the United Nations Children's Fund successfully vaccinated 3.4 million children in April, and the World Food Programme reaches over 1.5 million people each month with critical food assistance.[107] While the Syrian interim authorities continue to facilitate vital humanitarian work, only 10 per cent of the $2 billion appear to reach 8 million of the most vulnerable people in the first half of 2025 has been funded.[108]

---

[98] Fanack Water, Syria's Water CrIslamic State: Assessing the Intersection of Climate Change and Geopolitical Interests, Feb. 12, 2025, available at https://water.fanack.com/publications/syrias-water-crIslamic State-assessing-the-intersection-of- climate-change-and-geopolitical-interests/ (last visited Jun. 18, 2025).

[99] ReliefWeb, Syria Complex Emergency - Need Assessment Report, Mar. 10, 2025, available at https://reliefweb.int/report/syrian-arab-republic/syria-complex-emergency-need-assessment-report-march-2025-enar (last visited Jun. 17, 1015).

[100] BTI, Country Report: Syria, available at https://bti-project.org/en/reports/country-report/SYR (last visited Mar. 24, 2025).

[101] BTI, Country Report: Syria, available at https://bti-project.org/en/reports/country-report/SYR (last visited Mar. 24, 2025).

[102] U.S. Congress, Syria: Transition and U.S. Policy, Mar. 11, 2025, available at https://www.congress.gov/crs-product/RL33487 (last visited Jun. 25, 2025).

[103] Office of Foreign Assets Control, Syria Sanctions, Jun. 4, 2024, available at https://ofac.treasury.gov/faqs/topic/1571 (last visited Jun. 25, 2025).

[104] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

[105] CSIS, Trump Announces Lifting of Sanctions on Syria. May 13, 2025, available at https://www.csis.org/analysis/trump-announces-lifting-sanctions-syria (last visited Jun. 26, 2025).

[106] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

[107] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

[108] UN, Humanitarian Needs Remain Immense, Growing in Complexity across Syria, Senior Official Tells Security Council, Noting Shortfalls in Funding, May 21, 2025, available at https://press.un.org/en/2025/sc16066.doc.htm (last visited Jun. 17, 2025).

12

DHS-AR-000062

***What are relevant national interest considerations for the Temporary Protected Status for Syria designation?***

The U.S. government seeks to promote the safety of nationals of Syria (or aliens having no nationality who last habitually resided in Syria). This objective must be evaluated along with national interest considerations of the United States. DHS data shows there are aliens who are either Syria Temporary Protected Status recipients or applicants who have been the subject of administrative investigations for fraud, public safety, and national security threats. Notably, nearly 300 such Syrian nationals (or aliens having no nationality who last habitually resided in Syria) have been investigated for national security threats (including connection to known suspected terrorists), though this represents a small percentage compared to the total population. DHS records show that the percentage of Syria Temporary Protected Status beneficiaries or applicants with at least one TECS[109] hit in their immigration benefit request history is considerably higher than other comparable countries. It must be noted that a TECS hit does not always lead to derogatory findings or negative adjudicative outcome. This information should be taken into consideration when evaluating whether a Temporary Protected Status decision for Syria aligns with the national interest of the United States.

## II. Additional Considerations

***What if any, additional information relevant to this decision should be considered?***

## A. Changes in Conditions

### Political Situation

The government of Bashar al-Assad was overthrown on December 8, 2024, by a coalition of armed opposition groups, including Hay'at Tahrir al-Sham and factions of the Syrian National Army, marking an end to over 50 years of Baath Party rule in Syria. As the opposition groups seized cities, they freed prisoners across Syrian prisons and detention centers, and local and international journalists visited former detentions sites and locations of mass graves and other atrocities, providing a new opportunity for accountability.[110]

Prior to the fall of the Assad regime, the armed conflict in Syria was constantly in flux and included local and international actors, such as the Syrian regime, foreign states, opposition groups, and terrorist groups.[111] Although a new transitional government has been established with former leaders of Hay'at Tahrir al-Sham at the helm, a power struggle seems likely. International interference in various regions by foreign attempting to exert influence over the future government of the country is common and will likely

---

[109] TECS is an information-sharing platform which can assist authorized users to access different databases to identify individuals who pose a risk to national security or public safety, and individuals attempting to obtain immigration benefits through fraud or misrepresentation.

[110] The Associated Press, Syrian rebels free prisoners from Assad's notorious dungeons who celebrate in Damascus streets, Dec. 9, 2024, available at https://apnews.com/article/syria-assad-prisons-human-rights-detainees-saydnaya-982edfde78e852431d94f3f1a51b26ba (last visited Mar. 24, 2025).

[111] U.S. Department of State, Syria Travel Information, Mar.3, 2025, available at https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html (last visited Jun. 17, 2025).

13

continue to be common as Hay'at Tahrir al-Sham attempts to strengthen its control and consolidate the new government.[112]

Three months after the fall of former President Bashar al-Assad's government, interim President Ahmed al-Sharaa signed a constitutional declaration which that will serve as Syria's constitution during the five-year transitional period.[113] Syria's newly adopted constitution is also facing criticism from legal experts and political groups arguing that its loopholes could deepen division and instability in the conflict-ridden country. Legal experts have expressed concern that the 53-article document fails to adequately reflect Syria's realities, particularly its ethnic and religious diversity, as 10-15% of Syria's 24 million people identify as something other than Arab and/or Sunni Muslim.[114] There are also concerns that the temporary constitution grants vast powers to the interim president and promotes Islamist ideology, despite claiming to establish a separation between government branches.[115]

**Human Rights Concerns**

Women's rights in Syria have been neglected for decades.[116] Before the Syrian revolution in 2011, any legal frameworks that offered women rights, privileges, and titles were symbolic and did not translate into meaningful social or political empowerment.[117] These laws and policies were largely superficial, serving more as "window dressing" to give the appearance of progress while women's actual roles and opportunities were limited in practice.[118]

In a sign of progress, Syria's new government appointed several women to high-level positions, including Maysaa Sabreen,[119] head of Syria's Central Bank (the first woman to ever serve the role); Aisha al-Dibs,[120] head of the newly established Women's Affairs Office; and Muhsina al- Mahithawi, the first

---

[112] International Institute for Strategic Studies, Regional reactions to the transition in Syria, Mar. 6, 2025, available at https://www.iiss.org/online-analysis/online-analysis/2025/03/regional-reactions-to-the-transition-in-syria/ (last visited Mar. 24, 2025).

[113] Voice of America, Analysts see flaws in Syria's temporary constitution, Mar. 14, 2025, available at https://www.voanews.com/a/analysts-see-flaws-in-syria-s-temporary-constitution/8011117.html (last visited Mar. 24, 2025).

[114] Voice of America, Analysts see flaws in Syria's temporary constitution, Mar. 14, 2025, available at https://www.voanews.com/a/analysts-see-flaws-in-syria-s-temporary-constitution/8011117.html (last visited Mar. 24, 2025).

[115] Voice of America, Analysts see flaws in Syria's temporary constitution, Mar. 14, 2025, available at https://www.voanews.com/a/analysts-see-flaws-in-syria-s-temporary-constitution/8011117.html (last visited Mar. 24, 2025).

[116] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[117] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[118] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[119] Reuters, Syria appoints Maysaa Sabrine as first woman to lead central bank, official says, Dec. 30, 2024, available at https://www.reuters.com/world/middle-east/syrias-new-rulers-appoint-maysaa-sabrine-lead-central-bank-official-says- 2024-12-30/ (last visited Jun. 18, 2025).

[120] Al Jazeera, Women will play a key role in a new Syria, says minister, Dec. 22, 2024, available at https://www.aljazeera.com/news/2024/12/22/women-will-play-a-key-role-in-a-new-syria-says-minister/ (last visited Jun. 18, 2025).

14

female governor of Suwaida.[121] While these appointments are significant, questions remain about whether they are genuine efforts or symbolic gestures.[122] For example, statements from officials (including al-Dibs[123] and government spokesperson Obaida Arnaout[124]) and the appointment of Minister of Justice Shadi al-Waisi, who has a controversial track record[125] with respect to women, have been perceived as dismissive of the demands of Syrian women across the country.[126] Syrians were quick to condemn these statements and say they did not reflect priorities for Syria's future.[127]

Despite denying a desire to mimic the Taliban's approach to girls and women in public life, Syria's new Islamist-led interim government has decreed that women must wear burkinis - a swimsuit that covers the body except for the face, hands and feet - or other "decent" clothes at public beaches and swimming pools.[128]

**Economy**

Fourteen years of conflict in Syria have undone nearly four decades of economic, social, and human capital progress, according to a new United Nations Development Programme preliminary socio-economic impact assessment.[129] The report issues a stark warning: at current growth rates, Syria's economy will not regain its pre-conflict GDP level before 2080.[130] Annual economic growth must rise

---

[121] The New Arab, New Syrian gov't taps Druze woman as governor of southern province, Jan. 1, 2025, available at https://www.newarab.com/news/new-syrian-govt-taps-druze-woman-governor-suwaida (last visited Jun. 18, 2025)

[122] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[123] The Syrian Observer, Syrian Women Between the Discourse of Empowerment and the Legacy of Marginalization: A Critical Analysis of Aisha al-Dibs' Statements, Jan. 1, 2025, available https://syrianobserver.com/syrian-actors/syrian- women-between-the-discourse-of-empowerment-and-the-legacy-of-marginalization-a-critical-analysis-of-aisha-al-dibs-statements.html (last visited Jun. 18, 2025).

[124] The Syrian Observer, Syrian Activists Outrages Over Obaida Arnaout's Remarks on Women's Role in Future Syria, Dec. 19, 2024, available https://syrianobserver.com/syrian-actors/syrian-activists-outraged-over-obaida-arnaouts-remarks-on-womens-role-in-future-syria.html (last visited Jun. 18, 2025).

[125] The New Arab, New Syrian justice minister 'oversaw execution of women for prostitution' in 2015, Jan. 5, 2025, available at https://www.newarab.com/news/syrian-minister-oversaw-execution-women-prostitution (last visited Jun. 18, 2025).

[126] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[127] Atlantic Council, Syria's women face a new chapter. Here's how to amplify their voices., Mar. 10, 2025, available at https://www.atlanticcouncil.org/blogs/menasource/syrias-women-face-a-new-chapter-heres-how-to-amplify-their-voices/ (last visited Jun. 18, 2025).

[128] BBC, Syria government says women must wear burkinis at public beaches, Jun. 11, 2025, available at https://www.bbc.com/news/articles/ckgq7d9qdego (last visited Jun. 18, 2025).

[129] ReliefWeb, The impact of the conflict in Syria: a devastated economy, pervasive poverty and a challenging road ahead to social and economic recovery, Feb. 20, 2025, available at https://reliefweb.int/report/syrian-arab-republic/impact-conflict-syria-devastated-economy-pervasive-poverty-and-challenging-road-ahead-social-and-economic-recovery-enar (last visited Jun. 20, 2025).

[130] ReliefWeb, The impact of the conflict in Syria: a devastated economy, pervasive poverty and a challenging road ahead to social and economic recovery, Feb. 20, 2025, available at https://reliefweb.int/report/syrian-arab-republic/impact-conflict-syria-devastated-economy-pervasive-poverty-and-challenging-road-ahead-social-and-economic-recovery-enar (last visited Jun. 20, 2025).

DHS-AR-000065

Case 1:25-cv-08686-KPF    Document 72-2    Filed 04/03/26    Page 66 of 211

six-fold to shorten recovery to ten years, and an ambitious ten-fold rise would be needed over 15 years to bring the economy to where it would have been without conflict.[131]

Syria experienced a modest reprieve from accelerating inflation in the early months of 2025, according to consecutive monthly bulletins issued by the Syrian Center for Policy Research.[132] In January 2025, the Consumer Price Index fell sharply by 13 percent – a correction following the sharp price surge in December 2024.[133] This trend moderated in February, which saw a further 2.9 percent decline month- on-month, though the annual inflation rate remained elevated at 15.9 percent.[134] These price movements were partly underpinned by a notable appreciation of the Syrian pound in the unofficial market, where it strengthened 22.9 percent in January and an additional 17.7 percent in February.[135] Despite this, significant disparities remained between the official and parallel market rates, fueling uncertainty.[136]

The United Nations estimates that 90% of the population now lives below the poverty line.[137] The cost of living, as measured by the Minimum Expenditure Basket, increased by 2% to SYP 2.2 million, up from SYP 2.1 million in the previous month.[138] This increase was primarily driven by the depreciation of Syrian Pound within March 2025.[139] Meanwhile, the monthly minimum wage of SYP 278,910 covers nearly 13 percent of the Minimum Expenditure Basket, underscoring a severe affordability gap.[140]

Persistent inflation has meant that salaries are insufficient to cover living costs. More than a decade of civil war has devastated Syria's economy. As a result, the output of the country's main sectors – agriculture and mineral extraction – has considerably declined, and much of the country's civilian infrastructure and services has been damaged or destroyed, severely affecting access to shelter, health care, electricity, education, public transportation, water, and sanitation.[141]

---

[131] ReliefWeb, The impact of the conflict in Syria: a devastated economy, pervasive poverty and a challenging road ahead to social and economic recovery, Feb. 20, 2025, available at https://reliefweb.int/report/syrian-arab-republic/impact-conflict-syria-devastated-economy-pervasive-poverty-and-challenging-road-ahead-social-and-economic-recovery-enar (last visited Jun. 20, 2025).

[132] Syrian Center for Policy Research, Monthly Bulletin for Consumer Price Index and Inflation in Syria, Feb. 2025, Available at https://scpr-syria.org/publications/bulletins/monthly-bulletin-for-consumer-price-index-and-inflation-in-syria- february-2025/ (last visited Jun. 20, 2025).

[133] The Syrian Observer, Syria's Inflation Cools, but Structural Fragility Persists, Apr. 21, 2025, available at https://syrianobserver.com/society/syrias-inflation-cools-but-structural-fragility-persists.html (last visited Jun. 20, 2025).

[134] The Syrian Observer, Syria's Inflation Cools, but Structural Fragility Persists, Apr. 21, 2025, available at https://syrianobserver.com/society/syrias-inflation-cools-but-structural-fragility-persists.html (last visited Jun. 20, 2025).

[135] The Syrian Observer, Syria's Inflation Cools, but Structural Fragility Persists, Apr. 21, 2025, available at https://syrianobserver.com/society/syrias-inflation-cools-but-structural-fragility-persists.html (last visited Jun. 20, 2025).

[136] The Syrian Observer, Syria's Inflation Cools, but Structural Fragility Persists, Apr. 21, 2025, available at https://syrianobserver.com/society/syrias-inflation-cools-but-structural-fragility-persists.html (last visited Jun. 20, 2025).

[137] Reuters, Syria's economy: The devastating impact of war and sanctions, Jan. 6, 2025 available at Https://www.reuters.com/world/middle-east/syrias-new-leaders-face-economy-decimated-by-war-sanctions-2025-01-06/ (last visited Jun. 20, 2025).

[138] Global Food Security Cluster, Monthly Market Price Bulletin, Apr. 28, 2025, available at https://fscluster.org/syria/document/wfp-syria-price-bulletin-march-2025 (last visited Jun. 20, 2025).

[139] Global Food Security Cluster, Monthly Market Price Bulletin, Apr. 28, 2025, available at https://fscluster.org/syria/document/wfp-syria-price-bulletin-march-2025 (last visited Jun. 20, 2025).

[140] Global Food Security Cluster, Monthly Market Price Bulletin, Apr. 28, 2025, available at https://fscluster.org/syria/document/wfp-syria-price-bulletin-march-2025 (last visited Jun. 20, 2025).

[141] BTI, Country Report: Syria, available at https://bti-project.org/en/reports/country-report/SYR (last visited Mar. 24, 2025).

DHS-AR-000066

In April, the transitional government implemented several measures to stimulate the Syrian economy.[142] These included a reduction in electricity prices for the industrial sector, the reopening of Baniyas Oil Refinery, the signing of a contract with a French company to renovate and operate Latakia port, and the resumption of phosphate exports.[143]

**Population Inflows and Outflows**

The ongoing insecurity has triggered massive population movement, with more 882,000 people internally displaced at the start and 664,100 still reportedly displaced.[144] Syria has the second-highest number of internally displaced persons in the world.[145] At the end of 2024, 8.1 million Syrians are internally displaced and 6.1 million are refugees, asylum seekers or otherwise in need of international protection.[146] Civilians on the move face multiple risks, including exposure to violence, trauma, injuries caused by explosive ordnance and the erosion of mental health.[147]

Although conditions inside Syria remain unfit for safe and dignified returns of Syrian refugees living abroad, many Syrian refugees hope to return to their homeland. Economic crises in their host countries, which have made life particularly hard for displaced people, and many of these countries have placed formal and informal pressures on refugees to return to their homeland.[148] In the wake of the fall of the Assad government in December 2024, refugee hosting countries like Turkey and Lebanon summarily deported thousands of Syrians back to Syria,[149] and the narrative of Syrian refugee returns intensified across European countries.[150] Against a backdrop of anti-refugee sentiment, Turkey, which hosts nearly 3.3 million Syrian refugees, deported or otherwise pressured thousands to leave the country to northern Syria in 2024, including to Tel Abyad, a remote Turkish-occupied district where lawlessness prevails and humanitarian conditions are dire.[151] Syrian refugees trying to reach Europe from Lebanon have been intercepted and expelled back by the Lebanese and Cypriot authorities, with many forcibly returned to

---

[142] Global Food Security Cluster, Monthly Market Price Bulletin, May 23, 2025, available at https://fscluster.org/syria/document/wfp-syria-price-bulletin-april-2025 (last visited Jun. 20, 2025).
[143] Global Food Security Cluster, Monthly Market Price Bulletin, May 23, 2025, available at https://fscluster.org/syria/document/wfp-syria-price-bulletin-april-2025 (last visited Jun. 20, 2025).
[144] WHO, Syrian Arab Republic: WHO Health Emergency Appeal 2025, Jan. 16, 2025, available at https://www.who.int/publications/m/item/syrian-arab-republic--who-health-emergency-appeal-2025 (last visited Jun. 17, 2025).
[145] WHO, Syrian Arab Republic: WHO Health Emergency Appeal 2025, Jan. 16, 2025, available at https://www.who.int/publications/m/item/syrian-arab-republic--who-health-emergency-appeal-2025 (last visited Jun. 17, 2025).
[146] UNCHR, Middle East and North Africa: Syrian Arab Republic, available at https://www.unhcr.org/us/where-we-work/countries/syrian-arab-republic (last visited Jun. 17, 2025).
[147] WHO, Syrian Arab Republic: WHO Health Emergency Appeal 2025, Jan. 16, 2025, available at https://www.who.int/publications/m/item/syrian-arab-republic--who-health-emergency-appeal-2025 (last visited Jun. 17, 2025).
[148] Center for Strategic and International Studies, Don't Rush Syrian Refugees' Return, Dec. 11, 2024, available at https://www.csis.org/analysis/dont-rush-syrian-refugees-return (last visited Mar. 25, 2025).
[149] UNCHR, Syria emergency, available at https://www.unhcr.org/us/emergencies/syria-emergency (last visited Jun. 25, 2025).
[150] Reuters, Syrian refugees in Europe fear being forced home after Assad's fall, December 11, 1014, available at https://www.reuters.com/world/europe/syrian-refugees-europe-fear-being-forced-home-after-assads-fall-2024-12-11/ (last visited Jun. 25, 2025).
[151] Syria Justice and Accountability Center, Intensified deportation campaigns by Lebanon and Türkiye amid EU funding pledges, Jun. 27, 2024, available at https://syriaaccountability.org/intensified-deportation-campaigns-by-lebanon-and-turkiye-amid-eu-funding-pledges/ (last visited Jun. 25, 2025).

17

DHS-AR-000067

Syria by the Lebanese Army. Iraqi authorities in Baghdad and Erbil have also arbitrarily detained and deported Syrians to Damascus and to parts of northeast Syria under the control of Kurdish-led forces.[152]

The Center for Strategic and International Studies estimated that with so much uncertainty, sending refugees back prematurely will backfire. Even though Hay'at Tahrir al-Sham has tried to ensure the continuity of government functions in areas it controls, the fall of the Assad regime has caused major disruptions. It is unclear who refugees can turn to if they face problems with housing or property rights after returning and if the transition government will be able to provide basic services.[153] Divisions between the different religious and ethnic groups have increased during the conflict, because of fear and distrust, a dynamic manipulated and encouraged by politically dominant forces. The state's resettlement process actively discourages Syrians from returning and seeks to punish those who were displaced by seizing property and other assets.[154] The division of Syria into areas with internal borders that are nearly impossible to cross has alienated citizens in these areas from each other.[155] More importantly, flooding Syrians back makes the odds of a successful transition in Syria even longer. If too many refugees return at once, it would increase pressure on strained public services, exacerbate social tensions, and undermine the already slim prospects of a successful transition, and cause many to flee for a second time, putting even more strain on neighboring countries.[156]

## B. Improvements

### Diplomatic Developments

Syria remains one of Israel's biggest foes, and Israeli officials have continued to describe Sharaa as a jihadist, though he severed ties with al Qaeda in 2016. Sharaa first joined the group in Iraq, where he spent five years in a U.S. prison. The United States removed a $10 million bounty on his head in December.[157] Israel opposes lifting sanctions on Syria, which would clear the way for greater engagement by humanitarian organizations and boost foreign investment. Israel has escalated military strikes in Syria since Sharaa took power after toppling former President Bashar al-Assad in December.[158]

---

[152] Global Detention Project, Iraq Summarily Deporting Refugees, Sept. 11, 2024, available at https://www.globaldetentionproject.org/iraq-accused-of-summarily-deporting-syrian-refugees (last visited Jun. 25, 2025).
[153] Center for Strategic and International Studies,Don't Rush Syrian Refugees' Return, available at https://www.csis.org/analysis/dont-rush-syrian-refugees-return (last visited Mar. 25, 2025).
[154] SNHR, The Syrian Regime is Using Provisional Seizure of Assets as An Instrument of Collective Punishment, Jul. 16, 2024, available at https://snhr.org/blog/2024/07/16/the-syrian-regime-is-using-provisional-seizure-of-assets-as-an- instrument-of-collective-punishment/ (last visited Apr. 3, 2025).
[155] BTI, Country Report: Syria, available at https://bti-project.org/en/reports/country-report/SYR (last visited Mar. 24, 2025).
[156] Center for Strategic and International Studies, Don't Rush Syrian Refugees' Return, available at https://www.csis.org/analysis/dont-rush-syrian-refugees-return (last visited Mar. 25, 2025).
[157] Reuters, Trump meets Syrian president, urges him to establish ties with Israel, May 14, 2025, available at https://www.reuters.com/world/middle-east/trump-meet-syrian-president-saudi-before-heading-qatar-2025-05-14/ (last visited Jun. 26, 2025).
[158] Reuters, Trump meets Syrian president, urges him to establish ties with Israel, May 14, 2025, available at https://www.reuters.com/world/middle-east/trump-meet-syrian-president-saudi-before-heading-qatar-2025-05-14/ (last visited Jun. 26, 2025).

18

DHS-AR-000068

Israel has escalated military strikes in Syria since Sharaa took power after toppling former President Bashar al-Assad in December.[159] Sharaa told Mills during their meeting that Syria is interested "under the right conditions" in joining the Abraham Accords — the series of normalization agreements that US President Donald Trump's previous administration negotiated between Israel and the United Arab Emirates, Bahrain and Morocco.[160] Serious talks regarding a deal to end hostilities between the two countries continue.[161]

In May 2023, Iranian President Ebrahim Raisi met with[162] President Bashar al-Assad in Damascus to strengthen economic cooperation—marking the first visit[163] of an Iranian president to Syria since the war. Later that month, the Arab League agreed to re-admit[164] Syria after a twelve-year suspension, despite the persistence of Western sanctions against President Assad's government that could deter[165] oil-rich Arab countries from investment in Syria. In July 2023, Iraqi Prime Minister Mohammed Shia al-Sudan discussed[166] drug trafficking, the return of Syrian refugees, and the removal of the Western sanctions with President Assad in Damascus.[167]

On May 14, 2025, a meeting between U.S. President Donald Trump and Sharaa in Riyadh upended decades of U.S. Syria policy, and signaled to Israel's right-wing government that it should work to reach understandings with Sharaa.[168] The regional intelligence source described Trump's engagement with Sharaa as a pivotal part of a realignment in U.S. policy that upset Israel's post-Assad strategy of exploiting Syria's fragmentation.[169]

On May 23 [2025], US Secretary of State, Marco Rubio, issued a 180-day waiver of mandatory Caesar Act sanctions to ensure sanctions do not impede the ability of our partners to make stability-driving

---

[159] Reuters, Trump meets Syrian president, urges him to establish ties with Israel, May 14, 2025, available at https://www.reuters.com/world/middle-east/trump-meet-syrian-president-saudi-before-heading-qatar-2025-05-14/ (last visited Jun. 26, 2025).

[160] The Times of Israel, Ahmed al-Sharaa said to seek peace with Israel, eyes Syrian entry to Abraham Accords, Apr. 24, 2025, available at https://www.timesofisrael.com/ahmed-al-sharaa-said-to-seek-peace-with-israel-eyes-syrian-entry-to- abraham-accords/ (last visited Jun. 26, 2025).

[161] The Times of Israel, Israel in 'advanced talks' for deal to end hostilities with Syria, says senior official, Jun. 30, 2025, available at https://www.timesofisrael.com/israel-in-advanced-talks-for-deal-to-end-hostilities-with-syria-says-senior- official/

[162] Al Jazeera, Iran's Raisi in Syria; visit hailed as 'strategic victory' May 3, 2023, available at https://www.aljazeera.com/news/2023/5/3/irans-raisi-in-syria-visit-hailed-as-strategic-victory (last visited Jun 26, 2025).

[163] Axios, Iran's president meets with Assad in first Syria visit since war began, May 3, 2023, available at https://www.axios.com/2023/05/03/iran-syria-assad-raisi-visit-meeting-damascus (last visited Jun 26, 2025).

[164] AP News, Pariah no more? Arab League reinstates Bashar Assad's Syria, May 7, 2023, available at https://apnews.com/article/syria-arab-egypt-saudi-qatar-jordan-f0298c40488470eb28274b2ffb859396 (last visited Jun 26, 2025).

[165] AP News, Back in the Arab League after 12 years, Syria urges group to invest in war-torn country, May 15, 2023, available at https://apnews.com/article/syria-saudi-arabia-arab-league-jeddah-f72106b01979e01874b93b61d14d1d6e (last visited Jun 26, 2025).

[166] Al Jazeera, Iraqi PM Sudani and Syria's Assad hold talks in Damascus, Jul. 16, 2023, available at https://www.aljazeera.com/news/2023/7/16/iraqi-pm-sudani-and-syrias-assad-hold-talks-in-damascus (last visited Jun 26, 2025).

[167] Global Conflict Tracker Center for Preventative Action, Conflict in Syria, May 14, 2025, available at https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria#RecentDevelopments-1 (last visited Jun 26, 2025).

[168] Reuters, Exclusive: Syria and Israel in direct talks focused on security, sources say, May 27, 2025, available at https://www.reuters.com/world/middle-east/syria-israel-direct-talks-focused-security-sources-say-2025-05-27/ (last visited Jun. 26, 2025).

[169] Reuters, Exclusive: Syria and Israel in direct talks focused on security, sources say, May 27, 2025, available at https://www.reuters.com/world/middle-east/syria-israel-direct-talks-focused-security-sources-say-2025-05-27/ (last visited Jun. 26, 2025).

19

DHS-AR-000069

investments, and advance Syria's recovery and reconstruction efforts.[170] These waivers will facilitate the provision of electricity, energy, water, and sanitation, and enable a more effective humanitarian response across Syria.[171] In addition, the Department of the Treasury issued Syria General License (GL) 25 to authorize transactions by U.S. persons previously prohibited by the Syrian Sanctions Regulations, effectively lifting sanctions on Syria.[172] An Executive Order on June 30, 2025,[173] a) removed the sanctions placed by the United States on Syria in 2004, 2006, 2008 and 2011 due to the changes in governance which have occurred over the past six months b) highlighted a desire for al- Assad to be held accountable for the atrocities his government committed over the course of the civil war and c) directed the Secretary of State to examine the designation of Hay'at Tahrir al-Sham as a terrorist organization, the designation of Ahmed al-Sharaa as a terrorist, and Syria as a State Sponsor of Terrorism. Following this Executive Order, Secretary of State, Marco Rubio, spoke with Foreign Minister Asaad Hassan al-Shaibani regarding the lifting of sanctions and underscored his intent to maintain sanctions on malign actors including Bashar al-Assad, his associates, and others who threaten Syrian and international security.[174] On July 7, 2025, the U.S. State Department announced that they were revoking the Foreign Terrorist Organization designation of Hay'at Tahrir al-Sham, effective July 8.[175]

**Tourism**

Following the fall of Bashar al-Assad's regime on December 8, 2024, the new Syrian government is focusing its efforts on investing in the tourism sector for the 2025 season, aiming to generate revenue for a state treasury seeking diverse resources to help revive the economy.[176] The Syrian Ministry of Tourism considered U.S. President Donald Trump's decision to lift sanctions on Syria a major turning point that opens new prospects for reviving investment in the tourism sector.[177] The return of Arab visitors to Syria signaled a renewed interest in the country as a preferred tourist destination, reminiscent of the pre-2011 era before the Arab Spring revolution.[178]

---

[170] U.S. Department of State, Providing Sanctions Relief for the Syrian People, May 23, 2025, available at https://www.state.gov/releases/office-of-the-spokesperson/2025/05/providing-sanctions-relief-for-the-syrian-people/ (last visited Jun. 26, 2025).

[171] U.S. Department of State, Providing Sanctions Relief for the Syrian People, May 23, 2025, available at https://www.state.gov/releases/office-of-the-spokesperson/2025/05/providing-sanctions-relief-for-the-syrian-people/ (last visited Jun. 26, 2025).

[172] U.S. Department of State, Providing Sanctions Relief for the Syrian People, May 23, 2025, available at https://www.state.gov/releases/office-of-the-spokesperson/2025/05/providing-sanctions-relief-for-the-syrian-people/ (last visited Jun. 26, 2025).

[173] U.S. White House, Providing for the Revocation of Syrian Sanctions, Jun. 30, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/06/providing-for-the-revocation-of-syria-sanctions/

[174] U.S. Department of State, Secretary Rubio's Call with Syrian Foreign Minister al-Shaibani, Jul. 3, 2025, available at https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-syrian-foreign-minister-al-shaibani/

[175] U.S. Department of State, Revoking the Foreign Terrorist Organization Designation of Hay'at Tahrir al-Sham, Jul. 7, 2025, available at https://www.state.gov/releases/office-of-the-spokesperson/2025/07/revoking-the-foreign-terrorist- organization-designation-of-hayat-tahrir-al-sham/

[176] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[177] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[178] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

DHS-AR-000070

Damascus has launched a comprehensive plan to rehabilitate Mount Qasioun, which overlooks the capital, with work beginning in April 2025.[179] Officials expect that some essential services on the mountain will be operational ahead of Eid al-Adha 2025.[180] The plan includes free public spaces tailored to community needs, entertainment venues, quality services, and a dedicated parking area.[181]

In another move, Minister al-Salhani announced in April 2025 a plan to accelerate the restoration of the Sulaymaniyya Takiyya—one of Damascus's most prominent historical and religious landmarks—in cooperation with Turkish experts, with the goal of reopening the site to visitors.[182]

Experts say reviving tourism could help stabilize and strengthen the Syrian pound, which has lost roughly 90% of its value since 2011—falling from around 50 pounds to the dollar to between 10,000 and 12,000 pounds today.[183] In 2022, the number of Arab and foreign visitors to Syria reached around 1.8 million, a 141% increase compared to 2021, despite persistent security concerns leading up to the Assad regime's downfall.[184] For the first time since 2011, international airlines including Qatar Airways[185] and Turkish Airlines[186] have resumed operations in Damascus.[187]

**Energy Agreement**

Syria has signed a memorandum of understanding with a consortium of international companies led by Qatar's UCC Holding to develop major power generation projects with a foreign investment valued at about $7 billion.[188] The agreement involves building four combined-cycle gas turbine power plants with a

---

[179] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[180] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[181] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[182] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[183] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[184] Al Estiklal, Syria's 2025 Comeback Season: Is the New Tourism Boom Underway?, available at https://www.alestiklal.net/en/article/syria-s-2025-comeback-season-is-the-new-tourism-boom-underway (last visited Jun. 18, 2025).

[185] Qatar Airways, Qatar Airways to Resume Flights to Syria, Jan. 2, 2025, available at https://www.qatarairways.com/press-releases/en-WW/245672-qatar-airways-to-resume-flights-to-syria (last visited Jun. 18, 2025).

[186] Turkish Airlines, Widen Your World: Damascus Flights, available at https://www.turkishairlines.com/en- int/flights/flights-to-damascus/ (last visited Jun. 18, 2025).

[187] CNN, 2025, 'Everything is better than before': How Syria is reopening to tourists, Feb. 19, 2025, available at https://www.cnn.com/travel/syria-tourism-war-reopening-resurgence (last visited Jun. 18, 2025).

[188] Reuters, Syria signs $7 billion power deal with Qatar's UCC Holding-led consortium, May 29, 2025, available at https://www.reuters.com/business/energy/syria-signs-7-billion-power-deal-with-qatars-ucc-holding-led-consortium-2025- 05-29/ (last visited Jun. 18, 2025).

21

total capacity of 4,000 megawatts, plus a 1,000-megawatt solar power plant in southern Syria.[189] Once completed, the projects are expected to provide over 50% of Syria's electricity needs. After 14 years of war, Syria's electricity sector has been suffering from severe damage to its grid and power stations, aging infrastructure, and persistent fuel shortages, generating only 1.6 gigawatts of electricity, down from 9.5 gigawatts before 2011.[190]

---

[189] Reuters, Syria signs $7 billion power deal with Qatar's UCC Holding-led consortium, May 29, 2025, available at https://www.reuters.com/business/energy/syria-signs-7-billion-power-deal-with-qatars-ucc-holding-led-consortium-2025- 05-29/ (last visited Jun. 18, 2025).

[190] Reuters, Syria signs $7 billion power deal with Qatar's UCC Holding-led consortium, May 29, 2025, available at https://www.reuters.com/business/energy/syria-signs-7-billion-power-deal-with-qatars-ucc-holding-led-consortium-2025- 05-29/ (last visited Jun. 18, 2025).

DHS-AR-000072

further concluded that there is a sufficient factual basis to find that Al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusra, also known as The Victory Front, also known as Al Nusrah Front for the People of the Levant is, also known as Jamaat Al-Nusrah Front in Lebanon, also known as Support Front for the People of the Levant, also known as Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad is no longer part of al-Qa'ida in Iraq.

Therefore, pursuant to Section 1(b) of Executive Order 13224, I hereby amend the designation of al-Qa'ida in Iraq as a Specially Designated Global Terrorist to include the following new aliases: the Islamic State of Iraq and the Levant, also known as Islamic State of Iraq and al-Sham, also known as Islamic State of Iraq and Syria, also known as ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, also known as Daesh, also known as Dawla al Islamiya, also known as Al-Furqan Establishment for Media Production; and remove the following aliases: Al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusra, also known as The Victory Front, also known as Al Nusrah Front for the People of the Levant.

This determination shall be published in the **Federal Register**.

Dated: May 7, 2014.

**John F. Kerry,**

*Secretary of State.*

[FR Doc. 2014–11219 Filed 5–14–14; 8:45 am]

**BILLING CODE 4710–01–P**

## DEPARTMENT OF STATE

**[Public Notice 8735]**

**In the Matter of the Designation of Al-Nusrah Front Also Known as Jabhat al-Nusrah Also Known as Jabhet al-Nusra Also Known as The Victory Front Also Known as Al Nusrah Front for the People of the Levant Also Known as Al-Nusrah Front in Lebanon Also Known as Support Front for the People of the Levant Also Known as Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended**

Acting under the authority of and in accordance with section 1(b) of Executive Order 13224 of September 23, 2001, as amended by Executive Order 13268 of July 2, 2002, and Executive Order 13284 of January 23, 2003, I hereby determine that the entity known as Al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet

al-Nusra, also known as The Victory Front, also known as Al Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in Lebanon, also known as Support Front for the People of the Levant, also known as Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, committed, or poses a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

Consistent with the determination in section 10 of Executive Order 13224 that ''prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously,'' I determine that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This notice shall be published in the **Federal Register**.

Dated: May 7, 2014.

**John F. Kerry,**

*Secretary of State.*

[FR Doc. 2014–11212 Filed 5–14–14; 8:45 am]

**BILLING CODE 4710–10–P**

## DEPARTMENT OF THE TREASURY

**Submission for OMB Review; Comment Request**

May 12, 2014.

The Department of the Treasury will submit the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995, Public Law 104–13, on or after the date of publication of this notice.

**DATES:** Comments should be received on or before June 16, 2014 to be assured of consideration.

**ADDRESSES:** Send comments regarding the burden estimate, or any other aspect of the information collection, including suggestions for reducing the burden, to (1) Office of Information and Regulatory Affairs, Office of Management and Budget, Attention: Desk Officer for Treasury, New Executive Office Building, Room 10235, Washington, DC 20503, or email at *OIRA_Submission@ OMB.EOP.gov* and (2) Treasury PRA Clearance Officer, 1750 Pennsylvania

Ave. NW., Suite 8140, Washington, DC 20220, or email at *PRA@treasury.gov.*

**FOR FURTHER INFORMATION CONTACT:** Copies of the submission(s) may be obtained by emailing *PRA@treasury.gov,* calling (202) 927–5331, or viewing the entire information collection request at *www.reginfo.gov.*

**Bureau of the Fiscal Service**

*OMB Number:* 1535–0137.

*Type of Review:* Extension without change of a currently approved collection.

*Title:* U.S. Treasury Auctions Submitter Agreement.

*Form:* PD F 5441.

*Abstract:* Used to request information from entities wishing to participate in U.S. Treasury Securities Auctions via TAPPS link.

*Affected Public:* Private Sector: Businesses or other for-profits.

*Estimated Annual Burden Hours:* 80.

**Dawn D. Wolfgang,**

*Treasury PRA Clearance Officer.*

[FR Doc. 2014–11168 Filed 5–14–14; 8:45 am]

**BILLING CODE 4810–39–P**

## DEPARTMENT OF THE TREASURY

**Office of Foreign Assets Control**

**Unblocking of Specially Designated Nationals and Blocked Persons Pursuant to Executive Order 13288, as Amended by Executive Order 13391**

**AGENCY:** Office of Foreign Assets Control, Treasury.

**ACTION:** Notice.

**SUMMARY:** The Treasury Department's Office of Foreign Assets Control (''OFAC'') is publishing the names of nine individuals whose property and interests in property have been unblocked pursuant to Executive Order 13288 of March 6, 2003, ''Blocking Property of Persons Undermining Democratic Processes or Institutions in Zimbabwe,'' as amended by Executive Order 13391 of November 22, 2005, ''Blocking Property of Additional Persons Undermining Democratic Processes or Institutions in Zimbabwe.''

**DATES:** The unblocking and removal from the list of Specially Designated Nationals and Blocked Persons (''SDN List'') of the nine individuals identified in this notice is effective as of April 17, 2014.

**FOR FURTHER INFORMATION CONTACT:** Assistant Director, Compliance Outreach & Implementation, Office of Foreign Assets Control, Department of the Treasury, Washington, DC 20220, tel.: 202/622–2490.

DHS-AR-000073

Dated: July 3, 2025.

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2025–12643 Filed 7–7–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

## DEPARTMENT OF STATE

**[Delegation of Authority No. 586]**

## Re-Delegation of Authority To Invoke the Law Enforcement Privilege for Information Relating to Security Vetting of Visa Applicants

**ACTION:** Delegation of Authority.

**SUMMARY:** The State Department is publishing a Delegation of Authority signed by the Assistant Secretary of Administration, pursuant to Department of State Delegations of Authority.

**DATES:** Effective June 27, 2025.

**FOR FURTHER INFORMATION CONTACT:** Alice Kottmyer, Attorney-Adviser, Office of Management, 202–647–2199.

**SUPPLEMENTARY INFORMATION:** José E.V. Cunningham, Assistant Secretary for Administration, signed the following document on June 27, 2025. The State Department maintains the original document.

(Begin text.)

By virtue of the authority delegated to the Under Secretary of State for Management by the laws of the United States, as delegated by Department of State Delegations of Authority No. 514 and No. 575, I hereby re-delegate to the Assistant Secretary for Consular Affairs, to the extent authorized by law, the authority to invoke the law enforcement privilege with respect to information relating to security vetting of visa applicants and visa holders to the United States.

This re-delegation of authority does not revoke or otherwise affect any other delegation of authority currently in effect. The authority re-delegated herein may also be exercised, to the extent authorized by law, by the Secretary, the Deputy Secretary, the Deputy Secretary for Management Resources, and the Under Secretary for Management.

This re-delegation will be published in the **Federal Register**.

Signed José E.V. Cunningham, Assistant Secretary, Bureau of Administration, Department of State.

[End text]

*Authority:* 22 U.S.C. 2651a; 5 U.S.C. 552.

**Alice M. Kottmyer,**

*Attorney-Adviser, Office of Management, Department of State.*

[FR Doc. 2025–12670 Filed 7–7–25; 8:45 am]

**BILLING CODE 4710–08–P**

---

## DEPARTMENT OF STATE

**[Public Notice: 12762]**

## Revocation of the Foreign Terrorist Organization Designation of al-Nusrah Front, Also Known as Hay'at Tahrir al-Sham

In consultation with the Attorney General and the Secretary of the Treasury, I hereby revoke the designation of al-Nusrah Front, also known as Hay'at Tahrir al-Sham (and other aliases) as a Foreign Terrorist Organization pursuant to section 219(a)(6)(A) of the Immigration and Nationality Act (8 U.S.C. 1189(a)(6)(A)).

This determination shall be published in the **Federal Register**. The revocation goes into effect upon publication.

Dated: June 23, 2025.

**Marco Rubio,**

*Secretary of State.*

[FR Doc. 2025–12720 Filed 7–7–25; 8:45 am]

**BILLING CODE 4710–AD–P**

---

## DEPARTMENT OF STATE

**[Public Notice 12753]**

## 60-Day Notice of Proposed Information Collection: Request for Department of State Personal Identification Card

**ACTION:** Notice of request for public comment.

**SUMMARY:** The Department of State is seeking Office of Management and Budget (OMB) approval for the information collection described below. In accordance with the Paperwork Reduction Act of 1995, we are requesting comments on this collection from all interested individuals and organizations. The purpose of this notice is to allow 60 days for public comment preceding submission of the collection to OMB.

**DATES:** The Department will accept comments from the public up to September 8, 2025.

**ADDRESSES:** You may submit comments by any of the following methods:

• *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering

''Docket Number: DOS–2025–0038 in the Search field. Then click the ''Comment Now'' button and complete the comment form.

• *Email: FergusonJM3@state.gov. Regular Mail:* DS/DO/DFP, Harry S Truman, 2201 C St. NW, Washington, DC 20520–0000, Room B237.

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**FOR FURTHER INFORMATION CONTACT:** Direct requests for additional information regarding the collection listed in this notice, including requests for copies of the proposed collection instrument and supporting documents to John Ferguson, who may be reached on (202) 647–0511 or at *fergusonjm3@ state.gov.*

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Request for Department of State Personal Identification Card.

• *OMB Control Number:* 1405–0232.

• *Type of Request:* Renewal of a currently approved collection.

• *Originating Office:* Diplomatic Security, Domestic Operations, Security Support Division (DS/DO/DFP/SSD).

• *Form Number:* DS–1838 and DS–7783.

• *Respondents:* Department employees and contractors.

• *Estimated Number of Respondents:* 13,500.

• *Estimated Number of Responses:* 13,500.

• *Average Time per Response:* 5 minutes.

• *Total Estimated Burden Time:* 1,125 hours per year.

• *Frequency:* On occasion (when new badge is required, or badge expires).

• *Obligation to Respond:* Mandatory.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be

DHS-AR-000074

# Presidential Documents

Executive Order 14312 of June 30, 2025

## Providing for the Revocation of Syria Sanctions

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003 (Public Law 108–175) (Syria Accountability Act), the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (Public Law 102–182, title III) (CBW Act), the Caesar Syria Civilian Protection Act of 2019, as amended (22 U.S.C. 8791 note) (Caesar Act), the Illicit Captagon Trafficking Suppression Act of 2023 (Public Law 118–50, div. P), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Background*. The United States is committed to supporting a Syria that is stable, unified, and at peace with itself and its neighbors. A united Syria that does not offer a safe haven for terrorist organizations and ensures the security of its religious and ethnic minorities will support regional security and prosperity. The Secretary of State and the Secretary of the Treasury have taken initial steps towards this goal through the issuance on May 23, 2025, of General License 25 and a waiver of sanctions under the Caesar Act.

**Sec. 2**. *Policy*. It is the policy of the United States to recognize that circumstances that gave rise to the actions taken in the Executive Orders described in section 3(a) of this order, related to the policies and actions of the former regime of Bashar al-Assad, have been transformed by developments over the past 6 months, including the positive actions taken by the new Syrian government under President Ahmed al-Sharaa. This order supports United States national security and foreign policy goals by directing additional actions, including the removal of sanctions on Syria, the issuance of waivers that permit the relaxation of export controls and other restrictions on Syria, and other actions to be taken by the Secretary of State, the Secretary of the Treasury, and the Secretary of Commerce, as well as by other executive departments and agencies (agencies) of the United States, without providing relief to ISIS or other terrorist organizations, human rights abusers, those linked to chemical weapons or proliferation-related activities, or other persons that threaten the peace, security, or stability of the United States, Syria, and its neighbors.

**Sec. 3**. *Revocation of Syria Sanctions*. (a) Effective July 1, 2025, I hereby terminate the national emergency declared in Executive Order 13338 of May 11, 2004 (Blocking Property of Certain Persons and Prohibiting the Export of Certain Goods to Syria), and revoke that order, as well as Executive Order 13399 of April 25, 2006 (Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria), Executive Order 13460 of February 13, 2008 (Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria), Executive Order 13572 of April 29, 2011 (Blocking Property of Certain Persons with Respect to Human Rights Abuses in Syria), Executive Order 13573 of May 18, 2011 (Blocking Property of Senior Officials of the Government of Syria), and Executive Order 13582 of August 17, 2011 (Blocking Property of the Government of Syria and Prohibiting Certain Transactions with Respect to Syria).

DHS-AR-000075

(b) Pursuant to section 202(a) of the NEA (50 U.S.C. 1622(a)), termination of the national emergency declared in Executive Order 13338, as modified in scope and relied upon for additional steps taken in Executive Order 13399, Executive Order 13460, Executive Order 13572, Executive Order 13573, and Executive Order 13582 shall not affect any action taken or pending proceeding not finally concluded or determined as of July 1, 2025, any action or proceeding based on any act committed prior to July 1, 2025, or any rights or duties that matured or penalties that were incurred prior to July 1, 2025.

**Sec. 4**. *Accountability for the Former Regime of Bashar al-Assad*. I find that additional steps must be taken to ensure meaningful accountability for perpetrators of war crimes, human rights violations and abuses, and the proliferation of narcotics trafficking networks in and in relation to Syria during the former regime of Bashar al-Assad and by those associated with it. Perpetrators of such actions threaten to undermine peace, security, and stability in the region, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States.

(a) I hereby expand the scope of the national emergency declared in Executive Order 13894 of October 14, 2019 (Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria), as amended in and relied on for additional steps taken in Executive Order 14142 of January 15, 2025 (Taking Additional Steps With Respect to the Situation in Syria), to deal with that threat, and accordingly further amend Executive Order 13894 by:

(i) striking section 1(a) and inserting, in lieu thereof, the following:

''**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(A) to be responsible for or complicit in, or to have directly or indirectly engaged in, or attempted to engage in, any of the following in or in relation to Syria:

(1) actions or policies that further threaten the peace, security, stability, or territorial integrity of Syria; or

(2) the commission of serious human rights abuse;

(B) to be a former government official of the former regime of Bashar al-Assad or a person who acted for or on behalf of such an official;

(C) to have engaged in, or attempted to engage in, activities or transactions that have materially contributed to, or pose a significant risk of materially contributing to, the illicit production and international illicit proliferation of captagon;

(D) to be responsible for or complicit in, to have directly or indirectly engaged in, or to be responsible for ordering, controlling, or otherwise directing, instances in which a United States national ((i) as defined in 8 U.S.C. 1101(a)(22) or 8 U.S.C. 1408, or (ii) a lawful permanent resident with significant ties to the United States) went missing in Syria during the former regime of Bashar al-Assad;

(E) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of:

(1) the former regime of Bashar al-Assad;

(2) any activity described in subsections (a)(i)(A)–(a)(i)(D) of this section; or

(3) any person whose property and interests in property are blocked pursuant to this order;

(F) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order; or

DHS-AR-000076

(G) to be an adult family member of a person designated under subsections (a)(i)(A)–(a)(i)(D) of this section.''; and

(ii) striking section 2(a) and inserting, in lieu thereof, the following:

''**Sec. 2**. (a) The Secretary of State, in consultation with the Secretary of the Treasury and other officials of the United States Government as appropriate, is hereby authorized to impose on a foreign person any of the sanctions described in subsections (b) and (c) of this section, upon determining that the person, on or after the date of this order:

(i) is responsible for or complicit in, has directly or indirectly engaged in, or attempted to engage in, or financed the obstruction, disruption, or prevention of efforts to promote a Syria that is stable, unified, and at peace with itself and its neighbors, including:

(A) the convening and conduct of a credible and inclusive Syrian-led constitutional process;

(B) the preparation for and conduct of supervised elections, pursuant to the new constitution, that are free and fair and to the highest international standards of transparency and accountability; or

(C) the development of a Syrian government that is representative and reflects the will of the Syrian people;

(ii) is an adult family member of a person designated under subsection (a)(i) of this section; or

(iii) is responsible for or complicit in, or has directly or indirectly engaged in, or attempted to engage in, the expropriation of property, including real property, for personal gain or political purposes in Syria.''

(b) I additionally amend Executive Order 13606 of April 22, 2012 (Blocking the Property and Suspending Entry into the United States of Certain Persons With Respect to Grave Human Rights Abuses by the Governments of Iran and Syria Via Information Technology), by removing the following text from the preamble: ''Executive Order 13338 of May 11, 2004, as modified in scope and relied upon for additional steps in subsequent Executive Orders'' and replacing it with: ''Executive Order 13894 of October 14, 2019, and relied upon for additional steps and further amended in subsequent Executive Orders.''

**Sec. 5**. *Caesar Act*. The Secretary of State, in consultation with the Secretary of the Treasury, shall examine whether the criteria set forth in section 7431(a) of the Caesar Act have been met, and on the basis of that examination may, pursuant to the Presidential Memorandum of March 31, 2020 (Delegation of Certain Functions and Authorities Under the National Defense Authorization Act for Fiscal Year 2020), suspend in whole or in part the imposition of sanctions otherwise required under the Caesar Act. If the Secretary of State determines to suspend in whole or in part the imposition of such sanctions, the Secretary of State, in consultation with the Secretary of the Treasury, shall provide the briefing to the appropriate congressional committees required by section 7431(b) of the Caesar Act within 30 days of such determination. Further, the Secretary of State, in consultation with the Secretary of the Treasury, shall continue to review the situation in Syria, and if the Secretary of State, in consultation with the Secretary of the Treasury, determines that the criteria set forth in section 7431(a) are no longer met, the Secretary of State shall reimpose sanctions.

**Sec. 6**. *Syria Accountability Act*. I hereby determine pursuant to section 5(b) of the Syria Accountability Act that it is in the national security interest of the United States to waive the application of subsection (a)(1), with respect to items on the Commerce Control List (supp. No. 1 to 15 C.F.R. part 774) only, and subsection (a)(2)(A) of the Syria Accountability Act only. The Secretary of State shall submit to the appropriate congressional committees the report required under section 5(b) of that Act.

**Sec. 7**. *CBW Act*. (a) Pursuant to section 307(d)(1)(B) of the CBW Act, I hereby determine and certify that there has been a fundamental change

DHS-AR-000077

**29398**    **Federal Register** / Vol. 90, No. 126 / Thursday, July 3, 2025 / Presidential Documents

in the leadership and policies of the Government of the Syrian Arab Republic. Accordingly, I hereby waive the following sanctions imposed on Syria for the prior use of chemical weapons under the former regime of Bashar al-Assad:

(i) the restriction on foreign assistance under section 307(a)(1) of the CBW Act;

(ii) the restriction on United States Government credit, credit guarantees, or other financial assistance under section 307(a)(4) of the CBW Act;

(iii) the restrictions on the export of national security-sensitive goods and technology under section 307(a)(5) of the CBW Act and on all other goods and technology under section 307(b)(2)(C) of the CBW Act; and

(iv) the restriction on United States banks from making any loan or providing any credit to the Government of Syria under section 307(b)(2)(B) of the CBW Act.

(b) The Secretary of State shall transmit this waiver determination and report as required by sections 307(d)(1)(B) and (d)(2) of the CBW Act to the appropriate congressional committees. This waiver shall be effective 20 days after it has been so transmitted.

**Sec. 8**. *Counterterrorism Designations.* (a) The Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, shall take all appropriate action with respect to the designation of al-Nusrah Front, also known as Hay'at Tahrir al-Sham and other aliases, as a Foreign Terrorist Organization under 8 U.S.C. 1189 and as a Specially Designated Global Terrorist under 50 U.S.C. 1702 and Executive Order 13224, as well as the designation of Abu Muhammad al-Jawlani, commonly known as Ahmed al-Sharaa, as a Specially Designated Global Terrorist.

(b) The Secretary of State shall take all appropriate action to review the designation of Syria as a State Sponsor of Terrorism consistent with section 1754(c) of the National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 50 U.S.C. 4813(c)), section 40 of the Arms Export Control Act (Public Law 90–629, as amended; 22 U.S.C. 2780), and section 620A of the Foreign Assistance Act of 1961 (Public Law 87–195, as amended; 22 U.S.C. 2371).

**Sec. 9**. *United Nations.* The Secretary of State shall take appropriate steps to advance United States policy objectives at the United Nations to support a Syria that is stable and at peace and to support Syrian efforts to counter terrorism and comply with its responsibilities and obligations concerning weapons of mass destruction, including chemical and biological weapons. The Secretary of State is further directed to explore avenues at the United Nations to provide sanctions relief in support of these objectives.

**Sec. 10**. *Implementation.* The Secretary of State, the Secretary of the Treasury, and the Secretary of Commerce, as appropriate, are hereby authorized to take such actions, including adopting rules and regulations, as may be necessary to implement this order. The Secretary of State, the Secretary of the Treasury, and the Secretary of Commerce may, consistent with applicable law, redelegate any of these functions within their respective agencies. The Secretary of State, in consultation with the Secretary of the Treasury, the Secretary of Commerce, and the Secretary of Transportation, as appropriate, is authorized to exercise the functions and authorities conferred upon the President in section 5 of the Syria Accountability Act and to redelegate these functions and authorities consistent with applicable law. All agencies of the United States shall take all appropriate measures within their authority to implement this order, consistent with applicable law.

**Sec. 11**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

DHS-AR-000078

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of State.

THE WHITE HOUSE,
*June 30, 2025.*

[FR Doc. 2025–12506
Filed 7–2–25; 8:45 am]
Billing code 4710–10–P

DHS-AR-000079

**Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    **8337**

# Presidential Documents

Executive Order 14150 of January 20, 2025

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2**. *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

DHS-AR-000080

8451



**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

DHS-AR-000081

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

DHS-AR-000083

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2522–12; DHS Docket No. USCIS 2012–0007]**

**RIN 1615–ZB12**

### Designation of Syrian Arab Republic for Temporary Protected Status

*Correction*

In notice document 2012–7498 appearing on pages 19026 through 19030 in the issue of Thursday, March 29, 2012, make the following corrections:

1. On page 19026, third column, in the **DATES** section, in the last sentence, ''September 30, 2013'' should read ''September 25, 2012.''

2. On page 19029, in the first column, the fourth line from the top, ''September 30, 2013'' should read ''September 25, 2012.''

[FR Doc. C1–2012–7498 Filed 4–2–12; 8:45 am]
**BILLING CODE 1505–01–D**

## DEPARTMENT OF THE INTERIOR

**[NPS–NERO–GATE–0112–9494; 1770–OZC]**

### Establishment of the Gateway National Recreation Area Fort Hancock 21st Century Advisory Committee

**AGENCY:** National Park Service, Interior.
**ACTION:** Notice and Call for Nominations.

**SUMMARY:** The Secretary of the Interior (Secretary) is announcing the establishment of the Gateway National Recreation Area Fort Hancock 21st Century Advisory Committee (Committee). The purpose of the Committee is to advise the Secretary, through the Director of the National Park Service, on the development of a reuse plan and on matters relating to future uses of the Fort Hancock Historic Landmark District of Gateway National Recreation area.

The Department of the Interior is seeking nominations for individuals to be considered as Committee members. Nominations should describe and document the proposed member's qualifications for membership to the Committee, and include a resume listing their name, title, address, telephone, email, and fax number.

**DATES:** Written nominations must be received by May 3, 2012.
**ADDRESSES:** Send nominations to: Gateway National Recreation Area, Public Affairs Office, 210 New York Avenue, Staten Island, New York 10305.

**FOR FURTHER INFORMATION CONTACT:** Gateway National Recreation Area, Public Affairs Office, 210 New York Avenue, Staten Island, New York, 10305, (718) 354–4606; or via email at *http://www.nps.gov/gate/contacts.htm.*

**SUPPLEMENTARY INFORMATION:** In accordance with the provisions of the Federal Advisory Committee Act (FACA), as amended (5 U.S.C. App. 2) and with the concurrence of the General Services Administration, the Department of the Interior is announcing the establishment of an advisory committee for the Gateway National Recreation Area Fort Hancock Historic Landmark District. The Committee is a discretionary advisory committee established under the authority of the Secretary of the Interior.

The Committee will operate under the provisions of the FACA and will report to the Secretary of the Interior through the Director of the National Park Service, with the Superintendent of the Gateway National Recreation Area as the Designated Federal Officer (DFO). The Gateway National Recreation Area will provide administrative and logistical support to the Committee.

The Committee is being established to provide advice on the development of a specific reuse plan and on matters relating to the future uses of the Fort Hancock Historic Landmark District within the Sandy Hook Unit of Gateway National Recreation Area. The Committee will provide guidance to the National Park Service in developing a plan for reuse of more than 30 historic buildings that the NPS has determined are excess to its needs and eligible for lease under 16 U.S.C. 1 *et seq.,* particularly 16 U.S.C. 1a–2(k), and 16 U.S.C. 470h–3, or under agreement through appropriate authorities.

Members of the Committee will include representatives from, but not limited to, the following interest groups: the natural resource community, the business community, the cultural resource community, the real estate community; the recreation community; the education community, the hospitality community, and the scientific community. Members of the Committee will also consist of representatives from the following municipalities: the Borough of Highlands, the Borough of Sea Bright, the Borough of Rumson, Middletown Township, and Monmouth County Freeholders.

Committee members will be selected based on the following criteria: (1) Ability to collaborate, (2) the ability to understand NPS management and policy, and (3) connection with local communities.

No individual who is currently registered as a Federal lobbyist is eligible to serve as a member of the Committee.

The Committee will meet approximately 4–6 times annually, and at such times as designated by the DFO.

Members of the Committee will serve without compensation.

Certification Statement: I hereby certify that the establishment of the Gateway National Recreation Area Fort Hancock 21st Century Advisory Committee is necessary, in the public interest, established under the authority of the Secretary of the Interior.

Dated: March 14, 2012.

**Ken Salazar,**
*Secretary of the Interior.*
[FR Doc. 2012–7845 Filed 4–2–12; 8:45 am]
**BILLING CODE 4310–52–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[AA–14015; LLAK965000–L14100000–KC0000–P]**

### Alaska Native Claims Selection

**AGENCY:** Bureau of Land Management, Interior.
**ACTION:** Notice of decision approving lands for conveyance.

**SUMMARY:** As required by 43 CFR 2650.7(d), notice is hereby given that the Bureau of Land Management (BLM) will issue an appealable decision to Sealaska Corporation. The decision approves conveyance of the surface and subsurface estates in the lands described below pursuant to the Alaska Native Claims Settlement Act (ANCSA) (43 U.S.C. 1601, *et seq.*). The lands being approved for conveyance are lands originally selected under ANCSA in the withdrawal area for Kassan, Alaska. The lands are located in:

**Copper River Meridian, Alaska**

T. 74 S., R. 85 E.
    Secs. 15, 16, 21 and 22.
    Containing approximately 805 acres.

Notice of the decision will also be published four times in the *Ketchikan Daily News.*

**DATES:** Any party claiming a property interest in the lands affected by the decision may appeal the decision within the following time limits:

1. Unknown parties, parties unable to be located after reasonable efforts have been expended to locate, parties who

DHS-AR-000084

| State and county | Location and case No. | Chief executive officer of community | Community map repository | Online location of letter of map revision | Date of modification | Community No. |
|---|---|---|---|---|---|---|
| New Jersey: Passaic. | Borough of Woodland Park (19–02–0818P). | The Honorable Keith Kazmark, Mayor, Borough of Woodland Park, Municipal Building, 5 Brophy Lane, Woodland Park, NJ 07424. | Municipal Building, Code Enforcement Office, 5 Brophy Lane, Woodland Park, NJ 07424. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 13, 2019 .... | 340412 |
| Ohio: Franklin .......... | Unincorporated Areas of Franklin County (19–05–3292P). | Mr. John O'Grady Commissioner, Franklin County Board of Commissioners, 373 South High Street, 26th Floor, Columbus, OH 43215. | Franklin County Engineer Office, 970 Dublin Road, Columbus, OH 43215. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 20, 2019 .... | 390167 |
| Warren. .......... | City of Springboro (19–05–2468P). | The Honorable John Agenbroad, Mayor, City of Springboro, 320 West Central Avenue, Springboro, OH 45066. | Municipal Building, 320 West Central Avenue, Springboro, OH 45066. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 12, 2019 .... | 390564 |
| Texas: Tarrant ....... | City of Arlington (18–06–3754P). | The Honorable Jeff Williams, Mayor, City of Arlington, City Hall, P.O. Box 90231, Arlington, TX 76010. | City Hall, 101 West Abram Street, Arlington, TX 76010. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 6, 2019 ...... | 485454 |
| Washington: Jefferson ........ | City of Port Townsend (19–10–0775P). | The Honorable Deborah Stinson, Mayor, City of Port Townsend, 250 Madison Street, Suite 2, Port Townsend, WA 98368. | City Hall, 250 Madison Street Suite 2, Port Townsend, WA 98368. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 12, 2019 .... | 530070 |
| Kitsap ............. | Unincorporated Areas of Kitsap County (18–10–1595P). | The Honorable Ed Wolfe, Kitsap County Commissioner, District 3, 614 Division Street, MS–4, Port Orchard, WA 98366. | Kitsap County, Department of Community Development, 614 Division Street, MS–36, Port Orchard, WA 98366. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 16, 2019 .... | 530092 |
| Wyoming: Natrona .......... | City of Casper (18–08–0276P). | The Honorable Charlie Powell, Mayor, City of Casper, 200 North David Street, Room 203, Casper, WY 82601. | City Hall, 200 North David Street, Casper, WY 82601. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 27, 2019 .... | 560037 |
| Natrona .......... | Unincorporated Areas of Natrona County (18–08–0276P). | Mr. Forrest Chadwick, Commissioner, Natrona County, 200 North Center Street, Suite 115, Casper, WY 82601. | Natrona County, Board of Commissioners, 200 North Center Street, Casper, WY 82601. | *https://msc.fema.gov/portal/ advanceSearch.* | Dec. 27, 2019 .... | 560036 |

[FR Doc. 2019–20481 Filed 9–20–19; 8:45 am]
**BILLING CODE 9110–12–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2649–20]

RIN 1615–ZB72

### Extension of the Designation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Syria for Temporary Protected Status (TPS) for 18 months, from October 1, 2019, through March 31, 2021. The extension allows currently eligible TPS beneficiaries to retain TPS through March 31, 2021, so long as they otherwise continue to meet the eligibility requirements for TPS.

This Notice also sets forth procedures necessary for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to re-register for TPS and to apply for Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). USCIS will issue new EADs with a March 31, 2021 expiration date to eligible beneficiaries under Syria's TPS designation who timely re-register and apply for EADs under this extension.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective October 1, 2019, and will remain in effect through March 31, 2021. The 60-day re-registration period runs from September 23, 2019 through November 22, 2019. (Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Samantha Deshommes, Branch Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 20 Massachusetts Avenue NW, Washington, DC 20529–2060, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http:// www.uscis.gov/tps.* You can find specific information about this extension of Syria's TPS designation by

DHS-AR-000085

selecting "Syria" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http:// www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Syria and whose applications have been granted.

For individuals who have already been granted TPS under Syria's designation, the 60-day re-registration period runs from September 23, 2019 through November 22, 2019. USCIS will issue new EADs with a March 31, 2021 expiration date to eligible Syrian TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that all re-registrants may not receive new EADs before their current

EADs expire on September 30, 2019. Accordingly, through this **Federal Register** Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Syria for 180 days, through March 28, 2020. Additionally, individuals who have EADs with an expiration date of March 31, 2018, and who applied for a new EAD during the last re-registration period but have not yet received their new EADs are also covered by this automatic extension. These individuals may show their EAD indicating a March 31, 2018, expiration date and their EAD application receipt (Notice of Action, Form I–797C) that notes the application was received on or after March 5, 2018, to employers as proof of continued employment authorization through March 28, 2020. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Syria TPS Form I–821 and/or Form I–765 that was still pending as of September 23, 2019 do not need to file either application again. If the TPS application is approved, the individual will be granted TPS through March 31, 2021. Similarly, if a pending TPS-related application for an EAD is approved, it will be valid through the same date. There are approximately 7,000 current beneficiaries under Syria's TPS designation.

**What is temporary protected status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Syria designated for TPS?**

Former Secretary of Homeland Security Napolitano initially designated Syria for TPS on March 29, 2012, based on extraordinary and temporary conditions resulting from the Syrian military's violent suppression of opposition to President Bashar al-Assad's regime that prevented Syrian nationals from safely returning to Syria. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012). Following the initial designation, former Secretaries Napolitano and Johnson extended and newly designated Syria for TPS three times. In 2016, former Secretary Johnson both extended Syria's designation and newly designated Syria for TPS for 18 months through March 30, 2018. *See Extension and Redesignation of Syria for Temporary Protected Status,* 81 FR 50533 (Aug. 1, 2016). Most recently, in 2018, former Secretary Nielsen extended Syria's designation for 18 months, though September 30, 2019. *See Extension of the Designation of Syria for Temporary Protected Status,* 83 FR 9329 (March 5, 2018).

**What authority does the Secretary have to extend the designation of Syria for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. The Secretary, in his discretion, may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Why is the Secretary extending the TPS designation for Syria through March 31, 2021?**

DHS has reviewed conditions in Syria. Based on the review, including input received from other U.S. Government agencies, the Secretary has determined that an 18-month extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions supporting Syria's TPS designation remain.

Syria remains engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country. The Syrian Arab Republic Government (SARG) continues to arbitrarily and unlawfully kill, torture, and detain civilians on a large scale, and non-state armed groups of varying ideologies exert control over civilians in wide areas of the country. The SARG, with the support of government-linked paramilitary groups, Iranian and Iranian-backed proxy forces, and Russian forces, continues to engage in hostilities with Syrian opposition forces. In addition, following its incursion into northern Syria in early 2018, the Turkish military and Turkish-backed groups continue to fight the Kurdish People's Protection Units (YPG). Following the defeat of the self-described Islamic State of Iraq and Syria (ISIS) in March 2019, ISIS sleeper cells have stepped up insurgency operations in cities controlled by the Syrian Democratic Forces (SDF). On January 16, 2019, a suicide bombing claimed by ISIS killed four Americans and 15 others in the northern city of Manbij, in Aleppo province. One week later, a vehicle-borne improvised explosive device targeted a joint American-SDF patrol in the town of Ash Shaddadi in Hasakah province. At least 10 people were killed June 1, 2019, in ISIS attacks in Raqqa. Despite a September 2018 agreement between Russia and Turkey that designated Idlib province and surrounding areas a demilitarized zone, non-state armed organizations, including designated terrorist groups, have continued to fight each other within the zone. In January 2019, Hayat Tahrir Al-Sham (HTS) seized large areas of Idlib from rival armed groups, constituting a significant threat to Syrian civilians in the country's northwest and northeast, as well as Syrian refugees residing across the adjacent Turkish border. Since April 2019, a renewed SARG offensive is exacting a heavy toll on civilians and civilian infrastructure in the area. The renewed violence has displaced over 630,000 civilians, and killed at least 1,089 civilians, including many children.

Currently, 11.9 million Syrians are displaced in or outside of Syria, of which 6.2 million are Internally Displaced Persons (IDPs) and 5.7 million are UNHCR-registered refugees. Of the country's 23 million people, 11.7 million require humanitarian assistance. Approximately 1.6 million Syrians were displaced by hostilities in 2018, and the overall IDP population increased 16% in 2018. Syria hosted approximately 482,200 refugees during the same time period. Additionally, 1.4 million Syrian IDPs voluntarily returned to their home areas in 2018. Just over 56,047 refugees returned to Syria in 2018, and as of March 2019, 21,575 had returned. Despite the significant number of spontaneous refugee and IDP returns in 2018 and 2019, the United Nations High Commissioner for Refugees (UNHCR) assessed in February 2019 that "present conditions in Syria are not conducive for voluntary repatriation in safety and dignity as significant risks remain for civilians across the country."

Syria's economy has significantly deteriorated since the outbreak of conflict in 2011, with economic output declining by more than 70% from 2011 to 2017, the most recent year for which confirmed economic data is available. Eight in ten Syrians live below the poverty line. Syria ranks last in the CIA World Factbook's survey of 224 countries in real annual Gross Domestic Product (GDP) growth rate, and 194th in GDP per capita.

Civilian health needs remain critical in Syria due to the ongoing conflict, and access to medical care is limited. Hundreds of thousands of civilians have suffered injuries, of which 45% are expected to sustain permanent impairment and require lifelong medical attention. As of March 2019, 46% of Syrian healthcare facilities are either partially functional or not functional, and 167 have been completely destroyed. Mass displacement has contributed to a reduction of up to 50% of qualified medical personnel in some areas, further compromising the provision of quality medical assistance. The SARG continues to attack healthcare personnel and infrastructure, with the United Nations reporting 142 confirmed attacks on healthcare personnel, facilities, supplies, patients, warehouses, and transport in 2018.

As of April 2019, 9 million people in Syria required food assistance, including 6.5 million people facing life-threatening food insecurity. Notwithstanding the ongoing challenges, food security increased in some areas in 2018 due to improvements in overall market accessibility and increased response efforts.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that:

• The conditions supporting Syria's designation for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continues to be an ongoing armed conflict in Syria and, due to such conflict, requiring the return to Syria of Syrian nationals (or aliens having no nationality who last habitually resided in Syria) would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

• There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals (or aliens having no nationality who last habitually resided in Syria) from returning to Syria in safety, and it is not contrary to the national interest of the United States to permit Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Syria for TPS should be extended for an 18-month period, from October 1, 2019 through March 31, 2021. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

DHS-AR-000087

**Notice of Extension of the TPS Designation of Syria**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, the conditions supporting Syria's designation for TPS continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of TPS for Syria for 18 months, from October 1, 2019, through March 31, 2021. *See* INA section 244(b)(1)(A), (b)(1)(C); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C).

**Kevin McAleenan,**
*Acting Secretary.*

**Required Application Forms and Application Fees To Re-register for TPS**

To re-register for TPS based on the designation of Syria, you *must* submit an Application for Temporary Protected Status (Form I–821). You do not need to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the "Biometric Services Fee" section of this Notice.

Through this **Federal Register** Notice, your existing EAD issued under the TPS designation of Syria with the expiration date of September 30, 2019, is automatically extended for 180 days, through March 28, 2020. Although not required to do so, if you want to obtain a new EAD valid through March 31, 2021, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 and pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

Additionally, individuals who have EADs with an expiration date of March 31, 2018, and who applied for a new EAD during the last re-registration period but have not yet received their new EADs are also covered by this automatic EAD extension through March 28, 2020. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. If you have a Form I–821 and/or Form I–765 that was still pending as of September 23, 2019, then you do not need to file either application again. If your pending TPS application is approved, you will be granted TPS through March 31, 2021. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation and to ensure that you receive your new EAD by March 28, 2020.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver, with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS website at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

*Note:* Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration application. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you would like to send your application by: | Then, mail your application to: |
| --- | --- |
| U.S. Postal Service ............................................. | U.S. Citizenship and Immigration Services, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| A non-U.S. Postal Service courier ....................... | U.S. Citizenship and Immigration Services, Attn: TPS Syria, 131 S Dearborn Street—3rd Floor, Chicago, IL 60603–5517. |

DHS-AR-000088

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Syria.''

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://www.uscis.gov,* or call the USCIS National Contact Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Contact Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 180-day extension of my current EAD through March 28, 2020, using this* **Federal Register** *Notice?*

Yes. Provided that you currently have a Syria TPS-based EAD, this **Federal Register** Notice automatically extends your EAD through March 28, 2020, if you:
- Are a national of Syria (or an alien having no nationality who last habitually resided in Syria); and either
- Have an EAD with a marked expiration date of September 30, 2019, bearing the notation A–12 or C–19 on the face of the card under Category, or
- Have an EAD with a marked expiration date of March 31, 2018 bearing the notation A–12 or C–19 on

the face of the card under Category and you applied for a new EAD during the last re-registration period but have not yet received a new EAD.

Although this **Federal Register** Notice automatically extends your EAD through March 28, 2020, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find the Lists of Acceptable Documents on the ''Acceptable Documents'' web page for Form I–9 at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. If your EAD has an expiration date of September 30, 2019, or March 31, 2018 (and you applied for a new EAD during the last re-registration period but have not yet received a new EAD), and states A–12 or C–19 under Category, it has been extended automatically by virtue of this **Federal Register** Notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through March 28, 2020, unless your TPS has been withdrawn or your request for TPS has been denied. If you have an EAD with a marked expiration date of September 30, 2019, that states A–12 or C–19 under Category, and you properly filed for a new EAD in accordance with this Notice, you will also receive Form I–797C, Notice of Action that will state your EAD is

automatically extended for 180 days. You may choose to present your EAD to your employer together with this Form I–797C as a List A document that provides evidence of your identity and employment authorization for Form I–9 through March 28, 2020, unless your TPS has been withdrawn or your request for TPS has been denied. See the subsection titled, ''How do my employer and I complete the Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?'' for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through March 28, 2020. You may also provide your employer with a copy of this **Federal Register** Notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization no later than before you start work on October 1, 2019. You will need to present your employer with evidence that you are still authorized to work. Once presented, your employer should note the automatic extension date from this **Federal Register** Notice in the Additional Information field in Section 2 of Form I–9. See the subsection titled, ''What updates should my current employer make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?'' for further information. You may show this **Federal Register** Notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through March 28, 2020. Your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you have an EAD with a marked expiration date of September 30, 2019 that states A–12 or C–19 under Category, and you

properly filed your Form I–765 to obtain a new EAD, you will receive a Form I–797C, Notice of Action. Form I–797C will state that your EAD is automatically extended for up to 180 days. You may present Form I–797C to your employer along with your EAD to confirm that the validity of your EAD has been automatically extended through March 28, 2020, unless your TPS has been withdrawn or your request for TPS has been denied. To reduce the possibility of gaps in your employment authorization documentation, you should file your Form I–765 to request a new EAD as early as possible during the re-registration period.

The last day of the automatic EAD extension is March 28, 2020. Before you start work on March 29, 2020, your employer must reverify your employment authorization in Section 3 of Form I–9, using the most current version available at *http://www.uscis.gov/I-9.* At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 "Lists of Acceptable Documents" that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Syrian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that has been automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and relates to you. Refer to the Note to Employees section of this **Federal Register** Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or

otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before March 29, 2020, you and your employer should do the following:

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter March 28, 2020 as the "expiration date"; and
b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:
a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a September 30, 2019, expiration date (or March 31, 2018 expiration date provided the employee applied for a new EAD during the last re-registration period but has not yet received a new EAD);
b. Write in the document title;
c. Enter the issuing authority;
d. Enter either the employee's Alien Registration number or USCIS number from Section 1 in the Document Number field on Form I–9; and
e. Write March 28, 2020, as the expiration date.

Before the start of work on March 29, 2020, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What updates should my current employer make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Determine if the EAD is auto-extended by ensuring:
a. It contains Category A–12 or C–19; and
b. Has a Card Expires date of September 30, 2019, or March 31, 2018 if the employee applied for a new EAD

during the last re-registration period but has not yet received a new EAD.
2. Enter EAD EXT and March 28, 2020 in the Additional Information field; and
3. Initial and date the update.
*Note:* This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day automatic extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By March 29, 2020, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for these employees by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. Before March 29, 2020, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@ dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the

DHS-AR-000090

U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin,

contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and on the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;
(2) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;
(3) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your Application for Temporary Protected Status for this re-registration; and
(4) A copy of your Notice of Action (Form I–797), the notice of approval, for a past or current Application for Temporary Protected Status, if you received one from USCIS. Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, I–797, or I–94. You should present the agency with a copy of the relevant **Federal Register** Notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your alien or I–94 number. You should explain that SAVE will be able to verify the continuation of your TPS. You should ask the agency to initiate a SAVE query with your information and follow through with additional verification

steps, if necessary, to get a final SAVE response showing the TPS. You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or auto-extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save.*

[FR Doc. 2019–20457 Filed 9–20–19; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

[FWS–R1–ES–2019–N086; FXES11140100000–190–FF01E00000]

**Habitat Conservation Plan for the Yelm Pocket Gopher; Incidental Take Permit Application in Thurston County, Washington; Categorical Exclusion**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of availability; request for comments.

---

**SUMMARY:** We, the U.S. Fish and Wildlife Service, have received an application from M-Gopher, LLC, for an incidental take permit (ITP) pursuant to the Endangered Species Act. The ITP would authorize ''take'' of the Yelm subspecies of the Mazama pocket gopher, incidental to otherwise lawful activities during construction of a single-family home in Thurston County, Washington. The application includes a habitat conservation plan (HCP) with

 

technical data and provide recommendations for resolution. Use of the SRP only may be exercised after FEMA and local communities have been engaged in a collaborative consultation process for at least 60 days without a mutually acceptable resolution of an appeal. Additional information regarding the SRP process can be found online at *http://floodsrp.org/pdfs/ srp_fact_sheet.pdf.*

The watersheds and/or communities affected are listed in the tables below. The Preliminary FIRM, and where applicable, FIS report for each community are available for inspection at both the online location and the respective Community Map Repository address listed in the tables. Additionally, the current effective FIRM and FIS report for each community are accessible online through the FEMA Map Service Center at *www.msc.fema.gov* for comparison.

| Community | Community map repository address |
|---|---|
| **Barnstable County, Massachusetts All Jurisdictions** | |
| Maps Available for Inspection Online at: *www.fema.gov/preliminaryfloodhazarddata* | |
| Town of Barnstable | Barnstable Town Hall, 367 Main Street, Hyannis, MA 02601. |
| Town of Bourne | Bourne Town Hall, 24 Perry Avenue, Buzzards Bay, MA 02532. |
| Town of Brewster | Town Office, 2198 Main Street, Brewster, MA 02631. |
| Town of Chatham | Town Hall, 549 Main Street, Chatham, MA 02633. |
| Town of Dennis | Dennis Town Hall, Conservation Department, 485 Main Street, South Dennis, MA 02660. |
| Town of Eastham | Town Hall, 2500 State Highway, Eastham, MA 02642. |
| Town of Falmouth | Town Hall, 59 Town Hall Square, Falmouth, MA 02540. |
| Town of Harwich | Town Hall, 732 Main Street, Harwich, MA 02645. |
| Town of Mashpee | Town Hall, 16 Great Neck Road North, Mashpee, MA 02649. |
| Town of Orleans | Town Hall, 19 School Road, Orleans, MA 02653. |
| Town of Provincetown | Town Hall, 260 Commercial Street, Provincetown, MA 02657. |
| Town of Sandwich | Town Hall, 130 Main Street, Sandwich, MA 02563. |
| Town of Truro | Town Hall, 24 Town Hall Road, Truro, MA 02666. |
| Town of Wellfleet | Town Hall, 300 Main Street, Wellfleet, MA 02667. |
| Town of Yarmouth | Yarmouth Town Hall, 1146 Route 28, South Yarmouth, MA 02664. |
| **Plymouth County, Massachusetts All Jurisdictions** | |
| Maps Available for Inspection Online at: *www.fema.gov/preliminaryfloodhazarddata* | |
| Town of Duxbury | Town Hall, 878 Tremont Street, Duxbury, MA 02332. |
| Town of Kingston | Town Hall, 26 Evergreen Street, Kingston, MA 02364. |
| Town of Marshfield | Town Hall, 870 Moraine Street, Marshfield, MA 02050. |
| Town of Norwell | Town Hall, 345 Main Street, Norwell, MA 02061. |
| Town of Plymouth | Town Hall, 11 Lincoln Street, Plymouth, MA 02360. |
| Town of Scituate | Town Hall, 600 Chief Justice Cushing Highway, Scituate, MA 02066. |

(Catalog of Federal Domestic Assistance No. 97.022, ''Flood Insurance.'')

Dated: June 3, 2013.

**Roy E. Wright,**

*Deputy Associate Administrator for Mitigation, Department of Homeland Security, Federal Emergency Management Agency.*

[FR Doc. 2013–14288 Filed 6–14–13; 8:45 am]

**BILLING CODE 9110–12–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2535–13; DHS Docket No. USCIS– 2013–0001]**

**RIN 1615–ZB22**

**Extension and Redesignation of Syria for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the existing designation of Syria for Temporary Protected Status (TPS) for 18 months, from October 1, 2013 through March 31, 2015, and redesignating Syria for TPS for 18 months, effective October 1, 2013 through March 31, 2015.

The extension allows currently eligible TPS beneficiaries to retain TPS through March 31, 2015 so long as they otherwise continue to meet the terms and conditions of TPS status. The redesignation of Syria allows additional individuals who have been continuously residing in the United States since June 17, 2013 to obtain TPS, if otherwise eligible. The Secretary has determined that an extension and redesignation are warranted because the extraordinary and temporary conditions in Syria that prompted the 2012 TPS designation have not only persisted, but have deteriorated, and because there is now an on-going armed conflict in Syria that would pose a serious threat to the personal safety of Syrian nationals if they were required to return to their country.

Through this Notice, DHS also sets forth procedures necessary for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) either to: (1) Re-register under the extension if they already have TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS); or (2) submit an initial registration application under the redesignation and apply for an EAD.

For individuals who have already been granted TPS under the original Syria designation, the 60-day re-registration period runs from June 17, 2013 through August 16, 2013. USCIS will issue new EADs with a March 31, 2015 expiration date to eligible Syrian TPS beneficiaries who timely re-register

DHS-AR-000092

and apply for EADs under this extension.

Under the redesignation, individuals who currently do not have TPS (or an initial TPS application pending) may submit an initial application during the 180-day initial registration period that runs from June 17, 2013 through December 16, 2013. In addition to demonstrating continuous residence in the United States since June 17, 2013 and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since October 1, 2013, the effective date of the redesignation of Syria, before USCIS can finally grant them TPS.

TPS applications that were filed during the original Syria designation that opened on March 29, 2012, and remain pending on June 17, 2013 will be treated as initial applications under the redesignation. Therefore, individuals who have a pending TPS application will not need to file a new Application for Temporary Protected Status (Form I–821). DHS provides additional instructions in this Notice for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through March 31, 2015.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective October 1, 2013, and will remain in effect through March 31, 2015. The 60-day re-registration period runs from June 17, 2013 through August 16, 2013.

*Redesignation of Syria for TPS:* The redesignation of Syria for TPS is effective October 1, 2013, and will remain in effect through March 31, 2015, a period of 18 months. The 180-day initial registration period for new applicants under the Syria TPS redesignation runs from June 17, 2013 through December 16, 2013.

**Further Information**

For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this extension and redesignation of Syria for TPS by selecting ''TPS Designated Country: Syria'' from the menu on the left of the TPS Web page.

You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW.,

Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FSA—Free Syrian Army
Government—U.S. Government
IDP—Internally Displaced Persons
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SARG—Syrian Arab Republic Government
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
Syria—Syrian Arab Republic
TPS—Temporary Protected Status
UN—United Nations
UNHCR—Office of the UN High Commissioner for Refugees
USCIS—U.S. Citizenship and Immigration Services

**What is Temporary Protected Status (TPS)?**

TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and may obtain work authorization, so long as they continue to meet the requirements of TPS status.

TPS beneficiaries may also be granted travel authorization as a matter of discretion.

The granting of TPS does not lead to permanent resident status.

When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or

been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

**When was Syria designated for TPS?**

On March 29, 2012, the Secretary designated Syria for TPS based on extraordinary and temporary conditions within that country that prevent Syrian nationals from returning to Syria in safety. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012), and correction at 77 FR 20046 (Apr. 3, 2012); *see also* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C). This announcement is the first extension and the first redesignation of TPS for Syria.

**What authority does the Secretary have to extend the designation of Syria for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* section 244(a)(1)(A) of the INA, 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended for an additional 6 months (or, in the Secretary's discretion, for 12 or 18 months). *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* section 244(b)(3)(B) of the INA, 8 U.S.C. 1254a(b)(3)(B).

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying HSA, tit. XV, sec. 1517).

DHS-AR-000093

## What is the Secretary's authority to redesignate Syria for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1); *see also* section 244(c)(1)(A)(i) of the INA, 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that ''the alien has been continuously physically present since the effective date of *the most recent designation of the state*'') (emphasis added). This is one of several instances in which the Secretary, and, prior to the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of South Sudan for Temporary Protected Status,* 78 FR 1866 (Jan. 9, 2013); *Extension and Redesignation of Sudan for Temporary Protected Status,* 78 FR 1872 (Jan. 9, 2013); *Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status,* 62 FR 16608 (Apr. 7, 1997) (discussing legal authority for redesignation of a country for TPS).

When the Secretary designates or redesignates a country for TPS, she also has the discretion to establish the date from which TPS applicants must demonstrate that they have been ''continuously resid[ing]'' in the United States. *See* section 244(c)(1)(A)(ii) of the INA, 8 U.S.C.S 1254a(c)(1)(A)(ii). This discretion permits the Secretary to tailor the ''continuous residence'' date to offer TPS to the group of eligible individuals that the Secretary deems appropriate.

The Secretary has determined that the ''continuous residence'' date for applicants for TPS under the redesignation of Syria shall be June 17, 2013. Initial applicants for TPS under this redesignation must also show they have been ''continuously physically present'' in the United States since October 1, 2013, which is the effective date of the Secretary's redesignation of Syria. *See* section 244(c)(1)(A)(i) of the INA, 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination whether the applicant has met the ''continuous physical presence'' requirement cannot be made until October 1, 2013. USCIS, however, will issue EADs, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

## Why is the Secretary extending the TPS designation for Syria and simultaneously redesignating Syria for TPS through March 31, 2015?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Syria. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions preventing the safe return of Syrian nationals that prompted the March 29, 2012 designation continue to be met. In fact, those conditions have worsened significantly. The Secretary has also decided to redesignate Syria for TPS based not only on the continuing extraordinary and temporary conditions, but also on the ongoing armed conflict in Syria. Furthermore, the Secretary has decided the conditions warrant changing the ''continuous residence'' date so as to provide TPS protection to eligible Syrian nationals who arrived between March 29, 2012 and June 17, 2013. The ''continuous physical presence'' date must be the effective date of the redesignation, which the Secretary has established as October 1, 2013 so that individuals granted TPS under the redesignation will have TPS for the same 18-month period through March 31, 2015 as TPS beneficiaries re-registering under the extension. *See* section 244(c)(1)(A)(i) of the INA; 8 U.S.C. 1254a(c)(1)(A)(i).

Conditions in Syria are unstable, volatile and dangerous, and have worsened significantly since the prior designation took effect on March 29, 2012. Acts of violence and human rights abuses have been reported in most major urban centers and have significantly increased over the last year, and access to humanitarian assistance for victims of the ongoing strife continues to be a serious challenge. By mid-July 2012, the International Committee of the Red Cross labeled the Syrian conflict a civil war. Economic sanctions continued to cripple the country, making basic goods like medicine difficult to obtain for civilians.

President Bashar al-Assad and the Syrian Arab Republic Government (SARG) have continued to use indiscriminate and deadly force, including military assaults on cities and residential areas throughout the country. The military continues to fight the opposition, responding with air strikes and heavy artillery to kill and capture combatants, and harming tens of thousands of civilians in the process. With an unrelenting armed opposition,

including jihadist elements, and a military-backed government fighting to remain in power, the number of people displaced by violence has continued to rise.

Government-rebel clashes are ongoing throughout the country and, in addition to the ongoing attacks perpetrated by the Syrian government, rebel faction extremists, foreign fighters, and unidentified assailants have killed and abducted civilians, humanitarian workers, and United Nations (UN) personnel. International funding and support for the armed opposition continues to build, enhancing their communications, weaponry, and paramilitary capabilities.

Indigenous and international jihadist groups have emerged among the armed opposition in the fight against the SARG, increasingly employing tactics, including suicide bombings, which have often resulted in civilian casualties. In addition to the Free Syrian Army (FSA) and Syrian National Army, reports published in 2012 indicate that ''a radical Islamist dynamic has emerged within the opposition.'' The armed opposition has reportedly also been reinforced by foreign fighters.

As of November 2012, the rebels reportedly controlled large areas around Aleppo, Idlib, Haffeh, Muhradeh, Rastan, al Qusayr, Tal Abyad, and Deir ez-Zor. The rebels also carried out sophisticated attacks and takeovers. Clashes between rebels and government forces frequently resulted in civilian deaths.

As of April 2013, based on reports cited by U.N. officials, the estimated Syrian death toll for the duration of the conflict is 70,000, with approximately 15,000 of those deaths occurring in the early months of 2013. Civilians accounted for the majority of those killed. The provinces of Homs, Damascus, Idlib, Hama, Deraa, and Aleppo were reported to have suffered the most casualties. According to Amnesty International, the main cause of civilian deaths has been the armed forces' indiscriminate aerial bombardment and artillery shelling in heavily populated areas. The U.N. Human Rights Council, through the Independent International Commission of Inquiry, stated that scores of civilians have also been killed in explosions caused by suicide bombers and improvised explosive devices.

Among the civilian casualties, 108 people, mostly women and children, died in the Houla massacre in May 2012. The Independent International Commission of Inquiry blamed the SARG for the killings; other sources reported that most were killed by

regime-affiliated death squads. Other notable massacres occurred, including an incident in Daraya where more than 500 people were killed in late August 2012. There were also reports that women have been subject to sexual and gender-based violence by SARG forces or pro-government militias at road checkpoints and during house searches.

Observers note that children have been placed at risk as well. In August 2012, the Independent International Commission of Inquiry reported that 125 children died in military offensives, sniper fire, attacks on protests, and massacres. Children have reportedly been used as human shields and placed at risk when combatants take posts at schools.

The UN reports there are approximately 4.25 million internally displaced persons (IDPs) in Syria. As the SARG military is expected to continue to fight the armed opposition as well as the jihadist groups to retain power of the country, the number of people displaced by violence is only expected to rise. According to an Office of the UN High Commissioner for Refugees (UNHCR) report from December 2012, at least 900,000 persons were displaced in 2012 due to fighting throughout the country.

According to UNHCR estimates, the flow of refugees into Syria's four neighboring states has increased dramatically since May 2012, with approximately 576,000 Syrian refugees registered in neighboring states by the end of 2012 and 1.1 million by early March 2013. In April 2013, an additional 230,000 refugees fled to neighboring countries. UNHCR predicts these numbers could increase to four million refugees and eight million IDPs by the end of 2013.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

The conditions that prompted the March 29, 2012 designation of Syria for TPS continue to be met. *See* sections 244(b)(3)(A) and (C) of the INA, 8 U.S.C. 1254a(b)(3)(A) and (C).

There continue to be extraordinary and temporary conditions in Syria that continue to prevent the safe return of Syrian nationals. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

It is not contrary to the national interest of the United States to permit Syrian nationals (and persons who have no nationality who last habitually resided in Syria) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

There is an armed conflict in Syria and, due to such conflict, requiring the return of Syrian nationals to Syria would pose a serious threat to their personal safety. *See* section 244(b)(1)(A) of the INA, 8 U.S.C. 1254a(b)(1)(A).

The designation of Syria for TPS should be extended for an additional 18-month period from October 1, 2013 through March 31, 2015. *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C).

Based on current country conditions, Syria should be simultaneously redesignated for TPS effective October 1, 2013 through March 31, 2015. *See* sections 244(b)(1)(A), (b)(1)(C), and (b)(2) of the INA; 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2).

TPS applicants must demonstrate that they have continuously resided in the United States since June 17, 2013.

The date by which TPS applicants must demonstrate that they have been continuously physically present in the United States is October 1, 2013, the effective date of the redesignation of Syria for TPS.

There are approximately 2,600 current Syrian TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

It is estimated that 9,000 additional individuals may be eligible for TPS under the redesignation of Syria.

## Notice of Extension of the TPS Designation of Syria and Redesignation of Syria for TPS

By the authority vested in me as Secretary under section 244 of the INA, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the designation of Syria for TPS on March 29, 2012, continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). In fact, those conditions have deteriorated further. In addition, there is now an on-going armed conflict in Syria that poses a serious threat to the

personal safety of nationals of Syria if they were to be required to return to Syria. On the basis of these determinations, I am simultaneously extending the existing TPS designation of Syria for 18 months from October 1, 2013 through March 31, 2015, and redesignating Syria for TPS for 18 months from October 1, 2013 through March 31, 2015. *See* sections 244(b)(1)(A), (b)(1)(C), and (b)(2) of the INA; 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2). I have also determined that eligible individuals must demonstrate that they have continuously resided in the United States since June 17, 2013. *See* section 244(c)(1)(A)(ii) of the INA, 8 U.S.C. 1254a(c)(1)(A)(ii).

**Janet Napolitano,**
*Secretary.*

### I am currently a Syrian TPS beneficiary. What should I do?

If you filed a TPS application during the original Syria TPS registration period that ran from March 29, 2012 through September 25, 2012, and that application was approved prior to June 17, 2013, then you need to file a re-registration application under the extension if you wish to maintain TPS benefits through March 31, 2015. You must also use the Application for Temporary Protected Status (Form I–821) to re-register for TPS. The 60-day open re-registration period will run from June 17, 2013 through August 16, 2013.

### I have a pending TPS application filed during the original Syria TPS registration period that ran from March 29, 2012 through September 25, 2012. What should I do?

If your TPS application is still pending on June 17, 2013, then you do *not* need to file a new Application for Temporary Protected Status (Form I–821). Pending TPS applications will be treated as initial applications under the re-designation. Therefore, if your TPS application is approved, you will be granted TPS through March 31, 2015. If you have a pending TPS application *and* you wish to have an EAD valid through March 31, 2015, please refer to Table 1 to determine whether you should file a new Application for Employment Authorization (Form I–765).

DHS-AR-000095

TABLE 1—FORM AND EAD INFORMATION FOR PENDING TPS APPLICATIONS

| If . . . | And . . . | Then . . . |
|---|---|---|
| You requested an EAD during the original registration period for Syria TPS. | You received an EAD with Category C19 or A12. | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request) if you wish to have a new EAD valid through March 31, 2015. |
| | You did not receive an EAD with Category C19 or A12. | You do not need to file a new Application for Employment Authorization (Form I–765). If your TPS application is approved, your Form I–765 will be approved through March 31, 2015. |
| You did not request an EAD during the original registration period for Syria TPS. | You wish to have an EAD valid through March 31, 2015. | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request). |
| | You do not wish to have an EAD valid through March 31, 2015. | You do not need to file a new Application for Employment Authorization (Form I–765). |

**I am not a TPS beneficiary, and I do not have a TPS application pending. What are the procedures for initial registration for TPS under the Syria redesignation?**

If you are not a Syrian TPS beneficiary or have a pending application for Syria TPS, you may submit your TPS application during the 180-day initial registration period that will run from June 17, 2013 through December 16, 2013.

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS for Syria, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

If you are filing an initial application, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(1) and 244.6 and information on initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

If you are filing for TPS re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17.

and

2. Application for Employment Authorization (Form I–765).

If you are applying for initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are 66 and older and applying for initial registration.

If you are applying for re-registration (or have a pending initial TPS application filed during the original designation and you received a previous TPS-related EAD), you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD.

You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for initial registration or re-registration.

You must submit both completed application forms together. If you are unable to pay for the application and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Refiling an *Initial* TPS Application After Receiving a Denial of a Fee Waiver Request**

If you request a fee waiver when filing your initial TPS application package and your request is denied, you may re-file your application packet before the initial filing deadline of December 16, 2013. If you submit your application with a fee waiver request before that deadline, but you receive a fee waiver denial and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still re-file your application within the 45-day period after the date on the USCIS fee waiver denial notice. Your application will not be rejected even if the filing deadline has passed, provided it is mailed within those 45 days and all other required information for the application is included. **Note:** If you wish, you may also wait to request an EAD and pay the Application for Employment Authorization (Form I–765) fee after USCIS grants you TPS, if you are found eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application for Employment Authorization (Form I–756) without fee and without requesting an EAD.

**Refiling a *Re-Registration* TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications *before* the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-

DHS-AR-000096

file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed under good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* section 244(c)(3)(C) of the INA; 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* **Note:** As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee, until after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

**Mailing Information**

Mail your application for TPS to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are applying through the U.S. Postal Service ................................. | U.S. Citizenship and Immigration Services, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using a non-U.S. Postal Service delivery service ...................... | U.S. Citizenship and Immigration Services Attn: TPS Syria, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD or are re-registering for the first time following a grant of TPS by the IJ or BIA, please mail your application to the appropriate address in Table 2. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to *TPSijgrant.vsc@uscis.dhs.gov* with the receipt number and state that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

**E-Filing**

You cannot electronically file your application when re-registering or applying for initial registration for Syria TPS. Please mail your application to the mailing address listed in Table 2.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants and re-registrants at local offices.

*Will my current EAD, which is set to expire on September 30, 2013, be automatically extended for 6 months?*

No. This Notice does not automatically extend previously issued EADs. DHS has announced the extension of the TPS designation of Syria and established the re-registration period at an early date to allow sufficient time for USCIS to process EAD requests prior to the September 30, 2013 expiration date. You must apply during the 60-day re-registration period.

Failure to file your TPS application during the re-registration period without good cause may result in gaps in work authorization. DHS strongly encourages you to apply as early as possible within the re-registration period.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http:// www.uscis.gov/I–9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). An EAD is an acceptable document under ''List A.'' Employers may not reject a document based upon a future expiration date.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

You must present any document from List A or any document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization. Your employer is required to reverify on Employment Eligibility Verification (Form I–9) the employment authorization of current employees upon the expiration of a TPS-related EAD. Your employer should use either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, in Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present.

USCIS anticipates that it will be able to process and issue new EADs for existing TPS Syria beneficiaries before their current EADs expire on September 30, 2013. However, re-registering beneficiaries are encouraged to file as early as possible within the 60-day re-registration period to help ensure that they receive their EADs promptly.

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing Employment Eligibility Verification (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the ''Lists of Acceptable Documents'' for Employment Eligibility Verification (Form I–9) and that reasonably appears to be genuine and that relates to you. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Syrian citizenship when completing Employment Eligibility Verification (Form I–9) for new hires or

DHS-AR-000097

reverifying the employment authorization of current employees. If presented with an EAD that is unexpired on its face, employers should accept such EAD as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to the employee. Refer to the Note to Employees section for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls and emails are accepted in English and many other languages including Arabic. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY for the hearing impaired is at 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@usdoj.gov.*

**Note to All Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls and emails are accepted in English, Spanish and many other languages including Arabic. Employees or applicants may also call the OSC Worker Information Hotline at 800–255–7688 (TTY for the hearing impaired is at 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline

provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the List of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify that receive an E-Verify initial case result of ''Tentative Nonconfirmation (TNC)'' must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from Social Security Administration, DHS, or DOS records. Employers may not terminate, suspend, delay training, withhold pay, lower pay or take any other adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). Additional information about proper nondiscriminatory I–9 and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal government agencies must follow the guidelines laid out by the Federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD card;

(2) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and/or

(3) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2013–14101 Filed 6–14–13; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–5687–N–28]**

**60-Day Notice of Proposed Information Collection: Mortgage Insurance Termination, Application for Premium Refund or Distributive Share**

**AGENCY:** Single Family Insurance Operations Division, Office of the FHA Comptroller, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* August 16, 2013.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing

 

Seafarers, 1978 and U.S. Coast Guard Certifications;

(2) The working group will review and develop proposed recommendations for Task Statement 30; and

(3) Adjournment of meeting.

The agenda for the January 29, 2015, working group meeting is as follows:

(1) The working group will review and develop proposed recommendations concerning evaluating military education, training, and assessment for the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 and U.S. Coast Guard Certifications;

(2) Public comment period;

(3) The working group will discuss and finalize proposed recommendations for the full committee to consider with regards to Task Statement 30, concerning evaluating military education, training, and assessment for the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 and U.S. Coast Guard Certifications; and

(4) Adjournment of meeting.

Dated: December 29, 2014.

**J.G. Lantz,**

*Director of Commercial Regulations and Standards.*

[FR Doc. 2014–30850 Filed 1–2–15; 8:45 am]

**BILLING CODE 9110–04–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2013–0001]**

**RIN 1615–ZB35**

## Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of the Syrian Arab Republic (Syria) for Temporary Protected Status (TPS) for 18 months, from April 1, 2015 through September 30, 2016, and redesignating Syria for TPS for 18 months, effective April 1, 2015 through September 30, 2016.

The extension allows currently eligible TPS beneficiaries to retain TPS through September 30, 2016, so long as they otherwise continue to meet the eligibility requirements for TPS. The redesignation of Syria allows additional individuals who have been continuously residing in the United States since January 5, 2015 to obtain TPS, if otherwise eligible. The Secretary has determined that an extension of the current designation and a redesignation of Syria for TPS are warranted because the ongoing armed conflict and other extraordinary and temporary conditions that prompted the 2013 TPS redesignation have not only persisted, but have deteriorated, and because the ongoing armed conflict in Syria and other extraordinary and temporary conditions would pose a serious threat to the personal safety of Syrian nationals if they were required to return to their country.

Through this Notice, DHS also sets forth procedures necessary for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) either to: (1) Re-register under the extension if they already have TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS); or, (2) submit an initial registration application under the redesignation and apply for an EAD.

For individuals who have already been granted TPS under the 2012 original Syria designation or under the 2013 Syria redesignation, the 60-day re-registration period runs from January 5, 2015 through March 6, 2015. USCIS will issue new EADs with a September 30, 2016 expiration date to eligible Syria TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on March 31, 2015. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Syria for 6 months, through September 30, 2015, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and E-Verify processes.

Under the redesignation, individuals who currently do not have TPS (or an initial TPS application pending) may submit an initial application during the 180-day initial registration period that runs from January 5, 2015 through July 6, 2015. In addition to demonstrating continuous residence in the United States since January 5, 2015 and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since April 1, 2015, the effective date of this redesignation of Syria, before USCIS may grant them TPS.

TPS initial applications that were either filed during 2012 designation or during the 2013 Syria redesignation and remain pending on January 5, 2015 will be treated as initial applications under this 2015 redesignation. Individuals who have a pending initial Syria TPS application will not need to file a new Application for Temporary Protected Status (Form I–821). DHS provides additional instructions in this Notice for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through September 30, 2016.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective April 1, 2015, and will remain in effect through September 30, 2016. The 60-day re-registration period runs from January 5, 2015 through March 6, 2015.

*Redesignation of Syria for TPS:* The redesignation of Syria for TPS is effective April 1, 2015, and will remain in effect through September 30, 2016, a period of 18 months. The 180-day initial registration period for new applicants under the Syria TPS redesignation runs from January 5, 2015 through July 6, 2015.

**FOR FURTHER INFORMATION CONTACT:**

For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this extension and redesignation of Syria for TPS by selecting ''TPS Designated Country: Syria'' from the menu on the left side of the TPS Web page.

You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

Applicants seeking information about the status of their individual cases

can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
ISIL—Islamic State of Iraq and the Levant (also sometimes referred to as the Islamic State, ISIS, the Islamic State of Iraq and al-Sham, or the Islamic State of Iraq and Syria)
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SARG—Syrian Arab Republic Government
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
UN—United Nations
UNHCR—United Nations High Commissioner for Refugees
USAID—U.S. Agency for International Development
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and may obtain work authorization, so long as they continue to meet the requirements of TPS.

TPS beneficiaries may also be granted travel authorization as a matter of discretion.

The granting of TPS does not result in or lead to permanent resident status.

When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Syria designated for TPS?

On March 29, 2012, the Secretary designated Syria for TPS based on extraordinary and temporary conditions within that country that prevented Syrian nationals and those with no nationality who last resided in Syria from returning to Syria in safety. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012), and correction at 77 FR 20046 (Apr. 3, 2012); *see also* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). In 2013, the Secretary both extended Syria's designation and redesignated Syria for TPS for 18 months through March 31, 2015. *See Extension and Redesignation of Syria for Temporary Protected Status,* 78 FR 36223 (Jun. 17, 2013). The 2013 redesignation of Syria for TPS added the ongoing armed conflict in Syria as an additional basis for TPS. This announcement is the third designation of TPS for Syria and the first extension since the 2013 redesignation.

## What authority does the Secretary have to extend the designation of Syria for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government (Government) agencies, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12 or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Syria for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added). This is one of numerous instances in which the Secretary, and prior to the establishment of DHS, the Attorney General, has simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of Syria for Temporary Protected Status,* 78 FR 36223 (Jun. 17, 2013); *Extension and Redesignation of Sudan for Temporary Protected Status,* 78 FR 1872 (Jan. 9, 2013); *Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608 (Apr. 7, 1997) (discussing legal authority for redesignation of a country for TPS).

When the Secretary designates or redesignates a country for TPS, he also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). This discretion permits the Secretary to tailor the "continuous residence" date to offer TPS to the group of eligible individuals that the Secretary deems appropriate.

The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Syria shall be January 5, 2015. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since April 1, 2015, which is the effective date of the Secretary's redesignation of Syria. *See* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination of whether the applicant has met the "continuous physical presence"

requirement cannot be made until April 1, 2015. USCIS, however, will issue EADs, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Syria and simultaneously redesignating Syria for TPS through September 30, 2016?**

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Syria. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension and redesignation is warranted because the ongoing armed conflict and other extraordinary and temporary conditions that prompted the June 17, 2013 redesignation continue to be met. Furthermore, the Secretary has decided the conditions warrant changing the "continuous residence" date so as to provide TPS protection to eligible Syrian nationals who arrived between June 17, 2013 and January 5, 2015. The "continuous physical presence" date must be the effective date of the redesignation, which the Secretary has established as April 1, 2015 so that individuals granted TPS under the redesignation will have TPS for the same 18-month period through September 30, 2016 as TPS beneficiaries re-registering under the extension. *See* INA section 244(c)(1)(A)(i); 8 U.S.C. 1254a(c)(1)(A)(i).

Violence in Syria is widespread and indiscriminate. The Syrian Observatory for Human Rights estimates that more than 191,000 people have been killed since the start of the civil unrest in Syria in March 2011. The situation is extremely dangerous for civilians throughout the country with the deterioration of public security, continued arbitrary and unlawful killings, and the near collapse of public institutions, including health, education, and sanitation. The Syrian Arab Republic Government (SARG) continues to target humanitarian outposts, hospitals, medical staff, schools, breadlines, and other civilian sites. The SARG also regularly disrupts the delivery of humanitarian assistance to those in need. In addition to the ongoing, high-level atrocities committed by the SARG, rebel factions, violent extremists, foreign fighters, and unidentified assailants have abducted and killed civilians, journalists, humanitarian workers, and United Nations (UN) personnel.

The UN reported in late September 2014 that approximately 6.4 million Syrians are internally displaced. Acts of violence and human rights abuses continue in most major urban centers, and have significantly worsened in Aleppo, rural Damascus, Dar'a, Raqqa, northern Hasakah province, Deir al-Zour, and Latakia. Violent extremists openly surfaced among the armed opposition in the fight against the SARG, increasingly employing irregular tactics, including suicide bombings of security force targets, resulting in civilian casualties. The military continued to fight the opposition, responding with air strikes and heavy artillery, and harming civilians in the process.

A number of violent extremists have factored prominently in the conflict and pose a danger to civilians. In early 2014, the Islamic State of Iraq and the Levant (ISIL) emerged as one of the most significant radical Islamist fighting forces. The al-Nusra Front (also known as the Jabhat al Nusra) represents the interests of al-Qaeda in Syria. These violent extremist groups have engaged in indiscriminate attacks including bombings and suicide attacks throughout Syria. Various other violent extremists have been actively engaged in armed resistance in Syria. Reports indicate that there may be as many as 5,000 foreign fighters in Syria.

Since 2011, the Syrian military has engaged in warfare against opposition forces, with fighting taking place throughout Syria. In June 2014, Amnesty International reported that SARG forces continue to carry out indiscriminate attacks, bombarding populated civilian areas, and that opposition fighters have also carried out indiscriminate attacks. The UN indicated that increasingly the attacks by SARG forces and the armed opposition have targeted civilians. There has been an increase in the reported use of barrel bombs (oil drums packed with crude explosives and shrapnel) by the SARG and mortars by opposition forces against residential neighborhoods, particularly in Aleppo, Dar'a, rural Damascus, and Deir al-Zour.

Chemical weapons have been used against civilian populations and soldiers. In December 2013, the UN stated that chemical weapons were used in Ghouta, Khan al-Assal, Jobar, Saraqueb and Ashrafieh Sahnaya. The U.S. Government concluded the SARG used chemical weapons in the eastern suburbs outside Damascus in an August 2013 attack, killing more than 1,400 individuals. The regime has also employed the use of incendiary weapons and landmines in civilian areas, as well as ballistic missiles. The Internal Displacement Monitoring Centre noted that by the end of 2013, Syria's internal displacement crisis had become the largest in the world. As of October 2014, the United Nations High Commissioner for Refugees (UNHCR) reported that more than 3.2 million refugees from Syria have sought refuge in neighboring countries. Although the pace of refugee outflow has decreased since mid-year 2013, UNHCR projects an estimated 3.6 million Syrian refugees in the region by the end of 2014. The UN Office for the Coordination of Humanitarian affairs reported that approximately 10.8 million Syrians remaining inside Syria were in need of humanitarian assistance as of June 2014. Access for delivery of humanitarian assistance to vulnerable people continues to be a serious challenge, with 4.7 million persons living in hard-to-reach areas with little or no access to assistance as of October 2014. The situation is extremely dangerous and precarious for civilians, including those who are internally displaced throughout the country.

Interethnic and sectarian violence is a severe problem and has resulted in civilian deaths and displacement. Armed groups are active in Syria, and several continue to threaten the long-term security of the region. Ongoing interethnic violence and the increasing role of violent extremist groups, including the ISIL and al-Nusra Front, are likely to perpetuate fighting for the foreseeable future.

In July 2014, the UN reported that siege tactics left many civilians trapped without food and subject to shelling and sniper attacks. Local NGOs and international humanitarian organizations such as UNHCR, the World Food Program, and the International Committee of the Red Cross face significant SARG-imposed obstacles to gaining access to areas under opposition control, particularly near Aleppo and the eastern suburbs of Damascus. Residents in Syria's northeastern provinces of Deir al-Zour, Hasakah, and Raqqa also are difficult to reach by humanitarian workers due to the presence of ISIL. Water and electricity supplies have been cut as a part of the conflict strategy. Due to lack of clean water, there has also been a rise in infectious and water-borne diseases. Illnesses such as measles and typhoid fever have grown exponentially since pre-war times and polio reemerged in Syria in 2013 for the first time since 1999, with 36 laboratory-confirmed cases.

Serious, persistent conflict continues to pose substantial risk throughout Syria. Tens of thousands have been killed by SARG forces and non-state armed groups. Concerns for safety have led to massive displacement within

Syria. The refusal of the SARG and certain armed groups to allow unfettered humanitarian access to vulnerable populations throughout the country, coupled with continued fighting, has caused a grave humanitarian crisis that continues to deteriorate. All of these factors together present an exceedingly dangerous security environment throughout most of the country. The high number of Syrian refugees and the continued escalation of the conflict within the country indicate that there is no immediate prospect for safe return.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

The conditions that prompted the June 17, 2013 redesignation of Syria for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

There continues to be ongoing armed conflict in Syria and, due to such conflict, requiring the return of Syrian nationals to Syria would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning to Syria in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

It is not contrary to the national interest of the United States to permit Syrian nationals (and persons who have no nationality who last habitually resided in Syria) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

The designation of Syria for TPS should be extended for an additional 18-month period from April 1, 2015 through September 30, 2016. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Based on current country conditions, Syria should be simultaneously redesignated for TPS effective April 1, 2015 through September 30, 2016. *See* INA sections 244(b)(1)(A), (b)(1)(C), and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2).

TPS applicants must demonstrate that they have continuously resided in the United States since January 5, 2015.

The date by which TPS applicants must demonstrate that they have been continuously physically present in the United States is April 1, 2015, the effective date of the redesignation of Syria for TPS.

There are approximately 5,000 current Syrian TPS beneficiaries who are expected to apply for re-registration and may be eligible to retain their TPS under the extension.

It is estimated that an additional 5,000 individuals may file initial applications for TPS under the redesignation of Syria.

## Notice of Extension of the TPS Designation of Syria and Redesignation of Syria for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Syria for TPS in 2013 not only continue to be met, but have significantly deteriorated. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of these determinations, I am simultaneously extending the existing TPS designation of Syria for 18 months from April 1, 2015 through September 30, 2016, and redesignating Syria for TPS for the same 18-month period. *See* INA sections 244(b)(1)(A), (b)(1)(C), and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2). I have also determined that eligible individuals must demonstrate that they have continuously resided in the United States since January 5, 2015. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii).

**Jeh Charles Johnson,**
*Secretary.*

### I am currently a Syria TPS beneficiary. What should I do?

If you filed a TPS application during the Syria TPS registration period that ran from June 17, 2013 through December 16, 2013, and that application was approved prior to January 5, 2015, then you need to file a re-registration application under the extension if you wish to maintain TPS benefits through September 30, 2016. You must use the Application for Temporary Protected Status (Form I–821) to re-register for TPS. The 60-day open re-registration period will run from January 5, 2015 through March 6, 2015.

### I have a pending initial TPS application filed during the Syria TPS registration period that ran from June 17, 2013 through December 16, 2013. What should I do?

If your TPS application is still pending on January 5, 2015, then you do not need to file a new Application for Temporary Protected Status (Form I–821). Pending TPS applications will be treated as initial applications under this re-designation. Therefore, if your TPS application is approved, you will be granted TPS through September 30, 2016. If you have a pending TPS application *and* you wish to have an EAD valid through September 30, 2016, please refer to Table 1 to determine whether you should file a new Application for Employment Authorization (Form I–765).

TABLE 1—FORM AND EAD INFORMATION FOR PENDING TPS APPLICATIONS

| If . . . | And . . . | Then . . . |
| --- | --- | --- |
| You requested an EAD during the previous initial registration period for Syria TPS. | You received an EAD with Category C19 or A12 .......... | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request) if you wish to have a new EAD valid through September 30, 2016. |
| | You did not receive an EAD with Category C19 or A12 | You do not need to file a new Application for Employment Authorization (Form I–765). If your TPS application is approved, your Application for Employment Authorization (Form I–765) will be approved through September 30, 2016. |
| You did not request an EAD during the previous initial registration period for Syria TPS. | You wish to have an EAD valid through September 30, 2016.. | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request). |
| | You do not wish to have an EAD valid through September 30, 2016. | You do not need to file a new Application for Employment Authorization (Form I–765). |

DHS-AR-000102

**I am not a TPS beneficiary, and I do not have a TPS application pending. What are the procedures for initial registration for TPS under the Syria redesignation?**

If you are not a Syria TPS beneficiary or do not have a pending TPS application with USCIS, you may submit your TPS application during the 180-day initial registration period that will run from January 5, 2015 through July 6, 2015.

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS for Syria, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

If you are filing an initial application, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17. and

2. Application for Employment Authorization (Form I–765).

If you are applying for initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are 66 and older and applying for initial registration.

If you are applying for re-registration, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for initial registration or re-registration.

You must submit both completed application forms together. If you are unable to pay for the application and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Refiling an *Initial* TPS Application After Receiving a Denial of a Fee Waiver Request**

If you request a fee waiver when filing your initial TPS application package and your request is denied, you may re-file your application packet before the initial filing deadline of July 6, 2015. If you submit your application with a fee waiver request before that deadline, but you receive a fee waiver denial and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still re-file your application within the 45-day period after the date on the USCIS fee waiver denial notice. Your application will not be rejected even if the filing deadline has passed, provided it is mailed within those 45 days and all other required information for the application is included. **Note:** If you wish, you may also wait to request an EAD and pay the Application for Employment Authorization (Form I–765) fee after USCIS grants you TPS, if you are found eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application for Employment Authorization (Form I–765) without fee and without requesting an EAD.

**Re-Filing a TPS *Re-Registration* Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* **Note:** As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee, until after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

**Mailing Information**

Mail your application for TPS to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service ................................. | USCIS, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using a non-U.S. Postal Service delivery service ..................... | USCIS, Attn: TPS Syria, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |

DHS-AR-000103

**250**    **Federal Register** / Vol. 80, No. 2 / Monday, January 5, 2015 / Notices

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 2. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to *TPSijgrant.vsc@uscis.dhs.gov* with the receipt number and state that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. You can find detailed information on what further information you need to email and the appropriate email address on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

### E-Filing

You cannot electronically file your application when re-registering or submitting an initial registration for Syria TPS. Please mail your application to the mailing address listed in Table 2.

### Employment Authorization Document (EAD)

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants or re-registrants at local offices.

*Am I eligible to receive an automatic 6-month extension of my current EAD through September 30, 2015?*

Provided that you currently have TPS under the Syria designation, this Notice automatically extends your EAD by 6 months if you:

Are a national of Syria (or an alien having no nationality who last habitually resided in Syria);

Received an EAD under the last extension or redesignation of TPS for Syria; and

Have an EAD with a marked expiration date of March 31, 2015, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although this Notice automatically extends your EAD through September 30, 2015, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification

(Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of March 31, 2015, and states "A–12" or "C–19" under "Category," it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through September 30, 2015 (see the subsection titled *"How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?"* for further information). To minimize confusion over this extension at the time of hire, you may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through September 30, 2015. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or a combination of one selection from List B and one selection from List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of March 31, 2015, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once March 31, 2015, is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). However, your employer

does not need a new document to reverify your employment authorization until September 30, 2015, the expiration date of the automatic extension. Instead, you and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled *"What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?"* for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for *Employment Eligibility Verification* (Form I–9).

By September 30, 2015, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) has expired (check the date in the upper right-hand corner of the form), complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing Employment Eligibility Verification (Form I–9), including re-verifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9) that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Syrian citizenship when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If

DHS-AR-000104

presented with EADs that have been automatically extended, employers should accept such EADs as valid List A documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after September 30, 2015, for purposes of employment authorization?*

After September 30, 2015, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of September 30, 2016, and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to September 30, 2015, you and your employer should do the following:

1. For Section 1, you should:
a. Check ''An alien authorized to work'';
b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix); and
c. Write the automatically extended EAD expiration date (September 30, 2015) in the second space.
2. For Section 2, employers should record the:
a. Document title;
b. Document number; and
c. Automatically extended EAD expiration date (September 30, 2015).
By September 30, 2015, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
a. Draw a line through the expiration date in the second space;
b. Write ''September 30, 2015'' above the previous date;
c. Write ''TPS Ext.'' in the margin of Section 1; and
d. Initial and date the correction in the margin of Section 1.
2. For Section 2, employers should:
a. Draw a line through the expiration date written in Section 2;
b. Write ''September 30, 2015'' above the previous date;
c. Write ''TPS Ext.'' in the margin of Section 2; and
d. Initial and date the correction in the margin of Section 2.
By September 30, 2015, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify and you have an employee who is a TPS beneficiary who provide a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when this EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red ''X'' in the ''dismiss alert'' column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). By September 30, 2015, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth re-verification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY for the hearing impaired is at 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (I–9 and E-Verify), employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@ usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY for the hearing impaired is at 877–875–6028) or email at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish and many other languages. Employees or applicants may also call the OSC Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the List of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information

DHS-AR-000105

entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from federal or state government records. Employers may not terminate, suspend, delay training, withhold pay, lower pay or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY for the hearing impaired is at 877–875–6028). To report an employer that discriminates against an employee in the E-Verify process based on citizenship or immigration status, or based on national origin, contact OSC's Worker Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal government agencies must follow the guidelines laid out by the Federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your unexpired EAD that has been automatically extended, or your EAD that has not expired;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2014–30871 Filed 1–2–15; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[FWS–R2–ES–2014–N245; FXES11130200000–156–FF02ENEH00]**

### Endangered and Threatened Species Permit Applications

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of applications; request for public comment.

---

**SUMMARY:** We, the U.S. Fish and Wildlife Service, invite the public to comment on the following applications to conduct certain activities with endangered or threatened species. The Endangered Species Act of 1973, as amended (Act), prohibits activities with endangered and threatened species unless a Federal permit allows such activities. Both the Act and the National Environmental Policy Act require that we invite public comment before issuing these permits.

**DATES:** To ensure consideration, written comments must be received on or before February 4, 2015.

**ADDRESSES:** Susan Jacobsen, Chief, Division of Classification and Restoration, by U.S. mail at Division of Classification and Recovery, U.S. Fish and Wildlife Service, P.O. Box 1306, Albuquerque, NM 87103; or by telephone at 505–248–6920. Please refer to the respective permit number for each application when submitting comments.

**FOR FURTHER INFORMATION CONTACT:** Susan Jacobsen, Chief, Division of Classification and Restoration, by U.S. mail at P.O. Box 1306, Albuquerque, NM 87103; or by telephone at 505–248–6665.

**SUPPLEMENTARY INFORMATION:**

### Public Availability of Comments

The Act (16 U.S.C. 1531 *et seq.*) prohibits activities with endangered and threatened species unless a Federal permit allows such activities. Along with our implementing regulations in the Code of Federal Regulations (CFR) at 50 CFR part 17, the Act provides for permits, and requires that we invite public comment before issuing these permits. A permit granted by us under section 10(a)(1)(A) of the Act authorizes applicants to conduct activities with U.S. endangered or threatened species for scientific purposes, enhancement of survival or propagation, or interstate commerce. Our regulations regarding implementation of section 10(a)(1)(A) permits are found at 50 CFR 17.22 for endangered wildlife species, 50 CFR 17.32 for threatened wildlife species, 50 CFR 17.62 for endangered plant species, and 50 CFR 17.72 for threatened plant species.

### Applications Available for Review and Comment

We invite local, State, Tribal, and Federal agencies and the public to comment on the following applications. Please refer to the appropriate permit number (*e.g.,* Permit No. TE–123456) when requesting application documents and when submitting comments.

Documents and other information the applicants have submitted with these applications are available for review, subject to the requirements of the Privacy Act (5 U.S.C. 552a) and Freedom of Information Act (5 U.S.C. 552).

### Permit TE–022190

*Applicant:* Arizona–Sonora Desert Museum, Tucson, Arizona.

Applicant requests an amendment to a current permit for research and recovery purposes to collect from the wild and conduct pollination research on 24 Kearney's bluestar (*Amsonia kearneyana*) from the wild in Arizona.

### Permit TE–123070

*Applicant:* Susana Morales, Tucson, Arizona.

DHS-AR-000106

qualifications bulleted above and be no more than two pages in length, single-spaced and 11 point font.

Dated: July 19, 2016.

**Nancy C. Lee,**

*Deputy Assistant Secretary for Health—Women's Health Director, Office on Women's Health.*

[FR Doc. 2016–18178 Filed 7–29–16; 8:45 am]

**BILLING CODE 4150–42–P**

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

[Docket No. USCG–2016–0440]

## Merchant Marine Personnel Advisory Committee; Vacancies

**AGENCY:** Coast Guard, DHS.

**ACTION:** Request for applications.

**SUMMARY:** The Coast Guard seeks applications for membership on the Merchant Marine Personnel Advisory Committee. This Committee advises the Secretary of the Department of Homeland Security on matters related to personnel in the U.S. merchant marine, including but not limited to training, qualifications, certification, documentation, and fitness standards.

**DATES:** Completed applications should reach the Coast Guard on or before September 30, 2016.

**ADDRESSES:** Applicants should send a cover letter expressing interest in an appointment to the Merchant Marine Personnel Advisory Committee that also identifies which membership category the applicant is applying under, along with a resume detailing the applicant's experience via one of the following methods:

*By Email: davis.j.breyer@uscg.mil.*
*By Fax:* (202) 372–8382.
*By Mail:* Davis J. Breyer, Alternate Designated Federal Officer, Merchant Marine Personnel Advisory Committee Commandant (CG–MMC–1), U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Ave. SE., Washington, DC 20593–7509.

**FOR FURTHER INFORMATION CONTACT:** Davis J. Breyer, Alternate Designated Federal Officer of the Merchant Marine Personnel Advisory Committee; telephone 202–372–1445 or email at *davis.j.breyer@uscg.mil.*

**SUPPLEMENTARY INFORMATION:** The Merchant Marine Personnel Advisory Committee is a statutory federal advisory committee established in accordance with the provisions of the Federal Advisory Committee Act, (Title 5 U.S.C. Appendix) to advise the Secretary of the Department of Homeland Security on matters relating to personnel in the U.S. merchant marine, including but not limited to training, qualifications, certification, documentation, and fitness standards and other matters as assigned by the Commandant. The Committee shall also review and comment on proposed Coast Guard regulations and policies relating to personnel in the United States merchant marine, including training, qualifications, certification, documentation, and fitness standards; may be given special assignments by the Secretary and may conduct studies, inquiries, workshops, and fact finding in consultation with individuals and groups in the private sector and with State or local governments; and shall advise, consult with, and make recommendations reflecting its independent judgment to the Secretary. The Committee meets not less than twice each year. Its subcommittees and working groups may also meet intercessionally to consider specific tasks as required.

Each Merchant Marine Personnel Advisory Committee member serves a term of office of up to three years. Members may serve a maximum of two consecutive terms. All members serve without compensation from the Federal Government; however, upon request, they may receive travel reimbursement and per diem.

We will consider applications for the following six positions that will be vacant on June 1, 2017. To be eligible, you should have experience in one or more of the following areas of expertise:

(1) One position for a licensed engineering officer who is licensed as a chief engineer, any horsepower;

(2) one position for a pilot who represents the viewpoint of Merchant Marine pilots;

(3) one position for a member who represents the viewpoint of shipping companies employed in ship operation management;

(4) one position for an unlicensed seaman who represents the viewpoint of able bodied seamen; and

(5) two positions for members who represent the viewpoint of maritime training institutions other than a state or federal academy.

Registered lobbyists are not eligible to serve on federal advisory committees in an individual capacity. See ''Revised Guidance on Appointment of Lobbyists to Federal Advisory Committees, Boards, and Commissions'' (79 FR 47482, August 13, 2014). Registered lobbyists are lobbyists as defined in 2 U.S.C. 1602 who are required by 2 U.S.C. 1603 to register with the Secretary of the Senate and Clerk of the House of Representatives.

The Department of Homeland Security does not discriminate in selection of Committee members on the basis of race, color, religion, sex, national origin, political affiliation, sexual orientation, gender identity, marital status, disability and genetic information, age, membership in an employee organization, or any other non-merit factor. The Department of Homeland Security strives to achieve a widely diverse candidate pool for all of its recruitment actions.

If you are interested in applying to become a member of the Committee, send your cover letter and resume to Davis J. Breyer, Alternate Designated Federal Officer of the Merchant Marine Personnel Advisory Committee according to the instructions in the **ADDRESSES** section by the deadline in the **DATES** section of this notice. All email submittals will receive email receipt confirmation.

Dated: July 22, 2016.

**J. G. Lantz,**

*Director of Commercial Regulations and Standards, U.S. Coast Guard.*

[FR Doc. 2016–18112 Filed 7–29–16; 8:45 am]

**BILLING CODE 9110–04–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2586–16; DHS Docket No. USCIS–2013–0001]

RIN 1615–ZB54

## Extension and Redesignation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of the Syrian Arab Republic (Syria) for Temporary Protected Status (TPS) for 18 months, from October 1, 2016 through March 31, 2018, and redesignating Syria for TPS for 18 months, effective October 1, 2016 through March 31, 2018.

The extension allows TPS beneficiaries to retain TPS through March 31, 2018, so long as they continue to meet the eligibility requirements for TPS. The redesignation

DHS-AR-000107

of Syria allows additional individuals who have been continuously residing in the United States since August 1, 2016 to obtain TPS, if otherwise eligible. The Secretary has determined that an extension of the current designation and a redesignation of Syria for TPS are warranted because the ongoing armed conflict and other extraordinary and temporary conditions that prompted the 2015 TPS redesignation have not only persisted, but have deteriorated, and because the ongoing armed conflict in Syria and other extraordinary and temporary conditions would pose a serious threat to the personal safety of Syrian nationals if they were required to return to their country.

Through this Notice, DHS also sets forth procedures necessary for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) either to: (1) Re-register under the extension if they already have TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS); or, (2) submit an initial registration application under the redesignation and apply for an EAD.

For individuals who have already been granted TPS under the 2012 original Syria designation or under the 2013 or 2015 Syria redesignations, the 60-day re-registration period runs from August 1, 2016 through September 30, 2016. USCIS will issue new EADs with a March 31, 2018 expiration date to eligible Syria TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on September 30, 2016. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Syria for 6 months, through March 31, 2017, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and E-Verify processes.

Under the redesignation, individuals who currently do not have TPS (or an initial TPS application pending) may submit an initial application during the 180-day initial registration period that runs from August 1, 2016 through January 30, 2017. In addition to demonstrating continuous residence in the United States since August 1, 2016 and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that

they have been continuously physically present in the United States since October 1, 2016, the effective date of this redesignation of Syria, before USCIS may grant them TPS.

TPS initial applications that were either filed during the 2013 redesignation or during the 2015 Syria redesignation and remain pending on August 1, 2016 will be treated as initial applications under this 2016 redesignation. Individuals who have a pending initial Syria TPS application will not need to file a new Application for Temporary Protected Status (Form I–821). DHS provides additional instructions in this Notice for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through March 31, 2018.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective October 1, 2016, and will remain in effect through March 31, 2018. The 60-day re-registration period runs from August 1, 2016 through September 30, 2016.

*Redesignation of Syria for TPS:* The redesignation of Syria for TPS is effective October 1, 2016, and will remain in effect through March 31, 2018, a period of 18 months. The 180-day initial registration period for new applicants under the Syria TPS redesignation runs from August 1, 2016 through January 30, 2017.

**FOR FURTHER INFORMATION CONTACT:**

For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.*

You can find specific information about this extension and redesignation of Syria for TPS by selecting ''TPS Designated Country: Syria'' from the menu on the left side of the TPS Web page. You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS

National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OHCHR—Office of the High Commissioner for Human Rights
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SARG—Syrian Arab Republic Government
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
UN—United Nations
UNHCR—United Nations High Commissioner for Refugees
UNICEF—United Nations Children's Emergency Fund
USAID—U.S. Agency for International Development
USCIS—U.S. Citizenship and Immigration Services
WFP—World Food Programme
WHO—World Health Organization

**What is Temporary Protected Status (TPS)?**

TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and may obtain work authorization, so long as they continue to meet the requirements of TPS.

TPS beneficiaries may also be granted travel authorization as a matter of discretion.

The granting of TPS does not result in or lead to permanent resident status.

When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

**When was Syria designated for TPS?**

On March 29, 2012, the Secretary designated Syria for TPS based on

DHS-AR-000108

extraordinary and temporary conditions within that country that prevented Syrian nationals and those with no nationality who last resided in Syria from returning to Syria in safety. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (March 29, 2012), and correction at 77 FR 20046 (April 3, 2012); *see also* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). In 2013, the Secretary both extended Syria's designation and redesignated Syria for TPS for 18 months through March 31, 2015. *See Extension and Redesignation of Syria for Temporary Protected Status,* 78 FR 36223 (Jun. 17, 2013). The 2013 redesignation of Syria for TPS added the ongoing armed conflict in Syria as an additional basis for TPS. In 2015, the Secretary both extended Syria's designation and redesignated Syria for TPS for 18 months through September 30, 2016. *See Extension and Redesignation of Syria for Temporary Protected Status,* 80 FR 245 (January 5, 2015). This announcement is the fourth designation of TPS for Syria and the third extension since the initial designation in 2012.

**What authority does the Secretary have to extend the designation of Syria for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government (Government) agencies, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation

may be extended for an additional period of 6, 12 or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**What is the Secretary's authority to redesignate Syria for TPS?**

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added). This is one of numerous instances in which the Secretary, and prior to the establishment of DHS, the Attorney General, has simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of Syria for Temporary Protected Status,* 78 FR 36223 (Jun. 17, 2013); *Extension and Redesignation of Sudan for Temporary Protected Status,* 78 FR 1872 (Jan. 9, 2013); *Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608 (Apr. 7, 1997) (discussing legal authority for redesignation of a country for TPS).

When the Secretary designates or redesignates a country for TPS, he also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). This discretion permits the Secretary to tailor the "continuous residence" date to offer TPS to the group of eligible individuals that the Secretary deems appropriate.

The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Syria shall be August 1, 2016. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since October 1, 2016, which is the effective date of the Secretary's redesignation of Syria. *See* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial

TPS application filed under the redesignation, the final determination of whether the applicant has met the "continuous physical presence" requirement cannot be made until October 1, 2016. USCIS, however, will issue EADs, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Syria and simultaneously redesignating Syria for TPS through March 31, 2018?**

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Syria. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension and redesignation is warranted because the ongoing armed conflict and other extraordinary and temporary conditions that prompted the January 5, 2015 redesignation continue to exist. Furthermore, the Secretary has decided the conditions warrant changing the "continuous residence" date so as to provide TPS protection to eligible Syrian nationals who arrived between January 5, 2015 and August 1, 2016. The "continuous physical presence" date must be the effective date of the redesignation, which the Secretary has established as October 1, 2016, so that individuals granted TPS under the redesignation will have TPS for the same 18-month period through March 31, 2018 as TPS beneficiaries re-registering under the extension. *See* INA section 244(c)(1)(A)(i); 8 U.S.C. 1254a(c)(1)(A)(i).

Violent conflict and the deteriorating humanitarian crisis continue to pose significant risk throughout Syria. Hundreds of thousands have been killed as a result of ongoing violence. Concerns for health and safety have led to largescale civilian displacement within Syria and migrations to neighboring countries and Europe. As of May 2016, the U.S. Agency for International Development (USAID) reports that 13.5 million people worldwide are in need of humanitarian assistance as a result of armed conflict in Syria. In May 2016, the United Nations Special Envoy for Syria has estimated that as many as 400,000 individuals have been killed, and 1.5 million injured since the violence began in 2011. According to information from USAID, as of March 2016, the United Nations High Commissioner for Refugees (UNHCR) had registered 4.8 million refugees in neighboring countries, and 6.5 million people were internally displaced Syria.

Syria's lengthy civil conflict has resulted in high levels of food

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

insecurity, limited access to water and medical care, and massive destruction of Syria's infrastructure. Attacks against civilians, the use of chemical weapons and irregular warfare tactics, as well as forced conscription and use of child soldiers have intensified the humanitarian crisis. USAID reports reductions in agricultural production, widespread displacement, disruption of markets and transportation, elimination of bread subsidies, damage to infrastructure including mills and bakeries, and loss of livelihoods are contributing to unprecedented food insecurity in Syria. As of 2015, it was estimated that over 6.3 million people within Syria, as well as 3 million Syrian refugees in neighboring countries are in need of emergency food assistance. In late 2015, due to significant funding deficits, food assistance distributed by the United Nation's World Food Programme (WFP) and 37 other non-governmental organizations (NGOs) reduced the level of assistance provided to 1.3 million Syrian refugees by 50 percent. According to information from USAID, WFP continues to face funding shortages for its programs in 2016, and is currently providing monthly food assistance to 1.4 million refugees and over 4 million people inside Syria.

Water availability in Syria has decreased to less than 50 percent of its pre- civil war levels. United Nations Children's Emergency Fund (UNICEF) reported that in 2015 alone, as many as 5 million people living in cities and communities across the country have suffered the consequences of long and sometimes deliberate interruptions to their water supplies. Additionally, strikes against population centers in the course of military operations has resulted in wide-scale destruction of water supply networks and infrastructure. According to information from USAID, between January and March 2016, 16 million Syrians relied on water assistance from the International Committee of the Red Cross and the Syrian Arab Red Crescent for survival.

Water scarcity as a result of power outages and limited access to fuel has caused numerous health and financial issues for families in Damascus, Aleppo, the southern city of Dera'a, and other areas. According to information from USAID, UNICEF reported in May 2016 that fuel supplies to the Sulaiman Al-Halabi and Bab Alnerab pumping stations were cut off, thus depriving 2 million people access to clean water. Additionally, water prices have dramatically increased, with cities like Aleppo seeing upwards of a 3,000 percent increase in the cost of clean

water. Unable to afford the rising cost of limited clean water supplies, families rely on dirty water from unprotected and unregulated groundwater sources. As a result, UNICEF reports increased cases of typhoid, diarrhea, hepatitis, and other diseases in children and other at-risk populations.

Civilian health needs continue to rise as Syria's health system deteriorates. The World Health Organization (WHO) reports that 58 percent of public hospitals were either partially functional or completely destroyed as of September 2015. Syrian medical personnel and facilities have been repeatedly struck in the course of military operations, particularly Syrian government air operations.

In early 2015, the WHO reported that the conflict has significantly impacted the ability for NGOs to deliver medical aid into and throughout Syria. Between 2011 and April 2016, Physicians for Human Rights reports that 738 medical personnel have been killed and 259 medical facilities indiscriminately or deliberately attacked. The organization reports that government forces use "double tap" tactics, attacking a site and then attacking it again once first responders arrive. Physicians for Human Rights documented 122 attacks on medical facilities in 2015, the highest rate of attacks on hospitals since the start of the conflict. The Office of the High Commissioner for Human Rights (OHCHR) reported an increase in miscarriages, birth defects, and infant mortality. NGOs operating near major population centers, such as Aleppo, reported on outbreaks of cholera, typhoid, scabies and tuberculosis among the populations.

As of November 2015, Syria's civil war has caused over $270 billion in damages to the country's infrastructure. An estimated 2.1 million homes, half of the country's hospitals, and over 7,000 schools have been destroyed due to the conflict. Population centers such as Raqqah, Homs, and Aleppo, valued for their strategic positions by the opposition, extremists, and government forces, have become targets of military operations from all sides of the conflict. For example, within the city of Kobane, after 4 months of fighting between Kurdish and Islamic State forces, over 3,200 buildings were damaged. In Aleppo, at least 14,000 structures were damaged or destroyed, mostly by government airstrikes, with an additional unknown number of buildings destroyed as a result of front line conflict.

The recruitment and use of child soldiers has become "commonplace" in the Syrian armed conflict according to

a 2015 United Nations report. Forced conscription has affected the Syrian population more broadly as the conflict persists into its 6th year. While mandatory military service is a longstanding practice in Syria, the government strengthened its enforcement measures in 2014 and 2015. High rates of draft-dodging, desertions, and defections have left the Syrian military lacking sufficient manpower. In response, the Assad regime has launched large-scale arrests of military-age men through raids and checkpoints. For example, over the course of a 4-day period in October 2014, more than 2,600 men were detained for service by government forces in the cities of Hama and Homs. Once detained, conscripts usually receive minimal training, and are often deployed to a frontline position within days of their arrest. Furthermore, conscripts have reported being held beyond the normal term of 18 months and forced to extend through multiple tours of duty.

Daily bombings of homes, marketplaces, schools, hospitals, and places of worship have become commonplace for Syrian civilians living in major cities. The use of barrel bombs by the Assad regime is an ongoing occurrence in major population centers. Human Rights Watch reports that the Syrian military has dropped dozens of barrel bombs a day on opposition-held neighborhoods in Aleppo, Idlib, Dara'a and elsewhere. Amnesty International reports that relentless aerial bombardment and shelling by Syrian government forces is magnifying the suffering of civilians trapped under siege and facing an escalating humanitarian crisis in the Eastern Ghouta region. Between January and June 2015, the report indicates, Syrian government forces carried out over 60 airstrikes that resulted in over 500 civilian deaths.

As of May 2016, nearly 11.3 million Syrians had been displaced from their homes since the beginning of the Syrian conflict, with over 1.2 million estimated to have been displaced in 2015 alone. According to the U.N. Office for the Coordination of Humanitarian Affairs, nearly 50 percent of displaced persons are children. Furthermore, an estimated 4.6 million Syrians live in over 127 "hard-to-reach" and 18 "besieged" locations within Syria, and are unlikely to receive humanitarian assistance. By May 2016, the United Nations and ground partners were only able to reach 11.7 percent and 64.9 percent of people in these locations, respectively. By the end of 2014, Syrians represented 43 percent of all internally displaced

DHS-AR-000110

persons worldwide. The Internal Displacement Monitoring Centre reports that in 2015, a family was displaced every minute as a result of the protracted civil war and conflict. The humanitarian crisis in Syria continues to deteriorate, and the escalation of the conflict indicates that there is no immediate possibility for safe return.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

The conditions that prompted the January 5, 2015 redesignation of Syria for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

There continues to be ongoing armed conflict in Syria and, due to such conflict, requiring the return of Syrian nationals to Syria would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning to Syria in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

It is not contrary to the national interest of the United States to permit Syrian nationals (and persons who have no nationality who last habitually resided in Syria) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

The designation of Syria for TPS should be extended for an additional 18-month period from October 1, 2016 through March 31, 2018. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Based on current country conditions, Syria should be simultaneously redesignated for TPS effective October 1, 2016 through March 31, 2018. *See* INA sections 244(b)(1)(A), (b)(1)(C), and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2).

TPS applicants must demonstrate that they have continuously resided in the United States since August 1, 2016.

The date by which TPS applicants must demonstrate that they have been continuously physically present in the United States is October 1, 2016, the effective date of the redesignation of Syria for TPS.

There are approximately 5,800 current Syrian TPS beneficiaries who are expected to apply for re-registration and may be eligible to retain their TPS under the extension.

It is estimated that an additional 2,500 individuals may file initial applications for TPS under the redesignation of Syria.

### Notice of Extension of the TPS Designation of Syria and Redesignation of Syria for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Syria for TPS in 2015 not only continue to be met, but have significantly deteriorated. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of these determinations, I am simultaneously extending the existing TPS designation of Syria for 18 months from October 1, 2016 through March 31, 2018, and redesignating Syria for TPS for the same 18-month period. *See* INA sections 244(b)(1)(A), (b)(1)(C), and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2). I have also determined that eligible individuals must demonstrate that they have continuously resided in the United States since August 1, 2016. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii).

**Jeh Charles Johnson,**
*Secretary.*

*I am currently a Syria TPS beneficiary. What should I do?*

If you filed a TPS application during the Syria TPS registration periods that ran from January 5, 2015 through March 6, 2015, and that application was approved prior to August 1, 2016, then you need to file a re-registration application under the extension if you wish to maintain TPS benefits through March 31, 2018. You must use the Application for Temporary Protected Status (Form I–821) to re-register for TPS. The 60-day open reregistration period will run from August 1, 2016 through September 30, 2016.

*I have a pending initial TPS application filed during the Syria TPS registration period that ran from January 5, 2015 through July 6, 2015. What should I do?*

If your TPS application is still pending on August 1, 2016, then you do *not* need to file a new Application for Temporary Protected Status (Form I–821). Pending TPS applications will be treated as initial applications under this re-designation. Therefore, if your TPS application is approved, you will be granted TPS through March 31, 2018. If you have a pending TPS application *and* you wish to have an EAD valid through March 31, 2018, please refer to Table 1 to determine whether you should file a new Application for Employment Authorization (Form I–765).

TABLE 1—FORM AND EAD INFORMATION FOR PENDING TPS APPLICATIONS

| If . . . | And . . . | Then . . . |
|---|---|---|
| You requested an EAD during the previous initial registration periods for Syria TPS. | You received an EAD with Category C19 or A12. | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request) if you wish to have a new EAD valid through March 31, 2018. |
| | You did not receive an EAD with Category C19 or A12. | You do not need to file a new Application for Employment Authorization (Form I–765). If your TPS application is approved, your Application for Employment Authorization (Form I–765) will be approved through March 31, 2018. |
| You did not request an EAD during the previous initial registration period for Syria TPS. | You wish to have an EAD valid through March 31, 2018. | You must file a new Application for Employment Authorization (Form I–765) with fee (or fee waiver request). |
| | You do not wish to have an EAD valid through March 31, 2018. | You do not need to file a new Application for Employment Authorization (Form I–765). |

*I am not a TPS beneficiary, and I do not have a TPS application pending. What are the procedures for initial registration for TPS under the Syria redesignation?*

If you are not a Syria TPS beneficiary or do not have a pending TPS application with USCIS, you may submit your TPS application during the 180-day initial registration period that will run from August 1, 2016 through January 30, 2017.

### Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS for Syria, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

If you are filing an initial application, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17. and

2. Application for Employment Authorization (Form I–765).

If you are applying for initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are 66 and older and applying for initial registration.

If you are applying for re-registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765), regardless of your age.

If you are not requesting an EAD, regardless of whether you are applying for initial registration or re-registration, you do not pay the fee for the Application for Employment Authorization (Form I–765).

You must submit both completed application forms together. If you are unable to pay for the application and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

### Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

### Refiling an *Initial* TPS Application After Receiving a Denial of a Fee Waiver Request

If you request a fee waiver when filing your initial TPS application package and your request is denied, you may re-file your application packet before the initial filing deadline of January 30, 2017. If you submit your application with a fee waiver request before that deadline, but you receive a fee waiver denial and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still re-file your application within the 45-day period after the date on the USCIS fee waiver denial notice. Your application will not be rejected even if the filing deadline has passed, provided it is mailed within those 45 days and all other required information for the application is included. Note: If you wish, you may also wait to request an EAD and pay the Application for Employment Authorization (Form I–765) fee after USCIS grants you TPS, if you are found eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application for Employment Authorization (Form I–765) without fee and without requesting an EAD.

### Re-Filing a TPS *Re-Registration* Application After Receiving a Denial of a Fee Waiver Request

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications *before* the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Note: As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee, until after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

### Mailing Information

Mail your application for TPS to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service. | USCIS, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using a non-U.S. Postal Service delivery service. | USCIS, Attn: TPS Syria, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 2. When submitting a re-registration application and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will aid in the verification of your grant of TPS and processing of your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

DHS-AR-000112

**E-Filing**

You cannot electronically file your application when re-registering or submitting an initial registration for Syria TPS. Please mail your application to the mailing address listed in Table 2.

**Supporting Documents**

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS Web site at *www.uscis.gov/tps* under "Syria."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through March 31, 2017?*

Provided that you currently have TPS under the Syria designation, this Notice automatically extends your EAD by 6 months if you:

Are a national of Syria (or an alien having no nationality who last habitually resided in Syria);

Received an EAD under the last extension or redesignation of TPS for Syria; and

Have an EAD with a marked expiration date of September 30, 2016, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although this Notice automatically extends your EAD through March 31, 2017, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). Or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of September 30, 2016, and states "A–12" or "C–19" under "Category," it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through March 31, 2017 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that USCIS has automatically extended your EAD through March 31, 2017. You may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through March 31, 2017. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of September 30, 2016, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once March 31, 2017 is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). Your employer may need to reinspect your automatically extended EAD to check the expiration date and code to record the updated expiration date on your Form I–9 if he or she did not keep a copy of this EAD when you initially presented it. However, your employer does not need a new document to reverify your employment authorization until March 31, 2017, the expiration date of the automatic extension. Instead, you and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for *Employment Eligibility Verification* (Form I–9).

By March 31, 2017, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for you or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) has expired (check the date in the upper right-hand corner of the form), complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt.

DHS-AR-000113

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing Employment Eligibility Verification (Form I–9), including re-verifying employment authorization, employers must accept any documentation that appears on the ''Lists of Acceptable Documents'' for Employment Eligibility Verification (Form I–9) that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Syrian citizenship or proof of re-registration for TPS when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such EADs as valid List A documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after March 31, 2017, for purposes of employment authorization?*

After March 31, 2017, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of March 31, 2018, and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to March 31, 2017, you and your employer should do the following:

1. For Section 1, you should:
a. Check ''An alien authorized to work'';

b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix); and

c. Write the automatically extended EAD expiration date (March 31, 2017) in the second space.

2. For Section 2, employers should record the:
a. Document title;
b. Document number; and
c. Automatically extended EAD expiration date (March 31, 2017).

By March 31, 2017, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, your employer may need to reinspect your automatically extended EAD if your employer does not have a copy of the EAD on file, and you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
a. Draw a line through the expiration date in the second space;
b. Write ''March 31, 2017'' above the previous date;
c. Write ''TPS Ext.'' in the margin of Section 1; and
d. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
a. Draw a line through the expiration date written in Section 2;
b. Write ''March 31, 2017'' above the previous date;
c. Write ''TPS Ext.'' in the margin of Section 2; and
d. Initial and date the correction in the margin of Section 2.

By March 31, 2017, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS was automatically extended in a **Federal Register** Notice. If you have an employee who is a TPS beneficiary who

provided a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. By March 31, 2017, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY for the hearing impaired is at 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (I–9 and E-Verify), employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY for the hearing impaired is at 877–875–6028) or email at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish and many other languages. Employees or applicants may also call the OSC Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the List of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee,

DHS-AR-000114

**Federal Register** / Vol. 81, No. 147 / Monday, August 1, 2016 / Notices    **50541**

or an acceptable List A, List B, or List C receipt as described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from Federal or State government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY for the hearing impaired is at 877–875–6028). To report an employer for discrimination in the E-Verify process based on citizenship or immigration status, or based on national origin, contact OSC's Worker Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify*.

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal government agencies must follow the guidelines laid out by the Federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your unexpired EAD that has been automatically extended, or your EAD that has not expired;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections or make an appointment can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''For Benefit Applicants'' from the menu on the right and then selecting ''Questions about Your Records?''

[FR Doc. 2016–17933 Filed 7–29–16; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

**[FWS–HQ–ES–2016–N114; 4500030115]**

## Endangered and Threatened Wildlife and Plants; Initiation of 5-Year Status Review of Orangutan

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of initiation of review; request for information.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, are initiating a 5-year status review under the Endangered Species Act of 1973, as amended (Act), of the orangutan. A 5-year status review is based on the best scientific and commercial data available at the time of the review; therefore, we are requesting submission of any such information that has become available since the last review of the species.

**DATES:** To ensure consideration, we are requesting submission of new information no later than September 30, 2016. However, we will continue to accept new information about any listed species at any time.

**ADDRESSES:** Please submit your information in writing by any one of the following methods:

*U.S. mail:* Janine Van Norman, Chief, Branch of Foreign Species, Endangered Species Program, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: ES, Falls Church, VA 22041;

*Hand-delivery:* Fish and Wildlife Service at the above address; or

*Email: es_foreignspecies@fws.gov*.

For more about submitting information, see ''Request for Information'' in the **SUPPLEMENTARY INFORMATION** section below.

**FOR FURTHER INFORMATION CONTACT:** Janine Van Norman, Chief, Branch of Foreign Species, Endangered Species Program, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: ES, Falls Church, VA 22041; telephone 703–358–2171. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:** We are initiating a 5-year status review under the Act of the orangutan (*Pongo pygmaeus*), which is listed as endangered (June 2, 1970; 35 FR 8491). A 5-year status review is based on the best scientific and commercial data available at the time of the review; therefore, we are requesting submission of any such information that has become available since the last review of the species.

### Why do we conduct a 5-year review?

Under the Act (16 U.S.C. 1531 *et seq.*), we maintain Lists of Endangered and Threatened Wildlife and Plants (which we collectively refer to as the List) in the Code of Federal Regulations (CFR) at 50 CFR 17.11 (for animals) and 17.12 (for plants). Section 4(c)(2)(A) of the Act requires us to review each listed species' status at least once every 5 years. Our regulations at 50 CFR 424.21 require that we publish a notice in the **Federal Register** announcing those species under active review. For additional information about 5-year reviews, go to *http://www.fws.gov/endangered/what-we-do/recovery-*

DHS-AR-000115

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Docket ID FEMA–2008–0010]**

### Board of Visitors for the National Fire Academy

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Committee Management; Request for applicants for appointment to the Board of Visitors for the National Fire Academy.

**SUMMARY:** The National Fire Academy (Academy) is requesting an individual who are interested in serving on the Board of Visitors for the National Fire Academy (Board) to apply for appointment as identified in this notice. Pursuant to the Federal Fire Prevention and Control Act of 1974, the Board shall review annually the programs of the Academy and shall make recommendations to the Federal Emergency Management Agency (FEMA) Administrator, through the United States Fire Administrator, regarding the operation of the Academy and any improvements that the Board deems appropriate. The Board is composed of eight members, all of whom have national or regional leadership experience in the fields of fire safety, fire prevention (such as community risk reduction to include wildland urban interface), fire control, research and development in fire protection, treatment and rehabilitation of fire victims, or local government services management, which includes emergency medical services. The Academy seeks to appoint an individual to a position on the Board that will be open due to term expiration. If other positions are vacated during the application process, candidates may be selected from the pool of applicants to fill the vacated positions.

**DATES:** Résumés will be accepted until 11:59 p.m. EST April 4, 2018.

**ADDRESSES:** The preferred method of submission is via email. However, résumés may also be submitted by mail. Please only submit by ONE of the following methods:

*Email: FEMA-NFABOV@ fema.dhs.gov.*

*Mail:* National Fire Academy, U.S. Fire Administration, Attention: Ellen Newlin, 16825 South Seton Avenue, Emmitsburg, Maryland 21727–8998.

**FOR FURTHER INFORMATION CONTACT:** *Alternate Designated Federal Officer,* Terry Gladhill, telephone (301) 447–

1239, email *Terry.Gladhill@ fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The Board is an advisory committee established in accordance with the provision of the Federal Advisory Committee Act (FACA), 5 U.S.C. Appendix. The purpose of the Board is to review annually the programs of the Academy and advise the FEMA Administrator on the operation of the Academy and any improvements therein that the Board deems appropriate. In carrying out its responsibilities, the Board examines Academy programs to determine whether these programs further the basic missions that are approved by the FEMA Administrator, examines the physical plant of the Academy to determine the adequacy of the Academy's facilities, and examines the funding levels for Academy programs. The Board submits a written annual report through the United States Fire Administrator to the FEMA Administrator. The report provides detailed comments and recommendations regarding the operation of the Academy.

Individuals who are interested in serving on the Board are invited to apply for consideration for appointment. There is no application form; however, a current résumé and statement of interest will be required. The appointment shall be for a term of up to three years. Individual selected for the appointment shall serve as Special Government Employees (SGEs), defined in section 202(a) of title 18, United States Code. The candidate selected for the appointment will be required to complete a Confidential Financial Disclosure Form (U.S. Office of Government Ethics (OGE) Form 450).

The Board shall meet as often as needed to fulfill its mission, but not less than twice each fiscal year to address its objectives and duties. The Board will meet in person at least once each fiscal year with additional meetings held via teleconference. Board members may be reimbursed for travel and per diem incurred in the performance of their duties as members of the Board. All travel for Board business must be approved in advance by the Designated Federal Officer. To the extent practical, Board members shall serve on any subcommittee that is established.

FEMA does not discriminate in employment on the basis of race, color, religion, sex, national origin, political affiliation, sexual orientation, gender identity, marital status, disability and genetic information, age, membership in an employee organization, or other non-merit factor. FEMA strives to achieve a

diverse candidate pool for all its recruitment actions.

Current DHS employees, contractors, and potential contractors will not be considered for membership. Federally registered lobbyists will not be considered for SGE appointments.

Dated: February 21, 2018.

**Tonya L. Hoover,**
*Superintendent, National Fire Academy, United States Fire Administration, Federal Emergency Management Agency.*

[FR Doc. 2018–04352 Filed 3–2–18; 8:45 am]

**BILLING CODE 9111–45–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2618–18; DHS Docket No. USCIS– 2013–0001]**

**RIN 1615–ZB72**

### Extension of the Designation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Syria for Temporary Protected Status (TPS) for 18 months, from April 1, 2018, through September 30, 2019. The extension allows currently eligible TPS beneficiaries to retain TPS through September 30, 2019, so long as they otherwise continue to meet the eligibility requirements for TPS. This Notice also sets forth procedures necessary for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to re-register for TPS and to apply for Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). USCIS will issue new EADs with a September 30, 2019 expiration date to eligible Syria TPS beneficiaries who timely re-register and apply for EADs under this extension.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective April 1, 2018, and will remain in effect through September 30, 2019. The 60-day re-registration period runs from March 5, 2018 through May 4, 2018. (**Note:** It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.)

**9330**    **Federal Register** / Vol. 83, No. 43 / Monday, March 5, 2018 / Notices

**FOR FURTHER INFORMATION CONTACT:**

You may contact Samantha Deshommes, Branch Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at 800–375–5283.

If you have additional questions about Temporary Protected Status, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also reach out to our USCIS contact center at 800–375–5283.

Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section (IER)
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Syria and whose applications have been granted. Certain individuals may be eligible to file a late initial application for TPS if they meet the conditions described in 8 CFR 244.2(f)(2). In addition to meeting other eligibility criteria, initial applicants for TPS under this extension must demonstrate that they have been continuously residing in

the United States since August 1, 2016, and continuously physically present in the United States since October 1, 2016. Information on late initial filing is also available on the USCIS TPS website link at *www.uscis.gov/tps.*

For individuals who have already been granted TPS under Syria's designation, the 60-day re-registration period runs from March 5, 2018 through May 4, 2018. USCIS will issue new EADs with a September 30, 2019 expiration date to eligible Syrian TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on March 31, 2018. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs issued under the TPS designation of Syria for 180 days, through September 27, 2018. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

Individuals who have a pending Syria TPS application will not need to file a new Application for Temporary Protected Status (Form I–821). DHS provides additional instructions in this Notice for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through September 30, 2019. There are approximately 7,000 current beneficiaries under Syria's TPS designation

**What is Temporary Protected Status (TPS)?**

TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

During the TPS designation period and so long as a TPS beneficiary continues to meet the requirements of TPS, he or she is eligible to remain in the United States, may not be removed, and is authorized to work and obtain an EAD.

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

The granting of TPS does not result in or lead to lawful permanent resident status.

To qualify for TPS, beneficiaries must meet the eligibility standards at

INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

When the Secretary terminates a country's TPS designation, beneficiaries return to either:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**When was Syria designated for TPS?**

Former Secretary of Homeland Security Napolitano initially designated Syria for TPS on March 29, 2012, based on extraordinary and temporary conditions resulting from the Syrian military's violent suppression of opposition to President Bashar al-Assad's regime that prevented Syrian nationals from safely returning to Syria. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012). Following the initial designation, former Secretaries Napolitano and Johnson extended and redesignated Syria for TPS three times. Most recently, in 2016, former Secretary Johnson both extended Syria's designation and redesignated Syria for TPS for 18 months through March 31, 2018. *See Extension and Redesignation of Syria for Temporary Protected Status,* 81 FR 50533 (Aug. 1, 2016).

**What authority does the Secretary have to extend the designation of Syria for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

DHS-AR-000117

Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that a foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Why is the Secretary extending the TPS designation for Syria through September 30, 2019?**

DHS has reviewed conditions in Syria. Based on the review, including input received from other U.S. Government agencies, the Secretary has determined that an 18-month extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions that prompted Syria's 2016 redesignation for TPS persist.

Syria is engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country. Beginning in March 2011, the Syrian Arab Republic Government (SARG) mobilized the military to violently suppress citizens advocating for greater political freedoms, initiating a brutal crackdown, and employing excessive force against civilians, including arbitrary executions, killing and persecution of protestors and members of the media, arbitrary detentions, disappearances, torture, and ill-treatment in an effort to retain control of the country. Since the beginning of the conflict, as many as 500,000 Syrians are dead or missing. The SARG and its allies continue to wage a brutal war resulting in significant civilian casualties. On April 4, 2017, the Syrian military used chemical weapons on the village of Khan Sheikhoun.

The SARG's use of barrel bombs against civilians is an ongoing occurrence in major population centers, with thousands of bombs dropped in 2016 and 2017. Syrian regime forces dropped 613 barrel bombs in November 2017 alone, according to monthly reporting statistics from the Syrian Network for Human Rights.

After nearly seven years of armed conflict, over half of Syria's pre-war population has been forced to flee from their homes. There are 11.5 million displaced Syrians in the region, both inside Syria and in neighboring countries. The United Nations High Commissioner for Refugees has reported over 1,240,000 civilian displacements in the last 12 months alone. Every year of the conflict has seen a massive growth in refugees. In July 2012, there were 100,000 refugees. One year later, there were 1.5 million. As of January 2018, there were over 5.4 million Syrian refugees in the region.

Syria is experiencing a humanitarian crisis, with over 73% of the Syrian population in need of assistance. The humanitarian situation is particularly severe in areas besieged by the SARG. For example, an estimated 400,000 civilians in Eastern Ghouta have been pushed to the brink of famine since March 2017, when the government tightened its siege of the Damascus suburb. The Syrian regime adds to this suffering by regularly bombing and firing artillery and rockets into Eastern Ghouta. Malnutrition rates there are the highest seen so far in Syria since the beginning of the crisis. In a December 10, 2017 statement, the United Nations Children's Fund called for the immediate evacuation of scores of sick children from Eastern Ghouta. The U.S. Mission to the United Nations has decried the situation in Eastern Ghouta as ''the latest version of the Assad regime's despicable 'starve and surrender' strategy.'' Although 29 critically-ill civilians were evacuated in late December 2017, the Department of State condemned the SARG for its ongoing blockade of humanitarian aid to the besieged area, where as of February 2018 hundreds still awaited medical evacuation, and many had died as they waited. Since early 2018, a new campaign of SARG airstrikes targeting major roads and hospitals has killed hundreds of civilians in Eastern Ghouta.

In northwestern Idlib province, a SARG offensive initiated in late December 2017 further threatens the safety and security of up to one million internally displaced civilians. As frequent airstrikes have forced civilians to evacuate the southern areas of Idlib, tens of thousands of newly displaced Syrians have amassed along the Turkish border seeking assistance.

Over 9 million Syrians are in need of emergency food assistance. As of September 2017, the United Nations World Food Program assessed that food production in Syria was at an all-time low and that the situation was showing no sign of improving. Due to an 800 percent increase in the consumer food price index between 2010 and 2016, 90 percent of Syrian households now spend over half of their income on food, compared with 25 percent before the crisis.

As of March 2017, 51 percent of Syrians lacked regular access to the public water system, relying instead on unregulated systems not tested for water purity. Schools and hospitals are significantly impacted by the lack of basic levels of sanitation, as well as the destruction of many facilities. Water shortages, particularly in Damascus, have exacerbated children's vulnerability to communicable diseases. In 2016, nearly half of Syria's current population suffered from the use of water as a weapon of war due to deliberate water cuts by warring factions.

Syria's medical system is in crisis. More than half of public hospitals and primary health centers have closed or are only partially functioning, and 11.5 million Syrians, including nearly 5 million children, do not have access to health care. SARG forces target Syrian medical personnel and facilities as part of their military strategy. Physicians for Human Rights has estimated that 98 percent of doctors have been killed or displaced in Aleppo. Outbreaks of preventable diseases are on the rise, including polio, which had been eradicated in Syria prior to the ongoing conflict.

Facing troop shortages after years of conflict, the Syrian military is increasingly relying on forced conscription to fill its ranks, launching large-scale arrests of military-age men through raids and checkpoints. In December 2016, SARG forces arrested and conscripted civilians fleeing rebel-held areas of Aleppo. In September 2017, the Syrian Network for Human Rights reported ''almost daily raiding and arrest campaigns'' focusing on males aged 18–42 years old for the purpose of military conscription. Numerous factions fighting the Syrian regime also forcibly recruit civilians, including children, to serve in combat roles. The self-described Islamic State of Iraq and Syria (ISIS) has the greatest reliance on child soldiers in Syria. Former ISIS child soldiers have described children as young as twelve being used as suicide bombers and children as young as six assisting in Islamic State executions.

Despite these circumstances, there have been incremental improvements in stability in Syria. In a January 17, 2018 speech, Secretary of State Tillerson noted that ISIS is substantially, but not completely defeated, although it

continues to wage an insurgency that poses a threat to the Syrian people. He highlighted significant gains made in combatting the terrorist organization, including the liberation of Raqqa (ISIS's self-declared capital) and the vast majority of Syrian territory once held by ISIS. Secretary Tillerson highlighted the ''catastrophic state of affairs . . . related to the continued lack of security and legitimate governance in Syria,'' and acknowledged the essential role of a continued U.S. military presence in Syria to cement gains and help bring an end to the civil war.

Secretary Tillerson related that U.S. efforts have helped tens of thousands of Syrian refugees and hundreds of thousands of internally-displaced persons return to their homes. According to the United Nations Office for the Coordination of Humanitarian Affairs, the number of Syrians returning to their homes in 2017 increased from 2016, with 721,000 Syrians returning home in 2017 (655,000 of whom were internally-displaced persons and approximately 66,000 of whom were refugees), compared to 560,000 returning in 2016. However, new displacement and attempts to flee Syria outstripped returns by 3 to 1 in 2017, and the UN has stated that large-scale returns now could have a catastrophic effect given the lack of safe conditions and the availability of basic infrastructure.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that:

The conditions supporting the 2016 redesignation of Syria for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

There continues to be an ongoing armed conflict in Syria and, due to such conflict, requiring the return of Syrian nationals (or aliens having no nationality who last habitually resided in Syria) to Syria would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals (or aliens having no nationality who last habitually resided in Syria) from returning to Syria in safety, and it is not contrary to the national interest of the United States to permit Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

The designation of Syria for TPS should be extended for an 18-month period, from April 1, 2018 through

September 30, 2019. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

## Notice of Extension of the TPS Designation of Syria

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, the conditions that supported Syria's 2016 redesignation for TPS continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of TPS for Syria for 18 months, from April 1, 2018, through September 30, 2019. *See* INA section 244(b)(1)(A), (b)(1)(C); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C).

**Kirstjen M. Nielsen,**
*Secretary.*

## Required Application Forms and Application Fees To Register or Re-register for TPS

To re-register for TPS based on the designation of Syria, you *must* submit an Application for Temporary Protected Status (Form I–821). You do not need to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this Notice.

Through operation of this **Federal Register** notice, your existing EAD issued under the TPS designation of Syria with the expiration date of March 31, 2018, is automatically extended for 180 days, through September 27, 2018. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. However, if you want to obtain a new EAD valid through September 30, 2019, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver). Note, if you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application. But unless you timely re-register and properly file an EAD application in accordance with this Notice, the validity of your current EAD will end on September 27, 2018. You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of

your employment authorization documentation and to ensure that you receive your new EAD by September 27, 2018.

If you are seeking an EAD with your re-registration for TPS, please submit both the Form I–821 and Form I–765 together. If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Note:** If you have a Form I–821 and/or Form I–765 that was still pending as of March 5, 2018, then you do *not* need to file either application again. If your pending TPS application is approved, you will be granted TPS through September 30, 2019. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

## Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Form I–912 or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please see the instructions to Form I–821 or visit the USCIS website at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center (ASC) to have your biometrics captured. In such a case, USCIS will send you an ASC scheduling notice. For additional information on the USCIS biometrics screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

## Re-filing a Re-registration TPS Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive

DHS-AR-000119

a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration application. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you . . . | Mail to . . . |
|---|---|
| Are sending through the U.S. Postal Service. | USCIS, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| Are sending by FedEx, UPS, or DHL. | USCIS, Attn: TPS Syria, 131 S. Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Syria.''

**Employment Authorization Document (EAD)**

*How can I get information on the status of my EAD request?*

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online, available at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 180-day extension of my current EAD through September 27, 2018, using this* **Federal Register** *notice?*

Yes. Provided that you currently have a Syria TPS-based EAD, this **Federal Register** notice automatically extends your EAD by 180 days (through September 27, 2018) if you:

Are a national of Syria (or an alien having no nationality who last habitually resided in Syria); and

Have an EAD with a marked expiration date of March 31, 2018, bearing the notation A–12 or C–19 on the face of the card under Category.

Although this **Federal Register** notice automatically extends your EAD through September 27, 2018, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Form I–9. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional detailed information about Form I–9 on USCIS' I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. If your EAD has an expiration date of March 31, 2018, and states A–12 or C–19 under Category, it has been extended automatically for 180 days by virtue of this **Federal Register** notice and you may choose to present this Notice along with your EAD to your employer as proof of identity and employment eligibility for Form I–9 through September 27, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. If you properly filed for a new EAD in accordance with this Notice, you will also receive Form I–797C, Notice of Action that will state your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may choose to present your EAD to your employer together with this Form I–797C as a List A document that provides evidence of your identity and employment authorization for Form I–9 through September 27, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. See the subsection titled, ''How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?'' for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through September 27, 2018. You may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

DHS-AR-000120

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer will need to ask you about your continued employment authorization no later than before you start work on April 1, 2018. You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. See the subsection titled, ''What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?'' for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through September 27, 2018. Your employer may need to re-inspect your automatically extended EAD to check the expiration date and Category code to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you properly filed your Form I–765 to obtain a new EAD, you will receive a Form I–797C, Notice of Action. Form I–797C will state that your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may present Form I–797C to your employer along with your EAD to confirm that the validity of your EAD has been automatically extended through September 27, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. To reduce the possibility of gaps in your employment authorization documentation, you should file your Form I–765 to request a new EAD as early as possible during the re-registration period.

The last day of the automatic EAD extension is September 27, 2018. Before you start work on September 28, 2018, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

By September 28, 2018, your employer must complete Section 3 of the current version of the form, Form I–9 (version 07/17/17 N), and attach it to the previously completed Form I–9, if your original Form I–9 was a previous version. Your employer can check the USCIS' I–9 Central web page at *http://www.uscis.gov/I-9Central* for the most current version of Form I–9.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 ''Lists of Acceptable Documents'' that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Syrian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before September 28, 2018, you and your employer should do the following:

1. For Section 1, you should:
a. Check ''An alien authorized to work until'' and enter September 27, 2018, the automatically extended EAD expiration date as the ''expiration date, if applicable, mm/dd/yyyy''; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD and other documents from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring it is in category A–12 or C–19 and has a March 31, 2018 expiration date;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert September 27, 2018, the date that is 180 days from the date the current EAD expires.

If you also filed for a new EAD, as proof of the automatic extension of your employment authorization, you may present your expired or expiring EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action showing that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been withdrawn or your request for TPS has been denied, this document combination is considered an unexpired EAD under List A. In these situations, to complete Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring:
It is in category A–12 or C–19; and
The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert September 27, 2018, the date that is 180 days from the date the current EAD expires. Before the start of work on September 28, 2018, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. You may, and your employer should, correct your previously completed Form I–9 as follows:
1. For Section 1, you may:

a. Draw a line through the expiration date in Section 1;

b. Write September 27, 2018, the date that is 180 days from the date your current EAD expires above the previous date (March 31, 2018); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

It is in category A–12 or C–19; and

Has an expiration date of March 31, 2018.

b. Draw a line through the expiration date written in Section 2;

c. Write September 27, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (March 31, 2018); and

d. Initial and date the correction in the Additional Information field in Section 2.

In the alternative, if you properly applied for a new EAD, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this Notice. Your employer should correct your previously completed Form I–9 as follows:

For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

It is in category A–12 or C–19; and

The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Draw a line through the expiration date written in Section 2;

c. Write September 27, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (March 31, 2018); and

d. Initial and date the correction in the Additional Information field in Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By September 28, 2018, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the EAD bearing the expiration date March 31, 2018, or the Form I–797C receipt information provided on Form I–9. In either case, the receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have employees who are TPS beneficiaries who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. This indicates that you should update Form I–9 in accordance with the instructions above. Before such an employee starts to work on September 28, 2018, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). The IER offers language interpretation in numerous

languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I–9Central@dhs.gov.* Calls are accepted in English and Spanish. Translation services in other languages including Arabic are also available upon request. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper

DHS-AR-000122

nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS website at *http://www.dhs.gov/E-verify.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your Application for Temporary Protected Status for this re-registration; and

(4) A copy of your Notice of Action (Form I–797), the notice of approval, for a past or current Application for Temporary Protected Status, if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has

received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save.*

[FR Doc. 2018–04454 Filed 3–1–18; 11:15 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Geological Survey**

**[GX18DK20GUV0300; OMB Control Number 1028–0114]**

**Agency Information Collection Activities; National Ground-Water Monitoring Network Cooperative Funding Application**

**AGENCY:** U.S. Geological Survey, Interior.

**ACTION:** Notice of Information Collection; request for comment.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, the U.S. Geological Survey (USGS) is proposing to renew an information collection (IC).

**DATES:** Interested persons are invited to submit comments on or before May 4, 2018.

**ADDRESSES:** Send your comments on the information collection request (ICR) by mail to the USGS, Information Collections Officer, 12201 Sunrise Valley Drive MS 159, Reston, VA 20192; or by email to *gs-info_collections@usgs.gov.* Please reference OMB Control Number 1028–0114 in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** To request additional information about this ICR, contact Daryll Pope by email at *dpope@usgs.gov,* or by telephone at (609) 771–3933.

**SUPPLEMENTARY INFORMATION:** We, the USGS, in accordance with the Paperwork Reduction Act of 1995, provide the general public and other Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are soliciting comments on the proposed ICR that is described below. We are especially interested in public comment addressing the following issues: (1) Is the collection necessary to the proper functions of the USGS; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the USGS enhance the quality, utility, and clarity of the information to be collected; and (5) how might the USGS minimize the burden of this collection on the respondents, including through the use of information technology.

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you may ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* The USGS is working with the Federal Advisory Committee on Water Information (ACWI) and its Subcommittee on Ground Water (SOGW) to develop and administer a National Ground-Water Monitoring Network (NGWMN). This network is required as part of Public Law 111–11, Subtitle F—Secure Water: Section 9507, 42 U.S.C. 10367, ''Water Data Enhancement by United States Geological Survey.'' The NGWMN will consist of an aggregation of wells from existing Federal, State, Tribal, and local groundwater monitoring networks. To support data providers for the NGWMN, the USGS will be providing funding through cooperative agreements to water-resource agencies that collect groundwater data. The USGS will be soliciting applications for funding that will request information from the Agency collecting the data. Elements will include contact information (phone number and email address), and a proposal describing their proposed work in support of the NGWMN. The proposal will describe the groundwater networks to be included in the NGWMN, the purpose of the networks, and the Principal aquifers that are monitored. Proposals may include work to become a new data provider to the NGWMN, support for maintaining connections to agency databases, and work to enhance NGWMN sites

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2681–21; DHS Docket No. USCIS–2013–0001]

RIN 1615–ZB72

## Extension and Redesignation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Syria for Temporary Protected Status (TPS) for 18 months, from March 31, 2021 through September 30, 2022 and redesignating Syria for 18 months, effective March 31, 2021 through September 30, 2022. The extension allows currently eligible TPS beneficiaries to retain TPS through September 30, 2022, so long as they otherwise continue to meet the eligibility requirements for TPS. The redesignation of Syria allows additional individuals who have been continuously residing in the United States since March 19, 2021 to obtain TPS, if otherwise eligible. Through this notice, DHS also sets forth procedures necessary for Syrian nationals (or noncitizens having no nationality who last habitually resided in Syria) either to re-register under the extension, if they already have TPS, and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS) or to submit an initial registration application under the redesignation and apply for an EAD.

**DATES:** *Extension of Designation of Syria for TPS:* The 18-month extension of the TPS designation of Syria is effective March 31, 2021 and will remain in effect through September 30, 2022. The 60-day re-registration period runs from March 19, 2021 through May 18, 2021. (Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.) *Redesignation of Syria for TPS:* The 18-month redesignation of Syria for TPS is effective March 31, 2021, and will remain in effect through September 30, 2022. The 180-day initial registration period for new applicants under the Syria TPS redesignation runs March 19, 2021 through September 15, 2021.

**FOR FURTHER INFORMATION CONTACT:**
You may contact Maureen Dunn, Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this extension of Syria's TPS designation by selecting ''Syria'' from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this notice, DHS sets forth procedures necessary for eligible nationals of Syria (or noncitizens having no nationality who last habitually resided in Syria) to (1) re-register for TPS and to apply for renewal of their EADs with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under the designation of Syria and whose applications have been granted.

For individuals who have already been granted TPS under Syria's designation, the 60-day re-registration period runs from March 19, 2021 through May 18, 2021. USCIS will issue new EADs with a September 30, 2022 expiration date to eligible Syrian TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire on March 31, 2021. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs previously issued under the TPS designation of Syria for 180 days, through September 27, 2021. Therefore, TPS beneficiaries can show their EADs with: (1) A March 31, 2021 expiration date and (2) an A–12 or C–19 category code as proof of continued employment authorization through September 27, 2021. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Syria TPS application (Form I–821) and/or Application for Employment Authorization (Form I–765) that was still pending as of March 19, 2021 do not need to file either application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through September 30, 2022. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date. There are approximately 6,700 current beneficiaries under Syria's TPS designation.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the 180-day initial registration period that

DHS-AR-000124

runs from March 19, 2021 through September 15, 2021. In addition to demonstrating continuous residence in the United States since March 19, 2021 and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since March 31, 2021, the effective date of this redesignation of Syria, before USCIS may grant them TPS. USCIS estimates that approximately 1,800 individuals are eligible to file initial applications for TPS under the redesignation of Syria.

## What is temporary protected status (TPS)?

TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. Upon return from such authorized travel, TPS beneficiaries retain the same immigration status they had prior to the travel.

○ The granting of TPS does not result in or lead to lawful permanent resident status.

To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)-(2), 8 U.S.C. 1254a(c)(1)-(2).

When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was Syria designated for TPS?

Former Secretary of Homeland Security Janet Napolitano initially designated Syria for TPS on March 29, 2012, based on extraordinary and temporary conditions resulting from the Syrian military's violent suppression of opposition to President Bashar al-Assad's regime that prevented Syrian nationals from safely returning to Syria. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012). Following the initial designation, former Secretaries Napolitano and Jeh Johnson extended and newly designated Syria for TPS three times. In 2016, former Secretary Johnson both extended Syria's designation and newly designated Syria for TPS for 18 months through March 30, 2018. *See Extension and Redesignation of Syria for Temporary Protected Status,* 81 FR 50533 (Aug. 1, 2016). In 2018, former Secretary Kirstjen Nielsen extended Syria's designation for 18 months, through September 30, 2019. *See Extension of the Designation of Syria for Temporary Protected Status,* 83 FR 9329 (March 5, 2018). Most recently, in September 2019, former Acting Secretary Kevin McAleenan again extended Syria's TPS designation for 18 months based on ongoing armed conflict and extraordinary and temporary conditions, but he did not newly designate Syria for TPS at that time. *See Extension of the Designation of Syria for Temporary Protected Status,* 84 FR 49751 (Sep. 23, 2019).

## What authority does the Secretary have to extend the designation of Syria for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. The Secretary, in his/her discretion, may then grant TPS to eligible nationals of that foreign state (or noncitizens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## Why is the Secretary extending and redesignating TPS for Syria through September 30, 2022?

DHS has reviewed conditions in Syria. Based on the review, including input received from other U.S. Government agencies, the Secretary has determined that an 18-month extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions supporting Syria's TPS designation remain.

The protracted civil war continues to contribute to the severe humanitarian crisis in Syria and continues to demonstrate deliberate targeting of civilians, the use of chemical weapons and irregular warfare tactics, and forced conscription and use of child soldiers. The war has resulted in a sustained need for humanitarian assistance, an increase in refugees and displaced people, food insecurity, limited access to water and medical care, and a large-scale destruction of Syria's infrastructure.

As further indication of the deteriorating conditions, on October 8, 2020, President Donald Trump continued for one year the national emergency with respect to Syria declared in Executive Order 13894, citing "the actions by the Government of Turkey to conduct a military offensive into northeast Syria, undermines the campaign to defeat the Islamic State of Iraq and Syria, or ISIS, endangers civilians, and further threatens to undermine the peace, security, and stability in the region, and continues to pose an unusual and extraordinary threat to the national security and foreign policy of the United States."

While the last documented chemical weapons attack by the Syrian government was an attack using chlorine on May 19, 2019 in Latakia province that injured several civilians, in October 2020, United States Ambassador to the UN Kelly Craft stated

DHS-AR-000125

that Syria had breached its obligation under the Chemical Weapons Convention and UN resolutions to dismantle its chemical weapons program.

In addition to chemical weapons, according to the Department of State (DOS), the regime also frequently employed prohibited cluster munitions and barrel bombs. Per DOS, the Syrian Network for Human Rights [2] documented at least 3,420 barrel bombs dropped by Russian and Syrian helicopters and airplanes on Idlib between April and September of 2019, often striking civilians and civilian infrastructure, including homes, medical facilities, and schools. In the last weeks of December 2020, the regime's forces dropped barrel bombs in Maaret al-Norman, resulting in the deaths of a child and a White Helmets humanitarian volunteer.

DOS reported that in late 2019, regime and pro-regime forces attacked civilians in hospitals, residential areas, schools, and settlements for IDPs and refugee camps; these attacks included bombardment with barrel bombs in addition to the use of chemical weapons. These forces used the massacre of civilians, as well as their forced displacement, rape, starvation, and protracted sieges that occasionally forced local surrenders, as military tactics. In late 2019, ISIS members in Syria continued to plot or inspire external terrorist operations, also according to DOS.

According to the UN Independent International Commission of Inquiry on the Syrian Arab Republic, Syrian Government troops ''carried out air and ground attacks which decimated civilian infrastructure, depopulated towns and villages,'' killing hundreds of women, men and children'' between November of 2019 and June of 2020. In a press release related to the report, Commission Chair Paulo Pinheiro stated that, ''Children were shelled at school, parents were shelled at the market, patients were shelled at the hospital. . .entire families were bombarded even while fleeing. What is clear from the military campaign is that pro-government forces and UN-designated terrorists flagrantly violated the laws of war and the rights of Syrian civilians.''

According to the Internal Displacement Monitoring Center,[3] Syria

has the highest number of Internally Displaced Persons in the world, seeing 1.8 million new displacements in 2019, and an additional 1.5 million new displacements in the first half of 2020, mostly as a result of the regime's military offensives in the northeast and northwest areas of the country. In 2020, USAID reported 6.6 million people are internally displaced within Syria, an increase of 400,000 from USAID's 2019 reports. In 2020, UNHCR registered 5,580,396 Syrian refugees in neighboring countries, representing an increase of approximately 10,000 refugees from 5,570,382 Syrian refugees in neighboring countries in 2019. As of September 2020, the United States Agency for International Development (USAID) reported 11.1 million people in Syria were in need of humanitarian assistance (a reduction from 11.7 million people in 2019).

In September 2020, the UN World Food Programme (WFP) estimated that 9.3 million people in Syria are food insecure, the highest number ever recorded, as the conflict persists and ''the overall food security situation is deteriorating across the country.'' USAID reported that ''inflation, high food prices, and the worst drought in 30 years—that killed high numbers of livestock and drastically reduced crop yields in 2018—have also contributed to food assistance needs across Syria in 2019.'' The COVID–19 pandemic in 2020 has also exacerbated food insecurity. In the summer of 2020, the head of the WFP assessed that, ''Syria faces the risk of mass starvation or another mass exodus unless more aid money is made available.''

DOS says that, according to the UN Office for the Coordination of Humanitarian Affairs (UNOCHA), half of all health facilities were closed or partially functioning, and the conflict had killed hundreds of healthcare workers.

According to the World Bank, the conflict in Syria has continued to devastate the Syrian economy. A lack of sustained access to health care, education, housing, and food have exacerbated the effects of the conflict and pushed millions of people into unemployment and poverty.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that:

The conditions supporting Syria's designation for TPS continue to be met.

*See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

There continues to be an ongoing armed conflict in Syria and, due to such conflict, requiring the return to Syria of Syrian nationals (or noncitizens having no nationality who last habitually resided in Syria) would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals (or noncitizens having no nationality who last habitually resided in Syria) from returning to Syria in safety, and it is not contrary to the national interest of the United States to permit Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

There are extraordinary and temporary conditions in Syria that prevent Syrian nationals (or noncitizens having no nationality who last habitually resided in Syria), who have arrived in the United States since Syria's 2016 TPS designation from returning to Syria in safety.

The designation of Syria for TPS should be extended for an 18-month period, from March 31, 2021 through September 30, 2022. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

The designation of Syria for TPS should be redesignated for an 18-month period, from March 31, 2021 through September 30, 2022. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of Extension of the TPS Designation and Redesignation of Syria for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, the conditions supporting Syria's designation for TPS continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am simultaneously extending the existing designation of TPS for Syria for 18 months, from March 31, 2021 through September 30, 2022 and redesignating Syria for TPS for the same 18-month period. *See* INA section 244(b)(1)(A),

---

[2] The Syrian Network for Human Rights is ''an independent, neutral, non-governmental, non-profit human rights organization'' which documents human rights violations in Syria. *https://sn4hr.org/*.

[3] The Internal Displacement Monitoring Center is a non-profit organization that ''provides data and

analysis and supports partners to identify and implement solutions to internal displacement.'' *https://www.internal-displacement.org/*.

DHS-AR-000126

(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

### Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS based on the designation of Syria, you *must* submit an Application for Temporary Protected Status (Form I–821). If you are filing an initial application, you must pay the fee for the Application for Temporary Protected Status (Form I–821) or request a fee waiver. If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Through this **Federal Register** notice, your existing EAD issued under the TPS designation of Syria with the expiration date of March 31, 2021, is automatically extended for 180 days, through September 27, 2021. Although not required to do so, if you want to obtain a new EAD valid through September 30, 2022, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or submit a Request for a Fee Waiver (Form I–912)). If you do not want a new EAD, you do not have to file Form I–765 and pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

If you have a Form I–821 and/or Form I–765 that was still pending as of March 19, 2021, then you do not need to file either application again. If USCIS approves your pending TPS application, USCIS will grant you TPS through September 30, 2022. Similarly, if USCIS approves your pending TPS-related Form I–765, it will be valid through the same date. If you are applying for initial registration and want an EAD, you must file and pay the fee for the Application for Employment Authorization (Form I–765).

You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation and to ensure that you receive your new EAD by September 27, 2021.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

### Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy*.

### Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps*. Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration application. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

### Mailing Information

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you would like to send your application by: | Then, mail your application to: |
| --- | --- |
| U.S. Postal Service ........ | U.S. Citizenship and Immigration Services, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| FedEx, UPS, or DHL ...... | U.S. Citizenship and Immigration Services, Attn: TPS Syria, 131 S Dearborn Street—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

### Supporting Documents

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Syria.''

### Employment Authorization Document (EAD)

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

DHS-AR-000127

**Am I eligible to receive an automatic 180-day extension of my current EAD through September 27, 2021 using this *Federal Register* Notice?**

Yes. Regardless of your country of birth, provided that you currently have a Syria TPS-based EAD with a marked expiration date of March 31, 2021, bearing the notation A–12 or C–19 on the face of the card under Category, this notice automatically extends your EAD through September 27, 2021.

Although this **Federal Register** notice automatically extends your EAD through September 27, 2021 you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?*

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for further information. If your EAD has an expiration date of March 31, 2021 and states A–12 or C–19 under Category, it has been extended automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through September 27, 2021, unless your TPS

has been withdrawn or your request for TPS has been denied. See the subsection titled, "How do my employer and I complete the Form I–9 using my automatically extended EAD for a new job?" for further information.

As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expiration date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section "What updates should my current employer make to Form I–9 if my EAD has been automatically extended?" of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through September 27, 2021.The last day of the automatic EAD extension is September 27, 2021. Before you start work on September 28, 2021, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Syrian citizenship or a Form I–797C showing I re-registered for TPS?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents

that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Syrian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that has been automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and relates to you. Refer to the Note to Employees section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete the Form I–9 using my automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before September 28, 2021, for Section 1, you should:

a. Check "An alien authorized to work until" and enter September 27, 2021 as the "expiration date"; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a Card Expires date of March 31, 2021;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write September 27, 2021, as the expiration date.

Before the start of work on September 28, 2021, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What updates should my current employer make to Form I–9 if my EAD has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current

EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a Card Expires date of March 31, 2021.

If your employer determines that your EAD has been automatically extended, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and September 27, 2021 as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By September 28, 2021, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E–Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E–Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E–Verify.

*If I am an employer enrolled in E–Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E–Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on September 28, 2021, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E–Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification

rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E–Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E–Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E–Verify who receive an E–Verify case result of Tentative Nonconfirmation (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E–Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E–Verify. A Final Nonconfirmation (FNC) case result is received when E–Verify cannot verify an employee's

employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E–Verify-related discrimination or to report an employer for discrimination in the E–Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E–Verify procedures is available on the IER website at *https://www.justice.gov/ier* and on the USCIS and E–Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, TPS beneficiaries presenting an EAD referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action, to prove that they qualify for this extension. However, while Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

Your current EAD;

A copy of your Form I–797C, Notice of Action, for your Form I–765;

A copy of your Form I–797C, Notice of Action, for your Form I–821 for this re-registration;

A copy of your Form I–797, the notice of approval, for a past or current Form I–821, if you received one from USCIS; or

Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency

DHS-AR-000129

will accept. Some benefit-granting agencies use USCIS' Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended EAD. You should:

a. Present the agency with a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the SAVE response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records. More information can be found on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–05715 Filed 3–18–21; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7039–N–03; OMB Control No.: 2501–0019]**

### 60-Day Notice of Proposed Information: Semi-Annual Labor Standards Enforcement Report Local Contracting Agencies (HUD Programs)

**AGENCY:** Field Policy and Management, Office of Davis Bacon and Labor Standards, HUD.

**ACTION:** Notice.

---

**SUMMARY:** HUD is seeking approval for the proposed information collection requirement described below and will be submitting to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date:* May 18, 2021.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Saundra A. Green, Administrative Officer, Office of Field Policy and Management, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410, Room 7108 or the number (202–402–5537) this is not a toll free number or email at *Saundra.A.Green@hud.gov* or a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number though TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410, telephone (202) 402–3400 (this is not a toll free number) or email Colette Pollard at *Colette.Pollard@hud.gov* for copies of the proposed forms and other available information. Persons with hearing or speech impairments may access this number though TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:** The Department is submitting the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35, as amended). This Notice is soliciting comments from members of the public and affected agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

This Notice also lists the following information:

*Title:* Semi-Annual Labor Standards Enforcement Report Local Contracting agencies (HUD Programs).

*OMB Control Number, if applicable:* 2501–0019.

*Description of the need for the information and proposed use:* The Department of Labor (DOL) Regulations 29 CFR 5.7(b), requires Federal agencies administering programs subject to Davis-Bacon and Related Act (DBRA) and Contract Work Hours and Safety Standards Act (CWHSSA) labor standards to furnish a Semi-Annual Labor Standards Enforcement Report to the Administrator of the Wage and Hour Division. Some HUD programs are administered by state and local agencies for the labor standards compliance. HUD must collect information from such agencies in order to capture enforcement activities for all HUD programs in its reports to DOL.

*Agency form numbers, if applicable:* HUD FORM 4710, 4710i.

*Estimation of the total numbers of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:*

| Information collection | Number of respondents | Frequency of response | Responses per annum | Burden hour per response | Annual burden hours | Hourly cost per response | Annual cost |
|---|---|---|---|---|---|---|---|
| HUD 4710 Semi-annual Labor Standards Enforcement Report—Local Contracting Agencies ................................................... | 4,870 | 2 | 9,740 | 2.5 | 24,350 | 37.34 | 909,229 |

DHS-AR-000130

authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2022–16469 Filed 7–29–22; 8:45 am]
**BILLING CODE 9111–28–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2681–21; DHS Docket No. USCIS–2013–0001]**

**RIN 1615–ZB72**

### Extension and Redesignation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Syria for Temporary Protected Status (TPS) for 18 months, effective October 1, 2022, through March 31, 2024. This extension allows existing TPS beneficiaries to retain TPS through March 31, 2024, so long as they otherwise continue to meet

the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through March 31, 2024, must re-register during the 60-day re-registration period described in this notice. The Secretary is also redesignating Syria for TPS. The redesignation of Syria allows additional Syrian nationals (and individuals having no nationality who last habitually resided in Syria) who have been continuously residing in the United States since July 28, 2022 to apply for TPS for the first time during the initial registration period described under the redesignation information in this notice. In addition to demonstrating continuous residence in the United States since July 28, 2022 and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since October 1, 2022, the effective date of this redesignation of Syria for TPS.

**DATES:**

*Extension of Designation of Syria for TPS:* The 18-month extension of Syria's designation for TPS is effective on October 1, 2022, and will remain in effect for 18 months, through March 31, 2024. The extension impacts existing beneficiaries of TPS.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from August 1, 2022through September 30, 2022. (Note: It is important for re-registrants to timely re-register during the registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying reregistration could result in gaps in their employment authorization documentation.)

*Redesignation of Syria for TPS:* The 18-month redesignation of Syria for TPS is effective on October 1, 2022, and will remain in effect for 18 months, through March 31, 2024. The redesignation impacts potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Syria TPS redesignation begins on August 1, 2022 and will remain in effect through March 31, 2024.

**FOR FURTHER INFORMATION CONTACT:** You may contact Renā Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

MD 20746, or by phone at 800–375–5283.

For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about Syria's TPS designation by selecting ''Syria'' from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Syria (or individuals having no nationality who last habitually resided in Syria) to (1) re-register for TPS and

DHS-AR-000131

**Federal Register** / Vol. 87, No. 146 / Monday, August 1, 2022 / Notices

to apply for renewal of their EADs with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under a prior designation of Syria and whose applications have been granted. Failure to re-register properly may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Syria's designation, the 60-day re-registration period runs from August 1, 2022 through September 30, 2022. USCIS will issue new EADs with a March 31, 2024 expiration date to eligible Syrian TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain EADs previously issued under the TPS designation of Syria through September 30, 2023. Therefore, as proof of continued employment authorization through September 30, 2023, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 30, 2022, March 31, 2021, September 30, 2019, or March 31, 2018. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Syria TPS application (Form I–821) and/or Application for Employment Authorization (Form I–765) that was still pending as of August 1, 2022 do not need to file either application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through March 31, 2024. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date. There are currently approximately 6,448 beneficiaries under Syria's TPS designation.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from August 1, 2022 and runs through the full length of the redesignation period

ending March 31, 2024.[1] In addition to demonstrating continuous residence in the United States since July 28, 2022 and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since October 1, 2022,[2] the effective date of this redesignation of Syria, before USCIS may grant them TPS. DHS estimates that approximately 960 individuals may become newly eligible for TPS under the redesignation of Syria.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work so long as they continue to meet the requirements of TPS. They may apply

for and receive EADs as evidence of employment authorization.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was Syria designated for TPS?

Syria was initially designated on the basis of extraordinary and temporary conditions that prevented nationals of Syria from returning in safety. *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012). Following the initial designation, TPS for Syria was extended and newly designated three times: (1) from October 1, 2013, to March 31, 2015, based on ongoing armed conflict and extraordinary and temporary conditions;[3] (2) from April 1, 2015, to September 30, 2016, based on ongoing armed conflict and extraordinary and temporary conditions;[4] and (3) from October 1, 2016, to March 31, 2018, based on ongoing armed conflict and extraordinary and temporary conditions.[5] Thereafter, TPS for Syria was extended from April 1, 2018, to September 30, 2019, based on ongoing armed conflict and extraordinary and temporary conditions[6] and October 1, 2019, to March 31, 2021, based on ongoing armed conflict and extraordinary and temporary conditions.[7] Most recently, TPS for Syria was extended and redesignated

---

[1] In general, individuals must be given an initial registration period of no less than 180 days to register for TPS, but the Secretary has discretion to provide for a longer registration period. *See* 8 U.S.C. 1254a(c)(1)(A)(iv). In keeping with the humanitarian purpose of TPS and advancing the goal of ensuring ''the Federal Government eliminates . . . barriers that prevent immigrants from accessing government services available to them'' under *Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021), the Secretary has recently exercised his discretion to provide for TPS initial registration periods that coincide with the full period of a TPS country's initial designation or redesignation. *See, e.g., Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021) (providing 18-mos. registration period under new TPS designation of Haiti); *Extension of Initial Registration Periods for New Temporary Protected Status Applicants Under the Designations for Venezuela, Syria and Burma; Correction to the Notice on the Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 41986 (Aug. 4, 2021) (extending initial registration periods from 180 days to 18 months for the three applicable countries)). For the same reasons, the Secretary is similarly exercising his discretion to provide applicants under this TPS designation of Syria with an 18-month initial registration period.

[2] The ''continuous physical presence date'' (CPP) is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or such later date as the Secretary may establish. The ''continuous residence date'' (CR) is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA § 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (discussing CR and CPP date requirements).

[3] *See* Extension and Redesignation of Syria for Temporary Protected Status, 78 FR 36223 (June 16, 2013).

[4] *See* Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 80 FR 245, (Jan. 4, 2015).

[5] *See* Extension and Redesignation of Syria for Temporary Protected Status, 81 FR 50533, (Jul. 31, 2016)

[6] *See* Extension of the Designation of Syria for Temporary Protected Status, 83 FR 9329, (Mar. 4, 2018).

[7] *See* Extension of the Designation of Syria for Temporary Protected Status, 84 FR 49751, (Sep. 22, 2019)

DHS-AR-000132

**46984**    **Federal Register** / Vol. 87, No. 146 / Monday, August 1, 2022 / Notices

from March 31, 2021, to September 30, 2022, based on ongoing armed conflict and extraordinary and temporary conditions.[8]

**What authority does the Secretary have to extend the designation of Syria for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[9] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[10] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**What is the Secretary's authority to redesignate Syria for TPS?**

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* section 244(b)(1) of the Act, 8 U.S.C. 1254a(b)(1); *see also* section 244(c)(1)(A)(i) of the Act, 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of the most recent designation of the state").

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* section 244(c)(1)(A)(ii) of the Act, 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Syria will be July 28, 2022. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since October 1, 2022, which is the effective date of the Secretary's redesignation, of Syria. *See* section 244(c)(1)(A)(i) of the Act, 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination of whether the applicant has met the "continuous physical presence" requirement cannot be made until October 1, 2022, the effective date of this redesignation for Syria. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Syria and simultaneously redesignating Syria for TPS through March 31, 2024?**

DHS has reviewed country conditions in Syria. Based on the review, including input received from the Department of State (DOS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions supporting Syria's TPS designation remain. The Secretary has further determined that the conditions support redesignating Syria for TPS under section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) of the Act and is changing the "continuous residence" and "continuous physical presence" dates that applicants must meet to be eligible for TPS.

*Overview*

DHS has conducted a thorough review of country conditions in Syria. The ongoing civil war has resulted in large-scale destruction of infrastructure, mass displacement of civilians, high levels of food insecurity, limited access to water and medical care, and widespread civilian casualties. These impacts have been compounded by the COVID–19 pandemic which has contributed to the further breakdown of the economy and strained an already overburdened healthcare system.

The United Nations (UN) has verified that at least 350,209 identified civilians and combatants were killed between March 2011 and March 2021, including 26,727 women and 27,126 children, but it has warned that this figure "indicates a minimum verifiable number" and is an "undercount of the actual number."[11] The Syrian Observatory for Human Rights (SOHR), a UK-based monitoring group with a network of sources on the ground, had documented the deaths of 494,438 people as of June 2021 and said that at least 159,774 civilians had been killed.[12] The group estimated that the actual toll from the war was more than 606,000, saying 47,000 civilians were believed to have died of torture in government-run prisons.[13] Another monitoring group, the Violations Documentation Center, which relies on information from

---

[8] *See* Extension and Redesignation of Syria for Temporary Protected Status, 86 FR 14946, (Mar. 18, 2021).

[9] INA § 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at § 244(b)(1).

[10] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

[11] This count includes "only those people identifiable by full name, with an established date of death, and who died in an identified governorate" and was sourced from OHCHR's own data, records maintained by civil society organizations, and information from the Syrian government. UNOHCR, "Oral update on the extent of conflict-related deaths in the Syrian Arab Republic | OHCHR" (September 24, 2021), *https:// www.ohchr.org/en/statements/2021/09/oral-update-extent-conflict-related-deaths-syrian-arab-republic?LangID=E&NewsID=27531.*

[12] SOHR, "Total death toll | Over 606,000 people killed across Syria since the beginning of the "Syrian Revolution", including 495,000 documented by SOHR (June 1, 2021), *https:// www.syriahr.com/en/217360/.*

[13] SOHR, "Total death toll | Over 606,000 people killed across Syria since the beginning of the "Syrian Revolution", including 495,000 documented by SOHR (June 1, 2021), *https:// www.syriahr.com/en/217360/.*

**Federal Register** / Vol. 87, No. 146 / Monday, August 1, 2022 / Notices    **46985**

activists across the country, had documented 239,251 battle-related deaths, including 145,240 civilians, as of June 2022.[14] Additionally, the ongoing military operations have injured more than 2.1 million Syrian civilians with varying injuries, wounds, and permanent disabilities.[15]

Eleven years of war have inflicted immense suffering on the Syrian people. More than half of Syria's pre-war population of 22 million have either fled the country or are displaced within its borders.[16] Syria remains the world's largest displacement crisis.[17] The number of Syrian IDPs to date is approximately 7 million people.[18]

Harm to civilians has been widespread, but the magnitude of violence has varied greatly by location. Parties to the Syrian conflict killed 1,271 civilians in 2021, including 299 children and 134 women.[19] Both government and opposition forces reportedly engage in indiscriminate attacks through the use of airstrikes, explosives, snipers, and rocket and mortar attacks, killing thousands and leaving many without the means or ability to escape the violence.[20] Since 2021, cities as far north as Idlib, and as far south as Daraa have seen heavy civilian casualties as well as damage to civilian objects.[21]

Multiple actors in the conflict have been accused of targeting civilians and civilian facilities. In January 2022, Russia conducted airstrikes on the Al Arshani Water Pump Station located west of Idlib city, injuring at least one station worker, causing substantial damage to the station's buildings and equipment, and forcing the station's main water pumping pipe temporarily out of service.[22] In February 2022, there were at least six incidents of attacks impacting vital civilian facilities, among them, a school, two markets, a park, and a livestock farm.[23] In April 2022, ISIS claimed responsibility for an attack on civilians gathering for an iftar meal during Ramadan, killing seven people and wounding four.[24] Also in April 2022, Syrian government forces shelled a village in north Idlib countryside, killing at least three students on their way to school.[25] According to the Syrian Civil Defense, Russian and Syrian forces and allied militias have launched 130 air and artillery attacks on northwestern Syria during the first quarter of 2022.[26] These attacks struck civilian homes, public buildings, and service facilities, killing[47] people and wounding more than 100 others.[27]

Mandatory military service has been the law in Syria since 2007.[28] Men from the ages of 18 to 42 are required to serve, and women may enlist voluntarily.[29] Conscripts are required to serve for 18 to 21 months, depending on their level of education.[30] Syria has intermittently declared amnesties for military service evaders to encourage returns, however, "returnees have found themselves back on conscription lists in as little as seven days, after the government exploited a loophole in the decree," thereby rendering the amnesty provisions meaningless.[31] In February 2021, the Syrian regime announced an amendment to the military conscription laws. Under the amended law, those who did not do military service before the age of 43 must pay $8,000, or lose their property without notice or any right to appeal.[32]

The Syrian Democratic Forces and other entities in Syria have also been accused of forced conscription: "[The Syrian Network for Human Rights (SNHR)] . . . recorded Syrian Democratic Forces kidnapping two children [in January 2022] with the aim of taking them to its training and recruitment camps and forcibly conscripting them . . ." [33] Further, compulsory recruitment under the "Law on Mandatory Self-Defense Duty" was first introduced in 2014 and is confined to the areas of northern and eastern Syria under the control of the Kurdish-led Autonomous Administration.[34] Under this law, conscription is mandatory for all male residents, both Syrian nationals and stateless Kurds, after reaching 18 years old. Syrians from other parts of the country who have resided in the area longer than five years are obligated to join as well.[35]

Syrian children have suffered disproportionately since the start of the conflict. At least 29,661 children have been killed in Syria since March 2011, including 181 due to torture, in addition to 5,036 arrested or forcibly disappeared children.[36] The SNHR estimates that

[14] Violation Documentation Center, "Monthly statistical on casualties in Syria, June 2022" (June 2022), *https://scm.bz/en/violations-watch/monthly-statistical-on-casualities-in-syria-june-2022.*

[15] SOHR, "Total death toll | Over 606,000 people killed across Syria since the beginning of the "Syrian Revolution", including 495,000 documented by SOHR (June 1, 2021), *https://www.syriahr.com/en/217360/.*

[16] UNHCR, "Eleven years on, mounting challenges push many displaced Syrians to the brink" (March 15, 2022), *https://www.unhcr.org/en-us/news/briefing/2022/3/623055174/eleven-years-mounting-challenges-push-displaced-syrians-brink.html.*

[17] UNHCR, "Eleven years on, mounting challenges push many displaced Syrians to the brink" (Mar 15, 2022), *https://www.unhcr.org/en-us/news/briefing/2022/3/623055174/eleven-years-mounting-challenges-push-displaced-syrians-brink.html.*

[18] USAID, "Syria—Complex Emergency Fact Sheet #4, Fiscal Year (FY) 2022" (Mar 4, 2022), *https://reliefweb.int/report/syrian-arab-republic/syria-complex-emergency-fact-sheet-4-fiscal-year-fy-2022.*

[19] Syrian Network for Human Rights, "Eleventh Annual Report: The Most Notable Human Rights Violations in Syria in 2021" (Jan 21, 2022), *https://snhr.org/wp-content/pdf/english/Eleventh_Annual_Report_The_Most_Notable_Human_Rights_Violations_in_Syria_in_2021_en.pdf.*

[20] Human Rights Watch, "Syria: Events of 2021" (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[21] Human Rights Watch, "Syria: Events of 2021" (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[22] Syrian Archive, "Airstrikes on the Al Arshani Water Pump Station in Idlib" (February 14, 2022), *https://syrianarchive.org/en/investigations/arshani.*

[23] Syrian Network for Human Rights, "The Most Notable Human Rights Violations in Syria in February 2022," (Mar. 4, 2022), *https://snhr.org/wp-content/uploads/2022/03/M220303E.pdf.*

[24] Syrian Observatory for Human Rights, "SOHR: Daesh kills 7 Syrians at Ramadan iftar meal" (Apr 29, 2022), *https://www.syriahr.com/en/249367/.*

[25] Syrian Observatory for Human Rights, "Regime offensive | Three students killed in regime rocket attack on area in Idlib countryside" (Apr 4, 2022), *https://www.syriahr.com/en/245693/.*

[26] Euro-Med Monitor, "Killing 4 children in Syrian regime bombardment may amount to war crime" (Apr 5, 2022), *https://reliefweb.int/report/syrian-arab-republic/killing-4-children-syrian-regime-bombardment-may-amount-war-crime-enar.*

[27] Euro-Med Monitor, "Killing 4 children in Syrian regime bombardment may amount to war crime," (April 6, 2022), *https://reliefweb.int/report/syrian-arab-republic/killing-4-children-syrian-regime-bombardment-may-amount-war-crime-enar.*

[28] The Tahrir Institute for Middle East Policy, "TIMEP Brief: Conscription Law" (Aug 22, 2019), *https://timep.org/reports-briefings/timep-brief-conscription-law/.*

[29] The Tahrir Institute for Middle East Policy, "TIMEP Brief: Conscription Law" (Aug 22, 2019), *https://timep.org/reports-briefings/timep-brief-conscription-law/.*

[30] The Tahrir Institute for Middle East Policy, "TIMEP Brief: Conscription Law" (Aug 22, 2019), *https://timep.org/reports-briefings/timep-brief-conscription-law/.*

[31] Human Rights Watch, "Our Lives are Like Death" (Oct. 2021), *https://www.hrw.org/sites/default/files/media_2021/10/syria1021_web.pdf.*

[32] Human Rights Watch, "Syrian 'Military Evaders' Face Unlawful Seizure of Property, Assets" (Feb 9, 2021), *https://www.hrw.org/news/2021/02/09/syrian-military-evaders-face-unlawful-seizure-property-assets.*

[33] Syrian Network for Human Rights, "143 Arbitrary Arrests/Detentions Documented in Syria in January 2022," including 2 children, (Feb. 2, 2022), *https://snhr.org/wp-content/pdf/english/143_Arbitrary_Arrests_Detentions_Documented_in_Syria_in_January_2022_Including_Two_Children_en.pdf.*

[34] European Union Agency for Asylum, "Persons fearing forced or child recruitment by Kurdish forces," (last updated Sept. 2020), *https://euaa.europa.eu/country-guidance-syria/26-persons-fearing-forced-or-child-recruitment-kurdish-forces.*

[35] European Union Agency for Asylum, "Persons fearing forced or child recruitment by Kurdish forces," (last updated Sept. 2020), *https://euaa.europa.eu/country-guidance-syria/26-persons-fearing-forced-or-child-recruitment-kurdish-forces.*

[36] Syrian Network for Human Rights (SNHR). "On World Children's Day; Tenth Annual Report on Violations against Children in Syria" (Nov. 20, 2021), *https://reliefweb.int/report/syrian-arab-*

Continued

there are at least 1,374 children currently serving in the Syrian regime forces.[37] Other actors in the conflict are also accused of engaging in forced conscription of children. These include: Hay'at Tahrir al Sham, Syrian Democratic Forces, factions of the Syrian National Army (SNA), Al-Nusra Front, ISIS, as well as Iranian militias or militias supported by Iran.[38] According to the United Nations High Commissioner for Refugees (UNHCR), there are currently at least 2.5 million displaced children in Syria.[39] The United Nations Children's Fund (UNICEF) reported 6.5 million children in need of humanitarian assistance in a March 2022 report.[40]

Human rights abuses continue to be rampant in Syria. One report cites 2,218 cases of arbitrary arrest or detention, including 85 children and 77 women, committed by parties to the conflict and controlling forces in 2021, almost half of which were attributed to the Assad regime.[41] The same report notes that at least 104 individuals were documented as dying as a result of torture in 2021 at the hands of Syrian regime forces, Syrian Democratic Forces, Hay'at Tahrir al Sham, factions of the Syrian National Army as well as other parties to the conflict.[42] Furthermore, individuals returning to Syria have reported that the Syrian government or its affiliated militias subjected them or their family members to arbitrary arrest or detention, torture and other cruel, inhuman or degrading treatment, kidnappings, and extrajudicial killings after their return to Syria.[43] Human Rights Watch has reported ''21 cases of arrest and arbitrary detention . . .'' 13 cases of torture, 3 kidnappings, 5 extrajudicial killings, and 17 enforced disappearances between 2017 and 2021 among refugees who had returned to Syria from Jordan and Lebanon.''[44]

After 11 years of conflict, Syria's healthcare system has suffered gravely. As of March 2022, Physicians for Human Rights has documented and verified 601 attacks hitting at least 350 health facilities since the start of the conflict.[45] A January 2022 report states that more than 50% of healthcare workers are estimated to have left the country in the last decade.[46] Out of the almost 1,800 available public health centers, 45% were not fully functioning as of September 2021, at a time when the Syrian people needed them the most amidst the COVID–19 pandemic.[47] Seven medical personnel were killed in Syria in 2021 at the hands of parties to the conflict and controlling forces in Syria.[48] The COVID–19 pandemic has further exacerbated shortcomings in an already weakened healthcare system. The UN identifies Syria as one of the countries in the Middle East most severely affected by the COVID–19 pandemic, particularly as low vaccine availability, vaccine hesitancy, infections among frontline health workers, high transmission rates in IDP camps, oxygen supply shortages, inadequate testing materials, and limited cold chain and technical capacity hamper infection prevention, monitoring, and response efforts.[49] As of March 2022, 11.4% of the total population had received at least one dose of the COVID–19 vaccine, and only 6.6% were fully vaccinated.[50]

According to the World Food Program (WFP), at least 12.4 million Syrians, out of an estimated population of 16 million, are food insecure.[51] This 2021 estimate reflects an increase of 3.1 million food insecure people in one year.[52] Moreover, according to the same report, more than 600,000 children are chronically malnourished.[53] The United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) reports that routine shortages in basic goods, including bread and fuel, have become commonplace and the number of people in need of humanitarian assistance increased by 21% in 2021—reaching a total of 13.4 million people, with 1.48 million in ''catastrophic'' need.[54] The price of the national food basket[55] increased by 24% from February to March 2022, the greatest monthly increase and the highest price recorded since tracking began in 2013.[56]

In 2021, Syria was impacted by several climate and natural resource-related shocks. Erratic rainfall as well as historically low water levels in the Euphrates River have reduced access to water for drinking and domestic use for over five million people.[57] In addition,

[37] Syrian Network for Human Rights (SNHR). ''On World Children's Day; Tenth Annual Report on Violations against Children in Syria'' (Nov. 20, 2021), *https://reliefweb.int/report/syrian-arab-republic/world-children-s-day-tenth-annual-report-violations-against-children.*

[38] Syrian Network for Human Rights (SNHR). ''On World Children's Day; Tenth Annual Report on Violations against Children in Syria'' (Nov. 20, 2021), *https://reliefweb.int/report/syrian-arab-republic/world-children-s-day-tenth-annual-report-violations-against-children.*

[40] UNICEF, ''Whole of Syria Humanitarian Situation Report: March 2022,'' (May 15, 2022), *https://reliefweb.int/report/syrian-arab-republic/unicef-whole-syria-humanitarian-situation-report-march-2022.*

[41] Syrian Network for Human Rights, ''Eleventh Annual Report: The Most Notable Human Rights Violations in Syria in 2021'' (Jan 21, 2022), *https://snhr.org/wp-content/pdf/english/Eleventh_Annual_Report_The_Most_Notable_Human_Rights_Violations_in_Syria_in_2021_en.pdf.*

[42] Syrian Network for Human Rights, ''Eleventh Annual Report: The Most Notable Human Rights Violations in Syria in 2021'' (Jan 21, 2022), *https://snhr.org/wp-content/pdf/english/Eleventh_Annual_Report_The_Most_Notable_Human_Rights_Violations_in_Syria_in_2021_en.pdf.*

[43] Human Rights Watch. ''Our Lives are Like Death'' (Oct. 2021), *https://www.hrw.org/sites/default/files/media_2021/10/syria1021_web.pdf.*

[44] Human Rights Watch, ''Syria: Events of 2021'' (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[45] International Rescue Committee, ''11 years of violence against health care in Syria'' (Mar 31, 2022), *https://www.rescue.org/resource/11-years-violence-against-health-care-syria.*

[46] UNOCHA, ''Situation Report #35: Recent Developments in Northwest Syria and RAATA'' (Jan 2022), *https://www.humanitarianresponse.info/en/operations/stima/document/situation-report-35-recent-developments-northwest-syria-and-raata-january.*

[47] International Rescue Committee, ''11 years of violence against health care in Syria'' (Mar 31, 2022), *https://www.rescue.org/resource/11-years-violence-against-health-care-syria.*

[48] Syrian Network for Human Rights, ''Eleventh Annual Report: The Most Notable Human Rights Violations in Syria in 2021'' (Jan 21, 2022), *https://snhr.org/wp-content/pdf/english/Eleventh_Annual_Report_The_Most_Notable_Human_Rights_Violations_in_Syria_in_2021_en.pdf.*

[49] USAID, ''Syria—Complex Emergency Fact Sheet #4, Fiscal Year (FY) 2022'' (Mar 4, 2022), *https://reliefweb.int/report/syrian-arab-republic/syria-complex-emergency-fact-sheet-4-fiscal-year-fy-2022.*

[50] World Health Organization, ''Monthly COVID–19 Bulletin: March 2022,'' (Mar. 26, 2022), *https://reliefweb.int/sites/reliefweb.int/files/resources/monthly_covid-19_bulletin-march_2022.pdf.*

[51] Human Rights Watch, ''Syria: Events of 2021'' (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[52] Human Rights Watch, ''Syria: Events of 2021'' (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[53] Human Rights Watch, ''Syria: Events of 2021'' (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[54] Human Rights Watch, ''Syria: Events of 2021'' (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[55] The UN's Food and Agriculture Organization (FAO) issues a monthly food price index, a measure of change in international prices of a basket of food commodities. *See* United Nations, ''Global Issues: Food'' (last visited 6/27/2022), *https://www.un.org/en/global-issues/food.* A national food basket is a group of essential food commodities. In Syria, the food basket is set at a group of dry goods providing 2,060 kcal a day for a family of five during a month. The basket includes 37 kg bread, 19 kg rice, 19 kg lentils, 5 kg of sugar, and 7 liters of vegetable oil. *See* World Food Program, ''Syria Country Office Market Price Watch Bulletin Issue 88, March 2022, (Apr. 27, 2022), *https://reliefweb.int/report/syrian-arab-republic/syria-country-office-market-price-watch-bulletin-issue-88-march-2022.*

[56] UNICEF, ''Whole of Syria Humanitarian Situation Report: March 2022,'' (May 15, 2022), *https://reliefweb.int/report/syrian-arab-republic/unicef-whole-syria-humanitarian-situation-report-march-2022.*

[57] UNOCHA, ''2022 Humanitarian Needs Overview: Syrian Arab Republic'' (Feb 22, 2022), *https://reliefweb.int/report/syrian-arab-republic/2022-humanitarian-needs-overview-syrian-arab-republic-february-2022.*

DHS-AR-000135

this has triggered substantial harvest and income losses, decreased hydroelectricity generation, and increased water-borne illnesses.[58] Northern Syria is experiencing severe water shortages as a result of higher-than-average temperatures.[59] Of 1,087 UNICEF beneficiaries surveyed across Syria in February and March 2022, 15% reported water availability once a week or less and 19% reported no water availability.[60]

In October 2021, the World Bank estimated that the Syrian economy had shrunk by more than 60% since 2010.[61] Between October 2019 and October 2021, the Syrian pound lost 82% of its value against the dollar.[62] UNOCHA estimated that, in 2021, 90% of the population lived below the poverty line.[63] An April 2022 World Bank report indicates that "the continued depreciation of the local currency has led to rampant inflation, worsening already high food insecurity and pushing more people into poverty." [64] A UN report from April 2022 estimates that 14.6 million people are in need of humanitarian assistance, which is a 9% increase from the previous year.[65]

In summary, the ongoing conflict, compounded by economic downturn, food insecurity, water insecurity, the COVID–19 pandemic, a weakened healthcare system, weakened civilian infrastructure, human rights violations and abuses, violations of the law of armed conflict, forced conscription and

---

[58] UNOCHA, "2022 Humanitarian Needs Overview: Syrian Arab Republic" (Feb 22, 2022), *https://reliefweb.int/report/syrian-arab-republic/2022-humanitarian-needs-overview-syrian-arab-republic-february-2022.*

[59] International Rescue Committee, "Crisis in Syria: Economic crisis compounds over a decade of war" (Mar. 15, 2022), *https://www.rescue.org/article/crisis-syria-economic-crisis-compounds-over-decade-war.*

[60] UNICEF, "Whole of Syria Humanitarian Situation Report: March 2022," (May 15, 2022), *https://reliefweb.int/report/syrian-arab-republic/unicef-whole-syria-humanitarian-situation-report-march-2022.*

[61] Human Rights Watch, "Our Lives Are Like Death" (Oct. 2021), *https://www.hrw.org/sites/default/files/media_2021/10/syria1021_web.pdf.*

[62] International Rescue Committee, "Crisis in Syria: Economic crisis compounds over a decade of war" (Mar. 15, 2022), *https://www.rescue.org/article/crisis-syria-economic-crisis-compounds-over-decade-war*

[63] Human Rights Watch, "Syria: Events of 2021" (Jan. 2022), *https://www.hrw.org/world-report/2022/country-chapters/syria.*

[64] World Bank. "Macro Poverty Outlook for Syria: April 2022" *(*April 2022), *http://documents.worldbank.org/curated/en/099039004242232398/IDU0107dbcc10f799044b70bc070ac75483e6628.*

[65] UNHCR, "Syria: UNHCR Operational Update, April 2022" (May 12, 2022), *https://reliefweb.int/report/syrian-arab-republic/syria-unhcr-operational-update-april-2022.*

mass displacement have an enormous human cost for the Syrian people.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Syria's designation for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continues to be an ongoing armed conflict in Syria and, due to such conflict, requiring the return to Syria of Syrian nationals (or individuals having no nationality who last habitually resided in Syria) would pose a serious threat to their personal safety. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

• There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals (or individuals having no nationality who last habitually resided in Syria) from returning to Syria in safety, and it is not contrary to the national interest of the United States to permit Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Syria for TPS should be extended for an 18-month period, from October 1, 2022, through March 31, 2024. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Syria should be simultaneously extended and redesignated for TPS effective October 1, 2022, through, 2024. *See* section 244(b)(1)(A) and (C) and (b)(2) of the Act, 8 U.S.C. 1254a(b)(1)(A) and (C) and (b)(2).

• The Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since July 28, 2022.

• Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since October 1, 2022, the effective date of the redesignation of Syria for TPS.

• There are approximately 6,448 current Syria TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

• It is estimated that approximately 960 additional individuals may be eligible for TPS under the redesignation of Syria. This population includes Syrian nationals in the United States in nonimmigrant status or without immigration status.

## Notice of the Designation of Syria for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after

consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Syria's designation for TPS on the basis of ongoing armed conflict and extraordinary and temporary conditions are met. *See* INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A) and INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am simultaneously extending the existing designation of TPS for Syria for 18 months, from October 1, 2022, through March 31, 2024, and redesignating Syria for TPS for the same 18-month period. *See* INA section 244(b)(1)(A), (b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

*Eligibility and Employment Authorization for TPS*

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS based on the designation of Syria, you must submit a Form I–821, Application for Temporary Protected Status, and pay the filing fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

TPS beneficiaries are authorized to work in the United States. You are not required to submit Form I–765 or have an EAD, but see below for more information if you want to work in the United States.

Individuals who have a Syria TPS application (Form I–821) that was still pending as of August 1, 2022 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through March 31, 2024.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?**

Every employee must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are

eligible to obtain an EAD, which proves their legal right to work. Those who want to obtain an EAD must file a Form I–765, Application for Employment Authorization, and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form along with their TPS application, or at a later date, provided their TPS application is still pending or has been approved. Beneficiaries with a Syrian TPS-related Form I–765 that was still pending as of August 1, 2022 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request**

If you receive a denial of a fee waiver request, you must refile your Form I–821 for TPS along with the required fees during the registration period, which extends until March 31, 2024. You may also file for your Employment Authorization Document on Form I–765 with payment of the fee along with your TPS application or at any later date you decide you want to request an EAD during the registration period.

**Filing Information**

USCIS offers the option to applicants for TPS under Syria's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[66] To file these forms online, you must first create a USCIS online account.[67]

Mail filing: Mail your application for TPS to the proper address in Table 1.

Table 1-Mailing Addresses

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

#### TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are using the U.S. Postal Service (USPS) ...................................... | USCIS, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using FedEx, UPS, or DHL ...................................... | USCIS, Attn: TPS Syria (Box 6943), 131 S Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *uscis.gov/tps* under ''Syria.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

#### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

---

[66] Find information about online filing at ''Forms Available to File Online,'' *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[67] *https://myaccount.uscis.gov/users/sign_up.*

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/ privacy.*

*General Employment-Related Information for TPS Applicants and Their Employers*

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/ e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through September 30, 2023, using this Federal Register notice?**

Yes. Regardless of your country of birth, provided that you currently have a Syria TPS-based EAD that has the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 30, 2022, March 31, 2021, September 30, 2019, or March 31, 2018, this **Federal Register** notice automatically extends your EAD through September 30, 2023. Although this **Federal Register** notice automatically extends your EAD through September 30, 2023, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on the last page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I–9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for further information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of September 30, 2022, March 31, 2021, September 30, 2019, or March 31, 2018, it has been extended automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through September 30, 2023, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect the TPS designated country of Syria for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not

keep a copy of your EAD when you initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through September 30, 2023, but you are not required to do so. The last day of the automatic EAD extension is September 30, 2023. Before you start work on October 1, 2023, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through March 31, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation such as evidence of my status or proof of my Syrian citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Syrian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If

you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

### How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?

When using an automatically extended EAD to complete Form I–9 for a new job before October 1, 2023:

1. For Section 1, you should:

a. Check ''An alien authorized to work until'' and enter September 30, 2023, as the ''expiration date''; and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a ''Card Expires'' date of September 30, 2022, March 31, 2021, September 30, 2019, or March 31, 2018;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write September 30, 2023, as the expiration date.

Before the start of work on October 1, 2023, employers must reverify the employee's employment authorization on Form I–9.

### What updates should my current employer make to Form I–9 if my EAD has been automatically extended?

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 on the front of the card and has a ''Card Expires'' date of September 30, 2022, March 31, 2021, September 30, 2019, or March 31, 2018. The employer may not rely on the country of birth listed on the

card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and September 30, 2023, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not reverify the employee until either the one-year automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By October 1, 2023, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

### If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter September 30, 2023, as the expiration date for an EAD that has been extended under this **Federal Register** notice

### If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on October 1, 2023, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including

those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a

DHS-AR-000139

case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ier* and the USCIS and E-Verify websites at *uscis.gov/i-9-central* and *e-verify.gov*.

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, TPS beneficiaries presenting an automatically extended EAD referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action or this **Federal Register** notice, to prove that they qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Syria;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Present the agency with a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2022–16508 Filed 7–29–22; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7060–N–04]

### 60-Day Notice of Proposed Information Collection: Evaluation of Moving to Work Cohort 4 Landlord Incentives, OMB Control No.: 2528-New Collection

**AGENCY:** Office of the Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:**
*Comments Due Date:* September 30, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Anna P. Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210 Washington, DC 20410–5000; telephone 202–402–5535 (this is not a toll-free number) or email at *Anna.P.Guido@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**FOR FURTHER INFORMATION CONTACT:** Anna P. Guido, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410–5000; email Anna P. Guido at *Anna.P.Guido@hud.gov* or telephone 202–402–5535 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339. Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Evaluation of Moving to Work Cohort 4 Landlord Incentives.

DHS-AR-000140

specified in the filing instructions. At the same time, the F–1 nonimmigrant student may file a separate TPS application but must submit the Form I–821 according to the instructions provided in the **Federal Register** notice designating Syria for TPS. If the F–1 nonimmigrant student has already applied for employment authorization under Special Student Relief, they are not required to submit the Form I–765 as part of the TPS application. However, some nonimmigrant students may wish to obtain a TPS-related EAD in light of certain extensions that may be available to EADs with an A–12 or C–19 category code that are not available to the C–3 category under which Special Student Relief falls. The F–1 nonimmigrant student should check the appropriate box when filling out Form I–821 to indicate whether a TPS-related EAD is being requested. Again, as long as the F–1 nonimmigrant student maintains the minimum course load described in this notice and does not otherwise violate the student's nonimmigrant status, included as provided under 8 CFR 214.1(g), the nonimmigrant will be able to maintain compliance requirements for F–1 nonimmigrant student status while having TPS.

**When a student applies simultaneously for TPS and benefits under this notice, what is the minimum course load requirement while an application for employment authorization is pending?**

The F–1 nonimmigrant student must maintain normal course load requirements for a ''full course of study''[33] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.,* clock hours for non-traditional academic programs). Once approved for a TPS-related EAD and Special Student Relief employment authorization, as indicated by the DSO's required entry in SEVIS and issuance of an updated Form I–20, the F–1 nonimmigrant student may drop below twelve credit hours, or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

---

[33] *See* 8 CFR 214.2(f)(6).

**How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?**

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the current armed conflict and current humanitarian crisis in Syria. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

**Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?**

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision may apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

**How long will this notice remain in effect?**

This notice grants temporary relief until September 30, 2025,[34] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Syria. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the current armed conflict and current humanitarian crisis

---

[34] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a ''full course of study,'' *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of Sept. 30, 2025, provided the student satisfies the minimum course load requirements in this notice.

in Syria must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control Number 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2024–01762 Filed 1–26–24; 8:45 am]
**BILLING CODE 9111–28–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2763–24; DHS Docket No. USCIS–2013–0001]**

**RIN 1615–ZB72**

**Extension and Redesignation of Syria for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

---

**SUMMARY:** Through this notice, the Department of Homeland Security

(DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Syria for Temporary Protected Status (TPS) for 18 months, beginning on April 1, 2024, and ending on September 30, 2025. This extension allows existing TPS beneficiaries to retain TPS through September 30, 2025, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through September 30, 2025, must re-register during the 60-day re-registration period described in this notice. The Secretary is also redesignating Syria for TPS. The redesignation of Syria allows additional Syrian nationals (and individuals having no nationality who last habitually resided in Syria) who have been continuously residing in the United States since January 25, 2024, to apply for TPS for the first time during the initial registration period described under the redesignation information in this notice. In addition to demonstrating continuous residence in the United States since January 25, 2024, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since April 1, 2024, the effective date of this redesignation of Syria for TPS.

**DATES:** Extension and Redesignation of the Designation of Syria for TPS begins on April 1, 2024, and will remain in effect for 18 months. For registration instructions, see the Registration Information section below.

**FOR FURTHER INFORMATION CONTACT:**
You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Syria's TPS designation by selecting ''Syria'' from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

You can also find more information at local USCIS offices after this notice is published.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Registration Information

*Extension of Designation of Syria for TPS:* The 18-month designation of Syria for TPS begins on April 1, 2024, and will remain in effect for 18 months, ending on September 30, 2025. The extension impacts existing beneficiaries of TPS.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from January 29, 2024 through March 29, 2024. (*Note:* It is important for re-registrants to timely re-register during the re-registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying reregistration could result in gaps in their employment authorization documentation.)

*Redesignation of Syria for TPS:* The 18-month redesignation of Syria for TPS begins on April 1, 2024, and will remain in effect for 18 months, ending on September 30, 2025. The redesignation impacts potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Syria TPS redesignation begins on January 29, 2024 and will remain in effect through September 30, 2025.

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Syria (or individuals having no nationality who last habitually resided in Syria) to (1) re-register for TPS and apply to renew their EAD with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under the prior designation of Syria and whose applications have been granted. If you do not re-register properly within the 60-day re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Syria's designation, the 60-day re-registration period runs January 29, 2024, through March 29, 2024. USCIS will issue new EADs with a September 30, 2025, expiration date to eligible Syrian TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through March 31, 2025, the validity of certain EADs previously issued under the TPS designation of Syria. As proof of continued employment authorization through March 31, 2025, TPS beneficiaries can show their EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 31, 2024, September 30, 2022, or March 31, 2021. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Syria TPS application (Form I–821) or Application for Employment Authorization (Form I–765) that was still pending as of January 29, 2024, do not need to file either application again. If USCIS approves an

individual's pending Form I–821, USCIS will grant the individual TPS through September 30, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from January 29, 2024 through the full length of the redesignation period ending September 30, 2025. In addition to demonstrating continuous residence in the United States since January 25, 2024, and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since April 1, 2024,[1] the effective date of this redesignation of Syria, before USCIS may grant them TPS. DHS estimates that approximately 2,500 individuals may become newly eligible for TPS under the redesignation of Syria.

## What Is Temporary Protected Status (TPS)?

TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs if they continue to meet the requirements of TPS.

TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or

category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date their TPS terminates.

## When was Syria designated for TPS?

Syria was initially designated for TPS on March 29, 2012, on the basis of extraordinary and temporary conditions in Syria that prevented nationals of Syria from returning in safety.[2] Following the initial designation, the Secretary extended and redesignated Syria for TPS three times based on ongoing armed conflict and extraordinary and temporary conditions: (1) from October 1, 2013, to March 31, 2015;[3] (2) from April 1, 2015, to September 30, 2016;[4] and (3) from October 1, 2016, to March 31, 2018.[5] Thereafter, the Secretary extended TPS for Syria from April 1, 2018, to September 30, 2019,[6] and again on October 1, 2019, to March 31, 2021,[7] based on ongoing armed conflict and extraordinary and temporary conditions. Most recently, the Secretary extended and redesignated TPS for Syria based on ongoing armed conflict and extraordinary and temporary conditions from March 31, 2021, to September 30, 2022,[8] and from October 1, 2022, to March 31, 2024.[9]

## What authority does the Secretary have to extend the designation of Syria for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that

certain country conditions exist.[10] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Syria for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that ''the alien has been continuously

---

[1] The ''continuous physical presence'' date is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or a later date established by the Secretary. The ''continuous residence'' date is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA sec. 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (continuous residence and continuous physical presence date requirements); 8 U.S.C. 1254a(b)(2)(A); 1254a(c)(1)(A)(i–ii).

[2] *See Designation of Syrian Arab Republic for Temporary Protected Status,* 77 FR 19026 (Mar. 29, 2012).

[3] *See Extension and Redesignation of Syria for Temporary Protected Status,* 78 FR 36223 (June 17, 2013).

[4] *See Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status,* 80 FR 245 (Jan. 5, 2015).

[5] *See Extension and Redesignation of Syria for Temporary Protected Status,* 81 FR 50533 (Aug. 1, 2016).

[6] *See Extension of the Designation of Syria for Temporary Protected Status,* 83 FR 9329 (Mar. 5, 2018).

[7] *See Extension of the Designation of Syria for Temporary Protected Status,* 84 FR 49751 (Sept. 23, 2019).

[8] *See Extension and Redesignation of Syria for Temporary Protected Status,* 86 FR 14946 (Mar. 19, 2021).

[9] *See Extension and Redesignation of Syria for Temporary Protected Status,* 87 FR 46982 (Aug. 1, 2022).

[10] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

**Federal Register** / Vol. 89, No. 19 / Monday, January 29, 2024 / Notices      **5565**

physically present since the effective date of *the most recent designation of the state*") (emphasis added).[11]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA sec. 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Syria will be January 25, 2024. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since April 1, 2024, which is the effective date of the Secretary's redesignation of Syria. *See* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, USCIS cannot make the final determination of whether the applicant has met the "continuous physical presence" requirement until April 1, 2024, the effective date of this redesignation for Syria. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Syria and simultaneously redesignating Syria for TPS through September 30, 2025?**

DHS has reviewed country conditions in Syria. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the ongoing armed conflict and extraordinary and temporary conditions supporting Syria's TPS designation remain. The Secretary has further determined that redesignating Syria for TPS under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) is warranted and is changing the continuous residence and continuous physical presence dates

that applicants must meet to be eligible for TPS.

*Overview*

The ongoing civil war in Syria is in its thirteenth year and has involved large-scale destruction of infrastructure, widespread civilian casualties, and human rights abuses and violations. The humanitarian consequences are dire, including mass displacement of civilians, high levels of food insecurity, and limited access to healthcare and clean water. These impacts have been compounded by the February 6, 2023 earthquake, which resulted in the further destruction of infrastructure and has contributed to the further breakdown of the economy and strained an already overburdened healthcare system.[12][13]

*Armed Conflict and Security Situation*

The armed conflict in Syria continues to include numerous local and international actors, such as the Syrian regime, foreign states, opposition groups, and terrorist groups, like ISIS.[14][15] Syrian civilians are suffering with 61 percent of Syria's pre-war population displaced, and Syria remains the third least peaceful country in the world according to the Global Peace Index (GPI).[16] The United Nations High Commissioner for Refugees (UNHCR) reports 5,183,140 Syrian refugees in neighboring countries,[17] and 6.8 million people internally displaced (IDPs)

within Syria—the highest in the world.[18]

The conflict and its levels of violence are regularly in flux. Ongoing hostilities in several parts of the country include "artillery shelling, air strikes and land mines, [and] continue to threaten the lives of civilians and hamper humanitarian activities."[19] In January 2023, regime-controlled areas experienced "an alarming escalation of violence, worsening living conditions, tightening security grip and ongoing arbitrary arrests."[20] On October 5, 2023, northern Syria experienced renewed hostilities with reports of multiple attacks by regime-forces that killed civilians and damaged vital civilian infrastructure across the region.[21] Since October 5, 2023, parties to the conflict have engaged in continuous shelling and airstrikes, which have struck more than 1,400 locations, including frontline and residential areas, in Idlib and western Aleppo.[22] As of October 13, at least 53 people in affected areas have been killed, including 11 women and 15 children, and 303 others injured as reported by local health authorities since the start of the incidents on October 5.[23]

Since the conflict began, civilian casualty counts have varied among media sources and human rights groups, in part due to the large number of missing and forcibly disappeared Syrians. Human rights groups estimate more than 550,000 people have been

---

[11] The extension and redesignation of TPS for Syria is one of several instances in which the Secretary and, before the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension and Re-designation of Temporary Protected Status for Sudan,* 69 FR 60168 (Oct. 7, 2004); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608 (Apr. 7, 1997).

[12] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, 6, available at *https://reliefweb.int/report/turkiye/devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr* (last visited Oct. 10, 2023).

[13] The World Bank, Syria Earthquake 2023 Rapid Damage and Needs Assessment (RDNA), Mar. 2023, 48, available at *https://reliefweb.int/report/syrian-arab-republic/syria-earthquake-2023-rapid-damage-and-needs-assessment-rdna-enar* (last visited Nov. 9, 2023).

[14] *See* U.S. Dep't of State, 2022 Country Report on Human Rights Practices: Syria, Mar. 20, 2023, available at *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/syria/#:~:text=As%20of%20December%2C%20the%20SNHR,Directorate%2C%20Air%20Force%20Intelligence%20Directorate%2C* (last visited Oct. 5, 2023).

[15] U.N. Gen. Assembly Human Rights Council, Report of the Independent International Commission of Inquiry on the Syrian Arab Republic, Aug. 14, 2023, available at *https://www.ohchr.org/en/hr-bodies/hrc/iici-syria/report-coi-syria-september2023* (last visited Nov. 27, 2023).

[16] Inst. for Economics and Peace, Global Peace Index 2023: Measuring Peace in a Complex World, June 2023, 28, available at *http://visionofhumanity.org/resources* (last visited Oct. 26, 2023).

[17] UNHCR, Situation Syria Regional Refugee Response, lasted updated Nov. 30, 2023, available at *https://data2.unhcr.org/en/situations/syria* (last visited Dec. 13, 2023).

[18] UNHCR, Syria: UNHCR Operational Update, September 2023, Oct. 18, 2023, 1, available at *https://reliefweb.int/report/syrian-arab-republic/syria-unhcr-operational-update-september-2023-enar* (last visited Oct. 27, 2023).

[19] UNOCHA, Humanitarian Needs Overview: Syrian Arab Republic, 12 (Dec. 22, 2022), available at *hno_2023-rev-1.12_1.pdf* (humanitarianresponse.info) (last visited Oct. 5, 2023).

[20] The Syrian Observatory for Human Rights, Regime-controlled areas in January 2023 Nearly 190 fatalities in acts of violence . . . 12 assassinations and attacks in three provinces . . . escalating living crises, Feb. 9, 2023, available at *https://www.syriahr.com/en/288096/* (last visited Oct. 6, 2023).

[21] UNOCHA, Joint Statement by the United Nations Resident Coordinator and Humanitarian Coordinator for Syria, Mr. Adam Abdelmoula, and the Regional Humanitarian Coordinator for the Syria Crisis, Mr. Muhannad Hadi, on the renewed hostilities in northern Syria, Oct. 6, 2023, available at *https://reliefweb.int/report/syrian-arab-republic/joint-statement-united-nations-resident-coordinator-and-humanitarian-coordinator-syria-mr-adam-abdelmoula-and-regional-humanitarian-coordinator-syria-crisis-mr-muhannad-hadi-renewed-hostilities-northern-syria-enar* (last visited Oct. 6, 2023).

[22] UNOCHA, North-west Syria: Escalation of Hostilities—Flash Update No. 3, Oct. 13, 2023, available at *https://reliefweb.int/report/syrian-arab-republic/north-west-syria-escalation-hostilities-flash-update-no3-13-october-2023-enar* (last visited Oct. 26, 2023).

[23] *Id.*

DHS-AR-000144

killed since the start of the conflict.[24] Armed actors, including those of the Syrian regime and its Russian allies, continue to strike civilians and civilian facilities.[25] The Syrian Network for Human Rights (SNHR) reported that ground attacks and airstrikes ''have caused the destruction of homes, schools, hospitals, shops and other structures, and that there are reasonable grounds to believe that the war crime of attacking civilians has been committed in many cases.'' [26] In the first half of 2023, through June, SNHR documented that parties to the conflict and controlling forces in Syria killed 501 civilians, including 71 children and 42 women.[27]

### Human Rights Abuses and Civilian Deaths

The Syrian regime and other armed actors continue to commit human rights abuses. There are documented reports of unjust killings, arbitrary arrests, enforced disappearances, forced displacements, seizures of land and properties, and rampant security instability that have ''provided a ripe environment for many assassinations and bombings.'' [28] During the January 2023 escalation of violence in regime-controlled areas, SNHR reported that 55 civilians died, at least 42 civilians were arbitrarily arrested by regime forces and intelligence services, and 14 civilians were kidnapped.[29] SNHR reported that, in the first half of 2023, 20 individuals,

including civilians, died due to torture and that the Syrian regime was reportedly responsible for the deaths of 30 percent of these individuals.[30]

### Humanitarian and Economic Situation

Since 2022, the number of people in Syria in need of humanitarian assistance has increased by five percent to 15.3 million people, which is over two thirds of the population.[31] Of those 15.3 million people, there are 7 million children currently in need of humanitarian assistance.[32] According to the European Union's Directorate-General for Civil Protection and Humanitarian Aid Operations, 85 percent of households cannot meet their basic needs, over half the population lacks a stable water source, and more than 12 million people are food insecure.[33]

Food insecurity is of particular concern as the Syrian economy has been rapidly deteriorating.[34] Syria is experiencing hyperinflation with a record depreciation of the Syrian pound, which has led to substantial food and fuel price hikes.[35][36] About, 12.1 million Syrians (almost 60 percent of the population) are considered food insecure, with an additional three million more Syrians at risk of food insecurity.[37] After years of conflict,

Syria is now one of six countries ''with the highest food insecurity in the world.'' [38] Over the course of the conflict ''wheat production has declined by 75 per cent due to damaged infrastructure, the high cost of fuel, and drought-like conditions.'' [39]

The February 6, 2023 earthquake and subsequent aftershock that hit southern Turkey near the Syrian border also contributed to the worsening humanitarian situation and economic deterioration in Syria.[40] According to the International Blue Crescent Relief and Development Foundation, the earthquake killed 8,476 people in Syria.[41] In addition to the loss of life, the earthquake has also had devastating effects on Syria's economy, infrastructure, and health sector.[42] Prior to the earthquake, 90 percent of Syrians lived in poverty.[43] The effect of the earthquake in the northern border region of Syria resulted in further economic hardships. An estimated 170,000 employees lost their jobs because of the earthquake and approximately 35,000 micro, small, and medium sized businesses were damaged.[44] As a result, Syria's temporary loss of employment has been calculated to be a loss of labor income equal to at least 5.7 million dollars per month.[45] The United Nations estimates that Syria needs almost 15 billion dollars to recover from the earthquakes.[46]

### Healthcare Needs and Access to Water

Over 15.3 million people in Syria need healthcare assistance, which is an

---

[24] U.S. Dep't of State, 2022 Country Report on Human Rights Practices: Syria, Mar. 20, 2023, available at *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/syria/#:~:text=As%20of%20December%2C%20 the%20SNHR,Directorate%2C%20Air% 20Force%20Intelligence%20Directorate%2C* (last visited Dec. 7, 2023).

[25] Syrian Network for Human Rights, Most Notable Human Rights Violations in Syria in May 2023, June 5, 2023, available at *https://reliefweb.int/ report/syrian-arab-republic/most-notable-human-rights-violations-syria-may-2023* (last visited Oct. 10, 2023).

[26] *Id.*

[27] Syrian Network for Human Rights, 501 Civilians, Including 71 Children, 42 Woman, and 20 Individuals Who Died due to Torture Documented Killed in Syria, in the First Half of 2023, July 2, 2023, 7, available at *https://reliefweb.int/report/ syrian-arab-republic/501-civilians-including-71-children-42-woman-and-20-individuals-who-died-due-torture-documented-killed-syria-first-half-2023* (last visited Oct. 5, 2023).

[28] Syrian Network for Human Rights, 12th Annual Report—Most notable violations in 2022, 6–7, Jan. 24, 2023, available at *https://snhr.org/blog/2023/01/ 24/snhrs-12th-annual-report-most-notable-human-rights-violations-in-syria-in-2022/* (last visited Oct. 5, 2023).

[29] The Syrian Observatory for Human Rights, Regime-controlled areas in January 2023 Nearly 190 fatalities in acts of violence . . . 12 assassinations and attacks in three provinces . . . escalating living crises, Feb. 9, 2023, available at *https:// www.syriahr.com/en/288096/* (last visited Oct. 6, 2023).

[30] Syrian Network for Human Rights, 501 Civilians, Including 71 Children, 42 Woman, and 20 Individuals Who Died due to Torture Documented Killed in Syria, in the First Half of 2023, July 2, 2023, 13, available at *https://reliefweb.int/report/ syrian-arab-republic/501-civilians-including-71-children-42-woman-and-20-individuals-who-died-due-torture-documented-killed-syria-first-half-2023* (last visited Oct. 5, 2023).

[31] UNHCR, Syria: UNHCR Operational Update, September 2023, Oct. 18, 2023, available at *https:// reliefweb.int/report/syrian-arab-republic/syria-unhcr-operational-update-september-2023-enar* (last visited Oct. 27, 2023).

[32] UNICEF, Humanitarian Action for Children 2023—Syria, June 2023, available at *https:// www.unicef.org/media/143511/file/2023-HAC-Syrian-Arab-Republic-revised-June.pdf* (last visited Nov. 27, 2023).

[33] European Commission, European Civil Protection and Humanitarian Aid Operations, Syria, last updated Nov. 24, 2023, available at *https://civil-protection-humanitarian-aid.ec.europa.eu/where/ middle-east-and-northern-africa/syria_en* (last visited Oct. 6, 2023).

[34] World Food Programme, Syria—Market Price Watch Bulletin July 2023, Aug. 23, 2023, available at *https://reliefweb.int/report/syrian-arab-republic/ syria-market-price-watch-bulletin-july-2023* (last visited Sept. 27, 2023).

[35] Reuters, *Syria slashes gasoline subsidy, boosts public-sector salaries,* Aug. 16, 2023, available at *https://www.reuters.com/world/middle-east/syria-slashes-gasoline-subsidy-boosts-public-sector-salaries-2023-08-16/* (last visited Oct. 6, 2023).

[36] BBC News, *Syria doubles public-sector pay and cuts subsidies as economy sinks,* Aug. 16, 2023, available at *https://www.bbc.com/news/world-middle-east-66526132* (last visited Oct. 6, 2023).

[37] UN News, *More than half of all Syrians going hungry: WFP,* Mar. 14, 2023, available at *https://*

*news.un.org/en/story/2023/03/1134567* (last visited Oct. 6, 2023).

[38] *Id.*

[39] *Id.*

[40] Erol Yayboke, Shattered Relief: A 7.8-Magnitude Earthquake Strikes Turkey and Syria, CSIS, Feb. 7, 2023, available at *https:// www.csis.org/analysis/shattered-relief-78-magnitude-earthquake-strikes-turkey-and-syria* (last visited Oct. 10, 2023).

[41] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, 2, available at *https://reliefweb.int/report/turkiye/ devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr* (last visited Oct. 10, 2023).

[42] *Id.*

[43] Middle East Monitor, *UN Chief says 90% of Syrians live below poverty line,* Jan. 14, 2022, available at *https://www.middleeastmonitor.com/ 20220114-un-chief-says-90-of-syrians-live-below-poverty-line/* (last visited Oct. 10, 2023).

[44] International Blue Crescent, Kahramanmaraş Earthquakes Situation Report, Apr. 6, 2023, 6, available at *https://reliefweb.int/report/turkiye/ devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr* (last visited Oct. 10, 2023).

[45] *Id.*

[46] UN News, *Almost $15 billion needed for earthquake recovery in Syria,* May 8, 2023, available at *https://news.un.org/en/story/2023/05/1136452* (last visited Oct. 6, 2023).

DHS-AR-000145

increase of 3.2 million people from 2022.[47] The World Health Organization reports that 41 percent of public hospitals and 43 percent of primary health care facilities are either partially functioning or not functioning at all.[48] Further, up to 50 percent of healthcare workers have fled Syria since the start of the conflict.[49] In January 2023, sources in regime-controlled areas reported a lack of medicine in pharmacies as well as a significant increase in the prices of medicine for heart disease, epilepsy, diabetes, cancer, and the flu.[50]

Access to clean water outside of northwest Syria continues to be a serious situation for many Syrians as 52 percent of Syrians lack access to clean water and must turn to unsafe alternatives, such as polluted rivers or unregulated private companies providing unclean water.[51] Before the war, 92 percent of Syrians had consistent access to clean water but over the last few years, Syria's water infrastructure has deteriorated quickly, whether because of the conflict, climate change, Syria's energy crisis, and/or conflict actors limiting access to water as a political pressure tactic.[52] Without clean water, Syrians must forego basic hygiene and clean drinking water, which leaves Syrians at risk for infectious waterborne diseases.[53]

In February 2023, the earthquake exacerbated the health care system in northwest Syria, the area that saw most of the damage.[54] The World Bank

estimates that the total effect of both the damage and loss due to the earthquake on Syria's health sector is 300.4 million dollars.[55] Northwest Syria's earthquake-damaged infrastructure includes water, sanitation, and hygiene, and healthcare facilities, raising health concerns related to contaminated water and an increased risk of waterborne illness.[56] [57]

In summary, over a decade after the uprising that sparked the war, the Syrian conflict remains ongoing and detrimental impacts on the country continue. Armed actors continue to kill civilians and destroy vital civilian infrastructure, the economy is rapidly deteriorating, and Syrians cannot afford their basic needs, such as food and healthcare. Further, the lack of access to clean water has created a serious problem for those in most of the country. The February 2023 earthquake further complicated these issues.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

The conditions supporting Syria's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

There continues to be an ongoing armed conflict in Syria and, due to such conflict, requiring the return to Syria of Syrian nationals (or individuals having no nationality who last habitually resided in Syria) would pose a serious threat to their personal safety. *See* INA sec. 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A).

There continue to be extraordinary and temporary conditions in Syria that prevent Syrian nationals (or individuals having no nationality who last habitually resided in Syria) from returning to Syria in safety, and it is not contrary to the national interest of the United States to permit Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

The designation of Syria for TPS should be extended for an 18-month period, beginning on April 1, 2024, and ending on September 30, 2025. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Due to the conditions described above, Syria should be simultaneously extended and redesignated for TPS beginning on April 1, 2024, and ending on September 30, 2025. *See* INA sec. 244(b)(1)(A) and (C) and (b)(2), 8 U.S.C. 1254a(b)(1)(A) and (C) and (b)(2).

For the redesignation, the Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since January 25, 2024.

Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since April 1, 2024, the effective date of the redesignation of Syria for TPS.

There are approximately 6,200 current Syria TPS beneficiaries who are eligible to re-register for TPS under the extension.

It is estimated that approximately 2,500 additional individuals may be eligible for TPS under the redesignation of Syria. This population includes Syrian nationals in the United States in nonimmigrant status or without immigration status.

## Notice of the Designation of Syria for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Syria's designation for TPS on the basis of ongoing armed conflict and extraordinary and temporary conditions are met and it is not contrary to the national interest of the United States to allow Syrian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(A), (C); 8 U.S.C. 1254a(b)(1)(A), (C). On the basis of this determination, I am simultaneously extending the existing designation of Syria for TPS for 18 months, beginning on April 1, 2024, and ending on September 30, 2025, and redesignating Syria for TPS for the same 18-month period. *See* INA sec. 244(b)(1)(A), (C), and (b)(2); 8 U.S.C. 1254a(b)(1)(A), (C), and (b)(2).

**Alejandro N. Mayorkas**

*Secretary, U.S. Department of Homeland Security.*

---

[47] World Health Organization, Health sector needs HNO 2023, Dec. 4, 2022, available at *https://reliefweb.int/report/syrian-arab-republic/health-sector-needs-hno-2023* (last visited Oct. 12, 2023).

[48] *Id.*

[49] World Health Organization, Syrian Arab Republic: Public Health Situation Analysis (PHSA) Long-form, Aug. 18, 2022, 2, available at *https://reliefweb.int/report/syrian-arab-republic-public-health-situation-analysis-phsa-long-form-last-update-18-august-2022* (last visited Oct. 12, 2023).

[50] The Syrian Observatory for Human Rights, Regime-controlled areas in January 2023 Nearly 190 fatalities in acts of violence . . . 12 assassinations and attacks in three provinces . . . escalating living crises, Feb. 9, 2023, available at *https://www.syriahr.com/en/288096/* (last visited Oct. 6, 2023).

[51] The Century Foundation, Cholera in the Time of Assad: How Syria's Water Crisis Caused an Avoidable Outbreak, Jan. 24, 2023, available at *https://tcf.org/content/report/cholera-in-the-time-of-assad-how-syrias-water-crisis-caused-an-avoidable-outbreak/#:~:text=According%20to%20UN%20data%20collected,over%20the%20past%20few%20years.* (last visited Oct. 10, 2023).

[52] *Id.*

[53] *Id.*

[54] The World Bank, Syria Earthquake 2023 Rapid Damage and Needs Assessment (RDNA), Mar. 2023,

48, available at *https://reliefweb.int/report/syrian-arab-republic/syria-earthquake-2023-rapid-damage-and-needs-assessment-rdna-enar* (last visited Nov. 9, 2023).

[55] *Id.*

[56] Maia C Tarnas, Naser Almhawish, Nabil Karah, Richard Sullivan, & Aula Abbara, *Communicable diseases in northwest Syria in the context of protracted armed conflict and earthquakes,* The Lancet Infectious Diseases, July 2023, ISSN 1473–3099, available at *https://doi.org/10.1016/S1473-3099(23)00201-3* (last visited Oct. 6, 2023).

[57] The World Bank, Syria Earthquake 2023 Rapid Damage and Needs Assessment (RDNA), Mar. 2023, 49, available at *https://reliefweb.int/report/syrian-arab-republic/syria-earthquake-2023-rapid-damage-and-needs-assessment-rdna-enar* (last visited Oct. 10, 2023).

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS based on the designation of Syria, you must submit a Form I–821, Application for Temporary Protected Status. If you are submitting an initial TPS application, you must pay the application fee for Form I–821 (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you are filing an application to re-register for TPS, you do not need to pay the application fee. Whether you are registering as an initial applicant or re-registering, you may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

TPS beneficiaries are eligible for an Employment Authorization Document (EAD), which proves their authorization to work in the United States. You are not required to submit Form I–765, Application for Employment Authorization, or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have a Syria TPS application (Form I–821) that was still pending as of January 29, 2024, do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through September 30, 2025.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). The instructions for Form I–821 and Form I–765 also provide more information on requirements and fees for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

**How can TPS beneficiaries obtain an employment authorization document (EAD)?**

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved. Beneficiaries with a Syria TPS-related Form I–765 that was still pending as of January 29, 2024 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through September 30, 2025.

**Refiling An Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request**

If USCIS denies your fee waiver request, you can resubmit your TPS application. The fee waiver denial notice will contain specific instructions about resubmitting your application.

**Filing Information**

You may file Form I–821 and related requests for EADs online or by mail. However, if you request a fee waiver, you must submit your application by mail. When filing a TPS application, applicants may request an EAD by submitting a completed Form I–765 with their Form I–821.

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[58] To file these forms online, you must first create a USCIS online account.[59]

*Mail filing:* Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization, if applicable; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1-Mailing Addresses.

TABLE 1—MAILING ADDRESSES

| If you send your paper application via: | Then, mail your application to: |
| --- | --- |
| U.S. Postal Service (USPS) ...................................................................... | USCIS, Attn: TPS Syria, P.O. Box 6943, Chicago, IL 60680–6943. |
| FedEx, UPS, or DHL deliveries ................................................................ | USCIS, Attn: TPS Syria (Box 6943), 131 S Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please file online or mail your Form I–765 to the appropriate address in Table 1. If you file online, please include the fee. If you file by mail, please include the fee or fee waiver request. When you request an EAD based on an immigration judge or BIA grant of TPS, please include with your application a copy of the order from the immigration judge or BIA granting you TPS. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (also called, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Syria.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, you must:

Select Item Number 1.d. in Part 2 on the Form I–131; and

Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

---

[58] Find information about online filing at ''Forms Available to File Online,'' *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[59] *https://myaccount.uscis.gov/users/sign_up.*

DHS-AR-000147

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
| --- | --- |
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* USCIS may require you to visit an Application Support Center to submit biometrics. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https:// www.dhs.gov/publication/dhsuscispia- 060-customer-profile-management- service-cpms.*

**General Employment-Related Information for TPS Applicants and Their Employers**

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800– 375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through March 31, 2025, through this Federal Register notice?**

Yes. Regardless of your country of birth, if you currently have a Syria TPS-based EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 31, 2024, September 30, 2022, or March 31, 2021, this **Federal Register** notice automatically extends your EAD through March 31, 2025. Although this **Federal Register** notice automatically extends your EAD through March 31, 2025, you must timely re-register for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document

based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for more information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of March 31, 2024, September 30, 2022, or March 31, 2021, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through March 31, 2025, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth noted on the EAD does not have to reflect the TPS-designated country of Syria for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-examine your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expires date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for more information. You may show this **Federal Register** notice to your employer to

DHS-AR-000148

explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through March 31, 2025, but you are not required to do so. The last day of the automatic EAD extension is March 31, 2025. Before you start work on April 1, 2025, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

### If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through September 30, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

### Can my employer require that I provide any other documentation such as evidence of my status, proof of my Syrian citizenship, or a Form I–797C showing that I registered for TPS for Form I–9 completion?

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Syrian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or

immigration status or your national origin.

### How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?

When using an automatically extended EAD to complete Form I–9 for a new job before April 1, 2025:

1. For Section 1, you should:
a. Check ''A noncitizen authorized to work until'' and enter March 31, 2025, as the ''expiration date''; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:
a. Determine whether the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a Card Expires date of March 31, 2024, September 30, 2022 or March 31, 2021;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write March 31, 2025, as the expiration date.

Before the start of work on April 1, 2025, employers must reverify the employee's employment authorization on Form I–9.

### What updates should my current employer make to Form I–9 if my EAD has been automatically extended?

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a Card Expires date of March 31, 2024, September 30, 2022, or March 31, 2021. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and March 31, 2025, as the last day of the automatic extension in the Additional Information field; and
2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee

presents a new document to show continued employment authorization, whichever is sooner. By April 1, 2025, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

### If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter March 31, 2025, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

### If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on April 1, 2025, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in

numerous languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *www.justice.gov/ier.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper

nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Syria;

Your Form I–94, Arrival/Departure Record;

Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically

extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save/save-resources,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2024–01764 Filed 1–26–24; 8:45 am]

**BILLING CODE 9111–97–P**

DHS-AR-000150

adopt and implement a security program.

**DATES:** Send your comments by April 30, 2012. A comment to OMB is most effective if OMB receives it within 30 days of publication.

**ADDRESSES:** Interested persons are invited to submit written comments on the proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to Desk Officer, Department of Homeland Security/TSA, and sent via electronic mail to *oira_submission@ omb.eop.gov* or faxed to (202) 395–6974.

**FOR FURTHER INFORMATION CONTACT:** Joanna Johnson, Office of Information Technology, TSA–11, Transportation Security Administration, 601 South 12th Street, Arlington, VA 20598–0011; telephone (571) 227–3616; email *joanna.johnson@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Comments Invited**

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The ICR documentation is available at *www.reginfo.gov.* Therefore, in preparation for OMB review and approval of the following information collection, TSA is soliciting comments to—

(1) Evaluate whether the proposed information requirement is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including using appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

**Information Collection Requirement**

*Title:* Aircraft Operator Security.
*Type of Request:* Extension of a currently approved collection.
*OMB Control Number:* 1652–0003.
*Forms(s):* N/A.
*Affected Public:* Aircraft Operators.
*Abstract:* 49 CFR part 1544 requires aircraft operators to maintain, update, and comply with TSA-approved comprehensive security programs to ensure the safety of persons and

property traveling on their flights against acts of criminal violence and air piracy, and the introduction of explosives, incendiaries, or weapons aboard an aircraft. These programs and related records are subject to TSA inspection.

*Number of Respondents:* 801.
*Estimated Annual Burden Hours:* An estimated 1,918,371 hours annually.

Issued in Arlington, Virginia, March 27, 2012.

**Joanna Johnson,**
*Paperwork Reduction Act Officer, Office of Information Technology.*

[FR Doc. 2012–7671 Filed 3–28–12; 8:45 am]

**BILLING CODE 9110–05–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2522–12; DHS Docket No. USCIS 2012–0007]**

**RIN 1615–ZB12**

**Designation of Syrian Arab Republic for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

---

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has designated the Syrian Arab Republic (Syria) for Temporary Protected Status (TPS) for a period of 18 months, effective March 29, 2012 through September 30, 2013. Under section 244(b)(1) of the Immigration and Nationality Act (Act), 8 U.S.C. 1254a(b)(1), the Secretary is authorized to grant TPS to eligible nationals of designated foreign states or parts of such states (or to eligible aliens having no nationality who last habitually resided in such states) upon finding that such states are experiencing an ongoing armed conflict, an environmental disaster, or extraordinary and temporary conditions that prevent nationals from returning in safety.

This designation allows eligible Syrian nationals (and aliens having no nationality who last habitually resided in Syria) who have both continuously resided in and been continuously physically present in the United States since March 29, 2012 to be granted TPS. This notice also describes the other eligibility criteria applicants must meet.

Individuals who believe they may qualify for TPS under this designation

may apply within the 180-day registration period that begins on March 29, 2012. They may also apply for Employment Authorization Documents (EADs) and for travel authorization. In this notice, DHS also sets forth the procedures for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to apply for TPS and EADs with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** This designation of Syria for TPS is effective on March 29, 2012 and will remain in effect through September 30, 2013. The 180-day registration period for eligible individuals to submit TPS applications begins March 29, 2012, and will remain in effect through September 30, 2013.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this designation of Syria for TPS by selecting "TPS Designated Country— Syria" from the menu on the left of the TPS Web page.

• You can also contact the TPS Operations Program Manager at Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529– 2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online available at the USCIS Web site at *http://www. uscis.gov,* or call the USCIS National Customer Service Center at 1–800–375– 5283 (TTY 1–800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Abbreviations and Terms Used in This Document**

Act—Immigration and Nationality Act
BIA—Board of Immigration Appeals
COI—Independent International Commission of Inquiry, established pursuant to United Nations (UN) Human Rights Council resolution S–17/1 to investigate all alleged violations of international human rights law since March 2011 in the Syrian Arab Republic
COI Report—"*Report of the Independent International Commission of Inquiry on the Syrian Arab Republic,*" dated 22 February 2012, UN Doc. A/HRC/19/69

DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
DOS—U.S. Department of State
EAD—Employment Authorization Document
FSA—Free Syrian Army
Government—U.S. Government
HRC—United Nations Human Rights Council
IJ—Immigration Judge
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SARG—Syrian Arab Republic Government
SAVE—Systematic Alien Verification for Entitlements
Secretary—Secretary of Homeland Security
Syria—Syrian Arab Republic
TPS—Temporary Protected Status
UN—United Nations
UNHCR—Office of the United Nations High Commissioner for Refugees
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is an immigration status granted to eligible nationals of a country designated for TPS under the Act (or to persons without nationality who last habitually resided in the designated country).

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and obtain an EAD following a request and payment of the EAD fee, if required, so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS (unless that status has since expired or been terminated) or to any other lawfully obtained immigration status they received while registered for TPS.

• TPS applicants are subject to thorough background and security checks. Applicants who have committed a felony or two misdemeanors in the United States and applicants who are subject to certain other mandatory bars, including those who pose a threat to U.S. national security, are not eligible.

## What authority does the Secretary have to designate Syria for TPS?

Section 244(b)(1) of the Act, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1]

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Act describing functions transferred from the Department of Justice to the DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying HSA, tit. XV, sec. 1517).

The Secretary can designate a foreign state for TPS based on one of three circumstances. One circumstance is if "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." Section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Following the designation of a foreign state for TPS, the Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* section 244(a)(1)(A) of the Act, 8 U.S.C. 1254a(a)(1)(A). Applicants must demonstrate that they satisfy all eligibility criteria, including that they have been "continually physically present" in the United States since the effective date of the designation, which is either the date of the **Federal Register** notice announcing the designation or such later date as the Secretary may determine, and that they have "continuously resided" in the United States since such date as the Secretary may designate. *See* sections 244(a)(1)(A), (b)(2)(A), and (c)(1)(A)(i–ii) of the Act; 8 U.S.C. 1254a(a)(1)(A), (b)(2)(A), (c)(1)(A)(i–ii).

## Why is the Secretary designating Syria for TPS through September 30, 2013?

The Secretary has determined, after consultation with the Department of State (DOS) and other appropriate Government agencies, that there exist extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning in safety, and that permitting such aliens to remain temporarily in the United States would not be contrary to the national interest of the United States.

Protest crowds began to gather in Damascus and Dar'a by mid to late March 2011, when citizens seeking greater political freedom rose up against the rule of President Bashar al-Assad. In response, President al-Assad used the military to suppress the movement, and the Syrian Arab Republic Government (SARG) launched a brutal crackdown, violently repressing and killing thousands of its own civilians. The SARG continues to use excessive force against civilians, arbitrary executions, killing and persecution of protestors and members of the media, arbitrary detention, disappearances, torture, and ill-treatment in an effort to retain control of the country.

The Independent International Commission of Inquiry (COI), in its second report to the United Nations Human Rights Council (HRC) dated February 22, 2012 (A/HRC/19/69), reports that the SARG's initial violent suppression of dissent was followed by military defections and the formation of anti-government armed groups. The main armed opposition group is the Free Syrian Army (FSA). Other anti-government armed groups include the Higher Military Council and Al Faroukh Battalion, both of which are engaged in combat with the Syrian security forces in Homs. According to the COI report, while anti-government groups have also committed abuses, their actions are not comparable in scale or organization to those carried out by the Syrian state.

The COI report states that army snipers and Shabbiha (mercenaries hired by the SARG) have terrorized the population, targeting and killing small children, women, and other unarmed civilians. Military defectors report that soldiers continue to receive "shoot to kill" orders. Individual officers in the Syrian military have also shot unarmed protestors, including children, medical doctors, ambulance drivers, and mourners at funerals in Da'ra, Rif Dimashq, and Almastoumah governates.

Observers generally agree that the conflict has become increasingly violent and militarized. As of February 2012, the UN Under-Secretary-General for Political Affairs indicated that approximately 7,500 Syrians have been killed since the violence began, and new casualties are reported daily. The COI report pointed out that "casualties rose steeply as the violence intensified" in recent months. In fact, the UN's February 2012 death toll estimate of 7,500 exceeds its January 2012 estimate by 2,100 deaths. As of February 2012, public UN estimates indicated that between 100,000 and 200,000 Syrians are internally displaced, and as many as 500,000 citizens may be trapped in affected areas within Syria. According to the Office of the UN High Commissioner for Refugees (UNHCR), approximately 35,000 Syrians have sought shelter in the neighboring countries of Turkey, Lebanon, and Jordan.

The deteriorating security situation in Syria compelled the United States to suspend Embassy operations on February 6, 2012, and order the departure of all U.S. direct-hire personnel from the country. Several other diplomatic missions have also

DHS-AR-000152

suspended operations due to security concerns. On April 25, 2011, DOS advised all United States citizens to avoid travel to Syria and urged United States citizens in Syria to depart immediately. DOS has reiterated the travel warning several times, most recently on March 6, 2012.

The international community has responded to the crisis in Syria by imposing economic sanctions. The regime's economic mismanagement and economic sanctions have negatively affected the whole of the Syrian economy. According to the COI report, the prices of basic food items have increased by as much as 37 percent, and the unemployment rate is in the range of 22 to 30 percent. The economy is estimated to have shrunk by 2 to 4 percent in 2011, and a higher drop is expected in 2012. Tourism, which accounted for 6 to 9 percent of Syria's gross domestic product, has collapsed.

Thousands of Syrians have been uprooted from their communities and sought shelter in Turkey, Lebanon, and Jordan. Many of those that remain in the country are trapped in danger zones and are experiencing the effects of the economic sanctions. As of June 2011, UNHCR reports an estimated 10,000 Syrians are displaced in Turkey. Approximately 15,000 Syrians are displaced in Lebanon. Although in January 2012 Jordan reported that it formally hosts 2,500 to 3,000 Syrians displaced by violence, UNHCR estimates approximately 10,000 displaced Syrians are in Jordan. In February 2012, Jordan government sources stated that approximately 73,000 Syrians have entered Jordan through border crossings.

Journalists and bloggers have been subject to harm, including arrest, prolonged detention, and death. Reports also indicate that medical doctors providing treatment to wounded members of the opposition have been arrested. The campaign group Avaaz, which has been monitoring attacks on medical workers, recorded more than 250 arrests between March and October 2011. This has led to the establishment of clandestine makeshift clinics in mosques and basements of homes. According to the UN General Assembly's *Conflict-related sexual violence: report of the Secretary-General,* published in January 2012, reports of conflict-related sexual violence from both Syrian security forces and anti-government armed groups also have surfaced.

International humanitarian organizations face significant obstacles to gaining access to Syrian cities such as Homs and Hama that are crippled by the brutality and violence. As a result, they cannot assure humanitarian assistance to citizens in need of emergency relief, including medical care, food, and other supplies.

Given extraordinary and temporary conditions on the ground in Syria, Syrian nationals in the United States would face serious danger and threats were they to return to Syria.

Based upon this review, and after consultation with appropriate Government agencies, the Secretary finds that:

• Syrian nationals cannot return to Syria in safety due to extraordinary and temporary conditions. *See* section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C);

• It is not contrary to the national interest of the United States to permit Syrian nationals (and persons without nationality who last habitually resided in Syria) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C);

• The designation of Syria for TPS should be for an 18-month period from March 29, 2012 through September 30, 2013. *See* section 244(b)(2) of the Act, 8 U.S.C. 1254a(b)(2);

• The date by which Syrian TPS applicants must demonstrate that they have continuously resided in the United States is established as March 29, 2012. *See* section 244(c)(1)(A)(ii) of the Act, 8 U.S.C. 1254a(c)(1)(A)(ii);

• The date by which Syrian TPS applicants must demonstrate that they have been continuously physically present in the United States is March 29, 2012, the effective date of this TPS designation of Syria. *See* sections 244(b)(2)(A) and (c)(1)(A)(i) of the Act; 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i); and

• An estimated 2,500 to 3,000 Syrian nationals (and persons without nationality who last habitually resided in Syria) may be eligible for TPS under this designation, based on the issuance of nonimmigrant visas to Syrian nationals.

**Notice of the Designation of Syria for TPS**

By the authority vested in me as Secretary under section 244 of the Act, 8 U.S.C. 1254a, after consultation with the appropriate Government agencies, I designate Syria for TPS under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C), for a period of 18 months from March 29, 2012 through September 30, 2013.

**Janet Napolitano,**
*Secretary.*

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS for Syria, an applicant must submit:

1. Application for Temporary Protected Status (Form I–821) with the form fee; and

2. Application for Employment Authorization (Form I–765).

• If you want an EAD you must pay the Application for Employment Authorization (Form I–765) fee only if you are age 14 through 65.

• No Application for Employment Authorization (Form I–765) fee is required for an EAD with an initial TPS application if you are under the age of 14 or over the age of 65.

You must submit both completed application forms together. If you are unable to pay the required fees, you may apply for a waiver for these application fees and/or the biometrics services fee described below by completing a Request for Fee Waiver (Form I–912), or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for Application for Temporary Protected Status (Form I–821), Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Such applicants must submit a biometric services fee. As previously stated, if you are unable to pay the required fees, you may apply for a biometrics fee waiver by completing a Request for Fee Waiver (Form I–912), or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov/feewaiver.* If your biometrics are required, you will be mailed a notice scheduling you for an appointment at an Application Support Center to have your biometrics collected.

**Re-Filing a TPS Application After Receiving a Denial of a Fee Waiver Request**

If you request a fee waiver when filing your TPS and EAD application forms

and your request is denied, you may re-file your application packet with the correct fees before the filing deadline of September 30, 2013. If you attempt to submit your application with a fee waiver request before the initial filing deadline, but you receive your application back with the USCIS fee waiver denial, and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still re-file your application within the 45-day period after the date on the USCIS fee waiver denial notice. You must include the correct fees, or file a new fee waiver request. Your application will not be rejected even if the deadline has passed, provided it is mailed within those 45 days and all other required information for the application is included. Please be aware that if you re-file your TPS application with a new fee waiver request after the deadline based on this guidance and that new fee waiver request is denied, you cannot re-file again. **Note:** Alternatively, you may pay the TPS application fee and biometrics fee (if age 14 or older) but wait to request an EAD and pay the EAD application fee after USCIS grants your TPS application.

### Mailing Information

Mail your application for TPS to the proper address in Table 1:

TABLE 1—MAILING ADDRESS

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service ................................. | USCIS, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using a Non-U.S. Postal Service delivery service ..................... | USCIS, Attn: Syria TPS, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, please mail your application to the address in Table 1. Upon receiving a Receipt Notice from USCIS, please send an email to *TPSijgrant.vsc@uscis.dhs.gov* with the receipt number stating that you submitted a request for an EAD based on an IJ/BIA grant of TPS. You can find detailed information on what further information you need to email, and email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

### E-Filing

You cannot electronically file your application when applying for initial registration for TPS. Please mail your application to the mailing address listed in Table 1.

### Supporting Documents

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:
- Are a national of Syria or an alien of no nationality who last habitually resided in Syria. Such documents may include a copy of your passport if available, other documentation issued by the SARG showing your nationality (e.g., national identity card, official travel documentation issued by the SARG), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Syrian nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Syria. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. *See* 8 CFR 103.2(b)(9), 244.9(a)(1);
- Have continually resided in the United States since March 29, 2012. *See* 8 CFR 244.9(a)(2);
- Have been continually physically present in the United States since March 29, 2012, the effective date of the designation of Syria. *See* sections 244(b)(2)(A) and (c)(1)(A)(i) of the Act; 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i); and
- Present two color passport-style photographs of yourself.

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also see information on the acceptable documentation and other requirements for applying for TPS on the USCIS Web site at *www.uscis.gov/tps* under "TPS Designated Country—Syria."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

### Employment Authorization Document (EAD)

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants at local offices.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on page 5 of the Employment Eligibility Verification (Form I–9). Employers are required to verify the identity and employment authorization of all new employees by using the Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). An EAD is an acceptable document under "List A."

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing the Employment Eligibility Verification (Form I–9), employers must accept any documentation that appears on the lists of acceptable documentation, and that reasonably appears to be genuine and that relates to you. Employers may not request documentation that does not

**19030**    Federal Register / Vol. 77, No. 61 / Thursday, March 29, 2012 / Notices

appear on the Employment Eligibility Verification (Form I–9). Therefore, employers may not request proof of Syrian citizenship when completing the Employment Eligibility Verification (Form I–9). If presented with EADs that are unexpired on their face, employers should accept such EADs as valid "List A" documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the "Note to All Employees" section for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you because of your citizenship or immigration status, or national origin.

**Note to All Employers**

Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1–800–357–2099. The USCIS Customer Assistance Office accepts calls in English and Spanish only. Employers may also call the Department of Justice (DOJ), Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), Employer Hotline at 1–800–255–8155.

**Note to Employees**

Employees or applicants may call the DOJ OSC Worker Information Hotline at 1–800–255–7688 for information regarding employment discrimination based upon citizenship or immigration status and national origin, unfair documentary practices related to the Employment Eligibility Verification (Form I–9), and discriminatory practices related to E-Verify. Employers must accept any document or combination of documents acceptable for the Employment Eligibility Verification (Form I–9) completion if the documentation reasonably appears to be genuine and to relate to the employee. Employers may not require extra or additional documentation beyond what is required for the Employment Eligibility Verification (Form I–9) completion. Further, employees who receive an initial mismatch via E-Verify must be given an opportunity to challenge the mismatch, and employers are prohibited from taking adverse action against such employees based on the initial mismatch unless and until E-Verify returns a final non-confirmation. The Hotline accepts calls in multiple languages. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/*.

**Note Regarding Federal, State and Local Government Agencies (Such as Departments of Motor Vehicles)**

State and local government agencies are permitted to create their own guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. If you are applying for a state or local government benefit, you may need to provide the state or local government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your EAD that has a valid expiration date; and/or

(2) A copy of your Application for Temporary Protected Status Approval Notice (Form I–797), if you receive one from USCIS.

Check with the state or local agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this notice.

Some benefit-granting agencies use the Systematic Alien Verification for Entitlements (SAVE) Program to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response following completion of all required SAVE verification steps, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has completed all SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *www.uscis.gov/save,* then by choosing "How to Correct Your Records" from the menu on the right.

[FR Doc. 2012–7498 Filed 3–28–12; 8:45 am]

**BILLING CODE 9111–97–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Customs and Border Protection**

[CBP Dec. No. 12–06]

**Automated Commercial Environment Required for the Transmission of Advance Ocean and Rail Cargo Information**

**AGENCY:** U.S. Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** Various U.S. Customs and Border Protection (CBP) regulations require the transmission of advance cargo information to CBP through a CBP-approved electronic data interchange (EDI) system. CBP recently completed the testing of the Automated Commercial Environment (ACE) for the transmission of advance ocean and rail cargo information. This notice announces that, after a six month transition period, ACE will be the only CBP-approved EDI for submitting required advance information for ocean and rail cargo.

**DATES:** On September 29, 2012, ACE will be the only CBP-approved EDI for transmitting to CBP required advance information for ocean and rail cargo.

**FOR FURTHER INFORMATION CONTACT:** Susan Maskell, Office of International Trade, *Susan.Maskell@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

Section 343(a) of the Trade Act of 2002, as amended by the Maritime Transportation Security Act of 2002 (19 U.S.C. 2071 note) (referred to in this notice as the Trade Act), directed U.S. Customs and Border Protection (CBP) to promulgate regulations providing for the mandatory transmission of electronic cargo information by way of a CBP-approved electronic data interchange (EDI) system before the cargo is brought into or departs the United States by any mode of commercial transportation (ocean, air, rail or truck). The required cargo information is that which is reasonably necessary to enable high-risk shipments to be identified for purposes of ensuring cargo safety and security and preventing smuggling pursuant to the laws enforced and administered by CBP. To effectuate the provisions of the Trade Act, CBP published a final rule in the **Federal Register** in 2003, requiring the advance electronic transmission of information pertaining to cargo prior to its being brought into, or sent from, the United States by sea, air, rail or truck. *See* Required Advance Electronic

DHS-AR-000155

| | |
|---|---|
| **From**: | Chretien, Spencer [███████████████] |
| **Sent**: | 7/22/2025 6:11:45 PM |
| **To**: | LAW, ROB [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e64aaea5081b41d783d9868ebf048ff3-fe62cbe9-36] |
| **Subject**: | RE: [External] Upcoming TPS |

**This email is from an external US Government agency.**

Dear Rob,

I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues.

Spencer

## Spencer Chretien

Senior Bureau Official
Population, Refugees, and Migration

 **U.S. DEPARTMENT *of* STATE**

SENSITIVE BUT UNCLASSIFIED

**From:** LAW, ROB <████████████████>
**Sent:** Monday, July 21, 2025 3:27 PM
**To:** Chretien, Spencer <████████████████>
**Subject:** [External] Upcoming TPS

Spencer,

The following TPS designations are coming up for review:
- Syria: Aug. 1 decision deadline
- South Sudan: September 3 decision deadline
- Burma: September 26 decision deadline
- Ethiopia: October 13 decision deadline

Thanks,
RTL

Rob Law
Senior Counselor, Office of the Secretary
U.S. Department of Homeland Security
M: ███████████

DHS-AR-000156

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Advance Parole Applications from Syrian Citizens Inside the USA
Receipts from ELIS2
March 29, 2012 to June 23, 2025



**U.S. Citizenship and Immigration Services**

| Calendar Year | Receipts | Receipts for Travel to Syria |
|---|---|---|
| 2017 | 5 | - |
| 2018 | 252 | - |
| 2019 | 206 | 8 |
| 2020 | 79 | 2 |
| 2021 | 379 | 16 |
| 2022 | 508 | 43 |
| 2023 | 393 | 64 |
| 2024 | 447 | 35 |
| 2025 | 78 | 10 |
| Total | 2,347 | 178 |

**Table Key:**
– Represents zero or rounds to 0.0.

**Note(s):**
1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.
2) This report reflects the most up to date data available at the time the database is queried.
3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
4) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms
5) Syrian citizenship or nationality is based off of country of citizenship.
6) Counts are limited to bnft_typ_cd = 24, 144, and 145 (advance parole for self from inside the USA).

**Source:**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
ELIS, queried 6/2025, PAER0018193.

DHS-AR-000157

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Advance Parole Applications from Syrian Citizens Inside the USA
Receipts from CLAIMS3
March 29, 2012 to June 23, 2025



**U.S. Citizenship and Immigration Services**

| Calendar Year | Receipts |
|---|---:|
| 2012 | 447 |
| 2013 | 908 |
| 2014 | 960 |
| 2015 | 1,190 |
| 2016 | 1,171 |
| 2017 | 747 |
| 2018 | 661 |
| 2019 | 541 |
| 2020 | 412 |
| 2021 | 258 |
| 2022 | 230 |
| 2023 | 176 |
| 2024 | 138 |
| 2025 | 8 |

Note(s):

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Syrian citizenship or nationality is based off of country of citizenship.

6) Country of travel is not available in CLAIMS3, this table is limited to I-131 advance parole receipts for Syrian citizens from CLAIMS3.

7) Counts are limited to part_2_1 = D (advance parole for self from inside the USA).

Source:

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

CLAIMS3, queried 6/2025, PAER0018193.

DHS-AR-000158

Form I-821, Application for Temporary Protected Status
Current Beneficiaries by Country of Designation
As of July 11, 2025



**U.S. Citizenship and Immigration Services**

| Country of Designation | Current TPS Beneficiaries | | |
|---|---|---|---|
| | Approved Individuals that are not LPRs | Approved Individuals that are also LPRs | Total Approved Individuals |
| **TOTAL** | 953,367 | 134,352 | 1,087,719 |
| Afghanistan | 7,828 | 3,909 | 11,737 |
| Burma | 3,760 | 197 | 3,957 |
| Cameroon | 5,201 | 263 | 5,464 |
| El Salvador | 167,434 | 62,451 | 229,885 |
| Ethiopia | 4,645 | 244 | 4,889 |
| Haiti | 337,171 | 16,298 | 353,469 |
| Honduras | 50,551 | 21,196 | 71,747 |
| Lebanon | 343 | - | 343 |
| Nepal | 7,008 | 5,243 | 12,251 |
| Nicaragua | 2,864 | 1,112 | 3,976 |
| Somalia | 796 | 77 | 873 |
| South Sudan | 211 | 16 | 227 |
| Sudan | 1,780 | 262 | 2,042 |
| Syria | 3,970 | 2,101 | 6,071 |
| Ukraine | 101,934 | 3,011 | 104,945 |
| Venezuela | 255,586 | 17,414 | 273,000 |
| Yemen | 2,285 | 558 | 2,843 |

**Table Key:**
– Represents zero or rounds to 0.0.

**Note(s):**
1) The report reflects the most up-to-date estimate available at the time the database is queried.
2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
3) Counts may differ from other reports due to updated logic that utilizes more accurate SSN information.
4) Duplicates were removed based on receipt number, A-Number, SSN, and Name-DOB combination.
5) Country of Designation is based on Country of Citizenship or Country of Birth as of application.
6) Counts may include individuals that may have also been approved for lawful permanent resident (LPR) status.
7) Current holders reflect beneficiaries approved without a subsequent denial or TPS withdrawal.  USC are not included.
8) An "Unknown" "Country of Designation" indicates current TPS holders where their Country of Citizenship and Country of Birth is not one of the current TPS countries and not a former TPS designated country.  These counts may include "stateless" individuals.

**Source(s):**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
CLAIM3, ELIS, CIS2, NPD, queried 7/2025, PAER0018240.

DHS-AR-000159

Form I-821, Application for Temporary Protected Status
Current Pending by Country of Designation
As of July 11, 2025

**U.S. Citizenship and Immigration Services**

| Country of Designation | Current Pending TPS Applications | | | | |
|---|---|---|---|---|---|
| | I-821 Initial Pending Applications from Current Beneficiaries | I-821 Re-registration Pending Applications from Current Beneficiaries | I-821 Initial Pending Applications from non-Current Beneficiaries | I-821 Re-registration Pending Applications from non-Current Beneficiaries | Total Pending Applications |
| TOTAL | 2,871 | 569,280 | 333,413 | 117,162 | 1,022,726 |
| Afghanistan | 50 | 221 | 8,917 | 26 | 9,214 |
| Burma | 1 | 28 | 136 | 7 | 172 |
| Cameroon | 4 | 121 | 535 | 21 | 681 |
| El Salvador | 517 | 114,031 | 935 | 1,620 | 117,103 |
| Ethiopia | 2 | 30 | 291 | 3 | 326 |
| Haiti | 738 | 131,255 | 194,973 | 3,808 | 330,774 |
| Honduras | 141 | 2,573 | 783 | 151 | 3,648 |
| Lebanon | 11 | - | 974 | - | 985 |
| Nepal | 2 | 99 | 22 | 5 | 128 |
| Nicaragua | 13 | 307 | 375 | 34 | 729 |
| Somalia | 7 | 109 | 1,467 | 11 | 1,594 |
| South Sudan | 2 | 17 | 39 | 10 | 68 |
| Sudan | 4 | 583 | 141 | 99 | 827 |
| Syria | 56 | 277 | 632 | 35 | 1,000 |
| Ukraine | 166 | 52,532 | 49,024 | 41,399 | 143,121 |
| Venezuela | 1,139 | 267,006 | 73,891 | 69,907 | 411,943 |
| Yemen | 18 | 91 | 278 | 26 | 413 |

DHS-AR-000160

## Honig, Ofira M

| | |
|---|---|
| **From:** | MILLER, SARAH <█████████████> |
| **Sent:** | Friday, June 13, 2025 4:51 PM |
| **To:** | Cutlip-Mason, Rená  E; Williamson, Bryan J; OPS-HAD |
| **Cc:** | Baker, Bryan; Office of Homeland Security Statistics; Strano, Andria J; Honig, Ofira M |
| **Subject:** | RE: TPS \| Venezuela & Syria |

Here is the estimate of potentially newly eligible for TPS for Syria.

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 06/12/2025 | 2,300 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 01/25/2024 | 1,500 |
| Nonimmigrants who overstayed and arrived since 01/25/2024 | 300 |
| Post-01/25/2024 entrants (border/port encounters) w/o repatriation or relief | 400 |
| Post-01/25/2024 border crossers not apprehended | 200 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

Please let me know if you have any questions!

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** MILLER, SARAH
**Sent:** Friday, June 13, 2025 1:06 PM
**To:** Cutlip-Mason, Rená E <████████████████████████████>; Williamson, Bryan J
<████████████████████████>; OPS-HAD <█████████████████>
**Cc:** Baker, Bryan <████████████████████>; Office of Homeland Security Statistics <████████████████>; Strano, Andria J <████████████████████████>; Honig, Ofira M <████████████████████████>
**Subject:** RE: TPS \| Venezuela & Syria

Hi all,
Here are the estimates of Venezuelans who have arrived since 3/8/2021 and 4/7/2025. The vast majority of NIs are B2s.

Since 3/8/2021:

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 06/12/2025 | 1,010,000 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 03/08/2021 | 60,000 |
| Nonimmigrants who overstayed and arrived since 03/08/2021 | 50,000 |
| Post-03/08/2021 entrants (border/port encounters) w/o repatriation or relief | 810,000 |
| Post-03/08/2021 border crossers not apprehended | 90,000 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs. Humanitarian parole included in border/port encounters.

1

DHS-AR-000161

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



**U.S. Citizenship and Immigration Services**

## SYRIA TEMPORARY PROTECTED STATUS (TPS) RESULTS

### Disclaimer for all Special Protected Classes

Information contained within this report may be subject to immigration specific confidentiality provisions, such as IIRIRA § 404(h), IRCA Section 121(c); 8 C.F.R. § 208.6 (Disclosure of Asylum Information to Third Parties, which is applied to refugee information by policy); 8 U.S.C. § 1367, pertaining to certain victims of domestic abuse, and certain victims of qualifying criminal activities and severe forms of human trafficking; Legalization, 8 U.S.C. §1255a(c)(4)-(5); Special Agriculture Worker (SAW), 8 U.S.C. §§ 1160(b)(5) and (6); LIFE Act, Pub. L. 106-553; Temporary Protected Status, 8 U.S.C. § 1254a(c)(6); other immigration specific limitations; and the terms and conditions as set forth in USCIS's System of Records Notices. This information may only be accessed by authorized personnel with a need to know the information and must be safeguarded.

A violation of the confidentiality provisions in SAW (8 USC 1160(b)(6)(D)), Legalization (8 U.S.C. § 1255A (c)(5)(E)), or LIFE Legalization (Pub. L. 106-553 §1104(c)(5) (December 21 2000)) cases can result in a fine up to $10,000. Violations of the confidentiality provisions of Section 1367(a)(2) are punishable by disciplinary action and a fine of up to $5,000 per violation and may be assessed against anyone who shares any information relating to a protected individual in violation of the confidentiality provisions of Section 1367 (see 8 U.S.C. § 1367(c)).

### Onward disclosure request process

Requests for authorization to disclose information are to be made through the DHS Single Point of Service/Request for Information (SPS/RFI) process for referral to USCIS. To make a request for onward disclosure through the SPS/RFI process, an RFI form specifying the request for onward disclosure must be completed and submitted. The RFI form should include the information that would be shared, the entity with which it would be shared, and the purpose of the proposed disclosure, as well as the contact information of the requester.

The RFI form can be obtained from the RFI Desk/Office at uscis.rfi@uscis.dhs.gov or (202) 272-8812.

WARNING: this file is designated FOR OFFICIAL USE ONLY (FOUO) and contains DEPARTMENT OF HOMELAND SECURITY (DHS) U.S. CITIZENSHIP AND

DHS-AR-000162

IMMIGRATION SERVICES (USCIS) information.  This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know."

**Data Retrieval Date:** FDNS-DS NexGen as of June 25, 2025.
**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple National Security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF. Summary tables for Record and SOF results are provided in the workbook.

2

DHS-AR-000163

## SYRIA TEMPORARY PROTECTED STATUS (TPS) RESULTS

**Statement of Findings Determination on TPS Receipts Provided by TPS Country:**

| Fraud Record Determinations | Total |
|---|---|
| Fraud Found | 4 |
| Fraud Not Found | 2 |
| No SOF Information Found | 9,975 |
| **Total** | **9,981** |

**Notes:** Receipt data provided were passed through FDNS-DS NexGen to identify if any receipt had an associated Statement of Findings.
**Source:** FDNS-NexGen as of 6-23-2025

**TPS Alien Numbers Provided where the Alien Number is Associated with a Public Safety Record and TPS Country:**

| Public Safety Records | Total |
|---|---|
| EPS | 16 |
| Non-EPS | 6 |
| No Public Safety Record Information Found | 9,959 |
| **Total** | **9,981** |

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.
**Source:** FDNS-NexGen as of 6-23-2025



**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.
**Source:** FDNS-NexGen as of 6-23-2025

3

DHS-AR-000164

## Honig, Ofira M

| | |
|---|---|
| **From:** | Williamson, Bryan J |
| **Sent:** | Friday, June 20, 2025 7:53 AM |
| **To:** | Moley, Joanna M (Jo); Honig, Ofira M |
| **Cc:** | Turner, Ebony N; Akhter, Faisal K (Kamal) |
| **Subject:** | FW: TPS | Venezuela & Syria |

Good morning,



Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
Cell: ████████████

**From:** MILLER, SARAH <████████████████████>
**Sent:** Wednesday, June 18, 2025 5:16 PM
**To:** Williamson, Bryan J <████████████████████>
**Cc:** Baker, Bryan <████████████████>; Office of Homeland Security Statistics <████████████>; Strano, Andria J <████████████████████>; Cutlip-Mason, Rená E <████████████████████>; Smith, Mirna <████████████████>
**Subject:** RE: TPS | Venezuela & Syria

You're welcome!

████████████████████████████████████████████████

Here are the numbers for Venezuela and Syria:

| ICE Repatriations to Venezuela and Syria by Fiscal Year: 2020-2025TD | | | | | | |
|---|---|---|---|---|---|---|
| Removal Country | FY2020 | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 |
| Venezuela | 132 | 132 | 133 | 658 | 2,347 | 3,277 |
| Syria | 2 | 0 | 1 | 4 | 5 | 29 |

DHS-AR-000165

Source: OHSS Analysis of ICE ERO data as of May 31, 2025.

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Williamson, Bryan J <██████████████████████>
**Sent:** Wednesday, June 18, 2025 3:02 PM
**To:** MILLER, SARAH <████████████████>
**Cc:** Baker, Bryan <██████████████>; Office of Homeland Security Statistics <██████████>; Strano, Andria J <██████████████>; Cutlip-Mason, Rená E <████████████████████>; Smith, Mirna <██████████████>
**Subject:** RE: TPS | Venezuela & Syria

Hi Sarah,



Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
Cell: ███████████

---

**From:** Cutlip-Mason, Rená E <██████████████████████>
**Sent:** Monday, June 16, 2025 10:30 AM
**To:** MILLER, SARAH <████████████████████>; Williamson, Bryan J <██████████████████>; OPS-HAD <██████████████>
**Cc:** Baker, Bryan <██████████████████>; Office of Homeland Security Statistics <██████████>; Strano, Andria J <██████████████████>; Honig, Ofira M <████████████████>
**Subject:** RE: TPS | Venezuela & Syria

Thank you so much, Sarah, for your quick work; we really appreciate it!

2

DHS-AR-000166

Rená (Ruh-NAY) E. Cutlip-Mason
Chief, Humanitarian Affairs Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
Office: ███████████ | Cell: ███████████

This email, along with any attachments, is intended solely for the use of the addressee(s) and may contain information that is sensitive or protected by applicable law. Unauthorized use or dissemination of this email and any attachments is strictly prohibited. If you are not the intended recipient, please notify the sender and delete or destroy all copies. Thank you.

**From:** MILLER, SARAH <███████████████████>
**Sent:** Friday, June 13, 2025 4:51 PM
**To:** Cutlip-Mason, Rená E <███████████████████████>; Williamson, Bryan J <████████████████████████>; OPS-HAD <████████████████>
**Cc:** Baker, Bryan <███████████████████>; Office of Homeland Security Statistics <██████████>; Strano, Andria J <███████████████████>; Honig, Ofira M <████████████████████>
**Subject:** RE: TPS | Venezuela & Syria

Here is the estimate of potentially newly eligible for TPS for Syria.

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 06/12/2025 | 2,300 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 01/25/2024 | 1,500 |
| Nonimmigrants who overstayed and arrived since 01/25/2024 | 300 |
| Post-01/25/2024 entrants (border/port encounters) w/o repatriation or relief | 400 |
| Post-01/25/2024 border crossers not apprehended | 200 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

Please let me know if you have any questions!

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

**From:** MILLER, SARAH
**Sent:** Friday, June 13, 2025 1:06 PM
**To:** Cutlip-Mason, Rená E <███████████████████████>; Williamson, Bryan J <████████████████████████>; OPS-HAD <████████████████>
**Cc:** Baker, Bryan <███████████████████>; Office of Homeland Security Statistics <██████████>; Strano, Andria J <███████████████████>; Honig, Ofira M <████████████████████>
**Subject:** RE: TPS | Venezuela & Syria

Hi all,
Here are the estimates of Venezuelans who have arrived since 3/8/2021 and 4/7/2025. ██████████████
██████

DHS-AR-000167

Since 3/8/2021:

| | |
|---|---:|
| Newly potentially eligible given a new designation with continuous residence date of 06/12/2025 | 1,010,000 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 03/08/2021 | 60,000 |
| Nonimmigrants who overstayed and arrived since 03/08/2021 | 50,000 |
| Post-03/08/2021 entrants (border/port encounters) w/o repatriation or relief | 810,000 |
| Post-03/08/2021 border crossers not apprehended | 90,000 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs. Humanitarian parole included in border/port encounters.

Since 4/7/2025:

| | |
|---|---:|
| Newly potentially eligible given a new designation with continuous residence date of 06/12/2025 | 14,400 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 04/07/2025 | 14,000 |
| Nonimmigrants who overstayed and arrived since 04/07/2025 | 200 |
| Post-04/07/2025 entrants (border/port encounters) w/o repatriation or relief | 200 |
| Post-04/07/2025 border crossers not apprehended | 100 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Cutlip-Mason, Rená E <███████████████████████>
**Sent:** Friday, June 13, 2025 4:52 AM
**To:** MILLER, SARAH <██████████████>; Williamson, Bryan J <█████████████████████>
**Cc:** Baker, Bryan <████████████████>; Office of Homeland Security Statistics <█████████>; Strano, Andria J <███████████████████>; Honig, Ofira M <███████████████>
**Subject:** Re: TPS | Venezuela & Syria

Thank you!

Rena E. Cutlip-Mason
Chief, Humanitarian Affairs Division
Office of Policy & Strategy
US Citizenship and Immigration Services
Phone (cell) ████████

---

**From:** MILLER, SARAH <██████████████>
**Sent:** Thursday, June 12, 2025 5:41:18 PM
**To:** Cutlip-Mason, Rená E <████████████████████████>; Williamson, Bryan J
<███████████████>
**Cc:** Baker, Bryan <██████████████████>; Office of Homeland Security Statistics <████████████>; Strano,

4

Andria J <█████████████████████>; Honig, Ofira M <████████████████████>
**Subject:** RE: TPS | Venezuela & Syria

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Cutlip-Mason, Rená E <█████████████████████████>
**Sent:** Thursday, June 12, 2025 5:05 PM
**To:** Williamson, Bryan J <██████████████████████>; MILLER, SARAH <████████████████████>
**Cc:** Baker, Bryan <██████████████████>; Office of Homeland Security Statistics <█████████████>; Strano, Andria J <████████████████████>; Honig, Ofira M <████████████████████>
**Subject:** Re: TPS | Venezuela & Syria

Hi Sarah,

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Rena E. Cutlip-Mason
Chief, Humanitarian Affairs Division
Office of Policy & Strategy
US Citizenship and Immigration Services
Phone (cell) ██████████

---

**From:** Williamson, Bryan J <█████████████████████████>
**Sent:** Thursday, June 12, 2025 4:32:53 PM
**To:** MILLER, SARAH <████████████████████>; Cutlip-Mason, Rená E <███████████████████████████>
**Cc:** Baker, Bryan <██████████████████>; Office of Homeland Security Statistics <█████████████>; Cutlip-Mason, Rená E <█████████████████████████████>; Strano, Andria J <██████████████████████>; Honig, Ofira M <██████████████████>
**Subject:** Re: TPS | Venezuela & Syria

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services

5

DHS-AR-000169

Department of Homeland Security
Cell: ██████████

---

**From:** MILLER, SARAH <██████████████████>
**Sent:** Thursday, June 12, 2025 3:59:58 PM
**To:** Williamson, Bryan J <███████████████████>
**Cc:** Baker, Bryan <███████████████████>; Office of Homeland Security Statistics <██████████>; Cutlip-Mason, René E <████████████████████████>; Strano, Andria J <███████████████████>; Honig, Ofira M <████████████>
**Subject:** RE: TPS | Venezuela & Syria

Hi Bryan,

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Williamson, Bryan J <████████████████████>
**Sent:** Thursday, June 12, 2025 9:46 AM
**To:** MILLER, SARAH <██████████████>
**Cc:** Baker, Bryan <███████████████>; Office of Homeland Security Statistics <██████████>; Cutlip-Mason, René E <████████████████████████>; Strano, Andria J <███████████████████>; Honig, Ofira M <████████████>
**Subject:** TPS | Venezuela & Syria
**Importance:** High

Good morning Sarah,



Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

6

DHS-AR-000170

Cell: ███████████

7

DHS-AR-000171

Cite as 23 I&N Dec. 572 (A.G. 2003)          Interim Decision #3488

# In re D-J-, Respondent

*Decided April 17, 2003*

## U.S. Department of Justice
## Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally.  He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic.  He and other passengers on the vessel were apprehended ashore after the vessel sought to

572

DHS-AR-000172

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1]  On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

DHS-AR-000173

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

DHS-AR-000174

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

## II.

## A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4] *See supra* n.3.

575

DHS-AR-000175

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

### B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

DHS-AR-000176

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

_____

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

DHS-AR-000177

The first area of national security concern advanced by INS is the threat of further mass migration.  INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6]  In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations.  The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S.  Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants.  For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing.  The migrants should be detained unless and until they demonstrate a well-founded fear of persecution.  Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum).  The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations.  *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern.  The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration."  INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG).  Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants."  *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti.  The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6]  Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas.  In all, 264 Haitian migrants were interdicted on these dates.  Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have."  INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

DHS-AR-000178

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

## III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

DHS-AR-000179

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

DHS-AR-000180

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

---

[7] The INS also offered evidence disputing respondent's claim that, individually, he does not
(continued...)

DHS-AR-000181

Cite as 23 I&N Dec. 572 (A.G. 2003)                                    Interim Decision #3488

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim*.

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not

---

[7] (...continued)

pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

DHS-AR-000182

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

DHS-AR-000183

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8] I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-*, *Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*

(continued...)

DHS-AR-000184

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted.  The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8]  (...continued)

*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

585

DHS-AR-000185

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp*., 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER:  Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012).  The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree.  The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States.  Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I.  LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

DHS-AR-000186

interests, or welfare of the United States."   Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012). *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016). A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation. *See* 20 C.F.R. § 656.17(h)(1) (2016). Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity. *See* 20 C.F.R. § 656.17(i)(1). That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation. The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications. If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications). If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification. After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification." 8 C.F.R. § 204.5(k)(4)(ii).[1]  That subparagraph states, in pertinent part, that the

---

[1]  While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

DHS-AR-000187

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2]  Section 203(b)(2)(i) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B).  Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability.  *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability").  The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3]  *See* 8 C.F.R. § 204.5(k)(4)(ii).  This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous.  Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions.  *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

---

("MTINA").  Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2]  Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security.  *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3]  To do so, a petitioner must go beyond showing the individual's expertise in a particular field.  The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor.  By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability.  Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

DHS-AR-000188

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

[4] *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
[5] Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

DHS-AR-000189

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6]  While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

DHS-AR-000190

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake.  The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education.  Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact.  For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact.  An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances.  But we do not evaluate prospective impact solely in geographic terms.  Instead, we look for broader implications.  Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance.  In modifying this prong to assess "national

---

[7]   Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8]   Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements.  *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010).  We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence.  *Id.*

[9]   Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion.  *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

DHS-AR-000191

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or

(continued . . .)

DHS-AR-000192

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III.  ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

---

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

DHS-AR-000193

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities. The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework. First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor. The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles. In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance. The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests. He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development. The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor. Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration. The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

DHS-AR-000194

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11]   Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects.  The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field.  The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness.  In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful.  Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines.  He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students.    While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly.  Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11] Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

DHS-AR-000195

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

## IV.  CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought.  Section 291 of the Act, 8 U.S.C. § 1361 (2012).  The petitioner has met that burden.

**ORDER:**  The appeal is sustained and the petition is approved.

894

# Explore All Countries Syria

**Middle East**



## INTRODUCTION

**Background**

After World War I, France acquired a mandate over the northern portion of the former Ottoman Empire province of Syria. The French administered the area until granting it independence in 1946. The new country lacked political stability and experienced a series of military coups. Syria united with Egypt in 1958 to form the United Arab Republic. In 1961, the two entities separated, and the Syrian Arab Republic was reestablished. In the 1967 Arab-Israeli War, Syria lost control of the Golan Heights region to Israel. During the 1990s, Syria and Israel held occasional, albeit unsuccessful, peace talks over its return. In 1970, Hafiz al-ASAD, a member of the socialist Ba'ath Party and the minority Alawi sect, seized power in a bloodless coup and brought political stability to the country. Following the death of al-ASAD, his son, Bashar al-ASAD, was approved as president by popular referendum in 2000. Syrian troops that were stationed in Lebanon since 1976 in an ostensible peacekeeping role were withdrawn in 2005. During the 2006 conflict between Israel and Hizballah, Syria placed its military forces on alert but did not intervene directly on behalf of its ally Hizballah. In 2007, Bashar al-ASAD's second term as president was again approved in a referendum.

In the wake of major uprisings elsewhere in the region, antigovernment protests broke out in the southern province of Dar'a in 2011. Protesters called for the legalization of political parties, the removal of corrupt local officials, and the repeal of the restrictive Emergency Law allowing arrests without charge. Demonstrations and violent unrest spread across Syria, and the government responded with concessions, but also with military force and detentions that led to extended clashes and eventually civil war. International pressure on the Syrian Government intensified after 2011, as the Arab League, the EU, Turkey, and the US expanded economic sanctions against the ASAD regime and those entities that supported it. In 2012, more than 130 countries recognized the Syrian National Coalition as the sole legitimate representative of the Syrian people. In 2015, Russia launched a military intervention on behalf of the ASAD regime, and domestic and foreign-government-aligned forces recaptured swaths of territory from opposition forces. With foreign support, the regime continued to periodically regain opposition-held territory until 2020, when Turkish firepower halted a regime advance and forced a stalemate between

DHS-AR-000197

regime and opposition forces. The government lacks territorial control over much of the northeastern part of the country, which the predominantly Kurdish Syrian Democratic Forces (SDF) hold, and a smaller area dominated by Turkey.

Since 2016, Turkey has conducted three large-scale military operations to capture territory along Syria's northern border. Some opposition forces organized under the Turkish-backed Syrian National Army and Turkish forces have maintained control of northwestern Syria along the Turkish border with the Afrin area of Aleppo Province since 2018. The violent extremist organization Hay'at Tahrir al-Sham (formerly the Nusrah Front) emerged in 2017 as the predominant opposition force in Idlib Province, and still dominates an area also hosting Turkish forces. Negotiations have failed to produce a resolution to the conflict, and the UN estimated in 2022 that at least 306,000 people have died during the civil war. Approximately 6.7 million Syrians were internally displaced as of 2022, and 14.6 million people were in need of humanitarian assistance across the country. An additional 5.6 million Syrians were registered refugees in Turkey, Jordan, Iraq, Egypt, and North Africa. The conflict in Syria remains one of the two largest displacement crises worldwide (the other is the full-scale invasion of Ukraine).

On 8 December 2024, Syrian Islamist rebels captured the capital city of Damascus and overthrew President Bashar al-ASAD. The former president and his family fled to Moscow, where they were granted political asylum. The al-ASAD regime had ruled Syria for over 50 years.

## GEOGRAPHY

**Location**

Middle East, bordering the Mediterranean Sea, between Lebanon and Turkey

**Geographic coordinates**

35 00 N, 38 00 E

**Map references**

Middle East

**Area**

**total :** 187,437 sq km

**land:** 185,887 sq km

**water:** 1,550 sq km

**note:** includes 1,295 sq km of Israeli-occupied territory
comparison ranking: total 89

**Area - comparative**

slightly more than 1.5 times the size of Pennsylvania

## Area comparison map:



**Land boundaries**

**total:** 2,363 km

**border countries (5):** Iraq 599 km; Israel 83 km; Jordan 379 km; Lebanon 403 km; Turkey 899 km

**Coastline**

193 km

**Maritime claims**

**territorial sea:** 12 nm

DHS-AR-000198

**contiguous zone:** 24 nm

**Climate**

mostly desert; hot, dry, sunny summers (June to August) and mild, rainy winters (December to February) along coast; cold weather with snow or sleet periodically in Damascus

**Terrain**

primarily semiarid and desert plateau; narrow coastal plain; mountains in west

**Elevation**

**highest point:** Mount Hermon (Jabal a-Shayk) 2,814 m

**lowest point:** Yarmuk River -66 m

**mean elevation:** 514 m

**Natural resources**

petroleum, phosphates, chrome and manganese ores, asphalt, iron ore, rock salt, marble, gypsum, hydropower

**Land use**

**agricultural land:** 73.5% (2022 est.)

arable land: 23.8% (2022 est.)

permanent crops: 5.6% (2022 est.)

permanent pasture: 44.1% (2022 est.)

**forest:** 2.8% (2022 est.)

**other:** 23.7% (2022 est.)

**Irrigated land**

9,820 sq km (2022)

**Major rivers (by length in km)**

Euphrates (shared with Turkey [s], Iran, and Iraq [m]) - 3,596 km; Tigris (shared with Turkey, Iran, and Iraq [m]) - 1,950 km

**note:** [s] after country name indicates river source; [m] after country name indicates river mouth

**Major watersheds (area sq km)**

Indian Ocean drainage: *(Persian Gulf)* Tigris and Euphrates (918,044 sq km)

**Population distribution**

significant population density along the Mediterranean coast; larger concentrations found in the major cities of Damascus, Aleppo (the country's largest city), and Hims (Homs); more than half of the population lives in the coastal plain, the province of Halab, and the Euphrates River valley

**note:** the ongoing civil war has altered the population distribution

**Natural hazards**

dust storms, sandstorms

**volcanism:** Syria's two historically active volcanoes, Es Safa and an unnamed volcano near the Turkish border have not erupted in centuries

**Geography - note**

the capital of Damascus is located at an oasis fed by the Barada River and is thought to be one of the world's oldest continuously inhabited cities; there are Israeli settlements and

DHS-AR-000199

civilian land-use sites in the Israeli-controlled Golan Heights (2017)

## PEOPLE AND SOCIETY

**Population**

**total:** 23,865,423 (2024 est.)

**male:** 11,981,578

**female:** 11,883,845

comparison rankings: total 57; female 58; male 57

**Nationality**

**noun:** Syrian(s)

**adjective:** Syrian

**Ethnic groups**

Arab ~50%, Alawite ~15%, Kurd ~10%, Levantine ~10%, other ~15% (includes Druze, Ismaili, Imami, Nusairi, Assyrian, Turkoman, Armenian)

**Languages**

Arabic (official), Kurdish, Armenian, Aramaic, Circassian, French, English

**major-language sample(s):**

(Arabic) كتاب حقائق العالم، المصدر الذي لا يمكن الاستغناء عنه للمعلومات الأساسية

(Kurdish) راستییەکانی جیهان، باشترین سەرچاوەیە بۆ زانیارییە بنەڕەتییەکان

The World Factbook, the indispensable source for basic information.

# Arabic audio sample:

DHS-AR-000200

# U.S. Strikes Targets in Iraq and Syria in Response to Deadly Drone Attack

Feb. 2, 2024  |  By Joseph Clark, DOD News

**U.S. forces conducted a series of strikes today against Iran-backed militant groups in Iraq and Syria in response to last weekend's attack in Jordan that killed three U.S. soldiers.**



DHS-AR-000201

The strikes, which were carried out by U.S. Central Command forces, included more than 85 targets across seven facilities used by groups affiliated with Iran's Islamic Revolutionary Guard Corps' Quds Force.

Those targets included command and control centers, intelligence facilities and weapons storage facilities used by the Iran-backed militias to attack U.S. and coalition forces.

President Joe Biden said in a statement that the strikes were the first in a series of actions by the U.S. in response to the attack in Jordan.

"Our response began today," he said.  "It will continue at times and places of our choosing."

"The United States does not seek conflict in the Middle East or anywhere else in the world," he said. "But let all those who might seek to do us harm know this: If you harm an American, we will respond."

Secretary of Defense Lloyd J. Austin III echoed the president's resolve to hold the Iran-backed groups accountable.

"This is the start of our response," Austin said.

"The president has directed additional actions to hold the IRGC and affiliated militias accountable for their attacks on U.S. and coalition forces," he said. "These will unfold at times and places of our choosing."

He added that, while the U.S. does not seek conflict in the region, "the president and I will not tolerate attacks on American forces."

DHS-AR-000202



Today's strikes were announced just hours after Biden and Austin attended the dignified transfer in Dover, Delaware, of the remains of the three soldiers killed in last weekend's attack — Army Sgts. William J. Rivers, Kennedy L. Sanders and Breonna A. Moffett.

National security officials said the facilities targeted in today's strikes were carefully selected to avoid civilian casualties and were based on clear evidence that they were connected to attacks on U.S. personnel.

"The Department of Defense is in the early stages of battle damage assessment, but we believe that the strikes were successful," said John Kirby, National Security Council coordinator for strategic communications, during a briefing following the strikes.

Army Lt. Gen. Douglas A. Sims II, director of operations for the Joint Staff, said today's strikes employed multiple aircraft, including B-1 Lancers that flew from bases in the U.S.

"This has been in the planning since we were asked to look at it," Sims said, adding that weather played a factor in the timing of the strikes.

DHS-AR-000203

"Good weather presented itself today and, as a result, this took place," he said.

Kirby said the president was kept informed throughout the afternoon.

"As President Biden has made clear, we will not hesitate to defend our people and hold responsible all those who harm Americans at a time and place of our choosing," Kirby said. "That began tonight—but it will not end tonight."

Hosted by Defense Media Activity - WEB.mil

DHS-AR-000204



PRESS RELEASE

# Former Syrian Prison Official Charged with Immigration Fraud

Thursday, August 8, 2024

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – A former Syrian government official was indicted today for allegedly lying to United States immigration authorities about his time running a Syrian prison where prisoners, including political dissidents, were physically mistreated.

Samir Ousman Alsheikh, 72, of Lexington, South Carolina, is charged with one count of obtaining, using, and possessing a green card that was procured through false statements and one count of attempted naturalization fraud.

Alsheikh was arrested on a federal criminal complaint on July 10 at Los Angeles International Airport and remains in federal custody. His arraignment is scheduled for August 16 in United States District Court in downtown Los Angeles.

"Samir Alsheikh attempted to settle in Southern California after allegedly participating in grave abuses while part of the Assad regime in Syria," said United States Attorney Martin Estrada. "His indictment sends a clear message that those who seek immigration benefits in our country after having previously committed human rights violations will find no shelter here."

According to court documents, Alsheikh was a Syrian government official who held a variety of positions in the Syrian police and the Syrian state security apparatus, and was associated with the Syrian Ba'ath Party, the totalitarian party that ruled Syria.

DHS-AR-000205

He allegedly served as the head of Damascus Central Prison (colloquially known as "Adra Prison") from approximately 2005 to 2010. As described in the indictment, political dissidents and other prisoners were severely physically abused at Adra Prison during Alsheikh's tenure there. The indictment further alleges that Alsheikh was subsequently appointed governor of the province of Deir Ez-Zour by Syrian President Bashar al-Assad.

Alsheikh allegedly concealed his employment at the prison, persecution of any person because of political opinion, and involvement in harming others when he applied for U.S. citizenship in 2023. He allegedly made similar false statements when applying for a visa that enabled him to enter the United States in 2020, become a lawful permanent resident, and obtain a green card.

*An indictment is merely an allegation. All defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*

If convicted, Alsheikh faces a maximum penalty of 10 years in federal prison.

HSI and the FBI are investigating the case, with support from U.S. Citizenship and Immigration Services and the HSI-led Human Rights Violators and War Criminals Center (HRVWCC).

Assistant United States Attorney Joshua O. Mausner of the Violent and Organized Crime Section and Justice Department Trial Attorneys Patrick Jasperse and Alexandra Skinnion of the Criminal Division's Human Rights and Special Prosecutions Section are prosecuting the case. The Justice Department's Office of International Affairs also provided assistance.

Members of the public who have information about human rights violators in the United States are urged to contact U.S. law enforcement through the FBI tip line at 1-800-CALL-FBI or the HSI tip line at 1-866-DHS-2-ICE, or complete the FBI online tip form or the ICE online tip form.

**Contact**

Ciaran McEvoy

Public Information Officer

ciaran.mcevoy@usdoj.gov

(213) 894-4465

*Updated November 13, 2024*

**Topic**

**IMMIGRATION**

Component

[USAO - California, Central](#)

Press Release Number: 24-191

# Related Content

**PRESS RELEASE**

## Operation Guardian Angel's Initial Results Reported

The United States Attorney's Office along with its federal law enforcement partners today announced the initial results of Operation Guardian Angel, a program that seeks to neutralize California's sanctuary state...

September 25, 2025

**PRESS RELEASE**

## South L.A. Man Arrested on Federal Complaint Charging Him with Illegally Towing Government Vehicle Used During Immigration Arrest

A South Los Angeles man and tow truck driver was arrested today on a federal criminal complaint charging him with stealing government property by illegally towing a vehicle used by...

September 2, 2025

**PRESS RELEASE**

DHS-AR-000207

## Federal Grand Jury Indicts Two Ontario Surgery Staffers for Assaulting and Interfering with Lawful ICE Detention of Illegal Alien

A federal grand jury today indicted two staff members at a surgery center in San Bernardino County, charging them with assaulting and interfering with United States immigration officers attempting to...

August 27, 2025

## ✉ Central District of California

312 N. Spring St. Suite 1200

Los Angeles, CA 90012

📞 Phone: (213) 894-2400

Fax: (213) 894-0141

DHS-AR-000208



**PRESS RELEASE**

# Syrian Man Arrested on Terrorism Charges After Planning Attack on Christian Church

Wednesday, June 19, 2019

**For Immediate Release**

Office of Public Affairs

## Complaint Alleges Syrian Man Plotted Attacks in the Name of ISIS

Mustafa Mousab Alowemer, 21, a resident of Pittsburgh, Pennsylvania, was arrested today based on a federal complaint charging him with one count of attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization, and two counts of distributing information relating to an explosive, destructive device, or weapon of mass destruction in relation to his plan to attack a church in Pittsburgh.

The announcement was made by Assistant Attorney General for National Security John C. Demers, U.S. Attorney Scott W. Brady for the Western District of Pennsylvania, Assistant Director Michael McGarrity of the FBI's Counterterrorism Division and Special Agent in Charge Robert Jones of the FBI's Pittsburgh Division.

"Targeting places of worship is beyond the pale, no matter what the motivation," said Assistant Attorney General Demers. "The defendant is alleged to have plotted just such an attack of a church in Pittsburgh in the name of ISIS. The National Security Division and our partners will continue our efforts to identify and bring to justice individuals in our country who seek to

DHS-AR-000209

commit violence on behalf of ISIS and other terrorist organizations.  I want to thank the agents, analysts, and prosecutors who are responsible for this investigation."

"Our top priority is protecting the citizens of western Pennsylvania," said U.S. Attorney Brady. "Every day investigators and prosecutors work tirelessly behind the scenes to disrupt terrorist activity and keep our community safe.  While the public does not always see the results of the hard work of these dedicated men and women, this case is a visible demonstration of our commitment to rooting out terrorists and bringing them to justice."

"Court documents show Mustafa Alowemer planned to attack a church in the name of ISIS, which could have killed or injured many people.  Fortunately, his plans were foiled by the full force of the FBI Pittsburgh Joint Terrorism Task Force," said Assistant Director McGarrity.  "The FBI takes threats to churches and other religious institutions extremely seriously and will use all our resources to stop potential terrorist attacks against them."

"We will use every resource available to identify potential violent actors and protect the public," said Special Agent in Charge Jones.  "Our Joint Terrorism Task Force is dedicated to identifying and bringing to justice those individuals who provide material support to foreign terrorist organizations, promote violent extremism and threaten our national security.  The invaluable partnerships the FBI Pittsburgh JTTF has with our federal state and local partners allow us to work tirelessly to protect Americans from terrorism."

According to an affidavit filed in U.S. District Court in Pittsburgh:

The FBI Pittsburgh JTTF investigation of Mustafa Mousab Alowemer (Alowemer) revealed that Alowemer plotted to bomb a church located on the North Side of Pittsburgh, Pennsylvania (the Church), using a weapon of mass destruction (i.e., an explosive device).  According to Alowemer, his motivation to detonate a device at the Church was to support the cause of ISIS and to inspire other ISIS supporters in the United States to join together and commit similar acts in the name of ISIS.  Alowemer also targeted the Church in order to "take revenge for our [ISIS] brothers in Nigeria."  Alowemer was aware that numerous people in or around the Church could be killed by the explosion.

According to the complaint and information provided to the FBI by the Department of Homeland Security, Alowemer was born in Daraa, Syria, and was admitted to the United States as a refugee on Aug. 1, 2016.

In furtherance of the plot to bomb the Church, in May 2019, Alowemer distributed multiple instructional documents related to the construction and use of explosives and improvised explosive devices (IEDs) to an individual Alowemer believed to be a fellow ISIS supporter, but who was in fact an FBI employee.  Alowemer distributed these documents with the intent that the information be used in the assembly of a destructive device and in furtherance of conducting an attack in support of ISIS.  In or around June 2019, Alowemer purchased several

items with the belief that they were necessary to assemble a destructive device and with the intention that they be used to construct the explosives that would be detonated in the vicinity of the Church.

In planning the attack, Alowemer used multiple social networking and mobile messenger applications to communicate with an individual whom he believed to be a fellow ISIS supporter. During his communications, Alowemer stated his support for ISIS, and his desire to answer the call for jihad or travel to conduct jihad.  Alowemer also distributed propaganda materials, offered to provide potential targets in the Pittsburgh area, requested a weapon with a silencer, and recorded a video of himself pledging an oath of allegiance to the leader of ISIS, Abu Bakr Al-Baghdadi.

Between April 16 and June 11, Alowemer met four times in person with an FBI Undercover Employee (UCE) and/or an FBI Confidential Human Source (CHS).  At the June 11 meeting with the UCE and CHS, Alowemer provided additional details about the bomb plot and provided the materials he had purchased for construction of the device.  Alowemer provided two printed copies of detailed Google satellite maps, which included hand-written markings identifying the Church and routes of arrival and escape.  Alowemer also wrote and provided a 10-point handwritten plan ("Confirmation of this operation") outlining details related to his plot to personally deliver explosives in a backpack.   Alowemer expressed a desire to meet one more time to conduct planning and coordination prior to carrying out the attempted bombing in July 2019.  That meeting was later scheduled for June 19 in the Pittsburgh area.

A charge is merely an allegation, and the defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt in a court of law.

Members of the FBI's Joint Terrorism Task Force who were directly involved in this investigation include: FBI, U.S. Immigration and Customs Enforcement(ICE)/U.S. Citizen and Immigration Services(USCIS)/Homeland Security Investigations(HSI), Internal Revenue Service – Criminal Investigation, United States Secret Service, United States Postal Inspection Service, Pennsylvania State Police, Allegheny County Police Department, Pittsburgh Bureau of Police, Allegheny County Port Authority Police, Allegheny County Probation, University of Pittsburgh Police Department, and UPMC Police Security.

The case is being prosecuted by Assistant U.S. Attorney Soo C. Song of the Western District of Pennsylvania and Trial Attorney Brenda Sue Thornton of the National Security Division's Counterterrorism Section.

*Updated February 5, 2025*

DHS-AR-000211