## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Dahila DOE; Sara DOE; Nesma DOE; Laila DOE; Waleed DOE; Mustafa DOE; and Ahmad DOE, on their own behalf and on behalf of others similarly situated,<br><br><br>*Plaintiffs*,<br><br>– *versus* –<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br><br>*Defendants*. | **Case No. 1:25-cv-08686**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**INTRODUCTION**

1.      Syria remains a country in humanitarian crisis. In recognition of a brutal civil war that began in 2011, the United States has repeatedly granted Syrian nationals a form of statutory and humanitarian protection called Temporary Protected Status ("TPS"), which protects certain individuals from removal to countries designated unsafe on account of dire country conditions like armed conflict, natural disaster, or other extraordinary circumstances. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their countries of origin. Over 6,100 Syrian nationals currently have TPS and, as a result, have found refuge in the United States; and over 800 Syrian nationals have pending applications hoping for that same protection.

2.      Plaintiffs are seven Syrian nationals with TPS or pending applications for TPS, who have lived in the United States for years and have deep ties to this country and their communities. They bring this class action to challenge Defendants' remarkable and unlawful decision to terminate Syria's TPS designation. Defendants' actions put Plaintiffs with existing TPS at imminent risk of losing the critical humanitarian protection that TPS provides and rob Plaintiffs with pending applications of the opportunity to have their applications adjudicated. Should Defendants' termination of Syria's TPS take effect, all Plaintiffs will face the harm of unlawfully being stripped of their immigration status and critical protections from detention, deportation, loss of work authorization, and family separation, which many Plaintiffs have relied on for years to avoid the prospect of a forced return to Syria—a country plagued by ongoing violent conflict, including air strikes, civil unrest, humanitarian crisis, and volatile country conditions.

3.      Defendants' termination decision is unlawful for three reasons. First, Defendants' decision was *ultra vires* because former Secretary of Homeland Security Krisi Noem

lacked statutory authority to terminate TPS when that authority explicitly and exclusively lies with the Attorney General and was never appropriately delegated to the Secretary. Second, Defendant's termination of Syria's TPS, by failing to follow the TPS statute's mandates for terminating, will result in Plaintiffs' summary loss of immigration status and work authorization, in violation of the Fifth Amendment's due process guarantee.

4.    Third, the former Secretary's termination also violated the Equal Protection Clause of the Constitution because her decision was based on animus against Syrian TPS holders due to their race, ethnicity, and national origin, as well as the government's bare desire to harm TPS holders as a politically unpopular group. TPS holders from Syria join those of communities from the twelve other non-white, non-European countries[1] whose protections have been terminated by the Trump Administration—nearly every single TPS country that has come up for review. Noem, President Trump, and other members of the Trump Administration have repeatedly used racially charged and demeaning rhetoric to justify targeting TPS protections for immigrants from non-white, non-European[2] countries, including Syria, based on their race, ethnicity, national origin, and status as TPS beneficiaries. These

---

[1] To date, the current Trump Administration has terminated TPS for thirteen countries whose designations have been up for review. The countries subject to termination are: Syria, Burma, Nicaragua, Honduras, Nepal, Cameroon, Afghanistan, Haiti, Venezuela, Ethiopia, Somalia, and Yemen. South Sudan's TPS designation was extended in May 2025, but the government terminated it after six months the second time it came up for potential redesignation. Lebanon's TPS designation was automatically extended without any affirmative decision because the Secretary did not make a decision by the statutory deadline.

[2] For example, after the announcement of the administrative vacaturs of the TPS designations for Venezuela and Haiti, and when asked if he planned to revoke TPS for Ukrainians, President Trump responded, "[w]e're not looking to hurt them. Especially Ukrainians, they've gone through a lot." Sergio Martinez-Beltran & Joel Rose, *As protections expire, Ukrainians who escaped war face an uncertain future*, NPR (Mar. 28, 2025), https://www.npr.org/2025/03/28/nx-s1-5318049/as-protections-expire-ukrainians-war-uncertain-future-uniting-for-ukraine.)

statements demonstrate a discriminatory and calculated effort to harm Syrian TPS holders and TPS holders as a group.

5.      Although it has become alarmingly normalized, Noem, President Trump, and members of the Trump presidential campaign and Administration have consistently used racist and hateful invective to describe and justify their TPS decisions involving immigrants from non-white, non-European countries, including Syria.

6.      Plaintiffs have been unlawfully deprived of constitutionally protected interests by an official with no authority to take the challenged action. For these reasons, this Court should set aside DHS's decision purporting to terminate TPS for Syrian nationals.

## THE PARTIES

### Plaintiffs

7.      **Plaintiff Dahlia Doe** is a Syrian national and TPS holder who has lived in the United States since 2015 and currently resides in the Bronx, New York. She works as a research director and is the primary caregiver for her elderly U.S. citizen father, who suffers from Parkinson's disease. Unless her pending application for alternative relief is granted immediately, she will lose her protection from deportation if TPS for Syria is terminated. Losing TPS will force her to relocate to Syria where she has never lived, has no immediate family ties, and fears she will be targeted as a Syrian Christian religious minority. Dahlia will also be forcibly separated from her immediate U.S. citizen and lawful permanent resident family members.

8.      **Plaintiff Sara Doe** is a Syrian national and TPS holder who has lived in the United States since 2014 and currently resides in New York State. Sara moved to the United States after her brothers were killed during the civil war in Syria, and she herself was targeted by the government as a volunteer providing medical services. Sara is a medical practitioner and a

highly sought-after pediatrician. She will lose her work authorization, employer-based health insurance, and protection from deportation if TPS is terminated. Losing TPS will mean that Sara cannot continue working as a highly-specialized pediatrician, a career she has spent decades training for, and will not be able to provide crucial care to children across New York. Sara no longer has a home or anyone to return to in Syria.

9. **Plaintiff Nesma Doe** is a Syrian national and TPS holder who has lived in the United States since 2013 and currently resides in Florida. Nesma is in her late 70s and suffers from various health issues. Members of her close family—including two nieces who serve as her caregivers—all reside in the United States, and most are U.S. citizens. She will lose her protection from deportation and be forcibly separated from her only family in the United States. Losing TPS will force her to relocate to Syria without any family ties and where elderly people have increasingly been targets of crime and armed robberies due to the dire economic instability in the country. She also faces uncertainty over whether she could receive and afford the medical care she requires.

10. **Plaintiff Laila Doe** is a Syrian national and TPS holder who has lived in the United States since 2013 and currently resides in Illinois. She is a full-time special needs teacher and is studying to become a nurse. She is a single mother providing for her minor daughter (also a Syrian TPS holder) and is the primary caregiver for her elderly U.S. citizen mother. She will lose her work authorization and protection from deportation if TPS is terminated. Losing TPS will force Laila and her daughter to return to Syria where she fears for her safety as a divorced single woman, and where her daughter would not be able to pursue her education. She will also be forcibly separated from her U.S. citizen mother and sisters.

11.    **Plaintiff Waleed Doe** is a Syrian national and TPS holder who has lived in the United States since 2011 and currently resides in New Jersey. He is the primary breadwinner for his family and supports his wife, who is also a Syrian TPS holder, and three U.S. citizen children, the youngest of whom is 18 months old. He works full-time as a senior manager for a private company and recently started his own business. He will lose his work authorization, employer-based health insurance and protection from deportation if TPS is terminated. Losing TPS will prevent Waleed from providing for his family and force him to make the devastating choice of leaving his U.S. citizen children behind or taking them to a country where they would lack medical care, education, and basic necessities.

12.    **Plaintiff Mustafa Doe** is a Syrian national and TPS holder who has lived in the United States since 2021 and currently resides in New York, New York. He recently graduated from college and has temporary status and work authorization as an extension of his student visa. When that status expires, he will be left without work authorization and protection from detention or deportation and could be forcibly returned to a country where he was sexually trafficked as a child and will face persecution for his LGBTQI identity. Mustafa will also be forcibly separated from his parents who are lawful permanent residents.

13.    Plaintiff **Ahmad Doe** is a Syrian citizen with a pending initial application for TPS who has lived in the United States since 2022 and resides in Virginia. Ahmad is a highly sought-after journalist and media producer, but without work authorization cannot accept any of several job offers he has from reputable media companies. Ahmad's only current eligibility for work authorization is through his pending TPS application. If TPS is terminated, Ahmad will lose his protection from deportation as a pending applicant and lose his pathway to obtain work authorization. He fears that, if he is forced to relocate to Syria, he would be killed or targeted due

to his criticism of current and past regimes as a journalist. Further, he could be forcibly separated from his non-Syrian national wife.

**Defendants**

14.    **Defendant Markwayne Mullin** is the Secretary of the Department of Homeland Security ("DHS"). As the highest-ranking officer for DHS, Defendant Mullin has asserted ultimate authority over all TPS extension, termination, and designation decisions. He is sued in his official capacity. Defendant Mullin was preceded in office by Secretary Kristi Noem, who left the position on March 24, 2026, and was an original official-capacity defendant in this action.

15.    **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.

16.    **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

17.    **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or

controversy within the meaning of Article III of the U.S. Constitution. The Court also has

jurisdiction over Plaintiffs' claim under the Fifth Amendment to the U.S. Constitution. The Court

has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*,

and the APA, 5 U.S.C. §§ 701–706.

19.     The federal government has waived its sovereign immunity and permitted judicial

review of agency action under 5 U.S.C. § 702.[3] In addition, sovereign immunity does not bar

claims against federal officials seeking to prevent violations of federal law, rather than monetary

relief.[4]

20.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants

are agencies of the United States or officers of the United States acting in their official capacity,

and because at least one named Plaintiff, as well as unnamed members of the putative class,

reside in this judicial district.

**THE STATUTORY SCHEME FOR TPS**

***The TPS Statute and History***

21.     Congress created TPS in response to unconstrained executive discretion in

humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure"

to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, *Extended*

*Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85

Mich. L. Rev. 152, 157–60 (1986). Between 1960 and 1989, the Attorney General granted

extended voluntary departure to approximately sixteen countries, with periods of protection

---

[3] *See Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008).
[4] *See, e.g.*, *id.*; *Lunney v. United States*, 319 F.3d 550, 557–58 (2d Cir. 2003); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–20 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

ranging from eight months to 15 years.[5] This practice lacked "any specific . . . criteria." *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion by Mikva, J.).

22.    Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Meldon E. Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson). While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS. *See* Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978, §§ 302–303.

23.    Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Attorney General may designate a country for TPS where (1) "there

---

[5] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362–63 (1995).

is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; and (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

24.    Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

25.    In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Attorney General to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Attorney General "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the Attorney General may specify." *Id.* § 1254a(b)(2).

26.    The Attorney General thus has substantial discretion over initial TPS designations. So long as he determines certain country conditions exist, he may choose whether and when to designate a country for TPS.

27.    By contrast, Congress limited, in important ways, the Attorney General's discretion to review TPS designations after the initial designation is made. *See* U.S. Gov't

9

Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") 15–18, 27 (differentiating between the discretion afforded before and after an initial designation). The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

### Statutory Authority for TPS Decisionmaking

28.     In 1991, the Department of Justice ("DOJ") and the former Immigration and Naturalization Service ("INS") adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at Temporary Protected Status for Nationals of Designated States, 8 C.F.R. part 244) ("This interim rule implements a new section, 244A of the Immigration and Nationality Act, established by section 302 . . . ."). Those regulations delegated significant operational aspects of TPS to INS, including the authority to initially find individual noncitizens eligible for TPS and award protected status, *see id.* at 619 (codified as 8 C.F.R. § 244.2), and the authority to receive and process applications for protected status, *see id.* at 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

29.     The regulations, however, did not authorize any subordinate official to exercise the Attorney General's authority to terminate foreign states pursuant to 8 U.S.C. § 1254a. On the contrary, they defined an eligible state to mean a "foreign country or part thereof *as designated by the Attorney General* pursuant to section 244A(b) of the Act." *See id*. at 619 (codified as 8

10

C.F.R. § 244.1) (emphasis added). In practice, the Attorney General issued TPS terminations under the Act.

30.     In 2002, Congress created DHS, which absorbed many of the functions of the INS. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The Homeland Security Act charged the DHS Secretary "with the administration and enforcement of this chapter"—the INA— "and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred* upon the President, *Attorney General,* the Secretary of State, the officers of the Department of State, or diplomatic or consular officers." 8 U.S.C. § 1103(a)(1) (emphases added).

31.     Following the Act's passage, DOJ issued a final rule reorganizing 8 C.F.R. Chapter I—containing, among other things, the existing TPS regulations—in order to "reflect[] the transfer of functions of the Immigration and Naturalization Service through the division of jurisdiction over regulations currently codified in 8 CFR chapter I." Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003).

32.     The rule duplicated existing TPS regulations "because many of the decisions under temporary protected status are made by immigration judges and the Board of Immigration Appeals," which resides within DOJ under EOIR. *Id*. at 9827; *see also id*. at 9841–42. The rule noted regulations would "require further refinement to clarify the authority of Secretary of Homeland Security to designate countries for temporary protected status purposes." *Id*. at 9827.

33.     The president also issued an executive reorganization plan and amendment. *See* 6 U.S.C. § 542 (Department of Homeland Security Reorganization Plan). The reorganization plan purported to "[t]ransfer the . . . functions of the Immigration and Naturalization Service"— including delegated functions "performed by" INS "immediately before" the transfer—to DHS,

11

but it made no mention of TPS, or powers expressly vested in the Attorney General under the

INA. *See id.*; 6 U.S.C. § 551(d). By contrast, other portions of the reorganization plan did

specifically address the transfer of particular Attorney General functions. *See, e.g.,* 6 U.S.C. §

542. (transferring "the National Domestic Preparedness Office of the FBI, including the

functions of the Attorney General relating thereto.").

34.    Beginning in spring 2003, and through to the present, the DHS Secretary has

issued TPS terminations pursuant to the Attorney General's authority under 8 U.S.C. § 1254a.

***Periodic Review of a Country's TPS Designation***

35.    Under the TPS statute, countries designated with TPS undergo a periodic review

process which dictates a country's ongoing TPS status. The review process typically begins

months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both

USCIS and the State Department generally prepare country conditions memoranda and

recommendations. *See id.* at 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082

(N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir.

2020), *reh'g en banc granted, vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review

process).[6] Generally, USCIS manages and coordinates the TPS review process, soliciting a

country conditions report from the Refugee, Asylum, and International Operations (RAIO) unit

within USCIS and soliciting a country conditions report and recommendation from the State

Department. *See* GAO Report 15–21; *see also Saget v. Trump*, 375 F.Supp.3d 280, 299–300

(E.D.N.Y. 2019). After considering the materials provided, USCIS prepares a detailed

---

[6] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc, so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, vacated*, 59 F.4th 1010 (9th Cir. 2023).

recommendation, based on country conditions. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F.Supp.3d at 299–300.

36.     Once the decision has been made, the statute requires that the government "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

37.     Unless the Attorney General timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [his] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

38.     In contrast, if the Attorney General timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

39.     The Attorney General has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office,

13

the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.

***Statutory Protections for TPS Beneficiaries***

40.    Once the Attorney General has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Attorney General; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

41.    Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords

14

protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

42.    Individuals who apply for TPS and who are *prima facie* eligible for TPS may receive work authorization and are protected from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

## SYRIA'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS

43.    Syria is a Muslim-majority country in southwest Asia. Following its independence from the French colonial empire in 1947, Syria went through decades of political instability, internal conflict, and tumult. In 1970, Syria came under the authoritarian rule of Hafez al-Assad, and upon his death in 2000, the rule of al-Assad's son, Bashar al-Assad. The Assad's decades-long rule over Syria was infamous for systemic human rights abuses, war crimes, and repressive policies.

44.    In 2011, in response to pro-democracy protests calling for the end of the Assad regime, the Syrian government began killing protestors. Opposition militias formed in response to the government violence, and by the following year, the conflict expanded into a full-fledged civil war. The Assad regime committed grave human rights atrocities: systemic torture, unlawful killings, sexual violence, forced disappearances, and arbitrary detention. These atrocities are well-documented, including by prominent international human rights organizations[7] and the U.S. Department of State.[8]

---

[7] *See Syria 2025*, Amnesty Int'l, https://www.amnesty.org/en/location/middle-east-and-north-africa/middle-east/syria/report-syria/ (last visited July 22, 2026).
[8] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Syria 2024 Human Rights Report* (2024), https://www.state.gov/wp-content/uploads/2025/08/624521_ISYRIA-2024-HUMAN-RIGHTS-REPORT.pdf.

45.    The Secretary of DHS first designated Syria for TPS in March 2012, in recognition of the country's escalating civil war, widespread civilian casualties, and mass displacement caused by government and non-state armed forces.[9] The Federal Register notice of designation stated that Syria's armed conflict and humanitarian collapse created "extraordinary and temporary conditions" preventing the safe return of its nationals.[10] In October 2013, DHS extended the initial designation based on "extraordinary and temporary conditions" preventing the safe return of Syrian nationals; in that same Federal Register notice, DHS redesignated Syria for TPS based on its ongoing armed conflict and worsening conditions.[11]

46.    Successive Secretaries of Homeland Security repeatedly extended and redesignated Syria for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe.[12]  Each extension and redesignation underscored that conditions of armed conflict and humanitarian collapse in Syria prevent safe return for people in its diaspora.

47.    DHS reviewed Syria's TPS on January 29, 2024, and extended TPS for Syria through September 30, 2025. It did so on two bases: (1) an "ongoing armed conflict" and (2) the continuation of "extraordinary and temporary conditions".[13] As to armed conflict, DHS found that "the ongoing civil war in Syria . . . has involved large-scale destruction of infrastructure,

---

[9] *See* Designation of Syrian Arab Republic for Temporary Protective Status, 77 Fed. Reg. 19,026, 19,027–28 (Mar. 29, 2012).

[10] *Id*.

[11] Extension and Redesignation of Syria for Temporary Protected Status, 78 Fed. Reg. 36,223, 36,224–25 (June 17, 2013).

[12] *See, e.g.*, Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5,562 (Jan. 29, 2024); Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9,329, 9,331–32 (Mar. 5, 2018); Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 80 Fed. Reg. 245, 247–48 (Jan. 5, 2015).

[13] Extension and Redesignation of Syria for Temporary Protective Status, 89 Fed. Reg. 5,562, 5,565 (Jan. 29, 2024).

widespread civilian casualties, and human rights abuses and violations."[14] DHS also found that an earthquake had further destroyed Syrian infrastructure and deepened its economic collapse, and that food insecurity and limited access to healthcare and clean water persisted, leaving Syria incapable of supporting safe returns.[15]

48.    Although the Assad regime fell in December 2024, Syria continues to suffer from armed conflict and humanitarian crisis marked by over a decade of civil war. Throughout 2025, civilians in Syria were routinely killed and displaced by clashes between forces loyal to the interim government that replaced the Assad regime, sectarian militias, and armed groups from other nations.[16]

49.    These conditions are well-documented. For example, the Congressional Research Service reported in September 2025 that "instances of sectarian violence involving members of minority communities, Syrian security forces, nonstate armed groups, and armed vigilantes have threatened Syria's stability since March," with thousands of civilian deaths and more than 200,000 people newly displaced.[17] Indeed, the report makes clear that Syria is not a unified country: the interim government "does not exercise control over all of Syria, with areas of the northeast under the control of ethnic Kurdish-led forces and areas south of the capital, Damascus, controlled by members of [a] religious minority."[18] In addition, "Turkish forces remain in parts of the north, while Israeli forces have moved into formerly demilitarized areas between Syria and

---

[14] *Id*.
[15] *See id.* at 5,565–67.
[16] *See* Amnesty Int'l, *supra* note 10.
[17] Christopher M. Blanchard, Cong. Rsch. Serv., RL33487, *Syria: Transition and U.S. Policy* 2, 9 (2025).
[18] *Id.*

Israel and into some Syrian territory near" the two countries' shared border.[19] Israel also launches air strikes, and makes ground incursions, deeper into Syria.[20]

50.　In June 2025, the Council of the European Union found that Syria remains in a "continued catastrophic humanitarian situation."[21] Noting its "alarm[]" due to "widespread violence in Syria's coastal region and in other areas around Damascus," it called on the transitional government to "ensure control over armed groups."[22] The Council also warned that conditions in Syria remain dire, with "90 percent of Syrians living below the poverty line, 16.5 million Syrians relying on humanitarian aid, [and] over 7.2 million people internally displaced."[23] The "food security situation continues to deteriorate, the healthcare system is in ruins, access to basic services remains extremely limited, including due to continued hostilities with attacks on critical infrastructure."[24]

51.　Even today, almost a year after the termination notice was issued, the U.S. Department of State continues to maintain a Level 4 "Do Not Travel" advisory for Syria, which warns that "no part of Syria is safe from violence" and of risks from "terrorism, civil unrest, kidnapping, hostage taking, and *armed conflict*."[25]

---

[19] *Id.*

[20] *See* Danish Immig. Serv., *Syria – Security Situation* 21–22 (2025), https://us.dk/media/uhxnvfwp/syria-security-situation-final-20062025.pdf.

[21] Gen. Secretariat of the Council, *Council Conclusions on Syria* 9 (June 23, 2025), https://data.consilium.europa.eu/doc/document/ST-10688-2025-INIT/en/pdf.

[22] *Id.* at 3.

[23] *Id.* at 9.

[24] *Id.*

[25] *Syria Travel Advisory*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited July 22, 2026) (emphasis added).

**DEFENDANTS' UNLAWFUL TERMINATION OF SYRIA'S TPS DESIGNATION**

52.     On September 19, 2025, Noem announced the purported termination of Syria's TPS designation.[26] The purported termination was published in the Federal Register on September 22, 2025, with a termination date of November 21, 2025—a mere 60 days later and the minimum required by statute. *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

53.     Noem acknowledged that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical infrastructure, and significantly weakened the Syrian economy."[27] However, she stated that, in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[28]

54.     With respect to Syria's designation due to "extraordinary and temporary conditions," Noem dismissed the dire security and humanitarian situation, acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety."[29]

55.     Noem also stated that, "even assuming the relevant conditions in Syria remain both 'extraordinary' and 'temporary,' termination of the Syria [TPS] designation is required

---

[26] Press Release, Dep't of Homeland Sec., Noem Announces the Termination of Temporary Protected Status for Syria (Sep. 19, 2025), https://www.dhs.gov/news/2025/09/19/secretary-noem-announces-termination-temporary-protected-status-syria.

[27] Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398, 45,400 (Sept. 22, 2025).

[28] *Id.* ("[W]hile some sporadic and episodic violence occurs in Syria, the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals.").

[29] *Id.*

because it is contrary to the national interest to permit Syrian nationals . . . to remain temporarily in the United States."[30] To justify this statement, Noem relied on Syria's placement on the government's list of "state sponsors of terrorism" at the time, the lack of U.S. diplomatic presence in Syria, and the purported unavailability of reliable methods by which the U.S. could "meaningful[ly]" vet Syrian nationals.[31] Noem provided two anecdotes of Syrian nationals— neither one identified as a TPS recipient—who had been indicted, charged, or investigated for crimes related to their alleged roles in the Assad regime or their support for designated terrorist organizations.[32] She also asserted without elaboration that "there are Syrian nationals . . . who are [TPS] beneficiaries or applicants who are or have been the subject of administrative investigations for fraud, public safety, and national security."[33] The comments of Noem and other high-ranking government officials regarding fraud were belied by Defendants' own internal research. *See* Admin. R. 164, Dkt. No. 72-2 at 164 (fraud record determinations report for Syrian TPS holders showing 4 findings of fraud, 2 investigations concluding fraud was not found and 9,975 records with no statements of findings). The same conclusory statement appears in Noem's justification for terminating TPS for other countries, including Afghanistan and Haiti.

56.     Noem did not point to any situation in which even one of the more than 6,100 Syrian TPS holders had ever been convicted of a serious crime, implicated in the atrocities perpetrated by the Assad regime, or charged with supporting a terrorist organization.

57.     Finally, Noem noted both domestic and foreign policy reasons for the purported termination, citing President Trump's "America First Policy Directive to the Secretary of State,"

---

[30] *Id.*
[31] *Id.* at 45,401.
[32] *See id.*
[33] *Id.*

which mandated that, moving forward, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[34]

58.    Remarkably, the Trump Administration took a contradictory position regarding Syria's country conditions on September 30, 2025, days *after* DHS announced the purported termination of TPS for Syria. On that date, President Trump renewed Syria's "national emergency" designation pursuant to the International Emergency Economic Powers Act, finding that the "situation in and in relation to Syria undermines the campaign to defeat . . . ISIS, endangers civilians, and further threatens to undermine the peace, security, and stability in the region." Continuation of the National Emergency With Respect to the Situation in and in Relation to Syria, 90 Fed. Reg. 47,967 (Oct. 2, 2025).

59.    Noem failed to consult with other federal agencies about the presence of armed conflict in Syria, or other country conditions in Syria, before making her decision to terminate TPS for that country. Her decision also was not based on an objective review of Syria's country conditions. Rather, the decision to terminate TPS for Syria was made as part of a preordained plan to eliminate existing TPS designations consistent with the Trump Administration's political goals and campaign promises to curb non-white immigration and harm non-white immigrants.[35]

60.    Indeed, with respect to Syria's TPS designation, DHS' only communication with the State Department is this email exchange:

---

[34]  *Id.* (quoting Exec. Order No. 14150, 90 Fed. Reg. 8,837) (Jan. 29, 2025).

[35] *See, e.g.*, Hannah Fingerhut & Ali Swenson, *At Iowa Rally, Trump Doubles Down on Comments About Immigrants Poisoning the Nation's Blood*, PBS (Dec. 20, 2023), https://www.pbs.org/newshour/politics/at-iowa-rally-trump-doubles-down-on-comments-about-immigrants-poisoning-the-nations-blood.

*Email 1* (from DHS Senior Counselor Rob Law to U.S. State Department Senior Bureau Official Spencer Chretien, sent July 21, 2025):

Spencer,

The following TPS designations are coming up for review:

Syria: Aug. 1 decision deadline
South Sudan: September 3 decision deadline
Burma: September 26 decision deadline
Ethiopia: October 13 decision deadline

Thanks,

RTL

*Email 2* (response, sent July 22, 2025)

Dear Rob,

I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues.

Spencer

*See* Admin. R. 156, Dkt. No. 72-2.

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

61.    The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced purported terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F.Supp.3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, approximately 98

percent of all TPS holders at the time.[36] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

62.     Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close"), *vacated and remanded on other grounds by* 975 F.3d 872.[37]

63.     Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the purported terminations were part of a policy "to decrease the presence of non-white immigrants in the United States."[38]

---

[36] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

[37] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[38] *Saget*, 375 F. Supp. 3d at 368–372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F.Supp.3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F.Supp.3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

64.    DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual purported terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

65.    The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F.Supp.3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F.Supp.3d at 1097–98; *Centro Presente v. DHS*, 332 F.Supp.3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 321 (D. Md. 2018).

66.    To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F.Supp.3d at 343, 347–48, 359–62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS. *Id.* at 307–09. Secretary Kelly

24

and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F.Supp.3d at 1105.

67.    After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097–98; *see also Centro Presente v. DHS*, 332 F.Supp.3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

68.    Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F.Supp.3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for

25

immigration from majority-white European countries. *Id.* at 1099–1100, 1104. Notably, Noem expressly included the same "America First" objectives in the published Federal Register Notice purporting to terminate TPS for Syria and other countries in 2025.

69.    As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F.Supp.3d at 878–79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[39] *See id.* In doing so, DHS extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[40]

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

### *Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS*

70.    Even before she became Secretary of DHS, Noem publicly committed to ending protections for TPS holders for reasons unrelated to the situation in Syria, or any other country. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."

---

[39] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).
[40]  *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317, 40320 (June 21, 2023) (same for Nepal).

71.      Noem repeatedly insinuated that TPS was an illegal program and denigrated TPS holders. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[41] In her press statement announcing the partial vacatur of TPS for Haiti, Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[42] Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[43]

72.      President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[44]

73.      Both the President and the Vice-President made clear their intent to target TPS holders before taking office.[45] President Trump, while campaigning, said that he would

---

[41] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860 37 (at approximately 1:00).

[42] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

[43] *Id.* (Here, Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[44] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sep. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[45] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans,*

27

"[a]bsolutely . . . revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[46] He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[47] and that he would "do large deportations" of Haitian TPS holders.[48]

74.     For his part, Vice-President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[49] Given that TPS is, by statute, designed by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS holders. Vice President Vance expressed this view repeatedly while campaigning.[50]

---

*Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[46] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:05; 12:54); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[47] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concerned'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

[48] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC NEWS (Oct. 25, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS, (Sep. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[49] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporary-protected-status-venezuelans/.

[50] *See, e.g.*, CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sep. 16, 2024),

75.    According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS status from TPS holders as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[51]

76.    Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without elaboration as to any consideration of individual country conditions or any other statutory requirements.[52]

### DEFENDANTS' RENEWED EFFORTS TO END TPS

77.    Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from reinstating its plan to effectively end protection for TPS holders consistent with campaign promises. To date, the Administration has attempted to terminate all but one TPS designations that have come up for review. The termination

---

http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sep. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

[51] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Jan. 23, 2026), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

[52] Ken Cuccinelli, *2025 Presidential Transition Project*, in *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

29

decisions—including the purported termination of TPS for Syria—reflect animus against non-white, non-European immigrants, particularly those from Muslim-majority countries, and TPS holders driven by the very sort of domestic politics the statute is intended to forestall.

78.  On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 29, 2025) ("Invasion EO"). The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.* "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains." Deirdre Pfeiffer & Xiaoqian Hu, *Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).

79.  The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16. Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens[53] in the United States." *Id.*

---

[53] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093.
The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 102–125.

80.     Immediately after Noem was confirmed as Secretary of DHS, Defendants began

to implement the Executive Order's mandate and several of Noem's termination orders rely

explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below,

Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was

"used properly," adding that "when the President gives a directive, the Department of Homeland

Security will follow it."[54]

***Venezuela***

81.     Within days of taking office, Noem made the unprecedented decision to *reverse*

the prior Administration's extension of Venezuela's 2023 TPS designation.[55] The termination of

Venezuelan TPS followed soon after. A federal court later found that Noem's official

justification for her unprecedented vacatur was a pretext to cover "the desire to totally undo" the

redesignation signed by then-Secretary Alejandro Mayorkas.[56]

82.     Noem's decision was not based on the statutorily required country conditions

review. Rather, the limited review the agency conducted was designed to find support for a

termination decision that had already been made. The hasty process Defendants' undertook for

---

[54] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 11:57 PM),
https://x.com/sec_noem/status/18847527724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s
(statement appears in posted video clip from CNN interview).

[55] *See NTPSA I* PI Decision at 819–20.

[56] *Id.* at 855. This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulation," indeed the termination notice was prepared "even *before* the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS."[57]

83.    A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025 memo recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

84.    Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Noem, however, based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 (Feb. 5, 2025) ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and

---

[57] *NTPSA I* SJ Decision at *29 (emphasis added).

'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). The purported Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

*Haiti*

85.    Defendants targeted Haitian TPS holders next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate protections for TPS holders.[58]

86.    Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[59] The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[60]

87.    The justifications provided by Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Noem substantially based the vacatur decision on a critique of

---

[58] *NTPSA I* SJ Decision at 1155–56.

[59] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

[60] *Id.*

former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,514 (Feb. 24, 2025). But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension" once that decision has been made, is neither "unusual or impermissible."[61] Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." *NTPSA I* SJ Decision at 1155. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

88.    On June 27, 2025, Defendants purportedly terminated Haiti's TPS designation. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did— claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.* at 28,763(purporting to terminate Haitian TPS despite acknowledging "[w]idespread gang violence . . . sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti is in the grip of severe humanitarian and human rights crisis'"). Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." *Id*. DHS' press release,

---

[61] *NTPSA I* SJ Decision at 1155.

however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[62]

89.     On July 1, 2025, the Eastern District of New York held that the partial vacatur exceeded the Secretary's authority and set it aside, with the effect that no termination could take place before February 3, 2026, the expiration of the most recent extension. *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp 3d 255, 267, 272-73 (E.D.N.Y. 2025). In view of that ruling, the Secretary made "a new, superseding determination," announced November 28, 2025, resting on an assertion that no extraordinary and temporary conditions prevent safe return and on the same national-interest ground. 90 Fed. Reg. 54,733, 54,734-35.

*Afghanistan*

90.     On May 12, 2025, DHS announced the purported termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[63] Noem claimed that conditions had "notabl[y] improve[d].[64]" She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025). She also failed to address entire

---

[62] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Servs. (June 27, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.
[63] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html.
[64] Press Release, U.S. Dep't of Homeland Sec., DHS Terminating Temporary Protected Status for Afghanistan (May 12, 2025), https://www.dhs.gov/news/2025/05/12/dhs-terminating-temporary-protected-status-afghanistan.

categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730–33 (Sept. 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

91.    Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311.

***Cameroon***

92.    Defendants purportedly terminated TPS for Cameroon on June 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025). Cameroon was designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Noem issued the termination despite acknowledging that "Cameroon is currently experiencing two major conflicts" that "remain active." *Id*. at 23,698. Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697. As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest." Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698. In this

36

instance, Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration. *Id.*

***Nepal***

93.     On June 6, 2025, Defendants purportedly terminated TPS for Nepal. Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025). Repeating the pattern developed in the prior terminations, Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered. *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151.

***Honduras and Nicaragua***

94.     On July 8, 2025, Defendants announced the purported termination of TPS for Honduras and Nicaragua. Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July 8, 2025) ("Nicaragua Termination Notice"). These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely. *See* 8 U.S.C. § 1254a(b)(3)(B).

95.     The Honduras Termination Notice cites to the Invasion E.O., noting that "the Secretary should 'ensur[e] that designations of Temporary Protected Status . . . are appropriately

limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute.'"[65]

96.     Repeating the pattern developed in the prior purported terminations, Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that DHS had previously considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis." Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination Notice (not addressing political violence or crime). The Nicaragua Termination Notice similarly relies on the Invasion E.O.[66] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements . . . allow Nicaragua to adequately handle the return of its nationals." Nicaragua Termination Notice, at 30,088. The Termination Notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[67]

97.     In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Noem adopted a new definition of "adequate,"

[65] Honduras Termination Notice at 30,091, n.10.
[66] Nicaragua Termination Notice at 30,088, n.4.
[67] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).

38

defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[68]

98.    Discovery produced in litigation challenging Defendants' purported termination of TPS for Nepal, Honduras and Nicaragua[69] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

***Burma, South Sudan, Ethiopia, Somalia, and Yemen***

99.    DHS continued to issue purported terminations of TPS following the notice of termination for Syria: Yemen, 91 Fed. Reg. 10,402 (Mar. 3, 2026); South Sudan, 90 Fed. Reg. 50,484 (Nov. 6, 2025); Burma, 90 Fed. Reg. 53,378 (Nov. 25, 2025); Ethiopia, 90 Fed. Reg. 58,028 (Dec. 15, 2025); and Somalia, 91 Fed. Reg. 1,547 (Jan. 14, 2026). Each of these, like the purported termination for Syria, failed to account for country conditions, and several came with hostile and derogatory comments from the President and others about TPS holders from those countries.

100.    For example, on January 14, 2026, Defendants issued a notice in the Federal Register, terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026. Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1,547 (Jan. 14, 2026). Despite the fact that Congress tasked the Attorney General with reviewing

---

[68] *See* Honduras Termination Notice at n.23; Nicaraguan Termination Notice at n.14.
[69] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

TPS designations, President Trump posted on social media that he was terminating TPS for Somalis "effective immediately." The termination announcement declines to provide country conditions, does not specify by name any other agency consulted during the process, and does not mention that on April 8, 2025, President Trump himself renewed recognition of Somalia's "national emergency" status under the International Emergency Economic Powers Act, citing to the deterioration of the security situation and the "persistence of violence" that is "committed against civilians" and attributable to al-Shabaab. Notice of Apr. 8, 2026—Continuation of the National Emergency With Respect to Somalia, 91 Fed. Reg. 18,765 (Apr. 10, 2026). Nor does the notice mention the Level 4 State Department travel advisory for Somalia or explain why such conditions are consistent with safe return for Somali nationals. *Id*.

### *Yemen*

101.    On February 13, 2026, Noem announced her intent to terminate Yemen's TPS designation. In her press announcement, she stated: "Allowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest. TPS was designed to be temporary, and this administration is returning TPS to its original temporary intent. We are prioritizing our national security interests and putting America first."[70] The press announcement offered a "complimentary plane ticket" and "$2,600 exit bonus" payment for any Yemeni TPS beneficiaries willing to voluntarily self-deport.[71]

102.    DHS formally announced the termination of Yemen's Temporary Protected Status, effective May 4, 2026, via a notice published under Noem's name in the Federal Register

---

[70] Press Release, U.S. Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (February 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.

[71] *Id.*

40

on March 3, 2026. Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026). In the notice, Noem conceded that "Yemen still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety, *id*. at 10,404–05, but determined that "it is contrary to the national interest" to allow Yemeni TPS holders to remain in the U.S. Id. at 10,404.

103.    The majority of countries with TPS terminations had been designated since at least 2015. Rather than conforming to DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency had no particular practice. *Id.*[72] That is incorrect. DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

104.    In another break with past practice, Noem provided that, for every country whose TPS designation was terminated, the purported TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. § 1254a(b)(3)(B).

## FORMER SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS BASED ON RACE, ETHNICITY, NATIONAL ORIGIN, AND MEMBERSHIP IN A POLITICALLY UNPOPULAR GROUP

---

[72] Notably, the only prior terminations the Secretary cited as support for this position were the Termination of Angola's TPS status, which had only lasted three years at the time of termination and coincided with the end of the Angolan civil war, and the previous Lebanon designation, which had only lasted two years.

105.    President Trump, Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus against Syrian TPS holders based on their race, ethnicity, national origin, and membership in a politically unpopular group: TPS holders. This animus significantly motivated the Trump Administration's plan to target TPS holders as evidenced in numerous statements made by Noem, President Trump, and other Administration officials. A limited number of those statements are described herein.

106.    Members of the Trump Administration have publicly expressed strong biases against Syrians, communities in the Middle East that encompass Syria, and other Muslim-majority countries.

107.    At a campaign event in Iowa in October 2023, President Trump boasted of his successes at excluding non-white migrants, defending his Administration's travel ban for Muslim-majority countries as:

> [T]otally constitutional because we want to keep bad people out that want to destroy our country. . . . I banned refugees from Syria. I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world . . .[I]n my second term, we're going to expand each and every one of those bans because we have no choice. Some very rough people, some very, very rough people come out of these areas. They want to blow up our country. We aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya or anywhere else that threatens our security.[73]

Throughout his campaign, President Trump repeated similar statements, depicting people from Muslim-majority countries as "dangerous terrorists."[74]

---

[73] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, at 37:20–37:40, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[74] *See also Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, at 7:19–7:51,

108.    In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, President Trump claimed that immigrants have "wrecked our country," claiming that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists . . . this isn't just in South America. They're coming from Congo, from Yemen, from Somalia, from Syria."[75]

109.    In his Republican Convention speech in July 2024, President Trump, repeating the invasion talking point, stated: "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[76]

110.    At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[77]

---

https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20 ("They include Syria, Somalia, Yemen, Russia, China, Iran, all of Africa. They're storming our country. They're storming our borders. We have no idea who they are, where they come from.").

[75] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, at 3:15–3:37, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[76] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[77] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, at 45:56–46:15, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.

111.    In June 2025, ICE Director Todd Lyons insinuated that Syrians, Iranians, and Somalians as a whole posed threats to national security, warning that the public was "going to see an uptick in Syrian arrests, Somalis, anyone that pose [*sic*] that national security threat."[78]

112.    Stephen Miller has long expressed support for white nationalism, has "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[79] As an undergrad student at Duke, Miller was the national coordinator for a "Terrorism Awareness Project" whose mission was to "make our fellow students aware of the Islamic jihad and the terrorist threat, and to mobilize support for the defense of America and the civilization of the West."[80] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[81]

113.    Consistent with the support of Miller and other Administration officials for white nationalism, the so-called "replacement theory" is a unifying theme of the Trump Administration's racist statements and immigration policies. This conspiracy theory turns on the

---

[78] Ali Bradley & Jeff Arnaold, *Iranian nationals part of larger ICE enforcement focus: Lyons*, NEWSNATION (June 26, 2025), https://www.newsnationnow.com/us-news/immigration/iranian-nationals-ice-enforcement-lyons/.

[79] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019).
https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

[80] Andrew Kaczynski & Chris Massie, *In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism'*, CNN (Feb. 15, 2017, 3:40 PM), https://edition.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness; *see also* Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[81] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[82] Noem has endorsed this core premise, describing irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose . . . to remake the foundation of this country."[83]

114.    DHS recently posted a one-word tweet: "Remigrate."[84] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism and has been seen as a euphemism for ethnic cleansing."[85] Consistent with the so-called "replacement" theory, President Trump and members of his Administrations have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

115.    On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," railing that "immigration and their suicidal energy ideas will be the death of Western Europe."[86]

116.    Noem has repeatedly described non-white, non-European immigrants as "dirt bags"[87] and TPS holders as criminals.

---

[82] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

[83] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS, at 4:57 (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

[84] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[85] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.

[86] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[87] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on*

117.    In many comments between February 2024 through the present, Noem has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like." *NTPSA I* PI Decision at 859; *see also*, Homeland Security (@DHSgov), X (May 19, 2025, 9:18 PM), https://x.com/DHSgov/status/1924575437344186612 (criticizing the TPS program for allegedly facilitating the entrance of "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," even though TPS is available only to individuals who are already present in the United States and anyone with more than a single misdemeanor conviction is ineligible for protection). These types of baseless stereotypes and statements about TPS holders demonstrate bare animus toward them simply because of their status as TPS holders.

118.    President Trump has repeatedly conflated immigrants with "criminals, gang members and terrorists."[88] At a rally one week before the 2024 election, President Trump described the country as "occupied," and as "invaded and conquered" by criminal immigrants.[89]

---

*Immigration Raids in New York*, at 1:09 (YouTube Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

[88] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; *Read the Full Transcripts of Donald Trump's Interviews with TIME*, TIME (Apr. 2024), https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").

[89] LiveNOW from FOX (@kivenowfox), *FULL SPEECH: Trump holds MSG rally in NYC*, at 16:13 YouTube(Oct. 27, 2024), https://www.youtube.com/watch?v=bzVT4YEYsuI (Speech by Donald Trump at Madison Square Garden presidential campaign rally, at approximately 16:13).

119.    While campaigning in 2023, President Trump repeatedly said that non-white, non-European, and non-Christian immigrants are "poisoning the blood of our country."[90] Similar phrases recur throughout Adolf Hitler's discussions of Jewish people in his infamous book *Mein Kampf*.[91] President Trump also has repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[92]

120.    In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[93] By contrast, he told a predominately white crowd at a campaign rally in Minnesota that they have "good genes."[94]

---

[90] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country'*, C-SPAN, at 00:15 (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, at 1:34, (YouTube Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s.

[91] *See* ADOLF HITLER, MEIN KEMPF (1943).

[92] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[93] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[94] *Id.*

121.    President Trump has used overtly dehumanizing rhetoric to described non-white, non-European immigrants, referring to them as "animals,"[95] including snakes that will bite and kill anyone foolish enough to shelter them.[96] When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[97]

122.    He has also specifically targeted non-white TPS holders. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.[98] President Trump called Haitians in Springfield with lawful TPS status "illegal migrant[s]" who "descended upon a town

---

[95] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[96] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . .  And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[97] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[98] *See, e.g.*, *Simulcast – ABC News Presidential Debate*, C-SPAN, at 29:26 (Sep. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

of 58,000 people, destroying their way of life."[99] Following these statements, there were several

bomb threats against hospitals, government buildings, and schools in Springfield.[100]

123.    Vice President Vance has unapologetically repeated these knowingly unfounded

rumors, stating that if he "ha[s] to create stories" about Haitian migrants "so that the American

media actually pays attention to the suffering of the American people, then that's what I'm going

to do."[101] Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding

stereotypes[102] of immigrants as dangerous criminals and spreaders of disease. He accused

Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car

insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a

---

[99] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE GUARDIAN (Sep. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION, at 12:45 (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ , "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[100] Edward Helmore, *More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians*, THE GUARDIAN (Sep. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[101] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sep. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also* Rachel Leingang, *Republicans spread baseless slurs about 'cat-eating migrants' in Ohio city*, THE GUARDIAN (Sep. 9, 2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[102] Expert Decl. of Elliott Young in Supp. of Pl.'s Mot. to Postpone Effective Date of Agency Action ¶¶ 20, 22, 23, 25, *NTPSA I*, No. 3:25-CV-01766-EMC (N.D. Cal. Feb. 20, 2025), Dkt. No. 17 (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

small community."[103] He specifically stated that Haitians caused "TB and HIV" to be "on the rise."[104]

124.    During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[105]

125.    During his recent campaign, President Trump doubled down on these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[106]

---

[103] JD Vance (@JDVance), X (Sep. 13, 2024, 9:25 AM), https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC (@WCNC), *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YouTube (Sep. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[104] JD Vance (@JDVance), X (Sep. 10, 2024, 9:58 AM), https://x.com/jdvance/status/1833505359513661762?s=46.

[105] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[106] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

50

126.    President Trump has stated that Venezuelans have "destroyed the fabric of our country."[107] In 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [,Venezuela] and many other places . . . . And we have to live with these animals, but we're not going to live with them for long, you watch."[108] He also stated that he was "talking a lot about Venezuela because Aurora[,Colorado] is really *infected* by Venezuela."[109] One analysis by Axios of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan immigrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.[110]

127.    In March 2025, the Trump Administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported Tren de Aragua ("TdA")[111] membership as

---

[107] *See also Simulcast – ABC News Presidential Debate*, C-SPAN, at 33:40 (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 ("They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[108] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, at 41:05 (YouTube Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A; *see also* NBC News (@NBCNews), *Meet the Press full broadcast — Dec. 8*, at 8:52, (YouTube Dec. 8, 2024), https://www.youtube.com/watch?v=-UsHJWEAj_I ("Did you know that Venezuela their prisons are . . . at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—."); Fox News (@FoxNews), *Donald Trump delivers remarks at rally in Reading, PA*, YouTube (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (at approximately 29:55, 30:07, similar).

[109] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, at 43:15, (YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (emphasis added).

[110] Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[111] Tren de Aragua reportedly is a criminal group with origins in a Venezuelan prison and whose operations extend past the country. *See* John Otis, *Tren de Aragua—all you need to know about*

justification for deporting more than 200 Venezuelans to an infamous Salvadoran terrorist detention center, in apparent violation of a court order.[112] The Administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"— "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention, and removal if they are not U.S. citizens or lawful permanent residents.[113] President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."[114]

---

*the Venezuelan Gang*, NPR (Mar. 16, 2025), https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

[112] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Nicholas Riccardi & Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

[113] Proclamation by the President, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

[114] Donald J. Trump (@realDonaldTrump), TRUTH (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

128.    In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations perceived as white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.[115]

### *Other Evidence of Bare Animus Towards TPS Holders*

129.    The multiple disparaging statements that Trump Administration officials have made about TPS holders show that their efforts to end TPS protections go beyond hostility to the TPS program as a policy. Instead, the Administration has displayed bare animus towards TPS holders themselves.

130.    The Trump Administration's animus towards TPS holders has been expressed not just in word but also in deed. For example, the President's June 4, 2025, Travel Ban suspended entry of nationals of twelve countries, six of which are TPS countries, including Syria, Burma, Afghanistan, Haiti, Somalia, Sudan, and Yemen.[116]

131.    On November 27, 2025, USCIS updated to its Policy Manual directing USCIS personnel charged with processing discretionary benefit requests to consider "any relevant country-specific factors such as those specified in [the Travel Ban] as significant negative factors in the adjudication of discretionary benefit requests." *See* USCIS, PA-2025-26, Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits. USCIS explains that,

---

[115] Exec. Order No. 14204 § 4, 90 Fed. Reg. 9,497, 9,497 (Feb. 12, 2025).

[116] Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (Jun. 10, 2025).

while the Travel Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS may begin considering "on a case-by-case basis country-specific facts and circumstances" discussed in the Travel Ban "as a significant negative factor when making an individual assessment in weighing discretion." *Id*.[117]

132.    On December 2, 2025, USCIS issued a memorandum directing officers to freeze pending benefit requests from nationals of the Travel Ban countries and to re-review already-approved benefits, thus preventing TPS holders with pending immigration applications from obtaining permanent or otherwise stable status.[118]

133.    On December 16, 2025, President Trump issued Proclamation 10988, re-asserting the prior Travel Ban and expanding the number of countries subjected to full or partial entry restrictions, effective January 1, 2026. Eight of the thirteen countries whose TPS designation this Administration has stripped are covered by the extended Travel Ban.

134.    On January 1, 2026, USCIS issued a new memorandum expanding the freeze on pending benefits requests to nationals of Travel Ban countries, including Syria and several other countries whose nationals in the United States have been beneficiaries of TPS, including Afghanistan, Burma, Haiti, Somalia, South Sudan, Sudan, Venezuela, and Yemen. Again, TPS holders already in the United States with pending immigration applications would be unable to change or adjust status just as they were threatened with loss of TPS.[119]

---

[117] *See also Dorcas Intl. Inst. of Rhode Island v. U.S. Citizenship and Immig. Services*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *45-47 (D.R.I. June 5, 2026) (holding USCIS country-specific factors policy is contrary to law).
[118] USCIS Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High Risk Countries, PM 602-0192 (Dec. 2, 2025).
[119] USCIS Memorandum, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026).

135.    On January 21, 2026, the Department of State paused the issuance of all immigrant visas to applicants who are nationals of certain countries.[120] Thirteen out of seventeen countries with TPS designations in effect on January 20, 2025, are subject to the pause.[121]

136.    Having terminated TPS for Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, Syria, South Sudan, and Burma, in the ensuing months, Noem continued the campaign to terminate TPS for three more countries experiencing devastating crises: Ethiopia, Somalia, and Yemen.

137.    In the wake of the Supreme Court's June 25, 2026, decision overturning postponement orders in this case, and *Miot v. Trump* challenging the termination of TPS for Haitians, (*Mullin v. Doe*, Nos. 25-1083, 25-1084, 2026 WL 1825840, (U.S. June 25, 2026)), the Administration has continued its attacks on TPS holders. Although in both cases a mandate is expected to issue on July 27, 2026, the Department of Justice sought immediate stays in advance of the mandate issuing so as to deprive these TPS holders of a mere two to three weeks of work authorization, income, and protection from detention and deportation. *See* Defendant-Appellants' Renewed Mot. for a Stay, *Doe v. Mullin*, No. 25-2995 (2d Cir. July 1, 2026), Dkt. No. 57; Appellants' Renewed Stay Mot., *Miot v. Trump*, No. 26-5050 (D.C. Cir. July 1, 2026) Dkt. No. 35.

---

[120] Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance, Dept. of State (Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

[121] In analyzing these policies, a district court recently summarized aptly: "the public record is replete with direct evidence of the administration's hostility toward immigrants, with the possible exception of Scandinavians and white Afrikaners." *Doe v. Edlow*, No. 2:26-CV-494, 2026 WL 1945085, at *23 (S.D. Ohio July 6, 2026).

138.    Taken together with a series of denigrating and inflammatory statements against TPS holders, these actions—terminating more than a dozen countries whose countries of origin remain in dire crisis; providing just 60 days' notice of termination for people who have lived lawfully in the United States for years; freezing the adjudication of many TPS holders' applications for other immigration statuses; and expending extensive resources to cut protective status short by a matter of days—evince a desire to harm a politically unpopular group and cannot be explained by policy preferences or disagreement with the TPS program or its implementation.

## HARMS CAUSED BY DEFENDANTS' PURPORTED TERMINATION OF TPS FOR SYRIA

*Harms to TPS Holders and Their Families*

139.    Defendants' decision to terminate TPS for Syria would strip TPS status from more than 6,100 Syrians and prevent over 800 Syrian nationals with pending applications from securing protection. Many of these individuals have lived in the United States for over a decade, have children or close relatives who are U.S. citizens or permanent residents, and are deeply embedded in their communities. Should Defendants' biased and unlawful termination stand, the harm caused by that action would be massive.

140.    With the loss of their legal status, Syrian TPS holders may face imminent detention and/or deportation and must make the impossible choice either to relocate to a country in dire humanitarian crisis and at the peak of political transition, remain in the United States without lawful immigration status, or uproot themselves once again to find refuge in a third country.

141.    Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum, adjustment of status, or employment-based nonimmigrant status).

However, due to the years-long asylum backlog, affirmative asylum applications remain pending for months or years and do not guarantee protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return to Syria but may not fit the specific legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[122] TPS holders who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[123]

142.    TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S.Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id*.

143.    TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material

---

[122] *See* American Immigr. Council, *Temporary Protected Status: An Overview*, (June 2025), Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).
[123] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

assets, leading to further economic harm. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[124] In addition, because the Secretary's purported termination goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or driver's licenses for which they may be eligible.

144.    Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

145.    The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Syrian TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders face the risk of being forced to leave their family members behind or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

146.    TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite, in many cases, having paid into Social Security for decades, TPS holders also face the loss of this crucial benefit.

---

[124] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

147.    Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Syrian TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decision was announced, resulting in heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

148.    TPS holders have also suffered the additional constitutional harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

***Harms to the Named Plaintiffs***

149.    Dahlia Doe is a Syrian national in her 20s. She has lived in the United States since 2015 and currently lives in Bronx, New York. She has had TPS since 2021. Dahlia grew up outside of Syria and came to the United States to pursue a bachelor's degree in business. All of her immediate family members are U.S. citizens or lawful permanent residents. Dahlia provides crucial financial and emotional support for her elderly U.S. citizen father who suffers from Parkinson's disease.

150.    Dahlia has invested significant time and energy into her career as a market researcher. Over the last 6 years, she has climbed the ranks of her profession and now serves as a research director at her place of employment, where she manages and mentors several of her colleagues. Without TPS, Dahlia will lose her legal status and fears her job and career will be compromised.

151.    Dahlia also fears separation from her immediate family in the United States and forcible return to Syria. Dahlia has never lived in Syria and has no remaining family connections

to Syria. As a Syrian-Christian—a minority in Syria—Dahlia would also be a target for violence against minority communities in the country.[125]

152.    Sara Doe is a Syrian national who has had TPS since 2015. She has lived in the United States since 2014 and currently lives in New York state. Sara came to the United States from Aleppo—one of the cities most devastated by the civil war—after her brothers were killed. Following targeted threats from the Assad regime on account of her work in the medical field, Sara fled Syria to seek safety and rebuild her life in the United States.

153.    Sara is licensed to practice medicine in the United States and is highly sought after in her field. She leads a team of specialists treating children with serious heart issues.

154.    Without TPS, Sara risks losing work authorization and, with it, her ability to practice medicine and treat her patients—work to which she has dedicated her life and for which she was targeted in Syria. The termination of TPS on such short notice would additionally deprive her of the opportunity to pursue an employment-based change of status applications, which would require her to maintain lawful status until the start date of her new status.

155.    Sara fears for her safety and well-being if she is forced to return to Syria. Aleppo, where she lived before coming to the United States, continues to be a site of armed conflict and lacks basic infrastructure. Given the destruction of the medical system in Syria, Sara fears she will not be able to find employment in her specialty, or in any medical field, if she is deported. Sara has no close family ties in Syria because her family was killed and her house in Aleppo was destroyed. After losing her immediate family to the civil war, she now faces forcible separation

---

[125] *See, e.g.*, *European Parliament resolution of 10 July 2025 on the urgent need to protect religious minorities in Syria following recent terrorist attack on Mar Elias Church in Damascus*, European Parliament, https://www.europarl.europa.eu/doceo/document/TA-10-2025-0163_EN.html.

60

from her extended family in the United States, who are U.S. citizens and have served as her support system as she built a new life.

156.    Nesma Doe is a Syrian national who has had TPS since 2013. She is in her late 70s and has been living in the United States since 2013. She currently lives in Florida. Nesma fled violence in Syria and sought safety in the United States, where her U.S. citizen siblings have been living for decades. Nesma has significant medical issues, including chronic lung disease, thyroid issues, and arthritis, and she has undergone knee-replacement and shoulder-replacement surgeries.

157.    If TPS is terminated, Nesma will lose her status and protection from deportation. Since the announcement of the end of TPS, Nesma has already encountered issues renewing her driver's license, which is her only form of identification. She will also lose her medical insurance and access to necessary medications and medical care.

158.    If forcibly returned to Syria, Nesma will not be able to obtain the medical treatment she requires, as the Syrian health-care system has largely collapsed and services are not readily available. Nesma would also be separated from her family, who all live in the United States, including two nieces who serve as her primary caregivers. She has no family in Syria who could take care of her. As an elderly woman, she faces increased risk of being targeted for crime in Syria.

159.    Laila Doe is in her 40s and is a Syrian national. She has both lived in the United States and has had TPS since 2013. She currently lives in Illinois and works full time as an educator working with adults and young people with special needs. Laila is the primary and only available caretaker for her elderly U.S. citizen mother.

61

160.    Laila came to the United States with her minor child fleeing Syria's civil war after her daughter's daycare was bombed. TPS is Laila's (and her child's) only form of protection from confinement and deportation. TPS is also Laila's only form of work authorization. Laila is the only breadwinner in her household and the loss of her work authorization through TPS would jeopardize her ability to provide for her child and mother, including being able to afford her daughter's educational expenses and mother's medical care and medications.

161.    If her TPS is terminated, Laila is terrified that she will be forced to relocate to Syria where she and her daughter would be in danger. And as a single mother and divorced woman living alone, Laila faces increased risk of violence if she were to return to Syria.

162.    Waleed Doe is in his 40s and is a Syrian national. Even though he was born in the United States, Waleed grew up outside of Syria and has no meaningful connections to Syria. Waleed came to the United States in 2011 on a student visa to obtain a master's degree in business and obtained TPS in 2012 due to the increasing violence from Syria's civil war.

163.    Waleed currently lives in New Jersey with his wife (also a Syrian TPS holder) and three U.S. citizen children who are ages seven, four, and nine months. Waleed works as a senior manager at his place of employment and is the primary breadwinner for his family.

164.    TPS is Waleed's only form of protection against confinement, deportation, and work authorization. The loss of his TPS would jeopardize his ability to support his family and because his wife also relies on TPS for work authorization they face the loss of any source of income. If Waleed's TPS and work authorization is terminated, his family would also lose their health insurance, which is covered through his employer.

165.    The prospect of losing TPS has caused Waleed and his family significant stress and fear. Waleed especially fears being separated from his extended family in the United States and for his and his family's safety if they have to relocate to Syria—a place he's never lived.

166.    Mustafa Doe is in his 20s and is a Syrian national. He has had TPS since 2023. Mustafa experienced sexual abuse and trafficking as a minor in Syria, which left him with lasting psychological trauma. He is a member of the LGBTQI community and has found safety and freedom to authentically express his identity in the United States, after he moved in 2021 to pursue his bachelor's degree.

167.    Mustafa recently graduated from college and has temporary status and work authorization as an extension of his student visa, which has allowed him to accept a job in philanthropy and social impact at a global corporation. His temporary status expires next summer, at which point he will lose his work authorization and his job, as well as his protection from detention and deportation. Without TPS, Mustafa loses a crucial safety net and is left in limbo, unable to plan for his future in the United States.

168.    The possibility of losing TPS and having to return to Syria has caused Mustafa significant anxiety and has triggered his PTSD based on fears of returning to harm and persecution. If returned to Syria, he would face violence from individuals who abused him in the past as well as persecution and prosecution based on his LGBTQI identity.  Returning to Syria would also separate Mustafa from his parents, both of whom live in the United States and are lawful permanent residents, along with his extended family, who are all U.S. citizens.

169.    Ahmad Doe is a Syrian citizen in his 40s. He came to the United States on an exchange visitor visa to work as a journalist and has lived in the United States since 2022. Even though he is a Syrian citizen, he was born and raised outside of Syria.

170.    Due to layoffs at his prior place of employment in April 2025, Ahmad lost his job, his exchange visitor visa, and work authorization. In May 2025, he applied for TPS.

171.    Because Ahmad has built a highly respected career in journalism and speaks several languages, several U.S. media companies have sought his services. However, Ahmad is unable to accept any of the many job offers he has received because he lacks work authorization. Currently, TPS is his only pathway to obtaining work authorization and protection from deportation. Ahmad also cannot renew his driver's license without work authorization.

172.    Due to Defendants' unlawful termination of Syria's TPS designation, Ahmad's application cannot be adjudicated. Without access to TPS, Ahmad fears and is a risk of imminent confinement and deportation to a country where he fears he could be killed. Because of this, Ahmad suffers from severe stress and feelings of depression.

173.    All Plaintiffs have expressed fear and anxiety over forcibly returning to Syria given the widespread shortages of food, fuel, electricity, clean water; in addition to kidnappings, killings, and violence that have persisted across the country after the Assad regime fell in December 2024.

174.    All Plaintiffs are potentially targets for immigration detention here in the United States prior to future removal.

175.    Syrian TPS serves the purpose intended by Congress—providing nationality-based humanitarian relief regardless of whether individuals meet the more stringent eligibility requirements for other forms of humanitarian protection, such as asylum. Immigrants, including TPS holders, are integral to the social and economic fabric of the United States and, as the named Plaintiffs exemplify, contribute to their communities and this country in countless ways. The length of time TPS holders have lived in the United States and the deep ties they have built

64

with families and communities make the loss of legal status especially devastating and, equally important, highlight the real human cost of Defendants' unlawful actions challenged here.

## CLASS ACTION ALLEGATIONS

176.    This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of Syrian nationals (or individuals having no nationality who last habitually resided in Syria) who had TPS status on September 19, 2025, (recipient class) and Syrian nationals (or individuals having no nationality who last habitually resided in Syria) with pending TPS applications (applicant class).

177.    The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 6,132 TPS holders and the applicant class consists of 833 people with pending applications.

178.    There are common questions of law and fact affecting the members of both classes, including (a) whether Defendants' decision to terminate of Syrian TPS was preordained, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, or national origin; and (d) whether Defendants' failure to provide more than the minimum 60-day notice before purporting to terminate Syria's TPS designation violates the APA.

179.    The claims of Dahlia Doe, Sara Doe, Nesma Doe, Laila Doe, Waleed Doe, and Mustafa Doe are typical of those of the recipient class with respect to the legality of Defendants'

65

actions. Plaintiffs will fairly and adequately protect the interests of the class. None of the named Plaintiffs are aware of any conflicts that would preclude fair and adequate representation.

180.    Plaintiff Ahmad Doe's claims are typical of those of the applicant class with respect to the legality of Defendants' actions. Ahmad Doe will fairly and adequately protect the interests of the class. Ahmad Doe is unaware of any conflicts that would preclude fair and adequate representation.

181.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

182.    Defendants' illegal termination of TPS for Syria applies to the entire class, making class-wide relief appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

183.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

184.    The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702.

185.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2). The right

of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements."[126]

186. Defendants' purported termination of the TPS designations for Syria is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

187. Defendants' purported termination of the TPS designation for Syria violates the APA because, among other things:

    a. Defendants lack statutory authority to terminate Syria's TPS designation;

    b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a discriminatory effort to harm TPS holders based on their race, ethnicity, national origin, and status as TPS beneficiaries; a consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained and discriminatory end goal to terminate TPS;

    c. To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute and in violation of due process guarantees;

    d. Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and animated by animus based on the perceived race, ethnicity, national origin and TPS holder status of Syrian TPS holders.

---

[126] *Widakuswara v. Lake*, 773 F.Supp.3d 46, 56 (S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

188.    Plaintiffs will suffer irreparable injury from the unlawful termination.

189.    Defendants' decision to terminate Syria's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## SECOND CLAIM
### (Fifth Amendment of the U.S. Constitution—Equal Protection)

190.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

191.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.[127]

192.    Defendants' decision to terminate Syria's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

193.    Additionally, Defendants' decision to terminate Syria's TPS designation, like its decision to terminate TPS for country after country still experiencing devastating humanitarian conditions, impermissibly and intentionally discriminates against Plaintiffs because of explicit animosity and desire to harm holders of TPS as a group. *See Romer v. Evans*, 517 U.S. 620, 634 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

194.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

---

[127] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

68

195.    Defendants' termination of Syria's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

## THIRD CLAIM
### (Fifth Amendment of the U.S. Constitution—Due Process)

196.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

197.    The Due Process Clause of the Fifth Amendment applies "to all 'persons' within the United States, including aliens,"[128] and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."[129]

198.    Plaintiffs have liberty and property interests in their TPS status and related benefits, including employment authorization and removal protection. Defendants' purported termination of TPS for Syria without following the statutorily mandated requirements for termination deprives Plaintiffs of their liberty and property interests without due process of law.

199.    Among these procedural failings, Defendants' decision to terminate TPS for Syria occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C. § 1245a(b)(3);

200.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

201.    Defendants' purported termination of Syria's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of due process.

## FOURTH CLAIM
### (Ultra Vires / Administrative Procedure Act)

---

[128] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).
[129] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

69

202.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

203.    The power to terminate TPS designations is assigned by statute to the Attorney General of the United States, see 8 U.S.C. § 1254a(b)(3)(B), who has not exercised it to terminate the designation of Syria.

204.    That power was never properly transferred to the Secretary of Homeland Security, and therefore Noem's purported June 27, 2025 termination of Syria's TPS designation is void as statutorily ultra vires and is contrary to law and in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

205.    Declare that Defendants' purported terminations of TPS for Syria was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

206.    Set aside or otherwise vacate the termination of TPS for Syria as beyond Defendants' authority and/or unlawful under the APA;

207.    Postpone or stay the termination of TPS for Syria from taking effect or being put into effect;

208.    Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Syria;

209.    Order Defendants to take all steps necessary to ensure that the TPS designation for Syria remains in full force and effect;

70

210.    Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

211.    Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 24, 2026                              Respectfully submitted,


                                                  INTERNATIONAL REFUGEE ASSISTANCE
                                                     PROJECT
                                                   */s/ Hussein Elbakri*
                                                  Hussein Elbakri
                                                  Guadalupe Aguirre
                                                  Ghita Schwarz
                                                  One Battery Park Plaza, Fl 33
                                                  New York, NY 10004
                                                  (929) 246-0154
                                                  helbakri@refugeerights.org
                                                  laguirre@refugeerights.org
                                                  gschwarz@refugeerights.org

                                                  Megan Hauptman*
                                                  650 Massachusetts Ave NW
                                                  Suite 600
                                                  Washington, D.C. 20001
                                                  (646) 939-7329
                                                  mhauptman@refugeerights.org

                                                  MUSLIM ADVOCATES
                                                  Sadaf Hasan*
                                                  Melissa Keaney**
                                                  Nargis Aslami*
                                                  1032 15th Street N.W. # 362
                                                  Washington, D.C. 20005
                                                  (202) 655-2969
                                                  sadaf@muslimadvocates.org
                                                  melissa@muslimadvocates.org
                                                  nargis@muslimadvocates.org

                                                  VAN DER HOUT LLP

71

Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
ndca@vblaw.com

*Counsel for Plaintiffs*

*\*Admitted Pro Hac Vice*
 *\*\*Application for admission Pro Hac Vice*
 *forthcoming*