**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Dahlia DOE, et al.,<br><br>*Plaintiffs*,<br><br>– *versus* –<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-08686 (KPF) |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs, by and through their attorneys, set forth the following undisputed facts material to their motion for partial summary judgment.

## I. Temporary Protected Status: Governing Statutory Framework

1. Under the Immigration and Nationality Act (INA), a noncitizen who is granted Temporary Protected Status (TPS) "shall not [be] remove[d] from the United States during the period in which such status is in effect, and [] shall authorize the [noncitizen] to engage in employment in the United States[.]"
   a. 8 U.S.C. § 1254a(a); *see* 8 C.F.R. § 1244.12(a).
2. A noncitizen who is "provided temporary protected status . . . shall not be detained by the Attorney General on the basis of the [noncitizen's] immigration status in the United States."
   a. 8 U.S.C. § 1254a(d)(4).
3. A noncitizen who "can establish a prima facie case of eligibility for [TPS] benefits . . . , until a final determination with respect to the [noncitizen's] eligibility for such benefits . . . has been made, . . . shall be provided such benefits."
   a. 8 U.S.C. § 1254a(a)(4)(B).
4. The TPS statute provides that "[t]he Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state [for TPS] only if . . . the Attorney General finds that there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; ". . . there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is unable, temporarily, to handle adequately the return" of nationals; "or . . . there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States."
   a. 8 U.S.C. § 1254a(a)(b)(1)(A)–(C).
5. The TPS statute further provides that "[t]he designation of a foreign state (or part of such foreign state) under paragraph (1) shall . . . take effect upon the date of publication of the designation . . . or such later date as the Attorney General may specify in the notice published. . . and . . . shall remain in effect until the effective date of the termination of the designation . . . ."
   a. 8 U.S.C. § 1254a(b)(2).
6. The TPS statute further provides that "the initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months."
   a. *Id.*

7. The TPS statute further provides that "[a]t least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register."

   a. 8 U.S.C. § 1254a(b)(3)(A).

8. The TPS statute further provides that "[i]f the Attorney General determines . . . that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation . . . , the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination . . . (including the basis for the determination).

   a. 8 U.S.C. § 1254a(b)(3)(B).

9. The TPS statute further provides that "[s]uch termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C)."

   a. *Id.*

10. The TPS statute further provides that "[i]f the Attorney General terminates the designation of a foreign state (or part of such foreign state) under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the determination under that subsection (or, at the Attorney General's option, after such period after the effective date of the determination as the Attorney General determines to be appropriate in order to provide for an orderly transition)."

    a. 8 U.S.C. § 1254a(d)(3).

11. The TPS statute further provides that "[i]f the Attorney General does not determine . . . that a foreign state (or part of such foreign state) no longer meets the conditions for designation . . . , the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

    a. 8 U.S.C. § 1254a(b)(3)(C).

12. The TPS statute further provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

    a. 8 U.S.C. § 1254a(b)(5)(a).

## II. History of TPS Decision-Making

13. In 1991, the Department of Justice (DOJ) and the legacy Immigration and Naturalization Services (INS) adopted regulations governing TPS (1991 Regulations).

    a. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991).

14. The 1991 Regulations delegated certain operational aspects of the TPS program to the INS, including the authority to initially find individual noncitizens eligible for TPS and award protected status, and the authority to receive and process applications for protected status.

    a. *Id.* at 619 (codified as 8 C.F.R. § 244.2), 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

15. The 1991 Regulations did not, however, authorize any subordinate official to exercise the Attorney General's authority to terminate foreign states pursuant to the TPS statute, and for more than a decade, the Attorney General issued all TPS designations and terminations.

    a. *See generally* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991); *see, e.g.*, 65 Fed. Reg. 52,789, 52,791(Bosnia-Herzegovina Termination) (Aug. 30, 2000) ("By the authority vested in me as Attorney General under section 244(b)(3) of the Homeland Security Act . . . I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS . . ."); 63 Fed. Reg. 15,437, 15,438 (Liberia Termination) (Mar. 31, 1998); 58 Fed. Reg. 7,582 (Lebanon Termination) (Feb. 8, 1993); 57 Fed. Reg. 2,930, 2,931 (Kuwait Termination) (Jan. 24, 1992).

16. In 2002, Congress created the Department of Homeland Security (DHS), which led to the to the new agencies' absorption of many of the functions of the legacy INS.

    a. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

17. The Homeland Security Act provided that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers."

    a. 8 U.S.C. § 1103(a)(1).

18. Following the passage of the Homeland Security Act, the DOJ issued a final rule in 2003 (2003 Rule) which reorganized 8 C.F.R. chapter I—containing, *inter alia*, the existing TPS regulations—in order to "reflect[] the transfer of functions of the Immigration and Naturalization Service through the division of jurisdiction over regulations currently codified in 8 CFR chapter I."

    a. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003) (codified at 8 CF.R. pts. I, V).

19. The 2003 Rule duplicated existing TPS regulations "because many of the decisions under temporary protected status are made by immigration judges and the Board of Immigration Appeals," which resides within DOJ under EOIR.

    a. *Id.* at 9827; *see also id.* at 9841–42.

20. The 2003 Rule further provided that regulations would "require further refinement to clarify the authority of Secretary of Homeland Security to designate countries for temporary protected status purposes."

    a. *Id.* at 9827.

21. In 2002, President George W. Bush issued an executive reorganization plan and amendment, (2002 Plan), as required by the Homeland Security Act, which detailed "[t]he transfer of agencies, personnel, assets, and obligations to the [DHS] . . . ."

    a. *See* 6 U.S.C. § 542 note.

22. The 2002 Plan "[t]ransfer[red] the . . . functions of the [INS]", including delegated functions "performed by [the INS] immediately before the [transfer]", but it made no mention of TPS or to powers expressly vested in the Attorney General under the INA.

    a. *Id.*

23. As late as January 2003, when the government terminated TPS for Angola, the Attorney General was the official who made the determination whether to terminate TPS.

    a. *See* Termination of Designation of Angola under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

24. Beginning in September 2003, with the termination of TPS for Sierra Leone, and through to the present, the Secretary of the DHS has made the determination to terminate TPS that is codified to be under the Attorney General's authority under 8 U.S.C. § 1254a.

    a. *See* Termination of Designation of Sierra Leone under the Temporary Protected Status Program, 68 Fed. Reg. 52,407 (Sept. 3, 2003); *see also, e.g.,* Termination of the Designation of Montserrat Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation, 69 Fed. Reg. 40,642 (Jul. 6, 2004).

25. Other authorities that were not transferred to the Secretary of Homeland Security and remain with the Attorney General include those pursuant to 8 U.S.C. § 1533(a)(1)—a provision in Chapter 12 enacted in 1996—to apply to remove certain noncitizens in the U.S. "Alien Terrorist Removal Court" (ATRC).

    a. 8 U.S.C. § 1533(a)(1).

26. In July 2026, for the first time since the provision was enacted thirty years before, the Attorney General applied to commence removal proceedings against a noncitizen in the ATRC.

    a. *See* DOJ, Office of Public Affairs, *Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her*

*Family's Plans for Election-Day Shooting* (July 30, 2026), available at https://perma.cc/2CXR-BXFN; Aguirre Decl. Exhibit 1.

**III. Syria's TPS Designation and Successive Extensions and Redesignations**

27. In March 2012, the Secretary of DHS first designated Syria for TPS, in recognition of the country's escalating civil war, widespread civilian casualties, and mass displacement caused by government and non-state armed forces.
    a. Designation of Syrian Arab Republic for Temporary Protective Status, 77 Fed. Reg. 19,026, 19,027–28 (Mar. 29, 2012).
28. In June 2013, DHS extended the initial designation for Syria based on "extraordinary and temporary conditions" preventing the safe return of Syrian nationals. In that same Federal Register notice, DHS redesignated Syria for TPS based on its ongoing armed conflict and worsening conditions. The extension and redesignation was effective from October 1, 2013 through March 31, 2015.
    a. Extension and Redesignation of Syria for Temporary Protected Status, 78 Fed. Reg. 36,223, 36,224–25 (June 17, 2013).
29. In January 2015, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from April 1, 2015 through September 30, 2016.
    a. Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 80 Fed. Reg. 245 (Jan. 5, 2015).
30. In August 2016, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from October 1, 2016 through March 31, 2018.
    a. Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 81 Fed. Reg. 50,533 (Aug. 1, 2016).
31. In March 2018, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from April 1, 2018 through September 30, 2019.
    a. Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9329 (Mar. 5, 2018).
32. In September 2019, the Secretary of Homeland Security extended the designation of Syria for TPS for 18 months, from October 1, 2019 through March 31, 2021.
    a. Extension of the Designation of Syria for Temporary Protected Status, 84 Fed. Reg. 49,751 (Sept. 23, 2019).
33. In March 2021, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from March 31, 2021 through September 30, 2022.
    a. Extension and Redesignation of Syria for Temporary Protected Status, 86 Fed. Reg. 14,946 (Mar. 19, 2021).
34. In August 2022, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from October 1, 2022 through March 31, 2024.

a. Extension and Redesignation of Syria for Temporary Protected Status, 87 Fed. Reg. 46,982 (Aug. 1, 2022).

35. In January 2024, the Secretary of Homeland Security extended and redesignated Syria for TPS for 18 months, from April 1, 2024 through September 30, 2025.

a. Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5562 (Jan. 29, 2024).

## IV. The 2025 Termination of TPS for Syria

36. On July 21, 2025, DHS Senior Counselor Rob Law emailed U.S. Department of State Senior Bureau Official Spencer Chretien, stating: Spencer, [t]he following TPS designations are coming up for review: Syria: Aug. 1 decision deadline[;] South Sudan: September 3 decision deadline[;] Burma: September 26 decision deadline[;] Ethiopia: October 13 decision deadline[.] Thanks, RTL."

a. ECF No. 72-2 at 156.

37. On July 22, 2025, U.S. Department of State Senior Bureau Official Spencer Chretien responded by email to DHS Senior Counselor Rob Law, stating: "Dear Rob, I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration related issues. Spencer".

a. *Id.*

38. No other document appears in the Administrative Record (AR) documenting a consultation between the appropriate agencies regarding country conditions for Syria.

a. *See generally* ECF Nos. 27-2–93; AR 1–3203.

39. On September 19, 2025, the then-Secretary of Homeland Security, Kristi Noem, announced the termination of Syria's TPS designation.

a. *See* ECF No. 20-16, Press Release, Dep't of Homeland Sec., Noem Announces the Termination of Temporary Protected Status for Syria (Sep. 19, 2025), available at https://www.dhs.gov/news/2025/09/19/secretarynoem-announces-termination-temporary-protected-status-syria.

40. On September 22, 2025, the termination was published in the Federal Register (September 22, 2025 Termination Notice).

a. *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

41. The September 22, 2025 Termination Notice stated that the "Secretary of Homeland Security (Secretary) is terminating the designation of Syria for Temporary Protected Status."

a. *Id.*

42. The September 22, 2025 Termination Notice contains no mention of the Attorney General or any determination made by the Attorney General.

    a. *Id*.

43. The September 22, 2025 Termination Notice set a termination date of November 21, 2025, merely 60 days after the termination notice date and the minimum as required by the TPS statute.

    a. *Id.*; *see* 8 U.S.C. § 1254(b)(3)(B).

44. The September 22, 2025 Termination Notice states that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical infrastructure, and significantly weakened the Syrian economy", in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."

    a. Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398, 45,400 (Sept. 22, 2025).

45. The September 22, 2025 Termination Notice further provides that with respect to Syria's designation due to "extraordinary and temporary conditions," although "most Syrians require some form of humanitarian assistance" "this does not prevent nationals from returning in safety."

    a. *Id.*

46. The Termination Notice did not reflect that in July 2025, the State Department had issued a Level 4 "Do Not Travel" advisory for Syria, warning that "no part of Syria is safe from violence" due to "terrorism, civil unrest, kidnapping, hostage taking, and armed conflict."

    a. *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

    b. ECF No. 20-19.

47. On October 21, 2025, Plaintiffs filed the instant lawsuit, *Dahlia Doe v. Noem*, Civ No. 25-8686, in the Southern District of New York, challenging the government's termination of TPS for Syrian nationals.

    a. ECF No. 1.

48. On November 19, 2025, this Court, in an order accompanied by an oral decision, granted Plaintiffs' motion for postponement of agency action.

    a. ECF Nos. 54, 59.

49. On November 25, 2025, Defendants filed a Notice of Appeal to the Second Circuit Court of Appeals.

    a. ECF No. 56.

50. On December 4, 2025, Defendants filed an emergency motion for a stay pending appeal.

a. Defendants-Appellants' Emergency Motion for a Stay Pending Appeal and for an Immediate Stay During the Consideration of This Motion, *Doe v. Mullin*, 25-2995, (2d Cir. Dec 04, 2025), Dkt. No. 12.

51. On February 17, 2026, the Second Circuit issued an order denying Defendants' request for a stay of the Court's November 19, 2025 postponement order.

    a. *Doe v. Noem*, No. 25-2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026).

52. On March 16, 2026, the Supreme Court granted certiorari before judgment.

    a. *Noem v. Doe*, 146 S. Ct. 1803 (2026)

53. On April 3, 2026, Defendants filed their Certified Administrative Record on this Court's public docket.

    a. ECF No. 72.

54. On June 25, 2026, the Supreme Court issued an opinion reversing the Court's order postponing the termination of Syrian TPS that did not address the underlying factual record in *Doe v. Noem*, 25-cv-08686 (S.D.N.Y. 2025), but instead found that judicial review of statutory violations was unavailable under the Administrative Procedure Act.

    a. *Mullin v. Doe*, 146 S. Ct. 2121 (2026).

55. On July 24, 2026, Plaintiffs filed an amended complaint with the Court.

    a. ECF Nos. 83, 85.

56. On July 27, 2026, the Supreme Court issued a judgment following its June decision.

    a. Judgment, *Mullin v. Doe*, No. 25-1083, (U.S. Jul. 27, 2026).

57. USCIS announced on July 29, 2026 that the termination of TPS for Syria went into effect on July 27, 2026.

    a. Update on Termination of Temporary Protected Status for Syria (Release: July 29, 2026), available at https://www.uscis.gov/i-9-central/form-i-9-related-news/update-on-termination-of-temporary-protected-status-for-syria-release-july-29-2026; Aguirre Decl. Exhibit 2.

## V. Increased Obstacles for TPS Holders Seeking Alternative Statuses

58. On June 4, 2025, President Trump issued Presidential Proclamation 10949, "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which barred the entry into the United States of nationals from 12 countries, and restricted the entry of nationals from 7 other countries, many of which were countries that had been designated for TPS.

    a. Presidential Proclamation 10949, available at https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/.

59. On December 2, 2025, USCIS issued a policy memorandum entitled "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries", which "effective immediately" directed USCIS personnel to "[p]lace a hold on pending benefit requests[] for [noncitizens] from countries listed in Presidential Proclamation (PP) 10949. . . pending a comprehensive review, regardless of entry date[] and . . . [c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021."

    a. USCIS, PM-602-0192, "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries," (Dec. 2, 2025), https://perma.cc/VG95-6Z2V (archived Feb. 25, 2026); Aguirre Decl. Exhibit 3.

60. On December 16, 2025, President Trump issued a new Proclamation, "Restricting and Limiting the Entry of Foreign Nationals," that added 7 countries to the list of those whose nationals were fully suspended from entry, and added 22 countries to the list of those whose nationals were partly suspended from entry.

    a. Presidential Proclamation, "Restricting and Limiting the Entry of Foreign Nationals," https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.

61. On January 1, 2026, USCIS issued a policy memorandum entitled "Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries", which "effective immediately" directed USCIS personnel to "[p]lace a hold[] on all pending benefit applications, for [noncitizens] listed[] in Presidential Proclamation (PP) 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States,[] pending a comprehensive review, regardless of entry date[] . . .[c]onduct a comprehensive review of all policies, procedures, and screening and vetting . . ."

    a. USCIS, PM-602-0194, "Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries," (Jan. 1, 2026), https://perma.cc/FMR87M86 (archived Feb. 25, 2026); Aguirre Decl. Exhibit 4.

62. Meanwhile, since January 2025, the detention of noncitizens in the United States has increased, with current estimates showing approximately at least 65,000 noncitizens in Immigration and Customs Enforcement (ICE) detention as of July 11, 2026.

    a. TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE, https://perma.cc/5NRT-Z2HV (archived Aug. 17, 2026) (showing that,"[ICE] held 65,765 [people] in ICE detention according to data current as of July 11, 2026."); Aguirre Decl. Exhibit 5.

63. The Immigration and Nationality Act authorizes the detention of noncitizens pending a decision on whether they are to be removed, even if they have pending applications for lawful status.

a. *See* 8 U.S.C. § 1226(a); 8 C.F.R. 236.1.

## VI. Harms to Plaintiffs

64. Plaintiff Dahlia Doe is a Syrian national who had TPS from 2021 until TPS for Syria was terminated at the end of July 2026.

    a. ECF No. 20-39 ¶¶ 2, 6; Aguirre Decl. Exhibit 6 ¶¶ 2, 6, 7.

65. Dahlia Doe maintained lawful presence in the United States from her arrival in the United States on a student visa in 2015, her subsequent obtaining of Optional Practical Training status, and then TPS in 2021, until TPS for Syria was terminated.

    a. ECF No. 20-39 ¶¶ 3, 5–6, 10; Aguirre Decl. Exhibit 6 ¶¶ 3, 6–7, 10.

66. Under the INA, "[a noncitizen] is deemed to be unlawfully present in the United States if the [noncitizen] is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled."

    a. 8 U.S.C. § 1182(a)(9)(B)(ii).

67. A noncitizen who "was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States . . . and again seeks admission within 3 years of the date of such [noncitizen's] departure or removal . . . is inadmissible."

    a. 8 U.S.C. § 1182(a)(9)(B)(i)(I).

68. A noncitizen who "has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States . . . is inadmissible."

    a. 8 U.S.C. § 1182(a)(9)(B)(i)(II).

69. Dahlia Doe has been in a state of great anxiety since the announcement of the termination of Syrian TPS and through its effective date on July 27, 2026; terrified about her future and that of her family; and, now without TPS, scared to be vulnerable to the reality of ICE raids in New York City and elsewhere, and detention.

    a. ECF No. 20-39 ¶¶ 12, 16; Aguirre Decl. Exhibit 6 ¶¶ 11–16.

70. Although Dahlia Doe has a pending application for immigration status, it has yet to be adjudicated, and she is not protected from arrest and detention unless and until it is granted.

    a. Aguirre Decl. Exhibit 7 ¶ 8.

71. Plaintiff Sara Doe is a Syrian national who has had TPS since 2015.

    a. ECF No. 20-40 ¶¶ 1, 10; Aguirre Decl. Exhibit 7 ¶¶ 1, 10.

72. Sara Doe has maintained lawful presence in the United States since arriving in the United States in 2014 and through the termination of TPS in July, 2026.

   a. ECF No. 20-40 ¶¶ 3,10; Aguirre Decl. Exhibit 7 ¶¶ 3, 10.

73. Sara Doe is a "specialized pediatric doctor" and "[has] been able to build a specialization and do several clinical rotations as part of [her] medical training. This kind of highly-specialized training was not available in Syria."

   a. ECF No. 20-40 ¶¶ 3, 7; Aguirre Decl. Exhibit 7 ¶¶ 3, 7-9, 15.

74. Sara Doe was shocked to learn about the announcement of the termination of Syrian TPS in September 2025, noting "[i]t was incredibly stressful and sad that [she] would lose the job [she] she just started and feel[s] so passionate about. [She] kept working and doing medical procedures, but it was very challenging to stay focused."

   a. ECF No. 20-40 ¶ 13; Aguirre Decl. Exhibit 7 ¶ 11.

75. Between the announcement of the termination of TPS and its actual termination, Sara Doe's employer sponsored her for alternative immigration pathways, including H-1B and O-1 visas, but the first two applications "were delayed as a result of [her] Syrian nationality."

   a. Aguirre Decl. Exhibit 7 ¶¶ 14, 15–16.

76. Sara Doe's employer applied again for an H-1B visa for her in June 2026.

   a. Aguirre Decl. Exhibit 7 ¶ 15.

77. After the Supreme Court issued its decision on June 25, 2026, "work authorization linked to TPS status for Syrians was getting extended every few days without certainty of when exactly it would end," and she "was forced to go on an unpaid leave of absence for a few days."

   a. Aguirre Decl. Exhibit 7 ¶ 16.

78. "The period [Sara Doe] was unable to work caused a huge disruption at the hospital—not only for [her] patients but also for [her] staff who were scrambling to find substitute doctors with [her] skill-set to conduct [her] scheduled medical procedures. Many of [her] patients' critical and time-sensitive medical procedures had to be cancelled—for some, these procedures were a matter of life and death. For one of [her] patients, the hospital had to hire an external interventionist because the procedure couldn't be postponed."

   a. Aguirre Decl. Exhibit 7 ¶ 17.

79. Sara Doe's second H-1B visa "was approved just days before TPS officially ended for Syrians. Even though [she] now ha[s] an H-1B visa and ha[s] a bit more security from before, [she] feel[s] that every step forward will still be hard for [her] and [she] [does not] completely have peace of mind yet. [She] fear[s] [she] will still be targeted and scrutinized based on [her] nationality and the government revoking TPS for Syrians specifically."

   a. Aguirre Decl. Exhibit 7 ¶ 19.

80. Sara Doe's "H-1B visa is for two years but there is no guarantee that it will get renewed after," and without TPS she has no "safety net" if her status lapses.

a. Aguirre Decl. Exhibit 7 ¶ 24.

81. Sara Doe "cannot return to Syria" or her hometown of Aleppo, "which has been absolutely destroyed" and where she "would not even be able to meet my most basic necessities, let alone be able to continue [her] specialized medical career and provide medical treatment for those who need it." Her safety would be at risk "due to the ongoing armed conflict."

    a. Aguirre Decl. Exhibit 7 ¶ 23.

82. Plaintiff Nesma Doe is a Syrian national who has had TPS since 2013.

    a. ECF No. 20-41 ¶¶ 1, 3; Aguirre Decl. Exhibit 8 ¶ 1.

83. Nesma Doe has maintained lawful presence in the United States since arriving in the United States in 2013 and through the termination of TPS in July 2026.

    a. ECF No. 20-41 ¶¶ 1, 3; Aguirre Decl. Exhibit 8 ¶ 3.

84. Nesma Doe has been under extreme stress since learning about the government's plans to terminate Syrian TPS in September 2025.

    a. ECF No. 20-41 ¶ 11; Aguirre Decl. Exhibit 8 ¶ 11.

85. Nesma Doe is nearly eighty years and has multiple health conditions which require her to live with and near family members, who financially support her, pay for her health insurance, help care for her and take her to medical appointments.

    a. ECF No. 20-41 ¶ 6; Aguirre Decl. Exhibit 8 ¶¶ 6, 13.

86. If Nesma Doe is forced to return to Syria, she would not have any help from the government, social programs, or relatives, nor be able to receive the medical care that she needs to manage her chronic health conditions.

    a. Aguirre Decl. Exhibit 8 ¶¶ 14-15.

87. Nesma Doe would also face significant vulnerability to violence as an elderly woman in Syria, and fears that any relative who uproots their life to come to Syria to help her also would be endangered.

    a. Aguirre Decl. Exhibit 8 ¶¶ 15-16.

88. Although Nesma Doe's only form of protection from deportation was TPS, Nesma applied for asylum in November 2025, but that case was referred to immigration court and scheduled for January 2029.

    a. Aguirre Decl. Exhibit 8 ¶ 8.

89. Nesma Doe would like to travel to other parts of the United States to visit some of her siblings, some who are ill, but she cannot do so due to her fears of immigration enforcement. She is "constantly worried about immigration enforcement even when [she] steps outside [her] house to visit friends in the neighborhood."

    a. Aguirre Decl. Exhibit 8 ¶¶ 17-18.

90. Without valid work authorization, Nesma Doe has been unable to renew her Florida state identification documents.

    a. Aguirre Decl. Exhibit 8 ¶ 7.

91. Additionally, although she has a pending immigration application based on her relationship to her U.S. citizen sibling, Nesma Doe is concerned that the lapse in her lawful status due to the termination of Syrian TPS will pose an additional obstacle to adjustment.

    a. Aguirre Decl. Exhibit 8 ¶ 9.

92. Plaintiff Laila Doe is a Syrian national who had TPS since 2013 until it was terminated in July 2026.

    a. ECF No. 20-42 ¶¶ 1-2; Aguirre Decl. Exhibit 9 ¶¶ 1-2, 7.

93. Laila Doe lives in the United States with her eighty-year-old U.S. citizen mother and her teenage daughter, who was also a TPS holder.

    a. Aguirre Decl. Exhibit 9 ¶¶ 3, 6.

94. Laila Doe is the provider and caretaker for her daughter and her elderly U.S. citizen mother, the latter of whom requires daily assistance from Laila with things like showering, clothing, transportation to doctor's appointments, and medical care management.

    a. ECF No. 20-42 ¶ 6; Aguirre Decl. Exhibit 9 ¶ 6.

95. Laila Doe has been on leave from her job since July 27, 2026, "due to the termination of work authorization for Syrian TPS holders."

    a. Aguirre Decl. Exhibit 9 ¶ 4.

96. Before she went on leave, Laila Doe "worked with adults and young people with special needs, including individuals with autism and Down syndrome . . . ." In order to support her work, she completed Registered Behavior Technician training and other courses.

    a. ECF No. 20-42 ¶ 4; Aguirre Decl. Exhibit 9 ¶ 4.

97. Additionally, Laila Doe had been working towards enrolling in a nursing program for the past three years, but because she no longer has legal status in the United States, she had to stop taking certain prerequisites, such as English for Speakers of Other Languages (ESOL) classes.

    a. Aguirre Decl. Exhibit 9 ¶ 20.

98. Now that Laila Doe has lost her job and her income, she has to depend on her siblings to cover her expenses and those of her mother and daughter.

    a. Aguirre Decl. Exhibit 9 ¶ 15.

99. Laila Doe's 18-year-old daughter, who also lost TPS status in July 2026 shortly after graduating from high school, has been unable to work or plan for higher education and has been struggling, feeling defeated and excluded as her peers progress in life.

    a. Aguirre Decl. Exhibit 9 ¶ 14.

100. Laila Doe has applied for other immigration benefits, but those remain pending and delayed because USCIS suspended processing for immigration benefits for Syrian nationals until a court order intervened.

    a. Aguirre Decl. Exhibit 9 ¶¶ 8–9.

101. Laila Doe and her daughter do not have a home in Syria or Damascus, where her sister has been subject to bombings and airstrikes. "As a divorced woman living alone" with her daughter, she would be subject to increased risk of harassment and "fears for their safety."

    a. Aguirre Decl. Exhibit 9 ¶¶ 16-19.

102. Plaintiff Waleed Doe is a Syrian national who first obtained TPS in 2012.

    a. ECF No. 20-43 ¶¶ 1, 3; Aguirre Decl. Exhibit 10 ¶¶ 1, 3.

103. Waleed Doe has maintained lawful presence in the United States since arriving in the United States in 2011 and through the termination of TPS in July 2026.

    a. Aguirre Decl. Exhibit 10 ¶¶ 2–3.

104. Waleed Doe lives in New Jersey with his wife, a part-time teacher and also a Syrian TPS holder until TPS was terminated, and his three U.S. citizen children, aged eight, five, and one.

    a. Aguirre Decl. Exhibit 10 ¶¶ 4, 7.

105. As a senior manager in a private company in New York who also does contract work in the information technology sector, Waleed Doe is the primary breadwinner for his family, covering most of the costs of rent, education for his children, and other necessary expenses for his family.

    a. Aguirre Decl. Exhibit 10 ¶ 7.

106. At the end of 2025, Waleed Doe's wife filed for asylum and included him as a derivative. Through their asylum case, they obtained work authorization.

    a. Aguirre Decl. Exhibit 10 ¶ 5.

107. Waleed Doe is terrified about his future and that of his family since the termination of Syrian TPS went into effect. He has never lived in Syria and does not have any close family in Syria.

    a. Aguirre Decl. Exhibit 10 ¶¶ 8, 10, 14.

108. With TPS terminated, despite Waleed's wife's pending asylum application, Waleed Doe and his wife do not have protection from arrest, detention, and removal.

a. Aguirre Decl. Exhibit 10 ¶¶ 11–12.

109. Waleed Doe and his wife are "devastated" by the prospect of separation from their children and other family members in the United States, and just as terrified of the violence and danger to family members that the family could face in Syria.

a. Aguirre Decl. Exhibit 10 ¶¶ 8-9, 11–12.

110. Plaintiff Mustafa Doe is a Syrian national who has had TPS since 2023.

a. ECF No. 20-44 ¶ 1; Aguirre Decl. Exhibit 11 ¶¶ 1, 10.

111. Mustafa Doe has maintained lawful presence in the United States since arriving in the United States on a student visa in 2021 and through the termination of TPS in July 2026.

a. Aguirre Decl. Exhibit 11 ¶¶ 3, 10, 11.

112. Since graduating from his university program in May 2025, Mustafa Doe has worked at global corporation where he manages "social impact, sustainability, and philanthropic initiatives," work that he finds "extremely meaningful."

a. Aguirre Decl. Exhibit 11 ¶¶ 8–9.

113. Mustafa Doe has had a pending asylum application since approximately 2022, which has provided him with work authorization after the termination of Syrian TPS, but he has not yet received an asylum interview.

a. Aguirre Decl. Exhibit 11 ¶ 12.

114. Mustafa Doe also has a pending family-based immigration petition, which has been in process for approximately three years.

a. Aguirre Decl. Exhibit 11 ¶ 13.

115. Because of the "severe immigration delays on both pending immigration pathways in which TPS status provided a safety net," Mustafa Doe feels "like every avenue available to [him] is closing."

a. *Id.*

116. Although he has pending immigration applications, without TPS, Mustafa Doe has no protection from arrest and detention in the United States.

a. *Id.*

117. As a "queer Syrian man" and a victim of severe criminal abuse in Syria, Mustafa Doe faces grave danger if "forcibly deported to the very country and people" he fled for his safety.

a. Aguirre Decl. Exhibit 11 ¶¶ 15, 19, 24, 25, 28.

118. Mustafa Doe also fears the great harm to his physical and mental health if forced to be separated from his parents and family in the United States.

   a. Aguirre Decl. Exhibit 11 ¶¶ 16, 19, 24, 30.

119. Plaintiff Ahmad Doe is a Syrian national who applied for TPS in May 2025.

   a. ECF No. 20-45 ¶¶ 1, 5; Aguirre Decl. Exhibit 14 ¶¶ 1, 6.

120. Ahmad Doe entered the United States on a J-1 visa to work as a journalist, but due to federal funding cuts in April 2025, he was laid off his job and lost his visa.

   a. Aguirre Decl. Exhibit 12 ¶¶ 3, 5.

121. In November 2025, Ahmad Doe applied for asylum, but he believes that his application for asylum has been delayed due to heightened scrutiny based on his Syrian nationality. To date, he is still awaiting a decision on his asylum application.

   a. Aguirre Decl. Exhibit 12 ¶ 8.

122. Ahmad Doe never received a decision on his TPS application, which was still pending at the time of the termination of Syria's TPS designation after the Supreme Court's decision in July 2026.

   a. Aguirre Decl. Exhibit 12 ¶ 7.

123. In May 2026, Ahmad Doe received work authorization through his pending asylum application, but his pending asylum application does not protect him from arrest and detention.

   a. Aguirre Decl. Exhibit 12 ¶¶ 11, 24.

124. Between April 2025 and May 2026, Ahmad Doe was unable to act on multiple job offers from media companies that wanted him to work for them in the United States because he lacked work authorization.

   a. Aguirre Decl. Exhibit 12 ¶¶ 11, 12.

125. Before receiving work authorization in May 2026, Ahmad Doe was unable to obtain a REAL ID and instead obtained a different license for undocumented people. Now that he has work authorization, he was able to obtain a REAL ID, but even then he "still live[s] in fear because [he] still ha[s] not obtained lawful status and see[s] how TPS holders are getting targeted in the current moment."

   a. Aguirre Decl. Exhibit 12 ¶ 17.

126. Additionally, Ahmad Doe's fear of immigration enforcement and detention as well as the targeting of Syrians in the United States has prevented him from meaningfully contributing to and volunteering with his community.

   a. Aguirre Decl. Exhibit 12 ¶ 22.

127. For Ahmad Doe, the uncertainty of his legal status due to the termination of Syrian TPS has caused him severe stress and depression.

a. Aguirre Decl. Exhibit 12 ¶ 23.

128. Ahmad Doe "came to the United States with a strong sense of purpose and contribution," with "a respected career in journalism," and a belief "in the American values of fairness and opportunity." Now he is struggling without the ability to drive and the fear that he will not be able "survive—to live legally, to work, and to preserve [his] dignity."

a. Aguirre Decl. Exhibit 12 ¶¶ 19–20.

129. The State Department's Level 4 "Do Not Travel" advisory for Syria remains in effect and was most recently updated on August 7, 2026.

a. "Travel Advisory – Syrian Arab Republic" (Date Issued: August 7, 2026), available at https://travel.state.gov/en/international-travel/travel-advisories/syria.html; Aguirre Decl. Exhibit 13.

Dated: August 17, 2026 By:

INTERNATIONAL REFUGEE ASSISTANCE PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Ghita Schwarz
Pedro Sepulveda
Hussein Elbakri
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
gschwarz@refugeerights.org
helbakri@refugeerights.org

Megan Hauptman*
650 Massachusetts Ave NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

MUSLIM ADVOCATES
Sadaf Hasan*
Nargis Aslami*
Melissa Keaney**
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 655-2969
sadaf@muslimadvocates.org
nargis@muslimadvocates.org
melissa@muslimadvocates.org

VAN DER HOUT LLP
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
(415) 981-3000
ndca@vblaw.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*
***Application for admission Pro Hac Vice forthcoming*