**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Dahlia DOE, et al.,<br>*Plaintiffs*,<br>– *versus* –<br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, et al.,<br>*Defendants*. | Case No. 1:25-cv-08686 (KPF) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

I. THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS. ..... 6

A. The Judicial-Review Bar Does Not Preclude Constitutional Claims. ..... 6

B. The Judicial-Review Bar Does Not Preclude Plaintiffs' Challenge to the Former Secretary's Authority to Engage in TPS Decision-Making. ..... 7

II. FORMER SECRETARY NOEM ACTED *ULTRA VIRES* IN TERMINATING SYRIA'S TPS BECAUSE TPS TERMINATION AUTHORITY LIES EXCLUSIVELY WITH THE ATTORNEY GENERAL. ..... 9

A. The TPS Statute Vests TPS Termination Authority Exclusively in the Attorney General. ..... 10

B. The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary. ..... 11

C. Defendants Have Failed to Identify Any Source of Authority to the Contrary. ..... 14

III. DEFENDANTS' TERMINATION OF SYRIA'S TPS VIOLATED PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS. ..... 16

A. Section 1254a Creates Constitutionally Protected Interests in TPS Status. ..... 17

B. Defendants' Process of Terminating Syria's TPS was Constitutionally Inadequate. ..... 21

IV. THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT, VACATE THE TERMINATION OF SYRIA'S TPS, AND DECLARE IT UNLAWFUL. ..... 25

A. Partial Summary Judgment is Appropriate. ..... 25

B. Vacatur Is the Required Remedy Under the APA. ..... 25

C. A Declaratory Judgment Is Necessary to Resolve Any Uncertainty Regarding the Status of Syria's Designation. ..... 26

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014) ....................21

*Adams v. Suozzi*,
517 F.3d 124 (2d Cir. 2008)....................17

*African Communities Together v. Mullin,*
No. 25-cv-13939, 2026 WL 2274504 (D. Mass. 2026)....................15

*Aleutian Cap. Partners, LLC v. Scalia*,
975 F.3d 220 (2d Cir. 2020)....................25

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F.Supp.3d 66 (D. Md. 2025)....................26

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972).................... *passim*

*Bell v. Burson*,
402 U.S. 535 (1971)....................18

*Bellin v. Zucker*,
6 F.4th 463 (2d Cir. 2021) ....................7

*Bos. Redev. Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016)....................5

*Bridges v. Wixon*,
326 U.S. 135 (1945)....................20

*Brown v. Gardner*,
513 U.S. 115 (1994)....................16

*Carey v. Piphus*,
435 U.S. 247 (1978)....................17

*Cervantes v. Holder*,
597 F.3d 229 (4th Cir. 2010) ....................14

*Ching v. Mayorkas*,
725 F.3d 1149 (9th Cir. 2013) ....................20

*City & Cnty. of S.F. v. EPA*,
604 U.S. 334 (2025)....................16

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................10

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)....................20, 23

*Corner Post v. Board of Governors*,
603 U.S. 799 (2024) (Kavanaugh, J., concurring)....................26

*D.J.C.V. v. United States*,
605 F.Supp.3d 571 (S.D.N.Y. 2022)....................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
591 U.S. 1 (2020)....................16

*Dep't of Homeland Sec. v. Thuraissigiam*,
591 U.S. 103 (2020)....................21

*Destino v. FCI Berlin, Warden*,
No. 1:25-cv-374-SE-AJ, 2025 WL 4010424 (D.N.H. Dec. 24, 2025)....................20

*Dia v. Ashcroft*,
353 F.3d 228 (3d Cir. 2003)....................21

*Doe v. Mullin*,
No. 25-cv-15483, 2026 WL 2279577 (N.D. Ill. Aug. 7, 2026)....................6, 8

*Doe v. Noem*,
No. 25-2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026)....................22

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021)....................7

*Est. of Wobschall by Wobschall v. Ross*,
488 F.Supp.3d 737 (E.D. Wis. 2020)....................18

*Greenberg v. Bd. of Governors of Fed. Reserve Systm.*,
968 F.2d 164 (2d Cir. 1992)....................23

*Haitian Evangelical Clergy Ass'n v. Trump*,
No. 25-CV-1464, 2025 WL 4482992 (E.D.N.Y. July 28, 2025)....................27

*Jimenez v. Cronen*,
317 F.Supp.3d 626 (D. Mass. 2018)....................24

*Kapps v. Wing*,
404 F.3d 105 (2d Cir. 2005)................................................................................ *passim*

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
925 F.2d 556 (2d Cir. 1991)..................................................................................26

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)...........................................................................................2, 10

*Lackey v. Stinnie*,
604 U.S. 192 (2025)...............................................................................................9

*Landon v. Plasencia*,
459 U.S. 21 (1982)...............................................................................................20

*League of Women Voters of United States v. Newby*,
238 F.Supp.3d 6 (D.D.C. 2017) ..............................................................................7

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................................22

*London v. Polishook*,
189 F.3d 196 (2d Cir. 1999)....................................................................................8

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...........................................................................................8, 16

*Make the Road N.Y. v. Pompeo*,
475 F.Supp.3d 232 (S.D.N.Y. 2020).....................................................................22

*Mansor v. USCIS*,
685 F.Supp.3d 1000 (W.D. Wash. 2023)...............................................................18

*Mathews v. Eldridge*,
424 U.S. 319 (1976).......................................................................17, 21, 22, 23

*Mejia Rodriguez v. Dep't of Homeland Sec.*,
562 F.3d 1137 (11th Cir. 2009) ............................................................................15

*Mullin v. Doe*,
146 S.Ct. 2121 (2026)......................................................................................1, 6, 9

*Najera v. United States*,
926 F.3d 140 (5th Cir. 2019) ................................................................................14

*Nat'l Ass'n of Broads. v. FCC*,
39 F.4th 817 (D.C. Cir. 2022)..........................................................................10, 16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109 (2022) ..... 10

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ..... 26

*New York v. Nat'l Highway Traffic Safety Admin.*,
974 F.3d 87 (2d Cir. 2020) ..... 26

*New York v. U.S. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) ..... 10

*Noem v. Nat'l TPS All.*,
No. 24A1059 (U.S. May 1, 2025) ..... 14

*Ozturk v. Hyde*,
136 F.4th 382 (2d Cir. 2025) ..... 6

*Perez-Escobar v. Moniz*,
792 F.Supp.3d 224 (D. Mass. 2025) ..... 23

*Perry v. Sindermann*,
408 U.S. 593 (1972) ..... 17

*Perttu v. Richards*,
605 U.S. 460 (2025) ..... 8

*Portillo-Rendon v. Holder*,
662 F.3d 815 (7th Cir. 2011) ..... 21

*R.F.M. v. Nielsen*,
365 F.Supp.3d 350 (S.D.NY. 2019) ..... 5

*Radwan v. Manuel*,
55 F.4th 101 (2d Cir. 2022) ..... 24

*Ramos v. Nielsen*,
321 F.Supp.3d 1083 (N.D. Cal. 2018) ..... 18

*Rodas v. Chertoff*,
399 F.Supp.2d 697 (E.D. Va. 2005) ..... 18

*Sackett v. EPA*,
598 U.S. 651 (2023) ..... 16

*Saget v. Trump*,
375 F.Supp.3d 280 (E.D.N.Y. 2019) ..... 18

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) .......... 20

*Swarthout v. Cooke*,
562 U.S. 216 (2011) (per curiam) .......... 17

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) .......... 9

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 6

*Webster v. Fall*,
266 U.S. 507 (1925) .......... 9

*Whitman v. United States*,
574 U.S. 1003 (2014) (Scalia, J., denying certiorari) .......... 9

*Withrow v. Larkin,*
421 U.S. 35 (1975) .......... 23, 24

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .......... 17

**Statutes**

5 U.S.C. § 706(2) .......... *passim*

6 U.S.C. § 271 .......... 13

6 U.S.C. § 542(a) .......... 14

6 U.S.C. § 552(d) .......... 7, 14, 15

6 U.S.C. § 557 .......... 7, 14, 15

8 U.S.C. § 1103(a)(1) .......... 12

8 U.S.C. § 1103(g)(1) .......... 12

8 U.S.C. § 1105(b) .......... 13

8 U.S.C. § 1252(b)(9) .......... 6

8 U.S.C. § 1254a .......... *passim*

8 U.S.C. § 1533(a)(1) .......... 13

28 U.S.C. § 1331 .......... 6

28 U.S.C. § 2201 ....................26

28 U.S.C. § 2202 ....................26

Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 .................... *passim*

**Other Authorities**

8 C.F.R. § 244.1 ....................11

8 C.F.R. § 244.2 ....................11, 19

8 C.F.R. § 244.3 ....................19

8 C.F.R. § 244.4 ....................19

8 C.F.R. § 244.6 ....................11

8 C.F.R. § 244.7 ....................11

8 C.F.R. § 244.10(b) ....................19

8 C.F.R. § 244.14 ....................20

8 C.F.R. § 244.19 ....................23

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989) (statement of Rep. Levine) ....................21

56 Fed. Reg. 23,491 ....................11

56 Fed. Reg. 618 ....................11, 14

57 Fed. Reg. 2,930 ....................11

58 Fed. Reg. 7,582 ....................11

63 Fed. Reg. 15,437 ....................11

65 Fed. Reg. 52,789 ....................11

67 Fed. Reg. 48,950 ....................14

68 Fed. Reg. 9,824 ....................4

68 Fed. Reg. 23,744 ....................12

75 Fed. Reg. 3,476 ....................14

82 Fed. Reg. 47,228 ....................14

90 Fed. Reg. 45,398 ....................................................................................................4, 14

90 Fed. Reg. 19,217 ....................................................................................................19

91 Fed. Reg. 32,069 ....................................................................................................19

Fed. R. Civ. P. 56(a) ....................................................................................................5, 25

H.R. Rep. No. 100-627 (1988)....................................................................................................3

Reorganization Plan for the Department of Homeland Security, H.R. Doc. No. 108-16 (2003)....................................................................................................14

# INTRODUCTION

It is indisputable that the termination of Syria's Temporary Protected Status was made in violation of the TPS statute's procedural requirements to terminate a country's designation. Nothing in the Supreme Court's decision in *Mullin v. Doe*, 146 S.Ct. 2121 (U.S. 2026), which decided the judicial reviewability of challenges to the procedures leading to a TPS termination based on statutory grounds, refutes this. And though, following *Mullin*, Plaintiffs may no longer raise their prior statutory claims to vindicate those violations, they may, and now do, seek partial summary judgment on new, justiciable claims that the termination of Syria's TPS was an *ultra vires* act by the Secretary of the Department of Homeland Security under the Administrative Procedure Act and violated their procedural due process rights under the Fifth Amendment.

In *Mullin*, the Supreme Court interpreted a statutory bar providing that "[t]here is no judicial review of any *determination* of the *Attorney General*," 8 U.S.C. § 1254a(b)(5)(A) (emphasis added), with respect to a termination of a country's TPS. The decision does not preclude Plaintiffs' new claims. First, by its terms, the TPS statute's jurisdictional bar does not reach Plaintiffs' new *ultra vires* claim because Plaintiffs do not raise a procedural or substantive challenge to a decision made by the Attorney General. Rather, they challenge former Secretary Noem's very authority to have made a termination decision to begin with, a novel issue *Mullin* did not consider, let alone address or resolve. Second, *Mullin* left open the federal courts' power to review constitutional claims, so Plaintiffs' procedural due process claim also is justiciable.

On the merits, the DHS Secretary is not authorized to terminate a country's TPS designation. When Congress enacted the TPS statute in 1990 it vested sole authority to terminate TPS for a country with the Attorney General. *See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). The Attorney General acted on that authority for over a decade. In 2003, however, the DHS Secretary began

making TPS determinations based on a misreading of the statutory scheme. Congress never transferred authority over TPS designations from the Attorney General to the DHS Secretary. Because the powers of an executive agency and agency officials extend only so far as Congress allows, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it."), the DHS Secretary's termination of Syria's TPS is *ultra vires* and, therefore, must be "set aside." 5 U.S.C. § 706(2).

Plaintiffs' constitutional rights also compel that Syria's TPS termination be set aside. As TPS beneficiaries, Plaintiffs possess important property and liberty interests—including lawful immigration status, protection from detention and deportation to dangerous countries, and work authorization—that the Constitution protects. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B). Under the Due Process clause, these interests trigger procedural safeguards that are built into the TPS statute and are core to established due process constraints. In other words, Congress included mandatory procedural protections in the statute to ensure that once a country has been designated for TPS, the designation—and thereby the corresponding benefits of those entitled to TPS—cannot be summarily stripped away. 8 U.S.C. § 1254a(b)(3)(A). The former Secretary flouted those safeguards when issuing the termination and violated Plaintiffs' Due Process rights.

An executive official that lacked any authority in the first place violated the TPS statute's procedural requirements over TPS decision-making and deprived Syrian TPS holders of their constitutional rights in terminating Syria's TPS designation. This Court should grant Plaintiffs partial summary judgment on their *ultra vires* and procedural due process claims and fully set aside the illegal termination.

## BACKGROUND

TPS has now been terminated for hundreds of thousands of noncitizens who were previously lawfully present, including more than 6,100 Syrians, since the Supreme Court issued its mandate in *Mullin v. Doe* on July 27, 2026. Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts ("SUF") ¶¶ 39–40.

Plaintiffs filed an amended complaint on July 24, 2026, to add claims, including the *ultra vires* and procedural due process claims at issue in this motion, that were not foreclosed by the Supreme Court's decision. ECF Nos. 83, 85.

Prior to the creation of the Department of Homeland Security ("DHS") in 2002, Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on the prior practice of ad hoc presidential action for those purposes. *See* H.R. Rep. No. 100-627, at 4 (1988). The TPS statute provides that the Attorney General may designate a country for TPS and provide its nationals with work authorization and protection from detention and removal, 8 U.S.C. § 1254a(a)(1), (d)(4); SUF ¶¶ 1–3, if there is an "ongoing armed conflict" that "would pose a serious threat to . . . personal safety"; an environmental disaster that substantially disrupts living conditions; or "extraordinary and temporary conditions in a foreign state" that prevent return of that state's nationals in safety. 8 U.S.C. § 1254a(b)(1); SUF ¶ 4. Congress likewise established a clear statutory framework for the Attorney General to terminate those designations, mandating that at least 60 days before the end of each designation period, the Attorney General, "after consultation with appropriate agencies of the Government," must "review the conditions in the foreign state" and determine whether the conditions for TPS designation "continue to be met." 8 U.S.C. § 1254a(b)(3); SUF ¶¶ 7–9.

The September 22, 2025 Notice of Termination of the Designation of TPS for Syria, 90 Fed. Reg. 45,398, did not follow these statutory requirements. First, the Attorney General did not make the determination to terminate Syria's TPS, SUF ¶¶ 39–42, even though Congress made clear that only the Attorney General may terminate a TPS designation. After the passage of the Homeland Security Act of 2002, then-President Bush created a detailed executive reorganization plan that transferred many of the functions and assets of the Immigration and Naturalization Service ("INS") to DHS, making no mention of TPS or the authority of the Attorney General related to TPS. SUF ¶¶ 21–22. And in 2003, the Department of Justice ("DOJ") issued a regulation transferring many of the functions of the INS, not including those related to TPS, to DHS. 68 Fed. Reg. 9,824, 9,825–28 (Transferring INA Functions) (Feb. 28, 2003); SUF ¶ 18. While the regulation stated that authorities related to TPS would require further "refinement" to reflect the creation of DHS, no further clarification was ever issued. Although authority to terminate TPS was never effectively transferred to DHS, it was the former Secretary of Homeland Security Kristi Noem (the "former Secretary"), not the Attorney General, who made the determination to terminate Syria's TPS designation. SUF ¶¶ 39–42.

Second, neither the former Secretary nor the Attorney General complied with the statutory required procedures for terminating TPS, which include the requirement to consult appropriate agencies regarding the conditions of the designated country. 8 U.S.C. § 1254a(b)(3)(A). The Certified Administrative Record submitted by the government contains no such consultation about conditions in Syria, *see* SUF ¶¶ 36–38. The lone communication between DHS and the Department of State ("DOS") regarding Syria's TPS termination is a July 2025 email exchange between DHS Senior Counselor Rob Law and DOS Senior Bureau Official Spencer Chretien reflecting that the

State does not have "foreign policy concerns" with terminating the designation for Syria and three other countries. *Id.*

Many of the harms Plaintiffs feared in the event of termination have come to pass since the Supreme Court's issuance of its mandate in *Mullin v. Doe* on July 27, 2026. Plaintiffs and thousands like them have lost protection from detention and removal, even as many of them await action from DHS on their long-standing applications for alternative status. SUF ¶¶ 100, 108, 116, 123. Many former TPS holders, lacking other work authorization, have lost jobs, health insurance, and state-based identification. *See, e.g.*, SUF ¶¶ 90, 95, 98–99. They live in fear of arrest, detention, and removal, *see* SUF ¶¶ 69, 79–80, 86–87, 101, 109, 117–118, 126, to a country for which DOS continues to issue Level 4 "Do Not Travel" advisories warning that "no part of Syria is safe from violence." *See* SUF ¶¶ 46, 129.

## LEGAL STANDARD

A movant prevails on summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But "where a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on a review is a question of law." *R.F.M. v. Nielsen*, 365 F.Supp.3d 350, 360 (S.D.N.Y. 2019) (citation modified). Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" was unlawful. *Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation modified); *accord R.F.M*, 365 F.Supp.3d at 360.

## ARGUMENT

### I. THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS.

This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Neither the TPS statute's judicial-review bar, nor *Mullin v. Doe*, 146 S.Ct. 2121 (2026), forecloses the Court from considering Plaintiffs' constitutional and *ultra vires* claims.

#### A. The Judicial-Review Bar Does Not Preclude Constitutional Claims.

Plaintiffs' procedural due process claim is reviewable. In *Mullin*, the Supreme Court declined to extend the TPS statute's judicial review bar (8 U.S.C. § 1254a(b)(5)(A)) to constitutional claims. Consistent with the Government's concession at oral argument,[1] the Court reiterated that Congress must speak clearly if constitutional review is precluded. *See Mullin*, 146 S.Ct. at 2137 (stating """where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear'") (quoting *Webster v. Doe*, 486 U.S. 592 (1988). Section 1254a(b)(5)(A) contains no clear language barring review of constitutional claims. *See Ozturk v. Hyde*, 136 F.4th 382, 394 (2d Cir. 2025) ("our analysis is guided by longstanding principles of statutory interpretation requiring Congress to speak clearly and specifically when it wishes to deprive the federal courts of jurisdiction") (citation modified); *cf.* 8 U.S.C. § 1252(b)(9) (expressly referring to constitutional questions). Moreover, Plaintiffs' claim is not one of ordinary statutory interpretation. *See Doe v. Mullin*, No. 25-cv-15483, 2026 WL 2279577, at *9 (N.D. Ill. Aug. 7, 2026) (holding that procedural due process claim involving "statutory violations" was inherently constitutional and not barred by *Mullin*). As explained *infra* at Section III, Plaintiffs allege that the

[1] *See* Transcript of Oral Argument at 26:7–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026) (acknowledging that the government would "have to be fighting with [Supreme Court precedent] … to argue that there's no judicial review of [] constitutional claims" under § 1254a(b)(5)(A)).

former Secretary's termination of Syria's TPS deprived them of protected interests without process independently required by the Fifth Amendment.

**B. The Judicial-Review Bar Does Not Preclude Plaintiffs' Challenge to the Former Secretary's Authority to Engage in TPS Decision-Making.**

Plaintiffs' *ultra vires* claim is likewise reviewable. Section 1254a(b)(5)(A)'s plain text bars review of "any determination of the *Attorney General*[.]" 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). "In interpreting any statute, we start with—and absent any ambiguity, end with—the plain meaning of the text construed in its statutory context." *Bellin v. Zucker*, 6 F.4th 463, 483 (2d Cir. 2021). Plaintiffs challenge the former *DHS Secretary's* authority to terminate Syria's TPS designation. Plaintiffs' claim thus presents an antecedent statutory question concerning whether the official who acted possessed the statutory authority to take that action—not a challenge to the substance of the determination.[2]

Courts routinely are called to determine whether executive officials have acted without statutory authority. Here, Plaintiffs' *ultra vires* claim is reviewable because "a corollary" of the APA's directive to set aside agency actions taken in excess of statutory authority is "that courts reviewing agency action must determine that the particular official acting on behalf of the agency [was] delegated the authority to act; otherwise such agency action is invalid." *League of Women Voters of United States v. Newby*, 238 F.Supp.3d 6, 11 (D.D.C. 2017) (citation modified); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665–66 (9th Cir. 2021) (noting that courts are "responsible for reviewing whether the government has overstepped its delegated authority under the INA"). Indeed, the Supreme Court has held that courts "must exercise their independent

---

[2] The government may argue that the phrase "Attorney General" should be replaced with "Secretary" by operation of 6 U.S.C. § 557 and 6 U.S.C. § 552(d). However, as discussed *infra* Section II.C., those housekeeping provisions did not independently transfer any authority from DOJ to DHS. They apply only to the extent there was an independent transfer of authority, and no such transfer exists.

judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Because this claim concerns an exercise of extra-statutory authority, not a "determination" under the TPS statute, *see* 8 U.S.C. 1254a(b)(2)(5)(A), the TPS review bar does not apply and *Mullin* does not foreclose review because it neither addressed nor considered this argument.

Further, when jurisdictional and merits questions are intertwined, the reviewing court should resolve the statutory-authority question on the merits rather than dismiss for lack of jurisdiction. *See Doe*, 2026 WL 2279577, at *6 (holding that § 1254a(b)(5)(A) did not preclude review of the plaintiffs' *ultra vires* claim because the jurisdictional question was intertwined with the merits); *see also London v. Polishook*, 189 F.3d 196, 198–99 (2d Cir. 1999) ("where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment") (citation modified); *Perttu v. Richards*, 605 U.S. 460, 472–74 (2025) (explaining that merits-intertwined disputes ordinarily are resolved at the merits stage). This Court therefore should resolve the statutory-authority question rather than assume Defendants' merits position to dismiss for lack of jurisdiction.

*Mullin* did not decide who possessed TPS termination authority and thus did not resolve or foreclose this antecedent question. The question was neither presented through adversarial briefing nor decided; the parties' briefing assumed, without focused statutory analysis, that the Secretary possessed authority. *See Doe*, 2026 WL 2279577, at *6 (concluding that the government "overreads" *Mullin* because "no party. . . raised the issue of who has TPS authority in the first place under the statute," and the Supreme Court merely assumed the "undisputed premise that the jurisdictional bar . . . applied to the Secretary's determinations." (citation modified)). Rather, the

Supreme Court was called upon to consider the scope of the term "determination" in the TPS statute. While the Supreme Court did state in passing that the DHS Secretary exercises TPS authority, *see Mullin*, 146 S.Ct. at 2129, that background statement rested on an undisputed premise and was made without analysis of the statutory transfer question. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Whitman v. United States*, 574 U.S. 1003, 1003–04 (2014) (Scalia, J., denying certiorari) (a prior "drive-by ruling" warranted little weight where it contained "scarcely any explanation"). The question of who possesses the authority to terminate a TPS designation under the statute is just such a question that lurked in the background.

Moreover, *Mullin* arose in the context of interim relief and expressly characterized its assessment as "predictive—not final." 146 S.Ct. at 2137. Although *Mullin's* construction of § 1254a(b)(5)(A) controls claims that fall under the judicial-review bar, the interim posture in *Mullin* supplies an additional reason to refrain from transforming an unlitigated issue concerning the proper identity of the authorized decisionmaker into a final determination of that question. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (preliminary injunctions "do not conclusively resolve legal disputes"); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (preliminary findings and conclusions are not binding at final judgment). The Court should therefore resolve the newly presented statutory-authority question independently based on the summary-judgment record.

## II. FORMER SECRETARY NOEM ACTED *ULTRA VIRES* IN TERMINATING SYRIA'S TPS BECAUSE TPS TERMINATION AUTHORITY LIES EXCLUSIVELY WITH THE ATTORNEY GENERAL.

When the TPS scheme was established in 1990, Congress unambiguously vested authority to terminate TPS designations in the Attorney General. Since then, Congress has never transferred

that authority to another official, even when delegating other immigration authority—including a limited set of TPS-related functions—to DHS. The DHS Secretary therefore acted *ultra vires* in issuing a termination decision for Syria and the termination must be "set aside" under the APA. 5 U.S.C. § 706(2).

"'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 100 (2d Cir. 2020) (quoting *La. Pub. Serv. Comm'n.*, 476 U.S. at 374). As "creatures of statute," agencies "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Thus, when federal agencies "act beyond their jurisdiction, what they do is *ultra vires*" because "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress[.]" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency must "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022). Defendants fail to carry that burden here.

**A. The TPS Statute Vests TPS Termination Authority Exclusively in the Attorney General.**

Congress expressly authorized only one executive official to terminate TPS designations: the Attorney General. The TPS statute provides: "If the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). This delegation is consistent with Congress's choice to vest the "Attorney General" with other key TPS authorities, including the authority to "grant [an] alien temporary protected status in the United States" and "authorize the alien to engage in employment[,]" 8 U.S.C. § 1254a(a)(1); to "designate any foreign state" for TPS, *id.* § 1254a(b)(1); and to extend TPS designations, *id*. § 1254a(b)(3)(C). The DHS Secretary is never mentioned; nor is any other government official.

Subsequently adopted regulations for TPS reaffirmed the delegation of these authorities to the Attorney General. For example, in 1991, the DOJ and the former INS adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (TPS Interim Rule) (Jan. 7, 1991); 56 Fed. Reg. 23,491 (TPS Final Rule) (May 22, 1991) (codified as amended at 8 C.F.R. §§ 244.1–244.19). Those regulations delegated certain operational TPS functions to INS, including the authority to initially find individual noncitizens eligible and award protected status, *see id.* at 619 (codified as amended at 8 C.F.R. § 244.2), and to receive and process applications for protected status, *see id.* at 620 (codified as amended at 8 C.F.R. §§ 244.6, 244.7). The regulations, however, did *not* authorize any subordinate official to exercise the *Attorney General*'s authority to terminate a foreign state's designation under 8 U.S.C. § 1254a. Indeed, the regulations defined an eligible foreign state to mean any "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id.* at 619 (codified as amended at 8 C.F.R. § 244.1) (emphasis added). And in practice, the Attorney General issued all TPS country designations and terminations for more than a decade.[3]

### B. The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary.

DHS has claimed that the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred authority to terminate TPS designation from the Attorney General to DHS. *See, e.g.*, 68 Fed. Reg. 23,744 (Honduras TPS Extension) (May 5, 2003) (claiming that because "the Immigration and Naturalization Service (INS) transferred from the Department of

[3] *See, e.g.*, 65 Fed. Reg. 52,789, 52,791(Bosnia-Herzegovina Termination) (Aug. 30, 2000) ("By the authority vested in me as Attorney General under section 244(b)(3) of the Homeland Security Act . . . I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS . . ."); 63 Fed. Reg. 15,437, 15,438 (Liberia Termination) (Mar. 31, 1998); 58 Fed. Reg. 7,582 (Lebanon Termination) (Feb. 8, 1993); 57 Fed. Reg. 2,930, 2,931 (Kuwait Termination) (Jan. 24, 1992).

Justice to [DHS] . . . [t]he responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS)."). But that is incorrect for two reasons. First, the HSA did not make such a wholesale transfer, and DHS has not identified statutory provisions that prove otherwise. Second, while Plaintiffs agree that the HSA transferred *INS* functions to DHS, the authority to make TPS country designations was never one delegated to INS to begin with. Therefore, the authority over TPS country designations necessarily remained with the Attorney General and never was part of a general transfer of INS functions to DHS.

For example, 8 U.S.C. § 1103(a)(1), which outlines the DHS Secretary's authorities under the INA, provides that:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [the INA] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers.

(emphasis added). By its plain terms, Section 1103(a) is simply a default rule providing that immigration-related powers are *generally* vested in the DHS Secretary *unless* Congress expressly vests them in the Attorney General (or the other officials subject to the "except" clause).

The power to terminate a TPS designation falls squarely within the "except" clause, which makes clear that "powers, functions, and duties" expressly "conferred upon" the "Attorney General"—even those "relating to the immigration and naturalization of [noncitizens]"—would remain vested in the Attorney General notwithstanding the transfer of *other* such authorities to DHS. *Id.* Other provisions confirm that particular immigration-related powers remain with the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(g)(1) (providing that Attorney General would retain authority over functions "exercised by the Executive Office for Immigration Review"). The fact that 8 U.S.C. § 1103(g) states the Attorney General retains authorities and functions previously

exercised by the Executive Office for Immigration Review (EOIR) does not cabin the scope of powers retained by the Attorney General pursuant to § 1103(a). Indeed, the Attorney General recently exercised his authority, pursuant to 8 U.S.C. § 1533(a)(1)—a provision in Chapter 12—to file a high-profile "application to remove" a "[noncitizen] terrorist" to commence removal proceedings in the "alien terrorist removal court." SUF ¶¶ 25-26; *see also* 8 U.S.C. § 1105(b) (requiring Attorney General and director of FBI provide agency access to national crime information center database).

The HSA did transfer many immigration-related functions and a specific set of TPS-related functions from DOJ to DHS, but termination is not one of them. For example, the HSA created the Bureau of Citizenship and Immigration Services within DHS and "transferred" specific INS functions "from the Commissioner of Immigration and Naturalization [within DOJ] to the Director of the Bureau of Citizenship and Immigration Services" within DHS. *See* 6 U.S.C. § 271(b). Among the functions transferred were "all . . . adjudications performed by the [INS] immediately before" the effective date of the HSA. *Id.* § 271(b)(5). That included the authority to initially find individual noncitizens eligible and award TPS, since those adjudications were performed by *INS* rather than the Attorney General before the HSA was passed. *See supra* at page 4; SUF ¶ 22. But TPS country designations and terminations were *not* "performed by [INS] immediately before" the HAS's "effective date," so those broader authorities were *not* transferred to DHS by operation of 6 U.S.C. § 271.[4]

[4] Although the DOJ adopted regulations that gave INS responsibility over much of the day-to-day workings of TPS, those regulations recognized that topline foreign-state designations were made "by the Attorney General pursuant to section 244A(b) of the [HAS]," Temporary Protected Status, 56 Fed. Reg. 618, 619 (Jan. 7, 1991) (codified at 8 C.F.R. § 240.1), and the Attorney General herself continued to make such designations including up until the effective date of the Homeland Security Act, *see, e.g.*, 67 Fed. Reg. 48,950 (Somalia TPS Extension) (July 26, 2002).

The HSA also required the President to submit an executive Reorganization Plan to Congress by "[n]ot later than 60 days after November 25, 2002" detailing "[t]he transfer of agencies, personnel, assets, and obligations to" DHS. 6 U.S.C. § 542(a). In accordance with that provision, the President issued an executive Reorganization Plan, which "[t]ransfer[ed] the . . . functions of [INS]"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. *See* Reorganization Plan for DHS, H.R. Doc. No. 108-16, at 4, 12 (2003). But the plan made no mention of TPS, nor did it address those immigration-related powers expressly vested in the Attorney General as opposed to the INS or other subsidiary divisions. By contrast, other portions of the Plan did specifically address the transfer of particular Attorney General functions. *See, e.g.*, *id.* at 5 (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)).

**C. Defendants Have Failed to Identify Any Source of Authority to the Contrary.**

The termination notice for Syria does not cite any authority vesting the power to terminate in the Secretary of DHS. *See* 90 Fed. Reg. 45,398 (Syria TPS Termination) (Sept. 22, 2025). DHS has interpreted 6 U.S.C. § 557 as having transferred the Attorney General's TPS authority to the DHS Secretary. *See supra* Section II.B. But this provision, along with those cited in prior termination notices and litigation,[5] did not independently transfer any authority at all; they simply streamlined the process of amending the code by providing that certain "references" would be

[5] In the past, DHS has cited 6 U.S.C. § 552(d) and 6 U.S.C. § 557 to justify the Secretary's purported TPS decision-making authority. *See, e.g.*, 75 Fed. Reg. 3,476, 3,477 n.1 (Haiti TPS Designation) (Jan. 21, 2010); 82 Fed. Reg. 47,228, 47,229 n.1 (Sudan TPS Termination) (Oct. 11, 2017); Appl. to Stay Order Issued by U.S. District Court at 5 n.2, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025). And in dicta, various courts have done the same. *See, e.g.*, *Najera v. United States*, 926 F.3d 140, 142 (5th Cir. 2019); *Cervantes v. Holder*, 597 F.3d 229, 231 n.2 (4th Cir. 2010); *Mejia Rodriguez v. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009). In these cases, however, the courts did not grapple with—and the parties did not appear to meaningfully contest—the issue.

"deemed to refer" to the Secretary *to the extent that* they relate to functions that were *actually transferred* to the Secretary. *See* 6 U.S.C. § 557; *see also supra* n.5 (collecting similar provisions).

The plain text makes clear that these are housekeeping provisions, not substantive grants of authority. *See African Communities Together v. Mullin*, No. 25-cv-13939, 2026 WL 2274504, at *3 n.2 (D. Mass. 2026) (6 U.S.C. §§ 552(d) and 557 "are housekeeping provisions that ensure that statutory terms be construed as referring to the Department of Homeland Security wherever a substantive transfer of authority has occurred.").

For example, 6 U.S.C. § 557 provides that "*[w]ith respect to any function transferred by or under this chapter* . . . and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office *the functions of which are so transferred* shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred." (emphasis added). Similarly, 6 U.S.C. § 552(d) provides: "References *relating to an agency that is transferred* to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this chapter shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions." (emphasis added). Both provisions are aimed at clarifying statutory language related to transfers of power effectuated by other statutes or means of delegating authority—they do not serve as transfers of authority themselves.

Although it has been the DHS Secretary's practice to make TPS country determinations, that practice is not a source of authority nor is it entitled to persuasive weight. Whether authority over TPS determinations is vested exclusively with the Attorney General is a question of statutory interpretation and courts "must exercise their independent judgment in deciding whether an agency

has acted within its statutory authority, as the APA requires." *Loper Bright.*, 603 U.S. at 412. Indeed, courts routinely reject agencies' long-held—and mistaken—statutory interpretations. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (rejecting EPA's decades old interpretation); *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 355–57 (2025) (same); *Brown v. Gardner*, 513 U.S. 115, 122 (1994) (same for Department of Veterans Affairs interpretation).

The DHS Secretary terminated Syria's TPS without meeting the burden of identifying a valid statutory grounding for that authority, *see Nat'l Ass'n of Broads.*, 39 F.4th at 819, and therefore acted *ultra vires*, *see* 5 U.S.C. § 706(2).[6]

## III. DEFENDANTS' TERMINATION OF SYRIA'S TPS VIOLATED PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS.

Defendants deprived Plaintiffs of their constitutionally protected property and liberty interests by terminating Syria's TPS without adequate process, which can be found in the TPS statute's procedural mandates during a country's periodic review. The Due Process Clause reaches "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and "imposes constraints on government decisions which deprive individuals" of protected interests. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). It is meant to protect individuals from the

[6] A finding that the DHS Secretary lacked the authority to issue TPS terminations does not invalidate the initial TPS designation for Syria. First, this APA suit challenges only one final agency action—Syria's TPS termination; a lawsuit challenging Syria's TPS designation would need to overcome its own justiciability issues, including standing and timeliness. Second, even when the cited basis for an agency program is deemed invalid, the APA requires the government to consider alternatives to outright termination of that program; and, regardless, that action would constitute a new agency action that would be subject to APA and further court review. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24–28 (2020) (requiring assessment of reliance interests and considerations of alternatives to complete rescission). Third, procedural due process would apply to any rescission. *See infra* Section III.

government's arbitrary decision making. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). The "standard analysis" under the Due Process Clause requires courts to determine (1) "whether there exists a liberty or property interests of which a person has been deprived" and (2) "whether the procedures followed . . . were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219–20 (2011) (per curiam); *accord Adams v. Suozzi*, 517 F.3d 124 (2d Cir. 2008).

**A. Section 1254a Creates Constitutionally Protected Interests in TPS Status.**

Statutes may create and define constitutionally protected property or liberty interests, thereby requiring "fair procedures for [their] vindication." *See Swarthout*, 562 U.S. at 219–20. Government benefits, like those conferred by TPS status,[7] can be assessed as "property" interests—interests which "are not limited by a few, rigid technical forms" and "denote[] a broad range of interests that are secured by 'existing rules or understandings.'" *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Courts "look to the statues and regulations governing the distribution of benefits" to assess whether there exists a protected interest under the Due Process Clause. *Kapps v. Wing*, 404 F.3d at 113. Courts will find a property interest exists "[w]here those statues or regulations fully channel official discretion by mandating a defined administrative outcome." *Id.* In other words, a plaintiff must have "a legitimate claim of entitlement to" the benefit for a protected interest to arise. *Roth*, 408 U.S. at 577. "[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded

[7] While the decision to grant TPS to an individual applicant is discretionary, the attendant benefits of the status are mandatory once conferred. *See infra* pp. 19-20. So too for TPS applicants who are *prima facie* eligible: once an individual applies for TPS and makes a *prima facie* showing of eligibility, the government "shall" grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(B); *cf. Kapps v. Wing*, 404 F.3d 105, 115–117 (2d Cir. 2005) (collecting cases and finding applicants of benefits program possessed property interest).

by procedural due process." *Roth*, 408 U.S. at 576. Indeed, a fundamental purpose of the Due Process Clause is "to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *See id.* at 577. Here, Plaintiffs possess (and have relied upon) a property interest in TPS status, as set out and defined in the TPS statute.

Several district courts already have found constitutionally protected interests in TPS benefits. *See Saget v. Trump*, 375 F.Supp.3d 280, 333 (E.D.N.Y. 2019) ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law"); *Mansor v. USCIS*, 685 F.Supp.3d 1000, 1013 (W.D. Wash. 2023) (holding, in class action challenging USCIS's policy of refusing to provide work permits for pending TPS applicants, that "a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Ramos v. Nielsen*, 321 F.Supp.3d 1083, 1122 (N.D. Cal. 2018) ("Plaintiffs arguably have a property interest in loss of TPS status"); *Rodas v. Chertoff*, 399 F.Supp.2d 697, 706 (E.D. Va. 2005) ("[A] plausible argument may be made that TPS is a property right that cannot be withdrawn without due process").[8]

The "existing rules and understandings," *Roth*, 408 U.S. at 576, found in the TPS statute itself confirm the appropriateness of these holdings. The TPS statute "meaningfully channel[s]" the Attorney General's "discretion by mandating a defined administrative outcome" when

[8] TPS beneficiaries also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that a driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Est. of Wobschall by Wobschall v. Ross*, 488 F.Supp.3d 737, 748 (E.D. Wis. 2020) ("A person has a property interest in her driver's license which, once issued, may not be taken away without that procedural due process. . .") (citation modified)).

terminating TPS designations.[9] *See Kapps*, 404 F.3d at 113. The statute first mandates the process by which a country's TPS status can be terminated: The Attorney General "*shall* review the conditions in the foreign state . . . and *shall* determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A) (emphasis in original). The statute then *requires* the Attorney General to extend TPS if the statutory criteria are met; he has no discretion to terminate TPS where conditions warrant maintaining it. 8 U.S.C. § 1254a(b)(3)(C). Indeed, the TPS statute provides no discretion to terminate a country's TPS status *unless* the Attorney General can *affirmatively* determine that designation conditions no longer exist, *see id.*, as exemplified by the compelled automatic extensions for South Sudan and Lebanon. 90 Fed. Reg. 19,217 (South Sudan TPS Extension) (May 6, 2025); 91 Fed. Reg. 32,069 (Lebanon TPS Extension) (May 29, 2025). Importantly, the word "discretion" only appears in subsection 1254a(b)(3)(C), which is used only to permit the Attorney General to *lengthen* the timeframe of an extension from an automatic period of 6 months to a period of 12 or 18 months.

The statutory and regulatory standards defining individual eligibility for TPS status further establish Plaintiffs' protected interests in TPS benefits once designated. *See* 8 C.F.R. §§ 244.2, 244.3, 244.4, 244.10(b) (setting forth eligibility requirements); 8 U.S.C. § 1254a(a)(1) (TPS benefits conferred include nondiscretionary removal and work authorization documents). TPS "protects [beneficiaries] from removal and authorizes them to work here for as long as the TPS designation lasts." *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Both benefits are mandatory: "shall not remove"; "shall authorize . . . employment." § 1254a(a)(1)(A)–(B). These, too, are

[9] By contrast, and as Plaintiffs have always acknowledged, there is full discretion only at the *initial designation* stage. *See* 8 U.S.C. § 1254a(b)(1). But once a TPS country is designated and rights are conferred, the government may not "arbitrarily" deprive TPS beneficiaries of their protected interests. *See Roth*, 408 U.S. at 577.

"substantive predicates" with a mandated outcome. *Kapps*, 404 F.3d at 113; *Roth*, 408 U.S. at 576–78 (1972). Crucially, the statute and regulations also detail the specific conditions and process under which an individual may have their TPS status withdrawn. *See* 8 C.F.R. § 244.14 (requiring notice and opportunity to contest via different fora, depending on the reason for withdrawal).

Plaintiffs also possess liberty interests which arise from the statute's guarantee of a right to live and work lawfully in this country for TPS beneficiaries. The Constitution protects individuals from deprivation of lawful status and work authorization without due process. *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (finding a liberty interest at stake because deportation "visits a great hardship on the individual and deprives him of the right to stay and live in this land of freedom."); *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982) (same)*; see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood."). Plaintiffs' liberty interests also include the ability to remain in the U.S. and live with their family members, including U.S. citizens. *Destino v. FCI Berlin, Warden*, No. 1:25-cv-374-SE-AJ, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025) (concluding plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon*, 459 U.S. at 34–35); *see also D.J.C.V. v. United States*, 605 F.Supp.3d 571, 591–92 (S.D.N.Y. 2022) ("The right to family integrity is unquestionably a fundamental liberty interest."). These established liberty interests further establish Plaintiffs' entitlement to reasoned decision-making by Defendants in terminating TPS. Put another way, Congress intended the TPS program to be insulated from "the vagaries of our domestic politics," 101 Cong. Rec.

H25811, 25837 (daily ed. Oct. 25, 1989) (statement of Rep. Levine) (debating the immediate precursor to the TPS statute), and to allow the arbitrary deprivation of these interests would run counter to due process guarantees.

### B. Defendants' Process of Terminating Syria's TPS was Constitutionally Inadequate.

Once a protected interest is established, courts must determine "what process plaintiffs were due before they could be deprived of that interest," and apply the *Mathews v. Eldridge* test in doing so. *Kapps*, 404 F.3d at 118. Under *Mathews,* courts consider "1) the private interest affected; 2) the risk of erroneous deprivation, and the probable value, if any, of additional or substitute procedural safeguards; and 3) the government's interest, which may include the fiscal and administrative burdens that additional procedures would impose." *Id* (quotation modified). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334.

Here, the TPS statute provides the minimal process due to Plaintiffs: "[t]he due process afforded to [noncitizens] stems from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'" *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003); *see also Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls . . . .") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)); *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 138, 140 (2020) (even a noncitizen at the threshold of entry holds "those rights regarding admission that Congress has provided by statute"). Therefore, due process required compliance with the TPS statute's procedural requirements, in particular to mitigate against the risk of erroneous deprivation of critical property and liberty interests. *See Withrow v.*

*Larkin,* 421 U.S. 35, 47 (1975) (due process forbids practice that poses "risk of actual bias or prejudgment"). Thus, by failing to follow those mandates in its decision to terminate, Defendants violated Plaintiffs' due process rights.

The stakes involved in the loss of TPS status are indisputably high, *see Doe v. Noem*, No. 25-2995, 2026 WL 544631, *2 (2d Cir. Feb. 17, 2026), and therefore the risk of erroneous deprivation would result in the kind of irreparable harm that makes Plaintiffs' "interest in not being erroneously denied" TPS benefits "substantial." *Cf. Kapps*, 404 F.3d at 119 (finding adverse effects of erroneous loss of heat services as "self-evident" and risk of "collateral effects" substantial). By contrast, the government has no interest whatsoever in failing to comply with the TPS statute's procedural mandates, *cf. Make the Road N.Y. v. Pompeo*, 475 F.Supp.3d 232, 269 (S.D.N.Y. 2020) (no public interest in unlawful government action); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (same), and would suffer no additional burden from following procedures it is already required to follow.

The TPS periodic review process requires: (1) "consultation with appropriate agencies of the Government," (2) a "review" of "the conditions in the foreign state," and (3) notice of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A). The first two provisions mitigate "the risk of an erroneous deprivation," *Mathews*, 424 U.S. at 335, by reducing the risk that termination decisions will be based on inaccurate information and TPS beneficiaries would lose life-saving rights due to that error. *See Mathews*, 424 U.S. at 343–49 (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures). These provisions also protect Plaintiffs' right to a neutral decisionmaker who has not made a prejudged decision before reviewing the evidence. *See Perez-Escobar v. Moniz*, 792 F.Supp.3d 224, 226 (D. Mass. 2025);

*accord Greenberg v. Bd. of Governors of Fed. Reserve Systm.*, 968 F.2d 164, 167 (2d Cir. 1992) (noting that "a due process violation may be established" where facts and circumstances show "the risk of unfairness is intolerably high" (citing *Withrow*, 421 U.S. at 58)). The requirement that the Attorney General publish the "basis for the determination" in the Federal Register ensures proper notice of the reasons for the government's decision. 8 U.S.C. § 1254a(b)(3)(A); *see Loudermill*, 470 U.S. at 546. Absent these procedural safeguards, there are no alternative processes providing Plaintiffs an opportunity to be heard to protect the critical liberty and property interests of TPS holders. *See, e.g.*, 8 C.F.R. § 244.19 (termination of a country's TPS designation is not subject to administrative appeal). Thus, considering the "flexible" nature of due process protections, *Mathews*, 424 U.S. at 335, the statutes' periodic review process supplies the minimum process due in this case.

The government indisputably failed to comply with any of the statute's procedural requirements. *See* Oral Decision Transcript 21:11–21:20, ECF No. 59. First, the administrative record confirms that the government did not consult with appropriate agencies about Syria's country conditions. Rather, the sole correspondence between DHS and DOS is a two-sentence email concerning TPS designations for four countries, but which never references country conditions. ECF No. 72-2; AR 154. The government's established practice since the creation of the TPS statute has been to engage in consultation with agencies, particularly DOS when evaluating any changes in country conditions since the initial TPS designation. GAO Report, ECF No. 20-1. This practice created reasonable expectations among Syrian TPS beneficiaries that, so long as the conditions for designation continued (and they individually satisfied the requirements for eligibility and re-registration), the Government would extend the TPS designation, along with their individual benefits or at least follow statutory guidelines before terminating TPS and with it,

their work authorization and protection from detention and removal. Protection of such reliance interests, through the established procedure, is core to the Due Process Clause. *See Roth*, 408 U.S. at 576.

Finally, Defendants did not publish the true "basis for the determination." This Court has recognized that the stated reasons for the termination were likely false insofar as the termination was based on undue political influence, Oral Decision Transcript 24:12–25:22, ECF No. 59 (finding former Secretary Noem's "termination decision [was] ground not in law and not in fact" but "in political considerations simply not relevant under the TPS statute."); thus, the government also failed to provide meaningful notice of the government's decision. This is an independent deprivation that violated Plaintiffs' constitutional rights. *See Withrow*, 421 U.S. at 47 (1975) (due process forbids practice that poses "risk of actual bias or prejudgment").

Once the government confers a benefit that creates protected interests, it may not terminate that benefit in an arbitrary manner. *See Radwan v. Manuel*, 55 F.4th 101, 126 (2d Cir. 2022) ("It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." (citing *Roth*, 408 U.S. at 577)). Due process thus requires that the government carry out the statute's periodic review process in a non-arbitrary manner that comports with applicable statutory, regulatory, and constitutional requirements.[10] The government failed on all fronts, thereby acting "contrary to constitutional right," 5 U.S.C. § 706(2)(B), in terminating Syria's TPS—and Plaintiffs' protections from detention, deportation to danger, and entitlement to work authorization.

---

[10] Regulations may also define the minimum process due. *See Jimenez v. Cronen*, 317 F.Supp.3d 626, 638 (D. Mass. 2018) (holding that "[w]hen regulations are promulgated to protect a fundamental right derived from . . . a federal statute, . . . the Due Process Clause requires federal agencies to follow them, even when those regulations provide greater protection than is constitutionally required.").

## IV. THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT, VACATE THE TERMINATION OF SYRIA'S TPS, AND DECLARE IT UNLAWFUL.

### A. Partial Summary Judgment is Appropriate.

Rule 56(a) permits judgment on any "claim or defense" or "the part of each claim or defense" on which judgment is sought, and summary judgment is the proper mechanism for resolving APA claims on the administrative record. *See Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020) (summary judgment is generally appropriate where an "APA-based challenge to an agency's action presents a pure question of law").

Claims Three and Four—whether the termination stripped Plaintiffs of protected interests without due process and whether the Secretary possessed statutory authority to terminate Syria's TPS designation, respectively—present purely legal questions that require no discovery to resolve. While Claims One and Two require fact discovery to establish disputed issues of pretext and discriminatory animus, they have no bearing on Claims Three and Four. Thus the need for further development as to Claims One and Two should not delay resolution on otherwise fully justiciable claims. *See, e.g.*, Fed. R. Civ. P. 56(a) (authorizing judgment on "part of each claim or defense"). Therefore, Plaintiffs request for partial summary judgment is appropriate.

### B. Vacatur Is the Required Remedy Under the APA.

Section 706(2) of the APA directs courts to "hold unlawful and set aside" agency action that is "contrary to constitutional right" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B)–(C). Courts have consistently construed this language to "authorize[] vacatur of agency *rules*" held unlawful. *Corner Post v. Board of Governors*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) (emphasis added); *see New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 101 (2d Cir. 2020). The termination of Syria's TPS status is unlawful: it was issued by an official to whom Congress did not grant termination authority and it

violates the due process rights of Syrian TPS holders. *See supra* Sections II–III. And because "APA suits ultimately target the rule, and not necessarily the application of it to a particular person," settled APA principles compel *complete* vacatur of the illegal action, not just its application to any particular plaintiff. *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F.Supp.3d 66, 120 (D. Md. 2025); *accord Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Corner Post*, 603 U.S. at 831. Thus, because the agency did not effect a lawful termination, the Court should vacate and leave Syria's TPS status intact.

### C. A Declaratory Judgment Is Necessary to Resolve Any Uncertainty Regarding the Status of Syria's Designation.

The Declaratory Judgment Act authorizes the Court to "declare the rights and other legal relations" of the parties and to grant "further necessary or proper relief." 28 U.S.C. §§ 2201–02. Declaratory relief is warranted here to resolve any uncertainty regarding the status of Syria's designation and its attendant protections in light of the Supreme Court decision in *Mullin*, which resolved distinct jurisdictional issues and statutory claims, but which may nevertheless cause confusion. *See Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562–63 (2d Cir. 1991) (declaratory judgment justified where it affords "relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.").

A court in the Second Circuit recognized the utility of declaratory relief in a similar context, declining it only because the government made affirmative representations to the public and the court about TPS holders' forward-looking rights. *See Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464, 2025 WL 4482992, at *2–*4 (E.D.N.Y. July 28, 2025). Absent comparable

acknowledgement from Defendants that vacatur will leave Syria's TPS designation in effect, the Court should grant declaratory relief and remove all doubt.

## CONCLUSION

For these reasons, this Court should declare Defendants' termination of Syria's TPS unlawful, vacate the termination, and grant Plaintiffs summary judgment on Plaintiffs' *ultra vires* and procedural due process claims.

Dated: August 17, 2026

Respectfully submitted,

INTERNATIONAL REFUGEE ASSISTANCE PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Ghita Schwarz
Pedro Sepulveda, Jr.
Hussein Elbakri
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
gschwarz@refugeerights.org
psepulveda@refugeerights.org
helbakri@refugeerights.org

Megan Hauptman*
650 Massachusetts Ave NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

MUSLIM ADVOCATES
Sadaf Hasan*
Nargis Aslami*
Melissa Keaney**
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 655-2969
sadaf@muslimadvocates.org
nargis@muslimadvocates.org
melissa@muslimadvocates.org

VAN DER HOUT LLP
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
(415) 981-3000
ndca@vblaw.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*
***Application for admission Pro Hac Vice forthcoming*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this motion Memorandum of Law in support of Plaintiffs' Motion to for Partial Summary Judgment complies with the word limits of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York § 7.1(c) and United States District Judge Katherine Polk Failla, Individual Rules of Practice of Civil Cases § 4(B). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y and E.D.N.Y § 7(c) and U.S. Dist. J. Katherine Polk Failla's Individual Rules of Practice of Civil Cases § 4(B) is 8,587 words.

Dated: August 17, 2026
New York City, New York

/s/ *Guadalupe Aguirre*
Guadalupe Aguirre