**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Dahlia DOE, et al.,<br><br>*Plaintiffs*,<br><br>- *versus* -<br><br>Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-08686 (KPF) |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD.................................................................................................. 2

ARGUMENT ............................................................................................................. 3

I. THIS COURT MAY DECIDE WHETHER CONGRESS AUTHORIZED THE SECRETARY TO TERMINATE SYRIA'S TPS DESIGNATION. ....................................... 3

A. Section 1254a(b)(5)(A) bars review of determinations made pursuant to the Attorney General's authority and does not immunize action by the DHS Secretary............................ 3

B. *Mullin* did not decide which officer holds TPS decision-making authority. ................. 4

C. The preliminary posture of *Mullin* confirms that the Secretary's authority was assumed, not decided. ........................................................................................ 6

II. CONGRESS ASSIGNED TPS AUTHORITY TO THE ATTORNEY GENERAL AND NEVER TRANSFERRED IT TO DHS.......................................................................... 7

A. Section 1103(a)(1)'s exception preserves that assignment. ........................................... 8

B. Section 1103(g) is not superfluous under Plaintiffs' reading. ....................................... 9

C. Section 557 cannot supply a transfer that never occurred. .......................................... 10

D. Plaintiffs' *ultra vires* claim is not self-defeating. ...................................................... 10

III. THE AMENDED COMPLAINT STATES A PLAUSIBLE EQUAL PROTECTION CLAIM.................................................................................................................. 12

A. *Mullin* does not bar review of Plaintiffs' constitutional claim. .................................. 12

B. *Mullin* did not decide either equal protection claim and does not render them implausible.............................................................................................................. 13

C. Plaintiffs plead the Syria-specific animus the Court found lacking at the preliminary relief stage................................................................................................................ 14

D. Defendants' alternative explanation does not defeat plausibility. ............................... 17

E. The equal protection claim warrants discovery. ........................................................ 19

IV. DEFENDANTS DEPRIVED PLAINTIFFS OF PROTECTED INTERESTS IN TPS BENEFITS USING CONSTITUTIONALLY INADEQUATE PROCEDURES................... 19

A. Plaintiffs' due process claim is reviewable............................................................... 19

B. Plaintiffs' constitutionally protected interests stem from the mandatory, non-discretionary aspects of TPS status once conferred or when *prima facie* eligible................ 20

C. The standards governing procedural due process claims are flexible, and procedural due process applies to group-based determinations......................................................... 22

D. Defendants failed to provide constitutionally adequate process when terminating Syria's TPS. .............................................................................................................. 24

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.C.R. v. Noem*,
809 F.Supp.3d 103 (E.D.N.Y. 2025), *reconsideration denied*, No. 25-cv-3962, 2026 WL 102611 (E.D.N.Y. Jan. 14, 2026) ....................11

*AARP v. Trump*,
605 U.S. 91 (2025)....................24

*Acosta de Mata v. Sullivan*,
832 F.Supp.3d 1338 (N.D. Ga. 2026)....................22

*Afr. Cmtys. Together v. Mullin*,
No. 25-cv-13939, 2026 WL 2274504 (D. Mass. Aug. 7, 2026) ....................6, 7, 10

*Afr. Cmtys. Together v. Mullin*,
No. 26-cv-10278, 2026 WL 2408737 (D. Mass. Aug. 18, 2026) ....................7, 14, 20

*Afr. Cmtys. Together v. Mullin*,
No. 26-cv-11201, 2026 WL 2364398 (D. Mass. Aug. 14, 2026) ....................7, 14, 20

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)....................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................3, 12, 18

*Bah v. Cangemi*,
548 F.3d 680 (8th Cir. 2008) ....................22

*Barton v. Barr*,
590 U.S. 222 (2020)....................10

*Bell v. Burson*,
402 U.S. 535 (1971)....................20, 22

*Bell v. Hood*,
327 U.S. 678 (1946)....................4

*Bellin v. McDonald*,
177 F.4th 167 (2d Cir. 2026) ....................21

*Bi-Metallic Investment Co. v. State Board of Equalization*,
239 U.S. 441 (1915)....................24

*Board of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)....................20, 21, 22

*Brecht v. Abrahamson*,
507 U.S. 619 (1993)....................5

*Brown v. Gardner*,
513 U.S. 115 (1994)....................10

*Carter v. HealthPort Tech., LLC*,
822 F.3d 47 (2d Cir. 2016)....................2

*CASA de Maryland, Inc. v. Trump*,
355 F.Supp.3d 307 (D. Md. 2018)....................20

*Cent. Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006)....................5, 6

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................3

*Chen v. Garland*,
43 F.4th 244 (2d Cir. 2022) ....................10

*Deide v. Day,*
676 F.Supp.3d 196 (S.D.N.Y. 2023)....................17

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................11, 14

*Doe v. Mullin*,
No. 25-CV-15483, 2026 WL 2279577 (N.D. Ill. Aug. 7, 2026) .................... *passim*

*Garcia-Rubiera v. Fortuno*,
665 F.3d 261 (1st Cir. 2011)....................23

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....................24

*Hernandez v. Sessions*,
884 F.3d 107 (2d Cir. 2018)....................21

*Hill v. U.S. Dep't of Interior*,
151 F.4th 420 (D.C. Cir. 2025)....................23

*Kapps v. Wing*,
404 F.3d 105 (2d Cir. 2005)....................20, 22, 24

*Kentucky DOC v. Thompson*,
490 U.S. 454 (1989)....................21

*King Spider LLC v. 884886 CH Store,* No. 23-CV-3472, 2024 WL 5145837 (S.D.N.Y. Dec. 17, 2024)....................12

*Kopunek v. Dir. of Internal Revenue,*
528 F.Supp. 134 (S.D.N.Y. 1981)....................25

*L C & S, Inc. v. Warren Cnty. Area Plan Comm'n*,
244 F.3d 601 (7th Cir. 2001)....................23

*Lackey v. Stinnie*,
604 U.S. 192 (2025)....................6

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)....................3

*Manon v. Pons*,
131 F.Supp.3d 219 (S.D.N.Y. 2015)....................12

*Mathews v. Eldridge,*
424 U.S. 319 (1976)....................2, 22, 23, 24

*Mayor & City Council of Baltimore v. Trump*,
429 F.Supp.3d 128 (D. Md. 2019)....................2

*Medina v. DHS*,
313 F.Supp.3d 1237 (W.D. Wash. 2018)....................22

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016)....................17

*Miot v. Trump*, No. 25-cv-02471 (D.D.C. Sep. 4, 2026),
Joint Status Report, ECF No. 146....................14

*Mullin v. Doe*, 146 S.Ct. 2121 (2026).................... *passim*

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)....................18

*New York v. U.S. Dep't of Com.*,
315 F.Supp.3d 766 (S.D.N.Y. 2018)....................17

*New York v. U.S. Dep't of Com.*,
345 F.Supp.3d 444 (S.D.N.Y. 2018)....................2

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019)....................18

*Portillo-Rendon v. Holder*,
662 F.3d 815 (7th Cir. 2011) ....................25

*R.F.M. v. Nielsen*,
365 F.Supp.3d 350 (S.D.N.Y. 2019)....................2

*Reiter v. Cooper*,
507 U.S. 258 (1993)....................11

*Reyes v. McHenry*,
No. 19-cv-8674, 2020 WL 5583521 (S.D.N.Y. Aug. 3, 2020) (Failla, J.) ....................19

*Romer v. Evans*,
517 U.S. 620 (1996)....................12

*Sackett v. EPA*,
598 U.S. 651 (2023)....................10

*Saget v. Trump*,
345 F.Supp.3d 287 (E.D.N.Y. 2018) ....................17

*Saget v. Trump*,
375 F.Supp.3d 280 (E.D.N.Y. 2019) ....................6

*Seminole Tribe of Florida v. Florida,*
517 U.S. 44 (1996)....................5

*Simpson v. City of New York*,
793 F.3d 259 (2d Cir. 2015)....................12

*Tobar v. Garland*,
65 F.4th 195 (5th Cir. 2023) ....................22

*United States v. Caceres*,
440 U.S. 741 (1979)....................25

*United States v. Florida East Coast Railway Co.,*
410 U.S. 224 (1973)....................24

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)....................6, 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977).................... *passim*

*Webster v. Doe*,
486 U.S. 592 (1988)....................13

*Webster v. Fall*,
266 U.S. 507 (1925)........5

*Wilkinson v. Austin*,
545 U.S. 209 (2005)........24, 25

**Statutes**

5 U.S.C. §706(2)(C)........10

6 U.S.C. §552(d)........5, 7, 10

6 U.S.C. §557........5, 6, 7, 10

8 U.S.C. §1103........1, 4, 6, 7

8 U.S.C. §1103(a)........10

8 U.S.C. §1103(a)(1)........8, 9, 10

8 U.S.C. §1103(a)(8)........8

8 U.S.C. §1103(g)........7, 9, 10

8 U.S.C. §1103(g)(1)........9

8 U.S.C. §1103(g)(2)........9

8 U.S.C. §1254a(b)(1)........1, 7

8 U.S.C. §1254a(b)(1)(C)........23

8 U.S.C. §1254a(b)(3)(B)........1, 7, 21

8 U.S.C. §1254a(b)(3)(C)........21

8 U.S.C. §1254a(b)(5)(A)........*passim*

8 U.S.C. §1255a(b)(3)(C)........21

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135........*passim*

**Rules**

Fed. R. Civ. P. 12(b)(6)........2, 12, 13, 18

Fed. R. Civ. P. 13(a)-(b)........11

**Other Authorities**

48 Fed. Reg. 8,038 (Feb. 25, 1983) ....................................................................................9

52 Fed. Reg. 44,971 (Nov. 24, 1987)....................................................................................9

68 Fed. Reg. 9,827 (Feb. 28, 2003) ....................................................................................10

90 Fed. Reg. 45,398 (Sep. 22, 2025) ....................................................................................3

# INTRODUCTION

This Court should grant Plaintiffs' motion for partial summary judgment and deny Defendants' motion to dismiss. Defendants' jurisdictional arguments overread *Mullin v. Doe*, 146 S.Ct. 2121, 2137 (2026), which does not bar constitutional claims and decided only that the judicial-review bar precludes claims challenging statutory violations. *Mullin* also does not reach Plaintiffs' *ultra vires* claim because Plaintiffs raise the question of who has TPS decision-making authority to begin with, which *Mullin* did not decide. In short, Plaintiffs press only claims that *Mullin* left open.[1]

On the merits, Defendants' arguments do not contravene Plaintiffs' showings favoring partial summary judgment or their plausible allegations of equal protection violations. The TPS statute assigns the power to make TPS determinations to the Attorney General ("AG"), 8 U.S.C. §1254a(b)(1), (b)(3)(B), and Defendants' arguments to the contrary rest on a misunderstanding of 8 U.S.C. §1103, which transferred discrete immigration authorities to the DHS Secretary while preserving the AG's TPS decision-making authority. On equal protection, Plaintiffs have sufficiently plead Syria-specific animus—which includes a termination notice attributing terrorism and fraud to Syrian nationals as a class without support, and a course of official action singling out Syrians across the immigration system—warranting proceeding to the discovery phase of litigation. And Defendants do not even address Plaintiffs' claim that Defendants terminated Syria's TPS out of a bare desire to harm TPS holders as a politically unpopular group. Finally, Defendants misconstrue Plaintiffs' due process claims as APA challenges to violations of the TPS statute and fail to undermine Plaintiffs' arguments that they possess protected interests in retaining the non-

[1] Defendants misconstrue Plaintiffs' claims. *See* Defs.' Br. Section I, Sep. 11, 2026, ECF No. 96 ("Defs.' Br."). Plaintiffs do not bring statutory claims for violations of the TPS statute. *Contra id.* Rather, Plaintiffs assert that Defendants violated constitutional law, which independently violates the APA. And Plaintiffs' *ultra vires* claim is reviewable as explained *infra* Section I.

discretionary, mandatory benefits of TPS once that status is conferred or once an applicant is *prima facie* eligible. Plaintiffs do not argue, post-*Mullin*, that violations of the TPS statute render the termination invalid. Rather, they argue that the statutory mandates set the constitutional floor for the process due to prevent an erroneous deprivation of these interests under the flexible, case-specific *Mathews v. Eldridge* test, 424 U.S. 319 (1976). By failing to meet that floor, Defendants violated Plaintiffs' constitutional rights. The termination should be vacated and Defendants' motion denied.

## LEGAL STANDARD

The summary judgment standard in Rule 56(a) applies to constitutional as well as APA challenges to agency action. While courts evaluating APA claims typically review whether agency action was unlawful and do not determine factual questions, *R.F.M. v. Nielsen*, 365 F.Supp.3d 350, 360 (S.D.N.Y. 2019), heightened evidentiary considerations govern in constitutional challenges to agency actions. *See Mayor & City Council of Baltimore v. Trump*, 429 F.Supp.3d 128, 138 (D. Md. 2019) (noting that "where constitutional rights are in issue, courts must ensure that the controlling legal principles are applied to the *actual facts of the case.*" (citation modified)) (collecting cases); *New York v. U.S. Dep't of Com.*, 345 F.Supp.3d 444, 452 (S.D.N.Y. 2018) (reviewing extra-record evidence in equal protection action).

For motions to dismiss, Rule 12(b)(1) places the burden on Plaintiffs to demonstrate subject-matter jurisdiction; here, that question turns on the scope of the judicial-review bar in the TPS statute. But courts must accept Plaintiffs' material factual allegations as true and draw all reasonable inferences in their favor. *See Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016). Similarly, Rule 12(b)(6) requires the Court to accept Plaintiffs' well-pleaded facts as true, including documents incorporated by reference, and draw all reasonable inferences in their

favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Plaintiffs must state a plausible claim but need not prove that they will prevail. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may not choose between competing plausible inferences. *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020). Specifically, to plead discriminatory purpose, Plaintiffs must allege facts supporting a reasonable inference that discrimination was *a* motivating factor in Syria's TPS termination. *See Iqbal*, 556 U.S. at 678; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

## ARGUMENT

### I. THIS COURT MAY DECIDE WHETHER CONGRESS AUTHORIZED THE SECRETARY TO TERMINATE SYRIA'S TPS DESIGNATION.

#### A. Section 1254a(b)(5)(A) bars review of determinations made pursuant to the Attorney General's authority and does not immunize action by the DHS Secretary.

The judicial review bar is not a general grant of immunity for anything impacting TPS, but a provision of limited and specific scope. Every operative term in the statutory language—"[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection" 8 U.S.C. §1254a(b)(5)(A)—presupposes that there exists a determination, made by the named officer, with respect to a designation.

Plaintiffs challenge that predicate. They contend that Congress vested the power to terminate a designation in the AG and never transferred that authority to the DHS Secretary ("the Secretary"), *not* that the former Secretary weighed country conditions incorrectly, consulted the wrong agencies, or gave inadequate reasons. Therefore, Syria's termination notice, 90 Fed. Reg. 45,398 (Syria Termination) (Sep. 22, 2025), is not a determination as contemplated by the statute.

Before applying the bar on judicial review, a court must ask whether §1254a(b)(5)(A) applies to actions by the Secretary in addition to the AG. It does not.

*Mullin* does not foreclose this *ultra vires* claim as Defendants argue, Defs.' Br. 11. *Mullin* addressed *which* challenges to a covered determination are foreclosed by the judicial-review bar. Here, Plaintiffs ask *whether* there is a covered determination at all. Defendants' expansive reading would foreclose judicial review of *any* official's termination so long as it is styled as "a determination" "with respect to … [a] termination." *See id.* Nothing in the statute protects action by officers lacking such authority.

Defendants' reliance on *Mullin*'s merger language fails for the same reason. While subsidiary decisions leading up to a TPS determination merge into the determination itself, so that a challenge to the former is a challenge to the latter, *Mullin*, 146 S.Ct. at 2136, that reasoning presupposes a valid actor whose subsidiary steps merge into a valid final action. Unauthorized action outside the Secretary's power does not merge into anything, and *Mullin*'s holding does not extend to unauthorized activities. Plaintiffs object to the Secretary's lack of authority to act, not to how the Secretary decided. At minimum, the scope of the Secretary's authority is intertwined with the merits, which counsels in favor of reaching them. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Doe v. Mullin* ("Burma Decision"), No. 25-CV-15483, 2026 WL 2279577, at *6 (N.D. Ill. Aug. 7, 2026).

**B. *Mullin* did not decide which officer holds TPS decision-making authority.**

Defendants wrongly insist that *Mullin* resolved Plaintiffs' *ultra vires* claim. But the Court did not decide whether the bar applied to actions taken by anyone other than the AG; the phrase "Attorney General" appears in the Court's opinion exactly once, in a citation concerning the history of extended voluntary departure. 146 S.Ct. at 2128 n.1. *Mullin* never mentions the Homeland Security Act ("HSA"), and 8 U.S.C. §1103, which Defendants now identify as the

operative transfer, is never cited. Defendants point only to a single sentence in the background section: "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security," which cites 6 U.S.C. §§552(d) and 557. *Id.* at 2129. But that sentence appears in a passage describing how the TPS program replaced the Executive Branch's earlier practice of extended voluntary departure. This dictum merely records an assumption that no party asked the Court to examine.

Defendants' authority, *Seminole Tribe of Florida v. Florida*, stands only for the unremarkable proposition that the sole rationale for a holding, and the holding itself, is not dicta. 517 U.S. 44, 66-67 (1996). But here, the Court's paraphrase of §1254a(b)(5)(A), without explanation, substituted "[Secretary of Homeland Security]" for "Attorney General," the term Congress actually used. *Mullin*, 146 S.Ct. at 2133. Defendants treat that bracket as a ruling of statutory construction, Defs.' Br. 12, but the Court's modification in *Mullin* is not "well-established rationale upon which the Court based the results." *Seminole Tribe*, 517 U.S. at 66-67. Rather, it is a passing, unexamined assumption, recited in a single background sentence of one opinion, and supported only by a citation to 6 U.S.C. §§552(d) and 557, which the parties agree are general housekeeping provisions, not substantive grants of transfer authority. *Seminole Tribe* gave binding force to a rationale the Court had reasoned to and reaffirmed across a century of decisions. It offers no support for giving the same force to a premise the Court never examined. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) (unexamined questions lurking in the record do not constitute precedents); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (same). And a court "is not bound to follow its dicta in a prior case in which the point at issue was not fully debated." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006).

### C. The preliminary posture of *Mullin* confirms that the Secretary's authority was assumed, not decided.

On the only constitutional question before it, the *Mullin* Court held that the Haitian plaintiffs were "unlikely to prove" racially discriminatory purpose against Haitians and therefore were "not entitled to interim relief." *Mullin*, 146 S.Ct. at 2139. Four Justices, explaining why the Court could reach that question without first resolving jurisdiction, described the enterprise more directly: a court ruling on interim relief "does not make a final decision on any matter necessary to the ultimate judgment." *Id*. at 2137 (plurality opinion). A court making a predictive assessment on an expedited record does not resolve questions no party raised, and its conclusions on the questions it did reach do not bind at final judgment. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). Plaintiffs do not dispute that *Mullin's* holding on statutory claims binds this Court. They dispute that a passing and unexamined modification of a quotation in an expedited decision acquired the force of a holding.

Nor do the lower court decisions cited by Defendants substantively change this analysis. None of the pre-*Mullin* decisions that Defendants cite involved any dispute over which officer holds TPS authority. Those decisions recite the Secretary's authority in background passages and footnotes, without analyzing §1103, §557, or the statutory text. *See, e.g.*, *Saget v. Trump*, 375 F.Supp.3d 280, 297 (E.D.N.Y. 2019). Such recitations are not holdings. *See, e.g.*, *Katz*, 546 U.S. at 363.

Nor do the four post-*Mullin* district court decisions change the analysis, given the expedited briefing in those matters and the contradictory reasoning adopted by those courts. Only two contain independent analysis of the transfer question, and they disagree on the premises that matter. *Compare Afr. Cmtys. Together v. Mullin* ("South Sudan Decision"), No. 25-cv-13939, 2026 WL 2274504, at *3 & n.2 (D. Mass. Aug. 7, 2026) (finding that both readings produce surplusage and

treating §§552(d) and 557 as housekeeping provisions that presuppose a substantive transfer), *with* Burma Decision at *8 (treating §1103(g) superfluity as decisive and §557 as the means by which Congress "broadly reassigned functions"). The other two district courts adopted reasoning from the prior decisions wholesale, one on a likelihood-of-success standard, *Afr. Cmtys. Together v. Mullin* ("Somalia Decision"), No. 26-cv-11201, 2026 WL 2364398, at *12 (D. Mass. Aug. 14, 2026), and the other while declining to rely on the agency practice on which both earlier decisions leaned, *Afr. Cmtys. Together v. Mullin* ("Ethiopia Decision"), No. 26-cv-10278, 2026 WL 2408737, at *5 & n.10 (D. Mass. Aug. 18, 2026). Both independent analyses relied on *Mullin*'s background statement that responsibility for TPS decisions "rests with the Secretary." South Sudan Decision at *3; Burma Decision at *8. But the same background section of *Mullin* misstates that "the Secretary designated Somalia in 1991," eleven years before DHS existed, 146 S.Ct. at 2130, confirming that the Supreme Court was using "the Secretary" as shorthand for whoever held the designation power, not construing the HSA. With the benefit of more developed briefing, this Court should reach a different result.[2]

## II. CONGRESS ASSIGNED TPS AUTHORITY TO THE ATTORNEY GENERAL AND NEVER TRANSFERRED IT TO DHS.

The statutory text is unambiguous. "The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state" for TPS. 8 U.S.C. §1254a(b)(1). And "[i]f the Attorney General determines under subparagraph (A) that a foreign state … no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation." *Id.* §1254a(b)(3)(B). Every designation and

[2] For example, the three sessions of the Massachusetts District Courts also did not engage with the examples of non-EOIR powers retained by the AG, *see infra* at 8, that would help interpret the statutory scheme and undermine Defendants' reading of §1103.

termination issued between the statute's enactment in 1990 and the creation of DHS issued from the AG. *See* ECF No. 93 at 11 n.3.

**A. Section 1103(a)(1)'s exception preserves that assignment.**

Defendants argue that 8 U.S.C. §1103(a)(1) grants the Secretary this authority. This provision charges the Secretary with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," except "insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the … Attorney General [and certain other officials]." 8 U.S.C. §1103(a)(1). The TPS statute confers its designation and termination powers on the AG.

The history of the provision confirms that reading. Before 2002, §1103(a)(1) charged the AG with administering the immigration laws, and its exception named only the President and officials of the State Department. When the HSA reassigned that general charge to the Secretary, Congress did more than substitute one officer for another. It added the AG to the list of officials whose conferred powers the Secretary's charge does not reach. Homeland Security Act of 2002, Pub. L. No. 107-296, §1102, 116 Stat. 2135. Congress had no reason to write the AG into the exception if, as Defendants claim, every power the immigration laws conferred on him was moving to the Secretary regardless.

The exception is practically meaningful. The AG continues to exercise authorities the immigration laws confer on him by name. He authorizes officers of foreign countries to be stationed at preclearance facilities in the United States, 8 U.S.C. §1103(a)(8); administers access to the National Crime Information Center for immigration purposes, *id*. §1105(b); and files applications with the Alien Terrorist Removal Court. *Id*. §1533(a)(1).

**B. Section 1103(g) is not superfluous under Plaintiffs' reading.**

Defendants' argument that if §1103(a)(1)'s exception preserved every function the immigration laws confer on the AG, §1103(g) would have been unnecessary, Defs.' Br. 13, misunderstands what the HSA moved and what each provision retained. The Act transferred two distinct things to the Secretary. One, the general charge of administering and enforcing immigration laws. 8 U.S.C. §1103(a)(1). Two, the machinery for implementation: the power to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary." *Id.* §1103(a)(3). Before 2002, both belonged to the AG. The exception in §1103(a)(1) preserves powers conferred on the AG by name. It does not preserve functions that rested on the general charge, and it supplies none of the machinery.

Section 1103(g) fills both gaps. First, §1103(g)(1) retains for the AG the functions "exercised by the Executive Office for Immigration Review." EOIR is a creature of regulation; the INA does not mention it. The AG created EOIR in 1983 by removing "the immigration judicial review programs" from the Immigration and Naturalization Service, the agency through which he carried out his general charge. 48 Fed. Reg. 8,038, 8,038-39 (Feb. 25, 1983); *see also* 52 Fed. Reg. 44,971, 44,971-72 (Nov. 24, 1987). When the HSA abolished that agency and transferred the general charge to the Secretary, there would have been a substantial argument that EOIR's functions followed. Section 1103(g)(1) forecloses the argument.

Second, §1103(g)(2) restores to the AG implementing powers that track §1103(a)(3) nearly word for word: to "establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the AG determines to be necessary." 8 U.S.C. §1103(g)(2). Courts read §1103(g)(2) as an independent grant of authority.

*See Chen v. Garland*, 43 F.4th 244, 247 (2d Cir. 2022). A provision that confers powers and a provision that withholds powers from transfer are distinct.

Even if the provisions overlapped at the margins, that would not justify reading the exception out of the statute. "[R]edundancies are common in statutory drafting," often reflecting "a congressional effort to be doubly sure." *Barton v. Barr*, 590 U.S. 222, 239 (2020). Defendants' reading does not eliminate surplusage. It relocates it to the §1103(a)(1) exception, which in their view reserves no authority for the AG aside from what is also preserved by §1103(g).

**C. Section 557 cannot supply a transfer that never occurred.**

Defendants' remaining argument is that 6 U.S.C. §557 updates every statutory reference to the AG so that it now means the Secretary. But §557 operates only "[w]ith respect to any function transferred by or under this chapter;" that is, by the HSA itself. The only transfer Defendants identify is performed by 8 U.S.C. §1103(a), a provision of Title 8. Section 557 therefore presupposes the very transfer it is being asked to accomplish. It is a reference-updating provision, not a grant of substantive authority, and the same is true of 6 U.S.C. §552(d). *See* South Sudan Decision at *3 n.2.

Indeed, the Department of Justice did not treat the question as settled, stating in the 2003 rulemaking that the regulations would "require further refinement to clarify the authority of [the DHS Secretary] to designate countries for temporary protected status purposes." 68 Fed. Reg. 9,827, 9,827 (Feb. 28, 2003). No such refinement ever issued.

**D. Plaintiffs' *ultra vires* claim is not self-defeating.**

That an interpretation is longstanding does not make it correct. *See Sackett v. EPA*, 598 U.S. 651 (2023); *see also Brown v. Gardner*, 513 U.S. 115, 122 (1994). Because the termination was *ultra vires*, the APA requires that it be set aside. 5 U.S.C. §706(2)(C). Vacating the termination

restores the status quo that existed before the termination notice issued, under which Syria's designation remained in effect.

Defendants argue that Plaintiffs' theory is self-defeating because a Secretary who lacks authority to terminate a designation also lacked authority to designate Syria or extend its designation. Defs.' Br. 14, 15 n.4. But no party has challenged the designation, and Defendants cite no case rejecting a claim simply because its logic could result in a decision adverse to Plaintiffs' interests in a hypothetical lawsuit directed at a separate agency action. Defendants have filed no counterclaim seeking its invalidation, and their cross-motion asks for judgment on *Plaintiffs'* claims, not for relief unwinding a designation that has been extended repeatedly for over a decade. A defendant cannot obtain through argument what it has not sought through a pleading or counterclaim. *See* Fed. R. Civ. P. 13(a)-(b); *see also Reiter v. Cooper*, 507 U.S. 258, 263 (1993).

Even accepting Defendants' premise, unwinding a designation would require new agency action, reasoned and issued by an officer with authority to take it, and accounting for the reliance interests of those who have held status for years. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); *A.C.R. v. Noem*, 809 F.Supp.3d 103, 121 (E.D.N.Y. 2025), *reconsideration denied*, No. 25-cv-3962, 2026 WL 102611 (E.D.N.Y. Jan. 14, 2026). Defendants' suggestion that *Regents* turned on the existence of a lawful severable component misreads that decision, which faulted the agency for failing to address "retaining forbearance or accommodating particular reliance interests." *Regents*, 591 U.S. at 33.

On Defendants' reasoning, no challenge to an official's statutory authority could ever be maintained wherever that official both confers and withdraws a benefit, because any ruling on authority would implicate both. That baseless reasoning would place a substantial category of agency action beyond review.

## III. THE AMENDED COMPLAINT STATES A PLAUSIBLE EQUAL PROTECTION CLAIM.

Defendants move to dismiss Plaintiffs' equal protection claim under Rule 12(b)(6). Plaintiffs did not seek summary judgment on this claim. Therefore, the only question is whether Plaintiffs plead "factual content that allows the court to draw the reasonable inference" of discriminatory purpose. *Iqbal*, 556 U.S. at 678. It does.

The claim rests on two independent theories: the termination was motivated in part by animus toward Syrians based on national origin, a claim *Mullin* did not reach, Am. Compl. ¶192, and it was motivated by a bare desire to harm TPS holders as a politically unpopular group, *id.* ¶193 (citing *Romer v. Evans*, 517 U.S. 620, 634 (1996)). Defendants' motion addresses only the former.[3] As the movants, Defendants bear the burden of showing that the equal protection claim fails as pleaded, and they make no attempt to do so on the second theory. Therefore, the claim survives on this ground regardless of how the Court resolves the arguments under *Arlington Heights*.[4]

### A. *Mullin* does not bar review of Plaintiffs' constitutional claim.

Defendants' argument that the judicial review bar reaches their equal protection claims relies on a single sentence in the concurrence: "[t]he Court does not decide whether the *Miot* respondents' equal protection claim is barred as well." *See* Defs.' Br. 15 (citing 146 S.Ct. at 2140 (Thomas, J., concurring)). But the majority in *Mullin* expressly declined to decide whether the TPS

[3] Defendants reserve the argument that rational basis review applies. Defs.' Br. 16 n.5. This Court rejected it, Decision Tr. 27:25-28:19, ECF No. 59, and *Mullin* left that ruling undisturbed, assuming that the *Arlington Heights* standard governs. 146 S.Ct. at 2138.

[4] Defendants may not challenge the sufficiency of this theory for the first time in their reply. *See Manon v. Pons*, 131 F.Supp.3d 219, 238-39 (S.D.N.Y. 2015) ("arguments may not be made for the first time in a reply brief." (citing *Simpson v. City of New York*, 793 F.3d 259, 264 (2d Cir. 2015))); *see also King Spider LLC v. 884886 CH Store,* No. 23-CV-3472, 2024 WL 5145837, at *1 (S.D.N.Y. Dec. 17, 2024) (deeming forfeited an argument newly raised on reply at the motion to dismiss stage).

statute satisfies the rule that Congress must speak clearly to preclude review of constitutional claims, *Mullin*, 146 S.Ct. at 2137 (plurality opinion) (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). Defendants concede the point elsewhere. Defs.' Br. 19 ("This Court need not decide whether the review bar applies to every constitutional claim"). Defendants point to no clear statement in the statutory language because there is none. *See* Pls.' Br. 6, Aug. 17, 2026, ECF No. 93 ("Pls.' Br."); *infra* Section IV.A n.5.

**B. *Mullin* did not decide either equal protection claim and does not render them implausible.**

Defendants' motion to dismiss Plaintiffs' equal protection claims fails for three reasons. *First*, *Mullin* did not consider claims of national origin discrimination (or bare animus against TPS holders); it addressed only the Haitian plaintiffs' claim that derogatory language toward Haitians specifically and TPS holders in general constituted *racial* discrimination. 146 S.Ct. at 2138. While noting that Plaintiffs here had brought "a similar claim" that this Court held "not likely to succeed," and that "that claim is not before us," *id.* at 2137 n.4, the Court did not address whether the termination of Syria's designation was motivated by animus toward Syrians, or any of the allegations on which that claim rests.

*Second*, *Mullin* applied a heightened standard. The Court concluded that the Haitian plaintiffs were "unlikely to prove that race was a motivating factor," on a preliminary relief standard, and thus were "not entitled to interim relief." *Id.* at 2140. Defendants emphasize the Court's statement that the evidence was "insufficient to show" discrimination, Defs.' Br. 17-19, but the Court's conclusion rests on a likelihood of success on the merits, not on the Rule 12(b)(6) plausibility standard. A prediction that a different racial and national group's evidence on an expedited record is unlikely to succeed on the merits does not necessitate the dismissal of a claim on a plausibility standard. *See Camenisch*, 451 U.S. at 395; *Mullin*, 146 S.Ct. at 2137 (plurality

opinion) (a court ruling on interim relief "does not make a final decision on any matter necessary to the ultimate judgment"). Indeed, the Haitian plaintiffs continue to litigate equal protection claims. *See Miot v. Trump*, No. 25-cv-02471 (D.D.C. Sep. 4, 2026), Joint Status Report, ECF No. 146.

For that reason, both courts to address equal protection claims in TPS cases at the pleading stage since *Mullin* have denied dismissal. Burma Decision at *11; Ethiopia Decision at *7. And the decisions Defendants cite in opposition, Defs' Br. 17, also resolved the claim based on a lack of "Plaintiffs' likelihood of success." *See, e.g.*, Somalia Decision at *9 (denying motion to postpone).

*Third*, *Regents* does not help Defendants. *See* Defs.' Br. 17. The plurality found those allegations insufficient because the statements relied on were remote in time, made in unrelated contexts, and not articulated by the officials who took the challenged action. *Regents*, 591 U.S. at 34-35. Here, Plaintiffs rely on the decisionmaker's own statements in the termination notice and on contemporaneous government action directed at Syrian nationals. *See infra* Section IV.C.

**C. Plaintiffs plead the Syria-specific animus the Court found lacking at the preliminary relief stage.**

Defendants rely on this Court's ruling on Plaintiffs' motion to postpone. Defs.' Br. 18. That ruling does not support dismissal.

Plaintiffs framed their initial claim around animus toward noncitizens "who are not White or of European origin," ECF No. 59 at 27:1-4, a definition the Court found "too expansive, too amorphous" to permit the equal protection analysis, *id.* at 28:20-23. While this Court also observed that the evidence of "Syrian-specific animus" was insufficient to support a likelihood of success on the merits, *id.* at 29:3-6, it was only "on this definition of the class" that the Court declined to find a likelihood of success. Indeed, this Court observed that "one can find plenty of evidence of

race- and national origin-based animus in this record," *id.* at 29:7-11, and cautioned that its ruling "might be different on a more complete record." *Id.* at 4:3-6.

The Amended Complaint answers those concerns. The claim, as now pleaded, does not depend on a class of "non-White, non-European" noncitizens. Defendants misunderstand this. Syrian TPS holders' status as non-White, non-European noncitizens motivates at least some of the animus against them, which is why allegations about that grouping remain in the Amended Complaint. However, the Amended Complaint alleges that the termination was motivated by animus toward Syrians on the basis of national origin and ethnicity. Am. Compl. ¶¶105, 192. And it pleads specific facts supporting that inference, several of which postdate the Court's November 18, 2025, ruling.

*The termination decision.* "Substantive departures" where historically important factors "strongly favor a decision contrary to the one reached," support an inference of discriminatory purpose. *Arlington Heights*, 429 U.S. at 267. The Secretary did not rest her decision on country conditions. She declared it "contrary to the national interest to permit Syrian nationals ... to remain temporarily in the United States," and supported that conclusion by invoking Syria's designation as a state sponsor of terrorism, the purported inability to vet "Syrian nationals," and two anecdotes about Syrian nationals, neither of whom identified as TPS holders. Am. Compl. ¶55 (quoting 90 Fed. Reg. at 45,400-01). She did not identify any of the more than 6,100 Syrian TPS holders as having been convicted of a serious crime or charged with supporting terrorism. *Id.* ¶56. Her discriminatory assertions of fraud and national security concerns were contradicted by the agency's own records, which reflected four findings of fraud across nearly 10,000 records. *Id.* ¶55. Moreover, the Administration's contemporaneous conduct contradicted her premise: the State Department's only input noted that Syrian sanctions had just been lifted, *id.* ¶60, and days after

the termination the President renewed a national emergency because Syria "endangers civilians," *id.* ¶58.

*Statements confirmed by action.* Allegations of "a series of official actions" singling out Syrian nationals across the immigration system, is the kind of "historical background" *Arlington Heights* directs courts to consider. 429 U.S. at 267. The Court previously gave campaign statements "only limited significance," considering them "only to the extent that they were confirmed by and through writings and other actions." ECF No. 59 at 12:9-12. The Amended Complaint alleges that confirmation. In October 2023, then-candidate Trump boasted that he had "banned refugees from Syria," described "very, very rough people" who "come out of these areas" and "want to blow up our country," and promised that "in my second term, we're going to expand each and every one of those bans." Am. Compl. ¶107; *see also id.* ¶¶108, 111. As President, he did. The June 2025 travel ban suspended the entry of Syrian nationals. *Id.* ¶130. On November 27, 2025, USCIS directed its officers to treat the country-specific factors identified in the ban as "significant negative factors" in adjudicating immigration benefits. *Id.* ¶131. USCIS then froze pending benefit requests from nationals of travel ban countries and ordered re-review of benefits already approved, *id.* ¶132; the President expanded the ban, *id.* ¶133; and on January 1, 2026, USCIS extended the freeze to nationals of Syria by name, *id.* ¶134. None of these actions were before the Court at the preliminary stage, and the last four postdate its ruling.

*Procedural departures.* "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. The Secretary did not consult other agencies about conditions in Syria, Am. Compl. ¶¶59-60, and she broke with the agency's longstanding practice on transition periods, *id.* ¶¶103-104. On the

record before it, this Court could not find that she "engaged in a good-faith and objective review of country conditions in Syria." ECF No. 59 at 18:6-10.

Courts in this Circuit have denied motions to dismiss equal protection claims on comparable allegations. *See Saget v. Trump*, 345 F.Supp.3d 287, 303-04 (E.D.N.Y. 2018) (denying motion to dismiss equal protection challenge to termination of Haiti's TPS designation where plaintiffs alleged presidential statements disparaging Haitians, including asking "Why do we need more Haitians?" a week before the termination notice was published, together with an allegedly unexplained change in agency policy, and holding that plaintiffs need not allege that the Acting Secretary personally harbored animus); *New York v. U.S. Dep't of Com.*, 315 F.Supp.3d 766, 806-11 (S.D.N.Y. 2018) (denying motion to dismiss equal protection claim where plaintiffs alleged that the Secretary deviated from standard procedures in adding the citizenship question, that his stated rationale may have been pretextual, and that contemporary statements of decisionmakers, including the President, whose campaign credited him with "officially" mandating the decision, supported an inference of discriminatory animus). Indeed, in *Deide v. Day*, Judge Román preliminarily enjoined county orders barring migrants and asylum seekers from local hotels, 676 F.Supp.3d 196, 222-23 (S.D.N.Y. 2023); he found that county executives' contemporaneous statements, including describing the migrants as "not vetted" and as criminals, indicated discriminatory purpose based on national origin and alienage and relied on Second Circuit precedent for the principle that coded language can evince discriminatory intent. *Id.* (citing *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016)).

**D. Defendants' alternative explanation does not defeat plausibility.**

Defendants contend that *Mullin*'s explanation for the Haiti termination—the Administration's "general stance on immigration and its obvious antipathy toward past

administrations' TPS policies"—makes discrimination implausible. Defs.' Br. 16-17 (quoting *Mullin*, 146 S.Ct. at 2139). The argument fails for four reasons.

*First*, *Mullin* did not apply the 12(b)(6) pleading standard but rather the more stringent and rigorous standard of likelihood of success on the merits. *Mullin*, 146 S.Ct. at 2137.

*Second*, Defendants misstate the pleading standard. "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012); *accord Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019). An alternative explanation defeats a claim only where the well-pleaded facts permit no more than "the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679, 682; *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 & n.5 (2d Cir. 2013). The allegations here do far more.

*Third*, *Arlington Heights* does not require proof that discriminatory purpose was the sole, "dominant," or "primary" motive, it only requires that it was "a motivating factor." 429 U.S. at 265-66. Hostility to TPS in general and animus toward Syrians are not mutually exclusive, and the presence of one does not make the other implausible. Nor can opposition to TPS as a policy explain the Syria-specific features of this decision: a termination notice premised on the dangers posed by "Syrian nationals" as a class, and a series of nationality-based measures against Syrians that reach far beyond TPS. Am. Compl. ¶¶55, 130-134.

*Fourth*, Defendants' "alternative explanation" is, in substance, an affirmative defense, an assertion that the Secretary would have terminated Syria's designation regardless of any discriminatory purpose. Under *Arlington Heights*, proof that discriminatory purpose was a motivating factor shifts to the government "the burden of establishing that the same decision would

have resulted even had the impermissible purpose not been considered." 429 U.S. at 270 n.21. Defendants invoke that standard, Defs.' Br. 16; but a defense on which they bear the burden cannot be resolved against Plaintiffs on the pleadings.

### E. The equal protection claim warrants discovery.

Determining whether discriminatory purpose was a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. That inquiry cannot be completed on the pleadings, and this Court has recognized that constitutional claims are distinct from APA claims and may warrant development beyond the administrative record. *Reyes v. McHenry*, No. 19-cv-8674, 2020 WL 5583521, at *1 (S.D.N.Y. Aug. 3, 2020) (Failla, J.). To the extent Defendants' alternative request for summary judgment reaches this claim, it is premature.

## IV. DEFENDANTS DEPRIVED PLAINTIFFS OF PROTECTED INTERESTS IN TPS BENEFITS USING CONSTITUTIONALLY INADEQUATE PROCEDURES.

### A. Plaintiffs' due process claim is reviewable.

Defendants argue that §1254a(b)(5)(A) bars Plaintiffs' procedural due process claim because Plaintiffs "repackage[]" their prior statutory claim. Defs.' Br. 19 (citing *Mullin*, 146 S.Ct. at 2137). But Defendants' argument ignores the distinct legal standards for establishing a constitutional violation versus a statutory one. Burma Decision at *9 (noting "[P]laintiffs' due process claim relies exclusively on statutory violations. But if the plaintiffs are right ... the claims are distinct."). This distinction matters. It is insufficient for Plaintiffs to prove the statutory violations, which would win the day for an ordinary statutory claim. Plaintiffs must also identify constitutionally protected interests and conduct rising to the *Mathews* test, identifying the constitutional floor for procedural due process protections. *Infra* Sections IV.B-D. And no court

has held that §1254a(b)(5)(A) applies to these kinds of procedural due process claims.[5] *See, e.g.*, Burma Decision at *9; Somalia Decision at *5; Ethiopia Decision at *5.

**B. Plaintiffs' constitutionally protected interests stem from the mandatory, non-discretionary aspects of TPS status once conferred or when *prima facie* eligible.**

Defendants' merits arguments misconstrue the nature of Plaintiffs' protected interests in TPS and its benefits, the relevant caselaw safeguarding their continued receipt, and the interests of *prima facie* eligible applicants. *See Kapps v. Wing*, 404 F.3d 105, 115-117 (2d Cir. 2005); Pls.' Br. 17-20. They also ignore precedent instructing courts to find protected interests under the Due Process Clause where "statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome." *See id.* at 113.

Defendants cite *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 328 (D. Md. 2018), for the erroneous proposition that the "explicitly temporary nature of the [TPS program] forecloses any claim of protected reliance," Defs.' Br. 22. But the *CASA* court did not address whether Plaintiffs have constitutionally protected liberty and property interests in TPS benefits. In any case, the relevant standard focuses on whether a benefit is wholly discretionary, *see Kapps*, 404 F.3d at 114, and whether a beneficiary has "a legitimate claim of entitlement," *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), not how long that benefit lasts per grant.[6] *See* Defs.' Br. 21. Regardless, this argument ignores that Congress imposed several procedural requirements that made termination nonautomatic, including directives for how to make the termination decision and automatic trigger of an extension of the designation, and thus benefits, if the AG does not

[5] These courts' jurisdictional holdings also undermine Defendants' bald assertion that the statutory text "speaks with the requisite clarity to cover" even constitutional challenges. *See* Defs.' Br. 20. Defendants' contention is further undermined because §1254a(b)(5)(A) nowhere mentions the word "constitutional."

[6] *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (noting "important interests" of holders of time-limited driver's licenses, because "their continued possession may become essential in the pursuit of a livelihood.").

make a lawful and affirmative finding that a country does not continue to meet the TPS criteria. *See* 8 U.S.C. §1255a(b)(3)(C).

Plaintiffs demonstrate a legitimate claim of entitlement to certain TPS benefits. *See Roth*, 408 U.S. at 576-78 (explaining that public benefits recipients had entitlement to existing benefits based on statutory criteria when those benefits could only be withdrawn on specific grounds); Pls.' Br. 18-20. Defendants' argument that Plaintiffs cannot have constitutionally protected interests in discretionary country-wide designations or in discretionary initial grants to individual TPS holders, Defs.' Br. 22-23, is nonresponsive. Plaintiffs do not argue that these are the bases of their property and liberty interests but rather that their protected interests arise from the *continuation* of the *mandatory, non-discretionary* benefits[7]—the kind that impose "substantive limitations of official discretion," *Kentucky DOC v. Thompson*, 490 U.S. 454, 459 (1989), and that stem from a TPS designation, *see* Pls.' Br. 18-20. A decisionmaker's discretion in applying termination criteria does not eliminate the statutory requirement to extend TPS absent a specific finding that a country no longer meets designation conditions; absent that finding, the designation must be "extended." 8 U.S.C. §1254a(b)(3)(B)-(C). This directive satisfies the relevant test: the TPS statute imposes "substantive limitations on official discretion" and demands a mandatory outcome when "relevant criteria have been met." *See Kentucky DOC*, 490 U.S. at 462; *accord Bellin v. McDonald*, 177 F.4th 167, 190-92 (2d Cir. 2026) (recognizing a protected interest in 24-hour Medicaid home care despite the professional judgment required to assess a patient's needs).

*Hernandez v. Sessions*, 884 F.3d 107 (2d Cir. 2018) and similar cases, *see* Defs.' Br. 22, all consider a decisionmaker's discretion to deny a benefit to a "statutorily ineligible" applicant and are therefore irrelevant. *Hernandez*, 884 F.3d at 112 (comparing the mandatory benefits

[7] Or, in the case of applicants for TPS, the non-discretionary benefits that stem from their *prima facie* eligibility.

conferred to *prima facie* asylum applicants with a "discretionary grant of relief" to "statutorily ineligible" beneficiaries); *accord Tobar v. Garland*, 65 F.4th 195, 196-97 (5th Cir. 2023) (denying petition brought by TPS applicant who was *statutorily ineligible* for TPS); *Bah v. Cangemi*, 548 F.3d 680, 685 (8th Cir. 2008) (describing habeas petition by former TPS beneficiary who lost TPS due to a felony conviction). Here, Plaintiffs are statutorily eligible and rely on the foundational due process principle that once conferred, benefits may not be arbitrarily terminated. *See Roth*, 408 U.S. at 576; *Kapps*, 404 F.3d at 115-117. Nor does simply calling a statutory entitlement a "government-created privilege," Defs. Br. 22, defeat procedural protection. *See Bell*, 402 U.S. at 539 (noting "relevant constitutional restraints limit state power to terminate an entitlement" regardless of whether it is called a right or a privilege). And revoking protection from detention or removal arising from a grant of status without due process may violate the constitution. *See, e.g.*, *Acosta de Mata v. Sullivan*, 832 F.Supp.3d 1338 (N.D. Ga. 2026) (recognizing constitutional interest in freedom from detention from temporary U-Visa-related deferred action); *Medina v. DHS*, 313 F.Supp.3d 1237 (W.D. Wash. 2018) (same regarding DACA-related protection).

And Defendants' assertion that, "[o]nce Syria's designation was *lawfully* terminated," Plaintiffs become similarly situated to noncitizens without immigration status and therefore have no liberty interest in protection from removal, Defs.' Br. 24 (emphasis added), presupposes a critical fact: that the designation was not illegally terminated, and resulted in their loss of lawful status and attendant benefits—the exact kind of unconstitutional deprivation Plaintiffs seek to guard against.

### C. The standards governing procedural due process claims are flexible, and procedural due process applies to group-based determinations.

Defendants concede that procedural due process "is flexible and calls for such procedural protections as the particular situation demands." Defs.' Br. 24 (quoting *Mathews*, 424 U.S. at 334

(citation modified)). Yet they argue that *Mathews* cannot dictate the constitutionally required process here because Defendants' actions are legislative in nature. *Id.* Not so. "[T]he line between legislative and adjudicative action for purposes of procedural due process analysis is not always easy to draw," and "not all government actions fall neatly into these polar categories." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 274 (1st Cir. 2011). Government actions fall along a "continuum" and need not lie at the far, purely individualized end of that spectrum. *See id.* at 272-274. When determining whether an action is adjudicative or legislative, courts consider the prospectivity and generality of the action. *See L C & S, Inc. v. Warren Cnty. Area Plan Comm'n*, 244 F.3d 601, 602-03 (7th Cir. 2001). Thus, the nature of due process is not as rigid as Defendants argue; and here the particular situation demands, at minimum, compliance with the TPS statute's periodic-review mandates.

Plaintiffs challenge government conduct that is adjudicative under the relevant standards: Defendants terminated preexisting benefits that were granted to a specific class of TPS beneficiaries based on the application of particular statutory criteria (conditions) in a specific country, Syria.[8] *See* 8 U.S.C. §1254a(b)(1)(C). Moreover, the termination immediately deprives a defined group of benefits mandated by statute, including protection from detention and deportation, and work authorization—adjudicative characteristics to which due process applies. *See Fortuno*, 665 F.3d at 275; *see also Hill*, 151 F.4th at 434 & n.6 (distinguishing between deprivations that are "the direct consequence of a statute" and those resulting from "individualized determination[s] or adjudication[s]").

[8] Regardless, Plaintiffs' claims concerning Defendants' failure to adhere to statutory requirements constitutes a "defect in the legislative process" exempting the termination from the general bar on due process protections for legislative actions. *Hill v. U.S. Dep't of Interior*, 151 F.4th 420, 434 (D.C. Cir. 2025).

Defendants cite distinguishable cases that challenged prospective policies of general application; *i.e.*, truly legislative policies. *Bi-Metallic Investment Co. v. State Board of Equalization* held that an opportunity to be heard for all individuals on a prospective tax policy was not constitutionally required. 239 U.S. 441, 445-46 (1915). And *United States v. Florida East Coast Railway Co.* determined that the Interstate Commerce Act did not require an additional hearing on a prospective railroad policy. 410 U.S. 224, 245-46 (1973). Here, Plaintiffs challenge conduct that deprives them of non-discretionary benefits already conferred.

Moreover, courts routinely apply the *Mathews* factors and find procedural due process violations when the government deprives large groups of individuals of protected interests. *See, e.g.*, *Kapps*, 404 F.3d at 118-122 (applying *Mathews'* three-factor test to class of individuals benefiting from heating-assistance program); *AARP v. Trump*, 605 U.S. 91, 94-96 (2025) (finding failure to provide adequate notice to class of detained individuals); *Wilkinson v. Austin*, 545 U.S. 209, 225-26 (2005) (applying *Mathews* test to class of incarcerated individuals' challenge to supermax prison placement policy); *Goldberg v. Kelly*, 397 U.S. 254, 262-66 (1970) (concluding that New York public benefit termination procedures denied recipients procedural due process). The same should be done here.

**D. Defendants failed to provide constitutionally adequate process when terminating Syria's TPS.**

In claiming that Plaintiffs received adequate process, Defendants do not engage with or dispute Plaintiffs' *Mathews* analysis. Rather, Defendants reiterate their repackaging argument, *see supra* Section IV.A, and argue that a statutory violation does not "*necessarily* amount to a constitutional" violation. Defs.' Br. 26 (emphasis added). But, as explained above, due process is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. And Plaintiffs do not argue that every statutory violation has a constitutional

dimension, rather that the termination failed to meet the independent constitutional minimum required *in this instance*.

Here, *Mathews* counsels in favor of holding that Defendants violated Plaintiffs' due process rights. To mitigate the erroneous deprivation of core constitutional interests, Congress set the minimum due process requirements for terminating TPS rights in the statute—reliable information gathering, reasoned decision-making, and notice of the actual basis for the deprivation—and these closely track the functions due process is meant to protect. Pls.' Br. 21-24; *see also Wilkinson*, 545 U.S. at 221 (due process protects parties when a statute creates "an expectation" that they would not suffer deprivation without fair procedures). And Defendants' failure to adhere to these particular statutory procedures is a constitutional violation. *Cf. United States v. Caceres*, 440 U.S. 741, 751-53 (1979) (constitutional questions arise where, as here, "the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency.").[9]

Defendants' bare assertions that they complied with the statute are belied by the evidence.[10] Pls.' Br. 23-24. Plaintiffs' challenge is therefore not a question of adequacy: Defendants either did or did not comply with the statutory process and therefore Defendants either did or did not erroneously deprive Plaintiffs of their due process rights. And Plaintiffs do not demand, and never have, a particular substantive outcome; instead, Plaintiffs seek only the minimum procedural

---

[9] Defendants' citation to *Portillo-Rendon v. Holder* does not refute Plaintiffs' *Mathews* analysis; *Portillo-Rendon* concerned a wholly discretionary immigration benefit (cancellation of removal), which provided the plaintiff with no protected interests on which to base their claim. 662 F.3d 815, 817 (7th Cir. 2011). Similarly, *Kopunek v. Director of Internal Revenue*, concerned "discretionary" procedures that lacked "the force or effect of law." 528 F.Supp. 134, 137 (S.D.N.Y. 1981).

[10] Defendants discredit Plaintiffs' reliance on "this Court's findings at ECF No. 59" to demonstrate a violation of the TPS statute's mandates because the findings were made under a likelihood-of-success standard in an order reversed by the Supreme Court. Defs' Br. at 27. But the Supreme Court solely reversed the postponement order in this case on jurisdictional grounds and did not make any findings as to Defendants' compliance with the TPS statute; and this Court's findings, which Defendants have not refuted, stand.

process due, irrespective of the outcome, to safeguard against an arbitrary deprivation of their rights.

## CONCLUSION

The Court should deny Defendants' Motion and grant summary judgment on Plaintiffs' *ultra vires* and procedural due process claims.

Dated: September 30, 2026

Respectfully submitted,

INTERNATIONAL REFUGEE ASSISTANCE PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Hussein Elbakri
Pedro Sepulveda, Jr.
Ghita Schwarz
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
helbakri@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman*
650 Massachusetts Ave NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

MUSLIM ADVOCATES
Sadaf Hasan*
Nargis Aslami*
Melissa Keaney**
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 655-2969
sadaf@muslimadvocates.org
nargis@muslimadvocates.org
melissa@muslimadvocates.org

VAN DER HOUT LLP
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
(415) 981-3000
ndca@vblaw.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*
***Application for admission Pro Hac Vice forthcoming*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this motion Memorandum of Law in further support of Plaintiffs' Motion for Partial Summary Judgment and in opposition to Defendants Motion to Dismiss or for Summary Judgment complies with the word limit granted by court order at ECF No. 98 (8,000 words). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Loc. R S.D.N.Y and E.D.N.Y § 7(c) and U.S. Dist. J. Katherine Polk Failla's Individual Rules of Practice of Civil Cases § 4(B) is 7,892 words.

Dated: September 30, 2026
New York City, New York

/s/ *Guadalupe Aguirre*
Guadalupe Aguirre